IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| In re: Dairy Farmers Of America, Inc. Cheese Antitrust Litigation | ) ) ) | Master File No. 09-cv-03690 MDL No. 2031 |
| THIS DOCUMENT RELATES TO: | ) ) | Judge William J. Hibbler |
| DIRECT PURCHASER ACTION | ) ) ) ) ) | **CLASS ACTION COMPLAINT** **JURY TRIAL DEMANDED** |

## CONSOLIDATED CLASS ACTION COMPLAINT

Plaintiffs complain, upon knowledge as to themselves and their own acts and upon information and belief as to all other matters, as follows:

### I. SUMMARY OF ALLEGATIONS

1. (a) The Chicago Mercantile Exchange (sometimes, "CME") is located at 20 South Wacker Drive, Chicago, Illinois, and is the world's largest exchange for trading futures contracts. See ¶¶36-39 *infra.*

(b) Between at least April 1, 2004 and December 31, 2006, Defendants combined, conspired, and agreed to fix or manipulate the prices of Chicago Mercantile Exchange Class III milk futures contracts, CME Cheese Spot Call contracts, and other contracts the price terms of which were directly based on or directly affected by the prices of such CME contracts.

2. Defendant Dairy Farmers of America, Inc. ("DFA") is a serial antitrust defendant. See ¶¶73-77 *infra.* Among many other experiences, DFA has entered into at least three consent decrees involving government allegations of violating laws prohibiting anticompetitive activities. *Id.* At least two of those orders relate to this matter. *In the Matter of Dairy Farmers of America,*

1

*Inc., Gary Hanman and Gerald Bos*, U.S. Commodity Futures Trading Commission (sometimes, "CFTC") Docket No. 09-02; *United States of America v. Dairy Farmers of America, Inc.*, No. 00-1663 (E.D. PA).

3.　　Defendant Keller's Creamery LLC was required by the Department of Justice to be separated by DFA into a distinct company with additional owners. *United States of America v. Dairy Farmers of America, Inc.*, No. 00-1663 (E.D. PA). This separation was intended to ameliorate some of the anticompetitive impact of a merger in which DFA engaged prior to 2004. *Id*. The top officers of Keller's Creamery also entered into a consent decree with the government that directly relates to this case. *In the Matter of Frank Otis and Glenn Millar*, CFTC Docket No. 09-03.

4.　　Contrary to the recognition in the consent judgment alleged in paragraph 2 above that Keller's Creamery was a creamery operation with different interests from a dairy farmers' co-operative, Keller's Creamery agreed, combined and conspired with DFA from at least as early as April 1, 2004 forward to fix and inflate CME prices.

5.　　**April – June 2004**　(a)　During April and May 2004, Defendants agreed to and did purchase CME milk futures contracts in amounts in excess of the CME's anti-manipulation limits.

　(b)　Thus, in *In the Matter of Dairy Farmers of America, Inc., Gary Hanman and Gerald Bos*, CFTC Docket No. 09-02 and *In the Matter of Frank Otis and Glenn Millar*, CFTC Docket No. 09-03, Defendants agreed to pay $12,150,000 and consented to the entry of orders directing them to cease and desist from violating, among others, the laws imposing these anti-manipulation limits on futures contract positions.

2

6.      Consistent with the purposes of the CME's anti-manipulation limits, Defendants' excessive positions unlawfully and artificially inflated CME milk futures contract prices and other prices between April 1, 2004 and December 31, 2006.

7.      Defendants' foregoing excess purchases and the resulting Class III Milk Futures contract price increases greatly helped Defendant DFA by increasing milk prices. See ¶¶67-70, 79 *infra*. But after achieving that success for DFA, the excessive purchases of CME Milk Futures contracts became potentially harmful and threatening to Defendant Keller's Creamery.

8.      This was because, first, Keller's Creamery's excessive CME milk futures purchases exceeded its hedging needs for milk futures. Therefore, such excessive purchases exposed Keller's to large losses when the excessive purchases had to be sold out if they were sold for a loss. Also, creameries are favored by lower, not higher, costs, and the prices of milk are a key cost for creameries.

9.      Having acted against its commercial economic self-interest in order to help DFA inflate CME milk futures contract prices, Keller's Creamery then asked DFA reciprocally to act against DFA's commercial self-interest in order to help Keller's Creamery. Notwithstanding the fact that DFA did not need cheese because of what DFA internally referred to as an excess "mountain" of cheese inventory, Keller's Creamery asked DFA to initiate the second part of their agreement by making extensive purchases of CME spot cheese at a price that Keller's Creamery recommended to be $1.80 per pound. See ¶¶12, 14, 113, 123 *infra.*

10.      DFA's responsible sales and procurement offices were then warning DFA as follows. Because DFA had excess, unneeded cheese, DFA should try to get out of existing contracts to purchase cheese (rather than making new contracts to purchase more cheese).

11.     But CME cheese prices are one component in various federal and state government formulas for milk prices.  Thus, in their proposals during April and May 2004, Keller's Creamery's top officers –Defendants Otis and Millar – demonstrated detailed knowledge of DFA's CME Class III Milk Futures contract positions.  Indeed, Defendant Otis explicitly rationalized the proposed purchases by DFA of unneeded CME spot cheese based on the resulting artificial inflation of CME cheese and, therefore, CME Milk Futures contract prices.  See ¶¶109-112 *infra.*  Defendant Otis specifically calculated the approximate financial effect that the CME cheese price increases would have on DFA's CME Class III milk futures long positions.

12.     Notwithstanding the fact that DFA already had too much cheese and would later have to dump or sell the CME cheese it purchased at much lower prices, Defendants DFA, Hanman, and Bos executed their agreement to fix prices with Keller's Creamery, Otis, and Millar by making extensive purchases of CME spot cheese.  These purchases in late May and June 2004 were all at the price of $1.80 per pound that had been proposed by Keller's Creamery.  See ¶¶109-112 *infra.*

13.     Defendants did so specifically in order to inflate CME Class III Milk Futures prices, including until after Defendants had sold out their unlawfully large CME Class III Milk futures positions at a profit.

14.     Thus, DFA and Keller's each engaged in mutual and reciprocal acts that were against the commercial self-interest and normal commercial behavior of each.  These mutual acts against self-interest constitute *quid pro quo* behavior by DFA and Keller's Creamery that reflect (and make sense) only as an agreement to inflate and manipulate prices by which they both could profit through their joint actions.

15.     Also pursuant to or in order to cover up their agreement to inflate prices, DFA made statements to the CFTC and others that were false and misleading, and made further CME cheese purchases. See ¶¶128-130; 148-152; 153-156 *infra.* This conduct had the effect of continuing to inflate prices through at least December 31, 2006.

16.     The false statements to the CFTC were made from late 2004 until late 2006 and included the statement that DFA's reasons for buying CME cheese in late May and June 2004 were that DFA needed to fill sales contracts and projections. Shortly after the false statements to the CFTC began, DFA apparently acquired all of Keller's Creamery in 2005 on terms that are not publicly known.

17.     These false statements masked Defendants' manipulation and extended the CFTC investigation until December 16, 2008, when charges were finally brought and immediately settled. *In the Matter of Dairy Farmers of America, Inc., Gary Hanman and Gerald Bos*, CFTC Docket No. 09-02, Ordering Instituting Proceeding Pursuant To Section 6(c), and 6(d) of the Commodity Exchange Act Making Findings and Imposing Remedial Sanctions and *In the Matter of Frank Otis and Glenn Millar*, CFTC Docket No. 09-03, Order Instituting Proceedings Pursuant To Sections 6(c) and 6(d) of the Commodity Exchange Act, Making Findings, And Imposing Remedial Sanctions.

18.     Defendants' foregoing conduct violated Sections 1 and 2 of the Sherman Antitrust Act of 1890, 15 U.S.C. §§1 and 2 ("Sherman Act"), Section 9 of the Commodity Exchange Act, 7 U.S.C. §13 ("CEA"), the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §1951 *et seq.*, and the common law.

19.     Defendants' violations caused damages and Defendants' repeated anti-competitive conduct is likely to reoccur.

20.   (a)   In each of the different types of futures contracts traded on the CME, the prices resulting from that trading provide valuable information and a public service called "price discovery."

(b)   These publicly reported price signals indicate to producers, distributors, consumers and others interested in the commodity what the present and future price of the commodity should be.  Those interested in the commodity make decisions to sell, purchase, or consume the commodity based on these price signals.

(c)   The CME contracts in Class III Milk Futures and Spot Cheese at issue in this case not only provide the foregoing "price beacon" signals.  Again, the prices reported for such contracts are also explicitly used in Federal and State government formulas for the required minimum price or as the explicit basis for prices in contracts to purchase milk, cheese and other commodities.

(d)   However, price manipulation destroys price discovery and the other legitimizing functions of futures contracts, and has caused futures contracts and even futures exchanges to be closed down.

21.   Thus, Defendants' extensive anticompetitive and manipulative activity alleged herein not only threatened the CME.  See ¶40 *infra* (regarding closing down the Wisconsin Cheese Exchange).  Defendants' violations also injured Plaintiffs and Class members in their property by causing them to pay higher prices.

22.   The CFTC Order represents a negotiated document.  Defendants therein sought to limit and minimize its exposure to Plaintiffs and the Class herein.  Plaintiffs disagree with various characterizations in the CFTC Order.

## II.     JURISDICTION AND VENUE

23.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§1331, Section 7 of the Sherman Act, Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§15(a) and 26, and Section 22 of the CEA, 7 U.S.C. §§ 1a(4) and 25(a)(1)(D), and 18 U.S.C. § 1951. This Court also has pendant and ancillary jurisdiction over the State law claims pursuant to 28 U.S.C. §1337.

24.     Venue is proper in this District pursuant to 15 U.S.C. §§2, 7, 15, 22 and 26 and 28 U.S.C. §1391 and Section 22 of the CEA, §25(c).  Defendants are found in, reside, or transact business in this District (including, but not limited to, trading on the Chicago Mercantile Exchange).  A substantial part of the events or omissions giving rise to the claims occurred in this District.

25.     The Chicago Mercantile Exchange is a financial and commodity derivative exchange located in this District.  Various commodities are traded on the CME marketplace, including CME Class III milk futures and CME cheddar cheese.

## III.     THE PARTIES

### Plaintiffs

26.     Plaintiff Indriolo Distributors, Inc. (also doing business as VIP Products) is an Ohio corporation with its principal place of business in Warrensville Heights, Ohio.  Plaintiff Indriolo is a cheese distributor that is in the business of purchasing block and shredded cheese on the wholesale market.  As a result of Defendants' unlawful acts alleged herein, Plaintiff Indriolo was damaged in its property in that it paid artificially high prices.  For example, Plaintiff Indriolo entered into numerous commercial contracts in order to purchase block and shredded cheese

during the Class Period. Pursuant to industry practice, Plaintiff Indriolo's contracts included contracts that were priced "basis" (or based on) the CME Cheese Spot Call price.

27. Plaintiff Knutson's, Inc. is a Wisconsin corporation with its principal place of business in Ridgeland, Wisconsin. Plaintiff Knutson is a dairy farmer that also traded CME Class III milk futures during the Class Period. As a result of Defendants' unlawful acts alleged herein, Plaintiff Knutson was damaged in its property in that it paid artificially high prices to liquidate its short positions in CME Class III milk futures.

28. Plaintiff Valley Gold, LLC is a California limited liability corporation with its principal place of business in Gustine, California. As a result of Defendants' unlawful acts alleged herein, Plaintiff Valley Gold was damaged in its property in that it paid artificially high prices. For example, Plaintiff Valley Gold entered into numerous commercial contracts in order to purchase raw milk (primarily from dairies in California) during the Class Period. Pursuant to industry practice, Plaintiff Valley Gold's contracts included contracts that were priced "basis" (or based on) the CME Cheese Spot Call price and contracts that were subject to the California minimum price formula for milk, one component of which was the CME spot cheese price.

**Defendants**

29. Defendant Dairy Farmers of America, Inc. is organized under the laws of the State of Missouri with its principal place of business in Kansas City, Missouri. DFA claims to be a dairy marketing cooperative. It is a combination or trust owned by more than 18,000 dairy farmers in 48 states.

30. DFA acts supposedly to sell and market the milk produced by its members. In 2006, DFA had sales revenues of approximately $11.1 billion. In 2007, DFA marketed a record 61.9 billion pounds of milk (one hundred sixty million pounds of milk per day).

8

31.     Defendant Gary Hanman was the President and Chief Executive Officer of DFA from January 1, 1998 until December 31, 2005.  Defendant Hanman resides in Platte City, Missouri.

32.     Defendant Gerald Bos was Chief Financial Officer of DFA from January 1, 1998 until December 31, 2005.  Defendant Bos resides in Weatherby Lake, Missouri.

33.     Defendant Keller's Creamery LP ("Keller's") is a butter manufacturer headquartered in Kansas City, Missouri.  Keller's was formed in or around May 2000 as a joint venture between DFA and Frank Otis and Glenn Millar.  In or around January 2005, DFA acquired all of the interests in Keller's, but throughout 2000 through the end of 2004, Keller's, Millar, and Otis were all legally separate persons from DFA such that contracts or agreements between DFA and the other Defendants did not constitute intra-corporate contracts.

      a.  Defendant Keller's Creamery, LP, a Delaware limited partnership, was formed by February 2, 2000.  Delaware, Department of State, Division of Corporations (File No. 3169620).

      b.  Defendant Keller's Creamery, L.L.C. was created by May 24, 2000. Pennsylvania Department of State's Business Entity Filing History (Entity No. 2943682).[1]

      c.  Defendant Keller's Creamery Management, LLC, a Delaware limited liability company, was formed on December 17, 2002.  Delaware, Department of State, Division of Corporations (File No. 3603887).  The "Keller's Creamery,

---

[1] "Keller's Creamery, L.L.C." is registered with the Pennsylvania Department of State as a foreign limited liability company, with its state of business as Delaware, and with a registered office address of 855 Maple Avenue, Harleysville, PA 19438.

9

LP" 2004 Limited Partnership Annual Report reflects that "Keller's Creamery

Management, LLC" is the general partner of "Keller's Creamery, LP."

34.    Defendant Frank Otis ("Otis") was Chief Executive Officer for Keller's Creamery.

Defendant Otis is a resident of Ambler, Pennsylvania.

35.    Defendant Glenn Millar ("Millar") was Vice President of Procurement and

Operations for Keller's Creamery.  Defendant Millar is a resident of Las Vegas, Nevada.

## IV.    SUBSTANTIVE ALLEGATIONS

### A.    The Chicago Mercantile Exchange, "Long" Positions And "Short" Positions In Commodity Futures Contracts, Defendants' "Long" Positions, And The Value Of Publicly Reported Prices Established By Trades On The Exchange

36.    A person may act as a futures contract exchange or board of trade only if that

person is approved and designated to do so by the Commodity Futures Trading Commission.  The

CFTC approves such a designation only if the proposed exchange sufficiently demonstrates (a)

that it has rules, such as position limit rules, to prevent price manipulation, and (b) that it has

procedures to enforce such anti-manipulation rules.

37.    The Chicago Mercantile Exchange, located at 20 South Wacker, Chicago, Illinois

60606, is designated by the CFTC as a Board of trade. The CME is the world's largest commodity

futures exchange.  CME Glossary.[2]

38.    The CME applies to the CFTC for permission to trade each commodity in which

the CME offers a contract.  The CME must establish, among other things, that the proposed

contract is not prone to price manipulation in order to win approval to trade such contract.

39.    Because of the prohibition against manipulation, the prices produced by futures

contract trading serve three purposes: (1) price discovery, (2) efficient and fair risk transfer (also

---

[2] CME Glossary is available at http://www.cmegroup.com/education/glossary.html

known as hedging), and (3) reduction in price volatility. *Cargill, Inc. v. Hardin*, 452 F.2d 1154, 1173 (8th Cir. 1971) ("*Cargill*").

40.     These three legitimizing functions of futures trading make the CME what it is today, the largest exchange on earth.

41.     But price manipulation destroys all the legitimizing functions of commodity futures trading. *Id.* Indeed, price manipulation destroyed a commodity exchange in Wisconsin on which cheese was traded during the 1980s.

42.     A commodity futures contract is a standardized bilateral executory agreement for the purchase and sale of a particular commodity. See *Leist v. Simplot*, 638 F.2d 283, 322 (2d Cir. 1980) (Friendly, J.) ("*Leist*"), *aff'd, Merrill Lynch Fenner & Smith v. Curran*, 456 U.S. 353, 384-85 (1982). In the context of futures trading, a commodity is the underlying instrument upon which a futures contract is based. CME Glossary.

43.     The "bilateral" aspect of the futures contract is that there is a seller and buyer. *Leist*, 638 F.2d at 322.

44.     The sellers are one-half of the bilateral futures contract and one-half of the commodity futures market. *Id.* They are referred to as "shorts." *Id.*

45.     The buyers are the other one-half, and are referred to as "longs." *Id.*

46.     One of the many differences between stock and commodity futures trading is that the commodity exchange (here, the CME) publishes the amount of the open interest of "longs" and "shorts" at the end of each trading day.

47.     Open interest is defined as the total number of futures contracts in a delivery month or market that has been entered into and not yet offset or cancelled. CME Glossary. Each open transaction has a buyer (a long) and a seller (a short). *Id.*

11

48.     In this case, Defendants DFA and Keller's Creamery were "longs".  That is they had purchased futures contracts.  If they sold their long positions at a higher price than they purchased them, then DFA and Keller's would achieve a profit on such positions.

49.     All things equal, buying pressure in a commodity futures contract will increase prices and selling pressure will decrease prices.

50.     Because the prices are publicly reported, the increased or decreased prices resulting from buying pressure or selling pressure may encourage others to act accordingly.  For example, buying pressure may increase prices and induce members of the public to buy as well.

**B.      CME Class III Milk Futures Contracts**

51.     One of the commodity futures contracts traded on the CME is the CME Class III milk futures contracts.  See CME website at

http://www.cmegroup.com/trading/commodities/dairy/class-iii milk_contract_specifications.html

52.     CME Rules govern the trading of Class III milk futures contracts.[3]  *Id.*

53.     Class III milk is raw (non-pasteurized) milk used primarily for the production of cheese.

54.     Class III milk futures contracts trade daily on the CME and expire in each month of the calendar year.  *Id.*  Thus, CME Class III milk futures trade in all calendar months beginning with a January Class III milk futures contract, and continuing through a February contract, March contract, etc. to a December Class III milk futures contract.  *Id.*  As many as twenty-four CME Class III milk futures contracts can trade at a given time.  *Id.*

55.     Class III milk futures contracts are traded in units of 200,000 pounds of Class III milk, expressed as 2,000 hundredweight (cwt).  CME Rule 5202.B.

---

[3] The CME Rulebook is available at http://www.cmegroup.com/rulebook/CME/index html

56.     Trading in a particular month of the CME Class III milk futures contract terminates on the business day immediately preceding the day on which the United States Department of Agriculture ("USDA") announces the Class III milk price for that contract month. *Id*.

57.     Class III milk is not deliverable in satisfaction of CME Class III milk futures contracts.  CME Rule 5203.A.  Rather, at the termination of trading in a particular Class III milk futures contract, all open Class III milk futures contracts "cash settle" to the USDA Class III milk price for the particular month.  *Id*.

58.     This means that cash, rather than Class III milk, is exchanged at settlement of each Class III milk futures contract. The amount of the cash exchanged depends on the difference between the Class III Milk futures contract price at which a trader's position was established, and the final USDA settlement price.  For example, if a long purchased the CME Milk Futures Contract at 9 cents per pound and the USDA settlement price alleged above is 13 cents per pound, then the long realizes a 4 cents per pound profit (exclusive of trading commissions and other costs). On one Class III contract (200,000 pounds), this 4 cents per pound profit would produce a total profit of $8,000.

59.     CME Rules prohibit any one person from owning or controlling more than 1,500 CME Class III milk futures contracts (long or short) in any contract month.  CME Rule 5202.E; see also Rule 5202.F (for purposes of the position limits, positions of all accounts in which a person or persons have a proprietary interest shall be cumulated).

60.     The purpose of such "position limits" is to prevent manipulation and unwarranted price fluctuation from too much buying or selling pressure.

C.      **CME Cheese Spot Call Contracts**

13

61.     The CME also provides trading in cheese spot call contracts.  See CME website at

http://www.cmegroup.com/trading/commodities/dairy-spot-markets/cheese-spot-

call_contract_specifications.html

62.     CME Rules govern the trading of CME cheese spot call contracts.  *Id*.

63.     CME cheese spot call contracts are not futures contracts.  Rather, these contracts

are "cash market" contracts that require physical delivery of the underlying commodity within

approximately three business days after the date of sale.  *Id*.

64.     Trading in CME cheese spot call contracts takes place Monday through Friday for

only ten minutes (between 10:45 a.m. CST and 10:55 a.m. CST) on the trading floor of the CME

through a process referred to as "open outcry".  *Id*.  Open outcry is a method of public auction for

making bids and offers in the trading pits of a futures exchange (here, the CME).

65.     The final transaction price (or the final unfilled bid or offer) during the CME

cheese spot call trading session determines the settlement prices for the day.  CME Rule 53S.

66.     Trading on the CME cheese spot call is limited to:  (a) carloads (*i.e.*, between

40,000 – 44,000 pounds) of 40-pound blocks of cheddar cheese (primarily used for resale in

grocery stores) or (b) 500-pound barrels of cheddar cheese (primarily used in processed food

products).  *Id*.  The prices of these two types of CME cheese purchases directly affect one

another.

67.     Cheddar cheese traded on the CME cheese spot call must meet certain

standardized technical specifications such as grade, age, moisture content, color, etc.  *Id*.

> **D.      The Prices Produced By CME Spot Cheese Trading Are One Component In
> Federal And State Minimum Price Formulas For Milk And Directly Impact
> <u>the USDA Price On Which The CME Class III Milk Futures Contracts Settle</u>**

68.     Industry custom and practice is that CME cheese spot call prices are used as a basis for pricing commercial cheese and milk contracts.

69.     The foregoing prices are in turn captured by the USDA's NASS Survey of cheese prices (see ¶175 *infra*), which is a significant commodity component in the USDA's minimum milk pricing formulas.  See ¶¶176-177 *infra*; see also ¶179 *infra* (the NASS survey has a 98 percent correlation with CME spot cheese market prices).

70.     Accordingly, the CME cheese spot call price directly impacts the USDA minimum milk prices.

71.     The CME cheese spot call price also directly impacts the CME Class III milk futures contract price because such contract cash settles to the USDA Class III milk price.  See ¶57 *supra*.

**E.     Defendant DFA's Antitrust History**

72.     Defendant DFA subsumes a combination that begins with 18,000-plus dairy farmers located throughout the United States. The DFA combination also extended to include various non-dairy subsidiaries and/or joint ventures.  DFA and its members market approximately one-third of the nation's raw milk supply, amounting to well over 100,000,000 pounds of raw milk a day.

73.     The Capper-Volstead Act, 7 U.S.C. §291, provides qualifying agricultural cooperatives a very limited exemption from the Sherman Act.  DFA holds itself out as a Capper-Volstead marketing cooperative.  But when, among other circumstances, DFA acts with any part of its combination that is not a dairy farmer, then DFA loses its Capper Volstead exemption.

74.     Separately, DFA has also been a serial violator of, or defendant in, actions alleging violations of laws prohibiting anticompetitive activities.

75.     DFA  has entered at least three consent decrees settling government charges under such laws:

    a.   *In the Matter of Dairy Farmers of America, Inc., Gary Hanman and Gerald Bos*, CFTC Docket No. 09-02 (2009).

    b.   *United States of America v. Dairy Farmers of America, Inc.*, No. 00-1663 (E.D. Pennsylvania).

    c.   *United States of America v. Dairy Farmers of America, Inc.*, No. 03-206 (E.D. Kentucky).

76.     Defendant DFA has also been sued for agreeing to fix prices or otherwise act in an uncompetitive manner in a number of other lawsuits that are still pending and have not yet been resolved:

    a.   *Southeastern Milk Antitrust Litigation*, MDL No. 1899, 08-md-01000 (E.D. Tn.).[4]

    b.   *Allen, et al. v. Dairy Farmers of America*, 09-cv-00230 (Dist. of Vt.).

    c.   *Neville v. Dairy Farmers of America, Inc., et al.*, 10-cv-00009 (Dist. of Vt.).

77.     Defendant DFA has specifically been sued before for manipulating CME futures contract prices:

    a.   *Anderson, et al. v. Dairy Farmers of America, Inc., et al.*, No. 08-4726 (U.S.D.C. Minnesota).

---

[4] Several of the individual complaints were filed, related and/or transferred under the caption in *Southeastern Milk Antitrust Litigation*.  See *Sweetwater Valley Farm, Inc., et al. v. Dean Foods Company, et al.*, 07-cv-00051 (M.D. Tn.); *Baisley, et al. v. Dean Foods Company, et al.*, 07-cv-00052 (M.D. Tn.); *Ernest Groseclose & Sons, Inc., et al. v. Dean Foods and Company*, 08-cv-00053 (E.D. Tn.); *Breto, et al. v. Dean Foods, et al.*, 07-cv-00188 (E.D. Tn.); *Aker v. Dean Foods Company, et al.*, 07-cv-00248 (E.D. Tn.); *Farrar, et al. v. Dean Foods Company, et al.*, 07-cv-272 (E.D. Tn.); *Benson, et al. v. Dean Foods Company, et al.*, 09-cv-00128 (E.D. Tn.).

> b. *Ice Cream Liquidation, Inc. v. Land O' Lakes, et al.*, 253 F.Supp.2d 262 (Dist. Conn. 2003) (denying motion to dismiss claims that DFA, Keller's Creamery, and others agreed to fix and manipulate CME prices).

78.     In *Ice Cream Liquidation*, it was alleged that DFA combined, conspired or agreed with Defendant Keller's Creamery and others to fix CME butter prices. *Id.*

79.     With respect to its conduct at issue herein, DFA constituted and acted as a combination, contract, or conspiracy that operated through its officers to fix and manipulate prices in *per se* or other violation of Section 1 of the Sherman Act. DFA systematically abused its combinative status in order to manipulate CME prices. This conduct falls well outside any legitimate objects of a Capper-Volstead agricultural cooperative.

## F.     DFA's Appropriate Hedger Position Was "Short" The CME Class III Milk Futures Contracts

80.     From 2004 until 2006, DFA marketed at least one hundred million pounds of its members' milk as well as additional milk and cheese from its other agreements, per day.

81.     Thus, each day, DFA possessed or was "long" another, at least, one hundred million pounds of milk. Because it had so much milk to sell, DFA had an overwhelming net "long" exposure to changes in milk and cheese prices. That is, declines in milk prices adversely affected DFA and increases in milk prices positively affected DFA.

82.     Therefore, if DFA was acting as a commercial, competitive market participant, DFA's logical position on the CME would have been to sell or "short" CME milk futures in order to protect DFA's enormous net long exposure to falling prices. That is, when prices decline, a short position profits. It thereby offsets (or hedges) against the losses that falling prices cause the DFA's overwhelming net long exposure to milk prices.

83.     Accordingly, if DFA were trading as a hedger (*i.e.*, as one who reduces risks), would have traded "short" the CME milk futures contracts.

   **G.   Chronology**

   **1.    The DOJ And A Federal Court Judgment Required Keller's Creamery To Become A Separate Entity From DFA; Keller's Creamery Was Not An Agricultural Cooperative; And In Continuing And Agreeing To Work With Such Separate Keller's Creamery, Is Not Entitled To Capper-Volstead Immunity**

84.     On December 15, 1999, DFA entered into a letter agreement to purchase SODIAAL North America Corporation ("SODIAAL").  Some of the assets owned by SODIAAL included assets under the "Keller's Creamery" name.

85.     On or about March 31, 2000, the United States Department of Justice filed a civil antitrust action alleging that such acquisition violated Section 7 of the Clayton Act, 15 U.S.C. § 18 and seeking to ameliorate its anticompetitive aspects.  *United States of America v. Dairy Farmers of America, Inc*., No. 00-1663 (E.D. Pa.).

86.     With the consent of DFA, the U.S. Department of Justice sought court approval of a final judgment which permitted DFA to complete its acquisition of SODIAAL under various conditions.

87.     One such condition was that DFA agreed to transfer substantial assets into a new limited liability company.  This company was originally referred to as "Butter LLC."  It was to do business and, after 2000, did do business under the name Keller's Creamery, LLC.  Originally and through year-end 2006 at least, Keller's Creamery was **not** an agricultural cooperative.

88.     The published Final Judgment  in *United States of America v. Dairy Farmers of America, Inc*., No. 00-1663 (E.D. Pa.) further provided, among other things, that:

               DFA and/or Butter LLC shall require as a condition of the

sale or other disposition of either the *Keller*'s or *Hotel Bar* brands (or both) to an Agricultural Cooperative or to an entity in which DFA has a non-majority ownership interest that such person or persons agree to be bound by the provisions of this Final Judgment. However, except as provided in Paragraph III.A.(2) or III.A.(5) above, this Final Judgment shall not apply to transferees of either the *Keller's* or *Hotel Bar* brands (or both) who are neither an Agricultural Cooperative nor an entity in which DFA has an ownership interest.

89.     The final judgment in *United States of America v. Dairy Farmers of America, Inc.*, No. 00-1663 (E.D. Pa.), was signed by Judge Newcomer on November 3, 2000 and entered on the docket on November 6, 2000.

90.     According to the DFA's website, "Keller's Creamery" is a "joint venture" that was "forged" in 2000 between DFA and Sodiaal North America Corporation. "Keller's Creamery" is headquartered in Harleysville, Pennsylvania, and has plants in Winnsboro, Texas and Harleysville, Pennsylvania.

91.     Defendants Frank Otis and Glenn Millar are the former management team of Sodiaal North America Corporation. During at least 2001-2006, Frank Otis was the President and Chief Executive Officer of "Keller's Creamery," Harleysville, Pennsylvania, and Glenn Miller was its Executive Vice President.

**2.      By April 1, 2004, At The Latest, DFA Combines, Conspires And Agrees With Keller's Creamery And The Other Defendants To Fix, Inflate and <u>Manipulate Milk and Cheese Prices</u>**

**a.      Defendants' Agreement to Purchase CME Milk Futures Contracts In Violation of CME's Anti-Manipulation Limits <u>Artificially Inflates CME Prices</u>**

92.     In early 2004, Defendant DFA, under the control and direction of Defendants Hanman and Bos, began purchasing long positions in CME Class III Milk Futures contracts.

19

93.     In early 2004, Defendant Keller's Creamery, under the control and direction of Defendants Otis and Miller as well as Keller's Creamery Management, LLC, began purchasing long positions in CME Class III Milk Futures contracts.

94.     Ordinarily, futures contract purchase or sale decisions are made by the company employees involved in hedging, procurement, or sales.

95.     However, the position limit rules in commodity futures trading are designed, among other things, to prevent manipulation or unwarranted price increases.  They do so by limiting the amount of open positions that may be held.

96.     CME Rules prohibit any person from owning or controlling more than 1,500 CME Class III milk futures contracts (long or short) in any contract month.  CME Rule 5202.E; see also Rule 5202.F (for purposes of the position limits, positions of all accounts in which a person or persons have a proprietary interest or act under common control shall be cumulated).

97.     DFA and Keller's Creamery violated CME positions limits in the June, July and August Class III milk futures contracts by holding in excess of 1,500 contracts.  CFTC Order p. 2.

98.     For example, three such violations occurred on May 21, 2004: one in the June 2004 Class III Milk Futures Contract; another in the July 2004 Class III Milk Futures Contract; and a third violation in the August 2004 Class III Milk Futures Contract.

99.     On May 21, 2004, the DFA "arbitrage" accounts held long positions of 1,068 June 2004 Contracts, 1,118 July 2004 Contracts and 1,126 August 2004 Contracts.

100.     On May 21, 2004, Keller's Creamery held long positions of 600 June 2004 Class III Milk Futures Contracts, 428 July 2004 Class III Milk Futures Contracts and 340 August 2004 Class III Milk Futures Contracts.

101.     On May 21, 2004, National Dairy Holdings ("NDH") (a DFA subsidiary) held (outside the DFA "arbitrage" account) long positions of 102 July 2004 Class III Milk Futures Contracts and 99 August 2004 Class III Milk Futures Contracts.

102.     According to the CFTC, on May 21, 2004 all of DFA's long positions (the CFTC includes Keller's Creamery within DFA's positions) in Class III milk futures contracts totaled: 6,172 June Contracts, 4,656 July Contracts and 4,227 August Contracts.  CFTC Order at p. 3.

103.     The open interest reported by the CME for May 21, 2004 was:  6172 June 2004 Class III Milk Futures Contracts, 4,656 July 2004 Class III Milk Futures Contracts and 4,227 August 2004 Class III Milk Futures Contracts.

104.     In other words, on May 21, 2004, Defendants' total long positions  listed in the CFTC Order, represented 100% of the market in each of the June 2004 Class III Milk Futures, the July 2004 Class III Milk Futures, and the August 2004 Class III Milk Futures Contracts.

105.     The purpose of the position limits is to prevent manipulation. Defendants' coordinated purchases in violation of the CME anti-manipulation rules did unlawfully and artificially inflate the prices in all CME Class III milk futures contracts.

**3.     DFA and Keller's Agree That DFA Will Purchase Unneeded CME Cheese Contracts That Defendants Knew Would Later Have To Be Dumped At Much Lower Prices**

106.     As is indicated by Defendants' multiple violations of the anti-manipulation limits, Defendants' excessive purchases of 2004 Class III Milk Futures contracts were continuously discussed at the highest levels of DFA and Keller's Creamery.

107.     For example, during April and May 2004, Defendants Otis and Millar --- the top officers of Keller's Creamery --- repeatedly communicated with Defendant DFA's Chief

Financial Officer, Gerald Bos, and Defendant Hanman about their parallel long positions in CME Class III milk futures.

108.    Not only did Keller's Creamery's over-purchases of CME milk futures contracts violate the CME's anti-manipulation limits but they inflated milk prices in a manner contrary to a creamery operator's interest.

109.    Contrary to the spirit of the DOJ judgment that Keller's Creamery was not an agricultural cooperative, DFA and Keller's Creamery had agreed to and did conduct their purchases of CME Class III milk futures contracts in a manner that helped them jointly manipulate and increase milk prices, was beneficial to dairy farmers but could financially injure a true creamery operation.

110.    Pursuant to this agreement to inflate milk prices, Keller's Creamery did in fact act in the best interests of the dairy farmer cooperative.  For example, Defendant Keller's Creamery had over-purchased so many CME Class III milk futures contracts that, unlike a commercial creamery, Keller's was actually helped by increases in milk futures prices.  But Keller's would be financially damaged by decreases in the artificially inflated milk futures contract prices that Defendants had caused.

111.    Impliedly recognizing that their own purchases had artificially inflated milk prices, Defendants Otis and Millar expressed concerns during at least April and May 2004 to DFA about Defendants' CME long positions.

112.    These concerns arose from the fact that Defendants' excessive purchases in violation of the CME anti-manipulation rules would expose Keller's to large losses when Defendants withdrew their unlawfully large buying pressure on CME Milk Futures and, possibly,

placed selling pressure on such prices by selling out their large CME Milk Futures long positions. See ¶¶124-127 *supra*.

113.     On May 21, 2004 Defendant Keller's Creamery, per Defendant Otis, importuned Defendant DFA, per DFA's top officers (Messrs. Hanman and Bos), to purchase large amounts of CME spot cheese contracts in order to further support and inflate CME Class III Milk Futures Contract prices.

114.     Specifically, Defendants Otis and Keller's Creamery stated that such purchases by DFA of CME Spot Cheese Contracts should be made at $1.80 per pound to support prices of CME spot cheese and CME Class III milk futures contracts.

115.     However, DFA had already purchased what was internally characterized as a "mountain" of unneeded cheese.  DFA had excess cheese inventory, even before May 21, 2004, of between 16 and 23 million pounds.

116.     For one example, on May 20, 2004, one of DFA's managers was recommending that DFA even try to get out of **any existing** cheese purchase obligations it could (rather than take on new purchase obligations) because of the decline in cheese orders.  He stated: "This does not look good and Shred sales are falling fast. We will build cheese inventory fast and it will really start getting old.  I am sure you are already aware of this but I thought I would mention it. My suggestion is to turn off the faucet on any cheese that we think we can?"

117.     Thus, DFA's procurement, sales and other personnel had determined that DFA had excess cheese and no need for any additional CME spot cheese.  Plus, again, DFA's members were producing in excess of 100,000,000 pounds of milk each day, much of which would be made into yet additional cheese.

23

118.    (a) In proposing these purchases, Defendant Otis impliedly recognized that prices would fall when the CME Class III milk futures long positions were sold and/or the proposed CME spot cheese purchases ended.  Defendant Otis also recognized that DFA had no need for the CME sport cheese that he was recommending that DFA purchase.

(b)    But, demonstrating extensive knowledge of DFA's milk futures positions, Defendant Otis calculated for Defendant Bos on May 21, 2004 the losses to DFA from purchasing unneeded CME spot cheese and selling it after the prices declined versus the losses from selling DFA's CME long milk futures positions after prices collapsed.

119.    Similarly, on May 21, 2004, Defendant Millar explained to John Wilson, DFA's Corporate Vice President of Marketing, that DFA should purchase CME spot cheese "strongly" at $1.80 per pound.

120.    Once again, the purpose of these purchases, Millar said, was to fix and inflate CME cheese and Class III milk futures prices. "If we get clarification on intent with block [CME spot cheese] prices and it is signaled strongly to the market in the form of bids [to purchase CME spot cheese] we will see some nice pops [increases in prices] on the summer months [CME Class III milk futures expiring in June, July and August 2004] and I'll take advantage of these prices [by selling Keller's CME milk futures contracts at the artificially inflated prices]."

121.    The next day, on May 22, 2004, Defendant Millar again urged DFA to purchase CME spot cheese to fix and inflate cheese and milk prices while Defendants sold out of their Class III milk futures contracts.

122.    In sum, Defendants Otis and Millar were proposing to DFA that it purchase CME cheese contracts at $1.80, specifically because that would cause the prices of CME June, July, and

24

August 2004 Class III milk futures contracts to increase. This would allow Defendant Keller's and DFA to sell out their unlawfully large long positions in CME milk futures profitably.

123.     Contrary to DFA's internal analyses showing that DFA already had a large, unused inventory of cheese, DFA's top officers (Defendants Hanman and Bos) recognized DFA's *quid pro quo* arrangement with Keller's Creamery to fix and inflate prices.

124.     Therefore, Defendants Hanman and Bos overruled the reasoning of DFA's responsible sales and procurement employees, and ordered that DFA begin buying cheddar cheese blocks on the CME at $1.80 per pound even though DFA already had too much cheese.

125.     The price of $1.80 per pound was the exact price that Keller's Creamery --- which had "stuck its financial neck out" by over-purchasing CME milk futures to help DFA --- had proposed to DFA as the price at which Defendants continue to fix CME spot cheese contracts in order to inflate milk futures prices.

126.     Even though DFA had no need or sales contracts for the CME cheese and would have to dump same (including by overseas sales) at large losses, DFA, between May 21, 2004 and June 23, 2004, nonetheless purchased nearly 13 million pounds of cheddar cheese at a cost of over $21 million, *i.e.* $1.80 per pound. DFA did so precisely and solely in order to fix and manipulate prices.

127.     The CME cheese price closed at $1.80 every day from May 21 to June 22, 2004. This was because DFA --- which already had too much cheese and would have to dump (largely overseas) the cheese it was purchasing --- had agreed with the other Defendants to buy to fix the price at $1.80.

128.     Thus, on June 1, 2004, Jennifer Harr of DFA reported that Kevin Sanders of DFA told her that DFA had "decided to continue to defend [CME cheese price at] $1.80 and buy as many as it takes to do so."

129.     Similarly, on June 2, 2004, Elvin Hollon of DFA stated to Mr. Wilson of DFA: "If we abandon $1.80 prices will drop like a rock." Mr. Wilson agreed with that assessment.

### 4.     DFA' False Statements

130.     Contrary to Mr. Elvin Hollon's above-quoted June 2 statement that real CME cheese prices were much lower than the artificial ones caused by DFA's purchases and would soon "drop like a rock," Mr. Hollon falsely projected in writing on June 4, 2004, as follows. Block cheese prices would increase from $1.80 per lb. to higher levels in the months of July through September 2004.

131.     This misleading written projection was then sent by DFA to DFA members.  Mr. Hollon has admitted that such misleading projection could have had the effect of causing DFA members (and others) to further support and inflate CME prices.

132.     Limited mention of DFA's purchases of CME cheese was made in extremely low circulation industry newsletters but none of these disclosed that DFA had no need for the cheese nor many other important facts alleged at ¶¶194-204.

133.     On the contrary and consistent with DFA's false June 4 projections, one such report circulated shortly after this time in a very small and very limited circulation pizza newsletter.  In this report, the most knowledgeable industry participant surmised that DFA's customers and DFA "definitely needed the cheese" that DFA purchased on the CME.  This sophisticated observer's surmise turned out to have been 100% wrong.

134.     On May 21, 2004, the CME June 2004 Class III Milk Futures contract had closed at a price of $15.86; the July 2004 Class III Milk Futures contract had closed at a price of $14.11 and the August 2004 CME Class III Milk Futures Contracts had closed at a price of $14.12. On that day DFA started buying cheese at $1.80 per pound.

135.     Market participants may apply the formula for Class III milk prices by using the actual CME cheese price and their expectations of the other Class III milk price variables in order to calculate a Class III milk price.

136.     On June 3, 2004, Defendant Millar stated: "If [CME] cheese holds [at the price] here we will see prices for [the] June 2004 CME Class III Milk Futures Contract] above $17.15 next week."

137.     When the cheese market held at $1.80 per pound, the CME Class Milk Futures Contracts prices did in fact increase.

138.     On Monday, June 7, 2004, the June 2004 contract closed at $17.27, the July 2004 Contract closed at $15.55, and August 2004 Contract closed at $15.15. Defendants' unlawful conduct had caused both the CME block cheddar price and the CME Class III milk futures price to continue to increase to these artificial levels.

139.     On June 16, 2004, DFA salesman Mark Korsmeyer asked other DFA employees when "will we let the market [prices] fall?" and was told "Not right now we won't. The heads of the other 5 families said NOT Yet."

140.     By June 23, 2004, all of Defendants' June 2004, July 2004, and August 2004 CME Milk futures contracts had been sold at a profit.

141.     Consistent with Defendants' agreement to inflate prices until they had sold out their CME with futures contracts, Defendants then stopped buying CME cheese.

27

142.     The CME cheese price then promptly fell to $1.605 per pound on June 24.  The next day the CME cheese price fell further, to $1.45 per pound.

143.     The prices of CME June, July and August 2004 Class III Milk futures contracts also fell.

144.     But even these lower prices were still artificially inflated prices for several reasons.  See ¶¶147-163 *infra.*

145.     Cheese purchased on the CME is typically used immediately or within about 90 days. DFA did not store the cheese it purchased on the CME.  Rather, DFA sold it at severely discounted prices.  Indeed, most of DFA's excess cheese inventory was dumped on overseas customers at heavily discounted prices.

146.     As late as July 30, 2004, DFA's Mr. McCroskey calculated that DFA was still carrying an excess of "somewhere between 29 and 36 million pounds of cheese."

**5.     Defendants Continue To Inflate CME Prices**

147.     Defendants did NOT disclose to the market their foregoing agreement to inflate prices and unlawful purchases of CME Milk Futures contracts.  On the contrary, pursuant to their agreement, Defendants continued to make false statements to cover up their manipulative conduct.  After making such false statements to the CFTC, a government agency, DFA apparently purchased all of Keller's Creamery on terms that have not been disclosed.  Likely, these terms involved a payment by DFA to Defendants Otis and/or Millar.

**a.     DFA's False Statements To Dairylea**

148.     In October 2004, Defendant Hanman made false statements in a private context to the Dairylea Cooperative.  These statements began to become public only much later.

28

Nonetheless, Defendant Hanman falsely stated that DFA "had bought the [CME] cheese that we needed for our market, for our customers, for our demand."

149.     Defendant Hanman then further falsely stated that after DFA had satisfied its demand for its customers' needs, DFA had "backed out" and stopped purchasing CME cheese.

150.     Both these private statements were grossly false.  In truth, as Defendants well knew, DFA had excess cheese; DFA did not buy the CME cheese to satisfy any needs of customers; DFA purchased the CME cheese solely pursuant to its price fixing agreement with Keller's Creamery and solely in order to inflate and support prices, and DFA sold and dumped the CME cheese at a large loss and mostly overseas.

### b.     DFA's False Statements To The CFTC

151.     When the CFTC began to investigate DFA in late December 2004, DFA falsely stated that it had purchased cheese on the CME "to meet the needs forecast by its sales projections."  This non-public statement was also false for the reasons previously alleged.

152.     However, as the CFTC investigation continued, Defendants Hanman and Bos were replaced by early 2006.  By December 8, 2006, DFA had finally admitted to the CFTC "that from sometime in May 2004 forward, DFA's primary reason for purchasing block cheese on the CME was to defend the [the CME cheese] price at $1.80".

153.     DFA's belated admission that such price inflation as the "primary reason" for the CME cheese purchases would have been was true if price inflation was stated to be the sole reason.  But DFA then went further and also told the CFTC that DFA had inflated prices in order to protect the "value of DFA's existing inventories of physical cheese and its Class III milk futures contract positions."

154.    This was true to the extent that DFA had agreed with Keller's Creamery to manipulate the cheese price in order to manipulate the Class III milk futures prices.  But this statement was also partially false. Purchasing cheese at $1.80 per pound, when the un-manipulated market price would have been much less, did not protect the true value of DFA's existing inventory of cheese.

> c.    **Defendants' Omissions, And DFA's Further Purchases of CME Contracts**

155.    Defendants' purposeful manipulation of public CME prices in April – June 2004 had long term inflationary effects on CME and other prices.

156.    Absent full disclosure, an extended manipulation of public prices continues to cause a degree of price manipulation long after the manipulation ceases. *E.g.,* Kenneth French and Richard Roll, *Stock Return Variance: The Arrival of Information and the Reaction of Traders*, 17 J. Financial Econ. (1986).

157.    Here, Defendants made no full disclosure of their manipulation.

158.    On the contrary, Defendants made the false statements previously and hereinafter alleged.

159.    Further, government formulas in milk magnify the effects of such inflated prices by using them to further inflate prices for four weeks afterwards.

160.    Coupled with Defendants' ongoing failure to disclose their manipulation of the publicly posted and relied on upon prices and its affirmative misrepresentation of its supposed needs, DFA also purchased more CME contracts to inflate prices

161.    Describing itself as a "market maker," that is, as one who makes the market price what it is, Defendant DFA repeatedly purchased more CME cheese contracts during August and

September, 2004. In total, DFA purchased approximately 100 contracts of CME spot cheese during this time.

162.     Also DFA purchased substantial amounts of CME cheese in or about October 2004 and January 2005.

## V.     EFFECTS ON INTERSTATE COMMERCE AND INJURY TO PLAINTIFFS AND CLASS MEMBERS

163.     CME futures prices are publically reported throughout the United States in interstate commerce. They affect shipments of milk and cheese in interstate commerce. During the Class Period, purchasers in interstate commerce of CME contracts, as well as of milk and cheese, paid the artificially high prices caused by Defendants.

164.     Defendant DFA sold processed cheese and milk directly into interstate commerce. Defendants' unlawful acts alleged herein have had a substantial anticompetitive effect on interstate commerce within the United States.

165.     Defendants' unlawful agreement and other anticompetitive conduct restrained commerce, inflated CME milk and cheese prices, inflated the other prices alleged herein, and caused misleading signals to be sent to market participants. This caused "dead weight" losses as commodities were transported, stored and consumed based on the false price signals that Defendants caused between at least April 1, 2004 and December 31, 2006.

166.     Many or most cash market contracts are not priced on a "flat price" mechanism. (An example of a flat price is "$1.50 per pound".)

167.     By industry practice, cash market contracts are priced basis the CME price for Class III milk futures or, as in some of Plaintiff Indriolo's purchases, "basis" the CME cheese spot call price, or basis governmental minimum formula prices. For example, the contract would

31

provide that its price is "basis plus 17 cents", or "CME plus 17 cents". These and similar terms mean that the purchase price is the CME price at the specified time of delivery plus 17 cents.

168.     By agreeing to artificially inflate and artificially inflating the CME price as alleged herein, Defendants directly inflated the prices paid by purchasers in all cash market contracts that were so-called basis the CME price or basis various minimum price formulas under federal or State law.

169.     It is the practice in the industry that various contracts are based on the minimum price formulas provided by various States which incorporate the CME price as one part of the minimum price formula.

170.     It is also the practice in the industry that purchasers of raw milk frequently contract to purchase raw milk based on the federal minimum milk price plus a premium.

171.     As set forth below, the CME spot cheese is part of (and is highly correlated to) the federal minimum milk price.

172.     Thus, an artificially high CME spot cheese price results in purchasers of raw milk paying artificially high prices for their purchases or raw milk in these types of contracts.

173.     The minimum price of milk in the United States has been regulated by the federal government for decades. Under the authority of the Agricultural Marketing Agreement Act of 1937, as amended, 7 U.S.C. §601, *et seq*., the United States Department of Agriculture ("USDA") issues Federal Milk Marketing Orders ("FMMO"), which set minimum prices that handlers (*i.e.*, those that process or distribute milk) must pay to producers (*i.e.*, farmers) for their milk products. See 7 U.S.C. §605(c)(5). FMMO's do not apply to wholesale or retail milk or dairy products.

174. There are currently ten FMMO marketing areas: (1) Northeast; (2) Appalachian; (3) Southeast; (4) Florida; (5) Mideast; (6) Upper Midwest; (7) Central; (8) Southwest; (9) Arizona; and (10) Pacific Northwest.

175. The foregoing FMMO marketing areas directly affect approximately 65% of the milk marketed in the United States.

176. Several States (or portions of States) have their own milk marketing programs that operate outside of the foregoing FMMO marketing areas. Such States include California, Hawaii, Maine, Montana, Nevada, (Western) New York, North Dakota, Pennsylvania and Virginia.

177. The remainder of the milk marketed throughout the United States is priced under other State orders or is not subject to FMMO regulation.

178. FMMOs fix minimum milk prices by formula. See 7 C.F.R. §1000.50.

179. There are four "classes" of milk that are covered by FMMOs. These classes include: Class I milk (fluid milk, intended to be used as a beverage); Class II milk (milk used to produce fluid cream and other cream products); Class III milk (milk used to produce hard cheeses and cream cheese); and Class IV milk (milk used to produce butter and milk products in dried form).

180. Each class of milk has a different FMMO price formula.

181. For example, in 2004 – 2006, the FMMO price formula for Class III milk (*i.e.*, raw milk that has not been pasteurized) was as follows:

**Class III:**

Class III Price = (Class III skim milk price x 0.965) + (Butterfat price x 3.5).
Class III Skim Milk Price = (Protein price x 3.1) + (Other solids price x 5.9).
    Protein Price = ((Cheese price – 0.165) x 1.383 + (((Cheese price – 0.165) x 1.572)-Butterfat price x 0.9) x1.17).
Other Solids Price = (Dry whey price – 0.159) times 1.03.

Butterfat Price = (Butterfat price -0.115) times 1.20.

*See* USDA Federal Milk Order Market Statistics, 2004 Annual Summary at p. 45, available at

http://www.ams.usda.gov/AMSv1.0/getfile?dDocName=STELPRD3106915&acct=dmktord

182.　　The component prices in the foregoing FMMO formula are weighted monthly averages of weekly National Agricultural Statistical Service ("NASS") survey prices where these weights are weekly amounts of sales. *Id*. For Announced Class III milk prices, four to five weeks of sales data are used to determine the monthly average price.

183.　　Each week, the NASS surveys large cheddar cheese manufacturers about the prices of the cheddar cheese they have sold. *See* United States General Accounting Office ("GAO") report entitled, *Spot Cheese Market: Market Oversight Has Increased, But Concerns Remain about Potential Manipulation* ("GAO Report") at p. 23. According to analyses by the University of Wisconsin, from January 2000 to January 2007, cheddar cheese prices have determined upward of 83 percent of the minimum price of Class III milk. *See* GAO Report at p. 22, n. 30.

184.　　It is industry custom and practice in the dairy industry to price commercial contracts "basis" (or based on) the CME spot cheese price.

185.　　Thus, because CME spot cheese price is generally used to set commercial contracts, the NASS survey of prices generally end up capturing the CME spot cheese price. GAO Report a p. 1.

186.　　For example, the NASS survey price has a 98 percent correlation with CME spot cheese market price when adjusted to account for the difference in timing between collecting price information and publishing NASS survey results. See GAO Report at p. 25.

187.    The CME spot cheese price also impacts the USDA minimum price for Class I milk (*i.e.*, fluid milk).

188.    The Class I milk formula price is based on the higher of the minimum Class III milk price or Class IV milk price.

189.    During the entire Class Period, the Class III milk price was higher than the Class IV milk price.

190.    The State of California has its own state milk marketing order, which accounts for approximately another 20% of the milk marketed in the United States.

191.    With respect to the minimum milk price formula in California, the CME cheese spot call price is an explicit component.

192.    The FMMO Class III milk equivalent formula in California (referred to as Class 4b milk) is as follows:

<u>**Class 4b**</u>

Cheese price per cwt. =

(Cheddar cheese price – f.o.b. cheese price adjuster – cheese manufacturing cost

allowance) ∗ (cheese yield) + (Butter price – $0.10 – butter manufacturing cost allowance) ∗

whey butter yield + whey factor.

Cheddar cheese price = the 40 pound block CME Cheddar price
f.o.b. cheese price adjuster = $0.0252 per pound of cheese
cheese manufacturing cost allowance = $0.1988 per pound of cheese
cheese yield factor = 10.2 lbs. of cheese per cwt. of milk
butter price = the bulk butter price at the CME
butter manufacturing cost allowance = $0.156 per pound of butter
butter yield factor = 0.27 lbs. of butter per cwt. of milk
whey factor = $0.25

## VII.   FRAUDULENT CONCEALMENT AND EQUITABLE TOLLING

193.    Plaintiffs neither knew nor, in the exercise of reasonable diligence, could have known of the violations on which their claims are based until approximately four years and eight months after (Plaintiffs now have good grounds to believe and allege that) the violations began.

194.    First, the CME is not the wrongdoer here but had statutory and other duties to investigate, prevent and punish manipulation.  But the CME repeatedly made public statements to the effect that the CME believed that their market had integrity and that there had been no manipulation.  For just one example, on December 30, 2004, the CME was quoted as saying: "CME believes strongly in the integrity of all of its markets, including the spot dairy market. . . . The exchange devotes significant resources, through our market regulation department, to maintaining and closely monitors all of our markets."  A. Martin, *The Chicago Tribune*, "Dairy Insider Has Clout In Setting Prices," (Dec. 30, 2004), http://www.chicagotribune.com/services/chi-0412300250dec30,0,6760237.story.

195.    Second, until the CFTC Order was released on December 16, 2008, the key information indicating that Defendants had violated the laws was not public.  The information that was not public included, but was not limited to, the following information that was released for the first time in the CFTC Order:

    a.   the fact that Defendants were trading CME Class III milk futures contracts; and

36

    b.   the fact that Defendants had violated the CME anti-manipulation rule by

        purchasing excessive long positions in the CME Class III milk futures

        contracts.

196.    Third, the foregoing information about Defendants' violations of CME anti-manipulation rules was 180° the opposite of the CME's repeated calming statements.

197.    Fourth, many important facts were needed to assess the import and meaning of the limited information that appeared in very low circulation industry newsletters to the effect DFA was the purchaser of substantial amounts of CME spot cheese at $1.80.  But these important facts were not made public:

    a.   the motive of Keller's Creamery, which ordinarily would be expected to

        benefit from lower milk prices, was to make excessive purchases of CME

        milk futures contracts;

    b.   the fact that Keller's Creamery and DFA had agreed that, even though DFA

        had no need for cheese and had excess cheese, DFA would nonetheless make

        large purchases of CME spot cheese intentionally in order to fix and inflate

        prices at $1.80 per pound;

    c.   the fact that DFA and Keller's Creamery were specifically motivated to make

        such purchases of cheese in order to inflate and defend their unlawfully large

        Class III milk futures contracts;

    d.   the fact that, internally, DFA knew that it did not have a large demand for

        cheese, that it had excess cheese, and that cheese prices would "drop like a

        rock" as soon as DFA stopped purchasing the CME spot cheese;

e. the fact that DFA knowingly sent out a false projection indicating that it believed that cheese prices were going to increase whereas, internally, DFA actually believed and stated in writing that cheese prices were going to decrease as soon as DFA stopped purchasing CME cheese; and

f. the fact that DFA had to dump and sell, mostly overseas, at prices far below what it had paid, the CME cheese it purchased.

198. Fifth, in the context of all the foregoing missing important facts, there did appear in one low circulation industry newsletter the surmise by a highly informed market participant that DFA's purchases were made because the cheese was greatly needed. This surmise was 100% false.

199. Sixth, similarly, DFA misrepresented to the CFTC, when the CFTC began its investigation in late 2004, that DFA needed the cheese that it was purchasing on the CME to supply its customers and projected sales needs. (DFA later effectively admitted, in 2006, that this representation was false.)

200. By reason of the foregoing, the CFTC investigation had to be extended until 2008 in order for the true facts concerning DFA's and Keller's activities to emerge. The CFTC thus required four years of investigation, including the use of its subpoena power, to obtain DFA's reversal of its misrepresentations. Thereby the CFTC learned the true reasons for DFA's excessive cheese purchases, as well as the true facts about DFA's collaboration with Keller's Creamery in the buying up of CME Class III milk futures contracts.

201. Seventh, in addition to making made false projections and false statements about customer needs for cheese, DFA represented to newspapers that DFA's futures trading was

"proprietary". In fact, DFA's trading was violating CME ant-manipulation rules, was manipulating prices, and was being shared with Keller's Creamery.

202. The running of any statutes of limitations has been suspended with respect to any claims which the Plaintiffs and other members of the Class have. This is by virtue of the federal doctrines of fraudulent concealment and equitable tolling. As a result, all statues of limitations otherwise applicable to the allegations herein have been tolled until December 16, 2008 when, for the first time, the critical facts were disclosed.

## VIII.   <u>CLASS ALLEGATIONS</u>

203. Plaintiffs bring this action on behalf of themselves, and all others similarly situated, pursuant to Rules 23(a), 23(b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the following Class:

> All persons who, between April 1, 2004 through December 31, 2006 purchased (1) a CME Class III milk futures contracts (2) a CME spot cheese contract, (3) cheese or milk within a contract the price of which was based on the CME price or a government minimum price formula or (4) wholesale cheese or raw milk.[5]

204. Excluded from the Class are the Defendants and any parent, subsidiary, affiliate, or agent of any Defendant.

205. The Class is so numerous that joinder of all members is impracticable. Due to the nature of the commerce involved, the members of the Class are geographically dispersed throughout the United States. The number and identity of Class members is unknown to Plaintiff, but can be readily ascertained. Plaintiffs believe that there are hundreds or perhaps thousands or more members of the Class.

---

[5] Plaintiffs reserve their rights to change the definition of the Class in their class motion or otherwise.

206.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

a.   whether any of Defendants' agreements in unreasonable restraint of trade constitute violations of Section 1 of the Sherman Act;

b.   whether Defendants monopolized or attempted or conspired to monopolize the relevant markets in violation of Section 2 of the Sherman Act;

c.   whether Defendants' conduct otherwise constitutes violations of laws;

d.   the operative time period and extent of Defendants' foregoing violations;

e.   whether Defendants' violations caused injury and damage to Plaintiffs and members of the Class;

f.   the appropriate measure of the amount of damages suffered by the Class;

g.   whether Defendants have been unjustly enriched at the expense of Plaintiff and the Class;

h.   whether a constructive trust should be imposed on such unjust enrichment for the benefit of the class; and

i.   the appropriate disgorgement, restitution and equitable relief.

207.     Plaintiffs' claims are typical of the claims of the other members of the Class they seek to represent.  Plaintiffs and members of the Class they seek to represent have all sustained damages arising out of Defendants' same course of unlawful conduct alleged herein.

208.     Plaintiffs will fully and adequately protect the interests of all members of the Class.  Plaintiffs have retained counsel experienced in complex antitrust and commodity futures

manipulation class actions. Plaintiffs have no interests which are adverse to or in conflict with other members of the Class.

209.    The questions of law and fact common to the members of the Class predominate over any questions which may affect only individual members.

210.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all class members is impracticable. The prosecution of separate actions by individual members of the Class would impose heavy burdens upon the courts, and would also create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class. A class action, on the other hand, would achieve substantial economies of time, effort, and expense, and would assure uniformity of decision with respect to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results.

211.    The interest of members of the Class in individually controlling the prosecution of separate actions is theoretical rather than practical. The Class has a high degree of cohesion, and prosecution of the action through representatives would be unobjectionable. The damages suffered by the individual Class members may be relatively small; and therefore, the expense and burden of individual litigation make it virtually impossible for them to redress the wrongs done to them. Plaintiff anticipates no difficulty in the management of this action as a class action.

## AS AND FOR A FIRST CLAIM

**(Contract, Combination, or Conspiracy In Restraint of Trade—*Per Se* And Other Violations of Section 1 of the Sherman Act, 15 U.S.C. §1 *et seq*.)**

212.    Plaintiffs re-allege and incorporate by reference all of the allegations of this Complaint with the same force and effect as if fully restated herein.

213.    Defendants made and/or constituted a combination, conspiracy or contract in unreasonable restraint of trade and commerce to fix, manipulate, and maintain prices in violation of Section 1 of the Sherman Act.

214.    The conduct of DFA and Keller's Creamery constituted an agreement or combination in violation of Section 1 for many reasons. First, DFA and Keller's Creamery are separate entities. Their agreement and combination is, therefore, in violation of Section 1.

215.    Second, DFA and Keller's Creamery, render the combination of entities that are trading, a combination or agreement of approximately 18,000 farmers and Keller's Creamery. This, also, is a combination in violation of Section 1. This combination is not entitled to Capper-Volstead protection for many reasons, including because Keller's Creamery is not an agricultural cooperative.

216.    Defendants' conduct further violates Section 1 because all the futures contracts and CME spot cheese contracts they entered were specifically intended by Defendants to, and were specifically misused by them to, restrain trade unreasonably and inflate publicly reported prices.

217.    Fourth, DFA and Keller's combined in their trading with others, including another DFA subsidiary, as previously alleged herein.

218.    Defendants' violations substantially affected interstate trade and commerce and caused antitrust injury to Plaintiffs and all Class members.

219.    As a direct result of Defendants' violation, Plaintiffs and the members of the Class have been damaged in their property or business, and have paid supra-competitive prices.

## AS AND FOR A SECOND CLAIM

**(Monopolization In Violation of The Sherman Act, 15 U.S.C. §2 *et seq*.)**

42

220.     Plaintiffs re-allege and incorporate by reference all of the allegations of this Complaint with the same force and effect as if fully restated herein.

221.     CME June, July and August 2004 Class III milk futures contracts are products with unique attributes and characteristics for which there are no practical substitutes.

222.     The markets for such contracts, in Chicago and/or all locations where such contracts are traded, constitute relevant product and geographic markets.

223.     Defendants conspired to monopolize, and did in fact willfully acquire, maintain and exercise monopoly power and control over the foregoing contracts in violation of Section 2 of the Sherman Act, 15 U.S.C. §2.

224.     As alleged herein, Defendants engaged in restrictive, exclusionary, and anticompetitive acts in furtherance of accomplishing this unlawful purpose.  These acts included uneconomic purchases of CME cheese and unlawful and uneconomic purchases of CME Class III milk futures.

225.     As Defendants manipulated the spot price of cheese and the price of Class III milk futures on the CME, pursuant to this violation of Section 2, they caused Plaintiffs and Class members to pay higher prices.

226.     Defendants' anticompetitive conduct has directly injured Plaintiffs and the members of the Class in their business or property.  It has also resulted in monopolistic profits for Defendants.

## AS AND FOR A THIRD CLAIM

**(Attempt To Monopolize In Violation of The Sherman Act, 15 U.S.C. §2 *et seq*.)**

227.     Plaintiffs re-allege and incorporate by reference all of the allegations of this Complaint with the same force and effect as if fully restated herein.

228.     Defendants attempted to monopolize the markets for CME Class III milk futures markets for the June, July and August 2004 contracts in violation of Section 2 of the Sherman Act, 15 U.S.C. §2.

229.     Defendants acted with the intent to achieve (and, in fact, did achieve) monopoly power over such markets.

230.     There was a dangerous probability that Defendants would succeed in achieving monopoly power through the unlawful acts herein.

231.     Defendants' anticompetitive conduct has directly injured Plaintiffs and the members of the Class in their business or property.  It has also resulted in monopolistic profits for Defendants.

## AS AND FOR A FOURTH CLAIM

### (Manipulation In Violation of The Commodity Exchange Act, 7 U.S.C. §1 *et seq*.)

232.     Plaintiffs re-allege and incorporate by reference all of the allegations of this Complaint with the same force and effect as if fully restated herein.

233.     From on or about April 1, 2004 forward, Defendants specifically intended to inflate the prices of CME Class III milk futures.

234.     Defendants violated CME rules and federal law in order to purchase excessive CME Class III Milk futures contracts.

235.     Defendants violated commercial practices in order to purchase unneeded CME spot cheese specifically in order to manipulate and increase the artificially inflated prices.

44

236.     Defendant DFA sent out knowingly false and inflated projections for cheese prices which it knew could further support and inflate prices.

237.     Through the foregoing acts and others, Defendants intended to and did cause unlawfully and artificially inflated prices in violation of the CEA, 7 U.S.C. §1, *et seq.*  Class II milk futures contract prices were artificially high relative to Class IV milk futures prices and Class III spreads.

238.     As a direct result of this inflation, Class members who purchased CME Class III milk futures contracts were injured and thereby suffered damages.

## AS AND FOR A FIFTH CLAIM

### (Unjust Enrichment and Restitution)

239.     Plaintiffs re-allege and incorporate by reference all of the allegations of this Complaint with the same force and effect as if fully restated herein.

240.     Defendants have benefited from their unlawful acts through, *inter alia*, the receipt of overpayments by members of the Class.  It would be inequitable for Defendants to retain these benefits conferred by members of the Class.

241.     Plaintiffs and members of the Class are entitled to receive from Defendants an amount equal to Defendants' unjust enrichment.

## AS AND FOR A SIXTH CLAIM

### (Violation of Racketeer Influenced and Corrupt Practices Act, 18 U.S.C. §1961 *et seq.*)

242.     Plaintiffs re-allege and incorporate by reference all of the allegations of this Complaint with the same force and effect as if fully restated herein.

243. Each of DFA, Gary Hanman, Gerald Bos, Keller's Creamery, LP ("Keller's"), Frank Otis, and Glenn Millar (collectively, the "RICO Defendants") is a "person" within the meaning of 18 U.S.C. § 1961(3).

244. At all times material to the Class Period, DFA was an "enterprise," within the meaning of 18 U.S.C. § 1961(4). In the alternative: (a) DFA, Hanman, Bos, Otis, and Millar, and/or (b) DFA and Keller's and/or (c) DFA, Hanman, Bos, Otis, Millar, and the brokers who executed the trades for DFA and Keller's on the floor of CME are an association-in-fact constituting an "enterprise" within the meaning of 18 U.S.C. § 1961(4).

245. The enterprise engaged in interstate commerce, or in activities which affected interstate commerce, and functioned as a continuing unit with an existence beyond that necessary to commit the predicate acts.

246. The RICO Defendants engaged in the acts, transactions, and practices described herein. They used the means and instrumentalities of interstate commerce, including the mails, telephones, wires, the facilities of electronic communication, the facilities of brokers who executed trades for Defendants at the CME, the facilities of the CME, and the facilities for public reporting of the CME prices, to carry out an ongoing pattern of concerted activity to fix or manipulate the prices alleged herein.

247. One of the purposes of the manipulative conduct herein alleged was to artificially inflate the prices alleged herein so that DFA could make more than $1,000,000,000 in gains on sales of 100,000,000-plus pounds of milk per day at the inflated prices that DFA caused, and so that the RICO Defendants could each profit themselves.

248. Each of the RICO Defendants, with respect to the enterprise, acted: (a) willfully with the intent to defraud Plaintiffs and the other Class members who traded in CME Class III

milk futures, or CME Cheese Spot Call contracts, or the other contracts alleged herein, and (b) with knowledge of, or with reckless disregard for, the fact that they, and each of them, had failed to disclose publicly the true and very material facts about their manipulative scheme and their activities to increase such contract prices to, and maintain them at, artificially high levels.

249.    But for the manipulative scheme, the participation in the scheme by each of the respective RICO Defendants, their non-disclosure and false or misleading statements as previously and hereinafter alleged, and their systematic and fraudulent use of interstate mails and wires, among other devices and facilities, the manipulation would not have succeeded as it did in artificially boosting and supporting the prices of CME Class III milk futures, CME Cheese Spot Call contracts, and other contracts.

250.    The manipulative acts of the RICO Defendants and their concealment and non-disclosure constitute artifices, schemes, or devices designed to defraud Plaintiffs and other members of the Class.  They further constitute acts, practices, and course of business operating as a fraud or deceit upon Plaintiffs and the other members of the Class in connection with their trading in CME Class III milk futures, CME Cheese Spot Call contracts, or the other contracts alleged herein.

251.    In engaging in the manipulative acts alleged above, the RICO Defendants, and each of them, while employed by and associated with the enterprise, knowingly and intentionally:

> a.  made and/or constituted a combination, conspiracy, or contract in
>     unreasonable restraint if trade and commerce to fix, manipulate, and maintain
>     prices in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1; attempted
>     or conspired to monopolize, and did in fact willfully acquire, maintain, and
>     exercise monopoly power over the CME Class III milk futures market for

June, July, and August contracts, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2; and conspired to and did manipulate, in violation of Section 9 of the Commodity Exchange Act, 7 U.S.C. § 13, the price of CME Class III milk futures;

b.  used or caused the use of United States mails, interstate telephone and wire and electronic mail systems, and other instrumentalities of interstate commerce to further the manipulative scheme alleged above to obtain money and property, including from the Plaintiffs and the Class herein described, in violation of, among other statutory provisions, 18 U.S.C. § 1341 (mail fraud), and 18 U.S.C. § 1343 (wire fraud); and

c.  conspired to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d).

252.    Concerning use of the interstate mails, and wires, such use by any one or more or all of the RICO Defendants was reasonably foreseeable. The RICO Defendants, furthermore, by means of the interstate wires and mails, coordinated their efforts artificially to manipulate the price of the commodities alleged herein, to restrain trade as alleged and to monopolize the markets alleged herein.

253.    Thereby, the RICO Defendants conducted and participated, directly or indirectly, in the conduct of such enterprise's affairs through racketeering activity and a pattern of racketeering activity, as those terms are defined in 18 U.S.C. §§ 1961(1)(B) and 1961 (5).

254.    Among other acts, the RICO Defendants used the mails and wires in furtherance of their plan and scheme to fix, manipulate, and maintain prices in violation of Section 1 of the Sherman Act, and to manipulate the market in violation of the Commodity Exchange Act, as set forth above and summarized in part below.

48

255. **DFA**. DFA used the interstate wires and mails to transmit their orders to the CME, their false June 4, 2004 projection to DFA members, and their false statements to the CFTC, newspapers and others.

   a. DFA also used the facilities of electronic communication, the facilities of brokers who executed trades on the floor of the Spot cheese pit at the CME, other interstate facilities to cause the false statements of the artificially inflated prices to be publicly reported throughout the U.S.

   b. DFA also used interstate wires and mails to communicate with the other RICO Defendants.

256. **Hanman**. Using the interstate wires and mails, Hanman: (a) in furtherance of the RICO scheme and conspiracy to inflate milk prices, routinely communicated with the other RICO Defendants about their parallel long positions in CME Class III milk futures; (b) also in furtherance of the conspiracy, communicated with the other RICO Defendants concerning the need to purchase large amounts of CME Spot cheese contracts to further support and inflate CME Class III Milk Futures Contract prices; (c) acting in concert with RICO Defendant Bos, ordered that DFA begin buying cheddar cheese blocks on the CME at $1.80 per pound even though DFA then had too much cheese; and (d) also in furtherance of the conspiracy, made false and misleading statements concerning DFA's reasons for CME cheese purchases, supply and demand, and other facts.

257. **Bos**. Using the interstate wires and mails, and in furtherance of the RICO scheme and conspiracy, Bos: (a) routinely communicated with the other RICO Defendants about their parallel long positions in CME Class III milk futures; (b) communicated with the other RICO Defendants concerning the need to purchase large amounts of CME Spot cheese contracts to

further support and inflate CME Class III Milk Futures Contract prices; and (c) acting in concert with RICO Defendant Hanman, ordered that DFA begin buying cheddar cheese blocks on the CME at $1.80 per pound even though DFA then had too much cheese.

258. **Keller's**. Using the interstate wires and mails, and in furtherance of the RICO scheme and conspiracy, Keller's (a) during April and May 2004, made excessive purchases of CME milk futures contracts; which had the intended effect of artificially inflating CME milk futures contract prices and other prices; (b) combined, conspired, and agreed with the other RICO Defendants to fix, inflate, and manipulate milk and cheese prices; (c) made an agreement or acted in combination with DFA in restraint of trade (¶113); and (d) through Otis and Millar, agreed with DFA to the CME spot purchases.

152. **Otis**. Using the interstate wires and mails, and in furtherance of the RICO scheme and conspiracy, Otis: (a) directed Keller in each of its acts alleged above, (b) ordered excessive purchases by Keller's of CME Milk Futures; and (c) communicated with the other RICO Defendants concerning the need to purchase large amounts of CME Spot cheese contracts to further support and inflate CME Class III Milk Futures Contract prices.

259. **Millar**. Using the interstate wires and mails, and in furtherance of the RICO scheme and conspiracy, Millar: (a) routinely communicated with the other RICO Defendants about their parallel long positions in CME Class III milk future; (b) induced and encouraged DFA personnel to purchase CME Spot cheese "strongly" at $1.80 per pound for the purpose of fixing and inflating CME cheese and Class III milk futures prices; and (c) participated in Keller's decisions to purchase excessive CME contracts.

260. The RICO Defendants' numerous and repeated acts of racketeering activity, as described herein, all occurred after the effective date of RICO and within ten years of each other.

261.     The RICO Defendants repeated and continuous involvement in wire fraud and mail fraud constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5), which threatened to continue in the future. Absent, among other developments, the intervention of the CFTC, these acts would have continued in the future.

262.     The RICO enterprise had a continuity of structure and personnel over many years with the RICO Defendants in control at all relevant times.

263.      The activity alleged herein permitted the RICO enterprise and the RICO Defendants, and each of them, to maintain an anticompetitive and favored position vis-à-vis the general public, and resulted in extensive financial loss to Plaintiffs and the other members of the Class.

264.     The CME market for Class III Milk Futures contracts is an efficient market. Moreover, the material omissions and the artificially inflated prices reported to the public, automatically caused "pocket book" reliance because they were incorporated into minimum price formulas and contract terms.

265.     As a direct and proximate result of the RICO violations of the RICO Defendants, Plaintiffs and the other members of the Class have been injured in their business and/or property as contemplated by 18 U.S.C. § 1962(c). Such violations fraudulently manipulated and inflated the prices for CME Class III milk futures contracts, CME Cheese Spot Call contracts, and the other contracts alleged herein.

266.     In violation of 18 U.S.C. § 1962(d), each of the RICO Defendants agreed with each other to enter into a conspiracy to, and did, in fact, conduct and participate in the affairs of the RICO enterprise directly or indirectly, through a pattern of racketeering activity, which included the repeated acts of mail fraud and wire fraud alleged above.

267. Pursuant to 18 U.S.C. § 1964(c), Plaintiffs and the other members of the Class are entitled to recover treble damages from the RICO Defendants in amounts to be determined at trial, their costs of suit, and reasonable attorneys' fees.

268. Plaintiffs' allegations as to themselves are made upon knowledge. Plaintiffs' other allegations are made upon information derived from public sources. These sources include the files and the cases involving Defendants that have been previously cited herein, CME reports of prices and open interest, CME rules and news articles.

## DEMAND FOR JURY

269. Pursuant to Federal Rule of Civil Procedure 38(b) and otherwise, Plaintiffs respectfully demand a trial by jury.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for relief as follows:

A. That the Court determine this action may be maintained as a class action;

B. That the Court determine Defendants' actions herein are in violation of Section 1 of the Sherman Act and that judgment be entered against Defendants for treble damages as allowed by law;

C. That the Court determine Defendants' actions alleged herein are in violation of Section 2 of the Sherman Act and that judgment be entered against Defendants for treble damages as allowed by law;

D. That the Court determine Defendants' actions alleged herein are in violation of Section 9 of the CEA and that judgment be entered against Defendants for damages as allowed by law;

E.  That the Court determine that Defendants' actions alleged herein are in violation of Racketeer Influenced and Corrupt Practices Act and that judgment be entered against Defendants for damages as allowed by law;

F.  That the Court determine, find and declare that Defendants have been unjustly enriched at Plaintiff's expense and impose a trust upon such unjust enrichment for the benefit of class members;

G.  That Plaintiff and the Class recover their costs, including attorneys' fees;

H.  That injunctive relief be awarded to prevent future anticompetitive and unlawful conduct;

I.  That prejudgment interest be awarded according to law; and

J.  For such other and further relief as this Court may deem just and proper.


Dated:  New York, New York
        March 19, 2010

By: */s/ Mary Jane Fait*
   Mary Jane Fait
Theodore B. Bell
**WOLF HALDENSTIN ADLER FREEMAN &
    HERZ LLP**
55 West Monroe Street, Suite 1111
Chicago, Illinois 60603
Telephone:  (312) 984-0000

Fred Isquith
**WOLF HALDENSTIN ADLER FREEMAN &
    HERZ LLP**
270 Madison Avenue
New York, New York 10016
Telephone:  (212) 545-4600
Facsimile:  (212) 545-4653

Christopher Lovell
Gary S. Jacobson

53

Ian T. Stoll
Christopher M. McGrath
**LOVELL STEWART HALEBIAN &
    JACOBSON LLP**
61 Broadway, Suite 501
New York, New York 10006
Telephone:  (212) 608-1900
Facsimile:  (212) 719-4775

*Interim Co-Lead Counsel For Direct Purchaser
Plaintiffs*

Jeffrey A. Leon
**FREED & WEISS LLC**
111 West Washington Street, Suite 1331
Chicago, Illinois 60602
Telephone:  (312) 220-0000

Marvin A. Miller
Matthew E. Van Tine
**MILLER LAW LLC**
115 South LaSalle St., Suite 2910
Chicago, Illinois 60603
Telephone:  (312) 332-3400

James E. Cecchi
**CARELLA, BYRNE, BAIN, GILFILLAN,
    CECCHI, STEWART & OLSTEIN**
5 Becker Farm Road
Roseland, New Jersey 07068

*Other Counsel For Direct Purchaser Plaintiffs*

## CERTIFICATE OF SERVICE

I, Mary Jane Fait, hereby certify that, due to a technical failure relating to ECF, the Direct Purchaser Plaintiffs were unable to file the foregoing ***Consolidated Class Action Complaint*** on March 19, 2010 via ECF.  Service of the foregoing ***Consolidated Class Action Complaint*** was accomplished on all counsel of record pursuant to ECF as to Filing Users on March 20, 2010. The foregoing documents were also served via U.S. Mail Delivery and email transmission on the following counsel:

Paul W. Rebein
**REBEIN LAW FIRM PLLC**
500 East Kennedy Blvd., Suite 100
Tampa, FL 33602
Email: paul@rebeinlaw.com

_/s/ Mary Jane Fait_____
Mary Jane Fait