UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| IN RE: DAIRY FARMERS OF AMERICA, INC. CHEESE ANTITRUST LITIGATION | ) **JURY TRIAL DEMANDED** |
| | ) |
| | ) No. 09-cv-03690 |
| | ) No. 09-cv-40170 |
| THIS DOCUMENT RELATES TO: | ) |
| | ) MDL No. 2031 |
| ALL INDIRECT PURCHASER ACTIONS | ) |
| | ) Judge William J. Hibbler |
| | ) |

## FIRST AMENDED CLASS ACTION COMPLAINT

Plaintiffs, on behalf of themselves and all others similarly situated, bring this action for damages, disgorgement, injunctive relief and costs of suit including reasonable attorneys' fees for injuries to themselves and members of the proposed class they represent. The allegations set forth below are based upon information and belief pursuant to the investigation of counsel, except as to those allegations regarding the Plaintiffs.

## INTRODUCTION

1.     This action arises from Defendants' conspiracy to fix, stabilize, raise and maintain the wholesale price of milk and cheese through the manipulation of trading on the Chicago Mercantile Exchange ("CME"). To further their conspiracy, Defendants manipulated and raised the prices for cheese on the Chicago Mercantile Exchange ("CME") Cheese Spot Call Auction market. They did so because these contracts are used as a basis for the milk contract prices with the United States Department of Agriculture ("USDA") and wholesale whole milk and cheese prices with their customers. Defendants' primary business is the sale of milk and to a lesser extent, cheese. The CME cheese market is thinly traded representing about one percent of the nationwide supply of cheese. Accordingly, the loss that was suffered from buying these limited

number of cheese contracts on the CME was more than off-set by the profits made from the increase in milk and cheese prices caused by the engineered spike in CME cheese spot prices.

2.      This behavior strips the Defendants of any immunity under the Capper-Volstead Act.  It renders the Defendants – cooperatives of 18,000 dairy farmers – liable as naked combinations among competitors in unreasonable restraint of trade.

3.      On December 18, 2008, the Commodity Futures Trading Commission ("CFTC") concluded its investigation of Defendant Dairy Farmers of America, Inc.'s ("DFA") trading activity and ordered DFA to pay a $12 million fine for its market manipulation of the CME.  The order was the result of an agreement between the CFTC and DFA and does not purport to address the entirety of Defendants' illegal conduct.

4.      Indeed, manipulation of cash commodity markets such as the CME Cheese Spot Call Auction market falls outside the CFTC's jurisdiction unless it impacts commodities futures trading.  Thus, the CFTC's investigation of such conduct is necessarily limited and does not purport to address the entirety of DFA's conduct relating to the CME Cheese Spot Call Auction market.

5.      As a direct, foreseeable and intended result of Defendants' scheme, Plaintiffs and the Class paid artificially inflated prices for Dairy Products (as defined below) at retail establishments throughout the United States.

<u>JURISDICTION AND VENUE</u>

6.      Plaintiffs' and class members' claims arise under §§ 1 and 2 of the Sherman Act (15 U.S.C. §§ 1 & 2) and the antitrust and consumer protection statutes and common law of 48 states and the District of Columbia.  This Court has original jurisdiction over the federal claims pursuant to § 16 of the Clayton Act (15 U.S.C. § 26) and 28 U.S.C. §§ 1331 and 1337.  This

Court also has jurisdiction over this entire action pursuant to 28 U.S.C. § 1332(d) because one plaintiff and one defendant are citizens of different states and the amount-in-controversy sought on behalf of the Class exceeds $5 million exclusive of interest and costs. In addition, this Court has supplemental jurisdiction over the state claims pursuant to 28 U.S.C. § 1367 because they arise out of a common nucleus of operative facts of the federal claims asserted in this action.

7.      Venue is proper in the District of Vermont pursuant to § 12 of the Sherman Act (15 U.S.C. § 22) and 28 U.S.C. § 1391 because Defendants transact business and may be found in the District of Vermont.

8.      Defendants' activities were intended to, and did have, a substantial effect on interstate and intrastate commerce. They had a substantial intended, direct and foreseeable effect on the prices of Dairy Products in each and every state in the continental United States and the District of Columbia.

<div align="center">PARTIES</div>

Plaintiffs

9.      Plaintiff Jacqueline A. Rudman a/k/a Jacqueline Rudman Jurkowicz is a citizen of the State of New York. She purchased one or more Dairy Products indirectly for her own consumption and not for resale from the DFA Family and Keller's between April 14, 2004 and December 16, 2008 in the State of New York.

10.     Plaintiff Brandi Palombella is a citizen of the Commonwealth of Massachusetts. She purchased one or more Dairy Products indirectly for her own consumption and not for resale from the DFA Family and Keller's between April 14, 2004 and December 16, 2008 in the States of Tennessee and New York.

The DFA Family

11.     Defendant Dairy Farmers of America, Inc. is a not-for-profit corporation organized and existing under the laws of the State of Kansas with its principal place of business in Kansas City, Missouri.  DFA is a vertically integrated cooperative of 18,000 raw milk producers in 48 states and owns and operates its own hauling companies, processing plants and distribution centers for milk and cheese throughout the country.

12.     Defendant Keller's Creamery LP ("Keller's") is a limited partnership with its principal place of business in Kansas City, Missouri.  In or about January 2005, DFA acquired Keller's.  Until that time, DFA had no control of Keller's.  Keller's manufactures and sells various dairy products and until DFA's acquisition of it, Keller's competed with DFA.

13.     National Dairy Holdings, LP ("NDH") is a limited partnership organized and existing under Delaware law with its principal place of business in Dallas, Texas.  NDH is one of the largest dairy processors in the United States.  NDH is the parent company of Borden Dairy, Meadow Gold, Flav-O-Rich and Dairy Fresh.  NDH's direct or indirect subsidiaries own and operate plants that process DFA's raw milk.  Until May 2009, DFA owned an 87.5 percent common equity interest and 92 percent preferred equity interest in NDH.

14.     DFA, NDH (before DFA's sale of its interest) and Keller's (after its acquisition by DFA) and their direct and indirect subsidiaries and any and all other entities in which DFA has or had control since April 2004 are hereinafter referred to as the DFA Family.

15.     The DFA Family manufacture and sell milk, cheese and butter throughout the United States under the brand names, *inter alia*, Borden, Mid-America Farms, Hotel Bar, Breakstone's, Plugra, Roberts, Hiland Dairy Foods, Stremick's-Heritage Foods, Wilcox Dairy Farms, HP Hood, Meadow Gold, Flav-O-Rich, Dairy Fresh, Helluva Goods, Maggio, Penn

4

Maid, Dairymens, Chattanooga Dairy, Velda Farms, Coburg Milk, Goldenrod Dairy Foods, Cream O Webber and Stinton Dairy.

<div align="center">CO-CONSPIRATORS</div>

16.     Various individuals and entities that are presently unknown to Plaintiffs participated as co-conspirators with Defendants in the wrongful conduct alleged herein and have engaged in conduct and made statements in furtherance of the conspiracy.

17.     The acts charged in this Complaint were done or authorized by Defendants or their co-conspirators' officers including but not limited to Gerald Bos (DFA's Chief Financial Officer from January 1, 1998 to December 31, 2005), Gary Hanman (DFA's President and Chief Executive Officer from January 1, 1998 to December 31, 2005), Frank Otis (Keller's Chief Executive Officer) and Glenn Millar (Keller's Vice President of Procurement Operations), agents, employees or representative while actively engaged in the management of their business or affairs.

<div align="center">THE CME AND ITS EFFECT ON MILK AND CHEESE PRICES</div>

**The CME Cheese Spot Call Auction Market Is a Relevant Market**

18.     The CME is a commodity exchange.  To the extent that commodity futures contracts are traded on the CME, the CME must be licensed by the CFTC pursuant to the Commodity Exchange Act (7 U.S.C. § 1 *et seq.*).  To receive a license, the CFTC was required to, and did in fact, determine that the CME has adequate rules and policies that if obeyed would prevent market manipulation.

19.     Cash markets on the CME such as the Cheese Spot Call Auction market are unregulated by any government agency and fall outside the scope of the CFTC's jurisdiction.

<div align="center">5</div>

The CFTC can only investigate trading in such markets to the extent it impacts commodity futures trading.

20.     The CME is not a member of the DFA, Keller's or any cooperative.  It is not a producer of agricultural products or a cooperative of producers of agricultural products.  It is not engaged in the processing, preparing for market, handling or marketing of agricultural products.

21.     The CME Cheese Spot Call Auction market conducts trading in both cheddar cheese 40-pound blocks and 500-pound barrels during 15-minute weekday sessions.  CME members trade cheddar cheese blocks by posting bids and offers on a board.  The final transaction price or the final unfilled bid or offer, if different from the last transaction price, during the trading session determines the block and barrel settlement prices for the day.

22.     The CME Cheese Spot Call Auction market is the only commodity exchange market for cheddar cheese in the United States.  It brings together participants in the cheese industry that have interests in buying or selling cheese for immediate delivery.

23.     The CME has created a uniquely efficient market for the trading of cheddar cheese for immediate delivery by, among other things, creating standardized contract terms, rules governing trading behavior and public schedule for trading.  Chapter 53S of the CME Rulebook provides detailed standardized contract terms that include specifications on the quality and color of the cheese; quantities of cheese; settlement procedures for transactions; allowances for deviations from contract terms; the method to calculate freight charges for shipments; packaging; reimbursement for the cost of packaging; rules governing inspection of the cheese; arbitration for disputes and a method to calculate compensation in the event of default.  These rules minimize the transaction costs for traders.

24.     Because no government entity has authority to regulate cash price commodity exchange markets, the CME fills the gap with its own rules and enforcement mechanisms to minimize manipulation of prices on the exchange.   The CME can impose fines of up to $1,000,000 on its members for each violation of its rules.

25.     Because of its unique attributes, traders on the exchange, including participants in the dairy industry, do not have any reasonably available alternatives to the CME Cheese Spot Call Auction market to conduct the transactions for which they use that market.

**Manipulation of the CME Cheese Spot Call Auction Market**

26.     At all relevant times, Defendants knew that the CME Cheese Spot Call Auction market was vulnerable to manipulation as it comprises less than two percent of the annual U.S. supply of cheddar cheese.

27.     Defendants knew that since 1999 or earlier "the Chicago Mercantile Exchange (CME) ... spot cheese market ... impacts the prices of virtually all cheese traded in the United States as well as producer milk prices and milk futures contracts.  ...  Cheese producers generally use CME spot cheese market prices to set their sales prices, according to industry participants. In turn, minimum prices for raw farm milk bought by many cheese manufacturers are set using a U.S. Department of Agriculture (USDA) pricing formula whose most significant commodity component is the weekly average of cheddar cheese prices drawn from a survey of large cheese manufacturing plants.  Futures contracts for milk used in manufacturing cheese are also settled at expiration using the minimum price for milk as determined by the pricing formula." *Spot Cheese Market: Market Oversight Has Increased, But Concerns Remain about Potential Manipulation* ("GAO Report") at 5 (June 2007).  Available at http://www.gao.gov/new.items/d07707.pdf.

28.     CME spot cheese prices are also used as component for the pricing of Class I milk by, *inter alia*, the USDA and State of California.  Class I milk is fluid milk that is of sufficient quality to be processed into beverages.  Private industry participants throughout the nation use the prices set by the USDA and State of California for Class I milk as the mechanism for pricing in their contracts for the sale/purchase of Class I milk and products containing Class I milk.  An increase in the price of CME spot cheese prices would therefore have the effect of increasing the price of Class I milk and products containing Class I milk.

29.     Thus, Defendants knew that manipulation of the CME Cheese Spot Call Auction market that would cause an artificial increase in the prices on that market would have the effect of increasing the prices of wholesale milk and cheese and USDA Class I and III fluid milk prices throughout the United States.  Class III fluid milk is used to produce all cheeses (other than cottage cheese), including but not limited to hard and soft cheeses, cream cheese, stirred cheese curd, and creamy cheese bases or mixes.  Accordingly, Defendants' conduct had the effect of increasing the retail price of milk consumed as a beverage, all cheeses produced with Class III fluid milk as well as cheddar cheese ("Dairy Products").

30.     Defendants also knew that the CME Cheese Spot Call Auction market was vulnerable to manipulation because (1) it is thinly traded; (2) a relatively few number of traders make the predominate number of transactions; and (3) the pricing structure does not necessarily reflect the actual cost of buying and selling cheese.

31.     As the GAO explained, "the spot cheese market remains a thin market, which in combination with the presence of a small number of traders that make a majority of trades and the spot cheese market's pricing structure contributes to questions about the potential for price manipulation.  A thin market generally has either few transactions; transactions that represent

8

only a small proportion of the total transactions, including those that are priced off that market; or both. ... Little trading occurs on the CME spot cheese market, and the trading that does take place consistently represents a small proportion of the total volume of cheese produced in the United States. ... [T]he volume of cheese traded at CME generally represented less than 2 percent of all cheddar cheese and less than 1 percent of all cheese produced in the United States annually. ... [T]hin markets raise concerns about the potential for manipulation because of the small number of participants and transactions involved in the market and the ease with which prices can be impacted. For example, in thinly traded markets each individual participant's activity tends to be more influential than it would be on a market with more transactions and more participants. As a result, it may be easier for a market participant to move prices in a preferred direction over a short period of time with relatively few completed or unfilled transactions. Further, individual transactions to buy and sell cheese that set the market price may not accurately reflect supply and demand. Further, the CME spot cheese market has a small number of traders who make the majority of trades, another factor that contributes to questions about possible price manipulation. ... The CME spot cheese market's pricing structure, in combination with a thinly traded market and a small number of traders who comprise the majority of trading, contributes to questions about the potential for price manipulation. ... [P]rices at the CME spot cheese market are based on completed transactions and on unfilled higher bids and uncovered lower offers that are posted by market participants. During a trading session an unfilled bid that is higher than the previous bid or transaction price can result in a higher price. Similarly, an uncovered offer that is lower than the previous offer or transaction price can result in a lower price. ... [T]his pricing structure may increase opportunities to

ultimately change the price of milk without reference to the actual costs of buying and selling cheese." GAO Report at 9-13.

32. In its Order, the CFTC found "[b]eginning on April 14, 2004, as sellers offered cheddar blocks on the CME Cheese Spot Call, DFA purchased block cheddar cheese. From May 21 to June 23, 2004, DFA ... purchased and took delivery of a total of 323 loads (approximately 40,000 pounds per load) of cheddar cheese blocks at $1.80 per pound on the CME Cheese Spot Call. During this period, DFA was the sole purchaser of cheddar cheese blocks on the CME." Order at 2-3.

33. Defendants' continued their market manipulation after June 23, 2004. For example, DFA made large purchases of CME cheddar cheese blocks in August and September 2004 when it purchased about 100 truckloads of cheese.

34. DFA cornered the market giving it a 100 percent market share in the CME Cheese Spot Call Auction market during the periods of time when it purchased inordinate amounts of cheddar cheese blocks on the CME.

35. DFA processed and sold the cheese that it purchased on the CME outside of the CME at a substantial loss.

36. The purchases of these large quantities of cheese on the CME, and subsequent sale of that cheese at a loss would make no economic sense solely with respect to its trading activities on the CME. It was only rational, profit-maximizing behavior because it allowed Defendants to secure artificially inflated prices on its subsequent sales of raw milk, cheese and processed dairy products.

37. DFA admitted that its market manipulation scheme in 2004 increased revenue to dairy farmers by $1.3 billion, $278 million of which went to its members.

## AFFIRMATIVE CONCEALMENT

38.     Defendants made false public statements about the nature of their trading activities in furtherance of the conspiracy.  For example, in a December 30, 2004 article, the *Chicago Tribune* reported that it was advised by the DFA that its trading activities on CME Cheese Spot Call Auction market were "proprietary."

39.     There was nothing "proprietary" about the DFA's trading activities.  They were simply a naked manipulation of the CME Cheese Spot Call Auction market through purchasing all available cheese on that market.

40.     Defendants knew that unless they revealed these activities, they would be impossible to detect because the identity of trading participants on the CME Cheese Spot Call Auction market are secret.

41.     Plaintiffs did not and could not discover through reasonable diligence the conspiracy and market manipulation scheme until the CFTC publicly announced its findings on December 16, 2008.

## INJURY

42.     Food distributors and retailers of Dairy Products such as supermarkets and convenience and grocery stores – are in a fiercely competitive industry.  They operate on slim margins.  They have the ability to change prices frequently and cheaply.  They cannot afford to absorb price increases and remain profitable.  As a result, they typically pass on entire price increases to their customers such as Plaintiffs and the Class.

43.     As a direct and foreseeable consequence of Defendants' illegal behavior, Plaintiffs and the Class members have been injured in their property in a manner that the federal and state antitrust and consumer protection laws were designed to protect.  They have been

required to pay more for Dairy Products than they would have in the absence of the wrongful

conduct. Defendants' wrongful conduct has resulted in artificially inflated prices for Dairy

Products in each and every state in the continental United States and District of Columbia.

## CLASS ACTION ALLEGATIONS

44. Plaintiffs bring this action on their own behalf and on behalf of all others

similarly situated. The "Class" is defined as:

> All persons or other legal entities (excluding Defendants, their officers,
> directors, subsidiaries or affiliates), who purchased Dairy Products
> indirectly for themselves and not for resale in the continental United States
> and District of Columbia, between April 1, 2004 and December 16, 2008.

45. The members of the Class are so numerous that joinder of all of them would be

impracticable. The exact number of Class members is unknown by Plaintiffs at this time, but

Plaintiffs believe them to number in the millions.

46. Plaintiffs' claims are typical of the Class members. Plaintiffs and all Class

members were impacted and damaged in the same manner by Defendants' wrongful conduct.

Plaintiffs and the Class members purchased Dairy Products at artificially inflated prices because

of Defendants' wrongful conduct.

47. Plaintiffs will fairly and adequately protect the interest of the Class. Plaintiffs'

interests are coincident with, and not antagonistic to, those of the Class. Plaintiffs also have

retained counsel who have experience in the litigation of complex antitrust class actions

including of the type of claims alleged herein.

48. Questions of law and fact common to the Class members predominate over

questions that may affect only individual Class members. Defendants have acted on grounds

generally applicable to the entire Class. Common questions of law and fact include, but are not

limited to:

a.   Whether Defendants conspired to fix, raise, maintain or stabilize prices for wholesale milk and cheese;

b.   Whether the CME Cheese Spot Call Auction market is a relevant market;

c.   Whether DFA acquired market power in the CME Cheese Spot Call Auction market;

d.   Whether Defendants' conduct violated § 1 of the Sherman Act;

e.   Whether DFA's conduct violated § 2 of the Sherman Act;

f.   When Defendants took affirmative steps to conceal their illegal behavior;

g.   Whether Defendants' conduct caused the prices that Plaintiffs and the Class paid for Dairy Products to be higher than they would have been in the absence of the wrongful conduct;

h.   Whether Defendants' conduct violated the state statutes alleged in Count Four;

i.   Whether Defendants were unjustly enriched by Plaintiffs and the Class and should be required to disgorge the benefits conferred on it as alleged in Count Five;

j.   Whether Plaintiffs and the Class are entitled to equitable and injunctive relief and the nature of such relief.

49.   Class action treatment is superior to any other method for the fair and efficient adjudication of this controversy.  Class action treatment will permit, among other things, (1) millions of similarly situated persons to prosecute their claims in a single forum avoiding the duplication that individual actions would require and (2) adjudication of the Class' relatively small claims which would otherwise go unaddressed because the expense of prosecuting them would greatly outweigh the potential recovery in any individual action.

50.   There are no difficulties that will be encountered in maintenance of this action

that would otherwise preclude its treatment as a class action.

COUNT ONE

(*PER SE* VIOLATIONS OF § 1 OF THE SHERMAN ACT)

(FOR INJUNCTIVE RELIEF ONLY)

51.     Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs as if fully set forth herein.

52.     Defendants entered into contracts, combinations and agreements in unreasonable restraint of trade.

53.     These contracts, combinations and agreements constitute *per se* violations of § 1 of the Sherman Act (15 U.S.C. § 1).

54.     Plaintiffs have no adequate remedy at law and are threatened with harm to their property by reason of Defendants' violations of the Sherman Act.  Accordingly, Plaintiffs are entitled to injunctive and equitable relief pursuant to § 16 of the Clayton Act (15 U.S.C. § 26).

COUNT TWO

(QUICK LOOK/RULE OF REASON VIOLATIONS OF § 1 OF THE SHERMAN ACT)

(FOR INJUNCTIVE RELIEF ONLY)

55.     Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs as if fully set forth herein.

56.     The CME Cheese Spot Call Auction market is a relevant market.

57.     The anticompetitive effects of the agreements into which Defendants entered herein outweighed any purported procompetitve benefits in the relevant market or any market.

58.     These agreements caused prices in the relevant market to rise and the amount of cheese sold in the relevant market to decrease.  It also caused the prices for wholesale milk and

14

cheese to rise and production and the amount of wholesale milk and cheese purchased to decrease.

59.     By reason of the foregoing, Defendants have violated § 1 of the Sherman Act.

## COUNT THREE

### (MONOPOLIZATION IN VIOLATION OF § 2 OF THE SHERMAN ACT)

### (AGAINST DFA ONLY)

### (FOR INJUNCTIVE RELIEF ONLY)

60.     Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs as if fully set forth herein.

61.     DFA wrongfully acquired monopoly power in the relevant market.

62.     DFA's monopolization of the CME Cheese Spot Call Market caused prices in the relevant market to rise and the amount of cheese sold in the relevant market to decrease.  It also caused the prices for wholesale milk and cheese to rise and production and the amount of wholesale milk and cheese purchased to decrease.

63.     By reason of the foregoing, DFA violated § 2 of the Sherman Act.

64.     Plaintiffs have no adequate remedy at law and are threatened with harm to their property by reason of DFA's violations of the Sherman Act.  Accordingly, Plaintiffs are entitled to injunctive and equitable relief pursuant to § 16 of the Clayton Act (15 U.S.C. § 26).

## COUNT FOUR

### (STATE STATUTES)

65.     Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs as if fully set forth herein.

66.     Defendants' wrongful conduct violates the statutes in the following states and

District of Columbia:

    a.  Arizona (Uniform State Antitrust Act, Ariz. Rev. Stat. Ann. § 44-1402);

    b.  Arkansas (Deceptive Trade Practices Act, Ark. Code Ann. § 4-88-107(a));

    c.  Arkansas (Deceptive Trade Practices Act, Ark. Code Ann. § 4-88-108);

    d.  California (Cartwright Act, Cal. Bus. & Prof. Code §§ 16722 & 16726);

    e.  District of Columbia (Antitrust Act, D.C. Code Ann. § 28-4502);

    f.  Florida (Deceptive & Unlawful Trade Practices Act, Fla. Stat. § 501.204);

    g.  Idaho (Consumer Protection Act, Idaho Code § 48-603);

    h.  Iowa (Competition Law, § 553.4);

    i.  Kansas (Restraint of Trade Act, Kan. Stat. Ann. § 50-112);

    j.  Kansas (Unfair Trade and Consumer Protection Act, Kan. Stat. Ann. § 50-626);

    k.  Maine (ME Rev. Stat. Ann., Tit. 10, § 1101);

    l.  Maine (Unfair Trade Practices Act, ME Rev. Stat. Ann., Tit. 5, § 207);

    m.  Michigan (Antitrust Reform Act, Section 2, Mich. Comp. Laws Ann. § 445.772);

    n.  Minnesota (Antitrust Law, Minn. Stat. § 325D.51);

    o.  Mississippi (Miss. Code Ann. § 75-21-1);

    p.  Montana (Unfair Trade Practices and Consumer Protection Act, Mont. Code Ann. § 30-14-205);

    q.  Montana (Unfair Trade Practices and Consumer Protection Act, Mont. Code Ann. § 30-14-103);

    r.  Nebraska (Junkin Act, Neb. Rev. Stat. § 59-801);

    s.  Nebraska (Consumer Protection Act, Neb. Rev. Stat. § 59-1602 & 1603);

    t.  Nevada (Unfair Trade Practices Act, Nev. Rev. Stat. § 598A.06);

u.  New Hampshire (N.H. Rev. Stat. Ann. § 356:2);

v.  New Hampshire (N.H. Rev. Stat. Ann. § 358-A:2);

w.  New Mexico (Antitrust Reform Act, N.M. Stat. Ann. § 57-1-1);

x.  New York (Donnelly Act, N.Y. Gen. Bus. Law § 340(1));

y.  North Carolina (N.C. Gen. Stat. § 75-1);

z.  North Dakota  (Uniform State Antitrust Act, N.D. Cent. Code, § 51.08.1-02);

aa.   South Dakota (Antitrust Law, S.D. Codified Laws Ann. § 37-1-3.1);

bb.  South Dakota (Unfair Practices and Consumer Protection Law, S.D. Codified Laws Ann. § 37-24-6);

cc.   Tennessee (Trade Practices Act, Tenn. Code Ann. § 47-25-102);

dd.  Utah (Consumer Protection Sales Practices Act, Utah Code Ann. § 13-11-4);

ee.  Utah (Consumer Protection Sales Practices Act, Utah Code Ann. § 13-11-5);

ff.  Vermont (Vermont Consumer Fraud Act, 9 Vt. Stat. Ann. § 2453);

gg.  West Virginia (Antitrust Act, W.Va. Code § 47-18-3);

hh.  Wisconsin (Antitrust Act, Wis. Stat. Ann. § 133.03);

a.  Wyoming (Wyo. Stat. Ann. § 40-4-1).

67.    Defendants' conduct was a willful, deliberate, malicious and flagrant violation of the foregoing state antitrust and consumer protection laws.

<u>COUNT FIVE</u>

(UNJUST ENRICHMENT)

68.    Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs as if fully set forth herein.

69.    Through paying more for Dairy Products than they would have in the absence of

17

Defendants' wrongful conduct, Plaintiffs and the Class have conferred a benefit on the Defendants, which Defendants have unjustly retained.

70.     As a result of Defendants' wrongful conduct, Defendants were able to charge more for wholesale milk and cheese, which overpayments were made by Plaintiffs and the Class.

71.     Defendants have been unjustly enriched by overpayments made by Plaintiffs and the Class.  Equity demands that Defendants be required to make restitution and return the overpayments to Plaintiffs and the Class.

PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray that the Court enter judgment as follows:

a.     Determining that this action may be maintained as a class action pursuant to Rules 23(b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure;

b.     Remanding this case to the United States District Court for the District of Vermont at the conclusion of pre-trial proceedings pursuant to 28 U.S.C. § 1407(a);

c.     Enjoining Defendants from manipulating any market on the CME and ordering such other relief to remediate the market and contractual conditions that would render such wrongful behavior profitable in the future;

d.     Awarding Plaintiffs and the relevant Class members compensatory damages under the state statutes in an amount to be proven at trial, trebled according to law against Defendants, jointly and severally;

e.     Awarding Plaintiffs and the relevant Class members compensatory damages in an amount to be proven at trial under the state unfair competition, consumer protection and deceptive trade practices laws;

f.     Awarding Plaintiffs and the relevant Class members punitive, exemplary,

statutory, and full consideration damages under the state laws that permit such recoveries;

g.      Ordering Defendants to disgorge their profits earned as a result of their wrongful conduct and ordering them to make restitution to Plaintiffs and the Class;

h.      Awarding Plaintiffs and the Class pre-judgment and post-judgment interest;

i.      Awarding Plaintiffs and the Class their costs of suit, including reasonable attorneys' fees; and

j.      Granting Plaintiffs and the Class such other and further relief as the Court deems just and proper.

<u>JURY TRIAL DEMAND</u>

Pursuant to Rule 37(b), Federal Rules of Civil Procedure, Plaintiffs and the Class demand a trial by jury on all claims alleged herein that are so triable.

Dated:  May 21, 2010

<div style="margin-left: 50%;">

<u>s/ Matthew S. Wild</u>
Matthew S. Wild
Wild Law Group PLLC
500 Mamaroneck Avenue, Suite 320
Harrison, New York 10528
Tel. (914) 358-6443
Fax (914) 358-6453
mwild@wildlawgroup.com

Ilan Chorowsky
Progressive Law Group LLC
222 W. Ontario, Suite 310
Chicago, IL 60610
Tel. (312) 787-2717
ilan@progressivelaw.com

Interim Lead and Liaison Counsel
for Indirect Purchaser Class and
Plaintiffs

</div>

## CERTIFICATE OF SERVICE

I, Ilan Chorowsky, hereby certify that a copy of the foregoing pleading was filed electronically on May 21, 2010, with the United States District Court for the Northern District of Illinois, Eastern Division. Notice of this filing will be served upon counsel for the parties of record by operation of the Court's electronic filing system.

/s Ilan Chorowsky