# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

IN RE: DAIRY FARMERS OF AMERICA, )
INC. CHEESE ANTITRUST LITIGATION )  Master File No. 09 C 3690
_____ )  MDL No. 2031
              )
THIS DOCUMENT RELATES TO:   )  The Honorable William J. Hibbler
              )
All Direct Purchaser Actions     )

## MEMORANDUM OPINION AND ORDER

This multi-district litigation is a consolidation of suits by multiple Plaintiffs that claim, among other things, various antitrust violations by Defendants. One purported class of Plaintiffs, hereinafter referred to as the "Direct Purchaser Plaintiffs," has filed a Corrected Consolidated Class Action Complaint that makes claims of: (1) a contract, combination, or conspiracy in restraint of trade in violation of the Sherman Act, 15 U.S.C. § 1; (2) monopolization in violation of the Sherman Act, *id.* at § 2; (3) attempted monopolization in violation of the Sherman Act, *id.*; (4) manipulation in violation of the Commodity Exchange Act (CEA), 7 U.S.C. § 1 *et seq.*; (5) unjust enrichment and restitution under common law; and (6) violations of the Racketeering Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1961 *et seq.* Defendants now move to dismiss the complaint. They have filed five different motions to dismiss, each addressing different aspects of the complaint, and have joined in each other's motions. More specifically, Defendants Gary Hanman and Gerald Bos move to dismiss Counts 1-3 of the complaint as against all of the Individual Defendants (Hanman, Bos, Frank Otis, and Glenn Millar). Defendants Otis and Millar move to dismiss Count 6. Defendants Dairy Farmers of America (DFA) and Keller's Creamery LP move to dismiss each of the six counts, in whole or in part. Finally, the various Keller's Creamery entities, which include Keller's Creamery LLC,

1

Keller's Creamery LP, and Keller's Creamery Management LLC, have filed two motions to dismiss the entire complaint as against those entities. All of the motions are made, at least in part, for failure to state a claim, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. However, the Keller's entities' motions also include requests for relief for lack of personal jurisdiction, insufficient process, and insufficient service of process pursuant to Rules 12(b)(2), 12(b)(4), and 12(b)(5), respectively. For the following reasons, the Court: grants the motion to dismiss Count 6 filed by Defendants Otis and Millar; grants Keller's Creamery LLC's motion to dismiss pursuant to Rule 12(b)(5); grants Keller's Creamery Management LLC's motion to dismiss, but denies it as to Keller's Creamery LP; and grants the remaining motions in part and denies them in part.

## I.    Factual background

Direct Purchaser Plaintiffs allege the following facts, which the Court must accept as true for purposes of the Rule 12(b)(6) motions. *Disability Rights Wisc., Inc. v. Walworth County Bd. of Supervisors*, 522 F.3d 796, 799 (7th Cir. 2008).

To put Plaintiffs' allegations simply, they claim the Defendants' conspired to, and did in fact, buy up all of the available long positions in three months' worth of Class III milk futures contracts on the Chicago Mercantile Exchange (CME) in an effort to gain control of those markets and sell their positions at an unreasonably high price. In order to successfully pull off their scheme, Defendants also purchased large quantities of cheese at inflated prices on the CME spot cheese market, thereby creating the false impression that Class III milk prices were rising. By creating that impression, they could justify charging the inflated prices for their futures positions and maintain those prices long enough to sell off all of their positions at a profit. Plaintiffs allege that they were injured by Defendants' actions when they purchased CME Class

2

III milk futures, CME spot cheese, and other related products at artificially inflated prices. Finally, they allege that the Defendants compounded the effects of their actions by conspiring to conceal their scheme for years after they had sold off all of their futures positions.

## A. The parties

The named plaintiffs in this case are various businesses that purchased or traded either milk futures on the CME, or commodities that were priced on the basis of CME and government minimum milk prices, during the relevant time period. They define the class they purport to represent as follows:

> All persons who, between April 1, 2004 through December 31, 2006 purchased (1) a CME Class III milk futures contracts [sic][,] (2) a CME spot cheese contract, (3) cheese or milk within a contract the price of which was based on the CME price or a government minimum price formula or (4) wholesale cheese or raw milk.

Plaintiffs name both organizational and individual defendants. Defendant Dairy Farmers of America (DFA) is a purported dairy marketing cooperative owned by more than 18,000 dairy farmers in 48 states. Defendant Hanman was the President and Chief Executive Officer of DFA from January 1, 1998 until December 31, 2005. Defendant Bos was Chief Financial Officer of DFA during the same period.

Plaintiffs name three separate entities called Keller's Creamery: Keller's Creamery LLC, Keller's Creamery LP, and Keller's Creamery Management LLC. Each of these entities at some point allegedly engaged in the manufacture of butter. Defendants Otis and Millar were officers in each. In 2005, these organizations, in whatever form they survived at the time, were merged into DFA. However, the specifics of the relationships between the various Keller's entities and their business structures are not relevant to the resolution of most of the motions addressed herein. In fact, they are only relevant to the two motions filed exclusively by the Keller's entities

3

contesting their capacity to be sued.[1] Thus, outside of its analysis of those two motions, the Court will refer to the Keller's entities collectively as "Keller's" for the sake of convenience.

## B. The Chicago Mercantile Exchange, milk futures, & spot cheese

The CME is the world's largest commodity futures exchange. It serves as a market for trading a number of commodities and futures contracts. Futures contracts are a type of "derivative," meaning they derive their value from the value of the underlying commodity. In this case, Plaintiffs' allegations concern Class III milk futures contracts, which derive their value from the value of Class III milk.[2]

Generally speaking, the parties to a futures contract agree to the sale of the underlying commodity on some future date certain at a price determined on the date of the agreement. In other words, the seller promises to deliver a predetermined amount of the commodity to the buyer on the date certain, and the buyer promises to pay the agreed-upon price. Thus, if prices for the commodity go up in the meantime, the buyer benefits because he or she has the right to purchase the commodity for less than the market value. If, on the other hand, prices go down, the seller benefits because he or she has the right to sell the commodity for more than the market value. The buyer's stake in the commodity's rising price is known as the "long position," and the buyer is colloquially referred to as the "long." By contrast, the seller takes the "short position," and is known as the "short."

---

[1] Throughout their motions to dismiss, Defendants make reference to their dissatisfaction with Plaintiffs' characterization of the structures of and relationships between the organizational Defendants. For instance, they suggest that Plaintiffs' antitrust allegations are misguided because DFA has never been a horizontal competitor with any of the Keller's Creamery Defendants. However, Defendants seem to concede early on that, given the standard of review at the motion to dismiss stage, they will have to wait until the summary judgment stage to prove the Defendants' relationships and fully engage in such arguments. Nonetheless, Defendants dedicate significant portions of their reply briefs to more thorough elaborations on their earlier suggestions. Whether these are inappropriate attempts to engage in argument for the first time on reply, or more innocent attempts to provide some context for other arguments, the Court agrees with and accepts Defendants' earlier concessions and declines any actual or implied invitation to address arguments of this sort.

[2] Class III milk is raw (non-pasteurized) milk used primarily for the production of cheese.

4

As futures markets have developed, however, the links between futures and underlying commodities has become more attenuated. This is due, in large part, to the fact that many people who engage in futures trading are speculators who are not actually interested in the underlying commodity itself. Some traders are simply interested in the profits they may realize through successful speculative trading. Others who do have an interest in the underlying commodity or a related market may use futures trading to "hedge" against rising or falling prices. For instance, Plaintiffs claim that DFA, as a marketer of raw milk, has an inherent interest in the price of raw milk rising. Thus, in order to hedge against the possibility of an unexpected drop in milk prices, they might take some short positions in Class III milk futures contracts so that they would cover their losses at least in part.

The most notable change in the operation of futures markets as a result of this change in traders' interests, at least for purposes of this case, is that the parties to many types of futures contracts do not ever exchange the underlying commodity. Instead, many futures, such as CME Class III milk futures, "cash settle." In other words, the parties pay each other based on the fluctuation of the price of Class III milk.

This process is facilitated through the use of the CME as a clearinghouse for standardized futures contracts. CME participants can trade in Class III milk futures contracts for every month of the year. At any given time, contracts for 200,000 pounds (expressed on the CME as 2,000 hundredweight (cwt)) of Class III milk may be available for up to 24 contract months. The contracts expire on the business day immediately preceding the day on which the United States Department of Agriculture (USDA) announces the Class III milk minimum price for that contract month. When the USDA announces the price, the parties either pay in or receive payment based on the difference between the announced price and the price agreed upon at the

time they entered into the contract. For instance, if the price has risen, the long will receive the cash difference between the announced price and the agreed-upon price. On the other hand, the short will have to pay in the same amount.

Parties that trade on the CME Class III milk futures market are governed by the CME's anti-manipulation rules. These rules include a prohibition against any one person owning or controlling positions in more than 1,500 Class III milk futures contracts (long or short) in any contract month.

Plaintiffs' allegations also include claims about Defendants' trading on the CME cheese spot call contracts. These are not futures contracts, and do not cash-settle. Instead, they are contracts for the actual physical delivery of the underlying commodity, in this case, 40-pound blocks of cheddar cheese, within a few days of the agreement. Trading takes place on weekdays for ten minutes on the CME trading floor in the form of an "open outcry" public auction. The final transaction price during the trading session determines the settlement prices for the day.

In the context of this case, CME cheese spot call prices are significant for two reasons. First, by industry custom and practice, they are used as a basis for pricing commercial cheese and milk contracts. Second, those prices are captured by the USDA's NASS Survey of cheese prices, which, in turn, is a significant component in the USDA's minimum milk pricing formulas.

**C. The alleged scheme**

Plaintiffs essentially allege that Defendants' exceeded CME's position limits on the Class III milk futures markets and then took advantage of that position and the above-described relationship between cheese prices and milk futures contracts prices in order to make a profit off of selling milk futures contracts at artificially inflated prices.

In early 2004, Defendants DFA and Keller's, under the direction of the individual defendants, began purchasing long positions in CME Class III milk futures contracts for the June, July, and August 2004 contract months. By May 21, 2004, the combined positions of DFA and Keller's exceeded the CME positions limits on the number of futures contracts that any one person can control for all three contract months. In fact, on that date, DFA and Keller's controlled long positions on 100% of the open interest[3] on futures contracts for those three months. However, neither DFA nor Keller's exceeded these limits individually. During April and May 2004, the individual defendants repeatedly communicated with one another about DFA and Keller's parallel long positions in CME Class III milk futures.

By engaging in the heavy purchase of long positions in milk futures, Defendants drove the price of the futures up. However, Otis and Millar recognized that when the time came to sell their positions on the futures market, their rapid withdrawal from the market would cause a similarly rapid drop in the price of the futures. As a result, Defendants would not recognize the desired profit from selling their futures positions at an inflated price. Thus, Otis and Millar proposed to Hanman and Bos that DFA purchase large amounts of CME spot cheese contracts at an inflated, above-market price of $1.80 per pound. Defendants' aim in doing so was to drive the price of cheese up, knowing that the rising price of cheese would be factored into the USDA's calculation of the government minimum milk price for Class III milk.[4] Defendants

---

[3] The "open interest" is the number of futures contracts that have been entered into for any given contract month that have not yet been offset or cancelled. A party to a futures contract can offset that contract by entering into an equal and opposite futures contract. Thus, if buyer $A$ enters into a futures contract with seller $B$, $A$ may offset that contract by later entering into another futures contract as a seller, with $B$ as the buyer, for the same amount of the same commodity in the same contract month. Buyer $A$ might do this in order to cut its losses prior to the expiration date of the futures contract if prices of the commodity have dropped in the meantime.

[4] Plaintiffs supply relatively detailed allegations regarding the USDA's calculation of milk prices. However, for purposes of this motion, it is only necessary to note that the agency regularly sets milk prices, which set a floor, but not a ceiling, for market participants. *In re: Southeastern Milk Antitrust Litig.*, No. 2:08-MD-1000, 2008 WL 2368212, at *5-*6 (E.D. Tenn. June 6, 2008) (hereinafter "*Southeastern Milk*" or "*Se. Milk*"), provides a more thorough description of the regulatory process that is roughly in line with Plaintiffs' allegations in this case.

hoped that rising cheese prices would therefore cause market participants to expect an increase in the government minimum milk price over the next few months. This expectation would cause an increase in the demand for long positions on Class III milk futures contracts. Thus, Defendants could sell off their milk futures at inflated prices without the risk of an accompanying drop in demand.

Defendants executed this plan successfully. DFA purchased nearly 13 million pounds of cheddar cheese on the CME between May 21, 2004 and June 23, 2004 at a cost of $1.80 per pound. As a result, the CME cheese price closed at $1.80 every day from May 21, 2004 to June 22, 2004. Between May 21 and June 7, the prices of Class III milk futures contracts increased as follows: June 2004 contract prices increased from $15.86 to $17.27; July 2004 contract prices increased from $14.11 to $15.55; and August 2004 contract prices increased from $14.12 to $15.15. By June 23, 2004, Defendants had successfully sold all of their CME Class III milk futures contract positions for June, July, and August 2004 at a profit. Then, on June 24, the CME cheese price promptly fell to $1.605 per pound. The price dropped again to $1.45 per pound the following day. The price of futures contracts also began to drop.

Defendants took these actions despite the fact that, absent the alleged scheme, it would be counter to their economic interests. For instance, as a creamery, Keller's uses milk as an input product, and therefore generally benefits from lower milk prices. Thus, Keller's involvement in activity that inflated milk prices was contrary to its economic interests unless it recognized the benefits of its activity elsewhere, such as through the alleged scheme.

Similarly, DFA acted contrary to its economic interests when it purchased long positions in milk futures and large amounts of cheese. Generally, as the representative of dairy farmers (producers of milk), DFA benefits from rising prices in milk. Thus, its logical position on the

milk futures market would be to hedge against falling prices by taking short positions. In addition, when DFA began purchasing cheese, not only did it do so at inflated prices, but it did so despite the fact that it already had between 16 and 23 million pounds of excess cheese inventory. In fact, DFA's procurement, sales, and other personnel were recommending to its officers that it stop purchasing CME spot cheese. Bos and Hanman did not heed those recommendations, however, because Otis had calculated that the profit DFA would recognize from selling off its futures positions would outstrip the losses they would incur from maintaining and selling off their excess cheese inventory. Indeed, after DFA had sold off all of its milk futures at a profit, it sold off its excess cheese inventory at severely discounted prices, mostly to overseas customers.

Plaintiffs also complain about some of Defendants' statements and omissions both before and after they sold off their long positions on the milk futures markets. For instance, during the time period when DFA was purchasing cheese at $1.80 per pound, it issued a projection to its members that the price of cheese would continue to rise in the coming months, despite knowledge that the price was artificially inflated and would drop precipitously when DFA ceased its purchases. This statement was meant to encourage others to support the inflated CME cheese prices.

Then, after Defendants' had sold off their long positions on the milk futures markets, Defendants engaged in an effort to conceal their scheme and make their conduct appear legitimate. Defendant Hanman told Dairylea Cooperative that the DFA's purchases of cheese were based on its market needs, when in fact his goal had been to drive up the price of cheese, and that they had "backed out" of the market and stopped purchasing cheese when they met their demand. DFA made similar representations to the Commodity Futures Trading Commission

(CFTC) when the agency began to investigate DFA in late December 2004, claiming that it purchased cheese "to meet the needs forecast by its sales projections." DFA maintained that stance until Hanman and Bos were replaced in early 2006. By late 2006, DFA admitted to the CFTC "that from sometime in May 2004 forward, DFA's primary reason for purchasing block cheese on the CME was to defend [the CME cheese] price at $1.80," and even this admission fell short of a complete revelation of the scheme.

In addition to these false statements and failures to disclose by Defendants regarding their actions, Plaintiffs complain of some of Defendants' actions following the sale of their futures positions. First, DFA made additional cheese purchases against their economic interests in August, September, and October 2004, as well as January 2005. As mentioned above, they also dumped their excess cheese inventory at discounted prices on foreign markets. Finally, DFA purchased all of Keller's at the end of 2005 on terms that have not been disclosed. Plaintiffs suspect that those terms may have included payments to Otis and Millar.

## II.     Standard of review

All of Defendants' motions, at least in part, request dismissal for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Some of the various Keller's Creamery entities also move for dismissal under Rules 12(b)(2), 12(b)(4), and 12(b)(5).

In ruling on a 12(b)(6) motion to dismiss, the Court treats well-pleaded allegations as true, and draws all reasonable inferences in the plaintiff's favor. *Disability Rights Wisc., Inc.*, 522 F.3d at 799. In order to survive such a motion, a plaintiff must "provide the grounds of his entitlement to relief" by alleging "enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 1964-65, 167 L. Ed. 2d 929 (2007) (internal quotation marks, brackets, and citation omitted). Specific facts are not

necessary. *Erickson v. Pardus*, 551 U.S. 89, 93, 127 S. Ct. 2197, 2200, 167 L. Ed. 2d 1081 (2007).

The standards for reviewing the Keller's motions pursuant to Rules 12(b)(2), 12(b)(4), and 12(b)(5) are somewhat different from the standard for a Rule 12(b)(6) motion, but are related to one another. With regard to a motion for lack of personal jurisdiction under Rule 12(b)(2), the burden is on the plaintiff to establish that the court has jurisdiction over the defendant. *Turnock v. Cope*, 816 F.2d 332, 333 (7th Cir. 1987). However, the complaint need not include all facts necessary to show jurisdiction, *Purdue Research Found. v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 782 (7th Cir. 2003), and the Court will accept all well-pleaded allegations in the complaint as true unless controverted by the defendants' affidavits and evidentiary materials, *Turnock*, 816 F.2d at 333. The plaintiff must make out a *prima facie* case of personal jurisdiction, but if the defendant, through its affidavits and evidentiary materials, disputes any material facts, the court must hold an evidentiary hearing to resolve any disputes. *Hyatt Intern. Corp. v. Coco*, 302 F.3d 707, 713 (7th Cir. 2002). However, the case law also suggests that in determining whether the plaintiff has made out a *prima facie* case, the Court shall resolve all disputes in favor of the plaintiff. *Purdue Research Found.*, 338 F.3d at 782. At least one district court has resolved this apparent discrepancy by noting that a court may defer its evidentiary hearing until trial. *Hoffa Eng'g, LLC v. Craney*, No. 1:06-cv-481-JDT-TAB, 2007 WL 831820, at *3-*4 (S.D. Ind. Mar. 12, 2007). In other words, in some cases, the Court may allow discovery to proceed on the basis of a *prima facie* showing, despite some material disputes of fact, prior to requiring the plaintiff to make a "preponderance of the evidence" showing at a hearing. *Id.*; *see also Cent. States, Se. & Sw. Areas Pension Fund v. Phencorp Reinsurance Co., Inc.*, 440 F.3d 870, 877-78 (7th Cir. 2006).

Motions under Rules 12(b)(4) and 12(b)(5) challenge the process and the service of process, respectively. The standards of review of such motions are the same as for Rule 12(b)(2) motions because "valid service of process is necessary in order to assert personal jurisdiction over a defendant."[5] *Mid-Continent Wood Prods., Inc. v. Harris*, 936 F.2d 297, 301 (7th Cir. 1991); *see also Cardenas v. City of Chicago*, No. 08 C 3174, 2010 WL 610621, at *2 (N.D. Ill. Feb. 15, 2010).

## III. Analysis

### A. Keller's entities' motions

The Court first addresses the Keller's entities' two motions to dismiss them as parties under Rules 12(b)(2), 12(b)(4), 12(b)(5), and 12(b)(6). Essentially, the motions are both based on the theory that Keller's no longer exists in any independent form, but instead as a division of DFA, and thus is not subject to suit. Keller's provides evidence supporting its version of the history of the various Keller's entities, and Plaintiffs do not seem to dispute those facts. Keller's Creamery LLC converted into Keller's Creamery LP on December 31, 2002. At that time Keller's Creamery Management LLC was created to serve as general partner in Keller's Creamery LP. Then, at the end of 2005, Keller's Creamery LP was merged into DFA, and has since been a division of DFA. As a result, Keller's makes various arguments for dismissal, including that the Court cannot have personal jurisdiction over the Keller's entities, that sufficient process was not and could not be properly served on those entities, and that Plaintiffs are unable to state a claim against those entities.

---

[5] There is very little case law available on the standard to be applied to Rule 12(b)(4) motions claiming insufficient process. Essentially, a motion under 12(b)(4) challenges the form of the summons, whereas a 12(b)(5) motion challenges the service of the summons. *In re Potash Antitrust Litig.*, 667 F. Supp. 2d 907, 928 (N.D. Ill. 2009). Given the similarity between the two, the Court sees no reason to apply a different standard of review to Rule 12(b)(4) motions, despite the lack of precedent available on the issue.

Plaintiffs first point out that Keller's Creamery LP has waived its right to bring any motions under Rules 12(b)(2)-12(b)(5) because it already filed a motion under Rule 12(b)(6) and litigated the case for a year before it filed the motion addressing its capacity to be sued. This is true, *see* Fed. R. Civ. P. 12(g)(2), but Keller's Creamery LP concedes as much, and notes that while the other Keller's entities present multiple grounds for relief, it moves only for failure to state a claim under Rule 12(b)(6).

Keller's Creamery LP does not cite any controlling authority for the proposition that a Rule 12(b)(6) motion is the proper vehicle for contesting one's capacity to be sued, however. On the contrary, the Seventh Circuit has remarked that someone contesting their capacity to be sued is held to the same standard for waiver as on any motion under Rule 12(b)(2). *Swaim v. Moltan Co.*, 73 F.3d 711, 718 (7th Cir. 1996). Thus, Keller's Creamery LP has waived its right to make any such argument and the Court denies its motion to dismiss on the grounds that it is non-existent. In other words, Keller's Creamery LP's participation in this litigation thus far seems to be a concession that it is in fact an entity capable of litigation. As noted below, this may be a legal fiction that simply allows Keller's Creamery LP to be named for litigation purposes when it is merely a division of DFA represented by DFA's counsel. Nonetheless, Keller's Creamery LP has waived the right to complain about that fiction.

Plaintiffs also argue that they have properly served sufficient process on each of the individual Keller's entities independently. They note, however, that even if Keller's is correct that all of these organizations survive only as a division of DFA, they are still subject to suit. Since Plaintiffs seem to concede the aforementioned facts concerning the merger of Keller's into DFA, the Court only addresses this second argument. Federal Rule of Civil Procedure 17(b) guides the Court in a determination of what entities are capable of being sued. More specifically,

Rule 17(b)(3) provides that the law of the state where the Court is located guides the inquiry when it comes to limited liability companies. Illinois law provides that "an action or proceeding pending against a limited liability company or other party to a merger may be continued as if the merger had not occurred, or the surviving entity may be substituted as a party to the action or proceeding." 805 ILCS 180/37-30(a)(4). Plaintiffs argue that on the basis of this language, the Court should allow the action to proceed against the Keller's entities.

Plaintiffs' argument fails for a number of reasons. First, Illinois law also provides that the separate existence of a constituent entity ceases when a merger takes effect. 805 ILCS 180/37-30(a)(1). Second, none of the actions that are a part of this consolidated proceeding were pending at the time of the merger. Finally, even the law cited by Plaintiffs impliedly recognizes that the naming of the constituent entity is an unnecessary fiction because the action is in fact proceeding against the surviving entity.

The parties' arguments about whether to engage in this unnecessary fiction illuminate the real issue underlying these motions: Plaintiffs want to be sure that Keller's will not escape liability due to their merger with DFA. That is a question that has less to do with who is named in the action than whether DFA has successor liability. Plaintiffs seem pretty certain that DFA, a Kansas corporation, does in fact have such liability and provide statutory support for their claim. *See, e.g.,* Kan. Stat. Ann. § 17-78-206(a)(4) ("all liabilities of each merging entity are liabilities of the surviving entity"). However, that issue is not properly before the Court on this motion. The parties will have an opportunity to address that issue. In the meantime, the Court must grant the motions to dismiss Keller's Creamery LLC and Keller's Creamery Management LLC as parties because they exist only in the form of the surviving entity, DFA.

**B. Filed rate doctrine**

In their motion to dismiss, DFA and Keller's argue, among other things, that some of the claims brought by certain Plaintiffs should be barred by the court-created "filed rate doctrine." They concede that the doctrine only bars damages claims, not claims in equity. They also limit their arguments to plaintiffs who purchased either: (1) CME Class III milk futures; or (2) cheese or milk priced on the basis of the CME Class III milk futures or government minimum milk prices. But they argue that every count should be dismissed insofar as it includes a request for damages by one of those groups of plaintiffs.

"Simply stated, the [filed rate] doctrine holds that any 'filed rate' – that is, one approved by the governing regulatory agency – is per se reasonable and unassailable in judicial proceedings brought by ratepayers." *Wegoland Ltd. v. NYNEX Corp.*, 27 F.3d 17, 18 (2d Cir. 1994). The doctrine was originally defined in *Keogh v. Chicago & Northwestern Railway Co.*, 260 U.S. 156, 161-65, 43 S. Ct. 47, 49-50, 67 L. Ed. 183 (1922), and some courts therefore refer to it as the "*Keogh* doctrine," *see, e.g., In re: Lower Lake Erie Iron Ore Antitrust Litig.*, 998 F.2d 1144, 1157 (3d Cir. 1993) ("*Lower Lake Erie*"). The doctrine was more recently upheld in *Square D Co. v. Niagara Frontier Tariff Bureau*, 476 U.S. 409, 423-24, 106 S. Ct. 1922, 1930-31, 90 L. Ed. 2d 413 (1986). Two concerns lay at the heart of the doctrine. The first is that providing retroactive relief, in the form of damages, to a plaintiff who paid an unreasonably high rate is potentially discriminatory in that it rewards plaintiffs, but does not provide a similar benefit to other ratepayers who do not file suit. *Wegoland*, 27 F.3d at 19. The second is that by deciding what rates are reasonable, or determining a hypothetically reasonable rate for the purposes of calculating damages, courts would interfere with the regulatory agency's ratemaking authority. *Id.*

Defendants argue that any claim involving damages by the plaintiffs described above would require the Court to make precisely the type of determination forbidden by the filed rate doctrine. According to Defendants, the Court would have to determine what the reasonable government minimum milk price would have been if Defendants had not conspired to inflate milk futures and cheese prices. Then, the Court could calculate the difference between the price paid by Plaintiffs for futures and commodities that were priced on the basis of the government minimum milk price, or that cash-settled to that price.

Defendants also point to case law suggesting that the doctrine is applicable in this case. First of all, the doctrine has been applied to government minimum milk prices before, albeit in other jurisdictions. *See Carlin v. Dairy America, Inc.*, No. 1:09-CV-00430-AWI-DLB, 2010 U.S. Dist. LEXIS 10902, *14-*35 (E.D. Cal. Feb. 9, 2010); *Servais v. Kraft Foods, Inc.*, 246 Wis. 2d 920, 930-32, 631 N.W.2d 629, 633-34 (Wis. Ct. App. 2001). Secondly, there is no exception to the doctrine for situations where the filed rate is the result of fraud on the agency. *Wegoland*, 27 F.3d at 20 (citing cases). Because Plaintiffs have provided no authority to the contrary, and because the logic of *Carlin* and *Servais* is persuasive, the Court holds that the filed rate doctrine is generally applicable to government minimum milk rates, even in cases of fraud. Thus, the question is simply whether it is applicable to the claims made in this case.

Plaintiffs argue that it is not, pointing to two cases where courts did not apply the doctrine to government minimum milk rates. *See Ice Cream Liquidation, Inc. v. Land O'Lakes, Inc.*, 253 F. Supp. 2d 262 (D. Conn. 2003); *Se. Milk*, 2008 WL 2368212. They argue that, at least with regard to plaintiffs that purchased commodities priced on the basis of the government minimum milk price, this case is analogous to both of those cases because those plaintiffs were not just paying the government minimum, but an additional premium as well.

In *Southeastern Milk*, the court cited a number of reasons for why it would not apply the filed rate doctrine, only one of which is relevant to this case. The court noted that while the government did set a *minimum* milk price, market forces determined the fluctuation of the "over-order premium" prices of milk above that floor. 2008 WL 2368212, at *7. The plaintiffs did not "appear to be challenging the minimum prices set by the Secretary of Agriculture but rather the elimination of competition and the fixing of over-order premiums paid to dairy farmers." *Id.* Thus, the court held that the filed rate doctrine was not implicated by the plaintiffs' complaints. *Id.*

In *Ice Cream Liquidation*, the court employed similar, though not identical, logic. Both Dairy Farmers of America and Keller's LLC were defendants in that case, and the plaintiffs complained that they had manipulated and inflated CME butter prices, thereby causing a spike in government minimum milk prices (which are also apparently affected by butter prices). 253 F. Supp. 2d at 275-76. Once again, the court took note of the fact that the government rate was merely a minimum, however. *Id.* Thus, the court did not apply the doctrine to the plaintiffs, who were complaining that they were injured when they purchased wholesale milk from the defendants at prices that were higher than the minimum. *Id.*

At first blush, *Southeastern Milk* and *Ice Cream Liquidation* would seem to provide a great deal of support for Plaintiffs in this case, who did not purchase milk at the government minimum rate, but many of whom purchased other products whose value is determined, at least in part, by the government minimum rate. However, Plaintiffs' arguments, insofar as they are made by Plaintiffs who purchased products that were priced on the basis of the government minimum milk price, fail in two respects. For one, those claims are distinguishable from the claims in *Southeastern Milk* because they do not challenge the "over-order premiums" that

Plaintiffs paid in addition to the filed rate. Plaintiffs' complaint does not contain a single allegation that the over-order premiums they paid were fixed, manipulated, or unfair in any way. Instead, the injury they claim stems completely from the fact that these over-order premiums, whatever they may have been, were added on to manipulated, inflated government minimums.

Secondly, while the claims in *Ice Cream Liquidation* are more analogous to the claims regarding contracts based on minimum milk prices here, the Court is not persuaded by the logic in that case. Essentially, *Ice Cream Liquidation* seems to stand for the proposition that so long as the plaintiffs paid more than the filed rate, they are not challenging the filed rate. But, it seems that the plaintiffs in that case, and some of the plaintiffs here, are in fact challenging the filed rate. Plaintiffs do not propose, nor can the Court conceive of, a method for calculating damages in either case that would not require the Court to engage in just the type of ratemaking that the doctrine precludes. Because Plaintiffs are not challenging the size of the over-order premiums they paid, the difference between what they paid and what they would have paid absent Defendants' conduct must be the same as the difference between the filed rate, and the reasonable rate that the USDA would have set had the input data (CME cheese prices) not been inflated by Defendants' actions. Thus, the Court finds the filed rate doctrine applicable to all damages claims brought by plaintiffs who claim injury based on their purchase of products priced on the basis of the government minimum milk price.

The Court's holding does not extend to claims that are more tenuously linked with filed rates, however. More precisely, the doctrine does not bar the claims of plaintiffs who allege injury based on their purchase of CME Class III milk futures or products priced on the basis of the price of those futures. Defendants argue that the filed rate doctrine should apply to these claims as well because the value of the futures is based on the government minimum milk price.

However, the relationship between the futures market and the government minimum milk price is more complex than Defendants suggest.

Unlike the contracts some plaintiffs entered into for the purchase of actual milk, CME milk futures contracts are not priced using a formula based on the government minimum milk price. Instead, as explained above, market participants buy and sell milk futures for prices that are determined by their expectations for what the government minimum milk price will be at a particular point in the future. Thus, in order for their alleged scheme to succeed, Defendants did not need to actually alter the government minimum milk price. They only needed to alter the expectations of other market participants. If they could manipulate the market in such a way that others would expect the government minimum milk price to go up, then they could sell their futures at a high price and turn a large profit.

Plaintiffs do not even state what the actual government minimum milk price was during the relevant period. They do not have to, because it was not crucial to Defendants' alleged scheme. In fact, if Defendants had complete confidence in their ability to alter the government minimum, they could have kept their long positions and continued their manipulation of the market until the expiration date for their futures contracts. Then, due to their manipulation, the government minimum milk price would be so inflated that they would realize a profit when their futures cash-settled. They would realize such a profit despite the fact that they may have purchased their positions at a price that was unreasonably high at the time they purchased.

Instead, Plaintiffs allege that Defendants manipulated CME cheese prices and futures prices, rather than government minimum milk prices, so that other market participants would shift their expectations for the price of milk. They assumed, apparently correctly, that those other participants would see a rising demand for milk futures and a rising price for CME spot

cheese, and would conclude that the USDA would likely set a higher minimum price in the coming months. In order to profit off of those rising prices, the other market participants would pay a high price for milk futures.

Then, after they sold off all of their long positions, Defendants stopped purchasing cheese, causing a rather precipitous drop in the price of cheese on the CME. Thus, the actual government minimum, while perhaps altered, probably did not rise to the levels expected by the other market participants. In a way, by withdrawing from the market, Defendants probably ensured that the government minimum was actually *closer* to "reasonable" than the rate that Plaintiffs expected when they invested in the futures market. Thus, Plaintiffs' damages do not stem from Defendants' manipulation of the actual filed rate, or from the fact that they paid an unreasonable rate for milk, but from the fact that they paid an unreasonable amount for milk futures based on inflated expectations for what the filed rate would be. Calculating those damages will not be easy, but it will not require an estimation of what the filed rate would have been absent Defendants' actions. Instead, it will require an assessment of how much Plaintiffs' expectations were altered. The Court therefore holds that the filed rate doctrine does not bar Plaintiffs' claims of injury stemming from the purchase of milk futures contracts or products whose price was based on CME prices.

The Court's holding is supported by the *Lower Lake Erie* decision. In that case, the Third Circuit recognized that the mere fact that filed rates are "coincidentally implicate[d]" by antitrust defendants' conduct does not mean that the filed rate doctrine applies. 998 F.2d at 1159. While the theory of *Lower Lake Erie* was not exactly analogous to that set forth by Plaintiffs here, the holding is nonetheless informative. The defendant railways in *Lower Lake Erie*, who traditionally dominated the business of transporting iron ore from the docks to the steel

companies, were alleged to have excluded lower-cost competitors from that business. *Id.* at 1152-53. The steel companies, among others, complained of the conduct, arguing that they were injured because they had to pay the high fixed rates of the railways, rather than the prices offered by the excluded competitors that were not governed by those rates. *Id.* at 1154. The railways argued that the filed rate doctrine should apply to the steel companies' claims because the calculation of damages would require a comparison of the filed rates with the costs that would have been available to the steel companies if other competitors had been allowed into the market. *Id.* at 1158-61. The court stated that "[t]he mere measure of damages, which begins with an ICC-approved rate, does not define the nature of the conspiracy," and held that, because "[t]he instrument of damage to the steel companies was the absence of lower-cost combination," rather than the ICC-approved rates themselves, the filed rate doctrine did not apply. *Id.* at 1159-61.

Similarly, the "instrument[s] of damage" to the plaintiffs who purchased milk futures were not the allegedly altered government minimum milk prices. Instead, they were injured by the inflated milk futures prices, which were inflated as a result of expectations about the filed rates. Thus, while one cannot discuss Plaintiffs' theory without mentioning government minimum milk prices, they are really only "coincidentally implicate[d]," not directly challenged. In fact, there is a more tenuous relationship between the real instrument of damage and the filed rates here than in *Lower Lake Erie*, where the damages calculation actually required a comparison with the filed rates.

Thus, the Court grants Defendants' motion to dismiss those claims for damages stemming from the purchase of products priced on the basis of the government minimum milk prices. The Court denies Defendants' motion to apply the filed rate doctrine to all of Plaintiffs' remaining claims.

## C. Claims based on conduct occurring after June 2004

The only other argument Defendants make that is meant to apply universally to all of Plaintiffs' claims is that Plaintiffs have failed to state any claim based on conduct occurring after June 2004, when Defendants allegedly sold off all of their long positions on the CME Class III milk futures market. The Court finds this argument somewhat awkward. Though it sounds somewhat like a statute of limitations argument, it is not. In fact, Defendants are not actually moving the Court to dismiss any of the six counts in the complaint on the basis of this argument. Instead, they are asking the Court to sketch limits for the facts upon which these claims may be based. A motion to dismiss is not the proper vehicle for such arguments, however. At this point, the Court determines simply whether Plaintiffs' pleadings support the claims they bring. Defendants' arguments seem more suited to a motion concerning the type of evidence that will ultimately be admissible at trial in these matters, or perhaps to a motion concerning the scope of discovery. Thus, the Court reserves ruling on this issue and denies the motion to dismiss filed by DFA and Kellers' insofar as it is based on these arguments.

## D. Sherman Act § 1: Contract, combination, or conspiracy in restraint of trade

### 1. DFA and Keller's

In Count 1 of their complaint Plaintiffs claim that Defendants violated Section 1 of the Sherman Act by engaging in a contract, combination, or conspiracy in restraint of trade. *See* 15 U.S.C. § 1. DFA and Keller's only contest this count on the grounds identified above (the filed rate doctrine and the failure to state a claim based on conduct after June 2004). Thus, the claim will proceed against those defendants with the limitations imposed by the Court's rulings above.

## 2. The individual defendants

The individual defendants move the Court to dismiss the count as it concerns them, however. They essentially present two related arguments in support of their motion. First, they argue that Plaintiffs' allegations do not sufficiently reference the actions of the individual defendants specifically, but instead attempt to improperly attribute the allegations against DFA and Keller's to the individual defendants. Second, they argue that Plaintiffs make an improper leap of logic when they allege a "contract, combination, or conspiracy" on the basis of mere parallel conduct. The Court disagrees.

First of all, the individual defendants minimize the allegations against them in the complaint, completely omitting certain paragraphs from a list of quoted paragraphs that they suggest is exhaustive. Whether this omission was an intentional attempt to pull the wool over the Court's eyes or not, it is telling because, at the very least, Defendants seem to overlook the significance of Plaintiffs' allegations.

As noted above, Plaintiffs allege that during April and May 2004, the four individual defendants repeatedly communicated with one another about their parallel long positions in CME Class III milk futures. (Compl. ¶ 107.) During the same period, Otis and Millar expressed concern that those positions would expose them to large losses and proposed to Hanman and Bos that DFA should purchase large amounts of CME spot cheese contracts in order to support their futures positions. (Compl. ¶¶ 111-13.) In fact, they specifically suggested that DFA makes those purchases at $1.80. (Compl. ¶ 114.) Millar also told John Wilson, DFA's Corporate Vice President of Marketing, that DFA should purchase cheese "strongly" at $1.80 per pound. (Compl. ¶ 119.) Millar specifically stated that the purpose of the purchases was to inflate the price of cheese in order to support the price of milk futures while they sold off their positions.

(Compl. ¶ 120.) Otis even calculated for Bos on May 21, 2004 that the losses to DFA from purchasing unneeded cheese and selling it below cost would be outstripped by the profit they would make on the futures market. (Compl. ¶ 118(b).)

Then, contrary to the advice of their internal advisors at DFA, Hanman and Bos ordered that DFA begin buying CME cheese at exactly $1.80 per pound. (Compl. ¶¶ 116-18; 123-24.) DFA did not stop purchasing at that level until after it had sold off all of its milk futures at a profit. (Compl. ¶¶ 140-41.) Defendant Hanman explained DFA's cheese purchases and decision to withdrawal on the basis of the cooperative's needs, and DFA made similar statements until Hanman and Bos were replaced. (Compl. ¶¶ 148-152.) But at that point, DFA admitted that it actually purchased cheese in order to "defend the [CME cheese price] at $1.80" so that it could protect the value of its milk futures contract positions. (Compl. ¶¶ 152-53.)

These allegations certainly implicate all of the individual defendants in the alleged scheme. Plaintiffs' complaint does not merely impute the conduct of DFA and Keller's to its top officers, it lays out quite detailed allegations regarding the conduct of each individual defendant, down to the level of quotes at some points. Thus, the question is not whether Plaintiffs' allegations involve conduct by the individual defendants, but rather whether those allegations are sufficient to make out a claim under § 1 of the Sherman Act.

Defendants argue that Plaintiffs' allegations really only suggest parallel conduct by the officers of Keller's and DFA. And Defendants are right that *Twombly* and *Aschroft v. Iqbal*, --- U.S. ---, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009), require more from plaintiffs than allegations of parallel conduct in order to proceed to the burdensome discovery stage of a complex antitrust case. In *Twombly* the Supreme Court, more than just illuminating its approach to Rule 8(a)(2) notice pleading requirements generally, actually addressed the issue specifically within the

context of § 1 of the Sherman Act. 550 U.S. at 548, 127 S. Ct. at 1961. The *Twombly* Court noted that "[b]ecause § 1 of the Sherman Act does not prohibit all unreasonable restraints of trade[,] but only restraints effected by a contract, combination, or conspiracy, the crucial question is whether the challenged anticompetitive conduct stems from independent decision or from an agreement, tacit or express." *Id.* at 553, 127 S. Ct. at 1964 (internal quotations, citations, brackets, and ellipses omitted). Thus, "an allegation of parallel conduct and a bare assertion of conspiracy will not suffice." *Id.* at 556, 127 S. Ct. at 1966. Instead, "when allegations of parallel conduct are set out in order to make a § 1 claim, they must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." *Id.* at 557, 127 S. Ct. at 1966.

Defendants seize on this language in *Twombly* and suggest that it requires Plaintiffs to not only plead facts from which the court can draw the inference of an agreement, but that the inference of an agreement must be stronger than other competing inferences. This is an incorrect reading of *Twombly*. The *Twombly* Court made clear that a plaintiff could not proceed simply by pleading facts that were consistent with an agreement and therefore made such an agreement possible. *Id.* However, the Court also made clear that it was not "impos[ing] a probability requirement at the pleading stage." *Id.* at 556, 127 S. Ct. at 1965. Instead, an antitrust plaintiff must provide something in between possibility and probability – plausibility. *Id.* at 556-57, 127 S. Ct. at 1965-66; *see also Iqbal*, 129 S. Ct. at 1949 ("The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."). In order to nudge their claims across the line between possibility and plausibility, *Twombly* requires Plaintiffs to allege "enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Twombly*, 550 U.S. at 556, 127 S. Ct. at

1965. Stated differently, they must allege enough to raise a reasonable inference of an agreement. *Iqbal*, 129 S. Ct. at 1949. But, even after *Twombly* and *Iqbal*, the Court still makes all reasonable inferences in Plaintiffs' favor at this stage. *Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 463 (7th Cir. 2010). It follows that the inference of an agreement need not be more reasonable than the inference of independent parallel conduct. *Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010) (interpreting *Twombly* and *Iqbal* to mean that "it is not necessary to stack up inferences side by side and allow the case to go forward only if the plaintiff's inferences seem more compelling than the opposing inferences"). To hold otherwise would to require the very "probability requirement" eschewed by the Supreme Court. *Id.*; *cf. Twombly*, 550 U.S. at 554, 127 S. Ct. at 1964 (noting that evidence tending to exclude the possibility of independent action is required at the summary judgment and trial stages).

Defendants concede that Plaintiffs plead communications among the defendants, followed by parallel conduct in the form of the purchase of long positions on milk futures and the purchase of cheese at $1.80 per pound. But they argue that Plaintiffs have not provided enough additional facts to plausibly suggest that this parallel conduct was the result of some agreement between the individual defendants. They accuse Plaintiffs of engaging in the logical fallacy of *post hoc, ergo propter hoc* (in English, roughly, "after this, therefore because of this"). They analogize this case to *In re Text Messaging Antitrust Litigation*, No. 08 C 7082, 2009 WL 5066652, at *7 (Dec. 10, 2009) (hereinafter "*Text Messaging*"), where the court held that "an inference that [the defendant's] actions taken 'approximately a month' after a meeting resulted from an agreement undertaken at that meeting would be unreasonable given the current state of the law regarding pleading in cases of this type." In that case, plaintiffs essentially alleged that the defendants met at trade organization meetings and then slowly, over the course of months,

began raising their prices to match those of their competitors. *Id.* at *6-*7. The only other allegations plaintiffs provided to support an inference of an agreement were economic arguments that the court found illogical and unconvincing. *Id.* at *7-*10.

The case at bar is easily distinguishable from *Text Messaging*. First of all, Plaintiffs allege more than a meeting between the individual defendants. They allege that the individual defendants communicated specifically about their purchases of long positions on the CME Class III milk futures market and the CME spot cheese market. They allege that Otis actually explained the process by which DFA could support the price of milk futures by purchasing cheese at $1.80 per pound and provided calculations indicating that the scheme would be profitable. In fact, they even provide a quote from Millar about the proposed scheme. In light of these allegations of an actual, detailed proposal, Defendants' parallel actions are more likely the result of an agreement than in *Text Messaging*, where the defendants simply attended meetings together.

But, Plaintiffs provide more. They do not allege that the parallel conduct occurred intermittently over the course of months after the communications between Defendants, as was the case in *Text Messaging*. Instead, Plaintiffs allege communications between the individual defendants throughout the course of the execution of the scheme, and that DFA began buying cheese upon the orders of Hanman and Bos as early as the same day as the proposal by Otis and Millar. Then, DFA purchased cheese at precisely the price proposed by Otis and Millar until both DFA and Keller's had sold off their long positions in milk futures. Then, DFA stopped its purchases suddenly. All of this conduct is also consistent with an inference of an agreement. DFA's eventual admission (after Hanman and Bos were replaced) that it was in fact purchasing

27

cheese for precisely the reasons proposed by Otis and Millar is further indication of an agreement between the parties.

Finally, Plaintiffs suggest that the individual defendants pursued these actions through DFA and Keller's despite the fact that it was contrary to the organizations' economic interests. Defendants protest that Plaintiffs' suggestion is conclusory because it is difficult to determine the best interests of DFA and Keller's and assess whether they were taking appropriate actions given the complex markets in which they operate. But, Plaintiffs allegations are unique in that they do not simply state that DFA and Keller's were acting contrary to their own interests; they allege that officials and employees of DFA and Keller's, including Otis and Millar, explicitly recognized as much. Plaintiffs allege that Otis and Millar expressed their concern that purchasing so many long positions on the milk futures market would be against the economic interests of Keller's unless the parties did engage in a *quid pro quo* agreement involving DFA's purchase of cheese. They also allege that Hanman and Bos went against the advice of their advisers within DFA when they decided to purchase large amounts of cheese at $1.80 per pound. These allegations provide additional factual support, as opposed to legal conclusions, for an inference that there was an agreement between the individual defendants, whether express or tacit. *See In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 655 (7th Cir. 2002) (at the summary judgment stage, evidence that the market behaved in a noncompetitive manner supports a finding of an agreement).

For all of the above reasons, the Court denies the individual defendants' motion to dismiss Count 1.

### E. Sherman Act § 2: Monopolization or attempted monopolization

In Counts 2 and 3 of their complaint Plaintiffs claim that Defendants violated the prohibitions against monopolization and attempted monopolization in § 2 of the Sherman Act. *See* 15 U.S.C. § 2. In order to state a claim of monopolization, Plaintiffs must plead "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power." *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71, 86 S. Ct. 1698, 1704, 16 L. Ed. 2d 778 (1966). The elements of a claim of attempted monopolization are: "(1) specific intent to achieve monopoly power, (2) predatory or anticompetitive conduct directed at accomplishing this unlawful purpose, and...(3) a dangerous probability that the attempt to monopolize will be successful." *Ind. Grocery, Inc. v. Super Valu Stores, Inc.*, 864 F.2d 1409, 1413 (7th Cir. 1989). Defendants' arguments regarding both counts are the same. DFA and Keller's argue that Plaintiffs fail to plead either element of monopolization, and thus fail on their claim for attempted monopolization as well. They also argue that some of the plaintiffs lack standing to bring a claim under § 2. The individual defendants make two additional arguments. First, they argue that Plaintiffs' allegations concerning monopoly power do not reference the individual defendants specifically. Second, they argue that Plaintiffs must make additional allegations of "inherently wrongful conduct" by the individual defendants and that they have failed to do so.

### 1. Relevant markets

Defendants first argue that Plaintiffs fail to properly allege a relevant market or relevant markets over which Defendants allegedly possessed monopoly power. For purposes of § 2 of the Sherman Act, a market is defined by the reasonable interchangeability of the products and the cross-elasticity of demand for those products. *See United States v. E.I. du Pont de Nemours &*

*Co.*, 351 U.S. 377, 394-95, 76 S. Ct. 994, 1007, 100 L. Ed. 1264 (1956) (hereinafter "*E.I. du Pont*"). In other words, the products in a market must have unique attributes that allow them to be substituted for one another, but make them difficult to replace with substitute products from outside the market. *See Todd v. Exxon Corp.*, 275 F.3d 191, 201-02 (2d Cir. 2001). Defendants argue that Plaintiffs' allegations that the June, July, and August 2004 futures contracts "are products with unique attributes and characteristics for which there are no practical substitutes," (Compl. ¶ 221) are the type of "threadbare recitals" of the elements of monopolization that this Court need not accept as true under *Iqbal*, 129 S. Ct. at 1940. They posit that Plaintiffs must instead provide facts supportive of those recitals.

While the Seventh Circuit does not seem to have addressed the question directly, other courts have required plaintiffs to do more than simply assert reasonable interchangeability and cross-elasticity of demand. *See, e.g., Conte v. Newsday, Inc.*, 703 F. Supp. 2d 126, 142 (E.D.N.Y. 2010) (citing cases). However, "[b]ecause market definition is a deeply fact-intensive inquiry, courts hesitate to grant motions to dismiss for failure to plead a relevant product market." *Todd*, 275 F.3d at 199-200. For instance, courts will dismiss a claim because the alleged relevant market "clearly does not encompass all interchangeable substitute products" or when a plaintiff "fail[s] even to attempt a plausible explanation as to why a market should be limited in a particular way." *Conte*, 703 F. Supp. 2d at 142 (internal quotations omitted).

This is not such a case. Plaintiffs identify the CME Class III milk futures contracts markets for June, July, and August 2004 as the relevant markets. They describe the markets in detail, including a number of unique attributes. For instance, they explain the difference between Class III milk and other types of milk. They explain the unique standing of the CME as the largest commodity futures exchange. They explain that its status as a CFTC-approved exchange

30

means not only that it is governed by rules approved by the CFTC, but that it provides valid and useful information about the price of the commodities underlying the futures being traded. They explain that there is a unique value to be gained from trading in June 2004 Class III milk futures versus futures for another month or another type of milk because futures positions can be used to hedge against price changes for the underlying commodity during the same period of time. Finally, they allege that Defendants' increased purchases of long positions during those months led to an increased demand for those long positions and inflated their price, which suggests that there were not other readily interchangeable products elsewhere for potential investors to buy at a lower cost. For all of these reasons, the Court finds that Plaintiffs' have adequately pleaded relevant markets.

### 2. Possession of monopoly power

Even assuming the Plaintiffs have stated relevant markets, however, DFA and Keller's argue that Plaintiffs have not pleaded that DFA and Keller's possessed monopoly power in those markets. This is a more complicated question. "Monopoly power is the power to control prices or exclude competition." *E.I. du Pont*, 351 U.S. at 391, 76 S. Ct. at 1005. There are two accepted methods for proving that a defendant possessed monopoly power: (1) "through direct evidence of anticompetitive effects;" or (2) "by proving relevant product and geographic markets and by showing that the defendant's share exceeds whatever threshold is important for the practice in that case." *Toys "R" Us, Inc. v. Fed. Trade Comm'n*, 221 F.3d 928, 937 (7th Cir. 2000).

Plaintiffs allege that at least for one day in May 2004, DFA and Keller's held 100% of the open interest on CME Class III milk futures contracts for all three relevant months and that, when taken together, Defendants' holdings far exceeded the anti-manipulation limits set by the

CME. If proven, these allegations would seem to go a long way towards proving that Defendants held a monopoly by the second method. *See Grinnell*, 384 U.S. at 571, 86 S. Ct. at 1704 ("[t]he existence of [monopoly] power ordinarily may be inferred from the predominant share of the market"); *see also MCI Commc'ns Corp. v. Amer. Tel. & Tel. Co.*, 708 F.2d 1081, 1107 (7th Cir. 1983) ("Where that data reveals a market share of more than seventy to eighty percent, the courts have inferred the existence of monopoly power"). However, the Court cannot consider market share alone and in markets with low barriers to entry, a large market share does not necessarily translate into power over the prices in a market. *Ball Memorial Hosp., Inc. v. Mutual Hosp. Ins., Inc.*, 784 F.2d 1325, 1336 (7th Cir. 1986). There is case law suggesting that even a party with 100% ownership does not necessarily have monopoly power in a market with low barriers to entry. *See, Thompson's Gas & Elec. Serv., Inc. v. BP Amer., Inc.*, 691 F. Supp. 2d 860, 865 n.8 (N.D. Ill. 2010) (hereinafter "*Thompson's G&E*") (collecting cases). Moreover, even Plaintiffs' arguments fall more along the lines of the first method of proof. Of course, Plaintiffs need not prove anything at this stage, but given these suggestions that Plaintiffs may eventually have to show more than market share, the Court addresses Plaintiffs' pleadings as if they will proceed using the second method of proof.

Thus, the Court turns to Plaintiffs' allegations regarding the anticompetitive effects of Defendants' conduct. Plaintiffs undoubtedly allege that Defendants' actions caused the price of Class III milk futures to be artificially inflated. They also allege that, as a result of Defendants' actions, some plaintiffs purchased Class III milk futures at what were essentially noncompetitive prices. Defendants do not ignore these allegations, but instead argue that, given some of Plaintiffs' other allegations about the CME Class III milk futures market, Defendants could not have obtained monopoly power or caused these effects.

The Supreme Court has held that "[i]t is inconceivable that price could be controlled without power over competition or vice versa." *E.I. du Pont*, 351 U.S. 377 at 392, 76 S. Ct. at 1005. Relying on this axiom, Defendants argue that they could not have controlled prices on a cash-settled futures market that places no limit on the number of participants or the number of contracts that may be traded. They note first, correctly, that in a market with low barriers to entry, it is difficult to gain control over or exclude competition. *See Ind. Telecom Corp., Inc.*, No. IP97-1532-C-H/G, 2001 WL 1168169, at *11 (S.D. Ind. 2001) (compiling cases to show that "[t]he Seventh Circuit has long held that low barriers to competition demonstrate the absence of monopoly power").

Defendants turn next to the fact that CME Class III milk futures are cash-settled. They argue that *Kohen v. Pac. Inv. Mgmt. Co. LLC*, 571 F.3d 672 (7th Cir. 2009), effectively rules out the possibility that a cash-settled futures market can be monopolized. In *Kohen*, the court addressed a claim that the defendants "cornered" a futures market based on 10-year U.S. Treasury notes. *Id.* at 674. A corner is a form of monopolization (though *Kohen* concerns a claim under § 1 of the Sherman Act, not a § 2 claim of monopolization). *Id.* The Seventh Circuit has, in another case, described this form of manipulation as follows:

> A person who owns a substantial portion of the long interest near the contract's expiration date also obtains control over the supply that the shorts need to meet their obligations. Then the long demands delivery, and the price of the commodity skyrockets. It takes time and money to bring additional supplies to the delivery point, and the long can exploit these costs to force the shorts to pay through the nose.

*Bd. of Trade v. Sec. & Exch. Comm'n*, 187 F.3d 713, 724 (7th Cir. 1999). However, in both cases, the court noted that cornering a market for *financial* futures contracts, which are cash-settled, would be nigh impossible. *Kohen*, 571 F.3d at 675; *Bd. of Trade*, 187 F.3d at 725. The

court reasoned that because cash-settled futures do not have a deliverable supply, "there can never be a mismatch between demand and supply near the expiration [of the futures contracts], or at any other time." *Bd. of Trade*, 187 F.3d at 725; *see also Kohen*, 571 F.3d at 675 ("if a cash option exists there is no market to corner (no one can corner the U.S. money supply!)").

The Defendants' arguments are well-reasoned, and the case law does suggest that manipulation of a cash-settled futures market would be difficult, but Plaintiffs' theory differs from those presented in *Kohen* and *Board of Trade*, and is not precluded by those cases. Unlike in the traditional corner of a futures market, Plaintiffs were not shorts on the market that were forced to purchase the underlying commodity or offsetting long positions at inflated prices in order to meet or cancel their delivery obligations. Nor could they be, as Defendants point out, because this case concerns a cash-settled futures market. For the same reason, Defendants are not accused of inflating the price of milk futures by gaining control of the underlying commodity.

Plaintiffs circumvent the obstacles to stating a claim for monopolization of cash-settled futures market with low (or no) barriers to entry through a few crucial allegations. First, they allege that DFA and Keller's conspired to bid up the price of milk futures in order to buy up all of the long positions available in the relevant markets in spite of the CME position limits. Moreover, by bidding up the price of futures, they were able to control 100% of the markets for at least one day. While Defendants are correct that others could have entered the markets, Defendants had placed the rest of the competition in a position, at least temporarily, where they would not be able to seize control of a meaningful portion of the markets. While there is no limit to the number of futures contracts that may be traded at any time, Plaintiffs have pleaded that for every long on the market, there must be a short. Thus, unless there was a large number of shorts

rushing into the market that day, anyone interested in joining the market as a long would not have the option. *See Peto v. Howell,* 101 F.2d 353, 356 (7th Cir. 1938) (holding that even a one-day or one-month monopoly is forbidden); *see also Thompson's G&E,* 691 F. Supp. 2d at 866 (same) (quoting *Peto*). In addition, Defendants' alleged violation of the position limits allowed them to control a share of the market exceeding what any one other investor could possibly control.

Adding to this, Defendants had bid up prices without yet engaging in their related scheme to bid up the price of cheese. Thus, it is reasonable to infer that they were purchasing long positions at prices that others would not find competitive based on their expectations regarding the price of Class III milk. By inflating prices in that way, they were able to exclude their competitors for the time being. Defendants contest Plaintiffs' position that they could have been pricing out their competition because Plaintiffs' complaint includes allegations that some of the plaintiffs eventually purchased futures at those inflated prices. In fact, those purchases are source of some of the plaintiffs' injuries. However, this argument ignores the final piece of Defendants' alleged scheme. Defendants allegedly manipulated the price of cheese, thereby altering their competitors' expectations about the future price of milk and enticing them into buying long positions on the futures market at prices that were unreasonably high only days beforehand.

Thus, Plaintiffs have adequately alleged that DFA and Keller's possessed monopoly power. Through their allegedly extensive and improper purchases of milk futures at high prices, Defendants took control of a share of the futures markets that was impervious to competition for at least enough time for them to drive up the price of cheese and, correspondingly, milk futures. In other words, they excluded competition and controlled prices, the two hallmarks of a

monopoly. While Plaintiffs' theory of liability may be somewhat unique, these allegations will suffice, especially in light of the allegations that DFA and Keller's did in fact control 100% of the market and prices did in fact increase.

### 3. Willful acquisition or maintenance of that power

In order to plead the second element of a § 2 violation, Plaintiffs must allege not just that Defendants intentionally pursued monopoly power, but that they employed "unjustifiable means" to gain that power. *Endsley v. City of Chicago*, 230 F.3d 276, 282 (7th Cir. 2000). In other words, they must plead "predatory or exclusionary conduct." *MCI Commc'ns*, 708 F.2d at 1108 n.35 (7th Cir. 1983). As outlined above, Plaintiffs' allegations that Defendants used their bidding tactics and their large market share, which violated CME anti-manipulation limits, to exclude competitors do suggest that Defendants did not gain their monopoly power purely by chance or through their superior business acumen.

Nonetheless, the Court will quickly address Defendants' argument that Plaintiffs' allegations fail under *Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co., Inc.*, 549 U.S. 312, 127 S. Ct. 1069, 166 L. Ed. 2d 911 (2007). In *Weyerhaeuser*, the Court held that essentially the same factors which define predatory pricing in pursuit of monopoly power also define predatory bidding in pursuit of monopsony[6] power. *Id.* at 325, 127 S. Ct. at 1078. In a predatory pricing scheme, "the predator reduces the sale price of its product (its output) to below cost, hoping to drive competitors out of business. Then, with competition vanquished, the predator raises output prices to a supracompetitive level." *Id.* at 318, 127 S. Ct. at 1074. Thus, a plaintiff claiming that its competitor engaged in predatory pricing must prove: (1) "that the prices complained of are below an appropriate measure of its rival's costs;" and (2) that "the competitor

---

[6] "Monopsony power is market power on the buy side of the market. As such, a monopsony is to the buy side of the market what a monopoly is to the sell side and is sometimes colloquially called a 'buyer's monopoly.'" *Weyerhaeuser*, 549 U.S. at 320, 127 S. Ct. at 1075 (internal citations omitted).

had ... a dangerous probabilit[y] of recouping its investment in below-cost prices." *Id.* at 318-19, 127 S. Ct. at 1074 (quoting *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.,* 509 U.S. 209, 113 S.Ct. 2578, 125 L.Ed.2d 168 (1993)). A predatory bidding scheme is the mirror image of a predatory pricing scheme, executed on the buyer side of the market. A predatory bidder "bids up the market price of a critical input to such high levels that rival buyers cannot survive (or compete as vigorously) and, as a result, the predating buyer acquires (or maintains or increases its) monopsony power." *Id.* at 320, 127 S. Ct. at 1075 (quoting John B. Kirkwood, *Buyer Power and Exclusionary Conduct,* 72 Antitrust L.J. 625, 652 (2005)). Thus, a predatory bidding plaintiff must prove: (1) "that the alleged predatory bidding led to below-cost pricing of the predator's outputs;" and (2) "that the defendant has a dangerous probability of recouping the losses incurred in bidding up input prices through the exercise of monopsony power." *Id.* at 325, 127 S. Ct. at 1078. After establishing that the standard for predatory bidding was the same, the Court reversed the lower court's decision to allow a jury verdict in favor of the plaintiff to stand because the plaintiff proved only that the defendant had purchased more inputs than it needed at higher prices than necessary in order to prevent the plaintiff from buying what it needed to compete. *Id.*

Defendants argue that the reasoning in *Weyerhaeuser* applies here as well. This is not so for at least three reasons. First, *Weyerhaeuser* involved a motion for judgment as a matter of law following a jury trial based on the evidence that had been admitted. *Id.* at 314-15, 127 S. Ct. at 1072. This case is before the Court on a motion to dismiss. Thus, Plaintiffs need only plead facts that make their claim plausible. Secondly, the facts of this case do not fit neatly into the prototypical descriptions of predatory pricing or predatory bidding schemes laid out in *Weyerhaeuser.* Defendants are alleged to have bid up the price of both milk futures and cheese

at roughly the same time. They bid up the price of one in order to help maintain the inflated price of the other. And those products are not easily defined as inputs or outputs. For this reason, other investors (including Plaintiffs) were both competitors, in the sense that they may have also bought milk futures and cheese were it not for Defendants' manipulative tactics, and consumers, in the sense that their injury resulted simply from the purchase of those products at inflated prices (not their inability to compete in the manufacture and sale of some output).

Finally, even accepting that *Weyerhaeuser* has some applicability here, Plaintiffs' allegations are in line with that case's driving principle. *Weyerhaeuser* identifies two significant links between predatory pricing and predatory bidding. First, "both claims involve the deliberate use of unilateral pricing measures for anticompetitive purposes." *Id.* at 322, 127 S. Ct. 1076. Second, "both claims logically require firms to incur short-term losses on the chance that they may reap supracompetitive profits in the future." *Id.* Here, Plaintiffs allege both. In fact, they even provide allegations regarding specific conversations between the individual defendants where they discussed the potential short-term risks they faced on the cheese market and calculated the net profit they would gain through the resulting inflation of the milk futures market. At the motion to dismiss stage, this is enough.

### 4. Standing

Defendants argue next that only Plaintiffs who purchased milk futures have standing to bring a claim for monopolization. While the other plaintiffs do allege injury stemming from the conduct that forms the basis of the monopolization claim, Defendants argue that they suffered their injury outside the relevant markets, and therefore fall outside the group of people Congress meant to protect with § 2 of the Sherman Act. Defendants cite *Republic Tobacco, L.P. v. North Atlantic Trading Co., Inc.*, No. 98 C 4011, 1999 WL 1270681, at *2 (N.D. Ill. Dec. 27, 1999),

for the proposition that Plaintiffs "must sustain the antitrust injury in the relevant market, not in some other market." They also cite *Serfecz v. Jewel Food Stores*, 67 F.3d 591, 597-99 (7th Cir. 1995), which held that a plaintiff did not have standing when he was neither a consumer nor a competitor in the relevant market, but rather a lessor of rental space to competitors in the market. If the Court accepts the rule posited in *Republic Tobacco*, it must also grant this aspect of Defendants' motion to dismiss. But the rule in *Serfecz* does not so clearly bar claims by Plaintiffs who suffered injury outside the relevant milk futures markets, and Plaintiffs argue that intervening case law clarifies the law as it applies to them and overrules *Republic Tobacco*.

*Serfecz* is most concerned with two related issues: (1) whether the plaintiffs suffered "antitrust injury;" and (2) whether they are the proper plaintiffs to maintain an antitrust action with respect to the relevant markets. *Id.* at 596-97. The court provided only a vague definition of "antitrust injury," describing it as an injury "linked to the injury inflicted upon the market, such as when consumers pay higher prices because of a market monopoly or when a competitor is forced out of the market." *Id.* at 597. The court also described the proper plaintiffs vaguely as those "whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement." *Id.* at 597-98 (quoting *Assoc. Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 542, 103 S. Ct. 897, 911, 74 L. Ed. 2d 723 (1983)). The court stressed the "need to balance the interests of deterrence through private antitrust enforcement and avoidance of excessive treble damages litigation" in determining which plaintiffs' injuries were too indirectly tied to the defendants' actions to provide a basis for standing. *Id.* at 598. And the court's definitions do make reference to the relevant markets. But, the vague outlines given by the court do not clearly limit standing to plaintiffs who suffer injury in the relevant markets.

As noted above, Plaintiffs argue that any questions regarding their standing were cleared up more recently by the decision in *Loeb Industries, Inc. v. Sumitomo Corp.*, 306 F.3d 469 (7th Cir. 2002). In *Loeb*, the defendants were accused of manipulating the price of copper futures in violation of § 1 of the Sherman Act. *Id.* at 474. As a result, the price of copper was inflated as well. *Id.* at 474-75. The court held that plaintiffs who purchased the copper, even in forms that included a premium added on to the manipulated price, could still have standing to sue. *Id.* at 489.

The facts of *Loeb* seem much more analogous to this case than those in *Serfecz*. However, *Loeb* did not concern a claim of monopolization and the plaintiffs did not need to prove a relevant market. Thus, the Court must decide whether *Loeb* applies with equal force to this case and, if not, whether *Serfecz* bars the claims of Plaintiffs injured outside the relevant markets. Neither *Serfecz* nor *Loeb* explicitly limits monopolization plaintiffs to those injured inside the relevant market and neither suggests that the standing analysis should differ between claims under § 1 and § 2 simply because monopolization plaintiffs must prove the existence of a relevant market. Additionally, as noted above, given the unique method by which Defendants allegedly carried out their scheme (through the manipulation of multiple products in multiple markets), each group of plaintiffs in this case is in a unique position to vindicate the interests of the Sherman Act. Thus, the Court will not adopt a rule that bars all claims brought by those who incurred their injuries outside the relevant markets.

However, it seems that while plaintiffs who were injured by the inflation of the price of cheese were directly injured by Defendants' conduct, their injury stems more from Defendants' alleged violations of § 1 than of § 2. They did suffer an "antitrust injury," and they are the type of plaintiffs that the antitrust laws are meant to protect, but their injury did not stem from the

monopolization of the milk futures market. Instead, it stems from the collateral manipulation of the cheese market.

Thus, the Court grants Defendants' motion to dismiss monopolization claims by plaintiffs whose injuries stem from the inflated price of cheese for lack of standing. But the Court denies the motion with regard to claims by plaintiffs whose injuries stem from the anticompetitive effects on the milk futures market. This group of plaintiffs may include purchasers of milk futures during months besides June, July, and August 2004 if Plaintiffs can show that their injuries were directly related to Defendants' monopolization of the market. Similarly, any Plaintiffs who entered into contracts whose value was directly tied to the price of milk futures will also be allowed to proceed.

### 5. Allegations against individual defendants

The individual defendants contest Counts 2 and 3 on the additional grounds that Plaintiffs fail to allege that any of the individual defendants possessed, intended to possess, or had any chance of possessing monopoly power. Plaintiffs do not dispute the fact that they made no such allegations. Instead, they argue that they need not make such pleadings in the case of a conspiracy to monopolize. *See Carpet Group Intern. v. Oriental Rug Importers Ass'n, Inc.*, 256 F. Supp. 2d 249, 283 (D.N.J. 2003) (citing *Appraisers Coalition v. Appraisal Institute*, 845 F. Supp. 592, 603 (N.D. Ill. 1994)). Defendants agree, but point out that conspiracy to monopolize is a separate cause of action under § 2 of the Sherman Act. *See Appraisers Coalition*, 845 F. Supp. at 602-03; *see also* 15 U.S.C. § 2. For this reason, the Court must dismiss Counts 2 and 3 as against the individual defendants.

However, this does not resolve the question of whether Plaintiffs have stated a § 2 claim against the individual defendants. Plaintiffs need not plead legal theories, nor is the Court

constrained by the titles of Plaintiffs' counts. *Vidimos, Inc. v. Laser Lab Ltd.*, 99 F.3d 217, 222 (1996). As discussed above, Plaintiffs only have to provide sufficient notice of their claims to Defendants. The complaint does include an allegation that Defendants "conspired to monopolize" the relevant markets. (Compl. ¶ 223.) Thus, the question the Court must resolve is whether Plaintiffs have alleged sufficient facts to support a claim for conspiracy to monopolize.

To state such a claim, Plaintiffs must allege: "(1) the existence of a combination or conspiracy, (2) overt acts in furtherance of the conspiracy, (3) an effect upon a substantial amount of interstate commerce, and (4) the existence of specific intent to monopolize." *Appraiser's Coalition*, 845 F. Supp. at 603. Given the Court's analysis of Plaintiffs' allegations with regard to Counts 1, 2, and 3 above, the Court concludes that Plaintiffs have met their pleading burden for such a count. Thus, while the Court grants the individual defendants' motion to dismiss Counts 2 and 3 specifically, the Court allows Plaintiffs to proceed on a § 2 claim for conspiracy to monopolize against the individual defendants.

### 6. Inherently wrongful conduct

The individual defendants also argue for dismissal of Plaintiffs' § 2 claims on the grounds that the complaint does not include allegations that the individual defendants personally engaged in "inherently wrongful conduct." They derive this more burdensome test for establishing personal liability in antitrust cases from *Murphy Tugboat Co. v. Shipowners & Merchants Towboat Co., Ltd.*, 467 F. Supp. 841, 853 (N.D. Cal. 1979). In crafting the standard, the court in *Murphy Tugboat* relied on the Supreme Court's warning that "the behavior proscribed by the [Sherman] Act is often difficult to distinguish from the gray zone of socially acceptable and economically justifiable conduct" that one might even want to encourage. *Id.*

(quoting *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 98 S. Ct. 2864, 57 L. Ed. 2d 854 (1978)).

However, the court applied the test on a motion for a judgment notwithstanding the verdict in a criminal case, not on a motion to dismiss in a civil case. *See id.* at 853 n.7 (specifically distinguishing cases involving civil liability). Moreover, the Seventh Circuit has never addressed the standard. Indeed, Defendants do not point to a single appellate court that has affirmatively adopted such a standard. District court case law is also sparse and conflicting. *Compare Monarch Marking Sys., Inc. v. Duncan Parking Meter Maintenance Co.*, No. 82 C 2599, 1986 WL 3625, at *2 (N.D. Ill. 1986) (expressly rejecting the standard), *with Unity Ventures v. County of Lake*, No. 81 C 2745, 1983 WL 1957, at *8 (N.D. Ill. Dec. 16, 1983) (applying the standard with limited discussion).

Thus, the Court must decide whether to apply the standard here. Because the Seventh Circuit has never applied such a high standard, and because even *Murphy* concerned a later stage of litigation in the criminal context, the Court declines to require so much of Plaintiffs. The Court therefore denies the individual defendants' motion to dismiss for failure to allege "inherently wrongful conduct."

## IV.    Commodity Exchange Act: Manipulation

The only argument Defendants make regarding Plaintiffs' claim under the CEA is that the only plaintiffs who arguably have standing under the CEA are those who purchased milk futures. *See* 7 U.S.C. § 25(a)(1). This argument is moot, however, because Count 4 of the complaint is limited to those plaintiffs. Thus, the Court denies Defendants' motion to dismiss Count 4.

## V.     Unjust enrichment & restitution

In Count 5 of their complaint, Plaintiffs bring state law claims of unjust enrichment and restitution. Though state law varies, a claim for unjust enrichment generally must state that the defendant has been unjustly enriched at the expense of the plaintiff. *Montana v. Crow Tribe of Indians*, 523 U.S. 696, 721, 118 S. Ct. 1650, 1663, 140 L. Ed. 2d 898 (1998) (citing Rest. of Restitution § 1 (1937)). Defendants move for dismissal of Count 5 on two grounds. First, they argue that it relies on conclusory allegations which describe no particular benefit to Defendants and no particular detriment to Plaintiffs. Second, they argue that Plaintiffs fail to meet more specific pleading requirements under the various state laws that will apply.

The Court does not find there to be any merit in Defendants' first argument. The Plaintiffs have most certainly alleged injury in various forms, and they have alleged that Defendants profited enormously as a result of their scheme. Even if a direct economic transaction is required between the parties in some states (a determination that the Court leaves for another day), there is no doubt that at least some members of the class, which includes everyone who purchased milk futures during the relevant time period, must have purchased their futures directly from Defendants.

In discussing Defendants' second argument, the parties cite conflicting case law on the question of whether it is appropriate to address the specific requirements of individual state law at this stage of the litigation, none of which is binding on this court. *Compare In re K-Dur Antitrust Litigation*, 338 F. Supp. 2d 517, 546 (D.N.J. 2004) ("at this stage it is premature to consider…[the] requirements [of unjust enrichment law] on a state by state basis") *with In re Aftermarket Filters Antitrust Litigation*, No. 08 C 4883, 2009 WL 3754041, at *11 (N.D. Ill. Nov. 5, 2009) (dismissing unjust enrichment claims for failure to meet pleading requirements of

individual states). At this point, the Court cannot definitively determine what laws will ultimately apply to all of Plaintiffs' claims. Moreover, this multi-district litigation is a consolidation of cases that will ultimately be tried in other districts. The role of this court is to address issues that are globally relevant. Finally, the elements of a claim for unjust enrichment do not require proof that differs vastly from the other claims Plaintiffs make. Thus, reserving ruling on these issues will not have a significant effect on discovery. For all of these reasons, the Court declines to address Defendants' state-specific arguments for the time being. The Court denies Defendants' motion to dismiss Count 5 without prejudice.

## VI.  Racketeering Influenced and Corrupt Organizations Act

Plaintiffs' final claim is that Defendants violated RICO § 1962(c). *See* 18 U.S.C. § 1962(c). In order to defeat a Rule 12(b)(6) motion to dismiss such a claim, Plaintiffs must plead "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 496, 105 S. Ct. 3275, 3285, 87 L. Ed. 2d 346 (1985). Defendants argue that Plaintiffs have failed to adequately plead the second, third, and fourth elements. For the following reasons, the Court finds that Plaintiffs' pleadings do not satisfy the third element. Thus, the Court need not address the remaining elements.

In order to prove a pattern of racketeering activity, a plaintiff must prove at least two related racketeering predicate offenses that "amount to or pose a threat of continued criminal activity." *H.J. Inc. v. Nw. Bell Tele. Co.*, 492 U.S. 229, 239, 109 S. Ct. 2893, 2900, 106 L. Ed. 2d 195 (1989). Thus, a plaintiff must show either "closed-ended continuity," which is a "closed period of repeated conduct" or "open-ended continuity," which is "past conduct that by its nature projects into the future with a threat of repetition." *Id.* at 241, 109 S. Ct. at 2902. In either case,

the Court must bear in mind that "Congress was concerned in RICO with long-term criminal conduct." *Id.* at 242, 109 S. Ct. at 2902.

Closed-ended continuity is defined by the "duration and repetition of the criminal activity," which "carries with it an implicit threat of continued criminal activity in the future." *Midwest Grinding Co., Inc. v. Spitz*, 976 F.2d 1016, 1022-23 (7th Cir. 1992). Thus, in order to determine whether a plaintiff has shown closed-ended continuity, courts in this circuit consider the following five factors: (1) "the number and variety of predicate acts;" (2) "the length of time over which they were committed;" (3) "the number of victims;" (4) "the presence of separate schemes;" and (5) "the occurrence of distinct injuries." *Jennings v. Auto Meter Prods., Inc.*, 495 F.3d 466, 473 (7th Cir. 2007) (quoting *Morgan v. Bank of Waukegan*, 804 F.2d 970, 976 (7th Cir. 1986)). Among these factors, duration is the most important. *Id.* at 473-74 (citing *Roger Whitmore's Auto. Servs., Inc. v. Lake County*, 424 F.3d 659, 673 (7th Cir. 2005)); *Vicom, Inc. v. Harbridge Merchant Servs., Inc.*, 20 F.3d 771, 781 (7th Cir. 1994).

Plaintiffs do not allege the type of duration and repetition required to plead a RICO claim under the closed-ended analysis. They do make allegations about Defendants' conduct after they sold off all of their milk futures in June 2004. But, Defendants allegedly engaged in the majority of that conduct, including false statements, misleading statements, failures to disclose, and the dumping of cheese on foreign markets, in order to conceal their scheme.[7] And while the Court has reserved any decision as to the relevancy of such conduct with regard to the other counts, the case law in this circuit indicates that such attempts at a "cover up" do not extend the duration of

---

[7] The only other conduct Plaintiffs allege after June 2004 seems to be a few additional purchases of cheese DFA did not need and DFA's purchase of Keller's. Plaintiffs do not explain why DFA would make the additional purchases of cheese and even if they are related to the scheme, they seem to be part of the cover-up. Plaintiffs claim that DFA's purchase of Keller's was part of the original *quid pro quo* agreement and likely included payments to Otis and Millar as incentives for them to continue to conceal the scheme. Thus, even considering these allegations, the Court finds that virtually all, if not all of the conduct occurring after June 2004 was part of the parties' attempts to conceal their conspiracy.

a RICO scheme. *Jennings*, 495 F.3d at 474. The Court must "evaluate the allegations with the goal of 'achieving a natural and commonsense result, consistent with Congress's concern with long-term criminal conduct.'" *Id.* at 473 (quoting *Roger Whitmore's Auto. Servs., Inc. v. Lake County*, 424 F.3d 659, 673 (7th Cir.2005). To define the duration of a racketeering scheme by reference to the cover up would extend almost any scheme that involved a cover up infinitely. Rarely do criminals conceal their conduct temporarily with plans to reveal it in the future. Thus, the Court does not find the conduct that occurred after June 2004 relevant to its assessment of whether Defendants' scheme threatened repetition. Given the fact that the remainder of Defendants conduct spanned only a few months and involved only one scheme, the Court finds that Plaintiffs' have not demonstrated closed-ended continuity. *See H.J. Inc.*, 492 U.S. at 242, 109 S. Ct. 2902 (holding "a few weeks or months" of conduct to be insufficient).

For the same reasons, Plaintiffs are unable to show open-ended continuity. An open-ended conspiracy, for RICO purposes, consists of conduct that, "while short lived, shows clear signs of threatening to continue into the future." *Midwest Grinding Co., Inc.*, 976 F.2d at 1023. Plaintiffs may have alleged enough to suggest that, absent the CFTC's intervention, Defendants' would have continued to conceal their conduct into the future. But, given that the Court will not consider the cover up to be part of the pattern, this will not suffice. Frankly, Plaintiffs have not set forth any facts that suggest that Defendants were likely to repeat or continue their market manipulation scheme.

Thus, the Court grants Defendants' motion to dismiss Count 6 of the complaint.

### CONCLUSION

For the above reasons, and in sum, the Court:

    (a) DENIES Keller's Creamery LP's motion to dismiss based on its capacity to be sued;

(b) GRANTS the motions to dismiss by Keller's Creamery LLC and Keller's Creamery Management LLC;

(c) notwithstanding its decision to deny any other motion, GRANTS Defendants' motion to dismiss all claims for damages stemming from the purchase of products priced on the basis of the government minimum milk prices;

(d) DENIES Defendants' motion to apply the filed rate doctrine to the claims not described in (c) above;

(e) DENIES Defendants' motion to dismiss any claim based on conduct occurring after June 2004;

(f) DENIES the individual defendants' motion to dismiss Count 1;

(g) GRANTS Defendants' motion to dismiss monopolization claims by plaintiffs whose injuries stem from the inflated price of cheese for lack of standing;

(h) DENIES Defendants' motion to dismiss monopolization claims by plaintiffs not described in (g) above;

(i) GRANTS the individual defendants' motion to dismiss Counts 2 and 3, but allows Plaintiffs' to proceed on a claim of conspiracy to monopolize;

(j) DENIES Defendants' motion to dismiss Count 4;

(k) DENIES Defendants' motion to dismiss Count 5 without prejudice; and

(l) GRANTS Defendants' motion to dismiss Count 6.


IT IS SO ORDERED.



2/4/11
_____
Dated

_____
Hon. William J. Hibbler
United States District Court