**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| IN RE: DAIRY FARMERS OF AMERICA, INC. | ) | |
| CHEESE ANTITRUST LITIGATION | ) | Master File No. 9 CR 3690 |
| | ) | MDL No. 2031 |
| | ) | |
| THIS DOCUMENT RELATES TO: | ) | Judge Robert M. Dow, Jr. |
| | ) | |
| Direct Purchaser Actions | ) | |

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court on Defendant Schreiber Foods, Inc.'s motion to dismiss Direct Purchaser Plaintiffs' second amended consolidated class action complaint [265]. For the reasons set forth below, the Court grants in part and denies in part Defendant Schreiber's motion to dismiss [265].

**I.      Background**

This MDL action was reassigned from Judge Hibbler's docket to this Court's docket on April 30, 2012.

**A.      Procedural History for Direct Purchaser Actions**

The direct purchaser cases have been consolidated for pre-trial proceedings on this docket. The direct purchasers' amended corrected consolidated class action complaint ("initial complaint") [86] alleged that Defendants violated Sections 1 and 2 of the Sherman Act (Counts 1-3), violated the Commodity Exchange Act ("CEA"), 7 U.S.C. §1 et seq, (Count 4), were unjustly enriched at Plaintiffs' expense (Count 5), and violated the Racketeer Influenced and Corrupt Organizations Act ("RICO") (Count 6). The named Plaintiffs in that complaint were Indriolo Distributors, Inc., Knutson's, Inc. and Valley Gold, LLC, and Defendants were (a) Dairy Farmers of America, Inc. ("DFA"), (b) Gary Hanman, (c) Gerald Bos, (d)  Keller's Creamery,

LP, (e) Keller's Creamery, L.L.C., (f) Keller's Creamery Management, LLP, (g) Frank Otis, and (h) Glenn Millar (the "Initial Defendants"). The initial Defendants collectively filed motions to dismiss, which Judge Hibbler denied in part and granted in part [141 and 142]. All parties named in the initial complaint have reached a settlement in principle and are in the process of drafting settlement documents.

On March 22, 2012, Plaintiffs filed a second amended class action complaint [245], which added Schreiber Cheese, Inc. ("Schreiber") as a named Defendant and added a Cartwright Act claim under California law. Schreiber has moved to dismiss the second amended class action complaint.

B.     Factual History[1]

According to the complaint, in 2004, Defendants DFA, a cooperative group of dairy farmers, and Keller's Creamery, a producer of dairy products, engaged in a conspiracy to inflate the price of milk (for the benefit of DFA's members) and the price of Class III milk futures on the Chicago Mercantile Exchange ("CME") (for the benefit of both Defendants, who had purchased excessive "long" positions in milk futures). The conspiracy was led by Gary Hanman, then-CEO of DFA, Gerald Bos, then-CFO of DFA, Frank Otis, then-CEO of Keller's, and Glenn Millar, then-vice president at Keller's. As part of the scheme, DFA purchased large quantities of unneeded block cheddar cheese delivery contracts on the CME throughout May and June. These purchases were designed to inflate and support the price of spot block and barrel cheddar cheese (two forms of cheddar commodities). CME cheese prices influence the market price of cheese, which in turn influences the price of milk and the settlement price of milk futures. Thus, an

---

[1] Judge Hibbler's memorandum opinion and order of February 4, 2011, sets forth a detailed factual history, which the Court adopts and incorporates in this opinion. Thus, the Court only briefly recounts the facts alleged in Plaintiffs' second amended complaint, primarily as they pertain to Defendant Schreiber.

increase in the price of spot cheese at the appropriate time will increase the price that a holder of long positions in milk futures will reap when he unwinds his futures contracts.

After DFA allegedly spent most of the month of May holding the block price above $2.00 per pound, it became clear that its purchases were insufficient to sustain the price of cheese, in part because the "spread" between the price of blocks—which DFA was supporting—and the price of barrels—which had dropped to lower levels—created an incentive for arbitrage leading to a natural realignment to the traditional margin. The usual spread was for blocks to be priced at approximately three cents above barrels. On May 18, Millar told DFA that, if the price of blocks dropped below $2.00, barrel purchasers (including Defendant Schreiber, a processed cheese producer and one of DFA's largest customers) would close the spread by purchasing barrels. If purchasers supported the barrel side, Millar implied, then the barrel price would rise to meet the block price instead of causing the block price further to decline.

On May 21, the price of blocks dropped to $1.80 per pound and the barrel price dropped to $1.61, and the next week, on May 24, the price of barrels rose to $1.77 per pound. In the week during which the price of barrel cheese rose from $1.61 to $1.77, Schreiber purchased five of the eight loads of barrels purchased. Thereafter, Schreiber continued purchasing barrels, and the price remained at $1.77 per pound. Between May 24 and June 22, Schreiber allegedly purchased 90% of the loads of barrel cheese traded on the CME. The second amended complaint alleges that, during the exact same period, DFA purchased 100% of the loads of block cheese traded on the CME, all at $1.80 per pound. While it was doing so, DFA and Keller's "unwound" their long positions in milk futures at a large profit. On June 23, DFA and Schreiber allegedly stopped buying spot cheese simultaneously, and the price of blocks and barrels dropped 30-35 cents by June 25.

The complaint also alleges that DFA and Schreiber have a close relationship and engage in frequent communications. The second amended complaint refers to certain communications in which DFA and Keller's discussed prices and prospective prices on the public markets, including the CME Cheese Spot Call market, and the firm's costs and profits resulting from prices. The complaint also alleges that DFA and Keller's personnel and Schreiber personnel routinely discussed where they thought the prices on such CME cheese contracts should be, when Schreiber would buy in the market, when Schreiber would make profits on transactions, and how long the prices on the CME took until they registered in Schreiber's costs or profits. In 2004, Gary Hanman, then-CEO of DFA, and Larry Ferguson, then-CEO of Schreiber, who allegedly were close friends, met privately to negotiate a sale of 5 million pounds of cheese to Schreiber. That sale allegedly was announced on July 13, 2004, the month after the alleged conspiracy period.

In 2008, the DFA and Keller's Defendants entered into consent decrees with the Commodity and Futures Trading Commission ("CFTC") for violations of the Commodity Exchange Act ("CEA") based on their alleged manipulation of milk futures and spot cheese contracts. DFA, Keller's, and Defendants Hanman, Kos, Millar, and Otis did not admit liability, but they agreed to pay fines to settle the CFTC's charges.

## II.     Legal Standard

The purpose of a Rule 12(b) motion to dismiss is not to decide the merits of the case. A Rule 12(b)(6) motion tests the sufficiency of the complaint, *Gibson v. City of Chi.*, 910 F.2d 1510, 1520 (7th Cir.1990), while a Rule 12(b)(1) motion tests whether the Court has subject matter jurisdiction. *Long v. Shorebank Dev. Corp.*, 182 F.3d 548, 554 (7th Cir. 1999). In reviewing a motion to dismiss under either rule, the Court takes as true all factual allegations in

Plaintiffs' complaint and draws all reasonable inferences in their favor. *Killingsworth v. HSBC Bank Nev., N.A.*, 507 F.3d 614, 618 (7th Cir. 2007); *Long*, 182 F.3d at 554. To survive a Rule 12(b)(6) motion to dismiss, the claim first must comply with Rule 8(a) by providing "a short and plain statement of the claim showing that the pleader is entitled to relief" (Fed. R. Civ. P. 8(a)(2)), such that the defendant is given "fair notice of what the * * * claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). Second, the factual allegations in the claim must be sufficient to raise the possibility of relief above the "speculative level," assuming that all of the allegations in the complaint are true. *E.E.O.C. v. Concentra Health Servs., Inc.*, 496 F.3d 773, 776 (7th Cir.2007) (quoting *Twombly*, 550 U.S. at 555). "A pleading that offers 'labels and conclusions' or a 'formulaic recitation of the elements of a cause of action will not do.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555). However, "[s]pecific facts are not necessary; the statement need only give the defendant fair notice of what the * * * claim is and the grounds upon which it rests." *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (citing *Twombly*, 550 U.S. at 555) (ellipsis in original).

## III.    Analysis

Defendant Schreiber's motion to dismiss presents two primary arguments. First, Schreiber contends that the second amended complaint fails to adequately allege that Schreiber joined the antitrust conspiracy conceived by DFA and Keller's in 2004 to inflate the price of milk and milk futures by purchasing excessive loads of "spot" cheese on the CME. Second, Schreiber maintains that Plaintiffs' claims against Schreiber, which were filed almost eight years after the alleged conspiracy took place, are barred by the four-year statute of limitations in the

Clayton Act and the two-year statute of limitations in the Commodity Exchange Act. The Court

addresses each argument in turn.

> **A.** **Plausibility of Counts 1 and 5 (Violations of § 1 of Sherman Act and California's Cartwright Act**

Defendant Schreiber maintains that Counts 1 and 5 of the operative complaint (alleging

violations of § 1 of the Sherman Act and California's Cartwright Act) should be dismissed for

failure to plead a plausible conspiracy. A plaintiff alleging an antitrust conspiracy "generally

must prove three things: (1) that defendants had a contract, combination, or conspiracy ('an

agreement'); (2) that as a result, trade in the relevant market was unreasonably restrained; and (3)

that they were injured." *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 705 (7th Cir.

2011). Schreiber contends that Plaintiffs' conspiracy claims fail on the first requirement.

Plaintiffs allege that DFA and Schreiber simultaneously purchased CME spot cheese

contracts at inflated levels, thereby driving up the price of cheese and milk in general and,

indirectly, the price of milk futures. The question then is "whether the challenged

anticompetitive conduct stem[s] from independent decision or from an agreement, tacit or

express." *Twombly*, 550 U.S. at 553. This requires plausible allegations that the "conspirators

'had a conscious commitment to a common scheme designed to achieve an unlawful objective'"

or, in other words, "'a unity of purpose or a common design and understanding, or a meeting of

minds in an unlawful arrangement.'" *Omnicare, Inc.*, 629 F.3d at 706; see also *McCoy v.

Gamesa Tech. Corp.*, 2012 WL 245166, at *5 (N.D. Ill. Jan. 26, 2012).

Defendants repeatedly reference the language in *Twombly* and suggest, like DFA and

Keller's did in their motion to dismiss, that it requires Plaintiffs to not only plead facts from

which the Court can draw the inference of an agreement, but that the inference of an agreement

must be stronger than other competing inferences. This is an incorrect reading of *Twombly.*

6

The *Twombly* Court made clear that a plaintiff could not proceed simply by pleading facts that were consistent with an agreement and therefore made such an agreement possible. *Id.* However, the Court also made clear that it was not "impos[ing] a probability requirement at the pleading stage." *Id.* at 556, 127 S.Ct. at 1965. Instead, an antitrust plaintiff must provide something in between possibility and probability—plausibility. *Id.* at 556–57, 127 S.Ct. at 1965–66; see also *Iqbal,* 129 S.Ct. at 1949 ("The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."). In order to nudge their claims across the line between possibility and plausibility, *Twombly* requires Plaintiffs to allege "enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Twombly,* 550 U.S. at 556. Stated differently, they must allege enough to raise a reasonable inference of an agreement, drawing all reasonable inferences in Plaintiffs' favor. *Iqbal,* 129 S.Ct. at 1949; *Bonte v. U.S. Bank, N.A.,* 624 F.3d 461, 463 (7th Cir. 2010). It follows that the inference of an agreement need not be more reasonable than the inference of independent parallel conduct. *Swanson v. Citibank, N.A.,* 614 F.3d 400, 404 (7th Cir. 2010) (interpreting *Twombly* and *Iqbl* to mean that "it is not necessary to stack up inferences side by side and allow the case to go forward only if the plaintiff's inferences seem more compelling than the opposing inferences"). To hold otherwise would to require the very "probability requirement" eschewed by the Supreme Court. *Id.*; *cf. Twombly,* 550 U.S. at 554, 127 S.Ct. at 1964 (noting that evidence tending to exclude the possibility of independent action is required at the summary judgment and trial stages).

Defendant's primary point, stated various ways, is that Plaintiffs have not demonstrated an agreement between Schreiber and DFA and Keller's. Defendants concede that Plaintiffs plead communications among Defendants followed by parallel conduct, but they argue that

Plaintiffs have not provided enough additional facts to plausibly suggest that this parallel conduct was the result of some agreement between Defendants. At this stage, the Court disagrees.

The complaint alleges complex and unusual pricing practices by Defendants, which are not explained by forces of supply and demand. Judge Hibbler previously concluded that Plaintiffs plausibly alleged that DFA and Keller's conspired to and did manipulate CME cheese prices in order to create profits on the CME milk futures contract positions and DFA's milk sales. *In re Dairy Farmers of America, Inc. Cheese Antitrust Litig.*, 767 F. Supp. 2d 880, 897-901 (N.D. Ill. 2011). Plaintiffs now take the scenario a step further, and allege that, in the middle of the execution of their conspiracy to manipulate the milk futures market, DFA and Keller's realized that they could not succeed without another co-conspirator to inflate the price of CME barrel cheese. They thus enlisted Schreiber to serve as the prop for the barrel market, as the price of each of the block and barrel contracts influences the price of the others. Plaintiffs allege that DFA's CEO and Schreiber's CEO had many private communications and meetings about where the market "was going" and "how that would affect business," and that Schreiber agreed to purchase enough cheese to maintain a particular price before dropping out of the market at the same time as DFA. The parties then acted in conformity with this scheme and, according to Plaintiffs, the price of barrel cheese defied the laws of supply and demand. Specifically, Plaintiffs allege that DFA bought every load of CME block cheese and Schreiber bought every load of CME barrel cheese for the weeks ending June 11, 18, and 25, 2004, and Schreiber and DFA each purchased, between May 22 and June 24, an unusually or unprecedentedly high volume of CME Spot Cheese Contracts which caused highly usual or record volume in the CME Spot Cheese Contract. For the weeks ending May 28 through June 25, Schreiber bought

approximately 90% of the loads of barrel cheese traded on the CME. According to the complaint, not only was Schreiber's conduct usual for it and the market in general, the conduct also resulted in "unprecedented," record "flat line" CME barrel cheese prices and a record simultaneous "flat line" in both CME block and barrel prices over 22 consecutive trading days.

Unusual and sustained pricing stability is not expected in a competitive market and, as a "plus factor," can indicate collusion. *In re TFT-LCD Antitrust Litig.*, 586 F. Supp. 2d 1109, 1115-16 (N.D. Cal. 2008) ("the TFT-LCD product market ha[d] been characterized by unnatural and sustained price stability which is inconsistent with natural market forces"; allegations of "such unusual pricing practices state a cause of action under *Twombly*"). Furthermore, paying more than one has to pay suggests conduct contrary to economic interest and also can indicate collusion. See *In the Matter of Anthony J. DiPlacido*, 2008 WL 4831204, at \*10 (CFTC Nov. 5, 2008). Perhaps Schreiber has a legal reason for, on its own, deciding to buy unprecedentedly or usually high volumes of CME cheese at a price higher than it had to pay, but at this stage, Plaintiffs' allegations plausibly suggest an agreement to manipulate prices. See also *Re/Max Intern., Inc. v. Realty One, Inc.*, 173 F.3d 995, 1009 (6th Cir. 1999) ("whether the defendants' actions, if taken independently, would be contrary to their economic self-interest" is a plus factor); *Apex Oil Co. v. DiMauro*, 822 F.2d 246, 254 (2d Cir. 1987) (a showing that the parallel acts were "against the apparent individual economic self-interest of the alleged conspirators" "if successful, might tend to exclude the possibility of independent parallel behavior"); *Blomkest Fertilizer, Inc. v. Potash Corp. of Saskatchewan*, 203 F.3d 1028, 1044 (8th Cir. 2000) ("[A]cts that would be irrational or contrary to the defendant's economic interest if no conspiracy existed, but which would be rational if the alleged agreement existed, do tend to exclude the possibility of innocence."). When one adds to these factors the additional allegations that (i) DFA and

9

Schreiber are alleged to have simultaneously ended their parallel, hyperactive conduct (resulting in a 22% drop in prices) and (ii) shortly thereafter announced a private deal on "favorable" terms to Schreiber,[2] it becomes reasonable to infer that the private deal was additional consideration by DFA for Schreiber's agreement to support CME prices. See also *In re Dairy Farmers of America.*, 767 F. Supp. at 900 (drawing reasonable inferences in favor of Plaintiffs, "quid pro quo agreement involving DFA's purchase of cheese" provided "additional factual support * * * for an inference that there was an agreement between the individual defendants, whether express or tacit.").

Plaintiffs further allege that Schreiber's motive for its conduct was to increase (i) the prices at which Schreiber sold its cheese to its customers, and (ii) its profits on such sales, and that these things in fact happened. Although Schreiber has raised some notable arguments that cut against Plaintiffs' theory regarding Schreiber's motive, Plaintiffs' allegations, read in the light most favorable to Plaintiffs, suggest a plausible motive for Schreiber's unusual conduct.

Taken together, the conduct of DFA and Keller's (already found to plausibly suggest a conspiracy), Schreiber's parallel and simultaneous conduct, the alleged communication between DFA and Schreiber's, the unnatural effect on the market, and Schreiber's alleged motive, all raise a reasonable inference of an agreement between Schreiber and DFA and Keller's. Therefore, Defendant Schreiber's motion as it pertains to Counts 1 and 5 of the operative complaint (alleging violations of § 1 of the Sherman Act and California's Cartwright Act) is denied.

### B.    Counts 2 and 3 (Monopolization in Violation of § 2 of the Sherman Act)

---

[2]    Plaintiffs allege that in June 2004, DFA sold Schreiber 5,000,000 pounds of cheese for $1.40 per pound, despite the fact that DFA had just been paying $1.80-$2.15 per pound.

Plaintiffs do not appear to allege a violation of § 2 of the Sherman Act as Plaintiffs make no allegations against or even mention Schreiber under Count 3 (attempted monopolization) of the second amended complaint, and their only allegation against Schreiber in Count 2 (monopolization) is that "Defendants' anticompetitive conduct * * * has also resulted in monopolistic profits for Defendants and Schreiber." Further, in their response brief, they fail to mention let alone defend a reading which extends the monopolization counts to Schreiber. Therefore, the Court grants Schreiber's motion to dismiss Counts 2 and 3 of the second amended complaint, to the extent that those counts were intended to pertain to Schreiber.

### C.     Count 4 (CEA Claim)

Plaintiffs allege that Schreiber violated the CEA by manipulating the price of Class III milk futures. A plaintiff may recover either from a principal violator or from one who aids and abets another's violation. At this stage, it is sufficient for Plaintiffs to plead an entitlement to recovery under either theory. To state an aiding and abetting claim under § 25(a) of the CEA, Plaintiffs first must allege the components of a manipulation claim against a principal. See *Damato v. Hermanson*, 153 F.3d 464, 471 (7th Cir. 1998). Plaintiffs then must allege that Schreiber (1) knew of the principals' intent to manipulate milk futures; (2) had the intent to further that manipulation; and (3) committed some act in furtherance of the scheme. *In re Platinum and Palladium Commodities Litig.*, 2011 WL 4048780, at *8 (S.D.N.Y. Sept. 13, 2011). With respect to aider and abettor liability, Schreiber merely states that for "the reasons explained above [in arguing for the dismissal of Counts 1 and 5], the Complaint does not plausibly allege that Schreiber agreed to purchase spot cheese, knew of DFA and Keller's plan to manipulate milk futures, or specifically intended such a result from its purchase of cheese." The Court already rejected this argument in addressing Counts 1 and 5, concluding that Plaintiffs

11

have plausibly alleged a conspiracy to manipulate the prices of the CME spot cheese market. Therefore, for the same reasons set forth in discussing Counts 1 and 5, Defendants' motion as it pertains to Count 4 is denied.

### D.      Count 6 (Unjust Enrichment)

In denying without prejudice the motion to dismiss these claims as against the other Defendants, Judge Hibbler determined that "a claim for unjust enrichment generally must state that the defendant has been unjustly enriched at the expense of plaintiffs." *In re Dairy Farmers of America, Inc. Cheese Antitrust Litigation*, 767 F. Supp.2d 880, 909 (N.D. Ill. 2011) (citing *Montana v. Crow Tribe of Indians*, 523 U.S. 696, 721 (1998)). He concluded that Plaintiffs had sufficiently alleged both that Plaintiffs had been injured and that Defendants "profited enormously as a result of their scheme," but left for another day any argument that specific state law requirements were not met. *Id.* Schreiber now moves to dismiss Plaintiffs' claim for unjust enrichment and restitution, contending only that Plaintiffs "fail to state a claim for any fraudulent conduct against Schreiber under these predicate statutes [Sherman Act and the CEA]" and therefore their claims for unjust enrichment fail. As discussed earlier, the Court has concluded that dismissal of Plaintiffs' claims under Section 1 of the Sherman Act and the CEA is not appropriate at this stage. Accordingly, the Court denies the motion to dismiss as it pertains to Count 6.

### E.      Statute of Limitations Defense

Schreiber's final argument is that Plaintiffs' CEA and antitrust claims as pleaded are time-barred as a matter of law. Plaintiffs allege that Schreiber "conspired with the Defendants from May 25, 2004 until June 23, 2004 in order to artificially inflate CME cheese prices, which necessarily resulted in higher CME Class III milk futures contract prices." As pointed out by

Schreiber, Plaintiffs did not sue Schreiber until March 22, 2012, almost eight years after the alleged conduct underlying Plaintiffs' claims and more than three years after the CFTC issued orders finding that DFA and Keller's had manipulated milk futures and cheese contracts.

Private actions under the CEA are subject to a two-year statute of limitations. 7 U.S.C. § 25(c); *Indemnified Capital Invs., SA v. R.J. O'Brien & Assocs., Inc.*, 12 F.3d 1406, 1411 (7th Cir. 1993). The statute begins to run "when the plaintiff knew or in the exercise of reasonable diligence should have known of defendant's alleged misconduct." *Dyer v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 928 F.2d 238, 240 (7th Cir. 1991). The Clayton Act subjects Plaintiffs' federal antitrust claims to a four-year statute of limitations. 15 U.S.C. § 15b. An antitrust "'cause of action accrues and the statute begins to run when a defendant commits an act that injures a plaintiff's business.'" *Rotella v. Wood*, 528 U.S. 549, 558 (2000). Under the federal discovery rule, the limitations period does not begin to run until the plaintiff "discovers (or should if diligent have discovered) both the injury that gives rise to his claim and the injurer or * * * injurers." *Jay E. Hayden Found. v. First Neighbor Bank*, 610 F.3d 382, 386 (7th Cir. 2010); see also *In re Copper Antitrust Litig.*, 436 F.3d 782, 789 (7th Cir. 2006) ("Under the discovery rule, the statute does not begin running until the plaintiff discovers that he has been injured and who caused the injury.").

Schreiber's timeliness arguments misapprehend the law surrounding statute-of-limitations defenses raised at this stage of a case. Schreiber chides Plaintiffs for failing to allege that they were "unaware of their injuries before 2008 or that they could not reasonably have discovered their injuries had they been diligent." Schreiber's Memorandum at 20; see also *id.* at 25 ("Plaintiffs do not allege that they diligently pursued their claims, that anyone concealed Schreiber's alleged role in the conspiracy, or that anything prevented Plaintiffs from learning of

the basis of their claims against Schreiber."). As recent cases demonstrate, Plaintiffs were not obligated to plead around a potential limitations defense. The Seventh Circuit recently has been very clear in its assessment of the limitations periods: "[O]n the subject of the statute of limitations * * * * [w]hat a complaint must plead is enough to show that the claim for relief is plausible. Complaints need not anticipate defenses and attempt to defeat them. The period of limitations is an affirmative defense * * * * We have held many times that, because complaints need not anticipate defenses, Rule 12(b)(6) is not designed for motions under Rule 8(c)(1)." *Richards v. Mitcheff*, 696 F.3d 635, 637-38 (7th Cir. 2012) (internal citations omitted); see also *United States Gypsum Co. v. Indiana Gas Co.*, 350 F.3d 623 (7th Cir. 2003); *United States v. Northern Trust Co.*, 372 F.3d 886 (7th Cir. 2004); *Xechem, Inc. v. Bristol—Myers Squibb Co.*, 372 F.3d 899 (7th Cir. 2004). In *Mitcheff*, the Court concluded by reminding judges to "respect the norm that complaints need not anticipate or meet potential affirmative defenses."

Here, Plaintiffs have not pleaded themselves out of court by alleging facts that are sufficient to establish a statute-of-limitations defense for Schreiber. See *Walker v. Thompson*, 288 F.3d 1005, 1010 (7th Cir. 2002) (in cases in which a plaintiff effectively pleads herself out of court, the validity of the defense must be "apparent from the complaint itself, and unmistakable, so that the suit is fairly describable as frivolous"; "[t]hus a personal-injury suit filed 100 years after the date of the injury as stated in the complaint would be frivolous, even though expiration of the time within which to sue is an affirmative defense."); *Xechem, Inc. v. Bristol-Myers Squibb Co.*, 372 F.3d 899, 901 (7th Cir. 2004) ("Only when the plaintiff pleads itself out of court—that is, admits all the ingredients of an impenetrable defense—may a complaint that otherwise states a claim be dismissed under Rule 12(b)(6)."). "A complaint that invokes a recognized legal theory (as this one does) and contains plausible allegations on the

material issues (as this one does) cannot be dismissed under Rule 12." See *Erickson v. Pardus,* 551 U.S. 89 (2007). Schreiber's statute of limitations defense—arguably brought under the wrong part of Federal Rule of Civil Procedure 12 (see *Mitcheff*, 696 F.3d at 637-38) and asking the Court to consider various documents which, even prior to *Mitcheff*, would have been off limits—is premature.

## IV. Conclusion

For these reasons, the Court grants in part and denies in part Defendant Schreiber's motion to dismiss [265]. The motion is granted as it pertains to Counts 2 and 3 and denied as it pertains to the remaining counts asserted against Schreiber.

Dated: January 18, 2013                    _____
                                           Robert M. Dow, Jr.
                                           United States District Judge