**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| IN RE: DAIRY FARMERS OF AMERICA, INC. | ) | |
| CHEESE ANTITRUST LITIGATION | ) | Master File No. 09 CR 3690 |
| | ) | MDL No. 2031 |
| | ) | |
| THIS DOCUMENT RELATES TO: | ) | Judge Robert M. Dow, Jr. |
| | ) | |
| Indirect Purchaser Actions | ) | |

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court on three motions to dismiss [160, 197, 287] filed by

Defendants (referred to collectively as "DFA-Keller's Family") in three separate lawsuits which

are before this Court as part of MDL No. 2031.[1]  Also before the Court is DFA's motion to set

aside default on behalf of non-existent entity Keller's Creamery LP, which was fully briefed in

the Kansas transferor court and is now pending before this Court.[2]

For the reasons set forth below, the Court grants DFA's motion to set aside default.  The

Court also grants in part Defendants' motions to dismiss the *Rudman/Palombella* and *Waun*

---

[1] This MDL action was reassigned from the Judge Hibbler's docket to this Court's docket on April 30, 2012.  Earlier this year, the Court issued a ruling on the motion to dismiss filed by the one remaining Direct Purchaser Plaintiff (Schreiber Foods) [see 314].  The remaining Direct Purchaser Plaintiffs have filed a motion for preliminary approval of their settlement [327], to which Schreiber has objected [see 339, 341, 344, 354].  Those matters concerning the Direct Purchaser Plaintiffs remain pending and will be addressed in a separate order.  The principal difference between "direct" purchasers and "indirect" purchasers is that indirect purchasers purchased products from a person or company that is not one of the defendants, whereas direct purchasers purchased *directly* from the defendants.  This opinion relates solely to the motions seeking dismissal of the Indirect Purchaser claims.

[2] The motion to set aside default was brought in the Kansas Indirect Purchaser Action and was filed with the transferor court.  The motion has never been filed on this Court's docket.  Furthermore, the parties make passing reference to other motions to set aside Keller's default, presumably also brought before transferor courts.  To the extent that there are any additional pending motions to set aside default that were filed in the transferor courts and that rest on the same arguments and authority as the Kansas motion, the Court's ruling applies equally to those motions.  As a matter of efficient docket management, the parties are directed to re-file any motions previously filed before another court on this Court's docket.

complaints [160, 197] and dismisses Plaintiffs' three federal antitrust claims (Count I-III) for lack of antitrust standing. Disposition of the remaining issues, including Defendants' motion to dismiss the *Asmann* complaint [287] and Defendants' motion to dismiss the state law claims of the *Rudman/Palombella* and *Waun* Indirect Purchaser Plaintiffs, is deferred pending the receipt by the Court of further input from the parties on (1) the Court's subject matter jurisdiction under CAFA, (2) whether, if CAFA jurisdiction is lacking, the Court should exercise supplemental jurisdiction over the Indirect Purchaser Plaintiffs' state law claims given that all federal claims of the Indirect Purchaser Plaintiffs are subject to dismissal, and (3) how the Court's ruling today should affect the overall case management of these MDL proceedings.

## I. Background

To put Plaintiffs' allegations simply, they claim that Defendants conspired to, and did in fact, buy up all of the available long positions in three months worth of Class III milk futures contracts on the Chicago Mercantile Exchange ("CME") in an effort to gain control of those markets and sell their positions at an unreasonably high price. According to Plaintiffs, in order to successfully pull off their scheme, Defendants also purchased large quantities of cheese at inflated prices on the CME spot cheese market, thereby creating the false impression that Class III milk prices were rising. By creating that impression, they could justify charging the inflated prices for their futures positions and maintain those prices long enough to sell off all of their positions at a profit. Plaintiffs allege that they were injured by Defendants' actions when they purchased finished products at artificially inflated prices. Finally, they allege that Defendants compounded the effects of their actions by conspiring to conceal their scheme for years after they had sold off all of their futures positions. See, *e.g., In re Dairy Farmers of America, Inc. Cheese Antitrust Litigation*, 767 F. Supp. 2d 880, 886 (N.D. Ill. 2011).

### A.       Procedural History for Indirect Purchaser Actions

On May 29, 2009, Plaintiff Jacqueline Rudman filed a class action complaint against Defendants Dairy Farmers of America, Inc. ("DFA") and Keller's Creamery LP ("Keller's") in the District of Vermont.  On July 7, 2009, the Judicial Panel on Multidistrict Litigation ("JPML") transferred the case to the Northern District of Illinois as part of MDL No. 2031.  On May 21, 2010, Plaintiff Rudman filed an amended class action complaint that joined Brandi Palombella as a named Plaintiff in the indirect purchaser actions.  On February 4, 2011, Judge Hibbler denied in part and granted in part [141 and 142] the motion to dismiss the direct purchaser actions.  On March 14, 2011, Plaintiffs Rudman and Palombella filed a second amended class action complaint ("operative complaint") in the indirect purchaser actions, alleging that Defendants violated Sections 1 and 2 of the Sherman Act and the antitrust and consumer protection laws of 24 states and that Defendants were unjustly enriched at Plaintiffs' expense.  Defendants collectively moved to dismiss [160] on May 13, 2011.

On September 13, 2011, Plaintiffs' counsel filed another class action complaint in the District of Vermont, entitled *Waun v. Dairy Farmers of America, Inc.*, No. 11-cv-00219 ("*Waun*").  On September 14, 2011, the *Waun* Plaintiffs filed a Notice of Potential Tag-Along Action with the JPML.  On October 5, 2011, the JPML issued a Conditional Transfer Order that transferred the *Waun* case to this Court pending the Court's consent and the Clerk's filing of the JPML's order.  The JPML ruled that the *Waun* action "involves questions of fact that are common to the actions previously transferred to the Northern District of Illinois and assigned to Judge Hibbler."  Indeed, the *Waun* complaint contains identical claims and substantially similar allegations as the operative complaint.  On November 9, 2011, the Court consolidated the *Waun*

complaint with the operative indirect purchaser complaint in the MDL for pretrial purposes. On November 6, 2011, Defendants filed a motion to dismiss the *Waun* action.

On December 15, 2011, Plaintiff Courtney Asmann filed a complaint in the Eighteenth Judicial District Court, Sedgwick County, Kansas. On February 21, 2012, Defendants removed *Asmann v. Dairy Farmers of America, Inc.* ("*Asmann*") to the United States District Court for the District of Kansas. The next day, DFA filed a notice of potential tag along action with the JPML and a motion to stay the action pending the JPML's decision to transfer the case. On April 4, 2012, Magistrate Judge Waxse granted the motion to stay the action against DFA only and granted DFA an extension of time to answer or otherwise plead up to and including 30 days after entry of the JPML's transfer decision. On February 29, 2012, Asmann applied for default under Rule 55(a). On March 29, 2012, a clerk's entry of default was entered against Keller's. On March 30, 2012, DFA moved to set aside the default on behalf of Keller's. On April 18, 2012, DFA moved to dismiss the complaint against Keller's for lack of personal jurisdiction, insufficient process and service of process, and failure to state a claim. Plaintiff Asmann claims that both motions violate Rule 9(a)(2) and were waived and that the motion to dismiss cannot be considered unless and until Keller's is relieved of its default.

On June 8, 2012, the JPMDL transferred *Asmann* to this Court pursuant to 28 U.S.C. § 1407, finding that, "[l]ike several of the already-centralized actions, this action is brought by an indirect purchaser alleging that DFA engaged in a pattern of manipulated transactions for cheese and/or milk futures on the Chicago Mercantile Exchange * * * in violation of state antitrust statutes." As with the operative complaint and the *Waun* complaint, the *Asmann* complaint also arises from Defendants alleged "conspiracy to fix, stabilize, raise and maintain the prices of Class I and III Milk and products containing Class I and III Milk including cheeses (other than

cottage cheese) * * * through the manipulation of trading on the Chicago Mercantile Exchange."[3] On July 9, 2012, Defendant DFA moved to dismiss the Kansas indirect purchaser complaint.

### B.    Factual History[4]

Plaintiffs allege that Dairy Farmers of America, Inc. ("DFA") conspired with Keller's Creamery LP ("Keller's") to manipulate the prices at which DFA sold its milk and cheese to retailers and cheese producers. The prices at which DFA sells these products are indexed by contract to the Cheese Spot or the Milk Futures market prices. According to the complaint, DFA purchased every single contract on the Cheese Spot market beginning in the spring of 2004, and Defendants purchased every single contract on the Futures Milk market for the periods that expired on June 30, July 31, and August 31, 2004. According to Plaintiffs, Defendants intentional activity caused a spike in the prices on the Cheese Spot and Milk Futures markets and the wholesale prices at which DFA sold milk and cheese. Plaintiffs are consumers of milk and cheese products manufactured by DFA or Keller's and purchased from retailers.

The Cheddar Spot market is the only commodities exchange for the sale/purchase of cheddar cheese in the country. The Cheddar Spot market provides a market for trading cheddar cheese and a pricing mechanism for the sale of a myriad of products. Industry participants rely on the Cheese Spot market prices as the basis for prices at which they buy and sell many of their dairy products. Plaintiffs allege that Defendants knew that the Cheese Spot market was

---

[3]   While the *Rudman/Palombella* and *Waun* complaints assert three federal antitrust claims for injunctive relief (Count I-III) and claims for damages under state statutes (Count IV) and the common law of unjust enrichment (Count V), the *Asmann* complaint brings only state law claims for antitrust violations (Counts I and II) and unjust enrichment (Count III).

[4]   Judge Hibbler's memorandum opinion and order of February 4, 2011, sets forth a detailed factual history, which the Court adopts and incorporates in this opinion. Thus, the Court only briefly recounts the facts alleged in Plaintiffs' complaints.

vulnerable to manipulation because it is thinly traded and the pricing structure does not necessarily reflect the actual cost of buying and selling cheese.  The operative complaints allege that the CFTC found "[b]eginning on April 14, 2004, as sellers offered cheddar blocks on the CME Cheese Spot Call, DFA purchased block cheddar cheese.  From May 21 to June 23, 2004, DFA * * * was the sole purchaser of cheddar cheese blocks on the CME."  DFA also made large purchases of CME cheddar cheese blocks in August and September 2004.  According to the complaint, although DFA knew that it would lose money on the resale of the cheese bought on the CME, DFA made these purchases because it also knew that it would profit tremendously from the sales of its own products at the artificially inflated prices caused by the engineered spike in Cheese Spot market prices.[5]

The complaints allege that, between April 14, 2004 and December 31, 2006, Plaintiffs purchased one or more of Defendants' products under the brand names Borden, Mid-America Farms, Hotel Bar, Breakstone's, Plugra, Roberts, Hiland Dairy Foods, Stremick's-Heritage Foods, Wilcox Dairy Farms, HP Hood, Meadow Gold, Flav-O-Rich, Dairy Fresh, Helluva Goods, Maggio, Penn Maid, Dairymens, Chattanooga Dairy, Velda Farms, Coburg Milk, Goldenrod Dairy Foods, Cream O Webber and Stinton Dairy from retailers, such as

---

[5]    In ruling on the direct purchasers' motion to dismiss, the Court previously found that the direct purchasers complaint sufficiently alleged that (1) the markets for Milk Futures contracts for June, July and August 2004 were relevant markets; (2) Defendants had market power; and (3) Defendants wrongfully acquired that market power.  To the extent that these conclusions, as well as additional conclusions found in Judge Hibbler's prior ruling, apply to the indirect purchasers' allegations, the law-of-the-case doctrine applies, as the law-of-the-case presumption holds when a case is reassigned from one judge to another.  See *Minch v. City of Chicago*, 486 F.3d 294, 301 (7th Cir. 2007) ("Among other things, the law of the case doctrine embodies the notion that a court ought not to re-visit an earlier ruling in a case absent a compelling reason, such as manifest error or a change in the law, that warrants re-examination."); *Brengettcy v. Horton,* 423 F.3d 674, 680 (7th Cir. 2005); *Mendenhall v. Mueller Streamline Co.,* 419 F.3d 686, 691 (7th Cir. 2005) ("In situations where a different member of the same court re-examines a prior ruling, the law of the case doctrine * * * reflects the rightful expectation of litigants that a change of judges midway through a case will not mean going back to square one") (internal quotations omitted).

supermarkets. The complaints further allege that the prices of these products "are based on * * * the Cheddar Spot price or Milk Futures contract price, independent of prices set by any government agency." The complaints allege that DFA is vertically integrated, distributing their products to retailers and wholesalers. Thus, Plaintiffs either purchased directly from a retailer, who bought from DFA, or from a customer of a wholesaler who bought from DFA. In either case, Plaintiffs allege that they purchased one of Defendants' products in the same form as sold by Defendants at a price to the direct purchaser that had been fixed by either the Cheese Spot or Milk Futures market contract price.

Plaintiffs further allege that the antitrust violations caused indirect purchasers to pay artificially inflated prices, because the distributors and retailers from whom they buy necessarily pass on the inflated costs. Finally, the complaints allege that the antitrust violations substantially affected intrastate commerce in each and every state in the continental United States and District of Columbia by artificially inflating prices at retail establishments.

In 2008, the DFA and Keller's Defendants entered into consent decrees with the Commodity and Futures Trading Commission ("CFTC") for violations of the Commodity Exchange Act ("CEA") based on their alleged manipulation of milk futures and spot cheese contracts. DFA, Keller's, and Defendants Hanman, Kos, Millar, and Otis did not admit liability, but they agreed to pay fines to settle the CFTC's charges.

## II. Default of Keller's Creamery LP

The Federal Rules of Civil Procedure contemplate that a defendant may move to set aside a clerk's entry of default. Rule 55(c) allows a court to set aside an entry of default for good cause. Fed. R. Civ. P. 55(c). The Seventh Circuit has held that a district court may act *sua sponte* in setting aside an entry of default under Rule 55(c). *Judson Atkinson Candies, Inc. v.*

*LatiniHohberger Dhimantec,* 529 F.3d 371, 386 (7th Cir. 2008). The Seventh Circuit also has

ruled that Rule 55(c)'s "good cause" standard is "easier to satisfy" than Rule 60(b)'s mistake,

inadvertence, and excusable neglect standard. *Sims v. EGA Prods., Inc.,* 475 F.3d 865, 868 (7th

Cir. 2007). Normally, when a defendant has moved to set aside a default, it must demonstrate:

"(1) good cause for default, (2) quick action to correct it, and (3) meritorious defense to

plaintiff's complaint." *Pretzel & Stouffer v. Imperial Adjusters,* 28 F.3d 42, 45 (7th Cir. 1994).

The record does not establish that Defendants' culpable conduct led to the default. DFA

contends that Keller's has not existed as a legal entity for more than six years and could not have

been served. In fact, Plaintiffs delivered to DFA the summons and petition in the name of

Keller's. At best, there is a legal disagreement as to whether or not Keller's must respond to

Plaintiffs' complaints. Furthermore, as demonstrated below, insufficiencies in Plaintiffs'

complaints demonstrate that Keller's has a meritorious defense to at least some of Plaintiffs'

claims in the form of a motion to dismiss. Good cause having been shown, the Court sets aside

the defaults entered against Keller's Creamery LP. Furthermore, the Court will consider the

present motions to dismiss not only on behalf of DFA, but also on behalf of Keller's, finding that

the failure to do so will only result in unnecessary delay, expense, and inconvenience for all

parties, as well as the Court. See *Doe v. White*, 2010 WL 323510, at *2 (C.D. Ill. Jan. 20, 2010)

("There is a substantial amount of case law which provides that successive Rule 12(b)(6)

motions may be considered where they have not been filed for the purpose of delay, where

entertaining the motion would expedite the case, and where the motion would narrow the issues

involved."); see also *Coleman v. Pension Ben. Guar. Corp.*, 196 F.R.D. 193, 196-97 (D.D.C.

2000) (allowing argument via successive motion "[i]n the absence of any apparent bad faith, and

in the interest of promoting the efficient resolution of this case."); *Donnelli v. Peters Securities*

*Co., L.P.,* 2002 WL 2003217, at *3-4 (N.D. Ill. 2002); *Muhammad v. Village of Bolingbrook,* 2004 WL 1557958, at *1 (N.D. Ill. 2004); *Campbell-El v. District of Columbia,* 881 F. Supp. 42, 43 (D.D.C. 1995); *Sharma v. Skaarup Ship Mgmt. Corp.,* 699 F. Supp. 440, 444 (S.D.N.Y. 1988).

### III.     Legal Standard on Motion to Dismiss

The purpose of a Rule 12(b) motion to dismiss is not to decide the merits of the case, but rather to test the sufficiency of the complaint. *Gibson v. City of Chi.*, 910 F.2d 1510, 1520 (7th Cir. 1990). In reviewing a motion to dismiss, the Court takes as true all factual allegations in Plaintiffs' complaint and draws all reasonable inferences in their favor. *Killingsworth v. HSBC Bank Nev., N.A.*, 507 F.3d 614, 618 (7th Cir. 2007); *Long*, 182 F.3d at 554. To survive a Rule 12(b)(6) motion to dismiss, the claim first must comply with Rule 8(a) by providing "a short and plain statement of the claim showing that the pleader is entitled to relief" (Fed. R. Civ. P. 8(a)(2)), such that the defendant is given "fair notice of what the * * * claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). Second, the factual allegations in the claim must be sufficient to raise the possibility of relief above the "speculative level," assuming that all of the allegations in the complaint are true. *E.E.O.C. v. Concentra Health Servs., Inc.*, 496 F.3d 773, 776 (7th Cir. 2007) (quoting *Twombly*, 550 U.S. at 555). "A pleading that offers 'labels and conclusions' or a 'formulaic recitation of the elements of a cause of action will not do.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555). However, "[s]pecific facts are not necessary; the statement need only give the defendant fair notice of what the * * * claim is and the grounds upon which it rests." *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (citing *Twombly*, 550 U.S. at 555) (ellipsis in original).

## IV.    Standing

The Court begins its analysis with Defendants' contention that Indirect Purchaser Plaintiffs lack standing to assert their claims.  Defendants maintain that Indirect Purchaser Plaintiffs fail to allege injury in fact, antitrust injury, and antitrust standing.  Specifically, Defendants contend that Plaintiffs have failed to allege that Direct Purchasers incurred and passed on any overcharge, and, further, that Plaintiffs did not participate in the allegedly restrained markets and thus their alleged injuries are too remote.  Prior to addressing Defendants' *antitrust* injury and standing arguments, two threshold issues must be addressed:  (i) whether the Court should defer ruling on standing issues until after class certification; and (ii) whether Indirect Purchaser Plaintiffs have Article III standing for claims brought under the laws of states where no named Plaintiff alleges that he or she purchased Defendants' products.

### A.    Class Certification and Article III Standing

Indirect Purchaser Plaintiffs argue that Defendants' standing challenge is premature because class certification issues under Rule 23 are to be decided prior to issues of standing under Article III.  Specifically, Plaintiffs argue that in this case class certification questions are "logically antecedent" to standing issues and therefore should be resolved before standing issues are addressed.  See, *e.g., Ortiz v. Fireboard Corp.*, 527 U.S. 815, 831 (1999) (in considering the propriety of certifying a settlement-only class involving persons exposed to asbestos, the Court held that courts may evaluate class certification issues before Article III standing if the former are "logically antecedent" to the latter); *Arreola v. Godinez*, 546 F.3d 788, 795 (7th Cir. 2008).

Several courts—including many in this district—have addressed this issue in recent years and determined that the Supreme Court did *not* intend for district courts to delay determining whether an actual case or controversy is before them.  See *In re Potash Antitrust Litigation*, 667

F. Supp. 2d 907, 922 (N.D. Ill. 2009), rev'd on other grounds sub nom. *Minn-Chem, Inc. v. Agrium Inc.*, 657 F.3d 650 (7th Cir. 2011); see also *Easter v. Am. West. Fin.,* 381 F.3d 948, 962 (9th Cir. 2004) ("[*Ortiz*] does not require courts to consider class certification before standing."); *Tillman v. U.S. Energy Sav. Corp.,* 2008 WL 2754813, at *2 (N.D. Ill. July 14, 2008) (dealing with Article III standing before class certification); *In re Packaged Ice Antitrust Litig.*, 779 F. Supp. 2d 642, 656-57 & n.3 (E.D. Mich. 2011) ("The Court chooses to follow what it finds to be the better-reasoned opinion on this issue which recognize and refuse to abandon the fundamental prudential standing requirements of Article III"); *Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.,* 658 F. Supp. 2d 299, 302-05 (D. Mass. 2009) (ruling on Article III standing issues prior to class certification); *In re Wellbutrin XL Antitrust Litig.,* 260 F.R.D. 143, 151-56 (E.D. Pa. 2009) (refusing to postpone an inquiry into Article III standing); *Carfagno ex rel. Centerline Holding Co. v. Schnitzer,* 591 F. Supp. 2d 630, 633 (S.D.N.Y. 2008) ("[A]djudication of standing must be made prior to determining whether the requirements of class certification have been satisfied."); *In re Salomon Smith Barney Mut. Fund Fees Litig.,* 441 F. Supp. 2d 579, 605-07 (S.D.N.Y. 2006) (same). This Court concurs in these decisions, which interpret *Ortiz* as requiring a court simultaneously facing both class certification and Article III standing to deal with Rule 23 issues first when they are dispositive, but not directing district courts to postpone an inquiry into the threshold issue of justiciability outside of that context. The Court finds the approach followed in the cases cited above to be consistent with recent cases in which the Seventh Circuit has dealt with Article III standing prior to class certification. See *Arreola v. Godinez,* 546 F.3d 788, 794-95 (7th Cir. 2008) (deciding individual standing to pursue injunctive relief prior to evaluating class certification issues). Accordingly, the Court now turns to whether Indirect Purchaser Plaintiffs

have standing to assert claims in states in which they did not allege that they purchased Defendants' products. See also *In re Potash Antitrust Litigation*, 677 F. Supp. 2d at 923.

### B. Article III Standing for State Law Claims

To assert federal and state antitrust claims, Plaintiffs must plead an "injury in fact" that is fairly traceable to the challenged actions of Defendants. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). Plaintiffs also must sufficiently allege that they (1) have suffered an *"antitrust* injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful" (*Cargill,* 479 U.S. at 109 (quotation marks and citation omitted)); and (2) are the "proper party" to maintain an antitrust action. See *Associated General Contractors of California, Inc. v. California State Council of Carpenters ("AGC"),* 459 U.S. 519, 535 n.31 (1983) ("Harm to the antitrust plaintiff is sufficient to satisfy the constitutional standing requirement of injury in fact, but the court must make a further determination whether the plaintiff is a proper party to bring a private antitrust action."); *Kochert v. Greater Lafayette Health Serv., Inc.,* 463 F.3d 710, 715–16 (7th Cir. 2006) (citing *Serfecz v. Jewel Food Stores,* 67 F.3d 591, 597–98 (7th Cir. 1995)); *Sw. Suburban Bd. of Realtors, Inc. v. Beverly Area Planning Ass'n,* 830 F.2d 1374 (7th Cir. 1987). The Court first looks at whether Indirect Purchaser Plaintiffs have Article III standing for claims brought under the laws of states where no named Plaintiff alleges that he or she purchased Defendants' products.

Indirect Purchaser Plaintiffs—residents of New York, Tennessee, Massachusetts, Michigan, and Kansas—assert claims under the statutes and common law of these and other states as well as the District of Columbia. Defendants contend that, even if Plaintiffs have met their burden of demonstrating injury-in-fact in the states in which they allegedly purchased

Defendants' products, they have not met their burden of establishing injury in any of the other numerous states under whose laws they have brought challenges.

An Article III standing inquiry "focuses on whether the plaintiff is the proper party to bring this suit." *Raines v. Byrd,* 521 U.S. 811, 818 (1997). It is the "burden of the party who seeks the exercise of jurisdiction in his favor clearly to allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute." *Spencer v. Kemna,* 523 U.S. 1, 11 (1998) (internal quotations omitted). To satisfy Article III's standing requirement, a party must establish: (1) an injury in fact; (2) a causal connection between the injury and the conduct complained of; and (3) a likelihood that the injury will be redressed by a favorable decision. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560-61 (1992); *Rawoof v. Texor Petroleum Co.,* 521 F.3d 750, 756 (7th Cir. 2008). At the pleading stage, general factual allegations of injury resulting from a defendant's conduct may suffice to establish standing. See *Lujan,* 504 U.S. at 561.

Plaintiffs have alleged that they purchased Defendants' specific brand name products from retailers in New York, Tennessee, Michigan, and Kansas, and that they paid artificially inflated prices as a result of the antitrust violations. The Court will address injury-in-fact in greater detail below, but these allegations likely are sufficient to establish injury-in-fact at the pleading stage with respect to those jurisdictions, as there is no heightened pleading requirement and discovery is available to provide the particulars. See, *e.g., In re Packaged Ice Antitrust Litig.*, 779 F. Supp. 2d 642, 662-63 (E.D. Mich. 2011) ("the ACAC alleges that IP Plaintiff Desmond resides in and purchased packaged ice in California, that as a result of the nationwide conspiracy each of the IP Plaintiffs has suffered injury in that they have paid more for packaged ice than they would have paid absent the conspiracy and that they have thereby suffered an

injury. These facts are sufficient under *Twombly*"); *D.R. Ward Const. Co. v. Rohm & Haas Co.*, 470 F. Supp. 2d 485, 502 (E.D. Pa. 2006) (holding "[p]laintiffs' alleg[ations] that they purchased and paid significantly more for products containing plastic additives as a result of defendants' price-fixing conspiracy" were sufficient to defeat motion to dismiss).

The inquiry with respect to the remaining jurisdictions is different. Defendants ask the Court to dismiss claims brought under the laws of states in which no named Indirect Purchaser Plaintiff purchased goods. In response, Indirect Purchaser Plaintiffs fail to provide any support establishing their individual standing to assert claims under the laws of states where they neither reside nor purchased products. Instead, they simply urge the Court to postpone its inquiry into Article III standing until after class certification. As noted above, the Court has rejected this argument.

The Article III standing inquiry remains the same even if the case is proceeding as a class action: "That a suit may be a class action, however, adds nothing to the question of standing, for even named plaintiffs who represent a class must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent." *Simon v. Eastern Ky. Welfare Rights Org.,* 426 U.S. 26, 40 n.20 (1976) (internal quotations omitted); see also *Payton v. County of Kane,* 308 F.3d 673, 682 (7th Cir. 2002) ("[I]t bears repeating that a person cannot predicate standing on injury which he does not share. Standing cannot be acquired through the back door of a class action."). To have standing as a class representative, the plaintiff must be part of the class, "that is, he must possess the same interest and suffer the same injury shared by all members of the class he represents." *Keele v. Wexler,* 149 F.3d 589, 592-93 (7th Cir. 1998) (citing *Schlesinger v. Reservists Comm. to Stop the War,* 418 U.S. 208, 216 (1974)).

Here, the Indirect Purchaser Plaintiffs have not alleged an injury-in-fact for claims outside of New York, Tennessee, Michigan, and Kansas. See *Lujan,* 504 U.S. at 560. Instead, Plaintiffs allege injuries as a result of buying products in New York, Tennessee, Michigan, and Kansas.[6] The indirect complaints do not allege personal injury in any other state. Thus, Indirect Purchaser Plaintiffs fail to satisfy their burden of showing Article III standing for states in which they do not reside and/or did not purchase the products at issue. See *In re Potash Antitrust Litigation*, 667 F. Supp. 2d 907, 922 (N.D. Ill. 2009); *Zaycer v. Sturm Foods, Inc.*, 896 F. Supp. 2d 399, 409 (D. Md. 2012) ("Zaycer was neither harmed by the Product, nor purchased the Product, in any state other than Maryland. Zaycer suffered no injury-in-fact, and is not in imminent danger of being injured by the Product in any of the states except Maryland. Because the injury to the named plaintiff occurred in Maryland, she has no standing to sue under any state consumer protection law except for Maryland's."); *Catlin v. Hanser*, 2011 WL 1002736, at *8 (S.D. Ind. 2011) (dismissing state law claims of named plaintiff when he failed to allege a personal injury 33 states under which he claimed damages); see also *In re Plasma-Derivative Protein Therapies Antitrust Litigation*, 2013 WL 39766, at *6 (N.D. Ill. 2012) ("To the extent that San Mateo does not claim to suffer its own personalized injury by virtue of the defendants' alleged violations of non-California state-law, San Mateo lacks standing to assert those claims.") (citing *Simon v. Eastern Ky. Welfare Rights Org.,* 426 U.S. at 40 n. 20). Accordingly, this Court dismisses claims based on the antitrust and consumer unfair competition statutes of jurisdictions other than New York, Tennessee, Michigan, and Kansas.

---

[6]  Although Plaintiff Palombella resides in Massachusetts, she does not allege that she purchased any products in Massachusetts.

C.     **Antitrust Injury and Standing for Federal Claims**

The indirect purchaser complaints seek injunctive relief for alleged violations of the Sherman Act under § 16 of the Clayton Act.[7]  Two limitations have been placed on the scope of antitrust liability and, thus, the availability of injunctive relief under § 16.  To maintain an antitrust action, Plaintiffs must establish that they: (1) have suffered an antitrust injury; and (2) are the proper plaintiffs to maintain an antitrust action with respect to the relevant markets, or, in other words, possess antitrust standing.  See *Kochert v. Greater Lafayette Health Servs., Inc.,* 463 F.3d 710, 715-16 (7th Cir. 2006); *Serfecz v. Jewel Food Stores,* 67 F.3d 591, 596-97 (7th Cir. 1995); see also *Cargill, Inc. v. Monfort of Colo., Inc.,* 479 U.S. 104, 110-11 (1986) (requiring a party seeking injunctive relief under § 16 to show antitrust injury and antitrust standing).

To satisfy the antitrust injury requirement, Plaintiffs must allege that their "claimed injuries are 'of the type the antitrust laws were intended to prevent' and 'reflect the anticompetitive effect of either the violation or of anticompetitive acts made possible by the violation.'"  *Tri-Gen Inc. v. Int'l Union of Operating Eng'rs, Local 150,* 433 F.3d 1024, 1031 (7th Cir. 2006) (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 489 (1977)).  Further, a court must determine whether the plaintiffs are consumers or competitors in the market in which trade was restrained.  *Assoc. Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters,* 459 U.S. 519, 538-39 (1983).  And finally, where a plaintiff's injury is derivative of a more direct injury to some other person, and that person would have a strong

---

[7]   Section 16 provides: "[a]ny person, firm, corporation, or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws[.]" 15 U.S.C. § 26.

motivation to pursue its own antitrust claim against the defendant, standing is not likely to exist.[8] See, e.g., *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977) (holding that indirect purchasers are too remote to suffer true "antitrust injury" and therefore do not have standing under federal antitrust law to pursue damages for antitrust violations).

Antitrust standing "examines the connection between the asserted wrongdoing and the claimed injury to limit the class of potential plaintiffs to those who are in the best position to vindicate the antitrust infraction." *Greater Rockford Energy & Tech. Corp. v. Shell Oil Co.*, 998 F.2d 391, 395 (7th Cir. 1993) (citing *Cargill,* 479 U.S. at 111 n. 6). In *Associated General Contractors of California* (" *AGC* "), the Supreme Court outlined a series of factors to be evaluated to determine whether a plaintiff has standing to bring an antitrust action. 459 U.S. at 537-45. These factors are: (1) the causal connection between the alleged antitrust violation and the harm to the plaintiff; (2) the presence of improper motive; (3) the directness between the injury and the market restraint; (4) the speculative nature of the damages; and (5) the risk of duplicate recoveries or complex damages apportionment.[9] See *Loeb Indus., Inc. v. Sumitomo Corp.*, 306 F.3d 469, 484 (7th Cir. 2002) (citing *AGC,* 459 U.S. at 537-45). When injunctive

---

[8]  Although *Illinois Brick* dealt with indirect purchaser suits seeking damages (see *U.S. Gypsum Co. v. Indiana Gas Co.,* 350 F.3d 623, 627 (7th Cir. 2003) ("[T]he direct-purchaser doctrine does not foreclose equitable relief."), and Plaintiffs here seek only injunctive relief for their federal antitrust claims, subsequent cases also analyze the directness of the injury when only equitable relief is sought. See, e.g., *Int'l Bhd. of Teamsters, Local 734 Health & Welfare Trust Fund v. Philip Morris Inc*., 196 F.3d 818, 825 (7th Cir. 1999) (noting that the "direct-purchaser doctrine of *Illinois Brick* and the direct-injury doctrine of *Associated General Contractors* are analytically distinct" and are "independent obstacle[s] to recovery"); *In re Plasma-Derivative Protein Therapies*, 2013 WL 39766, at *8.

[9]  In *AGC,* the Supreme Court also held that courts examining antitrust standing are to consider the type of injury and whether it is "of the type that the antitrust statute was intended to forestall." 459 U.S. at 538-39 (citing *Brunswick,* 429 U.S. at 487-88). The Court will consider this factor under the rubric of antitrust injury, as the Seventh Circuit has structured its analysis of antitrust injury and antitrust standing in this manner. See *Kochert,* 463 F.3d at 715-719 (analyzing antitrust injury prior to the antitrust standing factors set out in *AGC* ); *Serfecz,* 67 F.3d at 596-97 (examining antitrust injury and antitrust standing separately); *Local Beauty Supply, Inc. v. Lamaur Inc.*, 787 F.2d 1197, 1201 (7th Cir.1986) (distinguishing between the requirements of antitrust injury and antitrust standing).

relief alone is at issue, some factors – namely the speculative nature of the damages and the risk of duplicate recoveries or complex damages apportionment – do not apply to the antitrust standing analysis. See *Cargill,* 479 U.S. at 111 n.6 ("Standing analysis under § 16 will not always be identical to standing analysis under § 4.").

Plaintiffs claim that Defendants conspired to manipulate and raise the prices for cheese on the CME Cheese Spot Market and for futures contracts on the Milk Futures Market, knew that these prices were used as a basis for the prices of dairy products with Defendants' customers, and also knew that increasing these prices would increase the price of dairy products with Defendants' customers, who in turn passed on the higher prices to Plaintiffs (purchasers at retail establishments in New York, Tennessee, Michigan, and Kansas). In response, Defendants contend that Indirect Purchaser Plaintiffs have failed to allege injury-in-fact because the complaints purportedly do not identify "what products they purchased or when and from whom they purchased those products" or that "the retailers from whom they purchased * * * incurred an overcharge or passed on any such overcharge." But Plaintiffs have provided enough detail— they purchased dairy products from retailers in their respective states, which were priced higher than they would have been because of Defendants' conduct—to survive this challenge.

Instead, Defendants' best argument as to why Plaintiffs fail to allege injury in fact is that Plaintiffs' complaints say very little about the chain of distribution, including whether the retailers with whom Plaintiffs dealt purchased dairy products directly from a manufacturer or indirectly through one or more distributors. Still, at this stage, Plaintiffs' less than robust allegations suffice to show fairly typical antitrust injury—that is, that Plaintiffs suffered higher prices as a result of Defendants' conduct. See *U.S. Gypsum Co.,* 350 F.3d at 626–27 ("A private plaintiff must show antitrust injury—which is to say, injury by reason of those things that make

the practice unlawful, such as reduced output and higher prices."); *Int'l Bhd. of Teamsters, Local 734 Health & Welfare Trust Fund v. Philip Morris Inc.,* 196 F.3d 818, 825 (7th Cir. 1999) ("To recover under the antitrust laws, the plaintiff must show that its injury flows from that which makes the conduct an antitrust problem: higher prices and lower output."); *Kochert,* 463 F.3d at 715 (observing that "the principal purpose of the antitrust laws is to prevent overcharges to consumers."); *In re Packaged Ice Antitrust Litig.*, 2011 WL 891169, at *16 (E.D. Mich. Mar. 11, 2011). As discussed below, Plaintiffs' chain-of-distribution allegations present problems for them with respect to the antitrust standing inquiry, but are sufficient to show typical antitrust injury.

Defendants also contend that Plaintiffs, as consumers who purchased from suppliers in a competitive market, could not have incurred the overcharge. Defendants rely solely on *In re Microsoft Corp. Antitrust Litig.*, 168 F. Supp. 2d 541, 546 (D. Md. 2001), which, without any analysis, supports Defendants' theory. However, Plaintiffs cite numerous cases offering the conflicting theory that consumers are injured more often than intermediaries. See, *e.g., D.R. Ward Const. Co.*, 470 F. Supp. 2d at 503 (denying motion to dismiss where "plaintiffs allege that they paid an inflated price for plastics additives due to defendants' price-fixing agreement, thereby implying that the direct harm of the price-fixing conspiracy was passed through the stream of commerce to them, purchasers of products containing plastics additives"); *Lorix*, 736 N.W.2d at 631 ("As an end user, plaintiff is the party most likely to be injured by an anticompetitive overcharge because she is the only party in the chain of purchase who cannot pass on part or all of that overcharge"). At this stage of the litigation, Plaintiffs' theory gets the

benefit of any doubt; whether the degree of "pass on"[10] of an industry-wide price increase is greater in a more competitive market is a matter that cannot be resolved on the pleadings alone.

Even assuming, based on the foregoing, that Plaintiffs' have sufficiently alleged an injury tied to Defendants' conduct, Plaintiff still must demonstrate that they are the proper plaintiffs to maintain an antitrust action with respect to the relevant markets. The focus of Defendants' argument is that Plaintiffs were not participants in the allegedly restrained markets. See *AGC,* 459 U.S. at 538-39. Defendants maintain that Indirect Purchaser Plaintiffs do not allege that they were participants in the "two relevant markets—the CME cheese spot market and the CME class III milk futures market * * * * To the contrary, [Indirect Purchaser Plaintiffs] allege that they purchased finished 'Dairy Products' from retail establishments." Indirect Purchaser Plaintiffs contend they should be treated as participants in the relevant market because their injury—paying higher prices for Defendants' products—was a foreseeable, intended consequence of Defendants' illegal actions and flows from that which makes Defendants actions unlawful.[11]

---

[10] In general, "[p]assing on describes the action of an overcharged buyer who passes the extra expense on to those who buy from him." *In re Sugar Industry Antitrust Litig.,* 579 F.2d 13, 16 n. 4 (3d Cir. 1978) (internal quotation marks omitted). The "passing-on" theory has been invoked in one of two ways: "Defensive passing on refers to efforts by antitrust defendants to show that a particular antitrust plaintiff was not injured because he had foisted the inflated price onto his own customers. Offensive passing on is used to characterize plaintiffs' strategy proving that an overcharge was imposed upon them by buyers closer to the chain of distribution." *Id.* (internal quotations omitted); see also *Warren Gen. Hosp. v. Amgen Inc.*, 643 F.3d 77, 85 (3d Cir. 2011).

[11] As a threshold matter, Judge Hibbler previously held that the Direct Purchaser Plaintiffs may only recover for damages caused by Defendants' monopolization of the milk futures market. Accordingly, the Court permitted claims to go forward for Plaintiffs whose injuries stem from the anticompetitive effects of monopolization on the milk futures market, including "purchasers of milk futures during months besides June, July, and August 2004 * * * [and] any Plaintiffs who entered into contracts whose value was directly tied to the price of milk futures will also be allowed to proceed." The Court denied recovery for damages arising from the increase of prices in the cheddar spot market because they "stem from the collateral manipulation of the cheese markets." Here, Indirect Purchaser Plaintiffs allege that both facets of Defendants' scheme injured them, as they purchased products whose prices were determined by both the cheese spot and milk futures markets. But, contrary to Plaintiffs' mistaken assumption, Direct

The first hurdle that Indirect Purchaser Plaintiffs face is demonstrating that their injury constitutes an integral part of the alleged price-fixing conspiracy:  to wit, Defendants' alleged agreement to (1) purchase all of the available long positions in three months' worth of Class III milk futures contracts and large quantities of cheese on the CME in an effort to gain control of those markets, (2) sell their positions at an unreasonably high price to justify charging inflated prices for their futures positions, and (3) maintain those prices long enough to sell off all of their positions at a profit.  In short, as Judge Hibbler previously observed, the object of the conspiracy was manipulating the futures market and the players were participants in the futures market, either by virtue of being competitors for the futures contracts who were boxed out of the market temporarily or as purchasers of those allegedly inflated contracts.  Indirect Purchaser Plaintiffs allege a general causal relationship between their injury and the alleged anticompetitive activity:  Defendants manipulated the futures market and in turn Plaintiffs paid higher prices for finished dairy products.  But their injury is not alleged to be a necessary step in furthering the ends of the conspiracy involving the two relevant markets.  Instead, their injury is, "at best, a result of— rather than a means to or a cause of"—the injury sustained by the participants in the milk futures and spot cheese markets.  See *In re Refrigerant Compressors Antitrust Litigation*, 2013 WL 1431756, at *12 (E.D. Mich. Apr. 9, 2013) (citing *Province v. Cleveland Press Publ'g Co.,* 787 F.2d 1047, 1052 (6th Cir. 1986)); see also *Potash*, 667 F. Supp. 2d at 940-41 (finding that

---

Purchaser Plaintiffs also include both cheese and milk commodities buyers at the wholesale level.  See Direct Purchaser Compl. ¶¶ 26, 28.  Thus, Plaintiffs are not claiming a new category of injuries as they suggest, and they have not put forth any additional reasons for departing from Judge Hibbler's prior ruling.  Judge Hibbler previously rejected the claims of Direct Purchasers of milk and cheese not indexed to the CME (based on the filed-rate doctrine) and the monopolization claims of purchasers whose injuries stem from the inflated price of cheese for lack of standing.  Because Plaintiffs have offered no support for departing from Judge Hibbler's prior rulings other than one based on a mistaken assumption about the identity of Direct Purchaser Plaintiffs, Judge Hibbler's prior holdings remain law of the case.  See *Creek v. Village of Westhaven*, 144 F.3d 441, 445 (7th Cir. 1998) ("The law of the case doctrine is a rule of practice, based on sound policy that, when an issue is once litigated and decided, that should be the end of the matter.").

indirect purchasers did not have standing because they failed to allege a chain of causation between the alleged restraint in the market—an illicit agreement to fix the price of potash—and their injury—paying higher prices for potash-containing products, specifically, fertilizer). That does not mean that they did not feel any effects from the conspiracy; however, as explained below, it bears on the directness of the injury.

In determining whether a plaintiff has antitrust standing, a court must look at "the directness between the injury and the market restraint." See *Loeb,* 306 F.3d at 484. Because the concept of antitrust standing was developed with common law proximate causation standards in mind, directness is a particularly important factor in the Court's analysis. See *Greater Rockford,* 998 F.2d at 395 (noting that antitrust standing serves the same function as the common law proximate cause requirement) (citing *AGC,* 459 U.S. at 533). In establishing directness as a factor in the antitrust standing analysis, the Court in *AGC* examined two separate considerations: (1) the chain of causation alleged by the plaintiffs; and (2) the existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement. *AGC,* 459 U.S. at 540-42.

By way of a few examples, in *Potash*, indirect purchasers bought products containing potash as a component from direct customers of the alleged conspirators. The district court concluded that the indirect purchasers failed to allege a chain of causation between the alleged restraint in the market—an illicit agreement to fix the price of potash—and their injury—paying higher prices for potash-containing products, specifically, fertilizer. 667 F. Supp. 2d at 940-41. As here, indirect purchasers argued that they satisfied this requirement by alleging "that Plaintiffs, as consumers, have been forced to pay higher prices for potash products as a result of defendants' price-fixing scheme." However, the court determined that their complaint failed "to

allege the necessary links between the anticompetitive activity and their injury," noting in particular the "absence of any allegation regarding whether the parties from whom Indirect Purchaser Plaintiffs purchased fertilizer actually passed on any overcharges they may have paid from parties further up the supply chain resulting from the alleged price-fixing agreement among Defendants." Similarly, in *In re Refrigerant Compressors Antitrust Litigation*, the court concluded that the "causal nexus between the alleged conspiracy in the hermetic compressor market and the IP Plaintiffs' alleged injury (paying inflated prices for finished goods that contain hermetic compressors) [was] too remote and attenuated to support antitrust standing." 2013 WL 1431756, at *14-15 (E.D. Mich. Apr. 9, 2013); see also *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 536 F. Supp. 2d 1129, 1136-41 (N.D. Cal. 2008) (dismissing state antitrust claims of computer purchasers because they did not participate in the market for computer memory).

Like the indirect purchasers in *Potash*, *DRAM*, and *Refrigerant Compressors*, Indirect Purchaser Plaintiffs are downstream participants in a retail market (finished dairy products), which is separate from the allegedly restrained markets (spot cheese and milk futures bought and sold on a commodities exchange). Further, the allegedly price-fixed products (commodities/futures contracts) are not even components of the products that Plaintiffs purchased. Plaintiffs' injury, to the extent they have one, occurred in a market secondary to the allegedly monopolized market and occurred only after the spot cheese commodity evolved, eventually, into a finished dairy product. Again, that is not to say that the price of those contracts does not ultimately affect the price of the finished dairy products, but the existence of different markets weighs against finding that they have antitrust standing to pursue their federal

antitrust claims. See also *In re Potash Antitrust Litigation*, 667 F. Supp. 2d 907, 937-41 (N.D. Ill. 2009).

The complicating factor here—which was not discussed in *Potash*, *DRAM*, and *Refrigerant*—is the Seventh Circuit's recognition that different injuries in distinct markets may be inflicted by an antitrust conspiracy and thus differently situated plaintiffs might be able to raise claims for the same anticompetitive behavior. *Loeb*, 306 F.3d at 481. In *Loeb*, purchasers of copper in the cash market, who in turn produced copper wire or repackaged and sold scrap, alleged that the defendants conspired to manipulate price of copper cathode on the futures market in violation of federal and state antitrust laws. The Seventh Circuit held that the fact that copper futures traders had a claim under the Sherman Act did not render purchasers in cash market "indirect purchasers" unable to bring their own claim; however, while copper wire producers who purchased cathode on the physical market could bring a Sherman Act claim, scrap dealers did not suffer direct injury and could not sue under the Sherman Act. In analyzing the relevant markets, the court concluded that the injuries suffered by the plaintiffs who purchased inflated futures contracts from the defendants were distinct from any harm inflicted on plaintiffs who paid inflated cash prices for cathode or who purchased copper rod from integrated producers.

The court pointed out the paradigm in all of the cases cited by the defendants: "Party A, the antitrust violator, sells to Party B, and then Party C, a down-stream purchaser from B, seeks to recover the implicit overcharges that B passed on to C."[12] *Loeb*, 306 F.3d 482; see, *e.g.,*

---

[12] In their response to Defendants' motion to dismiss, the Asmann Plaintiffs set up an almost identical scenario:

> Here, the Petition alleges Defendants manipulated the index that is used to set the price for the products that Plaintiff purchased. Consequently, the price that retailers paid DFA for those products was increased and those retailers in turn increased their prices to the general public, including Plaintiff. In particular, Defendants purchased all the contracts on the Cheddar Spot market with the purpose and effect of raising the prices that DFA

*Kansas v. UtiliCorp United, Inc.,* 497 U.S. 199, 207 (1990) (public utilities, but not residential customers to whom they sell, may sue natural gas companies); *In re Brand Name Prescription Drugs Antitrust Litig.,* 123 F.3d 599, 606 (7th Cir. 1997) (drug wholesalers, but not retail pharmacies to whom they sell, may recover from manufacturers); *McCarthy v. Recordex Serv., Inc.,* 80 F.3d 842, 852-54 (3d Cir. 1996) (attorneys, but the clients to whom they offer services, may recover overcharges for copies); *In re Beef Indus. Antitrust Litig.,* 710 F.2d 216, 218 (5th Cir. 1983) (packers who sell to grocers may recover for their unlawful conduct but feeders who sell to packers may not). The court then determined that the plaintiffs were not indirect purchasers along a supply chain; "instead, the alleged conspiracy operated in the separate but related futures market, through which it sought directly to manipulate the price of copper the plaintiffs were buying." *Loeb,* 306 F.3d 482; see also *Sanner v. Board of Trade,* 62 F.3d 918, 929 (7th Cir. 1995) (rejecting the proposition that "participants in the futures market were more directly injured," so as to preclude recovery by farmers in the cash market and finding that in the context of a market manipulation scheme, damages inflicted on the physical commodity market were not derivative of injuries in the futures market but rather formed a separate and compensable injury).

This analysis—which looks separately at the futures and physical markets—guides the Court, but at the end of the day does not save Indirect Purchasers' federal claims. As the court in *Loeb* pointed out, while there may be separate markets giving rise to separate claims—"in the context of a market manipulation scheme, damages inflicted on the physical commodity market [are] not derivative of injuries in the futures market"—the "directness inquiry" presents a

---

received for its products that use the Cheddar Spot market as the basis for their prices. Plaintiff's payment of higher prices for those products has been caused by the exact conduct forbidden by [antitrust statutes].

separate hurdle to Indirect Purchasers' claims. Even in the physical market, retail purchasers are classic examples of indirect victims of antitrust injury. Distributors and wholesalers already entered into monetary transactions involving these same products. In fact, there are numerous links in the chain of distribution before a finished dairy product reaches a retailer, including transactions between the retailer and its distributors or wholesalers, between distributors or wholesalers and manufacturers of cheese products, and between manufacturers and milk producers.[13] These companies at the least have suffered more direct injuries than the retail purchasers. *Cf. Sanner,* 62 F.3d at 927 (soybean farmers, clearly the most directly injured participants in the cash market because they were the only cash sellers of soybeans, were permitted to recover their soybean losses, but millers, wholesalers, or retailers of soybeans were not).

Ultimately, the directness inquiry focuses on the presence of more immediate victims of an antitrust violation who are presumed to be in a better position to advance an action. "The existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement diminishes the justification for allowing a more remote party * * * to perform the office of a private attorney general." *AGC,* 459 U.S. at 542; see also *Serfecz v. Jewel Food Stores*, 67 F.3d at 598 (noting that "only parties who can *most efficiently* vindicate the purposes of the antitrust laws have antitrust standing") (emphasis added). Here, the directness of the injury weighs "particularly heavily" in the Court's analysis because the existence of a less remote party to vindicate the public interest is no hypothetical proposition. The direct purchasers have actively pursued their claims and they seek damages as

---

[13] As discussed above, the fact that the alleged conspiracy operated in the separate but related futures market does not necessarily doom the Indirect Purchaser Plaintiffs' claims; however, it is a fact that the casual connection is even more attenuated and complicated here than in the typical indirect purchaser case because the allegedly price-fixed products are not components of the finished goods.

well as "injunctive relief * * * to prevent future anticompetitive and unlawful conduct."  See *Kochert,* 463 F.3d at 718–19; see also *In re Plasma-Derivative Protein Therapies Antitrust Litigation*, 2012 WL 39766, at *7-9 (N.D. Ill. 2012) (concluding that indirect plaintiffs lacked antitrust standing to pursue federal antitrust claims).  Thus, by denying Indirect Plaintiffs leave to proceed with their federal antitrust claims, the Court would not "leave a significant antitrust violation undetected or unremedied."  *Kochert,* 463 F.3d at 718–19.  For all of these reasons, the Court concludes that Indirect Purchaser Plaintiffs lack antitrust standing to pursue their federal antitrust claims.  See also *In re Plasma-Derivative Protein Therapies Anitrust Litigation*, 2012 WL 39766, at *7-9 (N.D. Ill. 2012) (concluding that indirect plaintiffs lacked antitrust standing to pursue federal antitrust claims).

## V.    Subject Matter Jurisdiction and the MDL

The parties have raised a number of other important issues, including whether and how the *AGC* factors apply to each of the various state antitrust claims that Plaintiffs seek to bring. Those questions will be deferred for the time being because the Court must address two issues that have not been briefed by the parties:  (i) whether the Court retains original jurisdiction pursuant to CAFA or, in the alternative, should decline to exercise supplemental jurisdiction now that it has been determined that all federal claims asserted by the Indirect Purchasers are subject to dismissal; and (ii) whether the dismissal of Indirect Purchaser Plaintiffs' federal antitrust claims should have any effect on the overall case management of this multi-district litigation.

More specifically, with the Indirect Purchasers' federal claims now subject to dismissal, the Court now must determine whether it retains original subject matter jurisdiction and if not, whether it should decline to exercise supplemental jurisdiction.  See *Pisciotta v. Old Nat'l Bancorp,* 499 F.3d 629, 634 (7th Cir. 2007).  At present, the parties have not addressed whether

the Indirect Purchaser Plaintiffs' complaints meet CAFA's jurisdictional requirements. Moreover, in the event that CAFA's jurisdictional requirements are not met, the Court must consider whether to retain supplemental jurisdiction over Indirect Purchaser Plaintiffs' state law claims, given the comity concerns involved and the fact that to date substantial judicial resources have not been committed to the state law counts. Because Plaintiffs seek to establish federal jurisdiction, it is their burden to establish the jurisdictional facts by a preponderance of the evidence. See *Blomberg v. Serv. Corp. Int'l*, 639 F.3d 761, 763 (7th Cir. 2011).

Finally, even if federal jurisdiction exists by virtue of the CAFA, the other cases that have been transferred to this Court all relate to Direct Purchaser claims in which all parties save Defendants Schreiber are engaged in settlement proceedings. Going forward, the Indirect Purchaser side of the case will involve a myriad of state-law claims. The Court invites the parties to address at the next status hearing and in any subsequent supplemental briefing how best to manage the rather unusual posture of this case in light of the purposes of coordinated multi-district pre-trial proceedings.

## VI. Conclusion

For the reasons stated above, the Court concludes that Indirect Purchaser Plaintiffs have Article III standing to pursue state-law claims based on New York, Tennessee, Michigan, and Kansas law, but lack antitrust standing to pursue their federal claims. Defendants' motions to dismiss [160, 197] are granted in part such that the federal claims are dismissed[14] and the remaining issues are deferred pending further input from the parties as to (1) the Court's subject

---

[14] Defendants have asked in their briefing that the dismissal be with prejudice and without leave to attempt to replead given that the Indirect Purchaser Plaintiffs already have had an original and two amended complaints; Plaintiffs request that the Court *sua sponte* grant leave to replead in the event of a dismissal order. The Court adopts a middle ground: if, after reviewing the Court's decision, the Indirect Purchaser Plaintiffs believe that they have a viable basis to replead, they may file a motion requesting leave to do so.

matter jurisdiction under CAFA, (2) whether, if CAFA jurisdiction is lacking, the Court should exercise supplemental jurisdiction over the Indirect Purchaser Plaintiffs' state law claims given that all federal claims of the Indirect Purchaser Plaintiffs are subject to dismissal, and (3) how the Court's ruling today should affect the overall case management of these MDL proceedings. This matter is set for a status hearing on September 6, 2013 at 10:30 a.m. to address how best to obtain the parties' input on these matters.

Dated:  August 23, 2013

_____
Robert M. Dow, Jr.
United States District Judge