Execution Copy

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| IN RE: DAIRY FARMERS OF AMERICA, INC. CHEESE ANTITRUST LITIGATION ) ) ) | Master File No. 09-cv-03690 MDL No. 2031 The Honorable Robert M. Dow Jr. |
| THIS DOCUMENT RELATES TO: ) ) ) | |
| DIRECT PURCHASER ACTION ) | |

## STIPULATION AND AGREEMENT OF SETTLEMENT BETWEEN DIRECT PURCHASER PLAINTIFFS AND SETTLING DEFENDANTS

THIS STIPULATION AND AGREEMENT OF SETTLEMENT is made and entered into on December 18, 2013, pursuant to Rule 23 of the Federal Rules of Civil Procedure. This Settlement Agreement (as defined in Section l(ff) hereof) is entered into on behalf of the Direct Purchaser Plaintiffs (as defined in Section l(k) hereof), both individually and on behalf of the Class (as defined in Section l(c)), by and through Lead Counsel (as defined in Section 1r hereof), and on behalf of Dairy Farmers of America, Inc. ("DFA"), including on behalf of former entities Keller's Creamery LP, Keller's Creamery, L.L.C., and Keller's Creamery Management, LLC, and Defendants Gary Hanman, Gerald Bos, Frank Otis, and Glenn Millar (collectively "Settling Defendants"), by and through their respective counsel of record.

WHEREAS, the Direct Purchaser Plaintiffs alleged in their Corrected Consolidated Class Action Complaint dated April 9, 2010 ("Amended Complaint")

(a) that the Settling Defendants and unnamed co-conspirators, between at least April 1, 2004 and December 31, 2006, combined, conspired, and agreed to fix or manipulate the prices of Chicago Mercantile Exchange ("CME") Class III milk futures contracts, CME Cheese Spot Call contracts, and other contracts the price terms of which were based on the CME Cheese Spot Call price or certain government minimum milk price formulas and to monopolize, or attempt to monopolize, CME June, July and August 2004 Class III milk futures contracts, all in violation of the Commodity Exchange Act ("CEA"), 7 U.S.C. §§ 1, *et seq.*, the Racketeering Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961, *et seq.*, the Sherman Act, 15 U.S.C. §§1 and 2, and (b) that the Settling Defendants also obtained unjust enrichment and are obligated to make restitution under the common law;

WHEREAS, the Settling Defendants produced more than 200,000 pages of documents to Direct Purchaser Plaintiffs pursuant to the March 4, 2010 Order of the Court [Docket No. 75] directing that "targeted discovery" be made, and the Direct Purchaser Plaintiffs received approximately fifteen deposition transcripts (with exhibits) and the equivalent of approximately 62,250 pages of data in response to their subpoenas to the Commodity Futures Trading Commission ("CFTC");

2

WHEREAS, the Settling Defendants filed motions to dismiss the Direct Purchaser Plaintiffs' Amended Complaint and the Direct Purchaser Plaintiffs opposed such motions;

WHEREAS, the Court (as defined in Section l(h) hereof) rendered a Memorandum Opinion and Order, dated February 4, 2011, which denied in part and granted in part the Settling Defendants' motions to dismiss the Amended Complaint;

WHEREAS, Plaintiffs filed a Second Amended Consolidated Class Action Complaint ("Second Amended Complaint") dated March 22, 2012, which added new factual allegations of a conspiracy between Settling Defendants and a new defendant, Schreiber Foods, Inc. ("Schreiber") and also alleged claims under California law, including an alleged violation of the Cartwright Act/California Bus. & Prof. Code §§16720, and 16750, *et seq.*;

WHEREAS, the Settling Defendants deny each and every one of the Direct Purchaser Plaintiffs' allegations of unlawful conduct in both complaints;

WHEREAS, the Settling Defendants disclaim any wrongdoing or liability whatsoever and assert that they are settling the claims against them in order to avoid the distraction of further litigation;

WHEREAS, the Direct Purchaser Plaintiffs have filed motions for class certification and for a stay of class certification briefing;

3

WHEREAS, on December 20, 2011 the Court granted the Direct Purchaser Plaintiffs' motion to stay briefing on their motion for class certification and held in abeyance the Direct Purchaser Plaintiffs' motion for class certification;

WHEREAS, extensive arm's-length settlement negotiations have taken place between the Direct Purchaser Plaintiffs and the Settling Defendants;

WHEREAS, such negotiations have included the provision by the Settling Defendants of further documents, information, data and legal research to the Direct Purchaser Plaintiffs in addition to the voluminous documents produced in discovery;

WHEREAS, such settlement negotiations included a settlement mediation under the direction of The Honorable Daniel Weinstein (Ret.), including an all-day mediation session on June 29, 2011;

WHEREAS, such mediation session did not conclude in a Settlement and the parties have continued their arm's-length negotiations through and including the date hereof;

WHEREAS, Lead Counsel have had an opportunity to conduct research and an extensive review of hundreds of thousands of pages of documents and deposition transcripts produced by the Settling Defendants and the CFTC both during discovery and in the course of settlement negotiations, records and data produced by third parties, deposition transcripts, expert and legal analysis,

4

information from interviews, and otherwise become well-informed before agreeing to the Settlement;

WHEREAS, Lead Counsel consider the Settlement set forth herein to be fair, reasonable, adequate and in the best interests of the Direct Purchaser Plaintiffs and the Class, as defined in Section 1(c) hereof;

WHEREAS, Class Counsel have further determined to enter into this Settlement Agreement in order to avoid the uncertainties of this complex litigation, and to assure a benefit to the Class;

WHEREAS, the Settling Defendants have concluded, despite their belief that the claims asserted have no merit, to enter into this Settlement Agreement to avoid the further expense, inconvenience and burden of this protracted litigation, the distraction and diversion of their personnel and resources, and the risks and expenses inherent in any complex litigation;

WHEREAS, the Direct Purchaser Plaintiffs and the Settling Defendants recognize that there are no rights to contribution among antitrust co-conspirators with respect to violations of the federal antitrust laws and that there are no rights to contribution with respect to violations of the Commodity Exchange Act, 7 U.S.C. §1 *et seq.* ("CEA");

NOW THEREFORE, it is agreed by the undersigned, on behalf of the Direct Purchaser Plaintiffs, the Class, and the Settling Defendants, that the Released

5

Claims (as defined in Section l(z) hereof) be settled and compromised, and the Action be dismissed on the merits and with prejudice solely as to the Settling Defendants (but not as to the Non-Settling Defendants), without costs as to the Direct Purchaser Plaintiffs or Settling Defendants, on the following terms and conditions, all as subject to the approval of the Court:

## 1. Terms Used In This Settlement Agreement

The words and terms used in this Settlement Agreement which are expressly defined below shall have the meaning ascribed to them.

(a) "Action" shall mean the consolidated class action concerning the Direct Purchaser Plaintiffs pending in the United States District Court for the Northern District of Illinois and captioned *In re: Dairy Farmers of America, Inc. Cheese Antitrust Litigation*, (Direct Purchaser Action), 1:09-cv-03690, MDL No. 2031 and shall include the Direct Purchaser Plaintiffs' Second Amended Consolidated Class Action Complaint [Docket No. 245], including actions previously filed as *Valley Gold LLC v. Dairy Farmers of America, Inc., et al.*, No. 09-cv-387 (N.D. Ill.), *Indriolo Distributors, Inc. v. Dairy Farmers of America, Inc., et al.*, No. 09-cv-1599 (N.D. Ill.), and *Knutson's, Inc. v. Dairy Farmers of America, Inc.*, No. 09-cv-2074 (N.D. Ill.), provided that (i) the Action shall be limited solely to Direct Purchaser Claims (as defined in Section l(j) below) and

(ii) the Action shall not include any action brought or claims asserted by the named plaintiffs or the proposed class in the Indirect Purchaser Action.

(b) "Any" shall mean one or more.

(c) "Class" shall be defined as: All persons who between April 1, 2004 through December 31, 2006: (1) purchased a CME Class III milk futures contract; (2) purchased a CME Cheese Spot Call contract for either blocks or barrels; (3) purchased cheese directly from DFA or Schreiber Foods, Inc. ("Schreiber") or made a first purchase of cheese from a first manufacturer of cheese (*i.e.* a manufacturer that transforms milk into cheese) pursuant to a contract the price term of which specified that the price was based, in whole or in part, on the CME Cheese Spot Call price (block or barrel price, average price, specific price, price formula, collar price or any variation that explicitly referenced the CME Cheese Spot Call price); or (4) purchased milk directly from DFA or made a first purchase of milk from a first producer of milk (*e.g.*, a dairy farmer) that was made pursuant to a contract the price term of which specified that the price was based, in whole or in part, on (i) the CME Cheese Spot Call price (block or barrel price, average price, specific price, price formula, collar price or any variation that explicitly referenced the CME Cheese Spot Call price); (ii) the CME Class III milk futures price; (iii) the National Agricultural Statistics Service ("NASS") cheese price; or (iv) a government milk formula price which included (i), (ii) or (iii) as a

component of such government milk formula price. Excluded from the Class are the Settling Defendants, the Non-Settling Defendants, and any parent, subsidiary, affiliate, or agent of any Settling Defendant or Non-Settling Defendant.

(d)   "Class Counsel" shall mean Lead Counsel and the other law firms representing the Direct Purchaser Plaintiffs in this Action.

(e)   "Class Member" or "Member of the Class" shall mean a Person who falls within the definition of the Class as set forth in Section 1(c) and who has not validly excluded themselves from the Class.

(f)   "Class Notice" shall mean notice of the Settlement to the Class in the form of the long form notice (substantially in the form of Exhibit A hereto), the publication notice (substantially in the form of Exhibit B hereto) and the internet notice and settlement website, all to be provided, established and maintained pursuant to the Scheduling Order and in the manner and form approved by the Court and which is in compliance with Rule 23 of the Federal Rules of Civil Procedure.

(g)   "Class Period" shall mean the period April 1, 2004 through December 31, 2006, inclusive.

(h)   "Court" shall mean the United States District Court for the Northern District of Illinois.

(i)   "DFA" shall mean Defendant Dairy Farmers of America, Inc.

8

(j)    "Direct Purchaser Claims" shall mean claims arising from the Settling Defendants' conduct alleged in the Action and relating to any of the following transactions during the Class Period: (1) a purchase of a CME Class III milk futures contract; (2) a purchase of a CME Cheese Spot Call contract for either blocks or barrels; (3) a purchase of cheese directly from DFA or Schreiber or a first purchase of cheese from a first manufacturer of cheese (*i.e.,* a manufacturer that transforms milk into cheese) that was made pursuant to a contract the price term of which specified that the price was based, in whole or in part, on the CME Cheese Spot Call price (block or barrel price, average price, specific price, price formula, collar price or any variation that explicitly referenced the CME Cheese Spot Call price); or (4) a purchase of milk directly from DFA or a first purchase of milk from a first producer of milk (*e.g.,* a dairy farmer) that was made pursuant to a contract the price term of which specified that the price was based, in whole or in part, on (i) the CME Cheese Spot Call price (block or barrel price, average price, specific price, price formula, collar price or any variation that explicitly referenced the CME Cheese Spot Call price); (ii) the CME Class III milk futures price; (iii) the National Agricultural Statistics Service ("NASS") cheese price; or (iv) a government milk formula price which included (i), (ii) or (iii) as a component of such government milk formula price.

9

(k)   "Direct Purchaser Plaintiffs" shall mean Indriolo Distributors, Inc., Knutson's, Inc. and Valley Gold, LLC.

(l)   "Effective Date" shall mean the date when this Settlement Agreement becomes final as provided in Section 13 of this Settlement Agreement.

(m)   "Escrow Account" shall mean the account to be established at U.S. Bank, N.A. to hold the Payment required herein.

(n)   "Escrow Agent" shall mean the Persons approved by the Court to act as escrow agent for the Settlement Fund pursuant to the terms of the Escrow Agreement.

(o)   "Escrow Agreement" shall mean the agreement, substantially in the form of Exhibit C hereto, governing the Escrow Account.

(p)   "Final Judgment" shall mean a final judgment and order of dismissal substantially in the form of Exhibit D to this Settlement Agreement, which is to be entered by the Court finally approving the terms of this Settlement Agreement and dismissing the Action with prejudice as to the Settling Defendants (or any alternative judgment that is mutually acceptable to the parties) provided that the Action will not be dismissed as to the Non-Settling Defendants.

(q)   "Indirect Purchaser Action" shall mean the consolidated class action concerning named plaintiffs Jacqueline A. Rudman and Brandi Palombella pending in the Northern District of Illinois and captioned *In re: Dairy Farmers of*

*America, Inc. Cheese Antitrust Litigation,* (Indirect Purchaser Action), 1:09-cv-03690, MDL No. 2031.

(r)     "Lead Counsel" shall mean Lovell Stewart Halebian Jacobson LLP, Court-appointed sole lead counsel.

(s)     "Net Settlement Fund" shall mean the Settlement Fund minus all costs and expenses associated with Class Notice, all attorneys' fees, settlement administration expenses, taxes and all other expenses or charges approved by the Court.

(t)     "Non-Settling Defendants" shall mean Schreiber and any other defendant other than the Settling Defendants that may be named as a defendant by the Direct Purchaser Plaintiffs in this Action.

(u)     "Parties" shall mean the Direct Purchaser Plaintiffs and the Settling Defendants, collectively.

(v)     "Payment" shall mean the payments referenced in Section 3(a) hereof totaling forty-six million dollars ($46,000,000.00) to be paid by Dairy Farmers of America, Inc. by wire transfer into the Escrow Account.

(w)     "Person" shall mean an individual, corporation, partnership, association, proprietorship, trust, governmental or quasi-governmental body or political subdivision or any agency or instrumentality thereof, or any other entity or organization.

11

(x)    "Plan of Allocation" shall mean the Direct Purchaser Plaintiffs' proposed plan of allocation attached hereto as Exhibit E, or such alternative plan of allocation as may be ordered by the Court.  The proposed plan of allocation is subject to Court approval, as provided in Section 11(b).

(y)    "Proof of Claim" shall mean the proof of claim and release form substantially in the form of that attached as Exhibit F hereto, or such alternative proof of claim form as may be approved by the Court.

(z)    "Released Claims" shall mean those claims identified in Section 6(a) of this Settlement Agreement.

(aa)    "Released Parties" shall mean Dairy Farmers of America, Inc., former entities Keller's Creamery LP, Keller's Creamery L.L.C., and Keller's Creamery Management LLC, and Gary Hanman, Gerald Bos, Frank Otis, and Glenn Millar, the predecessors or successors of each, and their respective present, former and future members, principals, officers, directors, employees, assigns, representatives, parents, subsidiaries, affiliates, stockholders and attorneys, in their representative capacity, provided that, in no event, shall Released Parties include Schreiber or any other Non-Settling Defendant.

(bb)    "Remedial Undertaking" shall mean the agreement, covenant and promise of DFA to conduct operations as set forth in Section 3(b) hereof and Exhibit G hereto.

(cc) "Reversion Waiver" shall mean the Settling Defendants' agreement that they shall have no right to reversion if the Settlement Agreement becomes final as set forth in Section 3(c) herein.

(dd) "Scheduling Order" shall mean the order that schedules deadlines leading up to the fairness hearing and that makes provisions for the Class Notice. A copy of the proposed Scheduling Order is attached as Exhibit H hereto.

(ee) "Settlement Administrator" shall mean the Persons approved by the Court to perform the tasks necessary to provide notice of the Settlement to the Class and to otherwise administer the Settlement Fund.

(ff) "Settlement Agreement" or "Settlement" shall mean this Stipulation and Agreement of Settlement and all exhibits attached hereto or, as the context may require, the settlement embodied in this Settlement Agreement.

(gg) "Settlement Consideration" shall consist of the Payment, the Remedial Undertaking and the Reversion Waiver.

(hh) "Settlement Fund" shall mean the Payment, any additional payment(s) pursuant to Section 18 herein, and all interest accrued thereon.

(ii) "Settling Defendants" shall have the meaning provided in the first paragraph of this Settlement Agreement, provided that neither Schreiber nor any other Non-Settling Defendant is a Settling Defendant.

(jj)   "Supplemental Agreement" shall mean the Supplemental Agreement Regarding Exclusions By Class Members dated as of the date herewith.

(kk)   "Taxes" shall mean any and all (i) federal, state and local taxes payable on interest or other income attributable to the Settlement Fund, including interest and penalties, and (ii) expenses and costs incurred in connection with the taxation of the Settlement Fund (including expenses of tax attorneys and accountants).

## 2.     The Class

Solely for the purposes of this Settlement Agreement, and without prejudice to the Parties' positions or any order of the Court in the event the Settlement Agreement is terminated for any reason, the Settling Defendants hereby consent to the certification of the Class, and the Direct Purchaser Plaintiffs agree to propose such Class to the Court and to provide appropriate support therefor as part of the Parties' efforts to obtain Court approval of this Settlement Agreement.

## 3.     Settlement Consideration

(a)   **Payment**. As an express and material condition of this Settlement Agreement, Defendant Dairy Farmers of America, Inc. has agreed to pay and shall pay by wire transfer into the Escrow Account the forty-six million dollar ($46,000,000.00) Payment, to be made in one or more payments by no later than

December 31, 2013. DFA guarantees the Payment on behalf of all Settling Defendants.

(b) **Remedial Undertaking**. DFA, and its successors and assigns, shall be bound to follow the remedial measures set forth in Exhibit G hereto.

(c) **Reversion Waiver**. The Settling Defendants agree that they shall not be entitled to any reversion of any funds in the event that the Settlement Agreement becomes final as set forth in Section 13 below, provided that if for any reason this Agreement does not become final and is not approved, then the Settling Defendants shall be entitled to the reversion of the entire Payment less all funds expended or incurred for Class Notice pursuant to Section 5(b) or ordered by the Court pursuant to Section 14(a).

4. **Attorneys' Fees, Costs and Expenses**

Other than the Payment in Section 3(a) above or as provided in Section 12(c) below, the Settling Defendants shall have no responsibility, financial obligation, or liability for any Class Counsel attorneys' fees, costs and expenses nor for any amount of Class Notice expenses, fees and expenses related to the administration of the Settlement or any other attorneys' or other fees, costs, or expenses of any kind of the Class, including the reimbursement of the Direct Purchaser Plaintiffs' own expenses and compensation for their time they devoted to this litigation, all of which shall be paid solely from the Settlement Fund.

### 5.    Settlement Fund Subject to Court Supervision

(a)    The Settlement Fund shall be maintained by the Escrow Agent under supervision of the Court, and shall be distributed solely at such times, in such manner and to such Persons as set forth in Section 14 and as shall be directed by subsequent orders of the Court.

(b)    Notwithstanding the foregoing, up to $250,000 of the Settlement Fund may be expended for expenses, fees and costs associated with providing the notice of the Settlement to the Class without further order of the Court. Neither the Direct Purchaser Plaintiffs, Class Members, nor Class Counsel shall have any responsibility, financial obligation, or liability for any fees, costs or expenses related to providing notice of the Settlement to the Class or for any fees, costs or expenses related to the administration of the Settlement. All such fees, costs and expenses shall be satisfied solely by the Settlement Fund. In the event that the Court ordered notice and administration costs exceed $250,000, the Direct Purchaser Plaintiffs and Class Counsel shall apply to the Court to pay such notice costs and administration costs from the Settlement Fund. To the extent so ordered by the Court, such costs shall be non-refundable.

(c)    The Settlement Fund is intended to be a "qualified settlement fund" within the meaning of Treasury Regulation § 1.468B-1(c) as to court jurisdiction, the underlying claims and the related liability assertion and the subsequent

16

segregation of the Settlement Fund. The Parties and their counsel shall treat, and shall cause the Escrow Agent, the Settlement Administrator to treat, the Settlement Fund as being at all times a "qualified settlement fund" within the meaning of Treasury Regulation § 1.468B-1 and to account and report the results of the Settlement Fund accordingly. The Parties and their counsel agree that they will not, nor will they permit the Escrow Agent or the Settlement Administrator to ask the Court to take any action inconsistent with the treatment of the Settlement Fund in such manner. The Defendants, with due notification to the opposing counsel, shall determine the appropriate tax elections to make with respect to the Settlement Fund and communicate such determinations to the Escrow Agent and Settlement Administrator for the Settlement Fund. Such elections shall be made in compliance with the procedures and requirements contained in the Treasury Regulations. The Defendants shall be responsible to implement the tax elections on their own returns; the Settlement Administrator shall be responsible to implement the same tax elections and any joint tax elections with the Defendants in the context of the return for the Settlement Fund. The Defendants shall be responsible to implement the tax statements required on their own tax returns; the Settlement Administrator shall be responsible to implement the tax statements required in the context of the return for the Settlement Fund. All provisions of this Settlement Agreement shall be interpreted in a manner that is consistent with

17

the Settlement Fund being a "qualified settlement fund" within the meaning of

Treasury Regulation § 1.468B-1.

### 6.    Release and Covenant Not To Sue

(a)    As an express and material condition of this Settlement Agreement,

upon the Effective Date, the Direct Purchaser Plaintiffs and Class Members shall

be deemed to have, and by operation of the Final Judgment shall have, fully,

finally and forever released and discharged the Released Parties from, and shall

covenant not to sue the Released Parties for or with respect to the Released

Claims, which shall be defined as all manner of claims, rights, demands, actions,

suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties,

covenants, contracts, controversies, agreements, promises, variances, trespasses,

judgments, extents, executions, and causes of action, whether class, individual, or

otherwise in nature, damages, whenever incurred, and liabilities of any nature

whatsoever, including costs, expenses, penalties and attorneys' fees, whether

known or unknown, suspected or unsuspected, whether concealed or hidden,

whether asserted or which could have been asserted in the Action, or in law,

admiralty or equity, that the Class Members or any of them, individually, or as a

class (whether or not they make a claim upon or participate in the Settlement

Fund), ever had, now have or hereafter can, shall or may have, against the

Released Parties arising from or related to the Settling Defendants' conduct

18

alleged in the Action with respect to Direct Purchaser Claims. Provided, however, that this release shall not include any claims asserted by the named plaintiffs or the proposed class in the Indirect Purchaser Action except for any Direct Purchaser Claims.

(b)     Except for any claims to enforce this Settlement Agreement, each Direct Purchaser Plaintiff, Class Member and Released Party hereby expressly and completely waives and releases any and all rights or benefits with respect to Released Claims which he, she or it has or may have under Section 1542 of the California Civil Code, and any similar provision in any other jurisdiction. Section 1542 provides as follows:

> A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor.

Each Direct Purchaser Plaintiff, Class Member and Released Party expressly waives all of these rights with respect to Released Claims notwithstanding that each may hereafter discover facts other than or different from those which he, she, or it knows, believes, or suspects with respect to the subject matter of this Agreement. Nevertheless, it is the intention of each Direct Purchaser Plaintiff, Class Member and Released Party, through this Settlement Agreement, and with the ability to seek independent advice of counsel, to fully, finally and forever settle

and release all claims released pursuant to Sections 6(a) or 6(b), as applicable. In

furtherance of such intention, the releases herein given by the Direct Purchaser

Plaintiffs shall be and remain in effect as full and complete releases of the Action

solely as to the Settling Defendants (but not as to the Non-Settling Defendants),

notwithstanding the later discovery or existence of any such additional or different

facts relative hereto or the later discovery of any such additional or different claims

that would fall within the scope of the release provided in Section 6(a) of this

Settlement Agreement, as if such facts or claims had been known at the time of this

release.

      (c)    Upon the occurrence of the Effective Date, the Released Parties shall

be deemed to have, and by operation of the Final Judgment shall have, fully,

finally and forever released and discharged the Direct Purchaser Plaintiffs and

Class Counsel from, and shall covenant not to sue the Direct Purchaser Plaintiffs

and Class Counsel for or with respect to, all manner of claims, rights, demands,

actions, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills,

specialties, covenants, contracts, controversies, agreements, promises, variances,

trespasses, judgments, extents, executions, and causes of action, damages,

whenever incurred, and liabilities of any nature whatsoever, including costs,

expenses, penalties and attorneys' fees whether known or unknown, suspected or

unsuspected, whether concealed or hidden, or in law, admiralty or equity, that the

Released Parties or any of them ever had, now have or hereafter can, shall or may

have, against the Direct Purchaser Plaintiffs and Class Counsel to the extent of the

Released Claims.

(d)        In no event shall this Settlement Agreement release or purport

to release any claims against Schreiber, any claims asserted by the named plaintiffs

or class in the Indirect Purchaser Action (except for any Direct Purchaser Claims),

any of the other Non-Settling Defendants, or any claims to enforce this Settlement

Agreement.  Further, the release, discharge and covenant not to sue set forth in this

Settlement Agreement include only Direct Purchaser Claims.

### 7.    Motion for Entry of Scheduling Order

As soon as practicable after this Settlement Agreement has been executed,

Lead Counsel shall submit to the Court this Settlement Agreement and shall move

the Court for entry of the Scheduling Order in the form attached hereto as Exhibit

H, which will make provisions for notice of the Settlement to the Class and will

schedule deadlines leading up to a fairness hearing.

### 8.    Motion for Entry of Final Judgment

(a)    In connection with the fairness hearing to be held by the Court on the

motion for final approval of this Settlement Agreement, the Parties hereto shall

jointly seek entry of the Final Judgment substantially in the form attached hereto as

Exhibit D and which:

(i)     finally certifies the Class solely for settlement purposes;

(ii)    finally approves this Settlement and its terms as being a fair, reasonable and adequate settlement of the Class' claims under Rule 23 of the Federal Rules of Civil Procedure;

(iii)   directs that, as to the Settling Defendants, the Action be dismissed with prejudice and without costs as against the Class and the Action be dismissed with prejudice and without costs as against the Direct Purchaser Plaintiffs;

(iv)   determines pursuant to Fed. R. Civ. P. 54(b) that there is no just reason for delay and directing that the judgment of dismissal shall be final and appealable;

(v)    reserves continuing and exclusive jurisdiction over the Settlement and this Settlement Agreement, including the administration and consummation of this Settlement.

(vi)   approves a record of opt outs, which Class Counsel shall have filed with the Clerk of the Court and provided to counsel for the Settling Defendants in advance of the fairness hearing.

(b)    In connection with the motion for final approval of the Settlement, Lead Counsel will seek an award of Class Counsel attorneys' fees, to be paid from the Settlement Fund, not to exceed one-third of the Settlement Fund and

reimbursement of expenses. At the time the Net Settlement Fund is distributed, the Direct Purchaser Plaintiffs may seek an award of compensation for the time they devoted to this Action and for reimbursement of their expenses, to be paid from the Settlement Fund, not to exceed $60,000 in the aggregate.

### 9. Notice Under Class Action Fairness Act

Within 10 days of the date on which Direct Purchaser Plaintiffs submit this Settlement Agreement to the Court and request preliminary approval, Settling Defendants shall serve upon the appropriate federal official and appropriate state official of each state in which a Class Member resides a notice of the proposed settlement, in accordance with the Class Action Fairness Act of 2005, 28 U.S.C. § 1715. Direct Purchaser Plaintiffs shall, to the extent practicable, assist Settling Defendants in making a reasonable estimate of (a) the number of Class Members who reside in each state; and (b) for each state, the estimated proportionate share of the claims of resident Class Members to the entire settlement, to the extent required by 28 U.S.C. § 1715(b)(7).

### 10. Protection Against Contribution

(a) Lead Counsel shall request that the following language be included in the Final Judgment: "There shall be no right of contribution between the Non-Settling Defendants and the Settling Defendants based on their potential, alleged or actual status as joint tortfeasors or co-conspirators with respect to the Released

Claims (any claim for such being a "Contribution Claim"). Notwithstanding the foregoing, should any court determine any Non-Settling Defendant is/was legally entitled to contribution from any Settling Defendant with respect to a Contribution Claim, then any money judgment subsequently obtained by the Direct Purchaser Plaintiffs against such Non-Settling Defendant shall be reduced to an amount such that, upon paying the entire amount, the Non Settling Defendant would have no Contribution Claim against any Settling Defendant.

(b) The parties agree that any money judgment obtained under the federal antitrust laws is not subject to contribution. Separate and apart from Section 10(a), Direct Purchaser Plaintiffs, individually and on behalf of the Class, agree that any money judgment (other than a money judgment obtained under the federal antitrust laws) subsequently obtained by the Direct Purchaser Plaintiffs against any Non-Settling Defendant shall be reduced by the amount of contribution, if any, determined by any court on the merits to be owing to a Non-Settling Defendant by the Settling Defendants.

### 11. Plan of Allocation

(a) Lead Counsel shall be responsible for establishing a Plan of Allocation.

(b) The Net Settlement Fund shall be distributed as ordered by the Court. The Settling Defendants shall have no responsibility for implementing the Plan of

Allocation and the approval, disapproval, or modification of any proposed plan of allocation shall not affect the preliminary or final approval of the Settlement or enforceability of this Settlement Agreement.

### 12. Best Efforts to Effectuate This Settlement

(a) Subject to the provisions of Section 17, the Parties agree to recommend approval of this Settlement Agreement by the Court. They agree to undertake their best efforts, including all steps and efforts contemplated by this Settlement Agreement and any other steps and efforts that may reasonably be necessary or appropriate to obtain Court approval of this Settlement and to carry out the terms of this Settlement Agreement, provided that this will not limit any express rights to withdraw from this Settlement Agreement that the Parties may have.

(b) The Parties agree that the Court's authority includes, but is not limited to, awarding monetary and/or injunctive relief and discretion to impose specific performance, sanctions or penalties including imposition of any sanction up to and including contempt of court, pursuant to 28 U.S.C. § 636(e). The Parties agree that the terms of this Settlement Agreement satisfy the requirements for injunctive relief and specific performance.

(c) In the event that any Party to this Settlement Agreement finds it necessary to bring an action or proceeding against another Party to this Settlement

Agreement as a result of a breach or default hereunder or to enforce the terms and conditions hereof, the prevailing party in such action or proceedings shall be paid all its reasonable attorneys' fees and costs and necessary disbursements incurred in connection with such action.

### 13. Finality, Effective Date

Unless terminated earlier as provided in Section 17, this Settlement Agreement shall become final upon the occurrence of all of the following three events:

(a)   approval in all respects by the Court as required by Rule 23(e) of the Federal Rules of Civil Procedure;

(b)   entry by the Court of the Final Judgment; and

(c)   expiration of the time for appeal or the time to seek permission to appeal from the Court's entry of the Final Judgment or, if appealed, either (i) the Final Judgment has been affirmed in its entirety by the court of last resort to which such appeal has been taken and such affirmance has become no longer subject to further appeal or review, or (ii) withdrawal or dismissal with prejudice of all such appeals.

### 14.    Administration of the Settlement Fund

The Escrow Agent shall administer the Settlement Fund under such terms and conditions as may be approved by the Court.  Subject to Court approval by written order, the Settlement Fund may be used:

(a)    To pay all the costs and expenses reasonably and actually incurred in connection with providing notice, locating Members of the Class, administering and distributing the Net Settlement Fund to Members of the Class who make claims, processing Proof of Claim forms and paying escrow fees and costs, if any;

(b)    To pay Taxes, as defined herein;

(c)    To pay Class Counsel's attorneys' fees, expenses and costs thereon;

(d)    To pay the Direct Purchaser Plaintiffs' requests for compensation and reimbursement for expenses;

(e)    To pay other charges on the Settlement Fund; and

(f)    To distribute Net Settlement Fund to Members of the Class as directed by the Court.

Settling Defendants and Settling Defendants' Counsel shall have no liability whatsoever for any acts or omissions of the Settlement Administrator, Escrow Agent or Class Counsel, or the administration of the Settlement.

### 15.    Confidentiality Protection

(a)    All materials provided by Settling Defendants or any Released Party hereunder during the discovery process in the Action, either before or after the date of this Settlement Agreement, may be used by the Direct Purchaser Plaintiffs in their claims in this Action against Schreiber or other Non-Settling Defendants. Such use shall be governed by all confidentiality and/or protective orders in force as of the date of this Settlement Agreement and by such additional confidentiality and/or protective orders as may be in effect on the date the discovery takes place. However, no settlement materials provided by Settling Defendants during settlement negotiations, including, but not limited to, materials prepared by Settling Defendants' experts, may be used by the Direct Purchaser Plaintiffs for any purpose provided that such materials were not previously produced during the discovery process in the Action.

(b)    The existence and terms and conditions of this Settlement Agreement are and shall remain confidential until Direct Purchaser Plaintiffs file a motion for preliminary approval of the Settlement Agreement.  Until Direct Purchaser Plaintiffs file the motion for preliminary approval, neither the Parties nor their counsel shall reveal the existence or terms and conditions of this Settlement Agreement to the public or any Person not a party to this Settlement Agreement in any form or fashion; provided, however, that this paragraph shall not prevent

28

Settling Defendants or their corporate parents, subsidiaries, or affiliates from disclosing such information, prior to that date, to regulators, government agencies, rating agencies, independent accountants, actuaries, auditors, advisors, financial analysts, members, shareholders, insurers, attorneys, or in any other manner required by law or regulation, nor shall it prevent the Parties or their counsel from disclosing such information to Persons (such as experts, courts, co-counsel, or the Administrator) to whom the Parties agree disclosure must be made in order to effectuate the terms and conditions of this Settlement Agreement; nor shall it prevent any of the Parties from disclosing the existence and terms of the Settlement Agreement to the Court in connection with any of the proceedings in this Action, including, without limitation, in the filings made seeking preliminary approval of the Settlement or in status reports or in response to requests for information by the Court.

(c)     Within sixty (60) days after the final termination of the Action, as well as any appeals and settlement administration, as to all defendants (i.e., Settling Defendants and Non-Settling Defendants), the Direct Purchaser Plaintiffs agree to return to the Settling Defendants all materials (and all copies of materials, kept in any format) designated as confidential, restricted confidential, or Rule 408 material and provided or produced to the Direct Purchaser Plaintiffs by the Settling Defendants, or, in the alternative, to destroy all such confidential materials (and all

copies of materials, kept in any format) and provide Settling Defendants with written confirmation that all such confidential materials and all copies thereof have been destroyed.

(d)     The contents of this Settlement Agreement may not be admitted into evidence in this Action, or in any other action or proceeding, except as may be required to approve or enforce this Settlement Agreement or to defend or enjoin such other litigation or proceeding.

## 16.     Application For Award of Attorneys' Fees and Reimbursement of Expenses; Immediate Withdrawal of 30% of Award

(a)     Lead Counsel may apply to the Court at the time of final approval of the Settlement for an award from the Settlement Fund of Class Counsel attorneys' fees and reimbursement of costs, expenses and charges.

(b)     When approved by the Court, Wolf Haldenstein Adler Freeman & Herz LLC ("Wolf Haldenstein") and Class Counsel other than Lovell Stewart Halebian Jacobson LLP may immediately withdraw up to thirty percent (30%) of the total amount of the fees, costs, expenses and charges awarded to such Class Counsel provided that each Class Counsel first obtains a letter of credit from a bank with at least an A credit rating guaranteeing repayment (in the event of termination or the Effective Date does not occur for any reason) of the total amount of fees, costs, expenses and charges withdrawn pursuant to this

subsection. The remainder may be withdrawn from the Settlement Fund only upon the occurrence of the Effective Date.

(c)     Upon termination or if the Effective Date does not occur for any reason, then within five (5) business days after receiving notice from counsel for Settling Defendants or from a court with appropriate jurisdiction, any Class Counsel who have withdrawn any such sums shall refund to the Settlement Fund any such portion thereof that was withdrawn plus interest thereon at the same rate at which interest is accruing for the Settlement Fund.

(d)     The Direct Purchaser Plaintiffs may apply to the Court for an aggregate payment of up to $60,000 as compensation for the time they devoted to this Action and for reimbursement of their expenses. The amount of any such payment approved by the Court may be withdrawn from the Settlement Fund only upon the occurrence of the Effective Date.

(e)     Lead Counsel may apply at the time of any application for distribution to Class Members for an award from the Settlement Fund of attorneys' fees for services performed and reimbursement of expenses incurred in connection with the administration of the Settlement after the date of the fairness hearing, including the costs and expenses of the Settlement Administrator. Lead Counsel reserves the right to make additional applications for fees and expenses incurred.

17.  **Termination**

(a)  **DFA's Right To Terminate**.  DFA shall have the right, but not the obligation, in its sole discretion, to terminate this Settlement Agreement by providing written notice by email to Lead Counsel of its election to do so within twenty-one (21) days of any of the following events, provided that any such termination shall be dependent upon the realization of the condition subsequent that the Direct Purchaser Plaintiffs' claims shall not be dismissed pursuant to this Settlement Agreement or, if they have been dismissed, that the Direct Purchaser Plaintiffs' claims dismissed pursuant to this Settlement Agreement are reinstated such that the Parties are returned to their respective positions before the Settlement Agreement was signed. Such events of termination are as follows:

(i)  the Court declines to enter the Scheduling Order in substantially the form attached as Exhibit H;

(ii)  the Court declines to enter the Final Judgment in substantially the form attached as Exhibit D;

(iii)  the Final Judgment is withdrawn, rescinded, reversed, vacated, or modified by the Court or on appeal;

(b)  DFA shall have the right, but not the obligation, in its sole discretion, to terminate this Settlement Agreement pursuant to the terms and conditions of the Supplemental Agreement.

(c)    If the Direct Purchaser Plaintiffs' claims are dismissed pursuant to this Settlement Agreement and not reinstated such that the Parties are returned to their respective positions before the Settlement Agreement was signed, then any termination by DFA shall be null and void.

(d)    **Direct Purchaser Plaintiffs' Right To Terminate**.  The Direct Purchaser Plaintiffs shall have the right, but not the obligation, in their sole discretion, to terminate this Settlement Agreement by Lead Counsel providing written notice by email to the Settling Defendants of their election to do so within twenty-one (21) days of any of the following events provided that the event occurs before full Payment has been made pursuant to Section 3(a): (1) dissolution of DFA and/or the liquidation of substantially all of DFA's assets; (2) the filing of a petition in bankruptcy or insolvency or for an arrangement or reorganization by, for or against DFA; (3) the appointment of a receiver or trustee for all or a portion of the assets of DFA; (4) DFA's assignment of assets for the benefit of creditors; (5) DFA's insolvency; (6) DFA's inability to pay its debts as they become due, as evidenced by a bankruptcy or insolvency filing; or (7) DFA's acknowledgment in writing that it is insolvent or unable to pay any portion of any debt upon coming due.  Any termination under this sub-Section will become effective immediately upon written notice by Direct Purchaser Plaintiffs to Settling Defendants.

33

(e)     If DFA fails to pay all or any part of the Payment when due, then

Lead Counsel, on ten (10) business days' written e-mail notice to DFA's

undersigned counsel, during which ten (10) business day period DFA shall have

the opportunity to cure the default without penalty, may withdraw from this

Settlement Agreement or elect to enforce it. DFA's obligation to pay may be

enforced in the Action as provided by the Federal Rules of Civil Procedure.

(f)     In the event that this Settlement Agreement is terminated pursuant to

any of the sub-Sections above, then: (i) the Settlement Fund, minus any funds

expended or incurred for Class Notice or settlement administration referenced in

Section 14(a) or approved by the Court and any costs and/or expenses required to

notify the Class of such termination, shall be returned to DFA together with the

interest earned thereon (less any portion of such interest properly reserved for the

payment of Taxes); (ii) this Settlement Agreement and the Final Judgment shall be

null and void and of no further effect, and no Party shall be bound by any of their

terms, (iii) the Direct Purchaser Plaintiffs' claims shall not be dismissed pursuant

to this Settlement Agreement or, if they have been dismissed pursuant to this

Settlement Agreement, shall be reinstated such that the Parties are returned to their

respective positions before the Settlement Agreement was signed, and all releases

and covenants not to sue shall be of no further force and effect; (iv) all the Settling

Defendants' rights to defend shall be reinstated; and (v) and the Parties are

returned to the *status quo ante* and the Parties shall jointly request that the Court modify any existing scheduling order to ensure that the Parties will have sufficient time to prepare for the resumption of litigation.

### 18.    Most Favored Nations Clause

(a)         If at any time within four (4) years of the date of entry of the Final Judgment a Settling Defendant enters into any agreement or other understanding with an Indirect Purchaser Plaintiff with respect to the claims in the Indirect Purchaser Action that provides for any monetary consideration that is greater than the Payment provided for herein to the Direct Purchaser Plaintiffs (*i.e.*, $46,000,000), then in each instance within ten (10) business days such Settling Defendant shall notify the Direct Purchaser Plaintiffs in writing of the material terms, conditions, benefits and limitations of such agreement or other understanding with reasonable particularity, including the consideration contained in such agreement or other understanding.

(b)         The Direct Purchaser Plaintiffs will have the option, exercisable by written notice to the Settling Defendant within ten (10) business days of the Direct Purchaser Plaintiffs' receipt of the notice described in subsection (a) above, to elect to receive, notwithstanding any other provision of this Settlement Agreement, the benefit of such greater consideration in an amount equal to the difference between (1) such greater consideration provided for in the agreement or

35

understanding between the Settling Defendant and the Indirect Purchaser Plaintiff

and (2) the Payment provided for herein (*i.e.*, $46,000,000). <u>Example</u>: An

agreement or other understanding between the Settling Defendant and the Indirect

Purchaser Plaintiff provides for consideration in the amount of $48,000,000. In

such circumstance, the Direct Purchaser Plaintiffs shall have the option to elect to

receive the benefit of such greater consideration in an amount equal to $2,000,000

(*i.e.*, the difference between $48,000,000 and $46,000,000).

### 19. This Settlement is Not an Admission

This Settlement Agreement is not and shall not be deemed or construed to be

an admission, adjudication or evidence of any violation of any statute or law or of

any liability or wrongdoing by the Settling Defendants or any Released Party or of

the truth of any of the claims or allegations alleged in the Action. In the event that

the Settlement does not become final or is terminated in accordance with the terms

hereof, then this Settlement Agreement, and the releases set forth herein, shall be

of no force or effect and the terms of this Settlement Agreement shall not be

offered or received in evidence in any proceeding. Further, this Settlement

Agreement is not and shall not be deemed or construed to be an admission,

adjudication or evidence of any lack of merit of any of the claims asserted in the

Action. The Parties hereto agree that this Settlement Agreement, including its

exhibits, whether or not it shall become final, and any and all negotiations,

36

documents and discussions associated with it, shall be without prejudice to the rights of any Party, shall not be deemed or construed to be an admission or evidence of any violation of any statute or law or of any liability or wrongdoing by Settling Defendants, or of the truth of any of the claims or allegations, or of any damage or injury, or of any lack of merit of any of the claims asserted in the Action. Evidence of this Settlement Agreement or the negotiation of this Settlement Agreement shall not be discoverable or used directly or indirectly, in any way, whether in the Action or in any other action or proceeding of any nature, except in connection with a dispute under this Settlement Agreement or an action in which this Settlement Agreement is asserted as a defense. Settling Defendants and Direct Purchaser Plaintiffs expressly reserve all of their rights if the Settlement does not become final in accordance with the terms of this Settlement Agreement.

### 20. Binding Effect

(a)    This Settlement Agreement shall be binding upon, and inure to the benefit of, the successors and assigns of the Settling Defendants, the Released Parties, the Direct Purchaser Plaintiffs and Class Members.

(b)    The waiver by one Party of any breach of this Settlement Agreement by another Party shall not be deemed a waiver of any other prior or subsequent breach of this Settlement Agreement.

### 21. Integrated Agreement

This Settlement Agreement, including its exhibits, contains an entire, complete, and integrated statement of each and every term and provision agreed to by and among the Parties and is not subject to any condition not provided for herein. This Settlement Agreement supersedes all prior or contemporaneous discussions, agreements, and understandings among the Parties to this Settlement Agreement with respect hereto. This Settlement Agreement shall not be modified in any respect except by a writing that is executed by all the Parties hereto.

### 22. Headings

The headings used in this Settlement Agreement are for the convenience of the Parties only and shall not have substantive effect.

### 23. Neither Party is the Drafter

None of the Parties hereto shall be considered to be the drafter of this Settlement Agreement or any provision hereof for the purpose of any statute, case law or rule of interpretation or construction that might cause any provision to be construed against the drafter hereof.

### 24. Choice of Law

All terms of this Settlement Agreement and the exhibits hereto shall be governed by and interpreted according to the substantive laws of the State of Illinois without regard to its choice of law or conflict of laws principles.

## 25. Execution in Counterparts

This Settlement Agreement may be executed in counterparts. Facsimile and scanned/PDF signatures shall be considered as valid signatures.

## 26. Submission to and Retention of Exclusive Jurisdiction

The Parties and Class Members hereby irrevocably submit, to the fullest extent permitted by law, to the exclusive jurisdiction of the United States District Court for the Northern District Of Illinois for any suit, action, proceeding or dispute arising out of or relating to this Settlement Agreement, or to the applicability of this Settlement Agreement, and exhibits hereto. Solely for purposes of such suit, action or proceeding, to the fullest extent permitted by law, the Parties hereto irrevocably waive and agree not to assert, by way of motion, as a defense or otherwise, any claim or objection that they are not subject to the jurisdiction of such Court, or that such Court is, in any way, an improper venue or an inconvenient forum or that the Court lacked power to approve this Settlement Agreement or enter any of the orders contemplated hereby.

## 27. Notices

All notices under this Settlement Agreement shall be sent as follows: (i) if to Direct Purchaser Plaintiffs, then to Christopher Lovell, Lovell Stewart Halebian Jacobson, LLP 61 Broadway, Suite 501, New York, New York, 10006 (clovell@lshllp.com);and (ii) if to Settling Defendants, then to Michael Pope,

McDermott Will & Emery LLP, 227 W. Monroe St., Chicago, Illinois 60606 (mpope@mwe.com), or such other address as a Party to this Settlement Agreement may designate in writing, from time to time, in accordance with this Settlement Agreement.

### 28. Execution by Counsel

Each counsel executing this Settlement Agreement on behalf of any Party hereto hereby warrants that he/she has full authority to do so.

### 29. Timing

If any deadline imposed herein falls on a non-business day, then the deadline is extended until the next business day.

### 30. Good Faith

No Direct Purchaser Plaintiff, Class member, or Settling Defendant shall assert in any forum that the Action was brought by Direct Purchaser Plaintiffs or defended by Settling Defendants in bad faith, nor shall any of them assert any claim of any violation of Fed. R. Civ. P. 11 relating to the prosecution, defense, or settlement of the Action.

Dated: December 8, 2013

By: _____

Christopher Lovell
Christopher M. McGrath
**LOVELL STEWART HALEBIAN &**
**JACOBSON LLP**
61 Broadway, Suite 501
New York, New York 10006
Telephone: (212) 608-1900
Facsimile: (212) 719-4775

*Counsel for Direct Purchaser Plaintiffs*


By: _____
Amanda Metts
**MCDERMOTT WILL & EMERY LLP**
227 West Monroe Street, Suite 4400
Chicago, Illinois 60606-5096
Telephone: (312) 372-2000
Facsimile: (312) 984-7700

*Counsel for Dairy Farmers of America, Inc.,*
*Keller's Creamery, LP, Keller's Creamery, L.L.C.,*
*And Keller Creamery Management, LLC*


By: _____
William M. Hannay
**SCHIFF HARDIN LLP**
233 South Wacker Drive, Suite 6600
Chicago, Illinois 60606
Telephone: (312) 258-5500

*Counsel for Defendant Gerald Bos*

41

Dated:  December 18, 2013


By: _____
Christopher Lovell
Christopher M. McGrath
**LOVELL STEWART HALEBIAN &
     JACOBSON LLP**
61 Broadway, Suite 501
New York, New York 10006
Telephone:  (212) 608-1900
Facsimile:   (212) 719-4775

*Counsel for Direct Purchaser Plaintiffs*

By: _____
Amanda Metts
**MCDERMOTT WILL & EMERY LLP**
227 West Monroe Street, Suite 4400
Chicago, Illinois 60606-5096
Telephone:  (312) 372-2000
Facsimile:   (312) 984-7700

*Counsel for Dairy Farmers of America, Inc.,
Keller's Creamery, LP, Keller's Creamery, L.L.C.,
And Keller Creamery Management, LLC*


By: _____
William M. Hannay
**SCHIFF HARDIN LLP**
233 South Wacker Drive, Suite 6600
Chicago, Illinois 60606
Telephone:  (312) 258-5500

*Counsel for Defendant Gerald Bos*

41

Dated: December 18 2013

By: _____
Christopher Lovell
Christopher M. McGrath
**LOVELL STEWART HALEBIAN &**
**JACOBSON LLP**
61 Broadway, Suite 501
New York, New York 10006
Telephone: (212) 608-1900
Facsimile: (212) 719-4775

*Counsel for Direct Purchaser Plaintiffs*

By: _____
Amanda Metts
**MCDERMOTT WILL & EMERY LLP**
227 West Monroe Street, Suite 4400
Chicago, Illinois 60606-5096
Telephone: (312) 372-2000
Facsimile: (312) 984-7700

*Counsel for Dairy Farmers of America, Inc.,*
*Keller's Creamery, LP, Keller's Creamery, L.L.C.,*
*And Keller Creamery Management, LLC*

By: _____
William M. Hannay
**SCHIFF HARDIN LLP**
233 South Wacker Drive, Suite 6600
Chicago, Illinois 60606
Telephone: (312) 258-5500

*Counsel for Defendant Gerald Bos*

41

By: _____

Ellen M. Wheeler
**FOLEY & LARDNER**
321 North Clark Street, Suite 2800
Chicago, Illinois 60654
Telephone: (312)832-4500

*Counsel for Defendant Gary Hanman*

By: _____

Glenn R. Reichardt
**K&L GATES LLP**
1601 K Street, NW
Washington, D.C. 20006
Telephone: (202)778-9065

*Counsel for Defendants Frank Otis and Glenn Millar*

DM_US 4797R510-3 046466 0083

42

By: _____

Ellen M. Wheeler
**FOLEY & LARDNER**
321 North Clark Street, Suite 2800
Chicago, Illinois 60654
Telephone: (312)832-4500

*Counsel for Defendant Gary Hanman*

By: _Glenn R. Reichardt_ *JdB*

Glenn R. Reichardt
**K&L GATES LLP**
1601 K Street, NW
Washington, D.C. 20006
Telephone: (202)778-9065

*Counsel for Defendants Frank Otis and Glenn Millar*

DM_US 47978510-3 046466.0083

42

# Exhibit A

IMPORTANT LEGAL NOTICE TO ALL MEMBERS OF THE CLASS
FORWARD TO CORPORATE HEADQUARTERS/LEGAL COUNSEL
_____

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: DAIRY FARMERS OF AMERICA, INC. CHEESE ANTITRUST LITIGATION | ) ) ) | Master File No. 09-cv-03690 MDL No. 2031 |
| THIS DOCUMENT RELATES TO: | ) ) | The Honorable Robert M. Dow Jr. |
| DIRECT PURCHASER ACTION | ) | |

**NOTICE OF PARTIAL SETTLEMENT OF ACTION, ___ 2014 HEARING THEREON, AND CLASS MEMBERS' RIGHTS**

**TO: All Persons Who Between April 1, 2004 Through December 31, 2006: (1) Purchased A CME Class III Milk Futures Contract; (2) Purchased A CME Cheese Spot Call Contract For Either Blocks Or Barrels; (3) Purchased Cheese Directly From DFA Or Schreiber Foods, Inc. ("Schreiber") Or Made A First Purchase Of Cheese From A First Manufacturer Of Cheese (*i.e.* A Manufacturer That Transforms Milk Into Cheese) Pursuant To A Contract The Price Term Of Which Specified That The Price Was Based, In Whole Or In Part, On The CME Cheese Spot Call Price (Block Or Barrel Price, Average Price, Specific Price, Price Formula, Collar Price Or Any Variation That Explicitly Referenced The CME Cheese Spot Call Price); Or (4) Purchased Milk Directly From DFA Or Made A First Purchase Of Milk From A First Producer Of Milk (*e.g.*, A Dairy Farmer) That Was Made Pursuant To A Contract The Price Term Of Which Specified That The Price Was Based, In Whole Or In Part, On (i) The CME Cheese Spot Call Price (Block Or Barrel Price, Average Price, Specific Price, Price Formula, Collar Price Or Any Variation That Explicitly Referenced The CME Cheese Spot Call Price); (ii) The CME Class III Milk Futures Price; (iii) The National Agricultural Statistics Service ("NASS") Cheese Price; Or (iv) A Government Milk Formula Price Which Included (i), (ii) Or (iii) As A Component Of Such Government Milk Formula Price. Excluded From The Class Are The Settling Defendants, The Non-Settling Defendants, And Any Parent, Subsidiary, Affiliate, Or Agent Of Any Settling Defendant Or Non-Settling Defendant.**

*PLEASE READ THIS ENTIRE NOTICE CAREFULLY. YOUR RIGHTS MAY BE AFFECTED BY THE ABOVE CAPTIONED CLASS ACTION LAWSUIT PENDING IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS. THIS NOTICE ADVISES YOU OF YOUR OPTIONS REGARDING THE CLASS ACTION SETTLEMENT, INCLUDING WHAT YOU MUST DO IF YOU WISH TO SHARE IN THE NET SETTLEMENT FUND.*

*If you are a brokerage firm or trustee through whom Chicago Mercantile Exchange ("CME") Class III milk futures contracts or CME Cheese Spot Call contracts were transacted between April 1, 2004 through December 31, 2006, for customers that are members of the above Class, you should provide the names and last known addresses for such customers to the Settlement Administrator at the address listed below within two weeks of receiving this Notice. The Settlement Administrator will cause copies of this Notice to be forwarded to each customer identified at the address so designated.*

This Notice of the proposed Settlement is being given pursuant to Rule 23 of the Federal Rules of Civil Procedure and an Order of the United States District Court for the Northern District of Illinois (the "Court").

The purpose of this Notice is to inform you of your rights in connection with a proposed partial Settlement[1] of the above captioned class action ("Action") with defendants Dairy Farmers of America, Inc. ("DFA"), including former entities Keller's Creamery LP, Keller's Creamery, L.L.C., and Keller's Creamery Management, LLC, Gary Hanman, Gerald Bos, Frank Otis, and Glenn Millar (collectively "Settling Defendants"). The action remains ongoing against another defendant who is **not** part of the Settlement. The Settlement does not relate to or purport to release any claims associated with the Indirect Purchaser Action (except any Direct Purchaser Claims).

In order to resolve the claims against them, the Settling Defendants have agreed to wire transfer forty-six million dollars ($46,000,000.00), to be made in one or more payments by no later than December 31, 2013. The foregoing payments, plus all interest earned thereon, constitute the Settlement Fund. The Settling Defendants have agreed to further consideration of certain remedial undertakings in order to resolve the claims against them. See II.A.2 below.

**Right To Submit A Proof Of Claim**. Members of the Class may be entitled to share in the Net Settlement Fund if they submit a valid and timely Proof of Claim prior to ___. See III.A. below. The Proof of Claim is attached. However, if you are a Member of the Class but do not file a Proof of Claim, you will still be bound by the releases set forth in the Settlement Agreement if the Court enters an order approving the Settlement Agreement. See II.E. below.

**Settlement Hearing and Right to Object**. The Court has scheduled a public fairness hearing for _____, 2014 ("Settlement Hearing"). The purpose of the Settlement Hearing is to determine, among other things, whether the proposed Settlement, the Plan of Allocation and the application by Lead Counsel for Class Counsel attorneys' fees and reimbursement of Class Counsel's expenses are fair, reasonable, and adequate. If you do not request exclusion from the Class, then you may object to any aspect of the Settlement, the Plan of Allocation, Class Counsel's request for attorneys' fees and expenses or any other matters. *See* III.B. below. All objections must be made in accordance with the instructions set forth below and must be filed with the Court and served on counsel for the Parties by _____, 2014 or they will not be

---

[1] Unless otherwise stated, capitalized terms used herein shall have the same meanings as set forth in the Settlement Agreement dated December 24, 2012 and fully executed by January 14, 2013.

considered.  *See* III.B below.

**Right to Exclude Yourself From The Settlement**.  The Court will exclude you from the Settlement if you make a written request for exclusion that includes all information requested in the Request For Exclusion attached hereto and that is received by the Settlement Administrator (Rust Consulting, Inc.) at the address set forth in Section VIII below on or before ____, 2014. See III.C. below.  If you exclude yourself from the Settlement, you will not be entitled to share in the Net Settlement Fund or otherwise participate in the Settlement.  See III.C. below.

## I.      BACKGROUND OF THE LITIGATION.

### A. The Nature of This Lawsuit

In this Action, the Direct Purchaser Plaintiffs alleged (a) that DFA, Keller's Creamery LP, Keller's Creamery, L.L.C., Keller's Creamery Management, LLC, Gary Hanman, Gerald Bos, Frank Otis, and Glenn Millar and unnamed co-conspirators, between April 1, 2004 and December 31, 2006 inclusive ("Class Period"), combined, conspired, and agreed to fix or manipulate the prices of CME Class III milk futures contracts, CME Cheese Spot Call contracts, and other contracts the price terms of which were based on the CME Cheese Spot Call price or certain government minimum milk price formulas in violation of the Commodity Exchange Act ("CEA"), 7 U.S.C. §§ 1, *et seq.*, the Racketeering Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961, *et seq.*, the Sherman Act, 15 U.S.C. §§1 and 2 *et seq.*, and the Cartwright Act, California Bus. & Prof. Code §§ 16720, 16750, *et seq.*, and (b) that the aforementioned Defendants also obtained unjust enrichment and are obligated to make restitution under the common law.  The Settling Defendants have denied and continue to deny the Direct Purchaser Plaintiffs' claims.

The Defendants have denied and continue to deny the Direct Purchaser Plaintiffs' claims.

### B.      Procedural History of the Action

On March 13, 2009, certain Direct Purchaser Plaintiffs filed an initial class action complaint against Settling Defendants in the United States District Court for the Northern District of Illinois.

On February 5, 2010, the Court appointed Lovell Stewart Halebian Jacobson LLP and Wolf Haldenstein Adler Freeman & Herz LLC as co-Lead Counsel for the Direct Purchasers. See Docket No. 61.  On March 4, 2010, the Court ordered certain document discovery.  In response, the Settling Defendants produced hundreds of thousands of pages of documents, including all documents they previously produced to the Commodity Futures Trading Commission ("CFTC") in *In the Matter of Dairy Farmers of America, Inc., Gary Hanman and Gerald Bos*, and *In the Matter of Frank Otis and Glenn Millar*, CFTC Docket Nos. 09-02 and 09-03 (CFTC Dec. 15, 2008).  See Docket No. 75.

The Direct Purchaser Plaintiffs filed a Consolidated Class Action Complaint on March 20, 2010 and subsequently filed a Corrected Consolidated Class Action Complaint on April 9, 2010.  See Docket Nos. 79 and 86.  The Settling Defendants moved to dismiss the Corrected Consolidated Class Action Complaint on May 19, June 3 and June 9, 2010.  See Docket Nos. 98,

100-101, 106 and 110.

On February 4, 2011, the Court granted in part and denied in part Defendants' motions to dismiss the Corrected Consolidated Class Action Complaint. See Docket No. 142; *In re Dairy Farmers of America, Inc. Cheese Antitrust Litig.*, 767 F.Supp.2d 880 (N.D. Ill. 2011). In his ruling, Judge Hibbler: dismissed Direct Purchaser Plaintiffs' RICO claims in their entirety, dismissed the damages claims of all Direct Purchaser Plaintiffs other than Class III milk futures traders and cheese or milk buyers at prices indexed to the CME, and dismissed the monopolization claims of all Direct Purchaser Plaintiffs whose injuries stem from the inflated price of cheese. *Id.*

Commencing in or around May 2011, and concurrent with the conduct of the litigation, Lead Counsel engaged the Settling Defendants in an extensive settlement negotiation process. Such settlement negotiations included the provision of additional documents by the Settling Defendants for settlement purposes only, additional briefing of legal issues by the Parties, and a settlement mediation under the direction of The Honorable Daniel Weinstein (Ret.), including an all-day mediation session on June 29, 2011. Although the mediation session did not conclude in a settlement, the Parties continued their arm's-length negotiations, which included Lead Counsel's extensive review of the voluminous records produced by the Settling Defendants both during discovery and in the course of settlement negotiations, review of records and data produced by third parties, review of expert analysis and deposition transcripts, and other information.

The Direct Purchaser Plaintiffs filed motions for class certification and for a stay of briefing on December 12, 2011. See Docket No. 207. On December 20, 2011, the Court granted the Direct Purchaser Plaintiffs' motion to stay briefing on their motion for class certification and held in abeyance the Direct Purchaser Plaintiffs' motion for class certification. See Docket No. 211.

Plaintiffs filed a Second Amended Consolidated Class Action Complaint dated March 22, 2012, which added a new defendant and also alleged claims under California law, including an alleged violation of the Cartwright Act/California Bus. & Prof. Code §§16720, and 16750, *et seq.* See Docket No. 245. The Court dismissed the Direct Purchaser Plaintiffs' claims against the new defendant for monopolization and attempted monopolization under § 2 of the Sherman Act but permitted all of the remaining claims to proceed to discovery.

The Settlement Agreement with the Settling Defendants was fully executed by January 14, 2013, based on each party's informed view of the factual and legal risks each faced in the Action.

On August 23, 2013, Judge Dow entered an order in response to the Settling Defendants' motion to dismiss the related action filed by alleged Indirect Purchaser Plaintiffs, dismissing many of the Indirect Purchaser Plaintiffs' claims. Specifically, Judge Dow: dismissed all federal claims alleged by the Indirect Purchaser Plaintiffs, dismissed the Indirect Purchaser Plaintiffs' state law claims for all but four states, and reserved ruling on the state law claims in the remaining states pending a determination of his continued jurisdiction over the claims. On November 15, 2013, the Court entered an order modifying the prior appointment of Lovell

Stewart and Wolf as co-lead counsel [Docket Nos. 61 and 63] and appointing Lovell Stewart as sole lead counsel for the direct purchasers.  Docket No. 413.

At this time, the Direct Purchaser Plaintiffs have not proven their assertions.  The Direct Purchaser Plaintiffs believe they have meritorious claims against the Settling Defendants, and the Settling Defendants believe that they have meritorious defenses to the Direct Purchaser Plaintiffs' claims.  Lead Counsel have concluded that a settlement with the Settling Defendants is in the best interests of the Direct Purchaser Plaintiffs and the Class.  The Settlement provides substantial and immediate benefit to Class Members and avoids the risks that liability or damages might not be proven at trial.  Accordingly, Lead Counsel have recommended that the Court approve the proposed Settlement and urge Class Members to file a Proof of Claim.

The Court expresses no opinion whether Direct Purchaser Plaintiffs' allegations are correct or whether any Defendant is liable to Direct Purchaser Plaintiffs for the conduct alleged in the Action.

C.  **The Class**

The Class certified by the Court for settlement purposes is defined as:

All persons who between April 1, 2004 through December 31, 2006:  (1) purchased a CME Class III milk futures contract; (2) purchased a CME Cheese Spot Call contract for either blocks or barrels; (3) purchased cheese directly from DFA or Schreiber Foods, Inc. ("Schreiber") or made a first purchase of cheese from a first manufacturer of cheese (*i.e.* a manufacturer that transforms milk into cheese) pursuant to a contract the price term of which specified that the price was based, in whole or in part, on the CME Cheese Spot Call price (block or barrel price, average price, specific price, price formula, collar price or any variation that explicitly referenced the CME Cheese Spot Call price); or (4) purchased milk directly from DFA or made a first purchase of milk from a first producer of milk (*e.g.,* a dairy farmer) that was made pursuant to a contract the price term of which specified that the price was based, in whole or in part, on (i) the CME Cheese Spot Call price (block or barrel price, average price, specific price, price formula, collar price or any variation that explicitly referenced the CME Cheese Spot Call price); (ii) the CME Class III milk futures price; (iii) the National Agricultural Statistics Service ("NASS") cheese price; or (iv) a government milk formula price which included (i), (ii) or (iii) as a component of such government milk formula price.  Excluded from the Class are the Settling Defendants, the Non-Settling Defendants, and any parent, subsidiary, affiliate, or agent of any Settling Defendant or Non-Settling Defendant.[2]

---

[2] The remaining non-settling defendant is being allowed, provisionally, to submit a proof of claim by which it would seek to participate in the distribution of the proceeds from the Settlement.  Direct Purchaser Plaintiffs oppose the participation by the non-settling defendant in the distribution of the proceeds of the Settlement.  The Court may determine to allow or disallow the non-settling defendant's proof of claim and participation, in whole or in part, in the

## II.    SUMMARY OF THE PROPOSED SETTLEMENT

On behalf of the Class, the Direct Purchaser Plaintiffs entered into the Settlement by January 14, 2013.  The following description of the proposed Settlement is only a summary.  This description and this entire Notice are qualified in their entirety by the Settlement Agreement and the exhibits thereto, which are on file with the Court at the address indicated in this Notice and are available at the official Settlement website at www.DairyFarmersDirectPurchaserAction.com.

### A.    The Settlement Consideration

The Settling Defendants have agreed to provide the following consideration in order to resolve the claims against them:

#### 1.    Payment

Defendant Dairy Farmers of America, Inc. has agreed to pay and shall pay by wire transfer into the Escrow Account the forty-six million dollar ($46,000,000.00)to be made in one or more payments by no later than December 31, 2013.

#### 2.    Remedial Undertaking

DFA undertakes, and its successors and assigns shall be bound to undertake, the following remedial measures:

a.    **Implementation of Policies and Guidelines**.  DFA will implement or continue to maintain the following policies or guidelines:  (a) Commodity Trading Policy; (b) periodic Commodity Trading Compliance Training as reflected in the presentation dated January 23, 2012; (c) Inventory Risk Management Policy; and (d) an "Oversight Committee" for the Inventory Risk Management Policy.

b.    **Implementation of Compliance and Ethics Program**.  DFA will implement and maintain a compliance and ethics program designed to detect and prevent violations of the Commodity Exchange Act ("CEA").

c.    **No Manipulation**.  DFA will not transact in Class III milk futures contracts or Cheese Spot Call contracts, both listed on the Chicago Mercantile Exchange ("CME"), with the specific intent to manipulate the prices of such contracts.  For a period of two (2) years from the date of the Settlement Agreement, DFA will (a) only transact in such futures contracts for legitimate business purposes; and (b) buy or sell CME Cheese Spot Call contracts

distribution of the proceeds of the Settlement.  You should follow the Settlement website for any further information or Court rulings that may relate to the non-settling defendant's participating in receiving the proceeds of the Settlement.

only after the proposed transaction is reviewed and approved by at least two (2) officers of DFA.

### 3. Contribution Waiver

The Settling Defendants agree not to seek contribution or indemnification from any other Person, including Non-Settling Defendants, for the attorneys' fees, costs or the Payment incurred herein. Notwithstanding the foregoing, if any Person sues a Settling Defendant for contribution or indemnification arising from the Released Claims, the preceding limitation does not apply as to that Person.

### 4. Reversion Waiver

The Settling Defendants agree that they shall not be entitled to any reversion of any funds in the event that the Settlement Agreement becomes final as set forth in Section 13 of the Settlement Agreement. If for any reason the Settlement Agreement is not approved by the Court, is terminated under the terms of the Settlement Agreement, or the Effective Date does not occur for any reason, then the Settling Defendants shall be entitled to the reversion of the entire Payment less all funds expended or incurred for Class Notice pursuant to Section 5(b) of the Settlement Agreement or ordered by the Court pursuant to Section 14(a) of the Settlement Agreement.

## B. The Parties' Potential Rights To Terminate The Settlement

### 1. DFA's Potential Right to Terminate

Sections 17(a)-(c) of the Settlement Agreement describe DFA's right to terminate if certain conditions anticipated by the Parties are not satisfied. These conditions are set forth in Section 17(a) of the Settlement Agreement. With respect to each such condition, DFA has the right (as qualified in the Settlement Agreement), but not the obligation, to exercise, in its sole discretion, a termination notice if the condition is not satisfied.

### 2. Plaintiffs' Potential Right To Terminate

Sections 17(d)-(e) of the Settlement Agreement describes the Direct Purchaser Plaintiffs' right to terminate if certain conditions anticipated by the Parties are not satisfied. These conditions are set forth in Sections 17(d)-(e) of the Settlement Agreement. With respect to each such condition, the Direct Purchaser Plaintiffs have the right (as qualified in the Settlement Agreement), but not the obligation, to exercise, in their sole discretion, a termination notice if the condition is not satisfied.

## C. Protection Against Contribution

Section 10(a) of the Settlement Agreement provides that "Lead Counsel shall request that the following language be included in the Final Judgment: There shall be no right of contribution between the Non-Settling Defendants and the Settling Defendants based on their potential, alleged or actual status as joint tortfeasors or co-conspirators with respect to the

Released Claims (any claim for such being a "Contribution Claim"). Notwithstanding the foregoing, should any court determine any Non-Settling Defendant is/was legally entitled to contribution from any Settling Defendant with respect to a Contribution Claim, then any money judgment subsequently obtained by the Direct Purchaser Plaintiffs against such Non-Settling Defendant shall be reduced to an amount such that, upon paying the entire amount, the Non Settling Defendant would have no Contribution Claim against any Settling Defendant."

**D.    Plan Of Allocation**

The Plan of Allocation is available for review on the official Settlement website at www.DairyFarmersDirectPurchaserAction.com.  You may also request that a copy of the Plan of Allocation be sent to you by contacting the Settlement Administrator by telephone toll free at 1 (866) 403-1828 or by writing to the Settlement Administrator at the address set forth in Section VIII below.

Generally, the Plan of Allocation provides that (a) 92.5% of the Net Settlement Fund shall be distributed to eligible Class members based on Plaintiffs' experts' artificiality estimates for qualifying transactions during the time period May 4, 2004 and June 25, 2004 and the time period September 1, 2004 and October 1, 2004 and (b) 7.5% of the Net Settlement Fund shall be distributed to eligible Class members based on total dollar volumes of qualifying transactions during the time period October 2, 2004 through December 31, 2006.

****

Examples of potential computations under the Plan of Allocation are available on the Settlement website at www.DairyFarmersDirectPurchaserAction.com.

The Plan of Allocation may be changed by the Court without providing further notice.

**E.    The Releases, Discharge And Covenant Not To Sue**

**IF YOU HAVE NOT BEEN EXCLUDED FROM THE CLASS, WHEN THE SETTLEMENT BECOMES FINAL YOU WILL BE RELEASING THE SETTLING DEFENDANTS FOR THE CLAIMS DESCRIBED BELOW, AND YOU WILL BE BOUND BY THE RELEASES IN THE SETTLEMENT AGREEMENT INCLUDING THE COVENANT NOT TO SUE—EVEN IF YOU DO NOT FILE A PROOF OF CLAIM**

In exchange for the consideration provided by the Settling Defendant, Members of the Class will release their claims against the Settling Defendants arising in any way from the nucleus of operative facts alleged or at issue or underlying the Action, whether or not asserted in the Action as is more fully set forth below.

*****

(a)      As an express and material condition of this Settlement Agreement, upon the

Effective Date, the Direct Purchaser Plaintiffs and Class Members shall be deemed to have, and by operation of the Final Judgment shall have, fully, finally and forever released and discharged the Released Parties from, and shall covenant not to sue the Released Parties for or with respect to the Released Claims, which shall be defined as all manner of claims, rights, demands, actions, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, judgments, extents, executions, and causes of action, whether class, individual, or otherwise in nature, damages, whenever incurred, and liabilities of any nature whatsoever, including costs, expenses, penalties and attorneys' fees, whether known or unknown, suspected or unsuspected, whether concealed or hidden, whether asserted or which could have been asserted in the Action, or in law, admiralty or equity, that the Class Members or any of them, individually, or as a class (whether or not they make a claim upon or participate in the Settlement Fund), ever had, now have or hereafter can, shall or may have, against the Released Parties arising from or related to the Settling Defendants' conduct alleged in the Action with respect to Direct Purchaser Claims.  Provided, however, that this release shall not include any claims asserted by the named plaintiffs or the proposed class in the Indirect Purchaser Action except for any Direct Purchaser Claims.

(b)    Except for any claims to enforce this Settlement Agreement, each Direct Purchaser Plaintiff, Class Member and Released Party hereby expressly and completely waives and releases any and all rights or benefits with respect to Released Claims which he, she or it has or may have under Section 1542 of the California Civil Code, and any similar provision in any other jurisdiction.  Section 1542 provides as follows:

A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor.

Each Direct Purchaser Plaintiff, Class Member and Released Party expressly waives all of these rights with respect to Released Claims notwithstanding that each may hereafter discover facts other than or different from those which he, she, or it knows, believes, or suspects with respect to the subject matter of this Agreement. Nevertheless, it is the intention of each Direct Purchaser Plaintiff, Class Member and Released Party, through this Settlement Agreement, and with the ability to seek independent advice of counsel, to fully, finally and forever settle and release all claims released pursuant to Sections 6(a) or 6(b), as applicable.  In furtherance of such intention, the releases herein given by the Direct Purchaser Plaintiffs shall be and remain in effect as full and complete releases of the Action solely as to the Settling Defendants (but not as to the Non-Settling Defendants), notwithstanding the later discovery or existence of any such additional or different facts relative hereto or the later discovery of any such additional or different claims that would fall within the scope of the release provided in Section 6(a) of this Settlement Agreement, as if such facts or claims had been known at the time of this release.

(c)    Upon the occurrence of the Effective Date, the Released Parties shall be deemed to have, and by operation of the Final Judgment shall have, fully, finally and forever released and discharged the Direct Purchaser Plaintiffs and Class Counsel from, and shall covenant not to sue the Direct Purchaser Plaintiffs and Class Counsel for or with respect to, all manner of claims, rights, demands, actions, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills,

specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, judgments, extents, executions, and causes of action, damages, whenever incurred, and liabilities of any nature whatsoever, including costs, expenses, penalties and attorneys' fees whether known or unknown, suspected or unsuspected, whether concealed or hidden, or in law, admiralty or equity, that the Released Parties or any of them ever had, now have or hereafter can, shall or may have, against the Direct Purchaser Plaintiffs and Class Counsel to the extent of the Released Claims.

(d)     In no event shall this Settlement Agreement release or purport to release any claims against Schreiber, any claims asserted by the named plaintiffs or class in the Indirect Purchaser Action (except for any Direct Purchaser Claims), any of the other Non-Settling Defendants, or any claims to enforce this Settlement Agreement.  Further, the release, discharge and covenant not to sue set forth in this Settlement Agreement include only Direct Purchaser Claims.

### F.     Changes Or Further Orders By The Court

Any change by the Court in the Plan of Allocation, in the time and place of the Settlement Hearing, or in any other matter and all further orders or requirements by the Court will be posted on the Settlement website at www.DairyFarmersDirectPurchaserAction.com as soon as practicable.  It is important that you refer to the Settlement website as no other notice of such changes may be published.

## III.     YOUR OPTIONS

### A.     Submit A Proof Of Claim

As a Member of the Class, you may be entitled to share in the Net Settlement Fund if you submit a valid and timely Proof of Claim, in the form attached hereto, demonstrating that you have an Allowed Claim (as defined in the Plan of Allocation).  An important aspect of the Settlement is that the Settling Defendants are not entitled to any reversion of the Settlement Fund if the Effective Date occurs.  See II.A.4 above.

### B.     Object To The Settlement

Any Member of the Class who does not request to be excluded from the Settlement may appear at the Settlement Hearing in person or by counsel and may be heard, to the extent allowed by the Court, either in support of or in opposition to the fairness, reasonableness, and adequacy of the Settlement Agreement or any related matter (including the request for attorneys' fees, the Plan of Allocation or any other matter).

However, no person shall be heard in opposition to the Settlement Agreement, and no papers or briefs submitted by or on behalf of any such person shall be accepted or considered by the Court, unless, by _____, 2014, such person files the following with the Court and serves the same on or before such filing by hand or overnight mail on the Lead Counsel and counsel for Defendants: (i) if a Member of the Class intends to appear and be heard at the

Settlement Hearing, a written notice of intention to appear; (ii) proof of membership in the Class; (iii) a detailed statement of the objections to any matters before the Court; (iv) a statement advising of any court proceeding in which said objector has made an objection to a proposed class action settlement within the past three years, including case name, docket number, and court; (v) if a Member of the Class intends to appear and be heard at the Settlement Hearing, the grounds or reasons why the Member of the Class desires to appear and be heard; and, (vi) all documents or writings the Member of the Class desires the Court to consider.

Christopher Lovell
**Lovell Stewart Halebian Jacobson LLP**
61 Broadway, Suite 501
New York, New York 10006

*Lead Counsel For Direct Purchaser Plaintiffs*

William M. Hannay
**Schiff Hardin LLP**
233 South Wacker Drive, Suite 6600
Chicago, Illinois 60606

Amanda J. Metts
**McDermott Will & Emery LLP**
227 W. Monroe Street
Chicago, Illinois 60606

Ellen M. Wheeler
**Foley & Lardner**
321 North Clark Street, Suite 2800
Chicago, Illinois 60654

Glenn R. Reichardt
**K&L Gates LLP**
1601 K Street, NW
Washington, D.C. 20006

*Counsel for Defendants*

### C.     Request To Be Excluded From The Settlement

To exclude yourself from the Class, you must submit a written request that includes all information requested in the Request for Exclusion attached hereto.  Requests for exclusion that do not include all of the requested information will be invalid.

Requests for exclusion from the Settlement must be sent by First-Class mail (preferably certified mail) to Lead Counsel, counsel for Defendants (see addresses in "B" above) and the Settlement Administrator (see address in Section VIII below).  Requests for exclusion must be

received no later than _____, 2014.

If you exclude yourself from the Class, you will not be bound by the Settlement Agreement and can independently pursue claims you may have against the Settling Defendants at your own expense. However, if you exclude yourself, you will not be eligible to share in the Net Settlement Fund.

## IV.   PROOF OF CLAIM

The Proof of Claim, which includes instructions on how and when to make a claim, is attached hereto. You should read the Settlement Agreement and Proof of Claim carefully before submitting your Proof of Claim or determining another course of action.

## V.   ATTORNEYS' FEES, COSTS AND INCENTIVE AWARDS

A.      To date, the attorneys representing the Direct Purchaser Plaintiffs and the Class in this Action have not received payment for their services or reimbursement for their expenses. Class Members are not personally responsible for payment of attorneys' fees or expenses. As compensation for their time and their risk in prosecuting the litigation on a wholly contingent fee basis for three-plus years, Lead Counsel will ask the Court for an award of attorneys' fees in the amount of one-third of the Settlement Fund, as a common fund, and for reimbursement of their costs and expenses in the amount of no more than $_____—all to be deducted from the Settlement Fund.

B.      At the time the Net Settlement Fund is distributed to Class Members, the Direct Purchaser Plaintiffs will seek reimbursement of their own expenses and compensation for their time devoted to this litigation in the aggregate amount of no more than $60,000 to be paid from the Settlement Fund. A separate notice of this application and an opportunity to object will later be provided to Class Members who submit approved Proofs of Claims.

## VI.   SETTLEMENT HEARING AND THE RIGHT TO OBJECT

The Court has scheduled a Settlement Hearing for _____, 2014 at ___ a.m. to be held at the Everett McKinley Dirksen United States Courthouse, 219 South Dearborn Street, Chicago, Illinois, Courtroom 1919. At the Settlement Hearing, the Court will determine if the proposed Settlement is fair, reasonable, and adequate. The Court will also consider Lead Counsel's request for attorneys' fees and reimbursement of litigation expenses.. See V.A. above.

The time and date of the Settlement Hearing may be continued from time to time without further notice and you are advised to confirm the time and location if you wish to attend; as soon as practicable after any change in the scheduled date and time, such change will be posted on the settlement website www.DairyFarmersDirectPurchaserAction.com. If you are a Member of the Class who has not requested to be excluded from the Settlement, you are entitled to appear, in person or through duly authorized attorneys, and to show cause why the Settlement or other applications should or should not be approved. See III.B. above.

## VII.    CHANGE OF ADDRESS

If this Notice reached you at an address other than the one on the mailing label, or if your address changes, please enter your current information online at www.DairyFarmersDirectPurchaserAction.com, or send it to the Settlement Administrator at the address set forth in VIII. below.

## VIII.    THE SETTLEMENT ADMINISTRATOR

The Court has appointed Rust Consulting, Inc. as the Settlement Administrator.  Among other things, the Settlement Administrator is responsible for providing notice of the Settlement to the Class and processing Proof of Claim forms.  You may contact the Settlement Administrator through the Settlement website (www.DairyFarmersDirectPurchaserAction.com), by telephone toll free at 1 (866) 403-1828, or by writing to the Settlement Administrator at this address

> Dairy Farmers of America, Inc. Cheese Antitrust Litigation Settlement
> c/o Rust Consulting, Inc.
> P.O. Box 2428
> Faribault, MN  55021-9128

## IX.    ADDITIONAL INFORMATION

The Settlement Agreement and other important documents related to this Action are available online at www.DairyFarmersDirectPurchaserAction.com and also available for review during normal business hours at the office of the Clerk of Court, United States District Court for the Northern District of Illinois, 219 South Dearborn Street, Chicago, Illinois 60604.  If you have questions about this Notice, the procedure for registering, or the Settlement Agreement, you may contact Lead Counsel at the address listed in III.B. above.

### <u>DO NOT CONTACT THE JUDGE OR THE CLERK OF THE COURT</u>

Dated: __, 2014

> **BY ORDER OF THE COURT**
> Clerk of the United States District Court
> Northern District of Illinois

# Exhibit B

# <u>NOTICE OF CLASS ACTION SETTLEMENT</u>

**If Between April 1, 2004 and December 31, 2006 You (1) Purchased A Chicago Mercantile Exchange ("CME") Class III Milk Futures Contract; (2) Purchased A CME Spot Cheese Contract; (3) Purchased Cheese From DFA Or Schreiber Or Made A First Purchase Of Cheese From A First Manufacturer Of Cheese Pursuant To A Contract The Price Term Of Which Specified That The Price Was Based, In Whole Or In Part, On The CME Cheese Spot Call Price; Or (4) Purchased Milk From DFA Or Made A First Purchase Of Milk From A First Producer Of Milk That Was Made Pursuant To A Contract The Price Term Of Which Specified That The Price Was Based, In Whole Or In Part, On (i) The CME Cheese Spot Call Price; (ii) The CME Class III Milk Futures Price; (iii) The National Agricultural Statistics Service ("NASS") Cheese Price; Or (iv) A Government Milk Formula Price Which Included (i), (ii) Or (iii) As A Component Of Such Government Milk <u>Formula Price, Then Your Rights May Be Affected and You May Be Entitled To A Benefit</u>**

The purpose of this notice is to inform you of a Settlement between the Direct Purchaser Plaintiffs and the Settling Defendants in the class action *In re Dairy Farmers of America, Inc. Cheese Antitrust Litigation,* No. 09-cv-3690 (Direct Purchaser Action) (N.D. Ill.) ("Action") pending in the U.S. District Court for the Northern District of Illinois. The Court has scheduled a public Settlement Hearing on _____, 2014, _____ [a.m. / p.m.] at the Everett McKinley Dirksen United States Courthouse, 219 South Dearborn Street, Chicago, Illinois, Courtroom 1919.

In this Action, the Direct Purchaser Plaintiffs alleged (a) that the Settling Defendants, a non-settling defendant and unnamed co-conspirators, between April 1, 2004 and December 31, 2006 ("Class Period"), combined, conspired, and agreed to fix or manipulate the prices of CME Class III milk futures contracts, CME Cheese Spot Call contracts, and other contracts the price terms of which were based on the CME Cheese Spot Call price or certain government minimum milk price formulas in violation of the Commodity Exchange Act ("CEA"), 7 U.S.C. §§ 1, *et seq.*, the Racketeering Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961, *et seq.*, the Sherman Act, 15 U.S.C. §§1 and 2, and the Cartwright Act, California Bus. & Prof. Code §§ 16720, 16750, *et seq.*, (b) that an additional non-settling defendant participated in the alleged conspiracy between May 24 and June 23, 2004 in violation of the CEA, the Sherman Act, and the Cartwright Act, and (c) that the Defendants also obtained unjust enrichment and are obligated to make restitution under the common law. . The Defendants have denied and continue to deny the Direct Purchaser Plaintiffs' claims.

In order to resolve the claims against them, the Settling Defendants have agreed to wire transfer $46,000,000.00 into the Escrow Account and have further agreed to additional consideration of certain remedial undertakings as specifically set forth in the Settlement.

If you are a Member of the Class, you may seek to participate in the Settlement by filing a Proof of Claim on or before _____, 2014. You may obtain a Proof of Claim on the Settlement website referenced below. All objections to the Settlement must be made in accordance with the instructions set forth in the formal Settlement Notice and must be filed with the Court and served

on the Parties' counsel by _____, 2014.  The Court will exclude you from the Settlement only if you make a written request for exclusion that contains all required information set forth in the Request For Exclusion attached to the formal Notice of Partial Settlement of Action, ___ 2014 Hearing Thereon, and Class Members' Rights and is <u>received</u> by the Settlement Administrator (Rust Consulting, Inc.) at the address below on or before ____, 2014.

> Dairy Farmers of America, Inc. Cheese Antitrust Litigation Settlement
> c/o Rust Consulting, Inc.
> P.O. Box 2428
> Faribault, MN  55021-9128

If you do not request exclusion from the Settlement, whether or not you file a Proof of Claim, you will be bound by the releases set forth in the Settlement Agreement if the Court enters an order approving the Settlement.

A copy of the Settlement Agreement, the formal Settlement Notice, Proof of Claim, Request for Exclusion, information on how to object or be excluded from the Settlement, and other important documents and information are available on the settlement website at www.DairyFarmersDirectPurchaserAction.com.  For additional information, you may also contact the Settlement Administrator at 1 (866) 403-1828.

# Exhibit C

Execution Copy

## ESCROW AGREEMENT

12/18/13 ✓

**THIS ESCROW AGREEMENT**, dated as of December 24, 2012 ("Agreement"), is entered by and among; Indriolo Distributors, Inc., Knutson's, Inc. and Valley Gold, LLC (collectively, "Plaintiffs"), individually, and as representatives of the proposed Class in the Litigation; Lovell Stewart Halebian Jacobson LLP ; and Rust Consulting, Inc., in the capacity of Escrow Agent (as defined below).

## RECITALS:

**WHEREAS,** Defendant Dairy Farmers of America, Inc. ("DFA" or "Defendant") and the Plaintiffs are parties to the direct purchaser class action litigation captioned *In re: Dairy Farmers of America, Inc. Cheese Antitrust Litigation*, 09-cv-03690 (N.D. Ill.) (the "Litigation") filed in the United States District Court for the Northern District of Illinois ("Court");

**WHEREAS,** Defendant, the other Settling Defendants in the Litigation, and Plaintiffs, on their own behalf and on behalf of the Class, have reached an agreement with respect to the settlement and resolution of the Litigation as reflected in the Stipulation and Agreement of Settlement among such parties, dated December 24, 2012 (the "Settlement Agreement), a true and correct copy of which is attached hereto as Exhibit A;

**WHEREAS,** the Settlement Agreement has been submitted to, and is subject to the approval of, the Court; and

**WHEREAS,** the Settlement Agreement contemplates the execution and delivery of this Escrow Agreement to, and the deposit of cash by defendant DFA into an escrow account to be controlled and disbursed by, the Escrow Agent in accordance with the terms of this Escrow Agreement.

**NOW THEREFORE,** in consideration of the foregoing, the mutual covenants and agreements set forth herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound, the parties hereto, hereby agree as follows:

## AGREEMENT:

1. Definitions:

(a)     All capitalized terms used herein and not otherwise defined shall have meaning ascribed thereto in the Settlement Agreement.

(b)     "Bank" shall mean U.S. Bank, N.A.

(c)     "Business Day" means any day other than a Saturday or a Sunday or a day on which banks located in New York, New York generally are authorized or required by law to close.

(d)     "Escrow Agent" means Rust Consulting, Inc. or any successor escrow agent appointed pursuant to Section 9 hereof.

(e)     "Escrow Account" means an account established by Escrow Agent with the Bank to directly receive Defendant's deposit of the Settlement Funds, as more specifically described in Section 3 below.

(f)     "Escrow Funds" means (i) the Settlement Funds deposited into the Escrow Account by Defendant pursuant to this Escrow Agreement, and (ii) any and all earnings and/or interest from investment of the Settlement Funds.

(g)     "Settlement" means the settlement of the Litigation pursuant to the terms of the Settlement Agreement.

(h)     "Settlement Funds" shall have the meaning ascribed in Section 4 below.

(i)     "Tax Expenses" shall have the meaning ascribed in Section 8(d) below.

(j)     "Taxes" shall have the meaning ascribed in Section 8(d) below.

(k)     "Terminating Event" shall have the meaning ascribed in Section 7 below.

(l)     "Written Direction" shall mean a written notification, signed by Class Counsel, substantially in the form attached hereto as Exhibit B.

2.     Appointment of and Acceptance by Escrow Agent.  Class Counsel, on behalf of the Plaintiffs and Class Members and themselves, hereby appoint Rust Consulting, Inc. to serve as Escrow Agent under the terms and conditions of this Escrow Agreement. Escrow Agent hereby accepts such appointment, and agrees to control and disburse the Escrow Funds, subject to and in accordance with the terms and conditions of this Escrow Agreement.

3.     Establishment of Escrow Account.  The Escrow Agent and Class Counsel have established an escrow account with the Bank. The name of the Escrow Account is: *In re: Dairy Farmers of America, Inc. Cheese Antitrust Litigation Direct Purchaser Settlement Fund (QSF)*. The wire instructions for the Escrow Account have been provided to Class Counsel and counsel for DFA.

4.     Deposit of Escrow Funds.  Defendant Dairy Farmers of America, Inc. has agreed to pay and shall pay by wire transfer into the Escrow Account the forty-six million dollar ($46,000,000.00) Payment, to be made in one or more payments by no later than December 31, 2013. "Settlement Funds" shall mean the total Payment. Promptly upon receipt of notification and confirmation of such Payment from the Bank, Escrow Agent shall confirm in writing to Class Counsel and Defendant's Counsel receipt of the Settlement Funds into the Escrow Account.

5.    Investment of the Escrow Funds.

    (a)    The Escrow Funds shall be invested and reinvested in any one or a combination of the following investment options pursuant to Written Directions signed by Class Counsel: (i) obligations issued or guaranteed by the United States of America or its agencies or instrumentalities with maturity dates of one year or less; (ii) certificates of deposit with maturity dates of ninety (90) days or less issued by any United States bank having combined capital, surplus and undistributed profits of at least $10,000,000,000, (iii) repurchase agreements fully collateralized by securities described in clause (i); (iv) money market funds having a rating in the highest investment category granted thereby by a nationally recognized credit rating agency at the time of acquisition; or (v) demand deposits with any United States bank having combined capital, surplus and undistributed profits of at least $10,000,000,000.  In the event no written investment instructions are received by the Escrow Agent, the Escrow Funds shall be invested and reinvested in (iv) above.  The Escrow Funds shall be deemed and considered to be in *custodia legis* of the Court, and shall remain subject to the jurisdiction of the Court, until such time as the Escrow Funds are fully distributed or upon further order(s) of the Court.

    (b)    To the extent practicable, monies and income credited to the Escrow Account shall be invested in such a manner so as to be available for uses at the times where monies are expected to be disbursed by the Escrow Agent as set forth herein.

    (c)    The Escrow Agent shall have no responsibility for any investment losses resulting from the investment, reinvestment or liquidation of the Escrow Funds if done in accordance with the terms of this Escrow Agreement.  It is understood and agreed that the Escrow Agent or its affiliates may derive financial benefits from the financial institution(s) in connection with the deposit and investment of Settlement Funds with such institution(s), including without limitation, discounts on eligible banking services and fees, and loans at favorable rates.

6.    Disbursement of Escrow Funds.  Subject to the terms hereof, Escrow Agent shall only disburse the Escrow Funds in accordance with the following:

    i)    Escrow Agent shall cause or permit the transfer and distribution of the Escrow Funds in accordance with a Written Direction signed by Class Counsel.

    ii)    Escrow Agent shall otherwise dispose of the Escrow Funds as the Court may direct by an order issued in the Litigation.

    iii)    Escrow Agent shall withhold from such transfer and distribution amounts necessary for payment of or reserves for payment of Taxes, associated Tax Expenses (as those terms are defined below) (if any) and expenses of Escrow Agent in connection herewith.

    iv)    Notwithstanding anything in this Paragraph 6, upon execution of this Escrow Agreement, and once preliminary approval has been granted by the Court, up to $250,000 of the Settlement Fund may be disbursed to Class Counsel from the Escrow Account and used for Class notice and administration expenses without further order of the Court.

3

7.     Termination of Settlement Agreement. If the Settlement in this action is not approved by the Court or the Settlement Agreement is terminated, canceled, voided, or the Effective Date as defined in Section 1(m) of the Settlement Agreement does not occur for any reason ("Terminating Event"), all Escrow Funds paid into the Escrow Account by Defendant (and interest thereon) shall be refunded to Defendant, net of any funds expended or incurred for Class Notice. In such case, the refund shall occur within five (5) Business Days of (i) Class Counsel or Defendant's Counsel providing Written Directions notifying Escrow Agent of the Terminating Event and instructing Escrow Agent to refund the Escrow Funds to Defendant, which notice shall be provided promptly following a Terminating Event, or (ii) receipt of an order issued by the Court in the Litigation directing that the Escrow Funds be refunded to Defendant. The refund to Defendant shall be reduced by any Taxes and Tax Expenses (as those terms are defined below) paid or owed, as applicable, to the date of the Terminating Event, unless otherwise set forth in the applicable Court order.

8.     Preparation and Payment of Taxes.

       (a)     The Settlement is to be treated for federal income tax purposes as a qualified settlement fund within the meaning of U.S. Department of Treasury ("Treas.") Reg. § 1.468B-1. Rust Consulting, Inc. shall, in addition to serving as Escrow Agent, also be appointed administrator (as that term is used in Treas. Reg. §1.468B-2(k)(3)) (the "Tax Administrator") of the Settlement Account and as such will file such federal, state or local returns, pay such federal, state or local taxes, comply with applicable federal, state or local information reporting requirements and otherwise generally comply with the rules and regulations applicable to qualified settlement funds under Treas. Reg. § 1.468B-1 and relevant provisions of state and local tax law.

       (b)     The Tax Administrator shall, on behalf of the Escrow Agent, apply for an employer identification number for the qualified settlement fund in accordance with Treasury Regulations §1.468B-2(k)(4) and provide the Escrow Agent with the appropriate IRS Form W9 as soon as available.

       (c)     The Tax Administrator will comply with its duties and obligations under the Reg. §1.468B rules.

       (d)     All taxes (including any estimated taxes, interest or penalties) arising with respect to the income earned by the Escrow Account ("Taxes") shall be paid out of such Escrow Account. Expenses and costs incurred in connection with the operation and implementation of this Section (including, without limitation, reasonable, out-of-pocket expenses of tax attorneys and/or accountants and mailing and distribution costs and expenses relating to filing (or failing to file) the returns described herein) ("Tax Expenses"), shall be paid in accordance with Section 12 below. Further, Taxes shall be treated as, and considered to be, a cost of administration of the Settlement Agreement and shall be timely paid out of each Escrow Account without prior order from the Court, and the Escrow Agent shall be obligated (notwithstanding anything herein to the contrary) to withhold from distribution to Class Members any monies necessary to pay such amounts including the establishment of adequate reserves for any Taxes and (as well as any amounts that may be required to be withheld under Treas. Reg. §1.468B-2($l$)) under Information

4

Reporting and Withholding Requirements, all as directed by terms of the Settlement and/or Orders.

(e)     The Tax Administrator shall timely make (or cause to be timely made) the "relation-back election" (as defined in Treas. Reg. § 1.46B-1(j)(2)) back to the earliest permitted date. Such election shall be made in compliance with the procedures and requirements contained in such regulations (or any successor regulations). It shall be the responsibility of the Tax Administrator to timely and properly prepare, and deliver the necessary documentation (including but not limited to the disclosures and elections referred to above) for signature by all necessary Parties, and thereafter to cause the appropriate filing to occur through either in the qualified settlement fund income tax return and through supplying the Defendant a copy of the executed election statement for inclusion in its income tax return.

(f)     The Parties hereto acknowledge that the Tax Administrator shall not be held accountable for any fines, penalties or interest associated with late filings and/or late payments as a result of the failure or refusal of others to cooperate with the Tax Administrator causing such filings and/or payments not to occur on a timely basis. The Tax Administrator may retain or hire a qualified third party or parties ("Qualified Third Party") to perform any of its duties or responsibilities specified herein or in Treas. Reg. § 1-468B-2. The fees or costs of such Qualified Third Party shall be billed to the Tax Administrator and shall be paid from amounts on deposit in the Settlement Fund.

(g)     Defendant is not responsible and shall have no liability therefore or for any reporting requirements that may relate thereto. The parties hereto agree to exercise their commercially reasonable efforts to cooperate with the Escrow Agent, each other, and their tax attorneys and accountants to the extent reasonably necessary to carry out the provisions of this Section.

9.     Resignation and Removal of Escrow Agent.

(a)     Escrow Agent may resign from the performance of its duties hereunder at any time by giving thirty (30) days prior written notice of its resignation to Class Counsel or may be removed, with or without cause, by Class Counsel furnishing thirty (30) days prior written notice to Escrow Agent. Such resignation or removal shall take effect upon the earlier of: (i) the appointment of a successor Escrow Agent as provided below, or (ii) thirty (30) days after the written notice referenced above is received by Class Counsel.

(b)     Upon any such notice of resignation or removal, Class Counsel shall appoint a successor Escrow Agent hereunder. Upon the acceptance in writing of any appointment as Escrow Agent hereunder by a successor Escrow Agent, such successor Escrow Agent shall thereupon succeed to and become vested with all the rights, powers, privileges and duties of the retiring Escrow Agent, and the retiring Escrow Agent shall be discharged from its duties and obligations under this Escrow Agreement, but shall not be discharged from any liability for actions taken as Escrow Agent hereunder prior to such succession.

(c)     The retiring Escrow Agent shall transmit all records pertaining to the Escrow Funds and shall transfer all Escrow Funds to the successor Escrow Agent, after making copies of

such records as the retiring Escrow Agent deems advisable. If Class Counsel fails to designate a successor Escrow Agent within thirty (30) days of receiving Escrow Agent's written notice of resignation, Escrow Agent may, at its sole discretion and option, petition any court of competent jurisdiction for the appointment of a successor Escrow Agent.

10.     Conflicting Demands or Claims.  In the event Escrow Agent receives or becomes aware of conflicting demands or claims with respect to some or all of the Escrow Funds or the rights of any of the parties hereto, Escrow Agent shall have the right to discontinue any or all further acts with respect to the Escrow Funds in question until such conflict is resolved either by mutual agreement of the Parties, or by a final order, decree or judgment of the Northern District of Illinois or other court or tribunal of competent jurisdiction. Escrow Agent shall have the further right to commence or defend an action or proceeding for the resolution of such conflict. The Escrow Agent shall have the option, after 30 calendar days' notice to the other parties of its intention to do so, to file an action in interpleader requiring the parties to answer and litigate any claims and rights among themselves.

11.     Liability of Escrow Agent.  The duties and obligations of Escrow Agent shall be determined by the express provisions of this Escrow Agreement, and no implied duties or obligations shall be inferred or otherwise imposed upon or against Escrow Agent, and Escrow Agent shall not be liable except for the performance of such duties and obligations as are specifically set out in this Escrow Agreement. Escrow Agent shall be protected in acting upon any written notice, request, waiver, consent, certificate, receipt, authorization, power of attorney or other paper or document which Escrow Agent in good faith believes to be genuine and what it purports to be, including, but not limited to, items requesting or authorizing release, disbursement or retainage of the subject matter of this Escrow Agreement and items amending the terms of this Escrow Agreement. It is expressly understood that Escrow Agent is obligated only to receive, hold and invest the Escrow Funds as set forth in this Escrow Agreement, and to disburse the same in accordance with the Written Instructions given under the provisions of this Escrow Agreement. Escrow Agent shall not be liable or responsible to anyone for any damages, losses or expenses unless the same shall be caused by the gross negligence, bad faith, fraud, or willful misconduct of Escrow Agent (provided that, if any Escrow Funds are placed in the wrong account or otherwise misplaced due to the Escrow Agent's mistake, said Escrow Funds shall be returned or reimbursed to the Escrow Account by the Escrow Agent). In any event, Escrow Agent's liability shall not exceed the return or reimbursement of the Escrow Account as it is then constituted as set forth in the preceding sentence. The other parties to this Escrow Agreement agree to and hereby waive any suit, claim demand or cause of action of any kind which it or they may have or may assert against Escrow Agent arising out of or relating to the execution or performance by Escrow Agent under this Escrow Agreement, unless such suit, claim, demand or cause of action is based upon gross negligence, bad faith, fraud, or willful misconduct of Escrow Agent. Plaintiffs and Class Counsel further agree to indemnify and hold harmless Escrow Agent against and from any and all claims, demands, costs, liabilities and expenses, including reasonable attorneys' fees and expenses, which may be asserted against Escrow Agent or to which it may be exposed or which it may incur by reason of its execution or performance under this Escrow Agreement, except those resulting from gross negligence, bad faith, fraud, or willful misconduct. This Section shall survive the termination of this Escrow Agreement for any reason.

12.    Compensation of Escrow Agent.    Escrow Agent shall be entitled to reasonable compensation as agreed among Escrow Agent, Class Counsel and Defendant's Counsel, as well as reimbursement for its reasonable costs and expenses incurred in connection with the performance of its obligations under this Escrow Agreement (including, without limitation, reasonable attorneys' fees and legal expenses). Class Counsel shall be solely responsible for effectuating payment to the Escrow Agent to which it is entitled under this Section, and any such compensation shall be from the Escrow Funds.

13.    Reports and Accounting.    Escrow Agent will provide reports as requested to Class Counsel and Defendant's Counsel reflecting income and disbursement activity in the Escrow Account for the period and year to date. The Escrow Agent shall further issue a final report and accounting that summarizes the income, expenses, and disbursements associated with the administration of the Escrow Account and such other reports as request may reasonably require from time to time. Escrow Agent shall provide copies of the final report and accounting as requested to the parties.

14.    Notices. All notices and other communications hereunder shall be in writing and shall be deemed to have been validly served, given or delivered five (5) days after deposit in the United States mail, by certified mail with return receipt requested and postage prepaid, when delivered personally, one (1) day after delivery to any overnight courier, or when transmitted by facsimile transmission facilities, and addressed to the party entitled to be notified as follows:

If to Class Counsel, then to:

Christopher McGrath
cmcgrath@lshllp.com
**LOVELL STEWART HALEBIAN JACOBSON LLP**
61 Broadway, Suite 501
New York, New York 10006
Telephone:    (212) 608-1900

If to Defendant's Counsel, then to:

Amanda Metts
ametts@mwe.com
**MCDERMOTT WILL & EMERY LLP**
227 West Monroe Street, Suite 4400
Chicago, Illinois 60606-5096
Telephone:    (312) 372-2000

If to Escrow Agent, then to:

Ken Wood
c/o Bank & Tax
**Rust Consulting, Inc.**
625 Marquette Avenue, Suite 880
Minneapolis, Minnesota 55402

Tel: (612) 359-2859
kwood@rustconsulting.com

or to such other address as each party may designate for itself by like notice.

15.     Rights to Accounts.  Neither the Plaintiffs nor any Class Members shall have any right or title to or interest in any portion of the Escrow Funds except as provided by order of the Court and as set forth in the Settlement Agreement.

16.     Amendment or Waiver.  This Escrow Agreement may be changed, waived, discharged or terminated only by a writing signed by all of the parties to this Escrow Agreement.  No delay or omission by any party in exercising any right with respect hereto shall operate as a waiver.  A waiver on any one occasion shall not be construed as a bar to, or waiver of, any right or remedy on any future occasion.  Escrow Agent agrees to negotiate an amendment of this Escrow Agreement with respect to the treatment, designation and/or use of the Escrow Funds, including, without limitation, the tax treatment of the Escrow Funds, should such amendment be deemed warranted by Class Counsel.

17.     Governing Law.   This Escrow Agreement shall be construed and interpreted in accordance with the internal laws of the State of Illinois without giving effect to the conflict of laws principles thereof.

18.     Entire Agreement.  This Escrow Agreement constitutes the entire agreement between the parties relating to the holding, investment and disbursement of the Escrow Funds and set forth in their entirety the obligations and duties of Escrow Agent with respect to the Escrow Funds.

19.     Binding Effect/Assignment.   All of the terms of this Escrow Agreement, as may be amended from time to time in accordance with the terms hereof, shall be binding upon, inure to the benefit of and be enforceable by the parties hereto and their respective heirs, successors and permitted assigns.  No party may assign any of its rights or obligations under this Escrow Agreement without the prior written consent of the other parties hereto.

20.     Counterparts.  This Escrow Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.   This Escrow Agreement may be executed and delivered in counterpart signature pages and delivered via facsimile or .pdf transmission, and any such counterpart executed and delivered via facsimile or .pdf transmission shall be deemed an original for all intents and purposes.

*{Signature page follows.}*

**IN WITNESS WHEREOF**, Class Counsel, on behalf of the Plaintiffs and Class Members and themselves, and Escrow Agent have each caused this Escrow Agreement to be executed under seal as of the date first above written.

Dated: December 13, 2013

**Class Counsel:**

By: _____  12/18/15

Christopher Lovell
**LOVELL STEWART HALEBIAN
JACOBSON LLP**
61 Broadway, Suite 501
New York, New York 10006
Tel: (212) 608-1900

**Escrow Agent:**
**Rust Consulting, Inc.**

By: _____

Name:   Ken Wood
Title:   Director of Bank & Tax

9

## EXHIBIT A

**[Settlement Agreement]**

## EXHIBIT B

### WRITTEN DIRECTION

*In re: Dairy Farmers of America, Inc. Cheese Antitrust Litigation, 09-cv-03690 (N.D. Ill.)*
**ACCOUNT #** _____

      In accord with the Escrow Agreement, dated _____, 20____ and the Settlement Agreement referenced in the Escrow Agreement, Class Counsel direct Rust Consulting, Inc., as the Escrow Agent, to take the following action with respect to the Escrow Funds:

      The Escrow Agent shall _____
_____
_____
_____.

DATED: _____, 20____

**Class Counsel:**

By: _____
Christopher Lovell
**LOVELL STEWART HALEBIAN
JACOBSON LLP**
61 Broadway, Suite 501
New York, New York 10006
Tel: (212) 608-1900

DM_US 47978946-3.046466.0083

11

# Exhibit D

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| IN RE:  DAIRY FARMERS OF AMERICA, INC. CHEESE ANTITRUST LITIGATION | ) ) ) ) ) ) ) |

Master File No. 09-cv-03690
MDL No.  2031
The Honorable M. Robert Dow, Jr.

THIS DOCUMENT RELATES TO:

DIRECT PURCHASER ACTION

## FINAL ORDER AND JUDGMENT

This matter came for a duly-noticed hearing on _____, __ 2014 (the "Settlement Hearing"), upon the Direct Purchaser Plaintiffs' motion for final approval of Settlement with Defendants Dairy Farmers of America, Inc., including former entities Keller's Creamery LP, Keller's Creamery, and L.L.C., Keller's Creamery Management, LLC, Gary Hanman, Gerald Bos, Frank Otis, and Glenn Millar (collectively, the "Settling Defendants") in the above-captioned action (the "Direct Purchaser Plaintiffs' Action"), which was joined and consented to by the Settling Defendants.  Due and adequate notice of the Stipulation and Agreement of Settlement dated December 18, 2013 (the "Settlement Agreement") having been given to the members of the Class, the Settlement Hearing having been held and the Court having considered all papers filed and proceedings had herein and otherwise being fully informed in the premises and good cause appearing therefor, and a determination having been made expressly pursuant to Rule 54(b) of the Federal Rules of Civil Procedure that there is no justification for delay, **IT IS HEREBY ORDERED, ADJUDGED AND DECREED:**

1.     This Final Order and Judgment hereby incorporates by reference the definitions in the Settlement Agreement and all terms used herein shall have the same meanings as set forth in the Settlement Agreement.

1

2.     The Court hereby finally certifies the Class, for purposes of settlement only, as defined in the Court's Order Preliminarily Approving Proposed Settlement, Scheduling Hearing for Final Approval thereof, and Approving the Proposed Form and Program of Notice to the Class dated _____.

3.     This Court has jurisdiction over the subject matter of the Direct Purchaser Plaintiffs' Action and over all parties to the Direct Purchaser Plaintiffs' Action.

4.     The Court finds that due process and adequate notice have been provided pursuant to Rule 23 of the Federal Rules of Civil Procedure to all Members of the Class, notifying the Class of the proposed Settlement.

5.     The notice provided was the best notice practicable under the circumstances and included individual notice to those Members of the Class who Co-Lead Counsel were able to identify through reasonable efforts.  The Court finds that notice was also given by publication as set forth in the Declaration of _____ dated _____, 2014, and previously submitted. Such notice fully complied in all respects with the requirements of Rule 23 of the Federal Rules of Civil Procedure, due process of law, and applicable law.

6.     Pursuant to and in compliance with Rule 23 of the Federal Rules of Civil Procedure, the Court hereby finds that due and adequate notice of these proceedings was directed to all Class Members of their right to object to the Settlement, the Plan of Allocation, Class Counsel's right to apply for attorneys' fees and reimbursement of expenses associated with the Direct Purchaser Plaintiffs' Action, and Direct Purchaser Plaintiffs' right to apply for reimbursement of their own expenses and compensation for their time devoted to this Action.  A full and fair opportunity was accorded to all Members of the Class to be heard with respect to the foregoing matters.

7.     The Court finds that the Members of the Class identified on the schedule attached hereto as Exhibit A, and no others, have validly requested to be excluded from the Class pursuant to the terms set forth in the Scheduling Order.  Accordingly, the Persons listed on Exhibit A are not included in the Class nor bound by this Final Order and Judgment.

8.     It is hereby determined that all Members of the Class whose names are not on Exhibit A hereto are bound by this Final Order and Judgment.

9.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, this Court hereby approves the Settlement, as set forth in the Settlement Agreement, and finds that the Settlement is, in all respects, fair, reasonable and adequate, and in the best interests of the Class, including the Direct Purchaser Plaintiffs.  This Court further finds that the Settlement set forth in the Settlement Agreement is the result of arm's length negotiations between experienced counsel representing the interests of the Parties.  Accordingly, the Settlement embodied in the Settlement Agreement is hereby approved in all respects.  The Parties are hereby directed to carry out the Settlement Agreement in accordance with all of its terms and provisions, including the termination provisions.

10.     The Court hereby directs that, as to the Settling Defendants (but not as to the Non-Settling Defendants), the Action is dismissed with prejudice and without costs.  Each of the Released Parties is hereby released and discharged from the Released Claims, which shall be defined as all manner of claims, rights, demands, actions, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, judgments, extents, executions, and causes of action, whether class, individual, or otherwise in nature, damages, whenever incurred, and liabilities of any nature whatsoever, including costs, expenses, penalties and attorneys' fees, whether known or unknown, suspected or unsuspected, whether concealed or hidden, whether asserted or which

could have been asserted in the Action, or in law, admiralty or equity, that the Class Members or any of them, individually, or as a class (whether or not they make a claim upon or participate in the Settlement Fund), ever had, now have or hereafter can, shall or may have, against the Released Parties arising from or related to the Settling Defendants' conduct alleged in the Action with respect to Direct Purchaser Claims.  Provided, however, that this release shall not include any claims asserted by the named plaintiffs or the proposed class in the Indirect Purchaser Action except for any Direct Purchaser Claims.  All Class Members (except those identified in Exhibit A hereto) and their respective heirs, executors, administrators, representatives, agents, successors and assigns are hereby permanently barred, enjoined, and restricted from commencing or prosecuting any and all Released Claims against the Released Parties.

11.     Upon the occurrence of the Effective Date, the Released Parties shall be deemed to have, and by operation of the Final Judgment shall have, fully, finally and forever released and discharged the Direct Purchaser Plaintiffs and Class Counsel from, and shall covenant not to sue the Direct Purchaser Plaintiffs and Class Counsel for or with respect to, all manner of claims, rights, demands, actions, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, judgments, extents, executions, and causes of action, damages, whenever incurred, and liabilities of any nature whatsoever, including costs, expenses, penalties and attorneys' fees whether known or unknown, suspected or unsuspected, whether concealed or hidden, or in law, admiralty or equity, that the Released Parties or any of them ever had, now have or hereafter can, shall or may have, against the Direct Purchaser Plaintiffs and Class Counsel to the extent of the Released Claims.

12.     Notwithstanding the provisions of any other paragraph of this Final Order and Judgment, if the Settlement Agreement is validly terminated, then by automatic operation of this

paragraph, this Final Order and Judgment shall be null and void except for the provisions in this paragraph; the Direct Purchaser Plaintiffs' claims dismissed pursuant to the Settlement Agreement shall be reinstated; all Orders of the Court in this Action shall be reinstated; Settling Defendants' defenses shall be reinstated; the Parties shall be returned to their respective positions before the Settlement Agreement was signed; and the Court will modify any existing scheduling order to ensure that the Parties have sufficient time to prepare for the resumption of litigation. Any termination of the Settlement Agreement by Settling Defendants shall be dependent upon the realization of the condition subsequent that the Direct Purchaser Plaintiffs' claims dismissed pursuant to the Settlement Agreement shall not be dismissed or, if they have been dismissed pursuant to the Settlement Agreement, that they are reinstated such that the Parties are returned to their respective positions before the Settlement Agreement was signed. Provided, however, that the Direct Purchaser Plaintiffs' claims dismissed pursuant to the Court's February 4, 2011 Order granting in part and denying in part Defendants' motions to dismiss the Corrected Consolidated Class Action Complaint shall not be reinstated upon any termination of the Settlement Agreement. If the Direct Purchaser Plaintiffs' claims dismissed pursuant to the Settlement Agreement are dismissed and not reinstated as provided herein, then Settling Defendants' termination of the Settlement Agreement shall be null and void.

13. The Settlement Fund has been established as a trust and as a settlement fiduciary account. The Court further approves the establishment of the settlement fiduciary account under the Settlement Agreement as a qualified settlement fund pursuant to Internal Revenue Code Section 4688 and the Treasury Regulations promulgated thereunder.

14. The Court reserves exclusive jurisdiction over the implementation and enforcement of the Settlement Agreement and the Settlement contemplated thereby and the enforcement of this Final Order and Judgment. The Court also retains exclusive jurisdiction to

resolve any disputes that may arise with respect to the Settlement Agreement, the Settlement, or the Settlement Fund, to consider or approve administration costs and fees, and to consider or approve the amounts of distributions to Members of the Class. In addition, without affecting the finality of this judgment, the Parties hereby irrevocably submit to the exclusive jurisdiction of the United States District Court for the Northern District of Illinois Eastern Division for any suit, action, proceeding or dispute arising out of or relating to this Final Order and Judgment or the Settlement Agreement.

15.     Each Class Member must execute a release and covenant not to sue in order to receive his/her/its *pro rata* share of the Settlement Fund. Co-Lead Counsel shall ensure that each claim form provided to Class Members contains a copy of the release and covenant not to sue set forth in Section 6 of the Settlement Agreement, which must be signed by the Member of the Class or its authorized representative as a precondition to receiving any portion of the Settlement Fund. Any Class Member not listed on Exhibit A hereto who elects not to receive his/her/its share of the Settlement Fund shall nevertheless be deemed to have released all claims against all Released Parties, as set forth in Section 10 above.

16.     The Settlement is not and shall not be deemed or construed to be an admission, adjudication or evidence of any violation of any statute or law or of any liability or wrongdoing by the Settling Defendants or any of the Released Parties or of the truth of any of the claims or allegations alleged in the Actions. The Settlement Agreement, including its exhibits, and any and all negotiations, documents and discussions associated with it, shall be without prejudice to the rights of any party, shall not be deemed or construed to be an admission or evidence of any violation of any statute or law or of any liability or wrongdoing by the Settling Defendants, or of the truth of any of the claims or allegations, or of any damage or injury. Evidence of this Settlement or the negotiation of this Settlement shall not be discoverable or used directly or

6

indirectly, in any way, whether in the Direct Purchaser Plaintiffs' Action or in any other action or proceeding of any nature, except in connection with a dispute under this Settlement or an action in which this Settlement is asserted as a defense. Notwithstanding the foregoing, any of the Released Parties may file the Settlement Agreement, or any judgment or order of the Court related hereto, in any other action that may be brought against them, in order to support any and all defenses or counterclaims based on res judicata, collateral estoppel, release, good-faith settlement, judgment bar or reduction, or any other theory of claim preclusion or issue preclusion, or similar defense or counterclaim.

17.     There shall be no right of contribution between the Non-Settling Defendants and the Settling Defendants based on their potential, alleged or actual status as joint tortfeasors or co-conspirators with respect to the Released Claims (any claim for such being a "Contribution Claim"). Notwithstanding the foregoing, should any court determine any Non-Settling Defendant is/was legally entitled to contribution from any Settling Defendant with respect to a Contribution Claim, then any money judgment subsequently obtained by the Direct Purchaser Plaintiffs against such Non-Settling Defendant shall be reduced to an amount such that, upon paying the entire amount, the Non Settling Defendant would have no Contribution Claim against any Settling Defendant.

18.     The Court finds that during the course of the Direct Purchaser Plaintiffs' Action, the Parties and their respective counsel at all times complied with the requirements of Rule 11 of the Federal Rules of Civil Procedure. The foregoing finding is exclusively between and among the Direct Purchaser Plaintiffs, the Settling Defendants and their respective counsel.

19.     Any data or other information provided by Class Members in connection with the submission of claims will be held in strict confidence, available only to the administrator, Class Counsel, experts or consultants acting on behalf of the Class, Settling Defendants' counsel,

Settling Defendants, and experts or consultants acting on behalf of Settling Defendants. In no event will a Class Member's data or information be made publicly available, except as provided for herein or upon Court Order for good cause shown.

20.     The proposed Plan of Allocation is approved as fair, reasonable and adequate.

21.     The Court has reviewed Class Counsel's petition for an award of attorneys' fees and reimbursement of expenses. The Court determines that an attorneys' fee of ____% of the Settlement Fund is fair, reasonable, and adequate and that Class Counsel should be paid $_____ as reimbursement for their expenses.

22.     If any deadline imposed herein falls on a non-business day, then the deadline is extended until the next business day.

23.     There is no just reason for delay in the entry of this Final Order and Judgment and immediate entry by the Clerk of the Court is expressly directed pursuant to Rule 54(b) of the Federal Rules of Civil Procedure.

**IT IS SO ORDERED.**

Signed this ___ day of _____, 20__, at the Courthouse for the United States District Court for the Northern District of Illinois Eastern Division.

_____
Hon. Robert Dow, Jr.
United States District Court Judge

# Exhibit E

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| IN RE:  DAIRY FARMERS OF AMERICA, INC. CHEESE ANTITRUST LITIGATION | ) ) ) ) | Master File No. 09-cv-03690 MDL No.  2031 The Honorable Robert M. Dow Jr. |
| THIS DOCUMENT RELATES TO: | ) ) ) | |
| DIRECT PURCHASER ACTION | | |

## [PROPOSED] PLAN OF ALLOCATION

Except for the terms defined herein, this Plan of Allocation adopts and incorporates the definitions in the Stipulation and Agreement of Settlement, dated December 18, 2013, to which this Plan of Allocation is attached as an exhibit.

**General Overview**.  Section "I" below concerns the proposed Plan of Allocation for 92.5% of the Net Settlement Fund.  Section "II" below concerns the proposed Plan of Allocation for 7.5% of the Net Settlement Fund.  Section "III" below concerns how the Net Settlement Fund shall be distributed among Class Members who are determined to be eligible to share in the Net Settlement Fund.

**Allowed Claim**.  A Class Member's "Allowed Claim" shall be the sum of (1) their Allowed Claim (if any) under Section I below (see I.2 below defining Allowed Claim for Section I) and (2) their Allowed Claim (if any) under Section II below (see II.2 below defining Allowed Claim for Section II).

## I.    THE PROPOSED PLAN OF ALLOCATION FOR 92.5% OF THE NET SETTLEMENT FUND

1.    **Overview**.  Section "A" below concerns purchases and sales of Chicago Mercantile Exchange ("CME") Class III milk futures contracts.  Section "B" below concerns

1

purchases and sales of CME Cheese Spot Call Contracts. Section "C" below concerns purchases of physical cheese. Section "D" below concerns purchases of physical milk.

2.      A Class Member's "Allowed Claim" under this Section I shall equal the sum of the Class Member's (a) CME Futures Net Adverse Impact; (b) CME Cheese Net Adverse Impact; (c) Physical Cheese Net Adverse Impact; and (d) Physical Milk Net Adverse Impact.

3.      "Relevant Period" in this Section I shall mean May 4, 2004 – June 25, 2004 and September 1, 2004 – October 1, 2004. The Relevant Period shall also include June 26, 2004 – July 2, 2004 for transactions in June 2004 CME Class III milk futures contracts and shall further include October 2 through October 7, 2004 for transactions in October 2004, November 2004, December 2004 and January 2005 CME Class III milk futures contracts.

4.      "CME Class III Milk Futures Contracts" in this Section I shall mean the CME Class III milk futures contract months of May 2004, June 2004, July 2004, August 2004, September 2004, October 2004 for the time period May 4, 2004 – June 25, 2004 and CME Class III milk futures contract months of September 2004, October 2004, November 2004, December 2004 and January 2005 for the time period of September 1, 2004 – October 1, 2004. CME Class III Milk Futures Contracts in this Section I shall also include June 2004 CME Class III milk futures contracts for the time period June 26, 2004 – July 2, 2004 and shall further include October 2 through October 7, 2004 for transactions in October 2004, November 2004, December 2004 and January 2005 CME Class III milk futures contracts.

5      "Hedging Deduction" shall refer to the 50% deduction applied to the CME Futures Adverse Impact of Class members who are determined in good faith, by the Settlement Administrator, to be hedgers.

6.     "Physical Cheese Discount" refers to the discount applied to each Class member's Physical Cheese Adverse Impact and shall be equal to a 20% discount.

7.     "Physical Milk Discount" refers to the discount applied to each Class member's Physical Milk Adverse Impact and shall be equal to a 82.5% discount.

### A.     CME Class III Milk Futures Contracts

1.     A Class Member's "CME Futures Adverse Impact" shall be equal to the sum of their "Artificiality Paid" on each purchase of a CME Class III Milk Futures Contract minus the sum of their "Artificiality Received" on each sale of a CME Class III Milk Futures Contract during the Relevant Period.  For the avoidance of doubt, "sale" means, closing a long position, opening a short position or receipt of payment as part of cash settlement of a long position and "purchase" means either closing a short position, opening a long position or payment as part of cash settlement of a short position.

2.     The amounts of "Artificiality Paid" and "Artificiality Received" for each Class Member shall be determined on a position-by-position basis for each CME Class III Milk Futures Contract.  For each purchase or sale of all or a portion of a position in a CME Class III Milk Futures Contract by a Class Member, the Class Member's "Artificiality Paid" or "Artificiality Received" shall be calculated based on the Daily Futures Artificiality Estimates for each CME Class III Milk Futures Contract.  See below tables and

www.DairyFarmersDirectPurchaserAction.com (listing the Daily Futures Artificiality Estimates).  The Daily Artificiality Estimates below are in U.S. dollars per cwt.

### May 4 – June 25, 2004

| Date | May 2004 Contract Artificiality | June 2004 Contract Artificiality | July 2004 Contract Artificiality | August 2004 Contract Artificiality | September 2004 Contract Artificiality | October 2004 Contract Artificiality |
|---|---|---|---|---|---|---|
| 5/4/2004 | 0.02355462 | 0.02432513 | 0.021337 | 0.018818016 | 0.016546025 | 0.014743249 |

| | | | | | |
|---|---|---|---|---|---|
| 5/5/2004 | 0.38059315 | 0.41352715 | 0.3627284 | 0.31990628 | 0.281282425 | 0.250635235 |
| 5/6/2004 | 0.38059315 | 0.41352715 | 0.3627284 | 0.31990628 | 0.281282425 | 0.250635235 |
| 5/7/2004 | 0.38059315 | 0.41352715 | 0.3627284 | 0.31990628 | 0.281282425 | 0.250635235 |
| 5/10/2004 | 0.42320932 | 0.4692734 | 0.4116266 | 0.363031811 | 0.319201199 | 0.284422561 |
| 5/11/2004 | 0.83682009 | 1.04896408 | 0.9201066 | 0.811482872 | 0.713508562 | 0.635768077 |
| 5/12/2004 | 0.28815275 | 0.22083454 | 0.1937066 | 0.170838499 | 0.150212329 | 0.133845911 |
| 5/13/2004 | 0.62579419 | 0.7729209 | 0.6779733 | 0.597934747 | 0.525743151 | 0.468460688 |
| 5/14/2004 | 0.62579419 | 0.7729209 | 0.6779733 | 0.597934747 | 0.525743151 | 0.468460688 |
| 5/17/2004 | 0.61917522 | 0.75993348 | 0.6665812 | 0.58788763 | 0.516909071 | 0.460589127 |
| 5/18/2004 | 0.61917522 | 0.75993348 | 0.6665812 | 0.58788763 | 0.516909071 | 0.460589127 |
| 5/19/2004 | 0.61917522 | 0.75993348 | 0.6665812 | 0.58788763 | 0.516909071 | 0.460589127 |
| 5/20/2004 | 0.61917522 | 0.75993348 | 0.6665812 | 0.58788763 | 0.516909071 | 0.460589127 |
| 5/21/2004 | 0.65237203 | 0.86849541 | 0.7618071 | 0.671871577 | 0.590753224 | 0.526387574 |
| 5/24/2004 | 0.88018978 | 1.76252128 | 1.5460085 | 1.363493617 | 1.19887234 | 1.068248936 |
| 5/25/2004 | 0.88608561 | 1.79144255 | 1.571377 | 1.385867234 | 1.218544681 | 1.085777872 |
| 5/26/2004 | 0.90598404 | 1.9215883 | 1.6855353 | 1.486548511 | 1.307070213 | 1.164658085 |
| 5/27/2004 | 0.91089723 | 1.96979043 | 1.7278162 | 1.523837872 | 1.339857447 | 1.193872979 |
| 5/28/2004 | 0.91605608 | 2.07101489 | 1.816606 | 1.602145532 | 1.408710638 | 1.255224255 |
| 6/1/2004 | 0.91605608 | 2.23836681 | 1.8757991 | 1.654350638 | 1.454612766 | 1.296125106 |
| 6/2/2004 | 0.91605608 | 2.34381398 | 1.968817 | 1.736387234 | 1.526744681 | 1.360397872 |
| 6/3/2004 | 0.91605608 | 2.4437113 | 2.0618349 | 1.81842383 | 1.598876596 | 1.424670638 |
| 6/4/2004 | 0.91605608 | 2.67529145 | 2.2901515 | 2.019786383 | 1.77592766 | 1.582431004 |
| 6/7/2004 | | 2.79637911 | 2.416994 | 2.131654468 | 1.874289362 | 1.670075745 |
| 6/8/2004 | | 2.88341086 | 2.51424 | 2.21742 | 1.9497 | 1.73727 |
| 6/9/2004 | | 2.92225982 | 2.5607489 | 2.258438298 | 1.985765957 | 1.769406383 |
| 6/10/2004 | | 2.95177494 | 2.5988017 | 2.291998723 | 2.015274468 | 1.795699787 |
| 6/14/2004 | | 3.04561787 | 2.7298723 | 2.407595745 | 2.116914894 | 1.886265957 |
| 6/15/2004 | | 3.09556653 | 2.8059779 | 2.474716596 | 2.175931915 | 1.938852766 |
| 6/16/2004 | | 3.13845174 | 2.8778553 | 2.538108511 | 2.231670213 | 1.988518085 |
| 6/17/2004 | | 3.15888529 | 2.9159081 | 2.571668936 | 2.261178723 | 2.014811489 |
| 6/18/2004 | | 3.20732035 | 3.0173821 | 2.661163404 | 2.339868085 | 2.084927234 |
| 6/21/2004 | | 3.23027655 | 3.0723472 | 2.709639574 | 2.382491489 | 2.122906596 |
| 6/22/2004 | | 3.24389891 | 3.1104 | 2.7432 | 2.412 | 2.1492 |
| 6/23/2004 | | 2.74128641 | 1.4256 | 1.2573 | 1.1055 | 0.98505 |
| 6/24/2004 | | 2.74128641 | 1.4256 | 1.2573 | 1.1055 | 0.98505 |
| 6/25/2004 | | 2.50157891 | 0.0864 | 0.0762 | 0.067 | 0.0597 |

## September 1 – October 7, 2004

| Date | September 2004 Contract Artificiality | October 2004 Contract Artificiality | November 2004 Contract Artificiality | December 2004 Contract Artificiality | January 2005 Contract Artificiality |
|---|---|---|---|---|---|
| 1-Sep-04 | 0.097495095 | 0.089534486 | 0.074954944 | 0.066994336 | 0.056529266 |
| 2-Sep-04 | 0.112023360 | 0.103543600 | 0.086682854 | 0.077476679 | 0.065374181 |
| 3-Sep-04 | 0.147725164 | 0.139781533 | 0.117019905 | 0.104591777 | 0.088253675 |
| 7-Sep-04 | 0.315128660 | 0.319138765 | 0.267171114 | 0.238796139 | 0.201494205 |
| 8-Sep-04 | 0.139461001 | 0.119855989 | 0.100338980 | 0.089682453 | 0.075673312 |
| 9-Sep-04 | 0.181148290 | 0.170103036 | 0.142403940 | 0.127279894 | 0.107397721 |
| 10-Sep-04 | 0.274414107 | 0.290013784 | 0.242788763 | 0.217003321 | 0.183105606 |

4

| | | | | |
|---|---|---|---|---|
| 13-Sep-04 | 0.276375436 | 0.292715560 | 0.245050589 | 0.219024930 | 0.184811423 |
| 14-Sep-04 | 0.246827730 | 0.248881944 | 0.208354714 | 0.186226350 | 0.157136252 |
| 15-Sep-04 | 0.352701573 | 0.419032866 | 0.350798743 | 0.313542074 | 0.264564207 |
| 16-Sep-04 | 0.490825872 | 0.661193907 | 0.553526967 | 0.494739497 | 0.417457092 |
| 17-Sep-04 | 0.499510723 | 0.677942922 | 0.567548620 | 0.507271977 | 0.428031895 |
| 20-Sep-04 | 0.625453019 | 0.947813769 | 0.793474464 | 0.709203310 | 0.598419882 |
| 21-Sep-04 | 0.625453019 | 0.947813769 | 0.793474464 | 0.709203310 | 0.598419882 |
| 22-Sep-04 | 0.714146682 | 1.192168877 | 0.998039479 | 0.892042446 | 0.752698032 |
| 23-Sep-04 | 0.776677615 | 1.393157066 | 1.166299322 | 1.042432210 | 0.879595670 |
| 24-Sep-04 | 0.785362467 | 1.426655097 | 1.194342629 | 1.067497171 | 0.900745276 |
| 27-Sep-04 | 0.768984504 | 1.347691527 | 1.128237263 | 1.008412542 | 0.850890155 |
| 28-Sep-04 | 0.780494753 | 1.421684476 | 1.190181410 | 1.063777895 | 0.897606982 |
| 29-Sep-04 | 0.812302868 | 1.728399332 | 1.446951689 | 1.293277822 | 1.091257121 |
| 30-Sep-04 | 0.796904487 | 1.431436606 | 1.198345530 | 1.071074943 | 0.903764171 |
| 1-Oct-04 | | 1.192863839 | 0.998621275 | 0.892562453 | 0.753136809 |
| 4-Oct-04 | | 0.954291071 | 0.798897020 | 0.714049962 | 0.602509447 |
| 5-Oct-04 | | 0.715718303 | 0.599172765 | 0.535537472 | 0.451882085 |
| 6-Oct-04 | | 0.477145535 | 0.399448510 | 0.357024981 | 0.301254724 |
| 7-Oct-04 | | 0.238572768 | 0.199724255 | 0.178512491 | 0.150627362 |

3. **June 2004 CME Class III Milk Futures Contract**. Notwithstanding anything herein to the contrary, transactions in June 2004 CME Class III milk futures contract from June 26, 2004 through the cash settlement of such contract on July 2, 2004 shall be also compensable. The artificiality for the June 2004 CME Class III milk futures contract from June 26, 2004 through July 2, 2004 shall be $2.50157891 per cwt.

4. "CME Futures Net Adverse Impact" shall mean the CME Futures Adverse Impact multiplied by the Hedging Discount (if any).

**B.     CME Cheese Spot Call Contracts**

1. A Class Member's "CME Cheese Spot Call Net Adverse Impact" shall be equal to the sum of their "Artificiality Paid" on each purchase of a CME Cheese Spot Call Contract minus the sum of their "Artificiality Received" on each sale of a CME Cheese Spot Call Contract during the Relevant Period. The Class Member's "Artificiality Paid" or "Artificiality Received" on CME Cheese Spot Call Contracts shall be calculated based on the Daily CME Cheese Spot Call Artificiality Estimates. See below tables and

www.DairyFarmersDirectPurchaserAction.com (listing Daily CME Cheese Spot Call

Artificiality Estimates for CME block and barrel cheese).  The Daily CME Cheese Spot Call

Artificiality Estimates below are in dollars per pound.

### May 4 – June 25, 2004

| Date | CME Block Artificiality | CME Barrel Artificiality |
|---|---|---|
| 5/4/2004 | 0.0055 | 0.0005 |
| 5/5/2004 | 0.0935 | 0.0085 |
| 5/6/2004 | 0.0935 | 0.0085 |
| 5/7/2004 | 0.0935 | 0.0085 |
| 5/10/2004 | 0.0935 | 0.0085 |
| 5/11/2004 | 0.209 | 0.019 |
| 5/12/2004 | 0.044 | 0.004 |
| 5/13/2004 | 0.154 | 0.014 |
| 5/14/2004 | 0.154 | 0.014 |
| 5/17/2004 | 0.154 | 0.014 |
| 5/18/2004 | 0.154 | 0.014 |
| 5/19/2004 | 0.154 | 0.014 |
| 5/20/2004 | 0.154 | 0.014 |
| 5/21/2004 | 0.176 | 0.016 |
| 5/24/2004 | 0.17893617 | 0.178936 |
| 5/25/2004 | 0.18187234 | 0.181872 |
| 5/26/2004 | 0.195085106 | 0.195085 |
| 5/27/2004 | 0.199978723 | 0.199979 |
| 5/28/2004 | 0.210255319 | 0.210255 |
| 6/1/2004 | 0.217106383 | 0.217106 |
| 6/2/2004 | 0.22787234 | 0.227872 |
| 6/3/2004 | 0.238638298 | 0.238638 |
| 6/4/2004 | 0.26506383 | 0.265064 |
| 6/7/2004 | 0.279744681 | 0.279745 |
| 6/8/2004 | 0.291 | 0.291 |
| 6/9/2004 | 0.296382979 | 0.296383 |
| 6/10/2004 | 0.300787234 | 0.300787 |
| 6/14/2004 | 0.315957447 | 0.315957 |
| 6/15/2004 | 0.324765957 | 0.324766 |
| 6/16/2004 | 0.333085106 | 0.333085 |
| 6/17/2004 | 0.337489362 | 0.337489 |
| 6/18/2004 | 0.349234043 | 0.349234 |
| 6/21/2004 | 0.355595745 | 0.355596 |
| 6/22/2004 | 0.36 | 0.36 |
| 6/23/2004 | 0.165 | 0.165 |
| 6/24/2004 | 0.165 | 0.165 |
| 6/25/2004 | 0.01 | 0.01 |

### September 1 – October 1, 2004

| Date | CME Block Artificiality | CME Barrel Artificiality |
|---|---|---|
| 1-Sep-04 | 0.003346457 | 0.013346457 |
| 2-Sep-04 | 0.003346457 | 0.015846457 |
| 3-Sep-04 | 0.008366142 | 0.018366142 |
| 7-Sep-04 | 0.018405512 | 0.040905512 |
| 8-Sep-04 | 0.028444882 | 0.000944882 |
| 9-Sep-04 | 0.033464567 | 0.005964567 |
| 10-Sep-04 | 0.033464567 | 0.025964567 |
| 13-Sep-04 | 0.033464567 | 0.025964567 |
| 14-Sep-04 | 0.05019685 | 0.00519685 |
| 15-Sep-04 | 0.068602362 | 0.021102362 |
| 16-Sep-04 | 0.070275591 | 0.062775591 |
| 17-Sep-04 | 0.071948819 | 0.064448819 |
| 20-Sep-04 | 0.105413386 | 0.087913386 |
| 21-Sep-04 | 0.105413386 | 0.087913386 |
| 22-Sep-04 | 0.140551181 | 0.105551181 |
| 23-Sep-04 | 0.160629921 | 0.125629921 |
| 24-Sep-04 | 0.163976378 | 0.128976378 |
| 27-Sep-04 | 0.165649606 | 0.108149606 |
| 28-Sep-04 | 0.168996063 | 0.118996063 |
| 29-Sep-04 | 0.174015748 | 0.171515748 |
| 30-Sep-04 | 0.174015748 | 0.116515748 |
| 1-Oct-04 | 0.2125 | 0.09 |

## C.    Physical Cheese Purchases

1.    (a)    Only (i) direct purchases of physical cheese from DFA or Schreiber during the Relevant Period and/or (ii) first purchases of physical cheese from a first manufacturer of cheese (*i.e.* a manufacturer that transforms milk into cheese) pursuant to a contract the price term of which specified that the price was based, in whole or in part, on the CME Cheese Spot Call price (block or barrel price, average price, specific price, price formula, collar price or any variation that explicitly referenced the CME Cheese Spot Call price) during the Relevant Period are compensable.

(b)    For the avoidance of doubt, compensable first purchases of physical cheese from a first manufacturer of cheese are purchases the price of which was based, in whole or in part, on

7

one or more CME Cheese Spot Call prices during the Relevant Period. For example, a first purchase of physical cheese from a first manufacturer of cheese made during the Relevant Period but that was made at a price which was based, in whole or in part, on one or more CME Cheese Spot Call prices not during the Relevant Period, is <u>not</u> compensable. Conversely, a first purchase of physical cheese from a first manufacturer of cheese not made during the Relevant Period but that was made at a price which was based, in whole or in part, on one or more CME Cheese Spot Call prices during the Relevant Period, <u>is</u> compensable.

2.    (a)    A Class Member's "Physical Cheese Adverse Impact" shall be equal to the sum of their "Artificiality Paid" on each purchase of physical cheese based, in whole or in part, on one or more CME Cheese Spot Call prices during the Relevant Period. The Class Member's "Artificiality Paid" on physical cheese shall be calculated based on the Daily CME Cheese Spot Call Artificiality Estimates. See tables at B.1 above and [www.DairyFarmersDirectPurchaserAction.com](www.DairyFarmersDirectPurchaserAction.com) (listing Daily CME Cheese Spot Call Artificiality Estimates for CME block and barrel cheese).

(b)    Notwithstanding anything herein to the contrary, Class Members who directly purchased physical cheese from DFA or Schreiber during the Relevant Period but purchased such physical cheese at a fixed price or other price which was not based, in whole or in part, on one or more CME Cheese Spot Call prices during the Relevant Period, shall have an "Artificiality Paid" on such physical cheese purchases equal to the product of the following two numbers: (1) the difference between (a) the fixed price or other price paid by the Class Member and (b) the but for price (which shall be CME Cheese Spot Call price on the date the fixed price was set MINUS the corresponding CME Cheese Spot Call Artificiality Estimate on the same date), multiplied by (2) 0.25. Thus, to any extent that a Class Member paid a fixed LESS than

the but for price, such Class Member's Artificiality Paid on such purchase shall be zero.

Example:  A Class Member directly purchased physical cheddar block cheese from DFA on May 20, 2004 at a fixed price of $2.50 per pound.  In this example, such Class Member's "Artificiality Paid" would be the product of the following two numbers: (1) the difference between (a) the $2.50 fixed price paid by the Class Member and (b) the but for price (*i.e.*, the CME Cheese Spot Call price for block cheddar on May 20, 2004 ($2.00) MINUS the CME Cheese Spot Call Artificiality Estimate for block cheese on May 20, 2004 ($0.14) (*i.e.*, $1.86 the difference equals $0.64 (*i.e.*, $2.50 – [$2.00 - $0.14])), multiplied by (2) 0.25.  Subtracting $1.86 from $2.50 produces a difference of $0.64, which is then multiplied by 0.25 to give the Class Member in this example an Artificiality Paid of $0.16.

3.　　　"Physical Cheese Net Adverse Impact" shall mean the Physical Cheese Adverse Impact reduced by the Physical Cheese Discount (*i.e.*, 20%).

**D.　　Physical Milk Purchases**

1.　　(a)　　Only (i) direct purchases of physical milk from DFA or (ii) first purchases of physical milk from a first producer of milk (*e.g.,* a dairy farmer) that was made pursuant to a contract the price term of which specified that the price was based, in whole or in part, on (a) the CME Cheese Spot Call price (block or barrel price, average price, specific price, price formula, collar price or any variation that explicitly referenced the CME Cheese Spot Call price); (b) the CME Class III milk futures price; (c) the National Agricultural Statistics Service ("NASS") cheese price; or (d) a government milk formula price which included (a), (b) or (c) as a component of such government milk formula price during the Relevant Period are compensable.

(b)　　For the avoidance of doubt, compensable first purchases of physical milk from a first producer of milk are purchases the price of which was based, in whole or in part, on one or

more of the prices set forth in (a)-(d) above during the Relevant Period. For example, a first purchase of physical milk from a first producer of milk made during the Relevant Period but that was made at a price which was based, in whole or in part, on one or more of the prices set forth in (a)-(d) above not during the Relevant Period, is <u>not</u> compensable. Conversely, a first purchase of physical milk from a first producer of milk not made during the Relevant Period but that was made at a price which was based, in whole or in part, on one or more of the prices set forth in (a)-(d) above during the Relevant Period, <u>is</u> compensable.

2.     A Class Member's "Physical Milk Adverse Impact" shall be equal to the sum of their "Artificiality Paid" on each purchase of physical milk during the Relevant Period.

3.     (a)     The Class Member's "Artificiality Paid" on physical milk that was made pursuant to a contract the price term of which specified that the price was based, in whole or in part, on the CME Cheese Spot Call price shall be calculated based on the Daily CME Cheese Spot Call Artificiality Estimates. See tables at B.1 above and www.DairyFarmersDirectPurchaserAction.com (listing Daily CME Cheese Spot Call Artificiality Estimates for CME block and barrel cheese).

(b)     The Class Member's "Artificiality Paid" on physical milk that was made pursuant to a contract the price term of which specified that the price was based, in whole or in part, on a CME Class III milk futures price during the Relevant Period shall be calculated based on the Daily Futures Artificiality Estimates for the relevant CME Class III Milk Futures Contract. See tables A.2 above and www.DairyFarmersDirectPurchaserAction.com (listing the Daily Futures Artificiality Estimates).

(c)     The Class Member's "Artificiality Paid" on physical milk that was made pursuant to a contract the price term of which specified that the price was based, in whole or in part, a

10

NASS cheese price during the Relevant Period shall be calculated based on the NASS Cheese Artificiality Estimates. See tables below and www.DairyFarmersDirectPurchaserAction.com (listing the NASS Cheese Artificiality Estimates).

| Monthly USDA NASS **Block** Cheese Price Component | Artificiality $/lb. |
|---|---|
| | |
| May 2004 | $0.0440 |
| June 2004 | $0.2208 |
| July 2004 | $0.1176 |
| | |
| September 2004 | $0.0079 |
| October 2004 | $0.0813 |

| Monthly USDA NASS **Barrel** Cheese Price Component | Artificiality $/lb. |
|---|---|
| | |
| May 2004 | $0.0161 |
| June 2004 | $0.1232 |
| July 2004 | $0.0176 |
| | |
| September 2004 | $0.0236 |
| October 2004 | $0.0527 |

| Monthly USDA NASS Cheese Price Component | Artificiality $/lb. |
|---|---|
| | |
| May 2004 | $0.0216 |
| June 2004 | $0.2010 |
| July 2004 | $0.0773 |
| | |
| September 2004 | $0.0087 |
| October 2004 | $0.0694 |

(d)     The Class Member's "Artificiality Paid" on physical milk that was made pursuant to a contract the price term of which specified that the price was based, in whole or in part, on a

11

government milk formula price during the Relevant Period which included (a) the CME Cheese Spot Call Price, (b) the CME Class III milk futures price or (c) the NASS cheese price as a component of such government milk formula price shall be based on the artificiality figures for the applicable foregoing component(s) that is/are included in the relevant government milk formula (*i.e.*, CME Cheese Spot Call Price, CME Class III milk futures price or NASS cheese price). See table B.1 (the Daily CME Cheese Spot Call Artificiality Estimates), table A.2 (Daily Futures Artificiality Estimates), table D.3(c) (NASS Cheese Artificiality Estimates) above and www.DairyFarmersDirectPurchaserAction.com (listing the artificiality estimates).

(e)      Examples. Set forth below are artificiality figures for (i) United States Department of Agriculture ("USDA") minimum Class III milk prices, (ii) USDA minimum Class I milk prices, (iii) California minimum Class 4b milk prices, and (iv) California (Northern and Southern) minimum Class 1 milk prices.

| USDA Minimum Class III Milk Price | Artificiality $/cwt |
|---|---|
|  |  |
| May 2004 | $0.21 |
| June 2004 | $1.94 |
| July 2004 | $0.74 |
|  |  |
| September 2004 | $0.09 |
| October 2004 | $0.66 |

| USDA Minimum Class I Milk Price | Artificiality $/cwt |
|---|---|
|  |  |
| July 2004 | $1.34 |
| August 2004 | $0.94 |
|  |  |
| November 2004 | $1.32 |

12

| California Minimum Class 4b Milk Price | Artificiality $/cwt |
|---|---|
|  |  |
| May 2004 | $0.96 |
| June 2004 | $2.62 |
|  |  |
| September 2004 | $0.48 |
| October 2004 | $0.44 |

| California (Northern & Southern) Minimum Class 1 Milk Price | Artificiality $/cwt |
|---|---|
|  |  |
| June 2004 | $0.3381 |
|  |  |
| October 2004 | $0.1147 |

(f)     Notwithstanding anything herein to the contrary, Class Members who directly purchased physical milk from DFA during the Relevant Period but purchased such milk at a fixed price or other price which was not based, in whole or in part, on (a) the CME Cheese Spot Call price (block or barrel price, average price, specific price, price formula, collar price or any variation that explicitly referenced the CME Cheese Spot Call price); (b) the CME Class III milk futures price; (c) the National Agricultural Statistics Service ("NASS") cheese price; or (d) a government milk formula price which included (a), (b) or (c) as a component of such government milk formula price during the Relevant Period, shall have an "Artificiality Paid" on such physical milk purchases equal to the produce of the following two numbers:  (1) the difference between (a) the fixed price or other price paid by the Class Member and (b) the but for price, (which is the applicable USDA Class III minimum milk price during the relevant time the fixed price was set MINUS the corresponding artificiality estimate for the USDA Class III

13

minimum milk[1]), multiplied by (2) 0.25.  Thus, to any extent that a Class Member paid a fixed or other price that was LESS than the but for price, such Class Member's Artificiality Paid on such purchase shall be zero.  Example:  A Class Member directly purchased physical milk from DFA on May 20, 2004 at a fixed price of $21.00 per cwt.  In this example, such Class Member's "Artificiality Paid" would be the product of the following two numbers:  (1) the difference between (a) the $21.00 fixed price and (b) the but for price (*i.e.*, May USDA Class III minimum milk price ($20.58) MINUS the artificiality estimate for the relevant USDA Class III minimum milk price, *i.e.*, the artificiality estimate for May 2004 USDA Class III minimum milk price is $0.21 such that the difference equals $0.63 (*i.e.*, $21.00 – [$20.58 - $0.21]), multiplied by (2) 0.25.  Subtracting $20.37 from $21.00 produces a difference of $0.63, which is then multiplied by 0.25 to give the Class member in this example an Artificiality Paid of $0.1575.

4.    "Physical Milk Net Adverse Impact" shall mean the Physical Milk Adverse Impact reduced by the Physical Milk Discount (*i.e.*, 82.5%).

## II.    THE PROPOSED PLAN OF ALLOCATION FOR 7.5% OF THE NET SETTLEMENT FUND

1.    **Overview**.  Section "A" below concerns purchases and sales of Chicago Mercantile Exchange ("CME") Class III milk futures contracts.  Section "B" below concerns purchases and sales of CME Cheese Spot Call Contracts.  Section "C" below concerns purchases of physical cheese.  Section "D" below concerns purchases of physical milk.

2.    A Class Member's "Allowed Claim" in this Section II shall equal the sum of the Class Member's (a) CME Futures Volume Net Adverse Impact; (b) CME Cheese Volume

---

[1] The Settlement Administrator shall use the UDSA Class III minimum milk price in order to calculate the but for price under this sub-section provided that it if the Settlement Administrator, in its discretion, determines that another benchmark is more appropriate, then the Settlement may use such other benchmark.

Adverse Impact; (c) Physical Cheese Volume Net Adverse Impact; and (d) Physical Milk Volume Net Adverse Impact.

3.      "Relevant Period" in this Section II shall mean October 2, 2004 through December 31, 2006 except that the Relevant Period for CME Class III milk futures contracts is October 8, 2004 through December 31, 2006, inclusive.

4.      "CME Class III Milk Futures Contracts" in this Section II shall mean the CME Class III milk futures contracts trading during the Relevant Period.

5      "Hedging Deduction" shall refer to the 50% deduction applied to the CME Futures Volume Adverse Impact of Class members who are determined in good faith, by the Settlement Administrator, to be hedgers.

6.      "Physical Cheese Discount" refers to the discount applied to each Class member's Physical Cheese Volume Adverse Impact and shall be equal to a 20% discount.

7.      "Physical Milk Discount" refers to the discount applied to each Class member's Physical Milk Volume Adverse Impact and shall be equal to a 82.5% discount.

**A.      CME Class III Milk Futures Contracts**

1.      A Class Member's "CME Futures Volume Adverse Impact" shall be equal to the sum of their dollar volume of each purchase and sale of a CME Class III Milk Futures Contract during the Relevant Period.

2.      For purposes of this sub-section "dollar volume" of a purchase or sale of a CME Class III milk Futures Contract means the price of the purchase or sale multiplied by 200,000 lbs (*i.e.*, the contract size of a CME Class III milk futures contract).  For example, if a Class Member purchased one CME Class III Milk Futures Contract at $19.50 per hundredweight during the Relevant Period, then this Class Member's dollar volume would be $39,000.

3.      "CME Futures Volume Net Adverse Impact" shall mean the CME Futures

Volume Adverse Impact multiplied by the Hedging Deduction (if any).

**B.      CME Cheese Spot Call Contracts**

1.      A Class Member's "CME Cheese Volume Adverse Impact" shall be equal the

sum of their dollar volume of each purchase and sale of a CME Cheese Spot Call Contract

during the Relevant Period.

2.      For purposes of this sub-section "dollar volume" of a purchase or sale of a CME

Cheese Spot Call Contract means the price of the purchase or sale multiplied by 42,000 lbs (*i.e.*,

the average contract size of a CME Cheese Spot Call Contract).  For example, if a Class Member

purchased one CME Cheese Spot Call Contract at $1.50 per pound during the Relevant Period,

then this Class Member's dollar volume would be $63,000.

**C.      Physical Cheese Purchases**

1.      Only (i) direct purchases of physical cheese from DFA or Schreiber during the

Relevant Period and/or (ii) first purchases of physical cheese from a first manufacturer of cheese

(*i.e.* a manufacturer that transforms milk into cheese) pursuant to a contract the price term of

which specified that the price was based, in whole or in part, on the CME Cheese Spot Call price

(block or barrel price, average price, specific price, price formula, collar price or any variation

that explicitly referenced the CME Cheese Spot Call price) during the Relevant Period are

compensable.

2.      A Class Member's "Physical Cheese Volume Adverse Impact" shall be the sum

of their dollar volume of each direct purchase and/or first purchase of physical cheese as

described in 1 above during the Relevant Period.

3.     For purposes of this sub-section "dollar volume" of a direct purchase and/or first purchase of physical cheese as described in 1 above means the total dollar purchase price of such purchase of physical cheese.  The total dollar purchase price may be obtained, for example, by multiplying the dollar per pound price by the volume (pounds) of such purchase.  For example, if a Class Member makes a direct purchase from DFA of 100 pounds of physical cheese at $1.50 a lb. during the Relevant Period, the dollar volume would be $150.

4.     "Physical Cheese Volume Net Adverse Impact" shall mean the Physical Cheese Volume Adverse Impact reduced by the Physical Cheese Discount (*i.e.*, 20%).

**D.     Physical Milk Purchases**

1.     Only (i) direct purchases of physical milk from DFA or (ii) first purchases of physical milk from a first producer of milk (*e.g.,* a dairy farmer) that was made pursuant to a contract the price term of which specified that the price was based, in whole or in part, on (a) the CME Cheese Spot Call price (block or barrel price, average price, specific price, price formula, collar price or any variation that explicitly referenced the CME Cheese Spot Call price); (b) the CME Class III milk futures price; (c) the National Agricultural Statistics Service ("NASS") cheese price; or (d) a government milk formula price which included (a), (b) or (c) as a component of such government milk formula price during the Relevant Period are compensable.

2.     A Class Member's "Physical Milk Volume Adverse Impact" shall be the sum of their dollar volume of each direct purchase and/or first purchase of physical Milk as described in 1 above during the Relevant Period.

3.     For purposes of this sub-section "dollar volume" of a direct purchase and/or first purchase of physical milk as described in 1 above means the total dollar purchase price of such purchase of physical milk.  The total dollar purchase price may be obtained, for example, by

17

multiplying the dollars per hundredweight price by the volume (hundredweights) of such purchase. For example, if a Class Member makes a direct purchase from DFA of 2,000 hundredweights of physical milk at $15.00 per hundredweight during the Relevant Period, the dollar volume would be $30,000.

4. "Physical Milk Volume Net Adverse Impact" shall mean the Physical Milk Volume Adverse Impact reduced by the Physical Milk Discount (*i.e.*, 82.5%).

## III. Distribution Among Class Members *Inter Se*

1. For the distribution among Class Members *inter se*, each Class Member who executes the required release and covenant not to sue and submits adequate documentation, all as determined by the Settlement Administrator, shall be entitled to receive an amount equal to (a) that Class Member's Allowed Claim under Section I above multiplied by a fraction the numerator of which is 92.5% of the Net Settlement Fund and the denominator of which is the sum of all Class Member's Allowed Claims under Section I above PLUS (b) that Class Member's Allowed Claim under Section II above multiplied by a fraction the numerator of which is 7.5% of the Net Settlement Fund and the denominator of which is the sum of all Class Member's Allowed Claims under Section II above.

2. All determinations under this Plan of Allocation shall be made by the Settlement Administrator subject to review by Co-Lead Counsel and the Court.

# Exhibit F

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

IN RE: DAIRY FARMERS OF AMERICA, INC. CHEESE
ANTITRUST LITIGATION

THIS DOCUMENT RELATES TO:

DIRECT PURCHASER ACTION

Master File No. 09-cv-03690
MDL No. 2031
The Honorable Robert M. Dow

PROOF OF CLAIM AND RELEASE

## I.   INSTRUCTIONS

1.   Except for the terms defined herein, the Proof of Claim and Release adopts and incorporates the definitions in the Stipulation and Agreement of Settlement, dated December 18, 2013, which is available on the settlement website at www.DairyFarmersDirectPurchaserAction.com

2.   If you are a member of the Class as defined below, in order to be entitled to a distribution, **you must complete, sign, have notarized and mail this Proof of Claim and necessary supporting documentation to the Settlement Administrator at the following address by no later than _____, 2013:**

Dairy Farmers of America, Inc. Cheese Antitrust Litigation Settlement
c/o Rust Consulting, Inc.
P.O. Box 2428
Faribault, MN 55021-9128

Do not submit your claim to the Court.

The Class.  The Class certified by the Court for settlement purposes is defined as:

All persons who between April 1, 2004 through December 31, 2006: (1) purchased a CME Class III milk futures contract; (2) purchased a CME Cheese Spot Call contract for either blocks or barrels; (3) purchased cheese directly from Dairy Farmers of America, Inc. ("DFA") or Schreiber Foods, Inc. ("Schreiber") or made a first purchase of cheese from a first manufacturer of cheese (*i.e.* a manufacturer that transforms milk into cheese) pursuant to a contract the price term of which specified that the price was based, in whole or in part, on the CME Cheese Spot Call price (block or barrel price, average price, specific price, price formula, collar price or any variation that explicitly referenced the CME Cheese Spot Call price); or (4) purchased milk directly from DFA or made a first purchase of milk from a first producer of milk (*e.g.*, a dairy farmer) that was made pursuant to a contract the price term of which specified that the price was based, in whole or in part, on (i) the CME Cheese Spot Call price (block or barrel price, average price, specific price, price formula, collar price or any variation that explicitly referenced the CME Cheese Spot Call price); (ii) the CME Class III milk futures price; (iii) the National Agricultural Statistics Service ("NASS") cheese price; or (iv) a government milk formula price which included (i), (ii) or (iii) as a component of such government milk formula price. Excluded from the Class are the Settling Defendants, the Non-Settling Defendants, and any parent, subsidiary, affiliate, or agent of any Settling Defendant or Non-Settling Defendant.

Only members of the Class who have not been excluded from the Class may participate in the Settlement.

3.   If you are a member of the Class as described above, then, by properly filling out, signing, having notarized and returning this Proof of Claim and furnishing the required supporting documentation, you may be entitled to share in the proceeds from the Settlement. However, submission of this Proof of Claim does not assure that you will share in any of the proceeds of the Settlement.

4.   Omission of necessary supporting documents will make your claim defective and for those reasons is subject be being rejected, in which case you will be notified of the rejection and given an opportunity to remedy the problems identified.

5.   If you are a member of the Class and you fail to submit a valid and timely Proof of Claim pursuant to the instructions set forth herein you may be precluded from any recovery from the Settlement. However, unless you opt out of the Class, as provided for in the Notice of Settlement, you will be bound by the terms of any judgment entered in the Action **whether or not you submit a Proof of Claim.**

6. The completed Proof of Claim and the information submitted therewith will be treated as confidential and will be used solely for purposes of administering the Settlement.

**IF YOU HAVE ANY QUESTIONS CONCERNING THIS PROOF OF CLAIM, WRITE TO, CALL, OR GO ON-LINE AT:**

> Dairy Farmers of America, Inc. Cheese Antitrust Litigation Settlement
> c/o Rust Consulting, Inc.
> P.O. Box 2428
> Faribault, MN 55021-9128
> 1-866-403-1828
> www.DairyFarmersDirectPurchaserAction.com

**DO <u>NOT</u> CONTACT THE COURT IF YOU HAVE QUESTIONS CONCERNING THIS PROOF OF CLAIM.**

7. If you need more space than provided for herein in order to provide complete responses, then you may attach schedules to this Proof of Claim.

8. <u>Overview</u>. Section "II" below sets forth the defined terms herein. Section "III" below concerns Claimant information. Section "IV" below concerns transactions involving Chicago Mercantile Exchange ("CME") Class III milk futures contracts. Section "V" below concerns transactions involving CME Cheese Spot Call Contracts. Section "VI" below concerns transactions involving physical cheese. Section "VII" below concerns transactions involving physical milk.

## II.  DEFINITIONS

1. "Relevant Period" shall mean May 4, 2004 – June 25, 2004 and September 1, 2004 – October 1, 2004. The Relevant Period shall also include June 26, 2004 – July 2, 2004 for transactions in June 2004 CME Class III milk futures contracts and shall further include October 2 through October 7, 2004 for transactions in October 2004, November 2004, December 2004 and January 2005 CME Class III milk futures contracts. Notwithstanding anything herein to the contrary, certain transactions in CME Class III milk futures, CME Cheese Spot Call Contracts, physical cheese and physical milk outside the Relevant Period may be compensable under Section II of the Plan of Allocation based on a dollar volume allocation. Generally, certain transactions in CME Class III milk futures contracts between October 8, 2004 and December 31, 2006 may be compensable on a dollar volume basis and certain transactions in CME Cheese Spot Call Contracts, physical cheese and physical milk between October 2, 2004 and December 31, 2006 may be compensable on a dollar volume basis. See below Section IV, ¶8(e), Table II (requesting information concerning CME Class III milk futures contract transactions between October 8, 2004 and December 31, 2006); Section V, ¶8(b), Table II (requesting information concerning CME Cheese Spot Call Contract transactions between October 2, 2004 and December 31, 2006); Section VI, ¶5(b), Table II and ¶8, Table IV (requesting information concerning certain physical cheese purchases between October 2, 2004 and December 31, 2006); Section VII, ¶5(b), Table II and ¶8, Table IV (requesting information concerning certain physical milk transactions between October 2, 2004 and December 31, 2006).

2. "Qualifying CME Class III Milk Futures Contract Transactions" shall mean purchases and sales during the Relevant Period in the CME Class III milk futures contract months of May 2004, June 2004, July 2004, August 2004, September 2004, October 2004, November 2004, December 2004 and January 2005. For the avoidance of doubt, "sale" means, closing a long position, opening a short position or receipt of payment as part of cash settlement of a long position and "purchase" means either closing a short position, opening a long position or payment as part of cash settlement of a short position. . Qualifying CME Class III Milk Futures Contract Transactions shall also include purchases and sales of the June 2004 CME Class III milk futures contract between June 26, 2004 and July 2, 2004.

3. "Qualifying CME Cheese Spot Call Contract Transactions" shall mean purchases and sales during the Relevant Period in CME Cheese Spot Call Contracts in either blocks or barrels.

4. "Qualifying Physical Cheese Transactions" shall mean (a) purchases of physical cheese from DFA or Schreiber during the Relevant Period and/or (b) first purchases of physical cheese from a first manufacturer of cheese (*i.e.* a manufacturer that transforms milk into cheese) pursuant to a contract the price term of which specified that the price was based, in whole or in part, on the CME Cheese Spot Call price (block or barrel price, average price, specific price, price formula, collar price or any variation that explicitly referenced the CME Cheese Spot Call price) during the Relevant Period. For the avoidance of doubt, compensable first purchases of physical cheese from a first manufacturer of cheese are purchases the price of which was based, in whole or in part, on one or more CME Cheese Spot Call prices during the Relevant Period. For example, a first purchase of physical cheese from a first manufacturer of cheese made during the Relevant Period but that was made at a price which was based, in whole or in part, on one or more CME Cheese Spot Call prices not during the Relevant Period, is <u>not</u> compensable. Conversely, a first purchase of physical cheese from a first manufacturer of cheese not made during the Relevant Period but that was made at a price which was based, in whole or in part, on one or more CME Cheese Spot Call prices during the Relevant Period, <u>is</u> compensable.

5. "Qualifying Physical Milk Transactions" shall mean (a) purchases of physical milk from DFA during the Relevant Period and/or (b) first purchases of physical milk during the Relevant Period from a first producer of milk (*e.g.,* a dairy farmer) that was made pursuant to a contract the price term of which specified that the price was based, in whole or in part, on (a) the CME Cheese Spot Call price (block or barrel price, average price, specific price, price formula, collar price or any variation that explicitly referenced the CME Cheese Spot Call price); (b) the CME Class III milk futures price; (c) the National Agricultural Statistics Service ("NASS") cheese price; or (d) a government milk formula price which included (a), (b) or (c) as a component of such government milk formula price. For the avoidance of doubt, compensable first purchases of physical milk from a first producer of milk are purchases the price of which was based, in whole or in part, on one or more of the prices set forth in (a)-(d) above during the Relevant Period. For example, a first purchase of physical milk from a first producer of milk made during the Relevant Period but that was made at a price which was based, in whole or in part, on one or more of the prices set forth in (a)-(d) above during the Relevant Period, is <u>not</u> compensable. Conversely, a first purchase of physical milk from a first producer of milk not made during the Relevant Period but that was made at a price which was based, in whole or in part, on one or more of the prices set forth in (a)-(d) above during the Relevant Period, <u>is</u> compensable.

<table>
<tr><td>MUST BE<br>POSTMARKED NO<br>LATER THAN<br>XXXXXXXXX XX, 2013</td><td>UNITED STATES DISTRICT COURT<br>NORTHERN DISTRICT OF ILLINOIS<br><br>IN RE: DAIRY FARMERS OF AMERICA, INC.<br>CHEESE ANTITRUST LITIGATION<br>MASTER FILE NO. 09-cv-03690<br><u>PROOF OF CLAIM AND RELEASE</u><br>Use Blue or Black Ink Only</td><td>For Official Use Only<br><br>01</td></tr>
</table>

### III. CLAIMANT INFORMATION

STATE OF _____ )

COUNTY OF _____ )

_____, being duly sworn, deposes and says:

1. Please provide the following information:

Claimant Name
("Claimant"): _____

Specify one of the following:

☐ Individual(s)    ☐ Corporation    ☐ Estate    ☐ Other: _____

Name of Person Executing Claim: _____

Capacity of Person Executing Claim: _____

Claimant Address
_____

City _____    State _____    Zip Code _____

Foreign Province and Postal Code _____    Foreign Country _____

Telephone Number (Day)                              E-mail Address

Claimant Social Security No. or Employer Identification No.

Nature of the Claimant's Business

2.      If this Proof of Claim does **not** reflect qualifying transactions by any affiliates of yours, who, to your knowledge, made any qualifying transactions during the Relevant Period, then please list below the names of such affiliates.

If you leave the above line blank, then by executing this Proof of Claim, you are affirming that, to the best of your knowledge, you have no affiliates who made qualifying transactions during the Relevant Period that are not reflected in this Proof of Claim.

## IV.     CME CLASS III MILK FUTURES CONTRACTS

1.      Only Qualifying CME Class III Milk Futures Contract Transactions are potentially compensable.

### Item 1 – List of Futures Commission Merchants

2.      Please list all futures commission merchants ("FCMs") through which you maintained accounts wherein you traded CME Class III milk futures contracts during the Relevant Period.

### Item 2 – List of Account Names and Account Numbers

3.      Please provide a list of account names <u>and</u> account numbers for each FCM you listed in response to Item 1 above wherein you traded CME Class III milk futures contracts during the Relevant Period.

### Item 3 – Proof of CME Class III Milk Futures Contracts

4.      Please provide proof of <u>all</u> CME Class III milk futures contracts you made during the Relevant Period by enclosing photocopies of daily brokerage confirmations, monthly account statements, and other documents evidencing purchases and/or sales reflecting transactions in such contracts. Each Claimant must provide sufficient documentation that reflects the date, price, and quantity of all transactions in CME Class III milk futures contracts during the Relevant Period. It is highly likely that <u>the most efficient method for Claimants to support their claims is to produce records reflecting ALL transactions in CME Class III milk futures contracts during the Relevant Period</u>.

5.      You must provide proof for each and every transaction in CME Class III milk futures contracts regardless of whether the transaction resulted in a gain or a loss. If any such documents are not in your possession, please obtain them or their equivalent from your broker or tax advisor or other sources if it is possible for you to do so. If you have this information in an electronic form, you are strongly encouraged also to return a disk in Microsoft Excel format along with a hard copy printout of your trading records in order to expedite the treatment of your Proof of Claim.

<u>**Item 4 – Instructions for Listing Transactions in CME Class III Milk Futures Contracts**</u>

6.      Claimants are required to list each transaction in CME Class III milk futures contracts during the Relevant Period in the form provided in Item 5 below.  If additional space is necessary, or if Claimants wish to use a Microsoft Excel format, please go to www.DairyFarmersDirectPurchaserAction.com.

7.      In listing the information requested in Item 5 below, you should always use trade dates, not settlement dates.  Do <u>not</u> average prices of separate transactions, including transactions within a given date.  It is important that you supply the information requested to the fullest extent that you are able to do so.

<u>**Item 5- List of Transactions In CME Class III Milk Futures Contracts**</u>

8 (a).   Please list below (by number of contracts) open positions (long or short) you held in CME Class III milk futures contracts at the beginning of trading on: (i) May 4, 2004 and (ii) September 1, 2004.

At the beginning of trading on May 4, 2004

| Open Position in Contract | Short | Long |
|---|---|---|
| May 2004 | | |
| June 2004 | | |
| July 2004 | | |
| August 2004 | | |
| September 2004 | | |
| October 2004 | | |
| November 2004 | | |
| December 2004 | | |
| January 2005 | | |

At the beginning of trading on September 1, 2004

| Open Position in Contract | Short | Long |
|---|---|---|
| September 2004 | | |
| October 2004 | | |
| November 2004 | | |
| December 2004 | | |
| January 2005 | | |

8 (b).   If you have any transactions in CME Class III milk futures contracts during the Relevant Period, then you must provide the information set forth in the Table I below for all such transactions.

**Table I—Transactions (By Trade Date) In (a) CME Class III Milk Futures Contracts Between May 4, 2004 – June 25, 2004 and September 1, 2004 – October 7, 2004, Inclusive and (b) The June 2004 CME Class III Milk Futures Contract Between June 26, 2004 – July 2, 2004, Inclusive**

| Date of Transaction | Contract Month/Year | Purchase/Sale | | Number of Contracts In Transaction | Contract Price | Brokerage Firm in Which Transaction Was Made | Account Number in Which Transaction Was Made | Hedging Transaction? | |
|---|---|---|---|---|---|---|---|---|---|
| | | Purchase | Sale | | | | | YES | NO |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

8 (c).   Were any of the transactions you listed in item 8(b) above hedging transactions?   That is, were any of your transactions in CME Class IIII milk futures contracts listed above acquired in connection with offsetting positions (in whole or in part) held in the cash or other derivative markets?  YES ____ or NO ____.

8 (d).   Please list below (by number of contracts) open positions (long or short) you held in CME Class III milk futures contracts at the close of trading on: (i) June 25, 2004, (ii) July 2, 2004, and (iii) October 7, 2004.

At the close of trading on June 25, 2004

| Open Position in Contract | Short | Long |
|---|---|---|
| July 2004 | | |
| August 2004 | | |
| September 2004 | | |
| October 2004 | | |
| November 2004 | | |
| December 2004 | | |
| January 2005 | | |

At the close of trading on July 2, 2004

| Open Position in Contract | Short | Long |
|---|---|---|
| June 2004 | | |

At the close of trading on October 7, 2004

| Open Position in Contract | Short | Long |
|---|---|---|
| October 2004 | | |
| November 2004 | | |
| December 2004 | | |
| January 2005 | | |

8(e).  If you have any transactions in CME Class III milk futures contracts between October 8, 2004 and December 31, 2006, inclusive, then then you must provide the information set forth in the Table II below for all such transactions.

Table II—Transactions (By Trade Date) In CME Class III Milk Futures Contracts Between October 8, 2004 and December 31, 2006, Inclusive

| Date of Transaction | Contract Month/Year | Purchase/Sale | | Number of Contracts In Transaction | Contract Price | Brokerage Firm in Which Transaction Was Made | Account Number in Which Transaction Was Made | Hedging Transaction? | |
|---|---|---|---|---|---|---|---|---|---|
| | | Purchase | Sale | | | | | YES | NO |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

## V.     CME CHEESE SPOT CALL CONTRACTS

1.      Only Qualifying CME Cheese Spot Call Contract Transactions are potentially compensable.

## Item 1 – List of Brokers

2.      Please list all floor brokers or other brokers through which you maintained accounts wherein you traded CME Spot Cheese Call contracts during the Relevant Period (*i.e.*, May 4, 2004 – June 25, 2004 and September 1, 2004 – October 1, 2004).

## Item 2 – List of Account Names and Account Numbers

3.      Please provide a list of account names and account numbers for each broker you listed in response to "Item 1" above wherein you traded CME Spot Cheese Call contracts during the Relevant Period.

## Item 3 – Proof of CME Cheese Spot Call Contract Transactions

4.      Please provide proof of all CME Cheese Spot Call contract transactions you made during the Relevant Period by enclosing photocopies of daily brokerage confirmations, monthly account statements, and other documents evidencing purchases and/or sales reflecting transactions in such contracts.  Each Claimant must provide sufficient documentation that reflects the date, price, and quantity of all transactions in CME Cheese Spot Call Contracts during the Relevant Period.  It is highly likely that the most efficient method for Claimants to support their claims is to produce records reflecting ALL transactions in CME Cheese Spot Call Contracts during the Relevant Period.

5.      You must provide proof for each and every transaction in CME Cheese Spot Call Contracts regardless of whether the transaction resulted in a gain or a loss.   If any such documents are not in your possession, please obtain them or their equivalent from your broker or tax advisor or other sources if it is possible for you to do so.  If you have this information in an electronic form, you are strongly encouraged also to return a disk in Microsoft Excel format along with a hard copy printout of your trading records in order to expedite the treatment of your Proof of Claim.

## Item 4 – Instructions for Listing Transactions in CME Cheese Spot Call Contracts

6.      Claimants are required to list each transaction in CME Cheese Spot Call contracts during the Relevant Period in the form provided in Item 5 below.  If additional space is necessary, or if Claimants wish to use a Microsoft Excel format, please go to www.DairyFarmersDirectPurchaserAction.com.

7.      In listing the information requested in Item 5 below, you should always use trade dates.  Do not average prices of separate transactions, including transactions within a given date.  It is important that you supply the information requested to the fullest extent that you are able to do so.

## Item 5- List of Transactions In CME Cheese Spot Call Contracts

8 (a).    If you have any transactions in CME Cheese Spot Call Contracts during the Relevant Period then you must provide the information set forth in the Table I below for all such transactions.

**Table I—Transactions In CME Cheese Spot Call Contracts Between May 4, 2004 – June 25, 2004 and September 1, 2004 – October 1, 2004, Inclusive**

| Date of Transaction | Cheddar Cheese | | | Purchase/Sale | | Number of Contracts In Transaction | Contract Price | Brokerage Firm in Which Transaction Was Made | Account Number in Which Transaction Was Made |
|---|---|---|---|---|---|---|---|---|---|
| | Blocks | OR | Barrels | Purchase | Sale | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|

8(b). If you have any transactions in CME Cheese Spot Call Contracts between October 2, 2004 and December 31, 2006, inclusive, then you must provide the information set forth in the Table II below for all such transactions.

Table II—Transactions In CME Cheese Spot Call Contracts Between October 2, 2004 and December 31, 2006, inclusive.

| Date of Transaction | Cheddar Cheese | | | Purchase/Sale | | Number of Contracts In Transaction | Contract Price | Brokerage Firm in Which Transaction Was Made | Account Number in Which Transaction Was Made |
|---|---|---|---|---|---|---|---|---|---|
| | Blocks | OR | Barrels | Purchase | Sale | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

## VI.    PHYSICAL CHEESE PURCHASES

1.       Only Qualifying Physical Cheese Transactions are potentially compensable.

### Item 1 – List of Persons and/or Entities From Whom You Purchased Physical Cheese

2.       Please provide a list of each person and/or entity from whom you purchased physical cheese during the Relevant Period.

_____

_____

_____

### Item 2 – Proof of Physical Cheese Purchases

3.       Please provide proof of all Qualifying Physical Cheese Transactions you made during the Relevant Period by enclosing photocopies of purchase contracts, account statements and other documents evidencing purchases of physical cheese during the Relevant Period.  Each Claimant must provide sufficient documentation that reflects the date, price, and quantity of all Qualifying Physical Cheese Transactions during the Relevant Period.  If any such documents are not in your possession, please obtain them or their equivalent from your broker or tax advisor or other sources if it is possible for you to do so.  If you have this information in an electronic form, you are strongly encouraged also to return a disk in Microsoft Excel format along with a hard copy printout of your records in order to expedite the treatment of your Proof of Claim.

### Item 3 – Instructions for Listing Purchases of Physical Cheese

4.       Claimants are required to list all (a) purchases of physical cheese from DFA or Schreiber during the Relevant Period (see Table I below) or (b) first purchases of physical cheese during the Relevant Period from a first manufacturer of cheese pursuant to a contract the price term of which specified that the price was based, in whole or in part, on the CME Cheese Spot Call price (see Table II below).  If additional space is necessary, or if Claimants wish to use a Microsoft Excel

format, please go to www.DairyFarmersDirectPurchaserAction.com. It is important that you supply the information requested to the fullest extent that you are able to do so.

### Item 4—List of Purchases of Physical Cheese From DFA or Schreiber

5(a). If you have any purchases of physical cheese from DFA or Schreiber during the Relevant Period then you must provide the information set forth in Table I below for all such purchases.

**Table I—Purchases of Physical Cheese From DFA or Schreiber Between May 4, 2004 – June 25, 2004 and September 1, 2004 – October 1, 2004, Inclusive**

| Date of Transaction | Type of Physical Cheese Purchased (*e.g.*, cheddar cheese) | Quantity of Cheese Purchased | Transaction Price | Cheese Purchased From | | Price Term of Purchase (*e.g.*, basis CME cheese price, fixed price, etc.) |
|---|---|---|---|---|---|---|
| | | | | DFA | Schreiber | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

5(b). If you have any purchases of physical cheese from DFA or Schreiber between October 2, 2004 and December 31, 2006, inclusive, then you must provide the information set forth in Table II below for all such purchases.

**Table II—Purchases of Physical Cheese From DFA or Schreiber Between October 2, 2004 and December 31, 2006, Inclusive**

| Date of Transaction | Type of Physical Cheese Purchased (*e.g.*, cheddar cheese) | Quantity of Cheese Purchased | Transaction Price | Cheese Purchased From | | Price Term of Purchase (*e.g.*, basis CME cheese price, fixed price, etc.) |
|---|---|---|---|---|---|---|
| | | | | DFA | Schreiber | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

### Item 5—First Purchases of Physical Cheese From A First Manufacturer of Cheese Pursuant To A Contract The Price Term of Which Specified That The Price Was Based, In Whole or In part, On The CME Cheese Spot Call Price

6. If you have any first purchases of physical cheese from a first manufacturer of cheese (*i.e.* a manufacturer that transforms milk into cheese) pursuant to a contract the price term of which specified that the price was based, in whole or in part, on the CME Cheese Spot Call price (block or barrel price, average price, specific price, price formula, collar price or any variation that explicitly referenced the CME Cheese Spot Call price) during the Relevant Period, then you must provide the information set forth in Table III below for all such purchases. You must also provide any first purchases of physical cheese from a first manufacturer of cheese not made during the Relevant Period but that was made at a price which was based, in whole or in part, on one or more CME Cheese Spot Call prices during the Relevant Period. Please do not list any

physical cheese purchases that were not based, in whole or in part, on the CME Cheese Spot Call price during the Relevant Period.

7.     In order to qualify for compensation under this Item, your purchases of physical cheese must be "first purchases" of physical cheese.  In other words, you must be the first person to have purchased the physical cheese such that the physical cheese was not previously sold to another person or entity.  Additionally, your purchases of physical cheese must be from a "first manufacturer" of physical cheese (*i.e.*, a manufacturer that transforms milk into cheese in the first instance).  That is, purchases of physical cheese from a "reseller" do not qualify for compensation.

Table III—First Purchases of Physical Cheese From A First Manufacturer of Cheese Pursuant to A Contract The Price Term of Which Specified That The Price Was Based, In Whole or In Part, On The CME Cheese Spot Call Price Between May 4, 2004 – June 25, 2004 and September 1, 2004 – October 1, 2004, Inclusive

| Date of Transaction | Type of Physical Cheese Purchased (*e.g.*, cheddar cheese) | Quantity of Cheese Purchased | Transaction Price | Was This Purchase A "First Purchase" of Physical Cheese **AND** Was The Manufacturer A "First Manufacturer" Of Physical Cheese? | | Name of Manufacturer From Whom The Physical Cheese Was Purchased | Was The Purchase Price Based In Whole Or In Part on The CME Cheese Spot Call Price During the Relevant Period? | |
|---|---|---|---|---|---|---|---|---|
| | | | | YES | NO | | YES | NO |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

8.     If you have any first purchases of physical cheese from a first manufacturer of cheese (*i.e.* a manufacturer that transforms milk into cheese) pursuant to a contract the price term of which specified that the price was based, in whole or in part, on the CME Cheese Spot Call price (block or barrel price, average price, specific price, price formula, collar price or any variation that explicitly referenced the CME Cheese Spot Call price) between October 2, 2004 and December 31, 2006, inclusive, then you must provide the information set forth in Table IV below for all such purchases.

Table IV—First Purchases of Physical Cheese From A First Manufacturer of Cheese Pursuant to A Contract The Price Term of Which Specified That The Price Was Based, In Whole or In Part, On The CME Cheese Spot Call Price Between October 2, 2004 and December 31, 2006, Inclusive

| Date of Transaction | Type of Physical Cheese Purchased (*e.g.*, cheddar cheese) | Quantity of Cheese Purchased | Transaction Price | Was This Purchase A "First Purchase" of Physical Cheese **AND** Was The Manufacturer A "First Manufacturer" Of Physical Cheese? | | Name of Manufacturer From Whom The Physical Cheese Was Purchased | Was The Purchase Price Based In Whole Or In Part on The CME Cheese Spot Call Price Between October 2, 2004 and December 31, 2006, inclusive? | |
|---|---|---|---|---|---|---|---|---|
| | | | | YES | NO | | YES | NO |
| | | | | | | | | |

|  |  |  |  |  |  |  |
|---|---|---|---|---|---|---|
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |

## VII.    PHYSICAL MILK PURCHASES

1.      Only Qualifying Physical Milk Transactions are potentially compensable.

### Item 1 – List of Persons and/or Entities From Whom You Purchased Physical Milk

2.      Please provide a list of each person and/or entity from whom you purchased physical milk during the Relevant Period.

_____

_____

_____

### Item 2 – Proof of Physical Milk Purchases

3.      Please provide proof of all Qualifying Physical Milk Purchases you made during the Relevant Period by enclosing photocopies of purchase contracts, account statements and other documents evidencing purchases of physical milk during the Relevant Period.  Each Claimant must provide sufficient documentation that reflects the date, price, and quantity of all Qualifying Physical Milk Purchases during the Relevant Period.  If any such documents are not in your possession, please obtain them or their equivalent from your broker or tax advisor or other sources if it is possible for you to do so.  If you have this information in an electronic form, you are strongly encouraged also to return a disk in Microsoft Excel format along with a hard copy printout of your records in order to expedite the treatment of your Proof of Claim.

### Item 3 – Instructions for Listing Purchases of Physical Milk

4.      Claimants are required to list all (a) purchases of physical milk from DFA or Schreiber during the Relevant Period (see Table I below) or (b) first purchases of physical milk during the Relevant Period from a first manufacturer of cheese pursuant to a contract the price term of which specified that the price was based, in whole or in part, on (a) the CME Cheese Spot Call price: (b) the CME Class III milk futures price: (c) the NASS cheese price; or (d) a government milk formula price which included (a), (b) or (c) as a component of such government milk formula price.  If additional space is necessary, or if Claimants wish to use a Microsoft Excel format, please go to www.DairyFarmersDirectPurchaserAction.com.  It is important that you supply the information requested to the fullest extent that you are able to do so.

### Item 4—List of Purchases of Physical Milk From DFA

5(a).    If you have any purchases of physical milk from DFA during the Relevant Period then you must provide the information set forth in Table I below for all such purchases.

Table I—Purchases of Physical Milk From DFA Between May 4, 2004 – June 25, 2004 and September 1, 2004 – October 1, 2004, Inclusive

| Date of Transaction | Type of Physical Milk Purchased (e.g., Class III milk) | Quantity of Milk Purchased (in cwt.) | Transaction Price | Was The Physical Milk Purchased From DFA? | | Price Term of Purchase (e.g., basis CME cheese price, fixed price, etc.) |
|---|---|---|---|---|---|---|
|  |  |  |  | YES | NO |  |

|  |  |  |  |  |  |  |
|---|---|---|---|---|---|---|
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |

5(b).  If you have any purchases of physical milk from DFA between October 2, 2004 and December 31, 2006, inclusive, then you must provide the information set forth in Table II below for all such purchases.

**Table II—Purchases of Physical Milk From DFA Between October 2, 2004 and December 31, 2006, Inclusive**

| Date of Transaction | Type of Physical Milk Purchased (*e.g.*, Class III milk) | Quantity of Milk Purchased (in cwt.) | Transaction Price | Was The Physical Milk Purchased From DFA? | | Price Term of Purchase (*e.g.*, basis CME cheese price, fixed price, etc.) |
|---|---|---|---|---|---|---|
|  |  |  |  | YES | NO |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |

**Item 5—First Purchases of Physical Milk From A First Manufacturer of Milk Pursuant To A Contract The Price Term of Which Specified That The Price Was Based On, In Whole or In Part, On (a) The CME Cheese Spot Call Price, (b) The CME Class III Milk Futures Price, (c) the NASS Cheese Price, or (d) A Governmental Milk Formula Price**

6.      If you have any first purchases of physical milk from a first producer of milk (*e.g.*, a dairy farmer) that was made pursuant to a contract the price term of which specified that the price was based, in whole or in part, on (a) the CME Cheese Spot Call price (block or barrel price, average price, specific price, price formula, collar price or any variation that explicitly referenced the CME Cheese Spot Call price); (b) the CME Class III milk futures price; (c) the NASS cheese price; or (d) a government milk formula price which included (a), (b) or (c) as a component of such government milk formula price during the Relevant Period, then you must provide the information set forth in Table III below for all such purchases.  You must also list any first purchases of physical milk from a first producer of milk not made during the Relevant Period but that was made at a price which was based, in whole or in part, on one or more of the prices set forth in (a)-(d) above during the Relevant Period.  Please do not list any physical milk purchases that were not based, in whole or in part, on one of the prices set forth in (a)-(d) above during the Relevant Period.

7.      In order to qualify for compensation under this Item, your purchases of physical milk must be "first purchases" of physical milk.  In other words, you must be the first person to have purchased the physical milk such that the physical milk was not previously sold to another person or entity.  Additionally, your purchases of physical milk must be from a "first

producer" of physical milk (*e.g.,* a dairy farmer).  That is, purchases of physical milk from a "reseller" do not qualify for compensation.

Table III—First Purchases of Physical Milk From A First Manufacturer of Milk Pursuant to A Contract The Price Term of Which Specified That The Price Was Based, In Whole or In Part, On (a) The CME Cheese Spot Call Price, (b) The CME Class III Milk Futures Price, (c) the NASS cheese price, or (d) A Governmental Milk Formula Price Between May 4, 2004 – June 25, 2004 and September 1, 2004 – October 1, 2004, Inclusive

| Date of Transaction | Type of Physical Milk Purchased (*e.g.,* Class III Milk) | Quantity of Milk Purchased (in cwt.) | Transaction Price | Was This Purchase A "First Purchase" of Physical Milk **AND** Was The Manufacturer A "First Manufacturer" Of Physical Milk? | | Name of Manufacturer From Whom The Physical Milk Was Purchased | Was The Purchase Price Based In Whole Or In Part on (a) The CME Cheese Spot Call Price, (b) The CME Class III Milk Futures Price, (c) the NASS cheese price, or (d) A Governmental Milk Formula Price During the Relevant Period? | |
|---|---|---|---|---|---|---|---|---|
| | | | | YES | NO | | YES | NO |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

8.  If you have any first purchases of physical milk from a first producer of milk (*e.g.,* a dairy farmer) that was made pursuant to a contract the price term of which specified that the price was based, in whole or in part, on (a) the CME Cheese Spot Call price (block or barrel price, average price, specific price, price formula, collar price or any variation that explicitly referenced the CME Cheese Spot Call price); (b) the CME Class III milk futures price; (c) the NASS cheese price; or (d) a government milk formula price which included (a), (b) or (c) as a component of such government milk formula price between October 2, 2004 and December 31, 2006, inclusive, then you must provide the information set forth in Table IV below for all such purchases.

Table IV—First Purchases of Physical Milk From A First Manufacturer of Milk Pursuant to A Contract The Price Term of Which Specified That The Price Was Based, In Whole or In Part, On (a) The CME Cheese Spot Call Price, (b) The CME Class III Milk Futures Price, (c) the NASS cheese price, or (d) A Governmental Milk Formula Price Between October 2, 2004 and December 31, 2006, Inclusive

| Date of Transaction | Type of Physical Milk Purchased (*e.g.,* Class III Milk) | Quantity of Milk Purchased (in cwt.) | Transaction Price | Was This Purchase A "First Purchase" of Physical Milk **AND** Was The Manufacturer A "First Manufacturer" Of Physical Milk? | Name of Manufacturer From Whom The Physical Milk Was Purchased | Was The Purchase Price Based In Whole Or In Part on (a) The CME Cheese Spot Call Price, (b) The CME Class III Milk Futures Price, (c) the NASS cheese price, or (d) A Governmental Milk Formula Price Between October 2, 2004 and December 31, 2006, inclusive? |
|---|---|---|---|---|---|---|

| | | | | YES | NO | | YES | NO |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

****

1.  Co-Lead Counsel and the Settlement Administrator reserve the right to seek further information from you regarding your Proof of Claim.

2.  It is important that you accurately disclose all qualifying transactions during the Relevant Period. The Claimant expressly consents to the release to the Settlement Administrator of any and all documents reflecting the Claimant's qualifying transactions may be obtained from third parties, including, but not limited to, your brokerage firm(s), the Commodity Futures Trading Commission and CME.

3.  The Claimant certifies that reasonable efforts have been made to locate all information requested in "IV" – "VII" above and that all information supplied in connection with this Proof of Claim is true, correct and complete.

4.  The Claimant understands that the information provided herein is subject to verification and the Claimant agrees to cooperate in any such verification including by furnishing additional information to support this claim and by assisting the Settlement Administrator if requested to do so.

5.  The Claimant understands that the Settlement Administrator will determine the adequacy of the Claimant's Proof of Claim and supporting documentation.

6.  The Claimant consents to the jurisdiction of the Court with respect to this Proof of Claim and for purposes of enforcing the terms of the Settlement Agreement or any order or judgment of the Court.

7.  The Claimant agrees to the terms of the Settlement as set forth in the Settlement Agreement and acknowledges being bound by and subject to the terms of any order or judgment that may be entered in the Action, including the Final Approval Order and Judgment.

8.  Each Claimant must execute a release and covenant not to sue in conformity with Section 6 of the Settlement Agreement in order to receive his/her/its *pro rata* share of the Net Settlement Fund. The Claimant agrees that the submission of this Proof of Claim constitutes a full release of and covenant not to sue on the Direct Purchaser Claims against the Released Parties as set forth in the Settlement Agreement and at the end of this Proof of Claim.

9.  The Claimant certifies that it is not subject to backup withholding under the provisions of Section 3406(a)(1)(C) of the Internal Revenue Code because: (a) the Claimant is exempt from backup withholding, or (b) the Claimant has not been notified by the Internal Revenue Service (the "I.R.S.") that the Claimant is subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the I.R.S. has notified that Claimant that the Claimant is no longer subject to backup withholding.

**I declare and affirm under penalties of perjury that the foregoing statements and the documents and information attached hereto, including the Social Security or Employee Identification Number shown on this Proof of Claim, are true, correct and complete, and that I agree to the Release and Covenant Not To Sue which follows.**

This Proof of Claim was executed this _____ day of _____ 2012 in _____, _____

               (City/Province)      (State/Country)

Signature of Claimant

Type or Print Name

Capacity of Person Signing (*e.g.*, President, Trustee, Custodian, etc.)

If you are acting for an entity, please submit proof of your authority (*e.g.*, corporate resolution, trust agreement, etc.).

Sworn to before me this _____ day of _____, 20__

_____

Notary Public

## RELEASE AND COVENANT NOT TO SUE

(a)      As an express and material condition of this Settlement Agreement, upon the Effective Date, the Direct Purchaser Plaintiffs and Class Members shall be deemed to have, and by operation of the Final Judgment shall have, fully, finally and forever released and discharged the Released Parties from, and shall covenant not to sue the Released Parties for or with respect to the Released Claims, which shall be defined as all manner of claims, rights, demands, actions, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, judgments, extents, executions, and causes of action, whether class, individual, or otherwise in nature, damages, whenever incurred, and liabilities of any nature whatsoever, including costs, expenses, penalties and attorneys' fees, whether known or unknown, suspected or unsuspected, whether concealed or hidden, whether asserted or which could have been asserted in the Action, or in law, admiralty or equity, that the Class Members or any of them, individually, or as a class (whether or not they make a claim upon or participate in the Settlement Fund), ever had, now have or hereafter can, shall or may have, against the Released Parties arising from or related to the Settling Defendants' conduct alleged in the Action with respect to Direct Purchaser Claims.  Provided, however, that this release shall not include any claims asserted by the named plaintiffs or the proposed class in the Indirect Purchaser Action except for any Direct Purchaser Claims.

(b)      Except for any claims to enforce this Settlement Agreement, each Direct Purchaser Plaintiff, Class Member and Released Party hereby expressly and completely waives and releases any and all rights or benefits with respect to Released Claims which he, she or it has or may have under Section 1542 of the California Civil Code, and any similar provision in any other jurisdiction.  Section 1542 provides as follows:

A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor.

Each Direct Purchaser Plaintiff, Class Member and Released Party expressly waives all of these rights with respect to Released Claims notwithstanding that each may hereafter discover facts other than or different from those which he, she, or it knows, believes, or suspects with respect to the subject matter of this Agreement. Nevertheless, it is the intention of each Direct Purchaser Plaintiff, Class Member and Released Party, through this Settlement Agreement, and with the ability to seek independent advice of counsel, to fully, finally and forever settle and release all claims released pursuant to Sections 6(a) or 6(b), as applicable.  In furtherance of such intention, the releases herein given by the Direct Purchaser Plaintiffs shall be and remain in effect as full and complete releases of the Action solely as to the Settling Defendants (but not as to the Non-Settling Defendants), notwithstanding the later discovery or existence of any such additional or different facts relative hereto or the later discovery of any such additional or different claims that would fall within the scope of the release provided in Section 6(a) of this Settlement Agreement, as if such facts or claims had been known at the time of this release.

(c)      Upon the occurrence of the Effective Date, the Released Parties shall be deemed to have, and by operation of the Final Judgment shall have, fully, finally and forever released and discharged the Direct Purchaser Plaintiffs and Class Counsel from, and shall covenant not to sue the Direct Purchaser Plaintiffs and Class Counsel for or with respect to, all manner of claims, rights, demands, actions, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, judgments, extents, executions, and causes of action, damages, whenever incurred, and liabilities of any nature whatsoever, including costs, expenses, penalties and attorneys' fees whether known or unknown, suspected or unsuspected, whether concealed or hidden, or in law, admiralty or equity, that the Released Parties or any of them ever had, now have or hereafter can, shall or may have, against the Direct Purchaser Plaintiffs and Class Counsel to the extent of the Released Claims.

(d)      In no event shall this Settlement Agreement release or purport to release any claims against Schreiber, any claims asserted by the named plaintiffs or class in the Indirect Purchaser Action (except for any Direct Purchaser Claims), any of the other Non-Settling Defendants, or any claims to enforce this Settlement Agreement.  Further, the release, discharge and covenant not to sue set forth in this Settlement Agreement include only Direct Purchaser Claims.

# Exhibit G

## <u>REMEDIAL UNDERTAKING</u>

Dairy Farmers of America, Inc. ("DFA") undertakes, and its successors and assigns shall be bound to undertake, the following remedial measures:

1.      **<u>Implementation of Policies and Guidelines</u>**.  DFA will implement or continue to maintain the following policies or guidelines:  (a) Commodity Trading Policy; (b) periodic Commodity Trading Compliance Training as reflected in the presentation dated January 23, 2012; (c) Inventory Risk Management Policy; and (d) an "Oversight Committee" for the Inventory Risk Management Policy.

2.      **<u>Implementation of Compliance and Ethics Program</u>**.  DFA will implement and maintain a compliance and ethics program designed to detect and prevent violations of the Commodity Exchange Act ("CEA").

3.      **<u>No Manipulation</u>**.  DFA will not transact in Class III milk futures contracts or Cheese Spot Call contracts, both listed on the Chicago Mercantile Exchange ("CME"), with the specific intent to manipulate the prices of such contracts.  For a period of two (2) years from the Effective Date of the Settlement, DFA will (a) only transact in such futures contracts for legitimate business purposes; and (b) buy or sell CME Cheese Spot Call contracts only after the proposed transaction is reviewed and approved by at least two (2) officers of DFA.

1

# Exhibit H

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| IN RE: DAIRY FARMERS OF AMERICA, INC. CHEESE ANTITRUST LITIGATION ) ) ) | Master File No. 09-cv-03690 MDL No. 2031 |
| THIS DOCUMENT RELATES TO: ) ) | The Honorable Robert M. Dow Jr. |
| DIRECT PURCHASER ACTION ) | |

**ORDER PRELIMINARILY APPROVING PROPOSED SETTLEMENT,
SCHEDULING HEARING FOR FINAL APPROVAL THEREOF, AND
APPROVING <u>THE PROPOSED FORM AND PROGRAM OF NOTICE TO THE CLASS</u>**

The Direct Purchaser Plaintiffs, having applied for an order preliminarily approving the

proposed Stipulation and Agreement of Settlement dated December 18, 2013 ("Settlement

Agreement" or "Settlement") with the Settling Defendants upon the terms and conditions set

forth in the Settlement Agreement, and the Court having read and considered the Settlement

Agreement and accompanying documents; and all Parties to the Settlement Agreement having

consented to the entry of this Scheduling Order ("Order"),

NOW, THEREFORE, this __ day of _____, 2014, upon application of the Parties to

the Settlement Agreement,

**IT IS HEREBY ORDERED** that:

1.      Except for the terms defined herein, the Court adopts and incorporates the

definitions in the Settlement Agreement for the purposes of this Order.

2.      Pursuant to Federal Rule of Civil Procedure 23, the Court hereby finds that the

requirements for a class action have been met and preliminarily certifies the following Class for

settlement purposes only:

1

All persons who between April 1, 2004 through December 31, 2006:
(1) purchased a CME Class III milk futures contract; (2) purchased a
CME Cheese Spot Call contract for either blocks or barrels; (3)
purchased cheese directly from Dairy Farmers of America, Inc.
("DFA") or Schreiber Foods, Inc. ("Schreiber") or made a first
purchase of cheese from a first manufacturer of cheese (*i.e.* a
manufacturer that transforms milk into cheese) pursuant to a contract
the price term of which specified that the price was based, in whole or
in part, on the CME Cheese Spot Call price (block or barrel price,
average price, specific price, price formula, collar price or any
variation that explicitly referenced the CME Cheese Spot Call price);
or (4) purchased milk directly from DFA or made a first purchase of
milk from a first producer of milk (*e.g.,* a dairy farmer) that was made
pursuant to a contract the price term of which specified that the price
was based, in whole or in part, on (i) the CME Cheese Spot Call price
(block or barrel price, average price, specific price, price formula,
collar price or any variation that explicitly referenced the CME
Cheese Spot Call price); (ii) the CME Class III milk futures price; (iii)
the National Agricultural Statistics Service ("NASS") cheese price; or
(iv) a government milk formula price which included (i), (ii) or (iii) as
a component of such government milk formula price.  Excluded from
the Class are the Settling Defendants, the Non-Settling Defendants,
and any parent, subsidiary, affiliate, or agent of any Settling
Defendant or Non-Settling Defendant.

3.    The Court hereby appoints Lovell Stewart Halebian Jacobson LLP as class counsel,

having determined that the requirements of Rule 23(g) of the Federal Rules of Civil Procedure

are fully satisfied by this appointment.

4.    Plaintiffs Indriolo Distributors, Inc., Knutson's, Inc., and Valley Gold, LLC are

hereby appointed as representatives of the Class.

5.    A hearing will be held on _____, 2013 at _____ [a.m./p.m.] [approximately 115

days after entry of this Order] in Courtroom 1919 of this Courthouse before the undersigned, to

consider the fairness, reasonableness, and adequacy of the Settlement Agreement (the

"Settlement Hearing").  The foregoing date, time, and place of the Settlement Hearing shall be

set forth in the mail notice and publication notice which is ordered herein, but shall be subject to

adjournment or change by the Court without further notice to the Members of the Class other

than that which may be posted at the Court, on the Court's website and/or the official settlement website.

6.      The Court reserves the right to approve the Settlement at or after the Settlement Hearing with such modifications as may be expressly consented to by all Parties to the Settlement Agreement and without further notice to the Class.

7.      Within seven days after the date of the entry of this Order, Lead Counsel shall cause copies of the long form notice, substantially in the form attached as Exhibit A to the Settlement Agreement, to begin to be mailed by United States first class mail, postage prepaid, to each of the following potential Class Members: (a) to all the "large traders" in the Chicago Mercantile Exchange ("CME") Class III milk futures contract during the Class Period whose names were obtained by the Direct Purchaser Plaintiffs pursuant to subpoena to the CME; (b) to all the firms who were clearing brokers on the CME during the Class Period whose names and addresses were obtained by the Direct Purchaser Plaintiffs pursuant to subpoena to the CME (such clearing firms shall forward copies of the long form notice to their customers who transacted in CME Class III milk futures contracts or CME Cheese Spot Call contracts during the Class Period or such clearing firms shall provide the names and addresses of such customers to the Direct Purchaser Plaintiffs and/or the Settlement Administrator); (c) to the customers of defendants Dairy Farmers of America, Inc. ("DFA") and Schreiber Foods, Inc. ("Schreiber") during the Class Period whose names and addresses were obtained by the Direct Purchaser Plaintiffs from DFA and Schreiber; (d) to the 100 largest dairy companies in the United States; and (e) any additional reasonably identifiable members of the Class. The foregoing mailings shall be completed by the later of twenty (20) days after the Scheduling Order is entered or seven (7) days after time by which any names and addresses are supplied to the Settlement

3

Administrator pursuant to any subsequent order of the Court requiring such names and addresses be provided to the Settlement Administrator.

8.     As soon as practicable after the mailing of the notice commences, Lead Counsel shall cause to be published a publication notice substantially in the form of Exhibit B to the Settlement Agreement in the following four publications and/or such publications' websites:  (a) Cheese Market News; (b) Dairy Foods; (c) The Cheese Reporter; and (d) Hoard's Dairyman.

9.     Lead Counsel shall also cause the long form notice to be published on a website established for purposes of this Settlement, www.DairyFarmersDirectPurchaserAction.com, within 10 days after the entry of this Order.  Both the long form notice and the publication notice will direct Members of the Class to the website where they can access the Settlement Agreement, this Order, the motion for preliminary approval, answers to anticipated questions about class action settlements, the Proof of Claim, the Request for Exclusion, and other information.

10.     The Court approves, in form and substance, the Class Notice.  The form and method of notice specified herein is the best notice practicable under the circumstances and shall constitute due and sufficient notice of the Settlement and the Settlement Hearing to all persons entitled to receive such notice, and fully satisfies the requirements of due process, Rule 23 of the Federal Rules of Civil Procedure, and applicable law.

11.     The terms of the Settlement Agreement are hereby preliminarily approved.  The Court finds that the Settlement Agreement was entered into at arm's-length by experienced counsel and is, in all respects, fair, reasonable and adequate, and in the best interests of the Class, including the Direct Purchaser Plaintiffs, such that notice of the Settlement Agreement should be given as provided in this Order.  The terms of the Plan of Allocation are preliminarily approved as within the range of reasonableness.

4

12.    Class Counsel shall file their motions for payment of attorneys' fees and reimbursement of expenses and for final approval of the Settlement at least 30 days prior to the Settlement Hearing.

13.    Any Member of the Class who objects to any aspect of the Settlement or the Final Order and Judgment, or who otherwise wishes to be heard, and who has not requested exclusion from the Settlement, may appear in person or by his or her attorney at the Settlement Hearing and present evidence or argument that may be proper and relevant; provided, however, that, except for good cause shown, no person other than Lead Counsel and counsel for the Settling Defendants shall be heard and no papers, briefs, pleadings, or other documents submitted by any Member of the Class shall be considered by the Court unless, not later than 23 days prior to the Settlement Hearing directed herein the objecting Member of the Class files the following with the Court and serves the same on or before such filing by hand or overnight mail on Lead Counsel and all counsel of record for the Settling Defendants:

(i) if a Member of the Class intends to appear and be heard at the Settlement Hearing, a written notice of intention to appear;

(ii) proof of membership in the Class;

(iii) a detailed statement of the objections to any matters before the Court;

(iv) a statement advising of any court proceeding in which said objector has made an objection to a proposed class action settlement within the past three years, including case name, docket number, and court;

(v) if a Member of the Class intends to appear and be heard at the Settlement Hearing, the grounds or reasons why the Member of the Class desires to appear and be heard; and

(vi) all documents or writings the Member of the Class desires the Court to consider.

5

14.     Any Member of the Class who fails to object in the manner described in Section 13 of this Order shall be deemed to have waived the right to object (including any right of appeal) and shall be forever barred from raising such objection in this Action or any other action or proceeding.  Discovery concerning any purported objections to the Settlement shall be completed no later than three days before the Settlement Hearing.

15.     Any request for exclusion from the Settlement by a Member of the Class must be made in writing, include all information requested in the "Request For Exclusion" attached hereto as Exhibit A, and be received by the Settlement Administrator no later than forty days before the Settlement Hearing.  Requests for exclusion that do not include all of the requested information will be held invalid.

16.     At least seven days prior to the Settlement Hearing, Lead Counsel shall cause to be served and filed a sworn statement attesting to compliance with the notice provisions in Sections 7-9 of this Order.

17.     All Proofs of Claim shall be submitted by Class Members as directed in the long form class notice no later than 60 days after the Settlement Hearing.

18.     To effectuate the Settlement Agreement and the notice provisions, the Court hereby approves Rust Consulting, Inc. (the "Settlement Administrator") to be responsible for:  (a) establishing a P.O. Box, information telephone line and website (to be included in the long form notice and publication notice) for the purpose of communicating with Members of the Class; (b) disseminating notice to the Members of the Class; (c) accepting and maintaining documents sent from Class Members including Proofs of Claim, and other documents relating to claims administration; (d) administering claims for allocation of funds among Members of the Class; and (e) acting as Escrow Agent for the Settlement Fund.

19.     The Settlement Agreement and any negotiations, statements, discovery or proceedings in connection therewith, shall not be construed or deemed evidence of, a presumption of, concession of, or admission by, any of the Released Parties or any other person of any fault, liability, or wrongdoing as to any facts or claims alleged or asserted in the Action or otherwise, or that the Direct Purchaser Plaintiffs, the Class, or any other Person, have suffered any damage attributable in any manner to any of the Released Parties.  The Settlement Agreement and any negotiations, statements, discovery or proceedings in connection therewith, shall not be construed or deemed evidence of, a presumption of, concession of, or admission or lack of merit of any of the claims in this Action.  The existence of the Settlement Agreement, its contents, and any negotiations, statements, discovery or proceedings in connection therewith, shall not be offered or admitted into evidence or referred to, interpreted, construed, invoked, or otherwise used by any person for any purpose in the Action or otherwise, except as may be necessary to enforce or obtain Court approval of the Settlement.  Notwithstanding the foregoing, all materials provided by Settling Defendants or any Released Party during the discovery process in the Action, either before or after the date of this Settlement Agreement, may be used by the Direct Purchaser Plaintiffs in their claims in this Action.

20.     If the Settlement is approved by the Court following the Settlement Hearing, a Final Order and Judgment will be entered as described in the Settlement Agreement.

21.     If the Settlement, including any amendment made in accordance with the Settlement Agreement, is not approved by the Court or the Effective Date does  not occur for any reason, the Settlement (including any modification thereof made with the express consent of all Parties as provided for in the Settlement Agreement), and preliminary certifications herein and any actions taken or to be taken in connection therewith (including this Order and any judgment

7

entered herein) shall be terminated and shall become void and of no further force and effect. In that event, neither the Settlement Agreement, nor any provision contained in the Settlement Agreement, nor any action undertaken pursuant thereto, nor the negotiation thereof or discovery provided solely in connection with the negotiations by any party, shall be deemed an admission or concession, or received as evidence in this or any other action or proceeding.

22.    The Court may, for good cause, extend any of the deadlines set forth in this Order without notice to Members of the Class.

23.    In the event that the Settlement Agreement is terminated in accordance with its provisions, the Settlement Agreement and all proceedings had in connection therewith shall be null and void, except as expressly provided to the contrary in the Settlement Agreement, and without prejudice to the *status quo ante* rights of the Parties.

24.    If the Settlement Agreement is terminated, not approved by the Court, or the Effective Date does not occur for any reason, the Court will modify any existing scheduling order to ensure that the Parties will have sufficient time to prepare for the resumption of litigation.

25.    Pending final determination of whether the Settlement should be finally approved, all Direct Purchaser Plaintiffs and putative Class Members and anyone who acts or purports to act on their behalf are hereby barred and enjoined from instituting, commencing or prosecuting any action asserting any Released Claims against the Released Parties, and any other action or proceedings brought by any putative Class Members asserting any Released Claims against the Released Parties are hereby stayed and suspended until further order of the Court. Provided, however, that this provision shall not apply to claims asserted in *Pizza Hut, Inc., et al. v. Dairy Farmers of America, Inc., et al.*, Case No. 1016-CV-27996 (Circuit Court of Jackson County,

Missouri at Independence) or *Unified Foodservice Purchasing Co-op, LLC v. Dairy Farmers of America, Inc.*, Case No. 52-459-334-11 (American Arbitration Association).

    26.    If any deadline imposed herein falls on a non-business day, then the deadline is extended until the next business day.

    **IT IS SO ORDERED.**

    Signed this \_\_\_ day of _____, 20\_\_, at the Courthouse for the United States District Court for the Northern District of Illinois.

_____
Hon. Robert Michael Dow, Jr.
United States District Court Judge

# Exhibit A

**MUST BE RECEIVED**
**NO LATER THAN** ▬▬▬▬

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| IN RE:  DAIRY FARMERS OF AMERICA, | ) | |
| INC. CHEESE ANTITRUST LITIGATION | ) | Master File No. 09-cv-03690 |
| | ) | MDL No.  2031 |
| THIS DOCUMENT RELATES TO: | ) | The Honorable Robert M. Dow Jr. |
| | ) | |
| DIRECT PURCHASER ACTION | ) | |

**REQUEST FOR EXCLUSION FROM CLASS ACTION SETTLEMENT**

*Complete This Form Only If You Choose <u>Not</u> To Participate In This Settlement*

**I.**     **Instructions**

1.     This "Request For Exclusion" may be used to exclude yourself from the partial Settlement in the above captioned class action.  If you wish to remain a member of the Class (as defined below), do not complete or return this Request For Exclusion.  Before deciding whether to request exclusion from the Settlement or take other action, make sure you have read the Notice of Partial Settlement of Action ▬▬, 2014 Hearing Thereon And Class Members' Rights ("Notice").

2.     In order to validly exclude yourself from the Settlement, you must complete, sign, and return this Request For Exclusion to the Settlement Administrator at the address set forth below.  Your Request For Exclusion must be <u>received</u> by the Settlement Administrator on or before ▬▬▬▬, 2014.

> Dairy Farmers of America, Inc. Cheese Antitrust Litigation Settlement
> c/o Rust Consulting, Inc.
> P.O. Box 2428
> Faribault, MN  55021-9128

3.     This Request For Exclusion adopts and incorporates the definitions in the Stipulation and Agreement of Settlement, dated December 18, 2013, which is available on the settlement website at www.DairyFarmersDirectPurchaserAction.com.

4.     In order to exclude yourself from the Settlement you must be a member of the following Class:

> All persons who between April 1, 2004 through December 31, 2006:  (1) purchased a CME Class III milk futures contract; (2) purchased a CME Cheese Spot Call contract for either blocks or barrels; (3) purchased cheese directly from Dairy Farmers of America, Inc. ("DFA") or Schreiber Foods, Inc. ("Schreiber") or made a first purchase of cheese from a first manufacturer of cheese (*i.e.* a

manufacturer that transforms milk into cheese) pursuant to a contract the price term of which specified that the price was based, in whole or in part, on the CME Cheese Spot Call price (block or barrel price, average price, specific price, price formula, collar price or any variation that explicitly referenced the CME Cheese Spot Call price); or (4) purchased milk directly from DFA or made a first purchase of milk from a first producer of milk (*e.g.,* a dairy farmer) that was made pursuant to a contract the price term of which specified that the price was based, in whole or in part, on (i) the CME Cheese Spot Call price (block or barrel price, average price, specific price, price formula, collar price or any variation that explicitly referenced the CME Cheese Spot Call price); (ii) the CME Class III milk futures price; (iii) the National Agricultural Statistics Service ("NASS") cheese price; or (iv) a government milk formula price which included (i), (ii) or (iii) as a component of such government milk formula price.  Excluded from the Class are the Settling Defendants, the Non-Settling Defendants, and any parent, subsidiary, affiliate, or agent of any Settling Defendant or Non-Settling Defendant.

## II.   <u>Background Information</u>

STATE OF            )
COUNTY OF           )

_____, being duly sworn, deposes and says:

1.     Please provide the following information:

Name of Person Requesting Exclusion:  _____

___ Individual ___ Corporation ___ Estate ___Other (specify) _____

Name of Person Executing Request For Exclusion:  _____

Capacity of Person Executing Request For Exclusion: _____

Address:  _____

Daytime Phone Number:  _____

Social Security or Tax Identification Number: _____

E-mail Address: _____

Nature Business: _____

## III.   <u>Information Concerning Certain Transactions</u>

Please provide the following information concerning certain transactions in (A) Chicago Mercantile Exchange ("CME") Class III milk futures contracts; (B) CME cheese spot call contracts; (C) physical cheese and/or (D) physical milk.

  A. **CME Class III Milk Futures Contracts**. Please identify below the volume of CME Class III milk futures contracts you purchased and/or sold during the Relevant Period (*i.e.*, May 4, 2004 – June 25, 2004 and September 1, 2004 through October 7, 2004). Please also identify below the volume of June 2004 CME Class III milk futures contracts you purchased and/or sold during the time period June 26, 2004 through July 2, 2004. Separately, please identify the number of May 2004 and June 2004 CME Class III milk futures contracts that you cash settled. For the avoidance of doubt, "sale" means, closing a long position and opening a short position and "purchase" means closing a short position and opening a long position.

    1. Number of CME Class III milk contracts <u>purchased</u> (a) between May 4, 2004 – June 25, 2004, inclusive: _____ (contracts) and (b) between September 1, 2004 – October 7, 2004, inclusive: _____ (contracts).

    2. Number of CME Class III milk contracts <u>sold</u> (a) between May 4, 2004 – June 25, 2004, inclusive _____ (contracts) and (b) between September 1, 2004 – October 7, 2004, inclusive: _____ (contracts).

    3. Number of June 2004 CME Class III milk contracts (a) <u>purchased</u> between June 26, 2004 – July 2, 2004, inclusive: _____ (contracts) and (b) <u>sold</u> between June 26, 2004 – July 2, 2004, inclusive: _____ (contracts).

    4. Number of May 2004 CME Class III milk contracts cash settled as a result of (a) closing a short position: _____ (contracts) and (b) closing a long position: _____ (contracts).

    5. Number of June 2004 CME Class III milk contracts cash settled as a result of (a) closing a short position: _____ (contracts) and (b) closing a long position: _____ (contracts).

    6. Were any of the transactions you identified above hedging transactions? That is, were any of your transactions in CME Class III milk futures contracts identified above acquired in connection with offsetting positions (in whole or in part) held in the cash or other derivative markets? YES ___ or NO ____.

  B. **CME Cheese Spot Call Contracts**. Please identify below the volume of CME cheese spot call contracts you purchased and/or sold during the Relevant Period (*i.e.*, May 4, 2004 – June 25, 2004 and September 1, 2004 through October 1, 2004).

    1. Number of CME cheese spot call contracts <u>purchased</u> (a) between May 4, 2004 – June 25, 2004, inclusive: _____ (blocks) / _____ (barrels) and (b) between September 1, 2004 – October 1, 2004, inclusive: _____ (blocks) / _____ (barrels).

2.      Number of CME cheese spot call contracts <u>sold</u> (a) between May 4, 2004 – June 25, 2004, inclusive: _____ (blocks) / _____ (barrels) and (b) between September 1, 2004 – October 1, 2004, inclusive: _____ (blocks) / _____ (barrels).

C.      **Physical Cheese Purchases**.  Please identify below (a) the volume of physical cheese you purchased from Dairy Farmers of America, Inc. ("DFA") or Schreiber Foods, Inc. ("Schreiber") during the Relevant Period and/or (b) the volume of your first purchases of physical cheese from a first manufacturer of cheese (*i.e.* a manufacturer that transforms milk into cheese) pursuant to a contract the price term of which specified that the price was based, in whole or in part, on the CME Cheese Spot Call price (block or barrel price, average price, specific price, price formula, collar price or any variation that explicitly referenced the CME Cheese Spot Call price) during the Relevant Period (*i.e.*, May 4, 2004 – June 25, 2004 and September 1, 2004 through October 1, 2004).

1.      Volume of physical cheese purchased from DFA or Schreiber (a) between May 4, 2004 – June 25, 2004, inclusive: _____ (pounds or dollars) and (b) between September 1, 2004 – October 1, 2004, inclusive: _____ (pounds or dollars).

2.      Volume of first purchases of physical cheese from a first manufacturer of cheese (*i.e.* a manufacturer that transforms milk into cheese) pursuant to a contract the price term of which specified that the price was based, in whole or in part, on the CME Cheese Spot Call price (block or barrel price, average price, specific price, price formula, collar price or any variation that explicitly referenced the CME Cheese Spot Call price) (a) between May 4, 2004 – June 25, 2004, inclusive: _____ (pounds or dollars) and (b) between September 1, 2004 – October 1, 2004, inclusive: _____ (pounds or dollars).

D.      **Physical Milk Purchases**.  Please identify below (a) the volume of physical milk you purchased from DFA during the Relevant Period and/or (b) the volume of your first purchases of physical milk from a first producer of milk (*e.g.,* a dairy farmer) that was made pursuant to a contract the price term of which specified that the price was based, in whole or in part, on (a) the CME Cheese Spot Call price (block or barrel price, average price, specific price, price formula, collar price or any variation that explicitly referenced the CME Cheese Spot Call price); (b) the CME Class III milk futures price; (c) the National Agricultural Statistics Service ("NASS") cheese price; or (d) a government milk formula price which included (a), (b) or (c) as a component of such government milk formula price during the Relevant Period (*i.e.*, May 4, 2004 – June 25, 2004 and September 1, 2004 through October 1, 2004).

1.      Volume of physical milk you purchased from DFA (a) between May 4, 2004 – June 25, 2004, inclusive: _____ (cwt or dollars) and (b) between September 1, 2004 – October 1, 2004, inclusive: _____ (cwt or dollars).

2.      Volume of your first purchases of physical milk during the Relevant Period from a first producer of milk (*e.g.,* a dairy farmer) that was made pursuant to a contract the price term of which specified that the price was based, in whole or in part, on (a) the CME Cheese Spot Call price (block or barrel price, average price, specific price, price formula, collar price or any variation that explicitly referenced the CME Cheese Spot Call price); (b) the CME Class III milk futures price; (c) the NASS cheese price; or (d) a government milk formula price which included (a), (b) or (c) as a component of such government milk formula price (a) between May 4, 2004 – June 25, 2004, inclusive: _____ (cwt or dollars) and (b) between September 1, 2004 – October 1, 2004, inclusive: _____ (cwt or dollars).

## IV.    <u>Certifications</u>

1.      I certify that I am a member of the Class as defined in Section I above.

2.      I certify that I have read the Notice which explains my rights with respect to the Settlement.  After reading the Notice, I have decided to opt out of the Settlement.  By opting out of the Settlement, I understand that I will not be eligible to share in the Net Settlement Fund. And I understand that by opting out I may independently pursue any claims I may have against the Settling Defendants at my own expense.

3.      I certify that I have taken reasonable efforts to locate all the information requested in Section III above.

4.      By signing below, I acknowledge that I am voluntarily excluding myself from the Settlement.

**I declare and affirm under penalties of perjury that the foregoing statements and the information provided herein are true, correct and complete.**

This Request For Exclusion was executed this _____ day of _____ 20____ in _____ (City), _____(State), _____ (Province), _____(Country).

_____
Signature of Class Member Requesting Exclusion

_____
Type or Print Name

_____
Capacity of Person Signing (*e.g.*, President, Trustee, Custodian, etc.)

If you are acting for an entity, please submit proof of your authority (*e.g.*, corporate resolution, trust agreement, etc.).

Sworn to before me this _____ day of _____, 20__
_____
       Notary Public

5