**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| IN RE: DAIRY FARMERS OF AMERICA, INC. | ) | |
| CHEESE ANTITRUST LITIGATION | ) | Master File No. 9 CR 3690 |
| | ) | MDL No. 2031 |
| | ) | |
| THIS DOCUMENT RELATES TO: | ) | Judge Robert M. Dow, Jr. |
| | ) | |
| Direct Purchaser Actions | ) | |

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court on Defendant Schreiber Foods, Inc.'s motion for summary judgment [430]. For the reasons set forth below, the Court grants Defendant Schreiber's motion for summary judgment [430].

**I.      Background**

This MDL action was reassigned from Judge Hibbler's docket to this Court's docket on April 30, 2012.

**A.      Procedural History for Direct Purchaser Actions**

Named Direct Purchaser Plaintiffs ("Plaintiffs") are Indriolo Distributors, Inc., a cheese distributor; Knutson's, Inc., a dairy farmer and Class III milk futures trader; and Valley Gold, LLC, a raw milk purchaser. Plaintiffs initially sued the following Defendants: Defendant Dairy Farmers of America, Inc. ("DFA"), a dairy marketing cooperative consisting of more than 18,000 dairy farmers in 48 states; Defendant Keller's Creamery LP, a butter manufacturer headquartered in Kansas City, Missouri, and wholly owned by DFA; Defendant Gary Hanman, the President and Chief Executive Officer of DFA from January 1, 1998 until December 31, 2005; Defendant Gerald Bos, the Chief Financial Officer of DFA from January 1, 1998 until

December 31, 2005; Defendant Frank Otis, the Chief Executive Officer of Keller's in 2004; and Defendant Glenn Millar, the Vice President of Procurement and Operations for Keller's in 2004.

The direct purchaser cases have been consolidated for pre-trial proceedings in this docket. The direct purchasers' amended corrected consolidated class action complaint ("initial complaint") [86] alleged that Defendants violated Sections 1 and 2 of the Sherman Act (Counts 1-3), violated the Commodity Exchange Act ("CEA"), 7 U.S.C. §1 et seq, (Count 4), were unjustly enriched at Plaintiffs' expense (Count 5), and violated the Racketeer Influenced and Corrupt Organizations Act ("RICO") (Count 6). The initial Defendants collectively filed motions to dismiss, which Judge Hibbler denied in part and granted in part [141 and 142]. All parties named in the initial complaint have reached a settlement with Plaintiffs. The Court has issued an order granting preliminary approval of the settlement and a fairness hearing is set for August 19, 2014.

On March 22, 2012, Plaintiffs filed a second amended class action complaint [245], which added Schreiber Foods, Inc. ("Schreiber") as a named Defendant and added a Cartwright Act claim under California law. Defendant Schreiber is an employee-owned manufacturer and distributor of natural cheese, process cheese, and cultured dairy products, such as cream cheese and yogurt, headquartered in Green Bay, Wisconsin. Schreiber moved to dismiss the second amended class action complaint. The Court granted in part and denied in part Defendant Schreiber's motion to dismiss, dismissing Counts 2 and 3 (monopolization and attempted monopolization in violation of § 2 of the Sherman Act) and allowing Plaintiffs to go forward with their claims arising under § 1 of the Sherman Act, 15 U.S.C. § 1 (Count I), § 22 of the Commodity Exchange Act, 7 U.S.C. § 25 (Count IV), and the Cartwright Act (Count V), as well

as a claim labelled "unjust enrichment and restitution" (VI).  Schreiber now moves for summary

judgment on these remaining claims.

**B.     Discovery**

This litigation has been going on for five years, and Schreiber has been a Defendant for at

least two.  Although Plaintiffs understandably have been preoccupied with settling the portion of

the case that relates to the DFA Defendants, Schreiber also understandably wants its role in these

events adjudicated.  To that end, in order to satisfy on the one hand Plaintiffs and DFA in pursuit

of an expeditious settlement and on the other Schreiber in pursuit of a declaration as to which

side of the "v" it belongs on, the Court set the parties on the path of "focused" discovery.

Fortunately for Plaintiffs, they have had in their possession for ample time documents

and deposition testimony from the Commodity Futures Trading Commission ("CFTC")

investigation.  Even if the CFTC investigation was focused on manipulation by Defendants, and

not a conspiracy including Schreiber, the massive amount of information collected, both in the

form of documents and depositions, undoubtedly provides a window into the conduct of the

relevant players in the market during the relevant time period.

Since the summary judgment motion was filed, Plaintiffs also have conducted additional

(albeit limited) Rule 56(d) discovery.[1]  Plaintiffs survived Schreiber's motion to dismiss because

of allegations that "high-level" Schreiber personnel had a high degree of communication with

---

[1]     Per this Court's referral, Magistrate Judge Valdez determined, in consultation with the parties, the
proper scope of the targeted Rule 56(d) discovery necessary for Plaintiffs to respond to Schreiber's
motion for summary judgment.  In making her determinations, Judge Valdez was guided by several
principles announced by this Court, including: (i) that the prior production of tens of thousands of
documents and the taking of fifteen depositions during the CFTC investigation, which occurred much
more contemporaneously than this litigation, likely provided Plaintiffs with most of the discovery that
they needed to contest summary judgment (and more documents than they possibly could use), and (ii)
that any remaining depositions should be focused on attempting to prove their allegations that high-level
DFA and Schreiber employees conspired to manipulate the price of spot cheese and milk futures traded
on the Chicago Mercantile Exchange.

"high-level" DFA personnel. Thus, after Schreiber filed its summary judgment motion, this Court initially (and Magistrate Judge Valdez subsequently) gave Plaintiffs leave to discover information regarding high-level Schreiber and DFA employees that might corroborate Plaintiffs' allegations that those employees agreed to coordinate their purchases of spot cheese on the Chicago Mercantile Exchange ("CME"). Plaintiff were given that discovery and then sought to depose additional employees who worked with those high-level employees, in the hopes of uncovering additional details about the sale of five million pounds of cheese from DFA to Schreiber. Both Magistrate Valdez and this Court concluded that there was no indication that additional depositions would reveal anything fruitful. As the Court previously noted in denying Plaintiffs' objections to Judge Valdez's 56(d) rulings, Plaintiffs deposed Gary Hanman and Larry Ferguson, the executives responsible for negotiating the deal, and Tom Goddard, the DFA employee responsible for implementing the deal. They also deposed Nancy Schwenke, the employee responsible for implementation on Schreiber's side. The Court also noted that the secretaries and purchasing personnel that were the subject of the protective order would be even less likely to provide useful testimony ten years after the events in question, as there are obvious limitations associated with taking depositions a decade after the fact. [2]

In total, Plaintiffs have taken twelve depositions of DFA employees, Schreiber employees, and third parties, reviewed the documents produced during the CFTC investigation,

---

[2] Judge Valdez allowed the depositions of Mr. Dunford and Ms. Van Dyke, even though she was skeptical that, ten years down the road, they would have any useful information to provide, and then allowed three depositions of individuals who were not engaged in high-level discussions. She allowed the depositions based on a nexus between them and the high-level employees who would have been involved in a conspiracy (per Plaintiffs' allegations), if one existed. For the remaining employees, the nexus was not sufficiently established, in part because Plaintiffs articulated nothing more than a hunch that these individuals might have relevant information (and in fact did not provide a single document linking these individuals to knowledge about a conspiracy) and further because the passage of ten years makes it even less likely that these individuals would have information relevant to establishing a conspiracy.

the transcripts of fifteen depositions taken by the CFTC, and additional documents and interrogatory responses from Schreiber and DFA produced in this litigation. As such, the fact that discovery on additional matters is not complete, at least in Plaintiffs' estimation, does not prevent the Court from resolving this central issue now. See *Cowen v. Bank United of Texas, FSB*, 70 F.3d 937, 941 (7th Cir. 1995) (noting the propriety of a defendant moving for summary judgment before class certification has been determined); see also *Chambers v. Am. Trans Air, Inc.*, 17 F.3d 998, 1002 (7th Cir. 1994) ("[T]he fact that discovery is not complete—indeed, has not begun—need not defeat the motion. A defendant may move for summary judgment at any time" (internal quotation marks omitted)). The Court believes that Plaintiffs have had more than enough time and access to conduct the discovery needed to support their allegations in response to Schreiber's summary judgment motion. In sum, the Court concludes that the management of discovery and dispositive motions has given both sides access to the relevant universe of materials and has equitably accounted for Plaintiffs' insistence that the fairness hearing on the motion for final approval of the class settlement proceed in a timely fashion and Schreiber's insistence that its status—as absent class member or alleged conspirator—be resolved prior to the fairness hearing.[3]

### C. The Parties' Fact Statements and Responses

Instead of filing a "concise" response to Schreiber's fact statements, Plaintiffs have submitted upwards of three-to-five-page responses to many of those fact statements, attempting to insert new facts into the record while also denying certain of Schreiber's statements. (In contrast, Schreiber's responses never exceeded one page and usually were limited to a concise

---

[3] Although this litigation has at times been somewhat contentious in regard to the merits—as high-stakes litigation often is—the Court commends the parties and their counsel for the highly professional approach they have taken to working with the Court and each other in setting and meeting the deadlines put in place to accommodate the parties' (and the Court's) desire for an efficient, orderly, and timely resolution of the complex issues presented on both the litigation and settlement fronts in this MDL action.

paragraph.)  Although many of Plaintiffs' responses are improper (see, *e.g., De v. City of Chicago*, 912 F. Supp. 2d 709, 715 (N.D. Ill. 2012) ("It is improper, and a violation of Local Rule 56.1, for the nonmoving party to add additional facts to his Local Rule 56.1(b)(3)(B) response"); *Prewitt v. United States*, 2012 WL 5381281 at *2 (N.D. Ill. Oct. 31, 2012)), in the interest of efficiency, the Court has reviewed and considered the entire 113-page response to Schreiber's fact statements.  However, it also is the function of the Court to eliminate from consideration any argument, conclusions, and assertions that are unsupported by the documented evidence of record offered in support of the statement.  Thus, to the extent that Plaintiffs' response (i) inserts facts not included in their own lengthy statement of additional facts, (ii) asserts legal conclusions, or (iii) suggests inferences as opposed to asserting a fact supported by the record, the Court has not considered those "facts," as they are not actually facts of record but instead are arguments that should be (and often were) made in the response brief.

### D.  Factual History

#### 1.  *Schreiber's industry presence and general practices in the industry*

In 2004, Schreiber sold more than 1.26 billion pounds of natural and process cheese to its customers, making it one of the largest cheese manufacturers and distributors in the world.  The natural cheese sold by Schreiber is produced directly from milk or is purchased in large blocks and then cut into smaller sizes and packaged for sale. The process cheese sold by Schreiber can be made with cheese produced from milk that Schreiber purchases, or it can be made from cheese purchased in 500-pound barrels.  Most of Schreiber's products are purchased for use by restaurants and other foodservice distributors or are produced as store brand ("private label") products for grocery stores.

During the first eleven of thirteen periods in fiscal year 2004, Schreiber purchased in the vicinity of 550 million pounds of bulk cheese, at a cost of approximately $1.2 billion. Most of Schreiber's cheese purchases were of block and barrel cheddar cheese. Schreiber purchased approximately 93 million pounds of that cheese from DFA, at a cost of approximately $179.9 million. DFA was Schreiber's second largest supplier in 2004, and Schreiber was one of DFA's largest customers. Schreiber also purchased about 1.2 billion pounds of milk in 2004 for use in the production of process cheese. By comparison, in fiscal year 2003, Schreiber purchased approximately 602 million pounds of bulk cheese, at a cost of approximately $841.5 million. Schreiber purchased approximately 116 million pounds of that cheese from DFA, at a cost of approximately $159 million.

Block and barrel cheddar cheese have different uses and come in different packaging (and also can have slight variations in moisture content and color). But to the undiscerning eye, they essentially are the same product: cheddar cheese. In 2004, Schreiber purchased most of its bulk cheddar cheese directly from suppliers, but it also purchased a small fraction (between 4-5 million pounds) of spot cheese on the Chicago Mercantile Exchange ("CME").[4]

The CME hosts the trading of commodity futures trading contracts, including Class III milk futures (Class III is the federal designation of milk used to make cheese and whey) and spot commodities, including spot block cheddar cheese, spot barrel cheddar cheese, and spot butter. Trading of spot block and barrel cheddar cheese is backed up by required immediate delivery of the commodity traded and cannot be cash-settled without the exchange of the underlying commodity. Each load of spot block or barrel cheddar cheese traded on the CME consists of 40,000 to 44,000 pounds of cheese. The CME spot block and barrel cheddar cheese markets

_____

[4] This figure represents less than one percent of Schreiber's total barrel cheese needs for 2004 and less than half a percent of Schreiber's total cheese needs for that year.

serve an informal "price discovery" function, and many cheese transactions in the wider market are priced based on the CME block and barrel cheese prices.

In 2004, trading in spot cheese on the CME usually occurred Monday through Friday for ten minutes per day on the trading floor of the CME through a process called "open outcry." Open outcry is a method of public auction for making bids and offers in the trading pits of a futures exchange. Observers of the open outcry in 2004 could see each bid, offer, or sale, as well as the brokers proposing them, and could react to activity or follow price or sales movements as they occurred. Trading is conducted by floor brokers on behalf of traders. Although the identity of traders is not disclosed during the trading session, frequent participants and observers of the spot cheese open outcry often could identify a trader based on the floor broker making the trade. The prices of the final consummated transactions or the final unfilled bids or offers during each trading session determine the respective closing prices of blocks and barrels each day.

According to the evidence of record, block packaging costs typically are three to three and a half cents higher per pound than barrel packaging costs, suggesting that packaging is a significant factor as to why blocks traded on the CME historically sell for about three cents more per pound than barrels. The differential between the CME block and barrel closing prices is known in the industry as "the spread." The actual spread, however, is not always three cents. The prices of blocks and barrels move independently, so the spread can fluctuate to levels above and below three cents. Additional factors, such as supply and demand, affect the spread. And, as explained below, the CME cheese markets are far from perfect in comparison to other traded commodities with a greater and more diverse number of participants. According to Schreiber, it has an interest in maintaining a three-cent spread, because a larger spread between blocks and barrels can be damaging to barrel cheese producers and producers of process cheese.

Milk sold in the United States usually is subject to either federal or state pricing orders that set the minimum price that processors must pay for milk. The calculation of the federal order price for milk sold for making cheese (Class III milk) is based indirectly on the historical average spread between block and barrel cheddar cheese. In essence, the federal government averages the market prices of block and barrel cheese after adding three cents to the barrel price to account for the assumed spread, then factors that number into the calculation of the minimum Class III order price. Thus, it is no surprise that the parties agree that the price of cheese is the most significant commodity component in the United States Department of Agriculture ("USDA") Class III milk price formula.[5]

Traditionally, the CME spot cheese markets are thinly traded, and the actions of a few participants can increase or decrease the price of block or barrel cheese without changing the price of the other. Despite the fact that millions of pounds of bulk cheddar cheese are sold in the United States every day, on many days few or no loads of spot cheese are traded on the CME at all. Participants in the spot cheese markets possess a diverse array of interests that often motivate their trading activity. For example, as a milk producer, DFA, during the relevant time period, had an interest in high cheese prices, which increased the price of milk. It was a frequent purchaser of cheese on the CME and regularly attempted to support or defend the block cheese price. By contrast, premium process cheese producers have an interest in low cheese prices,

---

[5] The cheese input price is based on price surveys conducted by the National Agricultural Statistical Service ("NASS") of large cheddar cheese manufacturers concerning their sales of block and barrel cheddar cheese. Thus, the NASS cheese survey price largely captures the CME cheese price. In fact, the NASS cheese survey price has a 98% correlation with CME spot cheese market prices when adjusted to account for the difference in timing between collecting price information and publishing survey results. According to studies by the University of Wisconsin, from January 2000 to January 2007, the cheese price component in the USDA Class III milk price formula has determined "upward of 83%" of the USDA price of Class III milk. In short, CME cheese prices impact USDA Class III milk prices and thereby necessarily impact CME Class III milk futures contract prices, which, again, "cash settle" to the USDA Class III milk price.

because they purchase barrel cheese at prices tied to the CME price but sell finished products at a fixed price well above the CME price. The lower the CME barrel price, presumably the higher their profit margins.

According to Schreiber, because it purchases around 1.2 billion pounds of milk to turn into process cheese every year, a large spread decreases Schreiber's profit on milk turned into and sold as process cheese.[6] As Schreiber COO David Pozniak explained when deposed by the Commodity Futures Trading Commission ("CFTC"):

> A. The -- The one plant that I mention where we make our natural cheese in Arizona, we buy milk there from a cooperative, and it would be a problem for us to buy, in essence, high priced milk if – if the spread was real high, if the blocks were real high relative to barrels, and then we took that milk and converted it into a low valued thing, like barrels, which we're doing. So that hurts us. That hurts the profitability of that plant.

> Q. Okay. And just to clarify that I understand what you're saying is[,] is that if the spread between blocks and barrels becomes too great, then it affects the price of Class III milk that you purchase to produce cheese, correct?

> A. Yes * * * by making the raw goods higher, the cost of the milk higher.

Similarly, Chris Herlache, a Risk Analyst and the Schreiber employee in charge of CME cheese trading during the relevant period, testified during the CFTC proceedings that it was to Schreiber's benefit to maintain a three cent spread and that it was a "general practice" at Schreiber. The testimony of record is that the spread between blocks and barrels therefore is a factor that Schreiber considers in making purchases of cheese. Obviously, other barrel and process cheese producers have a similar interest in the spread. Other factors that Schreiber considers include market conditions, current inventory and sales needs, the availability of cheese

---

[6] Schreiber also maintains that a large spread can cause cheese producers to divert more milk supply to blocks rather than barrels, thereby reducing the supply of barrel cheese; however, viewing the evidence before the Court, a question of fact remains as to whether Schreiber had a shortage of barrel cheese in 2004.

from other sources, and supply and demand projections. The record further reflects that Schreiber would purchase barrel cheese on the CME in a manner that would correct or maintain the spread.

### 2. Schreiber's CME activity in 2004

During 2004, Schreiber was one of the largest cheese distributors in the world. Higher CME cheese prices can (but do not always) benefit Schreiber's business. DFA was one of the largest sellers of milk in the United States and also benefits from higher CME cheese prices. In February, March, April, May, June, July, September, October, and December of 2004, Schreiber maintains that it purchased, attempted to purchase, or contemplated purchasing barrels on the CME in part[7] because of a desire to correct a spread larger than three cents or to maintain a spread of three cents.

On January 30, 2004, the spread was 7 cents. David Pozniak, Schreiber's President and COO of Global Sales and Development, oversaw the individuals who were in charge of making purchases in the cash and futures markets. On February 2, 2004, when the spread was 5.75 cents, Pozniak wrote to Chris Herlache, the Schreiber employee charged with conducting and supervising Schreiber's CME trading in 2004, "Chris, if there is any opportunity for us to help bid on barrels to close the gap then we should consider doing it especially since the markets are trending up and maybe its [sic] possible." On February 3, when the spread was 5 cents, Herlache responded, "If others are bidding I can try to get behind them. If there is a lot of selling interest, are we OK with buying a load or two? If not, I'll bid a little more cautiously." On February 5,

---

[7] As set forth *infra* page 12, the evidence also reflects that Schreiber bid on and purchased cheese in March 2004 in part so that the markets would rise enough that "Kraft would have to raise their prices on the shelf to create again a store brand and brand price difference."

when the spread was 4.25 cents, Pozniak responded, "[Y]es * * * okay with that plan." However, Schreiber ultimately did not purchase any cheese on the CME in February 2004.

On March 15, 2004, Pozniak sent an e-mail to Schreiber officers, stating:

They continue to go up. We helped today close the spread with barrels, otherwise the block market is moving up from others. Unless there are major objections by you, we will bid if necessary to get more cheese at least to the $2 ranger [sic] over the next few days. The thought would be to allow the markets to go high enough that Kraft would have to raise their prices on the shelf to create aain [sic] a store brand and brand price difference. We will employ this strategy beginning tomorrow unless we hear from you to the contrary, and why.

On March 16, 2004, Ron Dunford responded to Mr. Pozniak's e-mail stating: "Just one 'watch out' * * * our customers are not pleased with the current high pricing and will be even less pleased if they somehow find out that we are involve [sic] in helping drive the market up. Let's hope that the 'confidential trading' at the CME remains that way." Deborah Van Dyk, Schreiber's Vice President of Industry & Regulatory Affairs responded stating:

FYI – the industry is already talking about who is trading at the CME ("not the usual suspects"). I've had two inquiries (yesterday) asking about our trading and rationale. Within the industry it is well known who is trading at the CME. Therefore, if a customer wants to know who is actively trading it is very easy to find out. To Ron [Dunford's] point, if we need to have a Q&A prepared for sales to use for customer inquiries, the time is upon us.

On April 2, 2004, Chris Herlache e-mailed "Officers" stating:

As an update on the current tightness in cheese markets, I have attached a file detailing the CME cheese markets, and number of trades since the beginning of the year. Important points to take from this are:
1) Since the markets started taking off in March, there have been no trades, despite the high price.
2) This means the overall market supply of cheese is so tight that no one is willing to part with any cheese despite the very good profit they could make. If you have any questions on this, please let me know.

On April 21, 2004, the spread was 4.5 cents. Schreiber purchased 6 loads of barrels. On April 22, 2004, when the spread remained at 4.5 cents, Schreiber purchased 6 additional loads of

barrels.  On April 22, 2004, Schreiber employee Cheryl Glenzer provided Chris Herlache with a summary of the day's CME activity:

> Blocks closed unchanged at $2.20 with 2 sales to DFA. Sellers were Dairy State and Dean Management on offers. There was 1 bid left on board for $2.20 from DFA.

> Barrels closed unchanged at $2.1550 with 6 sales. [Schreiber] bought all 6 loads. All offers, no bids. RIC (Aaron thought this was Anderson) opened with $2.1600 offer.  Offer lowered to $2.1550.  Kraft, Bongards, and RIC then continued to put offers on board of $2.1550 or $2.1525 replacing an offer when [Schreiber] purchased one.

> Aaron made comment that he thought if [Schreiber] bought another 10-15 loads, we could possibly bring market back to $2.17.

If barrels had risen to $2.17, the spread would have been 3 cents.  Schreiber purchased 2 loads of barrels on April 23, 2004.  On April 27, 2004, the spread was 5 cents.  The next day, Schreiber purchased 4 loads of barrels.

Between May 4 and May 5, 2004, the spread grew from 3.5 cents to 11.5 cents.  On May 5, 2004, Schreiber purchased 2 loads of barrels at a price $2.04.  One other load of barrels traded at $2.05.  On May 11, 2004, the spread increased from 11.5 cents to 22 cents.[8]  Schreiber purchased 1 load of barrels at $1.95 on May 11, 2004.  One other load of barrels traded at $1.9775.  DFA bought all 5 loads of CME block cheese that traded.  The spread fell to 7 cents on May 12, 2004, before rising to 17 cents on May 13.  Seven loads of barrels were traded on May 13, 2004.  Schreiber did not purchase any.  The spread remained steady at 17 cents from May 13 through May 20, 2004.  One load of barrels was purchased on May 18, 2004, but not by Schreiber.

On May 20, 2004, when the spread remained at 17 cents, 6 loads of barrels were traded; Schreiber purchased 4 of these loads at $1.8275, $1.8300, $1.8300, and $1.8275.  The market closed at $1.8300.  On May 21, 2004, the price of blocks fell to $1.80, and the barrel price fell to

---

[8]    This 22-cent spread was the second largest CME block-barrel spread that ever had occurred on the CME up to that point.

$1.61.  Schreiber purchased 1 load of barrels at the closing price, and the spread grew to 19 cents.  Also on May 21, 2004, Herlache sent an e-mail to the President's Staff at Schreiber, detailing the day's activity on the CME:

> -Blocks and barrels were offered down aggressively right from the opening of the markets.
> -DFA had clearly stepped back and was allowing the market to move down.
> -Once blocks hit 1.80, DFA supported that level. It was in support of the 1.80 market that DFA made almost all of their purchases.
> -Barrels were basically moved along with the block market, although spread varied throughout the trading session * * * It appears this is in response to the April cold storage report that came out yesterday. The report did show inventories * * * * between .6% and 1% lower than last year, however, this decrease was smaller than expected. This may be why DFA decided to give some ground.

On May 24, 2004, the CME barrel cheese price increased 16 cents from $1.61 to $1.77 per pound.  Schreiber was the sole bidder in the CME barrel cheese market and was the sole purchaser.  The 16-cent increase in the CME barrel cheese price on May 24 caused the "spread" between CME block cheese and CME barrel to decrease from 19 cents to 3 cents.  The 16 cent decrease in the CME block-barrel spread price on May 24, 2004 was the largest decrease in the CME block-barrel spread price up to that time and is the third largest decrease observed on the CME.  On May 24, 2004, Schreiber placed several bids for barrels on the CME.  Its bids went unfulfilled until the barrel price rose to about three cents less than the block price, at which point Schreiber's bids were met for sales of two loads at $1.7700 and 1 load at $1.7650.  The spread reduced to 3 cents, where it remained through June 23, 2004.[9]

On May 25, 2004, 13 loads of barrels traded on the CME:  7 at $1.7675, 4 at $1.7700, 1 at $1.7650, and 1 at $1.7600.  Schreiber purchased all 13.  No blocks were traded.  The next day, Schreiber purchased 10 loads of barrels at $1.7700, 8 loads at $1.7675, 1 at $1.7600, and 1 at

---

[9] Schreiber testified before the CFTC that its barrel purchasing activity on the CME between May 25, 2004 and June 22, 2004 was motivated in part by a desire to maintain the spread by preventing offers of barrels by other traders from driving down the barrel price relative to the block price.

$1.7650.  On May 27, Schreiber purchased 2 loads of barrels at $1.7700, 1 at $1.7675, and 1 at $1.7600, and on May 28, Schreiber purchased 2 loads of barrels at $1.7625 and 1 at $1.7700.  On June 1, 2004, no barrels were traded, but DFA purchased 14 loads of blocks.

On June 1, 2004, Larry Ferguson, Schreiber's CEO, sent a letter to Craig Donohue at the CME, alerting Donohue to recent activity in the block and barrel markets and expressing concern about the spread and the lack of anonymity in trading:

> I am writing in reference to trades that were made on the cheese exchange on Friday, May 21 and Monday, May 24.  The barrel market fell $.20 and the block market fell over $.20. There was a spread between blocks and barrels on Friday of $.19. The cost of raw materials for these two products is exactly the same. I think is a clear indication to everyone in the dairy industry that the CME is not a decisive price discovery mechanism because of the small number of trades. Even more disturbing is that it seems all the brokers on the market are exchanging data of who is trading and why they are trading. I think this is very damaging to the price discovery process.

After Ferguson sent the letter, the trading on the CME in June 2004 proceeded with DFA and Schreiber purchasing 100% of the barrel and block cheese that was traded over the next few weeks.  On June 2, 2004, Schreiber purchased 1 load of barrels at $1.7600 and 2 at $1.7700.  The following day, no barrels were traded, however, DFA purchased 22 loads of blocks.  On June 4, Schreiber purchased 1 load of barrels at $1.7700 and 1 load at $1.7675, and on June 7, Schreiber purchased 2 additional loads of barrels at $1.7650 and $1.7700, respectively.   On June 8, Schreiber purchased 2 loads of barrels at $1.7600.  On June 9, no barrels were traded, but DFA purchased 11 loads of blocks.  On June 10, Schreiber purchased 1 load of barrels at $1.7700 and 1 at $1.7675.  On June 14, Schreiber purchased 2 loads of barrels at $1.7575, 1 at $1.7525, 2 at $1.7600, 1 at $1.7500, 2 at $1.7700, and 1 at $1.7650.  On June 15, Schreiber purchased 3 loads of barrels at $1.7700, 2 at $1.7675, and 1 at $1.7650.  On June 16, no barrels were traded, however, DFA purchased 17 loads of blocks; the following day, no barrels were traded but DFA

purchased 9 loads of blocks. On June 18, Schreiber purchased 1 load of barrels at $1.7700 and 1 at $1.7675. On June 21, no barrels were traded, however, DFA purchased 13 loads of blocks. On June 22, Schreiber purchased 4 loads of barrels at $1.7700, 1 at $1.7600, 1 at $1.7650, and 2 at $1.7675. On June 23, DFA did not make any bids for CME block cheese and did not accept the offers by another market participant (Glanbia) to sell CME block cheese at $1.80 or $1.780 per pound. Schreiber did not make any bids for CME barrel cheese and did not accept the offers by another market participant (Kraft) to sell CME barrel cheese at $1.77 or $1.575 per pound. DFA did accept two offers from Dairystates to sell CME block cheese at $1.700 and $1.605.

Also on June 23, 2004, Herlache sent an e-mail to Schreiber personnel regarding the drop in prices of block and barrel cheese on the CME:

> The decrease in cheese was a result of DFA no longer supporting the 1.80 block market. It is currently unknown why they chose today to pull their support, but I will pass on any information I do get. Block sellers were leading the decrease with barrels following to maintain a .03 spread.

By June 28, 2004, the price of CME barrel cheese had dropped thirty-seven cents to $1.40 per pound. No CME barrels traded from June 23 through June 28, 2004. By June 28, 2004, the price of CME block cheese had dropped forty-two cents to $1.38 per pound. Fewer than 10 CME blocks traded from June 23 through June 28, 2004.

On July 28, 2004, Schreiber purchased 2 loads of barrels. Herlache provided Pozniak and Nancy Schwenke, Schreiber's Vice President of Procurement,[10] with the following summary of that day's CME trading activity:

> Blocks were bid up again today by West Farm Foods. On the way up, West Farm had to purchase 2 blocks. As Blocks went up, we move the barrels to maintain the spread, but had to buy 2 barrels in the process. They were purchased at 1.47 and 1.48 (the market closed at 1.49). Both barrels were purchased from Bongards.

---

[10] Schwenke reported to David Pozniak, provided input to Chris Herlache, and served as Schreiber's Rule 30(b)(6) witness in this action.

Please let me know if there is any change in our plan to maintain the block/barrel spread.

On September 8, 2004, the spread was 5.75 cents.  Schreiber purchased 2 of the 5 barrels traded that day.  The spread fell to 4 cents on September 9 and 3.75 cents on September 10, then on September 14, it grew from 3.75 cents to 7.5 cents.  That same day, Schreiber purchased 4 loads of barrels.[11]  On September 15, the spread was 7.75 cents, and Schreiber purchased 2 of the 12 barrels traded that day.  On September 16, 2004, Schreiber purchased 1 load of barrels, and the spread closed at 3.75 cents.  Schreiber did not buy any cheese on the CME on September 17.

On September 17, 2004, Herlache sent an e-mail to Nancy Schwenke and Chip Smoot regarding Schreiber's CME activity:

> We purchased one more yesterday, but that should be it. With DFA supporting the 1.5675 level, the spread grew to around .10 on Tuesday before it was brought back to .0750. Throughout this past week, there has been a number of other companies also trying to correct the spread with us. On Wednesday, there were a total of 5 buyers for barrel. We're not sure what Davisco was trying to do here. One rumor what that they had some bad futures positions, and that they were trying to bring the market down so they could get out of them. If that was the case it didn't work, because the fact that there were so many buyers on Wednesday, the futures market actually rallied even though the barrels settled down a quarter cent. I've been working with David on this, and after Tuesday, we set the limit for Wednesday at 2 loads. Also, I have sold futures against these purchases to protect ourselves if the market would fall. On the block side, DFA bought all 21 loads that were traded today.

The spread grew to 4.75 cents on September 20, 2004 and to 6.5 cents on September 22, and Schreiber purchased 1 of the 7 loads of barrels traded on September 22, 2004.  Herlache

---

[11]  In a September 14, 2004 e-mail to Herlache—after Schreiber had purchased four loads of CME barrels—Schwenke asked:  "what are we doing Chris[Herlache]? I need inventory to go down, not up." In the same e-mail chain, Herlache responds the following morning, on September 15, 2004, and explains that the barrel-block spread had grown to 10 cents because DFA was supporting blocks at $1.5675. Herlache further explains that "[t]hroughout this past week, there ha[ve] been a number of other companies also trying to correct the spread with us."

provided the following summary of Schreiber's September 22 CME activity to a number of Schreiber personnel:

> We bought 1 barrel today @ $1.5100. We are not sure who sold the load, but think it is through a trading company like Killer Whale. Barrels were offered down aggressively today, (to a low of 1.4625) and we did not step in until after Hilmar and AMPI bought a few loads and looked like they were going to move the market back up. I then placed a bid behind 2 other bidders, and all 3 were sold.

The e-mail also noted that DFA bought all loads of blocks that were traded that day. On October 1, 2004, Herlache sent another summary of CME trading activity to Pozniak and Schwenke:

> DFA continues to buy blocks. They bought all 55 last week, and all 29 this week. This has resulted in a steady to higher market close each session this week. On the other hand, barrels were offered lower Monday, bid higher Wednesday, and then offered aggressively lower Thursday and Friday. The combination of lower barrels and higher blocks caused the spread grew to .1525 by the end of the week.

> I did not participate at all this week for a few reasons I want you to be aware of.

> 1) Based on conversations with our bulk cheese team, there seems to be some tightness in blocks, whereas barrel supply is more than sufficient for our current needs. So, by letting the spread grow, it encourages more block production, which is what we are in need of.
> 2) I do not want there to be the impression in the market place that we will be the only ones to come in and bring the spread back in line. In talking to our broker, I was getting the impression this was starting to take place.
> 3) Knowing that our inventories are long in barrel, and that the market should be poised to drop in the near future, I was weary of purchasing more barrels, only to have the market drop, and we are again sitting with high cost inventory.
> 4) There was no clear indication how many we were going to have to buy in order to maintain the spread. We could have ended up with a lot of cheese and still had the same end result.

On December 2, 2004, the spread had grown to 15.5 cents. On December 3, 2004, Pozniak wrote to Chip Smoot about the spread between blocks and barrels: "Because of the high spread, I think it's ok to go ahead and buy up to 3 loads today if it would help anybody in the market to close the spread. If the blocks begin to fall, ideally the market will fall with it and that

will be the way it goes. Whatever works out fine." Smoot replied: "We didn't buy anything today. Barrels did go up by $.04 and blocks stayed the same so the gap closed somewhat."

Schreiber and DFA purchased, respectively, 100% of the CME barrel cheese and 100% of the CME block cheese traded on the CME during the time period May 24 through June 22, 2004. In total, Schreiber purchased 79 carloads of CME barrel cheese (between 3,160,000 and 3,476,000 pounds) while DFA purchased 304 carloads of CME block cheese (between 12,160,000 and 13,376,000 pounds). Between approximately April 14 through July 6, 2004, Schreiber increased its barrel inventory and purchases significantly as a proportion of overall inventory. From April 13, 2004 to August 3, 2004, Schreiber's CME barrel purchases increased from zero pounds to 4.4 million pounds. Despite having an average barrel inventory of 7.4 million pounds from October 1, 2003 through April 13, 2004, Schreiber did not purchase from the CME until April 2004. In fiscal year 2004 (October 2013 to September 2014), Schreiber purchased 120 loads of CME barrel cheese. Of those 120 barrels, 107 barrels (or approximately 89%) were purchased between April 20, 2004 and June 22, 2004.[12]

### 3. DFA's CME activity in 2004

In 2004, Gary Hanman, Chief Executive Officer ("CEO") of DFA, made the ultimate decisions for DFA's purchases on the CME. Mark Korsmeyer served as DFA's President of

---

[12] The evidence of record, including from Plaintiffs' expert, is that March through June typically is an "inventory building period" in the cheese industry. Indeed, Schreiber was not the only firm building inventory during this period in 2004. The record also reflects that it was difficult to build inventory between January and April. In the spring of 2004, milk supply decreased substantially and cheese prices rose to record levels. Internal Schreiber documents at the time note that cheese was scarce and that, even at high prices, no seller would agree to fill any of Schreiber's CME bids. See, *e.g.,* April 2, 2004 internal Herlache e-mail ("1) Since the markets started taking off in March, there have been no trades, despite the high price. 2) This means the overall market supply of cheese is so tight that no one is willing to part with any cheese despite the very good profit they could make."). By March, Schreiber's cheese inventories were approximately 10 million pounds below their level in 2005 and 2006, and even by May, Schreiber's inventories were approximately 5 million pounds lower than usual.

American Dairy Brands, which was one of three business units under DFA's Dairy Food Products umbrella. American Dairy Brands was DFA's branded retail business, which included Borden cheese and the "typical retail grocer trade, the Wal-Mart Super Centers, the local HyVee type customers of the world." Korsmeyer reported to Sam McCroskey, who was the President of DFA's Dairy Food Products. Korsmeyer also gave orders with respect to Class III milk futures trading. Korsmeyer had "full business responsibility for American Dairy Brands," was responsible for its profits and losses of that division, and made all of the decisions with respect to American Dairy Brands. He also was responsible for the sales and marketing of finished products that the Dairy Foods Group produced.

Lavonne Dietrich, the Sales and Marketing Vice-President of DFA's Dairy Foods Group, reported to Korsmeyer. Dairy Foods Group also was one of three business units under DFA's Dairy Food Products umbrella and was DFA's food service and industrial cheese business, "which is the larger packaged products, services national chain accounts, the Taco Bells, the Outbacks, the TGI Friday's, Applebee's of the world, the restaurant trade." Tom Goddard, another DFA employee, participated in DFA CME cheese purchases on the phone and sometimes made the decisions whether or not to purchase cheese on the CME.[13] Elvin Hollon, Director of Fluid Marketing and Economic Analysis at DFA in 2004, "deal[t] with [DFA's] day to day transactions on the Chicago Mercantile Exchange and interact[ed] with [DFA's] broker each day on the market when the cash market is open."

On May 7, 2004, Hanman sent a memorandum to DFA personnel stating that DFA had, during the week beginning on May 3, 2004, "supported the [CME block cheese] market at $2.15." On May 21, 2004, Hanman sent another memorandum, stating that "It will be difficult

---

[13]   Goddard testified that he spoke to Schreiber at least once to get "their input as to where they thought the market should be or was going and how that would affect business."

to hold $1.80 for blocks if barrels stay at $1.61." That is, DFA had to "defend" the 19-cent CME block-barrel spread if it wanted to continue to "support" CME block cheese prices. Hanman further noted that defending a large spread was difficult with sellers like "Glanbia bringing blocks to the exchange to adjust the spread." The parties agree that Schreiber knew that DFA was supporting the CME block cheese market at $1.80.[14]

DFA employees, led by Hollon, attempted to track daily purchases and the identities of participants on the CME spot block cheese, barrel cheese, and butter markets. Typically they did so by matching the floor broker making a bid or offer with the trader that the broker usually represented. Hollon or other DFA employees who followed the open outcry on the CME regularly also sent out "Daily Cash Market" e-mails to "a wide range of people" from DFA that contained information purporting to identify the purchasers and sellers of block and barrel cheese and butter traded on the CME each day.

DFA also maintained a database in 2004 of all trades, bids, and offers in the spot cheese and butter markets and the purported identity of each trader, bidder, or offeror. Hanman also sent out fax transmissions containing charts summarizing activity on the CME ("Hanman Activity Charts") every week. The Hanman Activity Charts list the number of loads of block cheddar cheese, barrel cheddar cheese, and butter traded on the CME every week. The Hanman Activity Charts also identified or attempted to identify the seller and buyer of each load traded.

In his April 23, 2004 fax, Hanman wrote: "Twenty loads of barrels were traded this week.

_____

[14] Although market observers, including Schreiber, could see that DFA was supporting the block market at a high level, there is no direct evidence that Hanman communicated to Schreiber a request to raise barrel prices. Rather, as set forth above and below, the internal communications from both DFA and Schreiber fairly clearly indicate that neither side knew with precision what the other side was doing and rather that they were speculating about what moves the other would make and why. See, *e.g.*, June 23, 2004 internal Herlache e-mail regarding the drop in prices of block and barrel cheese on the CME ("The decrease in cheese was a result of DFA no longer supporting the 1.80 block market. It is currently unknown why they chose today to pull their support, but I will pass on any information I do get.").

Schreiber was the primary buyer * * * * There were 44 loads [of butter] traded during the week. We were the buyer of 18 loads; Rich Dairies (22) and Dreyers (16) were this week's biggest butter sellers." The accompanying Hanman Activity Chart notes that Kroger purchased 5 of the 20 loads of barrel cheese traded.

The May 21, 2004 Hanman Activity Chart identifies Hilmar as the supposed seller of 23 loads of block cheese and Glanbia as the seller of 5 loads on the CME during the week. It also identifies Schreiber as the purported purchaser of 5 loads of barrel cheese on the CME during the week. The fax transmission further notes:

> We opened the week with a 17¢ spread between blocks and barrels, and closed today with a 19¢ spread between barrels and blocks. It became obvious that we could not maintain the $2.00 block price – and defend a 17¢ spread between blocks and barrels with both Hilmar and Glanbia bringing blocks to the exchange to adjust the spread. It will be difficult to hold $1.80 for blocks if barrels stay at $1.61.

In his May 28, 2004 fax, Hanman wrote: "Today's barrel closing price of $1.77 was up 16¢ from last Friday's close. 43 loads of barrels were traded this week. Schreiber was the primary buyer." The May 28, 2004 Hanman Activity Chart identifies Schreiber as the purchaser of 36 loads of barrel cheese traded during the week, SAW as the purchaser of 7 loads, Bongards as the seller of 40 loads, and Misc. Brokers as the sellers of 3 loads.[15] DFA was mistaken as to the 7 loads attributed to SWA; Schreiber in fact purchased all 43 barrels for the week ending May 28, but purchased the 7 loads attributed to SWA through a broker other than the one whom Schreiber usually utilized.

The June 4, 2004 Hanman Activity Chart notes that 107 loads of block cheese were traded during the week and that 5 loads of barrels were traded during the same week. According

---

[15] The activity chart also purports to identify the purchasers of butter during the week as AgriTrading (11), Bert Lewis (3), California Dairies (6), DariGold (16), Grassland (8), Fulton's (1), Iowa Trading (7), ROZE (5), and Misc. Brokers (1), and to identify the sellers of butter as AgriTrading (2), Dreyers (21), HKI (4), Hoogwegt (3), Morningstar (Dean) (1), MINR (9), Rich Dairies (18), and ROZE (1).

to the Chart, Schreiber purchased 4 of the 5 loads of barrel cheese traded, and Glanbia purchased 1 load. The fax also notes that "all week Schreiber has been the defender of the barrel market – maintaining a 3[cent] spread between blocks and barrels. They again stepped up today and held the barrel market at $1.77." The June 4 chart also identifies the purchasers of butter during the week as AgriTrading (6), DariGold (39), Fulton's (1), and Iowa Trading (1), and the sellers as ConAgra (8), Dreyers (11), Fulton's (2), and Rich Dairies (20).

In his June 11, 2004 fax, Hanman wrote:

The CME block cheddar cheese market closed at $1.80 Thursday—unchanged from last Friday's close on 67 trades. We were the sole buyer of cheese this week. See the attached list for our best estimate of the sellers * * * * Thursday's barrel closing price of $1.77 was also unchanged from last Friday. Only 6 loads of barrels were traded this week—with Schreiber being the buyer.

The June 11 chart identifies the sellers of barrel cheese during the week as Glanbia (1), Kroger (4), and RIS (1). It also identifies the purchasers of butter during the week as AgriTrading (3), Bert Lewis (3), and DariGold (5), and the sellers of butter as Fulton's (1), Rich Dairies (9), and ROZE (1).

In his June 18, 2004 fax, Hanman wrote:

The CME block cheddar cheese market closed at $1.80 today—unchanged from last Friday's close on 82 trades. We were the sole buyer of cheese again this week. See the attached list for our best estimate of the sellers * * * * Today's barrel closing price of $1.77 was also unchanged from last Friday. Seventeen loads of barrels were traded this week—with Schreiber the buyer.

The June 18 chart provides DFA's "best estimate" of the sellers of block cheese as Jacoby (4), AgriTrading (4), Bongards (9), Jerome's (11), Dairystates (38), Kraft (8), Hilmar (6), and Kroger (2). It also identifies the sellers of barrels as Joe Gressel (1), and Kraft (16), the purchasers of butter as AgriTrading (11), Bert Lewis (3), California Dairies (1), DariGold (32), Grassland (8), and MINR (5), and the sellers of butter as Dreyers (16), JBJ Trading (1), Morningstar (Dean) (8),

MINR (20), Rich Dairies (10), and ROZE (5). 128.

The June 25 Hanman Activity Chart provides DFA's "best estimate" of the sellers of block cheese during the week as AgriTrading (3), Bongards (2), and Dairystates (13). It also identifies the sellers of barrels as Joe Gressel (2), Kraft (6), the purchasers of butter as AgriTrading (16), Bert Lewis (2), California Dairies (7), DFA (6), DariGold (41), Fulton's (5), Joe Gressel (1), Morningstar (6), Iowa Trading (1), and Dean (1), and the sellers of butter as ConAgra (11), Dreyers (25), Fulton's (3), Kroger (5), Morningstar (Dean) (4), Rich Dairies (37), and RIZ (1). The fax also noted that "[t]oday's barrel closing price of $1.46½ was down 30 ½[cents] from last Friday. Eight loads of barrels were traded this week – with Schreiber the buyer."

On May 18, 2004, Glenn Millar sent an e-mail to John Wilson and Frank Otis regarding conversations he had regarding the spread and its relationship to current and projected CME market activity:

> I talk to lots of brokers and cheese makers and will continue to forward their thoughts to you if you are interested. I truthfully tell them that I do[] not know dfa's target needs or prices and most of these folks talk to me to get a read on milk and butter.
>
> The Grainmiller guys think block buyers will get the same amount of chz at $2 as at any other price above $1.60. They volunteered that th[e]y too would buy at $2 if they had the needs and that $2.20 was probably too high.
>
> Jerry Dryer 'off the record' says any weakness now would be a bargain as chz will be much higher this summer.
>
> Hoogwegt's line level traders talk a lot to Schreiber and others in the barrel side and clearly they want the market lower. So they can drive it up later and take profits.
>
> All 3 of these groups stated, without prompting from me, that if blocks hold into mid next week the barrel guys will have to step in and close the spread. Some thought this might happen after 1-2 more showings of strength on the blocks.[16]

---

[16] Among other things, Grain Miller's, Inc. and Hoogwegt are dairy commodities traders, and Dryer is an industry analyst and publisher of the weekly e-letter *Jerry Dryer's Dairy & Food Market Analyst*.

On May 19, 2004, Wilson replied to Millar, "Thanks, Glenn. I welcome any intelligence."

On May 21, 2004, Frank Otis of Keller's wrote to Jerry Bos and John Wilson at DFA regarding his perception of how barrel purchasers would react to the current spread:

> What is alarms me about DFA letting the market drop to $1.80 is the fact that Barrels dropped a similar amount to $1.61, resulting in a spread that is pretty much equal to when blocks were at $2.00. Realizing that the Barrel guys cannot be happy about this wide spread, the question that needs to asked is how long do they (barrel guys as well as other block guys) want these cheese markets and how long with the barrel guys let this spread between the blocks and barrels remain before they start buying?

On May 22, 2004, Glenn Millar sent an e-mail to John Wilson regarding his perceptions of the futures and spot cheese markets:

> As I stated in my voicemail response, I agree that trading June for Sept is a good idea. However, I don't want to buy Monday or Tuesday since the $1.80 might get broken. The July-Sept contracts are basically dead money right now. They won't rise with defense of $1.80 but they might fall if $1.80 does. My main concern if blocks go to $1.80 is barrels going to $1.40. I agree with you John that stability is needed, right now all we are doing is telling the market that we will fold under pressure- *which means the barrels don't have to take a position.*
>
> John, not to offend in any way, but as we move forward I will update you and Frank with what the markets are telling us, I relied too heavily on DFA doing something that looks impossible, from hindsight. Hindsight sucks! I think you guys are on the right track by not using up all your ammo trying to hold $1.80 or $2+ as long as you have the ability to bring it back up this summer. If you don't then fire all the ammo now and buy time for us to get out of class III's.

The parties agree that DFA regularly sought to defend or support the CME block market because of the impact that it had on the prices that its dairy farmers received for milk. DFA's actions were well-known in the industry, and it was widely reported that DFA was the primary purchaser of block cheese in May and June of 2004. For instance, the May 7, 2004 issue of *Dairy & Food Market Analyst* reported:

> In the cheese market, Dairy Farmers of America bought all 49 loads of blocks traded this week, according to several sources. 'They are the sole buyer. Without DFA, the market would be trading at $1.85, maybe lower,' a knowledgeable

trader told me. If the block price holds, there is probably limited downside for barrels over the short term.

In a similar vein, on May 11, 2004, Sam Khoury, a purchaser for Taco Bell, forwarded DFA employees Mark Korsmeyer and Lavonne Dietrich the *Dairy & Food Market Analyst* report and asked Korsmeyer, "[W]hy the aggressive buying on the CME?"

Also in May 2004, Dairy Marketing Services reported that "**DFA has worked hard to maintain 40-lb block prices at the high range of market acceptability. They have been the buyer of almost all of the blocks trading on the cash exchange. Although DFA has the ability to nudge prices higher within a narrow range determined by supply and demand, it cannot defy market realities**." (Emphasis in original.)

Similarly, the June 4, 2004 issue of *Dairy & Food Market Analyst* reported:

Dairy Farmers of America bought 107 car loads of blocks at the CME this week, according to my sources. That left the price unchanged for the week and, in fact, for the past 10 trading sessions. DFA has bought 272 loads of blocks at the CME since the first of May. During this timeframe, the price has moved from $2.15 to $2.00 where it held for seven sessions before retrenching to $1.80. Almost everyone I've talked to this week is convinced that huge volumes of cheese will continue to move to the Exchange over the next several weeks * * * * At least seven different sellers brought cheese to the Exchange this week * * * * The barrel market went virtually untested this week. Just five loads changed hands.

Then, on June 11, 2004, *Dairy & Food Market Analyst* reported: "The purported buyer (Dairy Farmers of America) of all of the blocks offered for sale this week remains convinced that cheese supplies will be tight this fall."

4.     *Communications between DFA and Schreiber*

It was common for DFA to speak with its customers about market conditions, including conditions on the CME spot markets. DFA was one of Schreiber's largest suppliers, and, as set forth in detail below, DFA and Schreiber employees communicated regarding such matters as pending and proposed transactions, purchasing and sales needs and projections, market trends

and developments, quality issues, and complaints or other input from downstream customers. As repeatedly pointed out by Plaintiffs, Schreiber and DFA also were competitors.

Hanman was on the Board of Directors of Schreiber from the late 1980s to the early 1990s. By 2004, Hanman and Schreiber's CEO, Larry Ferguson, had long known one another and had met in private with one another to resolve issues from time-to-time. As set forth above, the record reflects that Hanman kept track of Schreiber's purchases of barrel cheese between May 24, 2004 and June 22, 2004, by reviewing charts prepared by DFA employees that attempted to track the identity of each buyer, seller, bidder, and offeror on the CME spot cheese and butter markets throughout all of 2004. Plaintiffs admit that DFA and Hanman used the charts to track Schreiber's CME positions; however, Plaintiffs also highlight meetings and conversations between DFA and Schreiber executives from April 28 to June 2004. In total, between April 28 and May 26, 2004, Schreiber's top executives and DFA's top executives met five times, on April 28, April 30, May 1, May 11, and May 26.[17]

For instance, on April 28, 2004, Hanman and Ferguson met at DFA's offices. Hanman does not recall meeting or what was discussed; Ferguson claims that the men discussed a patent infringement lawsuit.[18] Then, on April 30 and May 1, 2004, Hanman hosted an event in Louisville, Kentucky, which Ferguson and others attended. Ferguson testified that it was a social event and the men tried not to discuss business. Hanman did not recall what, if anything, they spoke about.

---

[17] On May 26, 2004, Korsmeyer, McCroskey and Pozniak met in Chicago regarding "Rabobank." Schreiber contends that the meeting was about a potential joint venture. No additional evidence has been presented by the parties about the substance of this meeting.

[18] In 2002, Schreiber sued DFA for patent infringement. On April 28, 2004, Larry Ferguson and Gary Hanman met to negotiate a settlement. Although a tentative settlement proposal was reached at that meeting, the suit was not finally settled for another year.

On May 11, 2004, Hanman, Mark Korsmeyer, and Sam McCroskey took a private jet to Green Bay, Wisconsin, where they met with Ferguson and David Pozniak in Schreiber's offices in Green Bay, Wisconsin.[19] Hanman's travel arrangements were made on April 29, 2004. The fact that DFA chartered a plane for the quarterly meeting was, according to Hanman, "an unusual thing" and that "there must have been some conflict somewhere in order to justify this cost." However, DFA and Schreiber typically conducted their quarterly meetings at one or the other's headquarters.

The first "Discussion Topic" on the agenda for the May 11 meeting was "market conditions & forecasts." Schreiber admits that DFA would start each quarterly meeting with its forecast on the CME market. According to Ferguson,

> [DFA] always give us their forecast on the CME market. Those were combined with Mary Ledman and Blooming. It's Blooming something, but we used DFA's forecast with other forecasts, combined them to give a customer forecast. Customers depended upon us to provide them market forecasts and we used, we combined their forecast with other people's forecast to communicate with customers.

Hanman testified that during these meetings he and Ferguson typically "would visit about" "how you read the markets," such as:

> Are these present price levels going to hold for cheese? How – how do you see the marketplace itself? Because they were big in the market, not so much on the production side. We were the – we were the milk suppliers that made cheese, so we had a feel for that. And he was on the marketing and sales side of cheese and he had a feel for that. And so those are the kinds of discussions he and I would have.

Conversely, Ferguson testified that "I don't recall us ever giving DFA a forecast because our, we're not forecasters. We're cheese manufacturers."

---

[19] Korsmeyer and David Pozniak were friends and their families were friends. Pozniak testified that he had conversations about the "markets in general" with Korsmeyer and other people in the cheese and dairy business.

DFA and Schreiber also communicated with one another regarding a concept referred to as the "One Market." On January 21, 2004, Pozniak e-mailed Deborah Van Dyk, Schreiber's Vice President of Industry and Regulatory Affairs, about his communications with DFA regarding "One Market":

> We talked with Gary Hanman and Sam McCroskey with regard to the One Market. The [sic] indicated that John Wilson will be your contact at DFA regarding The One Market. DFA will certainly be supporters of this One Market concept. Let's get started on the action plan. They liked the fact that you are going to lead this.

According to Hanman, the "One Market" concept was a "movement within the [] industry to only have one market on the CME." And Schreiber was the "primary pusher" of the "One Market" concept. John Wilson, who was Van Dyk's contact at DFA regarding "One Market," testified that the "One Market" concept was "about having a single market for cheese at the CME and eliminating the trading of barrels." Pozniak knew of this and had arranged for Van Dyk to help DFA in this respect.

In another communication between DFA and Schreiber, on May 13, 2004, Elvin Hollon of DFA e-mailed Van Dyk as follows: "I may be getting an audience at the CME on the replacement cheese issue in the next week or so. I may want you to make a call. Who do you clear trades thru?" On May 17, 2004, Ms. Van Dyk responded to Hollon's e-mail by providing the name of Schreiber's clearing firm and by providing confidential information in the form of the name of Schreiber's CME spot cheese broker: "We clear through Downs O'Neil – broker is usually Neil Kelne. Let me know if you want my support."[20] Hollon responded, "I'll try to call you after my 'prep call' with Mike Downes [of Downes O'Neill (Schreiber's clearing firm)] & the attorney at 1:30 today."

---

[20] Schreiber agrees that these facts are not in dispute, except that Ms. Van Dyk provided an incorrect name: Aaron and Nicholas Kelne were Schreiber's floor traders, and no person named Neil Kelne was a floor trader for Schreiber.

On May 17, 2004, Van Dyk reported her communications with DFA to Dave Pozniak:

> I talked with DFA today. We are working together to insist that the CME abide by their rules. One issue has been that when cheese is refused (due to grading, etc) replacement product has not been from the same time as the product that caused the change in the market price * * * * There will be a meeting on Thursday [May 20, 2004] at the CME with an attorney for DFA and the CME to discuss the cheese replacement issue. At this time, DFA will be represented by their attorney. I expect to receive a call from the attorney for support on the issue.

Plaintiffs also contend that DFA's Hollon reached out to Schreiber to discuss selling steel barrels. John Wilson "suspect[ed]" that Hollon reached out to Schreiber, but also noted that he probably reached out to "lots of other industry participants about the various issues that would have included steel barrels."

On May 25, 2004, Tom Goddard sent an e-mail to Korsmeyer and Dietrich, reflecting his conversations with certain DFA customers and CME market participants, including Schreiber, about "comments relative to current market levels":

> Great Lakes Cheese – Kurt Epprecht – 5/21/04 p.m.: Per Kurt, "at $1.70 to $1.80 Block Market their customers feel could work." Kurt expects markets could go back up this summer.

> Jerome Cheese – Troy Ammann – 5/24/04 a.m. (before CME session): Troy speculated "Block Market pretty close to acceptable levels but may need to go down between $1.60 to $1.70." Troy expects the Block Market will go back up in next 6 to 8 weeks. "Some buyers may sit on the sidelines until *levels out for several days*." (emphasis in original)

> Glanbia Cheese – Dave Snyder – 5/24/04 a.m. (before CME session): Dave expects Block Market to go back up in 30 to 45 days to $2.00 peak. Over $2.00 scares off buyers.

> Schreiber Foods – Clinton, MO – Clayne Higley (buyer) – p.m. (after CME session): Per Clayne it will be three weeks before benefit of lower CME Block Market realized by [Schreiber]. [Schreiber]/customers need that much time to work through inventories held at higher market values before new orders/demand reflect lower CME prices.

> AMPI – Jim Walsh – 5/24/04 p.m. (after CME session): Per Jim, "industry believes DFA going to buy CME Blocks at $1.80 unless get buried." Recent

futures have influenced buyers to hold off on purchases for lower CME Block Market prices. $1.80 much closer to futures values vs. $2.00 and could attract demand.

Masters Gallery – Chris Gentine – 5/24/04 p.m. (after CME session): Chris thought "$.40 slide in past three weeks adequate and barrels up on today['] s CME Barrel Market a good sign. Need to let market settle out."[21]

In addition to meetings and written correspondence, the parties agree that DFA and Schreiber employees communicated regularly by phone between May and June 2004. There is little, if any, detail in the record as to the substance of these phone calls.

<blockquote>5.    <em>Stability (or the lack thereof) on the CME block and barrel markets</em></blockquote>

The parties agree that extreme fluctuations and periods of extended price stability are both relatively common on the thinly traded CME block and barrel cheese markets. Aside from the flat line of $1.80 for 21 trading days from May 21 to June 22, 2004 (the period on which the complaint focuses), block prices have flat lined numerous times between 2000 and the present, including for:

- 62 trading days from July 31 to October 27, 2003;
- 18 trading days from July 17 to August 9, 2001;
- 17 trading days from January 21 to February 14, 2000, from March 31 to April 24, 2003, and from November 14 to December 10, 2003;

---

[21] Schreiber points out that DFA discussed pricing with other customers. For instance, on May 24, 2004, Steve Vesce of American Dairy Brands wrote to Mark Korsmeyer of DFA regarding Korsmeyer's request that Vesce "poll[] a few private label customers and retailers for optimum barrel/block pricing and here seems to be the consensus":

Private Label: Optimum markets around the $1.10 mark as this would allow PL to be promoted with significance and still make a margin for the retailer. These guys like to promote at 2/$3.00 or $1.49

Retail: A different but predictable answer is that they think a $1.30ish mark is best for them as this takes the swings out and allows for consistent pricing and still gives them the margin they are looking for.

In a similar vein, on June 24, 2004, Chris Hanson of Carlson Restaurants Worldwide, one of DFA's customers, sent an e-mail to Lavonne Dietrich of DFA, asking: "Lavonne, What's the story on the block and barrel market trending down right now?"

- 15 trading days from December 28, 2005 to January 19, 2006 and from July 7 to 27, 2006;
- 14 trading days from March 3 to 20, 2003;
- 13 trading days from April 6 to 25, 2006, and again for 10 trading days from April 27 to May 10, 2006 (on every day from April 6 to May 10, 2006, the price of cheese was at $1.16 per pound, except April 26, when it was at $1.165 per pound);
- 13 trading days from July 21 to August 6, 2010;
- 11 trading days from August 29 to September 17, 2001, from March 6 to 20, 2002, from September 16 to 30, 2005, and from December 19, 2011 to January 3, 2012;
- 10 trading days from August 10 to 23, 2001 (in the 38 trading days between July 2 and August 23, 2001, the price of blocks only changed twice), from May 21 to June 4, 2003, and from December 23, 2004 to January 6, 2005;
- 9 trading days from October 20 to November 1, 2000, from July 2 to July 13, 2001, from July 5 to 19, 2005, from November 4 to 16, 2005, from December 7 to 17, 2009, from June 17 to 30, 2011, from August 29 to September 8, 2011, from May 11 to 23, 2012, from October 3 to 15, 2012, and from January 24 to February 5, 2013;
- 8 trading days between November 16 and 29, 2012, and the next 9 trading days between November 20 and December 12, 2012; and
- 8 trading days from June 16 to 27, 2000, from July 15 to 25, 2003, from April 14 to 23, 2004, from January 31 to February 9, 2006, from January 31 to February 9, 2006, from December 5 to 15, 2006.

Similarly, in the CME barrel market, aside from the flat line at $1.77 for 20 trading days from May 24 to June 22, 2004 (the period on which the complaint focuses), barrel prices have flat lined the following times since January 1, 2000:

- 18 trading days from January 6 to 30, 2004;
- 16 trading days from July 10 to August 1, 2001;
- 15 trading days from April 3 to 24, 2003 and from August 18 to September 8, 2003;
- 14 trading days from April 24 to May 11, 2000, from August 24 to September 17, 2001, and from September 21 to October 8, 2010;
- 13 trading days from October 13 to 31, 2000;
- 12 trading days from March 6 to 21, 2002 and from December 27, 2005 to January 12, 2006;
- 11 trading days from September 11 to 25, 2003, from August 2 to 16, 2004, and from December 4 to 17, 2009;
- 10 trading days from May 31 to June 13, 2001, from December 6 to 19, 2002, from October 26 to November 8, 2004, and from June 28 to July 13, 2005;

- 9 trading days from December 4 to 14, 2006 and 11 trading days from December 15, 2006 to January 3, 2007 (for the month between December 4, 2006 and January 3, 2007, prices changed once);
- 9 trading days from February 15 to 28, 2000, from February 5 to 15, 2002, from December 27, 2004 to January 7, 2005, from August 19 to 31, 2005, from February 24 to March 8, 2006, and from June 21 to July 5, 2006;
- 8 trading days from June 26 to July 6, 2012, and another 8 trading days from October 4 to 15, 2012; and 8 trading days from January 10 to January 20, 2000, from February 22 to March 5, 2002, from October 22 to 31, 2002, from July 31 to August 11, 2003, from December 8 to 17, 200, from April 21 to May 2, 2006, from May 17 to 26, 2006, and from October 24 to November 4, 2008.

In light of these statistics, Plaintiffs point out that both block and barrel prices were constant during the period on which the complaint focuses, while during the remainder of the 2000-2014 period, there was no other period in which both prices were constant for 20 days.

Schreiber also points to extended stagnation in the spread. Aside from the 21-day flat line in the spread from May 24 to June 23, 2004, since 2000 the spread has flat lined:

- 15 trading days from August 19 to September 8, 2003, from April 3 to 24, 2003, and from August 19 to September 8, 2003;
- 13 trading days from August 29 to September 19, 2001;
- 12 trading days from July 18 to August 1, 2001;
- 11 trading days from December 28, 2005 to January 12, 2006 (between December 28, 2005 and January 24, 2006, the spread changed once);
- 11 trading days from March 6 to 20, 2002 and from September 11 to 25, 2003;
- 9 trading days from October 15 to 27, 2004 (between October 15 and November 8, 2004, the spread changed once);
- 9 trading days from February 16 to February 28, 2001, from May 28 to June 6, 2003, from June 16 to June 28, 2006, from December 7 to 17, 2009, from August 6 to 18, 2010, and from October 4 to 16, 2012; and
- 8 trading days from October 20 to 31, 2000, from July 31 to August 11, 2003, from February 27 to March 9, 2004, from December 17, 2004 to January 6, 2005, from March 12 to 23, 2010.

Large spreads also occur with some frequency. Since 2000, spreads above 17 cents have occurred on multiple occasions, including July 30, 2008 (32 cents), December 21-22, 2009 (27 cents), December 18, 2009 (26.25 cents), December 3-4, 2009 (25.75-26 cents), December 7-17,

2009 (24 cents), December 2, 2009 (22.75 cents), August 14, 2000 (22.5 cents), August 11, 2000 (21.5 cents), November 26, 2003 (21 cents), December 1, 2003 (21 cents), August 15-18, 2000 (19-19.75 cents), November 25, 2003 (18 cents), and December 1, 2009 (18 cents).

Large fluctuations in CME prices during a single day also are not unusual. According to data on the Daily CME Barrel Cheddar Cheese Price compiled by Understanding Dairy Markets, aside from the 16 cent increase in the barrel price on May 24, 2004 and the 19.5 cent decrease on June 23, 2004 (the period on which the complaint focuses), the barrel price changed 28 cents on July 30, 2008, 22.75 cents on December 18, 2007, 22.5 cents on December 11, 2008, 22 cents on May 21, 2004, 20 cents on December 13, 2004, 16.75 cents on March 12, 2004, 16.5 cents on three occasions in 2008 and 2012, 15.75 cents on October 6, 2004, 15 cents on July 31, 2008, 14.5 cents on November 5, 2003, and 14 cents on September 30, 2008. Similarly, the figures for Daily CME Block Cheddar Cheese Price from Understanding Dairy Markets reflect that aside from the 20 cent and 19.5 cent decreases in the block price on May 21 and June 23, 2004, the block price changed 28 cents on December 13, 2004, 20.25 cents on December 6, 2004, 19.25 cents on November 29, 2007, 18 cents on December 11, 2008, 16 cents on March 12, 2004, 15.5 cents on June 25, 2004, 15.25 cents on November 18, 2011, 15.25 cents on January 7, 2008, 15 cents on May 12, 2004, 14.5 cents on December 21, 2007, 14.25 cents on March 3, 2004, and 14 cents on March 23, 2012..

Schreiber's daily average purchases of CME barrel cheese during the May 24 through June 22, 2004 time period (approximately 3.95 loads per trading day) were approximately 20.8 times larger than Schreiber's historical eight-year daily average of 0.19 loads per trading day (excluding the May 24 through June 22, 2004 time period) during the time period from January 1, 1999 through December 31, 2006. Schreiber's daily average purchases of CME barrel cheese

during the May through June 22, 2004 time period were approximately 4.6 times larger than the historical eight-year daily average of 0.86 loads per trading day for entire CME barrel market (excluding Schreiber). Schreiber's purchase of 100% of the CME barrel cheese traded on the CME during the May 24 through June 22, 2004 time period is approximately 5.4 times greater than Schreiber's historical eight-year average purchases of approximately 18.4% of the CME barrel cheese traded on the CME (excluding the May 24 through June 22, 2004 time period).

DFA's daily average purchases of CME block cheese during the May 24 through June 22, 2004 time period (approximately 15.2 loads per trading day) was approximately 11.4 times larger than DFA's historical eight-year daily average of approximately 1.33 loads per trading day (excluding the May 24 through June 22, 2004 time period) during the time period from January 1, 1999 through December 31, 2006. DFA's daily average purchases of CME block cheese during the May through June 22, 2004 time period (approximately 15.2 loads per trading day) was approximately 12.6 times larger than the historical eight-year daily average of 1.2 loads per trading day for entire CME block market (excluding DFA).

The twenty-one (21) trading day flat-line in the CME block-barrel spread from May 24 to June 23, 2004 is an all-time record during the time period January 1, 1998 through the present. The twenty (20) trading day flat-line in the CME barrel market from May 24 to June 22, 2004 is an all-time record during the time period January 3, 2000 through the present. The twenty-one (21) trading day flat-line in the CME block market from May 21 to June 22, 2004, is the second longest flat line during the time period from January 3, 2000 through the present.

6.    *DFA's inventory reduction plan*

In the summer of 2004, DFA conceived a plan to reduce its inventory by at least 25-30 million pounds, which DFA called an "Inventory Reduction Plan" or "inventory liquidation

plan." On June 16, 2004, Lavonne Dietrich suggested to Mark Korsmeyer that, because DFA had a "mountain of inventory to move," DFA should subsidize the freight for sales of blocks to Sysco, an opportunity that Dietrich believed represented the sale of 12-15 million pounds. Bob Crotinger wrote back that same day, agreeing with the plan because he "like[d] the approach to finding solutions to using up this mountain of cheese."

Larry Ferguson testified that Gary Hanman called him in "late June, early July [of 2004], don't know the exact date but it was in that time period * * * it was kind of after the market had fallen [on June 23, 2004]" to discuss the 5 million pound sale. According to Hanman, the deal "was substantial, and it was a one-shot deal * * *." He further testified that he thought that it "was a part of that inventory [reduction] plan." According to Hanman, traditionally he did not "get involved in those, but since it was Larry –." The parties dispute who called whom.

On June 30, 2004, Mark Korsmeyer wrote Dietrich, requesting "3-4 specific sales initiatives" to provide to Gary Hanman at DFA's July 2, 2004 inventory meeting. Dietrich then forwarded Korsmeyer's e-mail to several DFA employees, asking, "If you had .15 to .25/lb. to move our inventory, who would you sell and what?" Goddard responded on July 1, 2004 with an idea for selling Schreiber "a minimum of 5 mil. pounds @ $1.500 lb. discount up to a $.25 lb. discount for 10 mil. lbs." of DFA's "existing CME colored cheddar inventory." On July 2, 2004, Korsmeyer sent an e-mail to various DFA employees with attached "Inventory Elimination Plans" that Korsmeyer planned to discuss at that day's inventory meeting. One of those ideas was to sell ~ 5 million pounds of cheese to Schreiber. The other two ideas were to sell ~ 10 million pounds to Blue Line and ~ 20 million pounds to Sysco. Korsmeyer presented the Inventory Elimination Plans to Hanman and other DFA employees on July 2, 2004. Another set of Inventory Elimination Plans presented by the American Dairy Brands group included using

discounts to achieve incremental volume increases of 4 million pounds of cheese to private label customers, 2 million pounds to Heluvagood Co-Pack, 2 million pounds in Puerto Rico, and 10 million pounds to Borden Branded Naturals.

On July 7, 2004, Dietrich sent an e-mail to Korsmeyer and McCroskey following up about sales incentive ideas, one of which was a sale of 5 million pounds of cheddar blocks to Schreiber and Marathon each, and another of which was a "significant inventory movement" under the Cooperatives Working Together Export Assistance Program, a program that subsidized the sale of cheese in foreign markets. On that same day, McCroskey projected that the Export Assistance Program might permit the sale of 30 million pounds of cheese in foreign markets.

Tom Goddard testified that he thinks he "learned of [the 5 million pound sale from DFA to Schreiber] in the inventory meeting." Tom Goddard "called Nancy [Schwenke of DFA] when [he] got back to [his] office, either after the meeting or the next day, and said, 'Nancy, I think our presidents have been speaking and you and I have a buy/sell to arrange and administer,' and she didn't know anything about it, so she had to go back and as a result sent me the e-mail." On July 13, 2004, Schwenke e-mailed Goddard, Dan Fonnesbeck of Schreiber, and "NLSteam": "Tom, Confirming our conversation, Schreiber Foods Inc. has agreed to purchase 5 million lbs of 40 lb Cheddar Blocks from DFA at today's block market of $ 1.4050 delivered."[22] Goddard forwarded Schwenke's e-mail to Korsmeyer, Dietrich and Kevin Sanders, stating:

> Mark, per your request below is email from Nancy re; 5 million pound sale between Gary and Larry. Immediate delivery upon determination of what we have where and [Schreiber] decision as to where they ship for storage/aging. I expect to hear from Dan Fonnesbeck by tomorrow. Meanwhile I will work to develop a listing of cheese, existing or new production, that we would present to [Schreiber] for their selection i.e. delivery point(s).

---

[22] The 5 million pound sale represented less than 5.4% of Schreiber's purchases from DFA in fiscal year 2004 and less than 0.9% of Schreiber's total bulk (block and barrel) cheese purchases during that same period.

Dietrich replied, "Great Job!"   Korsmeyer forwarded Goddard's e-mail to Sam McCroskey.

Communications about cheese purchases were ongoing from June through August 2004. On June 17, 2004, Tom Goddard wrote an e-mail to Lavonne Dietrich entitled "highlights": "Talked to [Schreiber] @ Clinton, MO and expect to get multiple truckload orders per week of blocks (cheddar an m j) via Corona starting shipments in early to mid-July.  I have to wait until 6/29 to call him after he returns from vacation."   On June 21, 2004, Kari Youngbauer at Schreiber wrote to DFA about a potential purchase.  Tom Goddard at DFA asked internally to "respond as soon as possible so we can internalize the below business" because "we need all the business we can get."  On June 23, 2004, Dietrich responded to a chain of e-mails about sourcing sales by routing cheese from DFA's Smithfield plant by stating, "Great, let's reduce the pile!"  On June 23, 2004, Gabriel Sevilla, a DFA employee, e-mailed Sam McCroskey (of DFA) with "leads for export sale of cheese" and suggesting the sale of over 6.6 million pounds or more to Algil, with delivery to occur in San Diego/Tijuana, 1 to 5 truck loads of cheddar blocks per month from June to December to Schreiber Mexico, 1.1 million pounds (or possibly double) of yellow cheddar to Jacoby Mexico, a potential sale of white cheddar to Nosawa in Japan, a potential sale of Monterey jack, Colby and cheddar blocks to Doosan in Korea, an unspecified potential sale to Schreiber Brazil, an unspecified potential sale to Schreiber Saudi Arabia Union Foods, an unspecified potential sale to Unifoods in Mexico, and a sale of cheese manufactured with Fromase rennet to Mitsubishi in Japan.  At the end of the e-mail, Sevilla asked for permission to contact "Algil, TC Jacoby and Schriber [sic] Mexico" with firm offers.  On June 29, 2004, Sevilla wrote to Bret Drake, confirming a contract with Schreiber Mexico for the sale of 1,200 metric tons (over 2.6 million pounds) of cheese to Schreiber Mexico.  The terms of the contract were still being finalized as of July 2, 2004.

On July 14, 2004, Sevilla wrote to McCroskey with a list of potential sales leads to foreign customers, including an offer of 1 million pounds of Monterey Jack to Algil Mexico at "7 cents under the market." McCroskey instructed an employee to send the list to Gary Hanman. On July 15, 2004, Sevilla again wrote to McCroskey with an update on his export efforts. Included in the update was a 3-month contract with Schreiber Germany for 300 metric tons (approximately 661,000 pounds) per month at a price of $1.22 per pound. Sevilla also discussed potential sales to Schreiber Saudi Arabia and Korea at discounted rates, the potential sale of 200-500 metric tons to Hoogwegt for export to North Africa, and the potential sale of 9,000 metric tons (approximately 19.8 million pounds) to Fonterra for export to various overseas markets.

Also on July 15, Dan Fonnesbeck e-mailed a group of Schreiber employees stating that he spoke to Tom Goddard about the 5 million pound block sale and noted:

> 1. We can take new production out of the Corona facility over the next two weeks. (Tom double checking). 2. If we move some to mid-west (minimize travel miles) this production would be exchange purchases. However we talked about some type of freight adjustment if we want all new out of Corona. CME cheese stored in Minn/WI * * * * 6. We can decide if we want new product or existing production."

At approximately the same time on July 15, Goddard sent an e-mail to Korsmeyer, Dietrich, and Sanders, memorializing his conversation with Dan Fonnesbeck. Goddard wrote:

> [Schreiber] having weekly inventory meeting at 9 a.m. today. Talked to Dan Fonnesbeck and he will get back to me by late morning/early afternoon today. It appears they [Schreiber] may be leaning toward new production via Corona * * * * If they want new production via Corona * * * * I will push to get all 5 million pounds produced in next two weeks (week of 7/18 & 25/04) * * * * If [Schreiber] does not want all the Corona 'new production' delivered into UT then [Schreiber] will pay the freight differential if Corona ships to WI, MO or GA.

Goddard also noted that Schreiber was "not receptive" to some of the manufacturers from whom DFA purchased CME cheese from and thus seemed skeptical that Schreiber would consider "existing available CME purchases."

Later on July 15, Goddard e-mailed a group of DFA employees, stating that he and Fonnesbeck discussed and agreed to the following:

> 35 loads of Corona 'new' colored cheddar block production to Smithfield, UT and 90 loads of colored cheddar blocks to Carthage, MO. All Smithfield shipments, he wants new production. Production next week, week of 7/18/04, would be good. Some portion, Corona decide, of the 90 loads to Carthage can be combination of new production and or Corona production up to 60 days age at shipment. Once Corona determines amount of aged available to send to Carthage we need to confirm with Dan that the amount being sent is acceptable relative to [Schreiber] needs. Aged loads may ship as soon as possible and new production should ship at less than 20 days 'cheese age' once all testing completed to confirm compliance to [Schreiber] specifications. The above referenced 'mix' of loads to UT/MO may change once Dan has the chance to talk to Clayne at Clinton, MO. Clayne is on vacation til next week.

On July 22, 2004, in response to an e-mail from John Wilson with the subject line "Gary wants to know how sales are," Sanders noted that Dietrich sold 24 loads of CME cheese to Green Bay Cheese and 5-20 loads to Master's Gallery and that Sevilla completed the sale of 2.6 million pounds of cheese to Schreiber Mexico. Sanders also noted that Dietrich "still has a shot @ a distributor called Hidden Villa – 66 loads." On July 23, 2004, Doug Moore of DFA Corona sent a memorandum with details of the sale of 50 loads of block cheddar cheese at ten cents under the CME block market average, as well as 16 loads of Monterey Jack at five cents under the CME average. On July 30, 2004, McCroskey sent an e-mail to Shawn Kaddoura noting that DFA Corona had an inventory of over 25 million pounds of cheese and wondering "why we cannot ship 5 million pounds to Schreiber immediately. It has been about 3 weeks since the deal was made for the 5 million and we are going to have to produce and extend shipments into September." Also on July 30, Sanders sent a memorandum to McCroskey summarizing requests for analysis from Hanman regarding DFA's excess inventory of cheese and inventory reduction plan. He stated that "there is some number that we have taken a loss on by writing inventory down and then there is also approximately 25-30 million pounds that we are currently selling at

discounted prices." Reports on the results of DFA's inventory reduction plan continued through August and into September.

By August 4, 2004 the "mix" of the 5 million pound sale to Schreiber changed and was broken down as follows: (1) Missouri: 20 loads shipped the week of July 26, 2004, 20 loads shipped the week of August 2, 2004, and 24 loads to be shipped the week of August 16, 2004; and (2) Utah: 25 loads shipping the week of August 2, 2004 and August 9, 2004, and 36 loads shipping the weeks of August 8, 2004 and August 16, 2004. This means that 64 loads were shipped to Missouri and 61 loads were shipped to Utah. *Id.* This totals 125 loads or 5 million pounds. Of the 64 loads shipped to Missouri at least 24 loads were "from current production." Of the 61 loads shipped to Utah, at least 5 loads were "up to 60 days of age" and at least 26 loads were "from current production." Thus, at least 50 loads or approximately 2 million pounds of block cheese came from current production.[23]

There is no dispute that the market price at delivery was different than the price agreed to by the parties earlier in July.[24] (CME block prices averaged $1.5628 per pound between late July

---

[23] "Current production" for this sale meant new production or cheese that was less than 20 days "cheese age" and "up to 60 days of age" refers to existing production or "Corona production up to 60 days age at shipment."

[24] The following examples illustrate the different prices per pound throughout July, August, and September 2004. The record indicates that if Schreiber had wanted "new production via Corona" then Tom Goddard was going to "push to get all 5 million pounds produced in next two weeks (week of 7/18 & 25/04)." The week of July 18, 2004 (a Sunday) the CME block cheese price ranged from $1.47 per pound on Monday, July 19, 2004 to $1.48 on Friday, July 23, 2004. Initially, as of July 15, 2004, the sale was for "35 loads of Corona 'new' colored cheddar block production to Smithfield, UT and 90 loads of colored cheddar blocks to Carthage, MO." For "[a]ll Smithfield shipments, [Schreiber] want[ed] new production." DFA was going to try and start producing the new production the week of July 18, 2004 when the CME block cheese price ranged from $1.47 on Monday, July 19, 2004 to $1.48 on Friday, July 23, 2004. These 24 loads of new production that were being shipped to Missouri were targeted to be shipped the week of August 16, 2004, and were scheduled to be delivered on September 1-2, 2004. If these 24 loads were less than 20 days cheese age at the time of shipment, then that gives them an approximate make-date of August 15, 2004. The CME block market price on August 13 and August 16, 2004 was $1.55 per pound, or $.145 more than Schreiber paid. Of the 61 loads shipped to Utah at least 5 loads were "up to 60 days of age" and at least 26 loads were "from current production." These 26 loads

and early September 2004; the price for the 5 million pound sale was the July 13, 2004 "block market price of $1.4050 delivered.")  There also is no dispute that internal Schreiber e-mails described the transaction as a "special purchase."

Freight via truck from Corona, CA to Smithfield, UT was paid for by DFA.  The cost of freight via truck from Corona, CA to Smithfield, UT was $.0317 per pound.  In total, 61 of the 125 loads of cheese associated with the five million pound transaction were shipped to Utah.  Thus, the total freight for this cheese was $77,348 and was paid by DFA.  Freight from Corona, CA to other locations was paid for by DFA up to the amount it cost to ship to from Corona, CA to Smithfield, UT.  Thus, the total price into Utah was $1.4050 or just the cost of the cheese (the block market price on July 13, 2004).  The total price per pound to Americold storage in Carthage, MO from Corona, CA was $1.4126 ($1.4050 + $.0076).  The $.0076 represents the difference in rail from Corona, CA to Americold in Carthage, MO ($.0393) and the delivered cost by freight (truck) from Corona, CA to Zollingers in Logan, Utah ($.0317).  In total, 64 of the 125 loads were shipped to Missouri.  Thus, the total freight for this cheese was $100,608.  DFA paid $81,152 of this cost and Schreiber paid $19,456.

For the week ending July 1, 2004, DFA had a block cheese inventory of 72.8 million pounds, which was 35.8 million pounds more than their inventory in the same week in 2003. By the week ending August 26, 2004, DFA's block inventory had been reduced by 23.4 million pounds.

7.   *The Commodity Exchange Act*

were scheduled to be shipped the weeks of August 8 and August 16, 2004.  If these 26 loads were less than 20 days cheese age at the time of shipment then for loads shipping the week of August 8 that would mean an approximate make-date of July 21, 2004.  The CME block market price on July 21, 2004 was $1.48 per pound, or $.075 more than Schreiber paid.  For loads shipping the week of August 16, 2004 that would mean an approximate make-date of July 29, 2004. The CME block market price on July 29, 2004 was $1.53 per pound, or $.125 more than Schreiber paid.

Named Direct Purchaser Plaintiffs Indriolo Distributors, Inc. and Valley Gold LLC did not transact in CME Class III milk futures contracts between April 1, 2004 and December 31, 2006. Named Plaintiffs Knutson's, Indriolo, and Valley Gold did not purchase CME spot cheese contracts between April 1, 2004 and December 31, 2006.

## II.    Legal Standard

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  In considering such a motion, the court must "draw[ ] all reasonable inferences in favor of" the nonmovant. *Jones v. City of Elkhart,* 737 F.3d 1107, 1112 (7th Cir. 2013).  To avoid summary judgment, the opposing party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  A genuine dispute of material fact "exists only if there is enough evidence upon which a reasonable jury could return a verdict in" the nonmovant's favor. *Swetlik v. Crawford,* 738 F.3d 818, 826 (7th Cir. 2013).  The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  In other words, the "mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252.

On a claim alleging a Sherman Act violation, "at the summary judgment stage a § 1 plaintiff's offer of conspiracy evidence must tend to rule out the possibility that the defendants were acting independently." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 554 (2007).  The Supreme Court has said that "antitrust law limits the range of permissible inferences from

ambiguous evidence in a § 1 case." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 588 (1986); see also *Omnicare, Inc. v. UnitedHealth Grp., Inc.,* 629 F.3d 697, 704 (7th Cir. 2011). ("Even on summary judgment, district courts are not required to draw every requested inference; they must only draw reasonable ones that are supported by the record."). The Seventh Circuit has said that courts are first to assess whether Plaintiffs' "evidence of agreement is ambiguous—that is, whether it is equally consistent with the Defendants' permissible independent interests as it is with improper activity." *Omnicare,* 629 F.3d at 707. Second, "[i]f we conclude that the evidence could support the conclusion that Defendants were acting independently, we then look for any evidence that tends to exclude the possibility that Defendants were pursuing independent interests." *Id.* A plaintiff need not present evidence excluding *all* possibility that defendants were acting independently, but "there must be some evidence which, if believed, would support a finding of concerted behavior." *Toys "R" Us, Inc. v. FTC,* 221 F.3d 928, 934–35 (7th Cir. 2000).

A plaintiff may prove its price-fixing case through direct or circumstantial evidence. The latter can include "economic evidence suggesting that the defendants were not in fact competing" as well as "noneconomic evidence suggesting that they were not competing because they had agreed not to compete." *In re High Fructose Corn Syrup Antitrust Litig.,* 295 F.3d 651, 655 (7th Cir. 2002). However, it is insufficient to show behavior that is merely parallel. "A statement of parallel conduct, even conduct consciously undertaken, needs some setting suggesting the agreement necessary to make out a § 1 claim; without that further circumstance pointing toward a meeting of the minds, an account of a defendant's commercial efforts stays in neutral territory." *Bell Atl. Corp.,* 550 U.S. at 557; see also *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.,* 509 U.S. 209, 227 (1993) (noting that this type of conduct has been

called "conscious parallelism," which is "not in itself unlawful.") Although this standard does not mean an antitrust plaintiff "must overcome a heightened burden to defeat summary judgment," it does mean "that 'conduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy.'" *Omnicare*, 629 F.3d at 707 (quoting *Matsushita,* 475 U.S. at 588); see also *In re Text Messaging Antitrust Litigation* 2014 WL 2106727, at *8 (N.D. Ill. May 19, 2014).

## III. Analysis

Plaintiff's core theory is that, between May 24, 2004 and June 23, 2004, Schreiber conspired with DFA to purchase cheddar cheese traded on the Chicago Mercantile Exchange in order to help DFA and Keller's Creamery, L.P. manipulate the price of Class III milk futures. According to Plaintiffs, Schreiber and DFA purchased cheese on the CME to stabilize prices while DFA and Keller's unwound their Class III milk futures positions at a profit, then Schreiber and DFA stopped buying cheese, causing the cheese price to crash at the end of June.

In turn, Schreiber contends that its purchasing activity was not unusual, was not parallel to DFA's activity, did not begin on May 24, and is fully explained by Schreiber's independent business interest in preventing a large spread between block and barrel prices from eroding Schreiber's profit margins.

### A. Violations of § 1 of Sherman Act and California's Cartwright Act[25]

Section 1 of the Sherman Act ("§ 1"), 15 U.S.C. § 1, works to prevent businesses from entering into collusive agreements.[26] By its terms, § 1 prohibits "[e]very contract, combination

---

[25]  "'Because the Cartwright Act is patterned after the federal Sherman Act and both have their roots in the common law, federal cases interpreting the Sherman Act are applicable in construing the Cartwright Act.'" *In re Copper Antitrust Litig*., 436 F.3d 782, 802 (7th Cir. 2006) (quoting *Oakland-Alameda Cnty. Builders' Exch. v. F.P. Lathrop Constr. Co.*, 482 P.2d 226, 231 n.3 (Cal. 1971)); see also *Aguilar v. Atl. Richfield Co*., 24 P.3d 493, 511 (Cal. 2011) (adopting the *Matsushita* standard and making it applicable to claims under the Cartwright Act).

* * * or conspiracy, in restraint of trade or commerce," although courts have long restricted its reach to agreements that unreasonably restrain trade. See, *e.g.*, *State Oil Co. v. Khan,* 522 U.S. 3, 10 (1997). Agreements to fix prices unambiguously fall within the ambit of § 1. *United States v. Socony–Vacuum Oil Co.,* 310 U.S. 150, 223 (1940). Typically, price-fixing agreements exist between sellers who collude to set their prices above or below prevailing market prices. Here, Direct Purchaser Plaintiffs contend that DFA and Schreiber simultaneously purchased CME spot cheese contracts at inflated levels, thereby driving up the price of cheese and milk in general and, indirectly, the price of milk futures.

To prevail under § 1, plaintiffs generally must prove three things: (1) that defendants had a contract, combination, or conspiracy ("an agreement"); (2) that as a result, trade in the relevant market was unreasonably restrained; and (3) that plaintiffs were injured. *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 705 (7th Cir. 2011); see also *Denny's Marina, Inc. v. Renfro Prods., Inc.,* 8 F.3d 1217, 1220 (7th Cir. 1993); *cf. Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*475 U.S. 574, 585–86 (1986) ("To survive petitioners' motion for summary judgment, respondents must establish that there is a genuine issue of material fact as to whether petitioners entered into an illegal conspiracy that caused respondents to suffer a cognizable injury."). Schreiber contends that Plaintiffs' case falters at the first requirement; in short, that Plaintiffs have failed to demonstrate that Schreiber agreed to participate in a conspiracy.

To show concerted action, antitrust plaintiffs must produce evidence that would allow a jury to infer that the alleged conspirators "had a conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto Co. v. Spray–Rite Serv. Corp.,* 465 U.S. 752, 764 (1984). Put another way, the circumstances of the case must show "a unity of purpose

---

[26] Section 4 of the Clayton Act, 15 U.S.C. § 15, provides a private cause of action for the enforcement of § 1, and also provides treble damages and attorneys' fees to successful antitrust plaintiffs.

or a common design and understanding, or a meeting of minds in an unlawful arrangement." *Am. Tobacco Co. v. United States,* 328 U.S. 781, 810 (1946). Two separate, economic decision-makers must be joined, "depriv[ing] the marketplace of independent centers of decisionmaking and therefore of a diversity of entrepreneurial interests." *Am. Needle, Inc. v. Nat'l Football League,* 560 U.S. 183 (2010) (quotation and citation omitted); see also *Copperweld Corp. v. Independence Tube Corp.,* 467 U.S. 752, 769 (1984) (noting that in an anticompetitive agreement, "two or more entities that previously pursued their own interests separately * * * combin[e] to act as one for their common benefit" in the restraint of trade); *cf. Kartell v. Blue Shield of Mass., Inc.,* 749 F.2d 922, 930 (1st Cir. 1984) ("Competitors cannot *agree,* for example, to insist that their contracts * * * contain arbitration clauses, even though each individual competitor can make up his own mind to insist upon such a term in any, or all, of his contracts."). Essentially, Direct Purchaser Plaintiffs must demonstrate that there is a genuine issue of material fact as to whether Schreiber's decision to purchase spot cheese on the CME was made not by Schreiber alone but rather by Schreiber acting in concert with DFA while the two were competitors. See, *e.g., Omnicare*, 629 F.3d at 706.

Plaintiffs' case would be much stronger "if there were a smoking gun buried in the voluminous record." *Omnicare,* 629 F.3d at 706; see also *In re High Fructose Corn Syrup Antitrust Litigation,* 295 F.3d 651, 654 (7th Cir. 2002) ("[A]n admission by the defendants that they agreed to fix their prices is all the proof a plaintiff needs."); *In re Baby Food Antitrust Litig.,* 166 F.3d 112, 118 (3d Cir. 1999) ("[W]ith direct evidence the fact finder is not required to make inferences to establish facts."). But Plaintiffs' case, like most in this vein, is "constructed out of a tissue of [ambiguous] statements and other circumstantial evidence." *Omnicare*, 629 F.3d at 706 (quoting *In re High Fructose Corn Syrup Antitrust Litigation,* 295 F.3d at 662).

Therefore, they must present evidence from which a trier of fact can infer that Schreiber and DFA had an anticompetitive agreement. *Id.* at 654. That is, Plaintiffs "must show that the inference of conspiracy is reasonable in light of the competing inferences of independent action or collusive action that could not have harmed" it. *Matsushita,* 475 U.S. at 588; see also *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 554 (2007) ("[A]t the summary judgment stage a § 1 plaintiff's offer of conspiracy evidence must tend to rule out the possibility that the defendants were acting independently."); *Miles Distribs., Inc. v. Specialty Constr. Brands, Inc.,* 476 F.3d 442, 449 (7th Cir. 2007) ("When a plaintiff attempts to defeat summary judgment by highlighting circumstantial evidence of a conspiracy, some of the evidence must tend to exclude the possibility that the alleged conspirators acted independently rather than in concert."). As previously set forth, this does not mean that Plaintiffs must overcome a heightened burden to defeat summary judgment (see *Eastman Kodak Co. v. Image Tech. Servs., Inc.,* 504 U.S. 451, 468 (1992); *Omnicare,* 629 F.3d at 707); rather, it simply reflects the state of the law, pursuant to which "conduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy." *Matsushita,* 475 U.S. at 588.

As mentioned above, in assessing whether summary judgment is appropriate, the Seventh Circuit has repeatedly guided district courts to use a two-part inquiry. See *Omnicare,* 629 F.3d at 707; *Market Force Inc. v. Wauwatosa Realty Co.,* 906 F.2d 1167, 1171 (7th Cir. 1990); *Serfecz v. Jewel Food Stores,* 67 F.3d 591, 599 (7th Cir. 1995); *Res. Supply Corp. v. Owens– Corning Fiberglas Corp.,* 971 F.2d 37, 49 (7th Cir. 1992). Within that structure, the Court first assesses whether Plaintiffs' evidence of agreement is ambiguous—"that is, whether it is equally consistent with [Schreiber's] permissible independent interests as it is with improper activity." *Omnicare,* 629 F.3d at 707 (quoting *Market Force,* 906 F.2d at 1171). If the Court concludes

that the evidence could support the conclusion that Schreiber was acting independently, the Court then looks for "any evidence that tends to exclude the possibility that Defendants were pursuing independent interests." *Id.* In other words, Plaintiffs must "show that the inference of conspiracy is reasonable in light of the competing inference of independent action." *Valley Liquors, Inc. v. Renfield Imps., Ltd.,* 822 F.2d 656, 660–61 (7th Cir. 1987); see also *Matsushita,* 475 U.S. at 597 n. 21 ("[C]onduct that is as consistent with permissible competition as with illegal conspiracy does not, without more, support even an inference of conspiracy.").

### 1. Evidence of an Agreement

The starting point is what is obvious from the record. First, it cannot be disputed that Plaintiffs lack direct evidence that Schreiber agreed to join the alleged conspiracy. Direct evidence "is explicit and requires no inferences to establish the proposition or conclusion being asserted." *In re Baby Food Antitrust Litig.,* 166 F.3d 112, 118 (3d Cir. 1999) ("[W]ith direct evidence the fact finder is not required to make inferences to establish facts."). Plaintiffs have not come forward with such evidence.

Second, in support of its summary judgment motion, Schreiber submitted declarations from Larry Ferguson, former President of Schreiber, Nancy Schwenke, former Vice President of Purchasing, and Chris Herlache, Risk Analyst and the employee in charge of CME cheese trading during the relevant period. Each declarant (not surprisingly) denies that Schreiber agreed with DFA or Keller's to purchase cheese on the CME, coordinated with DFA on its CME trading, signaled or received signals from DFA, or had any knowledge of the alleged plan to inflate the price of Class III milk futures. Similarly, Individual Defendants Hanman, Bos, Otis, and Millar also have submitted affidavits. In those affidavits, they deny that Schreiber agreed to

or was solicited to purchase cheese on the CME or to help DFA or Keller's impact any CME prices.

Nor does the CFTC investigation provide any direct evidence of a conspiracy between Schreiber and the other Defendants. Between 2006 and 2008, the CFTC examined the activity of DFA and Keller's during the relevant period. During those proceedings, the CFTC deposed the individual Defendants, as well as eight other DFA employees and three Schreiber employees involved in cheese purchasing, sales, or CME trading, and received the production of thousands of pages of documents from DFA and Schreiber, including every communication between DFA and Schreiber during 2004 concerning the CME. Nevertheless, the CFTC did not implicate Schreiber in the alleged scheme or even mention Schreiber as a potential participant or relevant actor. Plaintiffs have had access to the documents produced to the CFTC and the CFTC investigation deposition transcripts, none of which points to direct evidence that Schreiber agreed to help DFA or Keller's with their alleged plan or knew that it existed.

Having failed to uncover direct evidence that Schreiber agreed to help DFA and Keller's inflate their Class III milk futures positions, Plaintiffs' conspiracy claim rests on circumstantial evidence—namely, frequent and regular communication between the parties and Schreiber's purchases of barrel cheese contracts on the CME during part of the same time that DFA is alleged to have purchased block cheese. With respect to the frequent communications, the substance of those communications is largely unknown. While Plaintiffs portray regular interactions between the two companies as nefarious, their interpretation overlooks an obvious and innocuous reason for such interactions: DFA was one of Schreiber's main suppliers, Schreiber was one of DFA's largest customers, and the companies shared many legitimate business reasons to contact one another. While Plaintiffs repeatedly point out that Schreiber and

DFA also were competitors, having repeated communications with a supplier, who also is a competitor in certain markets, does not a conspirator make. This is particularly true when not a single communication between Schreiber and DFA from either the CFTC investigation or this litigation suggests a meeting of minds to fix prices. Conversely, internal communications between employees of DFA and Keller's demonstrate open and routine discussion of their efforts to support cheese prices and the relationship between this support and their futures positions.

Without testimony, documents, or e-mails that imply an agreement, the focus must shift almost entirely to Schreiber's conduct—namely, its purchases of barrel cheese contracts between May 24 and June 23, 2004. Again, the starting point is what is known: Parallel conduct, standing alone, is insufficient to support an inference of conspiracy. *Market Force Inc.*, 906 F.2d at 1172; see also *White v. R.M. Packer Co.*, 635 F.3d 571, 580 (1st Cir. 2011) ("Mere parallelism * * * does not even create a *prima facie* conspiracy case."). This is particularly true where a defendant can offer an independent business justification for its conduct. *Market Force Inc.*, 906 F.2d at 1174 (explaining that "a defendant is entitled to summary judgment when it provides a plausible and justifiable alternative interpretation of its conduct that rebuts the alleged conspiracy") (internal quotation marks omitted).

Uncontroverted evidence (in the form of contemporaneous e-mails) shows that, beginning in February of 2004, Schreiber voiced a significant interest in narrowing the spread between barrel and block cheese on the CME. As set forth in detail in the factual history, on repeated occasions throughout 2004—both before and after the Plaintiffs' targeted conspiracy period of May 24 to June 23, 2004—the evidence demonstrates that Schreiber purchased (or its employees discussed purchasing) barrel cheese on the CME motivated at least in part by a large spread, including in February, March, April, May, June, July, September, October, and

December.  See Fact Stmt. ¶ 43 (February 2, 2004:  "Chris, if there is any opportunity for us to help bid on barrels to close the gap then we should consider doing it especially since the markets are trending up and maybe its possible."); *Id.* at ¶ 45 (March 15, 2004:  "We helped today close the spread with barrels, otherwise the block market is moving up from others."); *Id.* at ¶¶ 46-51 (describing Schreiber's trading activity between April 21 and 27, 2004); *Id.* at ¶¶ 54-57 (describing Schreiber's trading activity on May 5 and 11, 2004); *Id.* at ¶ 90 (July 28, 2004:  "As Blocks went up, we move[d] the barrels to maintain the spread, but had to buy 2 barrels in the process * * * * Please let me know if there is any change in our plan to maintain the block/barrel spread."); *Id.* at ¶ 97 (September 17, 2004:  "With DFA supporting the 1.5675 level, the spread grew to around .10 on Tuesday before it was brought back to .0750.  Throughout this past week, there has been a number of other companies also trying to correct the spread with us.  On Wednesday, there were a total of 5 buyers for barrel."); *Id.* at ¶ 101 (October 1, 2004:  noting that DFA had driven the spread out of line but explaining that Schreiber did not buy any barrels in part because "I do not want there to be the impression in the market place that we will be the only ones to come in and bring the spread back in line.  In talking to our broker, I was getting the impression this was starting to take place."); *Id.* at ¶ 103 (December 3, 2004:  "Because of the high spread, I think it's ok to go ahead and buy up to 3 loads today if it would help anybody in the market to close the spread.").  The foregoing evidence suggests that DFA was not a co-conspirator, but rather Schreiber's well-known and frequent adversary vis-à-vis the barrel/block spread, as Schreiber repeatedly noted that DFA's purchases caused large and sustained spreads on the CME.

The evidence also suggests that Schreiber was attempting to mitigate the harmful effects of a large spread on its business prior to the alleged manipulation period.  The record reflects that

DFA began buying block cheese in large quantities in the middle of April, and its purchases allegedly caused block prices to rise relative to the barrel price. On May 5, the spread grew from 3.5 cents to 11.5 cents. That day, Schreiber purchased 2 loads of barrels. The spread increased to 22 cents on May 11, and Schreiber purchased 1 of the 2 loads of barrels traded that day. The spread fell to 7 cents the next day, before rising to 17 cents on May 13. Industry observers recognized that the large spread between block and barrel was adversely affecting barrel purchasers and predicted that those purchasers eventually would intervene in the market if the spread held. See, *e.g.,* May 18, 2004 e-mail from Glenn Millar to John Wilson and Frank Otis (regarding conversations he had with Grain Miller's, Inc. and Hoogwegt (dairy commodities traders) as well as Jerry Dryer (industry analyst and publisher of the weekly e-letter *Jerry Dryer's Dairy & Food Market Analyst*) in which "[a]ll 3 of these groups stated, without prompting from me, that if blocks hold into mid next week the barrel guys will have to step in and close the spread. Some thought this might happen after 1-2 more showings of strength on the blocks."). And that's what happened. Initially, purchasers other than Schreiber bought 7 loads of barrels on May 13, and Glanbia allegedly began "bringing blocks to the exchange to adjust the spread" (apparently by trying to lower the price of blocks and reduce the spread). Those blocks were purchased by DFA, however, and the wide spread remained. The spread held at 17 cents from May 13 through May 20, with 1 load of barrels traded on May 18. On May 20, the evidence reflects that Schreiber purchased 4 of the 6 loads of barrels traded in an attempt to keep the spread from growing. On May 21, the spread grew to 19 cents; Schreiber purchased 1 load of barrels.

After the wide spread persisted on May 21, Schreiber placed several bids on May 24. Its bids went unfulfilled until the barrel price rose to about three cents less than the block price, at

which point Schreiber's bids were met for sales of 3 loads—fewer than the four loads it purchased on May 20. The spread closed at three cents. Thereafter, the record reflects that as long as the block price stayed high, Schreiber intermittently purchased barrel cheese at a price in line with the traditional spread until June 22. But when the block price fell on June 23, 2004 (despite 3 block purchases by DFA), the falling block price was restoring the traditional spread. Schreiber did not purchase any barrels that day, and offers from sellers pushed the barrel price down concomitant with the falling block price (which maintained the spread at three cents). Schreiber did not purchase any more barrels until July 28, 2004, when the spread increased and it purchased 2 barrels.

The evidence—both Schreiber's communications and its conduct—reflects that beginning in February 2004, Schreiber's words and actions were consistent with an attempt to prevent large spreads from damaging its business. Its activity accelerated in April of 2004, and it again began to purchase barrel cheese on the CME on May 5, 2004, when the spread again grew out of line, not, as Plaintiffs claim, on May 24, when DFA supposedly needed Schreiber to join the conspiracy. Schreiber purchased barrels at various prices on May 11, May 20, and May 21 before allegedly joining the conspiracy on May 24. Plaintiffs attempt to isolate the May 24-June 23 period, but given that Schreiber purchased 4 loads of barrels on May 20, 1 load on May 21, and 3 loads on May 24, drawing the line at May 24 appears arbitrary. In addition, the last day on which Schreiber purchased barrels was June 22, but DFA continued to purchase blocks on June 23, even as the block price fell. When the block price collapsed after June 22, the reason for Schreiber's activity dissolved and it did not purchase any barrels on June 23. As the block price dropped, the barrel price was offered down by sellers in tandem. See Fact Stmt. ¶ 88 (June 23, 2004 e-mail from Herlache to Schreiber officers: "It is currently unknown why [DFA] chose

today to pull their support, but I will pass on any information I do get. Block sellers were leading the decrease with barrels following to maintain a .03 spread."). Schreiber then resumed conduct consistent with attempting to correct the spread in July and even later in that year.

It is difficult to support an inference of conspiracy almost solely with conduct similar to that engaged in by Schreiber before its alleged participation in the conspiracy began and after it ended. It also is difficult to explain why the reason Schreiber purchased cheese on the CME between May 5 and May 21, 2004 (or earlier) was not the same reason it purchased cheese on the CME from May 24 to June 22, 2004. Further, if DFA and Schreiber were jointly attempting to support prices, why did Schreiber fail to help DFA stave off falling prices by purchasing barrels on June 23? And why, in the midst of the alleged conspiracy, did Schreiber's President and CEO Larry Ferguson send a letter to the CME, complaining about the spread in May 2004 and highlighting the activity (of which it was a participant) occurring on the spot cheese markets? Ferguson's letter clearly alerts the CME to the possibility that this type of trading, along with the ability of market participants to identify traders, was damaging to the price discovery function served by the CME. It would be odd, to say the least, for a co-conspirator to alert the regulatory authorities to trading activity that might lead to the discovery of a conspiracy in the middle of the scheme. Viewing the evidence as a whole, Plaintiffs' "clever conspirator" argument simply has no support in the record.[27]

Other circumstantial evidence belies a conspiracy. Plaintiffs allege that Gary Hanman broadcast after-the-fact knowledge of Schreiber's CME purchases during the alleged conspiracy

---

[27] In their surreply, Plaintiffs contend that Schreiber's reply brief creates a new "evidentiary interpretation" of Ferguson's letter to the CME. What Plaintiffs' argument fails to appreciate is that the actual language of the letter—not anything that Schreiber or Plaintiffs say in their briefs—has the "evidentiary" value. And Schreiber clearly highlighted the letter in its opening brief. Whatever gloss Plaintiffs or Schreiber want to put on the letter, they can (and have); but the language and timing of the letter, viewed in consideration with the rest of the evidence of record (as opposed to the parties' spin on the evidence) is what matters to the Court's resolution of the issues in this case.

period.  But there is ample evidence suggesting that Hanman's knowledge of Schreiber's purchases came from daily efforts of DFA employees throughout all of 2004 to track the identity of all purchasers and sellers on the CME spot cheese and butter markets through the employees' "best estimate" of which market participant each floor broker represented.  DFA's records, which Hanman attached to the weekly faxes from which the complaint quotes, list the activity not only of Schreiber, but also traders such as AgriTrading, Bert Lewis, Bongards, ConAgra, Dairystates, DariGold, Dean Foods, Dreyers, Glanbia, Grassland, Hilmar, Hoogwegt, Jacoby, Jerome's Kraft, Kroger, Morningstar, and Rich Dairies. Given Schreiber's inclusion among this group, the reasonable inference is that Hanman obtained his knowledge of Schreiber's purchases on the CME in the same way that he obtained his knowledge of every other market participant's activity:  through reports generated by DFA employees who observed and tracked the activity of CME brokers.[28]

Plaintiffs also allege that, on May 18, 2004, Glenn Millar of Keller's told DFA that Schreiber communicated to him that it would support the barrel price if DFA let the block price fall a little lower.  According to Plaintiffs, this alleged "statement by Schreiber" constituted "an offer" from Schreiber to conspire.  However, in context, the e-mail shows that in fact there was no statement by Schreiber and no offer, only a recounting of what Millar had heard during conversations with various market participants (which did not include Schreiber), of what all "barrel guys" would do in response to a spread that continued to hold:

---

[28]  The evidence reflects that on May 13, 2004, Elvin Hollon of DFA emailed Van Dyk and stated:  "I may be getting an audience at the CME on the replacement cheese issue in the next week or so. I may want you to make a call. Who do you clear trades thru?"  In response, Van Dyk provided the name of Schreiber's clearing firm and CME spot cheese broker.  However, as set forth in detail *infra* at page 64, the evidence of record quite plainly indicates that Hollon and Van Dyk's correspondence had nothing to do with a conspiracy to manipulate the price of milk futures. Moreover, the manipulation period as alleged by Plaintiffs had not even begun yet.

I talk to lots of brokers and cheese makers and will continue to forward their thoughts to you if you are interested. I truthfully tell them that I do[] not know dfa's target needs or prices and most of these folks talk to me to get a read on milk and butter * * * * Hoogwegt [a commodity purchaser]'s line level traders talk a lot to Schreiber and others in the barrel side and clearly they want the market lower. So they can drive it up later and take profits * * * * All 3 of these groups stated, without prompting from me, that if blocks hold into mid next week the barrel guys will have to step in and close the spread. Some thought this might happen after 1-2 more showings of strength on the blocks.

See Fact Stmt. ¶ 129; see also *id.* at ¶ 130 (response from J. Wilson of DFA) ("Thanks, Glenn. I welcome any intelligence.").  Again, the reasonable inference from this e-mail is that Millar was privy to gossip among floor traders.  It does not provide evidence of an understanding between Schreiber and DFA (or even of communications between Schreiber and Millar).  In fact, this sort of speculation, coupled with undisputed evidence that demonstrates that Hanman's attempts to pinpoint Schreiber's purchases often were wrong,[29] cuts against the inference of collusion.  If DFA and Keller's were conspiring with Schreiber, Millar would not have to rely on industry analysts, participants, and observers for information about what Schreiber might do if the spread held.  Again, the record contains ample evidence that industry participants, outside of DFA and Schreiber, also were predicting where the market was headed and what various buyers and sellers would do in response.  This speculation may have helped DFA and Keller's to predict the market, but it does not constitute an offer to join a conspiracy or a statement from Schreiber to Millar, nor does it suggest that Schreiber offered advance information or assurances to DFA. *Cf. Mayor and City Council of Baltimore v. Citigroup, Inc.*, 709 F.3d 129, 139 (2d Cir. 2013) (concluding that plaintiffs' allegation that a Merrill Lynch executive told his superior that he had

---

[29]  Schreiber's internal records of its purchases conflict with DFA's own record when Schreiber utilized an unfamiliar broker, casting doubt on the allegation that Hanman's knowledge came directly from Schreiber.  On May 24, 2004, for example, DFA's records attribute a sale of 1 load of barrels at $1.7650 to "SAW."  This sale actually was to Schreiber through an unusual broker.  On May 26, DFA attributes the sale of 6 loads to barrels to SAW; those sales also were to Schreiber.  And on June 2, DFA attributes yet another sale to SAW that actually was purchased by Schreiber.

"3 parties confirm that Lehman is dropping out of the auction business" not only failed to support an inference of conspiracy, it actually tended to prove that no agreement existed: "[I]f, for example, Merrill Lynch and Lehman were talking, the former would not have had to rely on third parties to confirm the latter's strategy.").

Based on the foregoing evidence, reasonable jurors would not be able to infer that Schreiber had reached an unlawful agreement with DFA and Keller's; rather, the evidence as a whole supports an inference that, in May and June 2004, Schreiber independently engaged in activity on the CME in order to defend itself against an abnormally large spread of as much as 22 cents between the price of blocks of cheddar cheese and the price of barrels of cheddar cheese, a spread that allegedly was caused by DFA's attempt to inflate and support the block cheese price. Schreiber did not "suddenly" enter the spot cheese market on May 24, but rather continued the same course that it had been independently pursuing since the spread started to damage its business at the beginning of May. Further, the record reflects that independently defending itself against abnormal spreads is something Schreiber had being doing regularly, including in February, March, April, July, September, October, and December of 2004. The documents produced in this litigation, as well as the testimony adduced during the CFTC proceedings and this litigation, repeatedly show that Schreiber's actions conformed with its economic interest in keeping the spread between barrels and blocks at approximately 3 cents.[30]

---

[30] The additional reasons put forth by Schreiber for its conduct—many of which are the subject of both Plaintiffs' response brief and its surreply—are not as well supported by the evidence contemporaneous to the conspiracy period or by the testimony after the fact. At a minimum, those reasons (and the evidence offered in support) tend to raise questions of fact about Schreiber's business judgment during the time in question. However, as set forth in more detail below, that does not change the facts that Plaintiffs have not come forward with any evidence indicating an agreement beyond evidence of parallel conduct and that the contemporaneous evidence supports the opposite inference that Schreiber's conduct was in conformance with its economic interest in the spread.

### 2. *Is the inference of conspiracy reasonable in light of independent action?*

Given Schreiber's presentation of an independent, economically rational business justification for its actions in May and June 2004, the burden shifts to Plaintiffs to present evidence tending to exclude the possibility that Schreiber's CME purchases were motivated by its independent interest rather than by a desire to help DFA increase the value of its milk futures contracts. See *Omnicare, Inc.*, 629 F.3d at 707; *Market Force Inc.*, 906 F.2d at 1173-74. Plaintiffs need not present evidence excluding *all* possibility that defendants were acting independently, but "there must be some evidence which, if believed, would support a finding of concerted behavior." *Toys "R" Us, Inc. v. FTC,* 221 F.3d 928, 934–35 (7th Cir. 2000); *In re Text Messaging Antitrust Litigation*, 2014 WL 2106727, 8 (N.D. Ill. May 19, 2014).

In responding to the foregoing evidence of independent action, Plaintiffs' focus is not entirely where it should be. Plaintiffs highlight that (1) Schreiber and DFA were the only participants in the CME market during this time, (2) their conduct was in fact driving the price of cheese up, and (3) Schreiber did not need to be purchasing expensive cheese. Despite Plaintiffs' insistence that Schreiber manipulated the barrel cheese market, the question is not whether Schreiber's conduct manipulated the barrel cheese market; rather, the question is whether it *conspired* with DFA to manipulate the price of milk futures. To be sure, rather than let the natural forces of supply and demand dictate the market, Schreiber appears to have been engaged in an effort to influence the barrel cheese market for its own benefit. See, *e.g.*, March 15, 2004 internal e-mail from Pozniak ("We helped today close the spread with barrels, otherwise the block market is moving up from others. Unless there are major objections by you, we will bid if necessary to get more cheese at least to the $2 ranger [sic] over the next few days. The thought would be to allow the markets to go high enough that Kraft would have to raise their prices on

the shelf to create aain [sic] a store brand and brand price difference."); March 16, 2004, internal e-mail from Dunford ("Just one 'watch out' * * * our customers are not pleased with the current high pricing and will be even less pleased if they somehow find out that we are involve [sic] in helping drive the market up."); March 16, 2004 internal e-mail from Van Dyk ("FYI – the industry is already talking about who is trading at the CME ("not the usual suspects"). I've had two inquiries (yesterday) asking about our trading and rationale * * * * To Ron [Dunford's] point, if we need to have a Q&A prepared for sales to use for customer inquiries, the time is upon us.").  But that conduct, without a reasonable inference of an agreement with DFA, is not sufficient to maintain the Sherman Act violation alleged by Plaintiffs.

As described above, there are no communications between Schreiber and DFA from which a jury could infer an agreement to fix prices.  Instead, a jury would have to infer that because the parties communicated regularly during the spring of 2004, they must have been conspiring.  Such an inference requires too much of a leap, particularly given that Schreiber purchased hundreds of millions of dollars of cheese, milk, and cream from DFA every year[31] and that the parties communicated regularly outside the alleged conspiracy period, held quarterly meetings each year, attended the same industry functions, and had employees who had developed personal relationships over the years.[32]  Moreover, the evidence reflects that the companies met to discuss current and potential joint business ventures and also were attempting to resolve a patent infringement lawsuit that Schreiber brought against DFA.  Thus, this case is

---

[31]  The record reflects that in 2004, DFA was Schreiber's second largest cheese supplier.  Given the clear evidence of a customer-supplier relationship between Schreiber and DFA, Plaintiffs' refusal to concede the existence of this type of relationship—while repeatedly highlighting the fact that the parties also were competitors, a point not challenged by Schreiber—is puzzling.

[32]  Plaintiffs maintain that from these personal relationships, a jury could infer a conspiracy.  However, without any additional evidence of a conspiracy, that sort of logic requires an unsupported leap from legitimate conduct to unlawful conduct that is not supported in the case law.

distinguishable from those cases in which two competing companies had no pro-competitive reason to be communicating with one another. See, *e.g., In re Publ'n Paper Antitrust Litig.*, 690 F.3d 51, 65 (2d Cir. 2012) (heads of competing companies lacking any business or customer-supplier relationship met to discuss pricing strategies).

Aside from generally touting "frequent communications" and five meetings between April 28 and May 26, 2004 between the parties (two of which were at a social event attended by other industry participants),[33] Plaintiffs highlight two examples of supposedly suspect inter-firm communications. First, Plaintiffs focus on a May 11, 2004 quarterly review meeting attended by high-level executives of both Schreiber and DFA, including Larry Ferguson and Gary Hanman, the respective CEOs of the two companies. Plaintiffs contend that at this meeting "DFA and Schreiber's CEOs were discussing whether current CME price levels would hold (and such discussion was the first item on their written agenda)." Pls.' Opp. at 6-7. Plaintiffs ask the Court to infer from this alleged discussion that Schreiber agreed to participate in DFA's alleged market manipulation scheme.

As an initial matter, the evidence reflects that such meetings were held every quarter to review the status of Schreiber's business relationship with DFA.[34] At the May 11, 2004 quarterly meeting, DFA gave Schreiber its "forecast on the CME market," which also was typical for every quarterly meeting. Finally, the written agenda for the meeting lists "Market Conditions & Forecasts" as a topic for discussion, but does not mention CME price levels. No

---

[33] The decision by a group of industry players to have a meeting or to talk at a dinner or cocktail reception does not constitute a conspiracy. See *Market Force Inc. v. Wauwatosa Realty Co.*, 906 F.2d 1167, 1173 (7th Cir. 1990) ("[I]t is well established that evidence of informal communications among several parties does not unambiguously support an inference of a conspiracy.").

[34] For his part, Hanman testified that he had no recollection of the May 11, 2004 meeting and believed that he did not attend it. Hanman Dep. 212:19-213:10.14. For purposes of summary judgment, the Court assumes that he did attend.

one testified that the meeting involved discussions of whether CME prices would hold. However, even if the meeting participants had conveyed their views on current CME price levels, such a conversation between a supplier and one of its largest customers would not, on its own, indicate collusive behavior. As Plaintiffs concede, the record reflects that it was common for DFA to speak with its customers about market conditions, including conditions on the CME spot markets, which largely determine the prices that their customers pay for cheese. See, *e.g.*, May 25, 2004 internal Goddard e-mail to Korsmeyer and Dietrich (reflecting his conversations with six DFA customers and CME market participants, including Schreiber, about "comments relative to current market levels"); May 24, 2004 e-mail from Steve Vesce of American Dairy Brands to Korsmeyer (regarding Korsmeyer's request that Vesce "poll[] a few private label customers and retailers for optimum barrel/block pricing and here seems to be the consensus"); June 24, 2004 e-mail from Chris Hanson of Carlson Restaurants Worldwide, one of DFA's customers to Dietrich of DFA ("Lavonne [Dietrich], What's the story on the block and barrel market trending down right now?"). Indeed, it stands to reason that individuals in any buyer-seller relationship might naturally discuss current market conditions, as those conditions very likely affect the price at which the buyer sells and the seller buys the commodity at issue. Moreover, "Market Conditions & Forecasts" was on the agenda for every quarterly meeting between Schreiber and DFA, making it unlikely that the discussions at this particular meeting were anything beyond general market conditions. Finally, and most significantly, none of the evidence of record, including correspondence before and after the meeting, supports the proposition that Schreiber's and DFA's *CME trading activities* were discussed at the May 11, 2004 meeting, thus rendering any inference of collusion untenable in light of the evidence as a whole.

Plaintiffs also point to a May 17, 2004 e-mail in which a Schreiber employee provided the (wrong) name of one of its three CME floor traders to a DFA employee. In the e-mail, Elvin Hollon, Director of Fluid Marketing for DFA, wrote to Deborah Van Dyk, Vice President of Industry and Regulatory Affairs for Schreiber, as follows: "I may be getting an audience at the CME on the replacement cheese issue in the next week or so. I may want you to make a call. Who do you clear trades thru?" Van Dyk responded: "We clear through Downs O'Neil – broker is usually Neil Kelne. Let me know if you want my support." As Van Dyk explained at her deposition, this communication concerned an ongoing industry issue regarding the replacement of cheese that had been purchased on the CME and delivered to the buyer, but which did not meet the previously described specifications for cheese traded on the exchange. Van Dyk Dep. 23:12-23. She testified that she was handling this lobbying effort on Schreiber's behalf and that Hollon was handling the lobbying effort on this issue for DFA and that she understood Hollon to be asking whether she would be willing "to call the CME regarding Schreiber's position" on the replacement cheese issue. She further testified that she provided Hollon with the name of Schreiber's broker because that information "was readily known." Id. at 24:9-10, 25:2. Contrary to Plaintiffs' assertion, Van Dyk's response is consistent with the e-mail itself and nothing in this e-mail—or anywhere else in the record—suggests that Hollon inquired about Schreiber's broker as a means to detect whether Schreiber was "cheating" on its "agreement" with DFA. Moreover, the record is undisputed that DFA independently tracked the daily purchases and the identity of all participants on the CME spot cheese and butter markets, including Schreiber.

To survive summary judgment, "there must be at least some evidence supporting a finding that defendants' communications involved collusion regarding prices." *In re Text Messaging Antitrust Litig.*, 2014 WL 2106727, at *11. "[T]he mere opportunity to collude is

insufficient to establish a genuine issue for trial on this question." *Id.*; see also *Williamson Oil Co. v. Philip Morris USA*, 346 F.3d 1287, 1319 (11th Cir. 2003) ("[T]he opportunity to fix prices without any showing that [the defendants] actually conspired does not tend to exclude the possibility that they did not avail themselves of such opportunity."). Here, viewing the evidence in the light most favorable to Plaintiffs, there simply is not sufficient evidence from which a reasonable jury could infer collusion occurred during the meetings and phone calls between Schreiber and DFA in the spring of 2004, or "that the conspiracy was formed or advanced at any particular meeting or meetings." *In re Text Messaging Antitrust Litig.*, 2014 WL 2106727, at *12. Although Plaintiffs reference communications involving DFA and Schreiber that took place at or near the time of the CME activity at issue, they offer nothing other than speculation about the substance of these talks. Plaintiffs are "unable to point to anything beyond [their] own speculation to establish that [DFA and Schreiber] executives discussed collusive price increases" at numerous meetings. *Id.* at *24. Taken as a whole, evidence of any concerted action involving spot cheese contacts is no more suggestive of collusion than of parallel behavior, and thus it does not permit a reasonable inference of a conspiracy. At best, Plaintiffs' evidence shows sustained intra-industry communications, but without more such communications show only the opportunity to collude. This is insufficient to give rise to a dispute of material fact on a § 1 claim. See, *e.g.*, *In re Text Messaging Antitrust Litig.*, 2014 WL 2106727, at *12.

In sum, Plaintiffs have not pointed to communication between DFA and Schreiber in which the parties exchanged information regarding their past, current, or future CME purchases or intentions. Thus, as previously indicated, Plaintiffs' theory rests predominately on parallel conduct. And, as previously set forth, it is insufficient to show behavior that is merely parallel. *Id.* at *8. "A statement of parallel conduct, even conduct consciously undertaken, needs some

setting suggesting the agreement necessary to make out a § 1 claim; without that further circumstance pointing toward a meeting of the minds, an account of a defendant's commercial efforts stays in neutral territory." *Bell Atl. Corp.,* 550 U.S. at 557, 127 S.Ct. 1955.

Obviously aware of the lack of evidence of an agreement, and the unsustainability of a § 1 claim based solely on parallel conduct, Plaintiffs' final salvo to overcome the dearth of evidence indicating a meeting of the minds highlights the five million pounds of block cheese that Schreiber bought from DFA at the allegedly favorable price of $1.40 per pound. First, Plaintiffs maintain that there is a dispute between Ferguson and Hanman as to why the deal was made and who called whom. And second, Plaintiffs maintain that the deal was "very favorable" to Schreiber, such that the financial benefit to Schreiber from the five million pound transaction approximately offsets the amount of the overpayments that Schreiber made for the CME barrel cheese it purchased during the alleged manipulation period. In short, according to Plaintiffs, DFA made a "sweetheart" deal for Schreiber as a belated thank you for Schreiber's willingness to go along with the conspiracy to inflate cheese (and milk) prices.

Plaintiffs' theory does not withstand scrutiny of the documents and testimony presented at summary judgment. First, regardless of whether the CEOs of each company can recall "who called whom" in the summer of 2004, internal DFA e-mails demonstrate that the idea to sell Schreiber five million pounds of cheese was conceived by DFA in July of 2004 as part of an "Inventory Reduction Plan" designed to liquidate excess inventory accumulated by DFA during its purchasing activity on the CME. By July 1, 2004, DFA had a block cheese inventory of 72.8 million pounds, which was 35.8 million pounds more than their inventory in the same week in 2003. Prior to July, DFA had been attempting to reduce its "mountain of cheese," including

through potential sales of 10 to 20 million pounds to customers in Mexico, Japan, Korea, Brazil, North Africa, Puerto Rico, and Saudi Arabia.

Then, on June 30, 2004, Mark Korsmeyer asked DFA employees to generate "3-4 specific sales initiatives" to provide to Gary Hanman at DFA's July 2, 2004 inventory meeting. One idea generated, on July 1, 2004, was to offer Schreiber "a minimum of 5 mil. pounds @ $1.500 lb. discount up to a $.25 lb. discount for 10 mil lbs." of DFA's "existing CME colored cheddar inventory." On July 2, 2004, Korsmeyer sent out an Inventory Elimination Plan to discuss at that day's meeting with Hanman, including an idea to sell 5 million pounds of cheese to Schreiber. The two other ideas were to sell 30 million pounds to two other customers. At the inventory meeting, other employees presented ideas to sell 18 million pounds of cheese to various customers at discounted prices. On July 7, DFA employees again discussed offering Schreiber 5 million pounds of cheese. They also discussed selling 5 million pounds of cheese to Marathon and selling 30 million pounds of cheese in foreign markets through a program that subsidized the export of cheese.

On top of the contemporaneous, internal DFA e-mails, retired DFA employee Tom Goddard testified that the idea to sell Schreiber (and one other customer) five million pounds of block cheese was conceived after the alleged conspiracy had ended, in response to inquiries from DFA superiors about initiatives that might reduce DFA's excess supply of block cheese. See Goddard Dep. 55:3-9; 110:18-113:19. DFA employees subsequently met to go over the proposal, and the record reflects that the CEOs discussed the proposal. See Ferguson Dep. at 254:7–255:8. Then, inter-firm communications confirm that on July 13, 2004, Schreiber agreed to purchase five million pounds of block cheese from DFA at $1.4050 per pound—the price at

which CME block cheese closed on that same day. Far from special, the price was merely the market price for block cheese on the date of purchase.

In response to the testimony and documents in the record, Plaintiffs submitted a report from their accountant Charles Robinson. Robinson opines that Schreiber could not have received the market price for cheese anywhere else, that DFA's offer to pay shipping to (but no farther than) Utah was evidence of a favorable deal, and that Schreiber profited from the deal because, when the cheese finally was delivered, market prices were higher than they were when the deal was agreed to. See Aff. of Charles Robinson ("Robinson Aff.") ¶¶ 31-41. According to Robinson, these advantages managed to compensate Schreiber for the losses that it supposedly sustained in purchasing cheese on the CME in support of DFA's milk futures scheme.

Most notably, Plaintiffs' one-paragraph response on this issue[35] does not explain why a deal not conceived until after the conspiracy period ended could have incentivized Schreiber to join the conspiracy. In addition, Robinson's calculation of the difference between the CME price on the day the cheese was purchased and the CME price when it was delivered to Schreiber does not acknowledge that the evidence of record shows that Schreiber requested immediate delivery, but that delivery was delayed by DFA because of its inability to supply the specific product that Schreiber requested. Nor does Robinson explain how Schreiber could have predicted or been assured that the price of block cheese would have gone up rather than down over those months, even assuming that the agreement had been for future delivery.

Furthermore, Plaintiffs contend that the purportedly favorable terms from the five million pound cheese transaction "approximately offset[]" the "amount of overpayments that Schreiber made for the CME barrel cheese it purchased" during the alleged conspiracy period. According to Plaintiffs' own calculations, Schreiber's conduct in the conspiracy "transferred" the pressure

---

[35] Plaintiffs' surreply, which the Court has considered, does not mention the five million pound sale.

from DFA to Schreiber and led to "adverse financial consequences" for Schreiber. Pls.' Resp. at 5. But assuming that Plaintiff's theory is correct, Schreiber would not even have profited from the alleged scheme—at best, it would have broken even. Thus, Schreiber would have incurred the risk of participating in an illegal conspiracy, as well as supposed losses from buying barrel cheese for 20 days, in order to eventually construct a deal with DFA that would allow it to break even for the losses it supposedly sustained in purchasing cheese on the CME in support of DFA's milk futures scheme. This is not a reasonable inference.

Finally, even if the per-pound freight cost of three cents was favorable to Schreiber, the logical explanation for this, which is consistent with all of the documentary evidence and testimony, is that DFA needed to unload excess inventory. A reasonable jury simply could not find that this "sweetheart" deal[36] was part of a conspiracy to manipulate the price of milk futures.

### 3. Expert Testimony

As previously set forth, the Seventh Circuit has said there are "two types" of circumstantial evidence on which a plaintiff usually relies in a price-fixing case: "economic evidence suggesting that the defendants were not in fact competing, and noneconomic evidence suggesting that they were not competing because they had agreed not to compete." See *High Fructose Corn Syrup,* 295 F.3d at 655; see also *In re Brand Name Prescription Drugs Antitrust Litig.,* 186 F.3d 781, 785 (7th Cir. 1999) (noting economic circumstantial evidence as an alternative to direct evidence in antitrust cases). In addition to the noneconomic evidence discussed throughout, Plaintiffs, through their experts, point to economic evidence that they contend suggests that DFA and Schreiber had an agreement to manipulate the price of milk futures. In short, the experts opine that Schreiber's conduct—overpaying for cheese that it did

---

[36] Plaintiffs do not contend that DFA's deal with Schreiber was more favorable than sales DFA offered or made to other customers during the same period.

not need at the same time that DFA was overpaying for cheese that it did not need—was unlikely to happen unless the parties were colluding. Plaintiffs contend that this evidence refutes Schreiber's arguments that CME cheese prices have exhibited periods of stability and volatility over the years and its conduct during the manipulation period was "not so unusual."

But even one of Plaintiffs' experts, Professor Ed Jesse, acknowledges various independent reasons why Schreiber might have an economic interest in raising barrel prices in tandem with the rise in block prices, aside from the primary reasons advance by Schreiber (maintaining the spread at 3 cents). For instance, Dr. Jesse opines that "purchasing 100% of the CME barrel cheese to maintain prices at $1.77 through June 22" allowed Schreiber to protect "the value of inventory it held over that period" (Jesse Aff. ¶ 21); additionally, the higher CME prices meant "more profits for Schreiber from its flagship restaurant sales business" (*id.* ¶ 22); and further, "Schreiber believed that its retail business could benefit from higher CME prices if higher prices yielded an advantage over competitors" (*id.* ¶ 30). Thus, accepting for present purposes the validity of Dr. Jesse's opinions, they still would be consistent with an inference that Schreiber acted independently and in accordance with its own business interests. These reasons for Schreiber's conduct are "not economically irrational," nor do they suggest collusion between Schreiber and DFA. See *Market Force*, 906 F.2d at 1174 (affirming summary judgment where defendant submitted affidavits offering "several specific reasons" for its independent conduct that were "not economically irrational").

Plaintiffs' other expert, Professor Craig Pirrong, has opined that trading activity on the CME during the alleged conspiracy period was "highly unusual" and thus warrants an inference that DFA and Schreiber "cooperated." Although the evidence of record indicates (and Dr. Pirrong and Plaintiffs at least tacitly agree with Schreiber) that extreme price fluctuations and

extended periods of price stability are relatively common on the thinly traded CME block and barrel cheese markets, Dr. Pirrong asserts that, once he "corrected" for the admitted frequency of extreme price fluctuations and extended periods of stability, there was an extraordinarily low probability that the precise 20-day flat line during May to June 2004 would have been observed in a competitive market. However, both Dr. Pirrong and Dr. Jesse are on record stating that the CME cheese markets are *not* competitive. More fundamentally, Dr. Pirrong's method involves calculating the probability of very particular events occurring without taking into account the probability of the occurrence of similar events. His work thus calculates a low probability of a precisely 20-day flatline, but it ignores periods of similar or even longer flatlines (such as the 62-day flatline in block prices in 2003) in determining that probability.

Moreover, even accepting Dr. Pirrong's statistical analysis that these particular price fluctuations and extended period of price stability were "highly unusual," the inference that he draws from that analysis—that DFA and Schreiber cooperated—does not find the necessary support in the evidence. Like Dr. Jesse's analysis, Dr. Pirrong's analysis does not tend to exclude the possibility that Schreiber's actions were independently motivated by its desire to defend itself from the consequences of DFA's trading activity. See *In re Text Messaging Antitrust Litig.*, 2014 WL 2106727, at *14 (deeming experts' testimony to be of little value because their opinions did "not tend to exclude the possibility" that the defendants were acting independently).

This is particularly true when one looks at Schreiber's other efforts to close the spread. Contrary to Plaintiffs' claim that Schreiber's efforts in May and June 2004 were "radical" departures from its normal conduct, its concern in May and June mimicked its concern both before and after the alleged manipulation period. See *supra* pp. 51-54. Nor was 2004 the only

70

year in which Schreiber attempted to correct an abnormally large spread. During the summer of 2000, between July 20 and August 14, the spread grew from one cent to 22.5 cents. On August 14, Schreiber purchased one load of barrels, then purchased 138 loads between August 16 and September 18, when the spread closed at 3.5 cents. When the spread began to grow again, Schreiber purchased another 49 loads between September 19 and October 10, 2000. Schreiber engaged in similar conduct in 2005, when it purchased three loads on September 16, 2005, when the spread was 9.75 cents, followed by another 21 loads between September 19 and October 3, 2005, while the spread hovered between 6 and 15.75 cents, ceasing its purchases when the spread fell to three cents on October 4. Then, in the fall of 2007, the spread grew from 2.5 cents to 11 cents between October 24, 2007 and November 5, 2007. Schreiber then purchased 23 loads of barrels over the next 23 days until the spread closed. In July 2008, the spread grew from three cents to 32 cents in 8 days; Schreiber purchased 78 loads between the time that the spread began to grow on July 21, 2008 and September 5, 2008, when the spread fell to one cent. And in November 2009, the spread held above ten cents for 13 days, then above 20 cents for 14 days. Schreiber then entered the market and purchased 8 loads over 6 days, ceasing when the spread fell to 2 cents.

In short, although the experts' reports present impressive breakdowns of the CME market and the conduct of Schreiber and DFA relative to that market, they "do little to demonstrate * * * any sort of agreement." *Omnicare*, 629 F.3d at 716. To be sure, taken alone or with the other evidence, Plaintiffs' arguments about the CME activity and the analyses behind them inevitably present differences of opinion. The evidence in this case is, after all, voluminous. However, Plaintiffs have not shown that the disputed facts create a reasonable inference that Defendants actually colluded to manipulate prices. What still is missing is evidence that would allow a

reasonable jury to find collusion, as opposed to, for example, self-interested and independent behavior. Plaintiffs have not pointed to cases permitting such an inference from evidence of this sort. Nor can the opinions of their experts establish the existence of a dispute of material fact based on the same underlying evidence. The evidence does not tend to rule out the possibility of independent action; rather, it is "conduct as consistent with permissible competition as with illegal conspiracy," which "does not, standing alone, support an inference of antitrust conspiracy." *Matsushita,* 475 U.S. at 588, 106 S.Ct. 1348.

* * * * *

Although the Court has often discussed the evidence in isolation, the Court also must assess the evidence in the aggregate. The Seventh Circuit specifically warned in *High Fructose Corn Syrup* that courts must not "suppose that if no single item of evidence presented by the plaintiff points unequivocally to conspiracy, the evidence as a whole cannot defeat summary judgment." 295 F.3d at 655. "The question for the jury in a case such as this," the court said, "would simply be whether, when the evidence was considered as a whole, it was more likely that the defendants had conspired to fix prices than that they had not conspired to fix prices." *Id.* at 655–56. The Seventh Circuit has said in another context that this approach is akin to examining "a mosaic whose individual tiles add up to a complete picture." *Morgan v. SVT, LLC,* 724 F.3d 990, 995 (7th Cir. 2013).

Reviewing Plaintiffs' evidence in this manner nonetheless produces the conclusion that a reasonable jury could not find in favor of Plaintiffs. Critically, Plaintiffs' evidence does not undermine Schreiber's position that its conduct was consistent with its independent business interests, and Plaintiffs' own expert concedes that Schreiber benefitted from closing the spread in what is admittedly regarded to be a non-competitive market. Plaintiffs' attempts to marginalize

Schreiber's motivation are contradicted by the extensive evidence (temporally near and during the alleged manipulation period) demonstrating that Schreiber employees in fact were attempting to prevent a large spread from affecting their company's operations and profits. Taken as a whole, this is evidence that does not "reasonably tend[ ] to prove" that Schreiber consciously committed to a scheme with DFA designed to achieve an unlawful objective. See *Monsanto,* 465 U.S. at 764. Rather, it appears that Schreiber was engaging in an independent effort to defend its interests by reducing the spread between CME block and barrel cheese prices caused by DFA's support of the block cheese price, which (Plaintiffs allege) was done in an effort to manipulate the price of milk futures.

At the end of the day, Plaintiffs' economic evidence, coupled with the wealth of documents and testimony evincing Schreiber's concern with the spread and Schreiber's conduct before and after the manipulation period, leads to a reasonable inference, just not the one urged by Plaintiffs: Schreiber was reacting to volatile (and unfavorable) changes in the spot cheese market (caused by DFA and Keller's) and continued its prior behavior of purchasing in such a way as to defend its own profits during the manipulation period. Given Schreiber's clearly documented independent interests, its "parallel conduct, even conduct consciously undertaken" does not "point[ ] toward a meeting of the minds." *Bell Atl. Corp.,* 550 U.S. at 557. In short, the evidence compiled does not present a question for a jury on whether Schreiber conspired to manipulate the price of milk futures by purchasing spot cheese on the CME.

### B.     Count IV (Commodities Exchange Act Claim)

Beginning with the language of the statute, § 22(a)(1) of the Commodity Exchange Act ("CEA"), 7 U.S.C. § 25(a)(1), provides in relevant part:

(a)      Actual damages; actionable transactions; exclusive remedy

(1)     Any person (other than a registered entity or registered futures association) who violates this chapter or who willfully aids, abets, counsels, induces, or procures the commission of a violation of this chapter shall be liable for actual damages resulting from one or more of the transactions referred to in subparagraphs (A) through (D) of this paragraph and caused by such violation to any other person—

   (A)     who received trading advice from such person for a fee;

   (B)     who made through such person any contract of sale of any commodity for future delivery (or option on such contract or any commodity) or any swap ; or who deposited with or paid to such person money, securities, or property (or incurred debt in lieu thereof) in connection with any order to make such contract or any swap;

   (C)     who purchased from or sold to such person or placed through such person an order for the purchase or sale of--
      (i)     an option subject to section 6c of this title (other than an option purchased or sold on a registered entity or other board of trade);
      (ii)     a contract subject to section 23 of this title; or
      (iii)     an interest or participation in a commodity pool; or
      (iv)     a swap; or

   (D)     who purchased or sold a contract referred to in subparagraph (B) hereof or swap if the violation constitutes—
      (i)     the use or employment of, or an attempt to use or employ, in connection with a swap, or a contract of sale of a commodity, in interstate commerce, or for future delivery on or subject to the rules of any registered entity, any manipulative device or contrivance in contravention of such rules and regulations as the Commission shall promulgate by not later than 1 year after July 21, 2010; or
      (ii)     a manipulation of the price of any such contract or swap or the price of the commodity underlying such contract or swap.

7 U.S.C.A. § 25(a)(1).

To begin with, two Direct Purchaser Plaintiffs lack standing to bring claims under the CEA because they did not transact in Class III milk futures during the relevant period.  A condition precedent of § 25(a)(1)(D) is that the plaintiff purchased or sold a contract for future

delivery. See *Thompson's Gas & Elec. Serv., Inc. v. BP Am. Inc.*, 691 F. Supp. 2d 860, 871 (N.D. Ill. 2010) ("Section 22 specifies that only those persons trading in a contract of sale of any commodity for future delivery may bring suit, and it is well established that this language refers to a futures contract, rather than a cash-forward contract for sale of a physical commodity" (citing *CFTC v. Zelener*, 373 F.3d 861, 865-66 (7th Cir. 2004))); *In re Soybean Futures Litig.*, 892 F. Supp. 1025, 1041 (N.D. Ill. 1995). Plaintiffs Indriolo Distributors, Inc. and Valley Gold, LLC have admitted that they did not transact in CME Class III milk futures contracts between April 1, 2004 and December 31, 2006. Further, Indriolo and Valley Gold's allegations that they purchased physical milk and cheese affected by Class III milk futures prices are of no moment. Purchasers of physical commodities whose prices were affected by futures trading do not have a claim. *Thompson's Gas & Elec. Serv., Inc.*, 691 F. Supp. 2d at 871-72 (rejecting the assertion that downstream purchasers of the physical commodity underlying a futures market have standing and explaining that "standing to bring a CEA manipulation claim under 7 U.S.C. § 25(a)(1)(D) requires that the plaintiffs' injury arise as a result of having purchased or sold a contract of sale of any commodity for future delivery (or option on such contract or any commodity) * * * * In this Circuit, this means a futures contract." (internal citation and quotation marks omitted)); see also *Kolbeck v. LIT Am., Inc.*, 923 F. Supp. 557, 566 (S.D.N.Y. 1996) (collecting cases). As such, Indriolo and Valley Gold each lack standing to assert claims under the CEA, and summary judgment must be granted on their claims under the CME. [37]

Additionally, Plaintiffs have not been entirely clear whether, in addition to a claim that Schreiber manipulated Class III milk futures, they also seek to find Schreiber liable for manipulation of the spot cheese market. Presumably, Schreiber's conduct (at least as the

---

[37] Plaintiffs do not dispute that Indriolo and Valley Gold lack standing to pursue their CEA claims.

summary judgment record tells it) would be best suited for a claim based on manipulation of the spot cheese market.  But unfortunately for Plaintiffs, such a claim is not tenable.

First, the CEA grants a private right of action only for manipulation of a futures market, and spot cheese is not a "future" within the meaning of the CEA.  The CEA's private right of action refers only to "contracts for future delivery"; that is, a *futures* contract.  See 7 U.S.C. § 25(a)(1)(B), (D); see also 7 U.S.C. § 1a(27) (stating that the "term 'future delivery' does not include any sale of any cash commodity for deferred shipment or delivery"); *Thompson's Gas & Elec. Serv., Inc.*, 691 F. Supp. 2d at 871-72 ("In this Circuit, this means a futures contract."). Spot contracts, however, are not futures contracts. See *CFTC v. Zelener*, 373 F.3d 861, 863-64 (7th Cir. 2004) (defining a futures contract); *Nagel v. ADM Investor Servs., Inc.*, 217 F.3d 436, 437, 441 (7th Cir. 2000) (distinguishing between an "ordinary" forward contract and a "contract for future delivery" and explaining the features of a futures contract).  Spot contracts contemplate a contract for the exchange of title and delivery of the product within a short period and are not intended to facilitate speculation regarding the future price of the commodity.  See *Zelener*, 373 F.3d at 863 (distinguishing spot markets from futures markets).[38]  The CEA therefore does not provide a private right of action to recover for damages suffered in the trading of spot cheese contracts.[39]

---

[38] Compare *Black's Law Dictionary* (9th ed. 2009) (definition of futures contract:  "An agreement to buy or sell a standardized asset * * * at a fixed price at a future time * * *."), with *id.* (definition of "spot":  "Made, paid, or delivered immediately * * *."); see also *id.* (defining "market" and distinguishing between a "futures market," which is a "commodity exchange in which futures contracts are traded; a market for a trade (e.g., commodities futures contracts and stock options) that is negotiated at the current price but calls for delivery at a future time," from a "spot market," which is a "market (esp. in commodities) in which payment or delivery is immediate").

[39]  Additionally, even if the CEA did provide such a right of action, all of the named Direct Purchaser Plaintiffs would lack standing to assert such a claim because none of them purchased CME spot cheese contracts between April 1, 2004 and December 31, 2006.

That leaves Direct Purchaser Plaintiff Knutson's[40] claims that Schreiber violated the Commodities Exchange Act ("CEA") by manipulating the price of Class III milk futures as well as the commodity underlying Class III milk futures. Price manipulation of a commodity is prohibited by the CEA. See 7 U.S.C. §§ 13(a)(2) and 25(a). Although not defined in the statute, "broadly stated, [manipulation] is an intentional exaction of a price determined by forces other than supply and demand." *Frey v. Commodity Futures Trading Comm'n,* 931 F.2d 1171, 1175 (7th Cir. 1991); see also *Kohen v. Pacific Inv. Management Co. LLC*, 244 F.R.D. 469, 481 (N.D. Ill. 2007). For a CEA manipulation claim, a plaintiff must establish that: "(1) the defendant possessed the ability to influence prices; (2) an artificial price existed; (3) the defendant caused the artificial price; and (4) the defendant specifically intended to cause the artificial price." *In re Soybean Futures Litigation,* 892 F. Supp. 1025, 1030 (N.D. Ill. 1995). Since market "manipulation defies easy description * * * manipulation cases tend to be characterized by fact-specific, case-by-case analysis." *Id.* at 1044 (noting "Congress' decision to prohibit manipulation without defining it apparently arose from the concern that clever manipulators would be able to evade any legislated list of proscribed actions or elements of such a claim"); *Frey,* 931 F.2d at 1175 (stating that "[s]ophisticated economic justification for the distinctions made in this area of the law may at times seem questionable" and "[s]ometimes the 'know it when you see it' test may appear most useful"); see also *Premium Plus Partners, L.P. v. Davis*, 653 F. Supp. 2d 855, 875-76 (N.D. Ill. 2009). A plaintiff may recover either from a principal violator or from one who aids and abets another's violation. 7 U.S.C.A. § 25(a)(1); see also *Damato v. Hermanson*, 153 F.3d 464, 471 (7th Cir. 1998).

        *1.       Aiding and abetting*

---

[40] Knutson purchased or sold a CME Class III milk futures contract during the relevant time period and thus has standing.

To demonstrate an aiding and abetting claim under § 22 of the CEA, Plaintiffs first must demonstrate the components of a manipulation claim against a principal. See *Damato,* 153 F.3d at 470-71. Plaintiffs then must prove that Schreiber (1) knew of the principals' intent to manipulate milk futures; (2) had the intent to further that manipulation; and (3) committed some act in furtherance of the scheme. *In re Platinum and Palladium Commodities Litig.*, 2011 WL 4048780, at *8 (S.D.N.Y. Sept. 13, 2011).

As set forth in addressing Plaintiffs' § 1 claim, the evidence does not support a reasonable inference that Schreiber agreed to help DFA and Keller's manipulate the spot cheese markets. And the evidence is still more insufficient to support an inference that Schreiber knew of or intended to further the alleged scheme to manipulate the separate Class III milk futures market. Assuming (again for present purposes only) that DFA and Keller's were principal violators, Plaintiffs has not presented sufficient evidence that Schreiber knew of their intent or had any reason to want to help DFA and Keller's violate the CEA. Plaintiffs do not allege that Schreiber stood to profit from higher milk futures prices. Ferguson, Schwenke, and Herlache all have denied that they were aware of the alleged plan by DFA and Keller's to inflate the closing positions of milk futures, and they all deny that Schreiber purchased spot cheese in order to help DFA and Keller's affect the Class III milk futures market. Finally, the evidence does not support an inference that anyone at Schreiber discussed, was aware of, or deliberately sought to further the alleged plan. This lack of evidence defeats Plaintiffs' aiding and abetting claim. See *Damato*, 153 F.3d at 473 (stating that intent to aid and abet cannot be found where there are no facts indicating that defendant had knowledge of the scheme).

       *2.        Schreiber as principal violator*

As previously indicated, to prevail on a claim of manipulation under the CEA, Plaintiffs must prove that Schreiber had the ability to manipulate market prices; an artificial price existed; Schreiber caused the artificial price to exist; and Schreiber specifically intended the artificial price to exist. *In re Soybean Futures Litig.*, 892 F. Supp. at 1045. Specific intent requires "a showing that the accused acted (or failed to act) with the purpose or conscious object of influencing prices." *Id.* at 1059. Mere knowledge that certain actions might have an impact on the futures market is not sufficient to state a private claim under the CEA. See *Hershey v. Energy Transfer Partners, L.P.*, 610 F.3d 239, 249 (5th Cir. 2010) ("Under a specific intent standard, mere knowledge is not enough. Defendants must have specifically intended to impact the futures market.").

Schreiber contends that Plaintiffs' claim founders on the specific intent requirement. According to Schreiber, it had no interest in milk futures. Further, Schreiber contends that Plaintiffs have failed to allege, let alone present evidence, that Schreiber had an independent motive to inflate them. In response, Plaintiffs contend that Schreiber's internal documents reflect that Schreiber held and traded CME Class III milk futures positions in May and June 2004 in its "cheese opportunity account." Plaintiffs also contend that cheese traded on the CME is the "commodity underlying" a Class III milk futures contract and that Schreiber can be liable as a principal violator for manipulating the price of spot cheese.

With respect to Plaintiffs' argument that cheese traded on the CME is the "commodity underlying" a Class III milk futures contract, 7 U.S.C. § 25(a)(1)(D) permits a plaintiff who "purchased or sold a [contract for future delivery]" to recover for a violation "if the violation constitutes a manipulation of the price of any such contract or *the price of the commodity underlying such contract*" (emphasis added)). Unfortunately for Plaintiffs, courts have rejected

arguments that a commodity with an indirect effect on a futures contract is the commodity underlying the futures contract. See, *e.g., Hershey*, 610 F.3d at 247; *Three Crown Ltd. P'ship v. Caxton Corp.*, 817 F. Supp. 1033, 1043 (S.D.N.Y. 1993) (holding that "while defendants' alleged manipulation of [secondary] Markets in Treasury notes may have adversely impacted positions plaintiffs took in the Treasury bill and Eurodollar futures markets," Treasury notes "are not the commodity 'underlying'" those futures). Although spot cheese prices are a "significant component" in the USDA Class III milk price formula, CME cheese simply is not the underlying commodity in a milk futures contract. As the Fifth Circuit noted in *Hershey*, the commodity underlying a futures contract is the commodity specified for future delivery, the price of which determines the settlement price of the futures contract. 610 F.3d at 247; accord *Three Crown Ltd. P'ship*, 817 F. Supp. at 1043 ("Based on standard definitions of a 'futures contract,' the phrase 'the commodity underlying such [futures] contract' in § 22(a)(1)(D) refers to the commodity specified within the particular futures contract."). In this case, the commodity specified within Class III milk futures is Class III milk, an actual commodity, and "the USDA Class III price for milk for the particular month" determines the settlement price of Class III milk futures traded on the CME. CME Rule 5203.A. Therefore, the commodity underlying those futures contracts is Class III milk, not spot cheese.

Plaintiffs have not offered any authority supporting their conflicting interpretation of "commodity underlying" a futures contract. Plaintiffs cite *Hershey v. Energy Transfer Partners, L.P.*, in support of their position, but *Hershey* actually rejected a substantially similar argument to that advanced here:

> Plaintiffs argue that, contrary to the district court's finding, the underlying of a NYMEX natural gas future is natural gas generally, rather than the gas delivered at the Henry Hub. Plaintiffs contend that prices of physical natural gas, wherever bought or sold, directly affect NYMEX natural gas futures contract prices.

Plaintiffs further argue that the interconnected nature of the industry necessitates a finding that natural gas generally is the underlying commodity because the fungible commodity at any hub is 'inextricably linked' with the NYMEX natural gas futures price * * * * [W]e cannot agree with Plaintiffs' position.

Id. at 247.  According to the Fifth Circuit, even though natural gas prices everywhere directly affect the price of natural gas delivered at the Henry Hub (just like the price of spot cheese affects the price of milk), "[u]nder the CEA, actionable manipulation must be directed at 'the price of the commodity underlying *such* contract,'" and, "[b]y definition, the underlying of a futures contract depends on the contract itself." *Id.* (citing 7 U.S.C. § 25(a)(1)(D) (emphasis in original)).  The court further explained that "[i]t is undisputed that the contract in question here is the NYMEX natural gas futures contract. Therefore, Plaintiffs must allege that Defendants specifically intended to manipulate the underlying of *that* contract, not some hypothetical natural gas futures contract." *Id*. (emphasis in original).[41]

The Fifth Circuit's logic compels the same result here. The commodity specified within Class III milk futures contract traded on the CME is Class III milk, an actual commodity, and, as set forth above, the "USDA Class III price for milk for the particular month" determines the

---

[41]  Citing to *Board of Trade of City of Chicago v. S.E.C.*, 187 F.3d 713 (7th Cir. 1999), Plaintiffs maintain that "commodity underlying" is not defined in the CEA.  When read in context, the statement further undercuts Plaintiffs' argument. The court in *Board of Trade* was responding to an argument by the SEC that a utilities futures contract tied to the Dow Jones Utilities and Transportation Averages was defective because the Dow Jones average did not include any telecommunications stocks. See *id.* at 723. In other words, the SEC had argued that the futures contract was tied to the wrong underlying commodity (in the SEC's view, the NYSE Utilities Index would have been a better choice). The court rejected this argument, stating that a board of trade can choose any commodity to underlie a futures contract that it wants: "While the SEC thinks that the difference between the NYSE and Dow Jones utilities portfolios is bad, an investor may believe that choice is good. The more different proxies for 'utilities' are available, the easier it is to hedge or balance a particular portfolio. There's no right definition of the commodity underlying a futures contract.  Instead there are many possible definitions. Boards of trade experiment to find good combinations, but most contracts fail to attract enough trading to justify continued listing." *Id.* The implications of the Seventh Circuit's dicta are that each futures contract in fact has a defined underlying commodity and that commodity is the commodity (such as the Dow Jones Utilities and Transportation Average) specified in the futures contract.

settlement price of Class III milk futures traded on the CME. CME Rule 5203.A. Therefore, the commodity underlying a Class III milk futures contracts is Class III milk—not spot cheese.

That leaves Plaintiffs' contention that Schreiber's purchases of barrel cheese demonstrate a specific intent to manipulate milk futures. But there is a dearth of evidence in the record that suggests that Schreiber's barrel cheese purchases from May 24 to June 23 were undertaken with the purpose or conscious object of affecting milk futures prices. *Hershey*, 610 F.3d at 249; see id. at 248 (rejecting allegations that defendants "knew or should have known that their manipulation of natural gas prices at HSC would result in the artificial suppression of the prices of NYMEX natural gas futures contracts" where the defendants had no interest in the futures). There is no evidence in the record that Schreiber was interested in milk futures (unlike the evidence of Schreiber's almost-unwavering interest in the spread between CME blocks and barrels[42]). Moreover, Plaintiffs have failed to come forward with any evidence even showing why Schreiber might be motivated to inflate the cost of milk and the reason why appears simple: higher milk prices would only increase Schreiber's costs, and therefore Schreiber would not seem to have a reason to want to inflate milk futures.

In the face of this logical inference, the only evidence that Plaintiffs offer with respect to Schreiber's interest in milk futures prices is that Schreiber held 150 long positions for May 2004 in its internal risk management (hedging) account. Schreiber's small number of May futures positions (approximately 1% of alleged holdings of DFA and Keller's (reported to be in excess of 15,000 speculative long futures positions during the alleged manipulation period) simply are insufficient to lead a reasonable jury to conclude that they engaged in a risky, illegal conspiracy

---

[42] Dr. Pirrong identified two instances in which Schreiber did not purchase cheese on the CME despite the existence of a spread wider than 5 cents. Similarly, before the CFTC, Herlache testified that there are days in which Schreiber would allow the spread to maintain a larger space based on other factors.

to manipulate the price of milk futures.[43]  Plaintiffs have failed to demonstrate that Schreiber had the specific intent to manipulate milk futures, and summary judgment on Plaintiffs' CEA claim is appropriate.

### C.     Count 6 (Unjust Enrichment)

Plaintiffs' final claim against Schreiber is for unjust enrichment and restitution. This claim is predicated on Schreiber's alleged statutory violations.  See Compl. ¶¶272-73.  Because the Court has concluded that a jury could not reasonable infer that Schreiber was liable under these predicate statutes, Plaintiffs' claim for unjust enrichment under unspecified state laws perishes as well.  See *Omnicare, Inc*, 629 F.3d at 723.

## IV.     Conclusion

For these reasons, the Court grants Defendant Schreiber's motion for summary judgment [430].   Judgment will be entered in favor of Schreiber and against Direct Purchaser Plaintiffs on all claims asserted against it.

Dated: August 18, 2014

_____
Robert M. Dow, Jr.
United States District Judge

---

[43]  Moreover, the record reflects that Schreiber's purchases from May 24 to June 23 likely would not have affected the May Class III milk price (and thus would have had no impact on Schreiber's May futures positions). As Plaintiffs' expert Professor Jesse explains, the Class III milk price incorporates the average NASS survey prices for cheese in May, which are in turn correlated with CME prices after a two-week lag.  Jesse Aff. ¶ 6.  In other words, CME prices on May 24, 2004 (when Schreiber allegedly began participating in the conspiracy) would not have had an effect on NASS survey prices until approximately June 7, and NASS prices on June 7 had no input into the May Class III price, which was announced on June 4.  If Plaintiffs had wanted to determine whether Schreiber had an interest in higher futures prices during a potentially relevant time, they would have looked at Schreiber's June and July futures contract positions, as those were the positions whose closing prices potentially could have been affected by Schreiber's trading.  Schreiber has presented evidence that its hedging positions were net short for June and July by 148 contracts, meaning that its positions would (and did) lose money on higher June and July Class III milk prices.