**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| IN RE: DAIRY FARMERS OF AMERICA, INC. | ) | |
| CHEESE ANTITRUST LITIGATION | ) | Master File No. 09-cv-3690 |
| | ) | MDL No. 2031 |
| | ) | |
| THIS DOCUMENT RELATES TO: | ) | Judge Robert M. Dow, Jr. |
| | ) | |
| Direct Purchaser Actions | ) | |

**MEMORANDUM OPINION AND ORDER**

Before the Court are Class Counsel's petition for an award of attorneys' fees and reimbursement of expenses [613], Schreiber Foods, Inc.'s ("Schreiber") sealed motion for Rule 11 sanctions [676], and Schreiber's amended bill of costs [694]. Ancillary to these motions are Defendant Dairy Farmers of America's ("DFA") motion for leave to file a response to the Direct Purchaser Plaintiffs' reply memorandum in further support of Class Counsel's fee petition [649], and Direct Purchaser Plaintiffs' motions for leave to file a surreply in further opposition to Schreiber's motion for Rule 11 sanctions [703] and to seal exhibit 1 to that motion [701].

For the reasons stated below, the Court grants Class Counsel's fee petition [613], awarding them one-third of the $46 million common fund ($15,333,333.33) with interest thereon at the same rate paid on the Settlement Fund, plus $488,491.24 in costs and expenses. The Court grants DFA's motion for leave to file a response to Direct Purchaser Plaintiffs' reply memorandum in further support of Class Counsel's fee petition [649]. The Court denies Schreiber's motion for Rule 11 sanctions [676]. The Court grants in part and denies in part Direct Purchaser Plaintiffs' motion to file a surreply [703] and Direct Purchaser Plaintiffs' motion to file exhibit 1 to their surreply under seal [701], granting Plaintiffs leave to file only the

exhibits to their motion to file a surreply, which will remain under seal on the Court's docket as currently filed. Finally, the Court grants Schreiber's bill of costs [694], and awards it $32,215.23.

## I.     Factual Background

A more complete factual and procedural history can be found in this Court's order granting Schreiber's motion for summary judgment. [652, available at *In re Dairy Farmers of Am., Inc., Cheese Antitrust Litig.*, 2014 WL 4083938 (N.D. Ill. Aug. 18, 2014).]

### A.     Direct Purchaser Plaintiffs' Settlement with DFA

Direct Purchaser Plaintiffs filed their first class action complaint against various DFA-related defendants on March 13, 2009. After a heavily-briefed motion-to-dismiss phase, Judge Hibbler (to whom this case previously was assigned) allowed certain of Plaintiffs' claims to proceed [see 141 (Feb. 4, 2011)], after which the parties began engaging in a series of settlement discussions and proceedings. On or about March 18, 2012, Plaintiffs and DFA agreed to a payment of $46,000,000 in cash as consideration for a proposed settlement (the "Settlement Fund"). [634, ¶ 6.] It was approximately one year later that Direct Purchaser Plaintiffs moved for preliminary approval of the settlement [327 (Mar. 21, 2013)], which the Court granted on March 13, 2014 [494] and entered on March 17, 2014 [495]. Plaintiffs moved for final approval on July 21, 2014 [612], which the Court granted and entered on September 12, 2014 [667–68]. Having reached a settlement with DFA, Class Counsel now seeks an award of attorneys' fees and reimbursement of expenses [609] as contemplated by the parties' settlement agreement. [See Settlement Agreement, 487-1, § 8(b) ("In connection with the motion for final approval of the Settlement, Lead Counsel will seek an award of Class Counsel attorneys' fees, to be paid from the Settlement Fund, not to exceed one-third of the Settlement Fund and reimbursement of expenses.").]

## B.    Schreiber Foods, Inc.

Three years after filing their first class action complaint against DFA—and just weeks prior to reaching an agreement regarding the monetary component of their settlement with DFA—Direct Purchaser Plaintiffs filed a second amended consolidated class action complaint, adding Schreiber as a defendant. [245 (Mar. 22, 2012).] Approximately six weeks later, on May 9, 2012, Schreiber's counsel sent a letter to Class Counsel, claiming that Plaintiffs had no reasonable basis for the factual allegations in their complaint and requesting that Plaintiffs withdraw their complaint, citing the sanctions provision of Federal Rule of Civil Procedure 11(c)(2). [688, ex. A.] Five days after sending this letter, Schreiber moved to dismiss Plaintiffs' complaint [265], which the Court granted in part and denied in part on January 18, 2013 [314]. Then, after a year's worth of discovery transpired, Schreiber moved for summary judgment [430 (Dec. 13, 2013)], which the Court granted [652 (Aug. 18, 2014)]. Prior to the Court's ruling on Schreiber's motion (but while the motion was still pending), Schreiber's counsel sent another letter to Class Counsel [see 676-1, ex. A (Mar. 19, 2014)], reiterating its Rule 11 objections and attaching a draft of its Rule 11 motion for sanctions. Schreiber filed an amended version of its Rule 11 motion shortly after its victory on summary judgment. [See 673 (Sept. 18, 2014).] Schreiber also filed a bill of costs, seeking reimbursement of fees as the prevailing party. [679; revised at 694.]

Prior to being sued by Plaintiffs, Schreiber purportedly was the largest member of the settling class. [See 619, at 1.] But Schreiber was not officially a class member at the time of Plaintiffs' settlement with DFA; as of March 23, 2012, Schreiber was a named defendant in this action, and thus arguably excluded, at least in part, from participating as a class member. As the Court noted in its summary judgment order, this straddling of the line between class member and

defendant put Schreiber in an uncomfortable position, having to wear both its class member hat and its defendant hat simultaneously. After prevailing on its motion for summary judgment, Schreiber looked to end any disputes regarding its right to participate as a class member, moving the Court for such a declaration. [654 (Motion for Order Declaring Schreiber a Class Member).] The Court granted Schreiber's motion, leaving no dispute that Schreiber currently is a member of the settling class. [See 670, at 1 ("Schreiber is no longer a defendant in this action and, pursuant to the notice to the Class dated March 17, 2014, is fully able to participate as a Member of the Class * * *.").]

## II.     Analysis

### A.     Class Counsel's Fee Petition

"In a certified class action, the court may award reasonable attorney's fees * * * that are authorized by law or by the parties' agreement." Fed. R. Civ. P. 23(h). To determine the reasonableness of the sought-after fees in this, a common-fund case,[1] "courts must do their best to award counsel the market price for legal services, in light of the risk of nonpayment and the normal rate of compensation in the market at the time." *In re Synthroid Mktg. Litig.*, 264 F.3d 712, 718 (7th Cir. 2001) ("*Synthroid I*"); see also *In re Cont'l Ill. Sec. Litig.*, 962 F.2d 566, 572 (7th Cir. 1992) ("The object in awarding a reasonable attorney's fee * * * is to give the lawyer what he would have gotten in the way of a fee in arm's length negotiation, had one been feasible. In other words the object is to simulate the market where a direct market determination is infeasible."). The Seventh Circuit has recognized, however, that "[s]uch estimation is inherently conjectural," *Trans Union Corp. Privacy Litig.*, 629 F.3d 741, 744 (7th Cir. 2011), and thus a district court's award of fees is reviewed for abuse of discretion. *Silverman v. Motorola*

---

[1] "MDL courts have consistently cited the common fund doctrine as a basis for assessing common benefit fees in favor of attorneys who render legal services beneficial to all MDL plaintiffs." *In re Vioxx Prods. Liab. Litig.*, 760 F. Supp. 2d 640, 648 (E.D. La. 2010) (citing cases).

*Solutions, Inc.*, 739 F.3d 956, 958 (7th Cir. 2013). In *Synthroid I*, the Seventh Circuit held that the "market rate for legal fees depends in part on (1) the risk of nonpayment a firm agrees to bear, in part on (2) the quality of its performance, in part on (3) the amount of work necessary to resolve the litigation, and in part on (4) the stakes of the case." 264 F.3d at 721; see also *Taubenfeld v. AON Corp.*, 415 F.3d 597, 599 (7th Cir. 2005). The probability of success at the outset of the litigation is also relevant to this inquiry, see *Florin v. Nationsbank of Ga., N.A.*, 34 F.3d 560, 565 (7th Cir. 1994), as is the "complexity, length and expense of the litigation." *Isby v. Bayh*, 75 F.3d 1191, 1198–99 (7th Cir. 1996).

There are two predominant methods for calculating reasonable attorneys' fees in this district. The first is via the "lodestar" method, which considers "the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983); see also *Spegon v. Catholic Bishop of Chi.*, 175 F.3d 544, 550 (7th Cir. 1999). The other method—which has emerged as the favored method for calculating fees in common-fund cases in this district—sets the fee award as a percentage of the recovered settlement fund, plus expenses and interest. See *Blum v. Stenson*, 465 U.S. 886, 900 n.16 (1984) (acknowledging the percentage method in common-fund cases). But see *Florin*, 34 F.3d at 566 ("We therefore reiterate the law of this circuit that in common fund cases, the decision whether to use a percentage method or a lodestar method remains in the discretion of the district court."); *Stumpf v. Pyod, LLC*, 2013 WL 5753829, at *3 (N.D. Ill. Oct. 23, 2013). For reasons that will become apparent below, the Court finds the percentage-of-the-fund approach to be the more reasonable one here.

### 1.     The Terms of the Parties' Agreement

If possible, it is preferable to establish a fee structure at the outset of a lawsuit. See *Silverman*, 739 F.3d at 958 (noting that *ex ante* agreements better approximate the prevailing

market rate between willing buyers and willing sellers of legal services); Fed. R. Civ. P. 23(h) ("[T]he court may award reasonable attorney's fees * * * that are authorized by law *or by the parties' agreement*." (emphasis added)). Unfortunately the parties did not reach an *ex ante* agreement here, and by the time the case was transferred to this Court in April of 2012 [see 258], "it was not possible to recreate the conditions that existed at the case's outset." *Silverman*, 739 F.3d at 958. Instead, Class Counsel negotiated their compensation (one-third of the fund plus costs) contemporaneously with their settlement negotiations. [See Settlement Agreement, 487-1, § 8(b) ("In connection with the motion for final approval of the Settlement, Lead Counsel will seek an award of Class Counsel attorneys' fees, to be paid from the Settlement Fund, not to exceed one-third of the Settlement Fund and reimbursement of expenses.").[2]] Accordingly, there is no presumption of market-rate reasonableness here, and the Court will proceed to review the reasonableness of the fee petition in the exercise of its discretion. *Harman v. Lyphomed, Inc.*, 945 F.2d 969, 973 (7th Cir. 1991).

## 2. Market Rate: Fee Awards in Other Common-Fund Cases

As a barometer for assessing the reasonableness of a fee award in common-fund cases, courts look to the going market rate for legal services in similar cases. *Synthroid I*, 264 F.3d at 718. To assist in this assessment, the Seventh Circuit has counseled that "[t]he judicial task might be simplified if the judge and the lawyers bent their efforts on finding out what the market in fact pays not for the individual hours but for the ensemble of services rendered in a case of this character." *In re Cont'l Ill. Sec. Litig.*, 962 F.2d at 572. The Seventh Circuit noted that the

---

[2] See also Notice of Partial Settlement § V(A), available at http://dairyfarmersdirectpurchaseraction.com/ Portals/0/Documents/DFA.Long.Form.Notice.pdf ("As compensation for their time and their risk in prosecuting the litigation on a wholly contingent fee basis for three-plus years, Lead Counsel will ask the Court for an award of attorneys' fees in the amount of one-third of the Settlement Fund, as a common fund, and for reimbursement of their costs and expenses in the amount of no more than $600,000.00—all to be deducted from the Settlement Fund.").

"usual range for contingent fees is between 33 and 50 percent," while also noting that "in large commercial litigation with prospects of multimillion dollar recoveries the percentage frequently is tapered—it might be 33 percent of the first million, 25 percent of the next million, and so on down." *Id.*; see also *Silverman*, 739 F.3d at 959 ("Awarding counsel a decreasing percentage of the higher tiers of recovery enables them to recover the principal costs of litigation from the first bands of the award, while allowing the clients to reap more of the benefit at the margin (yet still preserving some incentive for lawyers to strive for these higher awards)."); *Synthroid I*, 264 F.3d at 721 ("This is not to say that systems with declining marginal percentages are always best. They also create declining marginal returns to legal work, ensuring that at some point attorneys' opportunity cost will exceed the benefits of pushing for a larger recovery, even though extra work could benefit the client.").

Coincidentally, the Seventh Circuit has delineated a seemingly tailor-made tiered-pricing arrangement for a $46 million settlement fund (as we have here), where the class counsel received 30% of the first $10 million, 25% of the next $10 million, and 22% for the $20–$46 million band. *In re Synthroid Marketing Litig.*, 325 F.3d 974, 979 (7th Cir. 2003) ("*Synthroid II*"). As applied here, that would result in an $11.22 million award, or 24.4% of the settlement fund (*i.e.*, a reduction of approximately $4.1 million, or roughly 9% of the fund). But to be sure, this is not a one-size-fits-all recovery scheme, and there are many other factors to consider before declaring this pricing grid the Cinderella slipper.

In defense of their requested one-third fee award, Class Counsel cite to multiple instances where courts in this district have awarded fees representing approximately one-third of the amount of the cash settlement, including antitrust cases involving the commodities market. See, *e.g.*, *In re Propane Direct Purchaser Antitrust Litig.*, 06-cv-3621 (ECF No. 209) (N.D. Ill. June

24, 2010) (granting a request for fees in the amount of 29.5% ($15.34 million) of the settlement fund, plus $782,869.28 in costs); *In re Potash Antitrust Litig.*, 08-cv-6910 (ECF No. 592) (N.D. Ill. June 12, 2013) (awarding class counsel fees equal to one-third ($6.75 million) of the $20.25 million fund, plus $418,098.52 in expenses); *In re Soybeans Futures Litig.*, 89-cv-7009 (ECF No. 470) (N.D. Ill. Nov. 27, 1996) (awarding class counsel one-third ($7.17 million) of a $21.5 million fund, plus $1,070,064.15 in expenses); *Goldsmith v. Tech. Solutions Co.*, 1995 WL 17009594, at *7–9 (N.D. Ill. Oct. 10, 1995) (awarding fees in the amount of one-third of the settlement fund, noting that "courts in this District commonly award attorneys' fees equal to approximately one-third or more of the recovery"). And these cases cite to even more cases awarding fees at or about the 33.3%-of-fund level.[3] In short, it appears that there is no shortage of cases supporting the reasonableness of Class Counsel's request.[4]

That being said, a fairly recent study analyzed fee awards in 689 common-fund cases spanning 18 years, reporting results that account for myriad factors, including both case type and overall fee award. See Theodore Eisenberg & Geoffrey P. Miller, *Attorneys' Fees & Expenses in Class Action Settlements: 1993–2008*, 7 J. of Empirical Legal Stud. 248 (2010).[5] Relevant here, in the 71 antitrust cases analyzed, the mean and median fee-to-fund ratios were 22% and 23% respectively, and none of the categories had a mean or median at or above 33.3%. And for common-fund cases with recoveries between $38.3 million and $69.6 million, the percentages

---

[3] See also *Heekin v. Anthem, Inc.*, 2012 WL 5878032, at *5 n.3 (S.D. Ind. Nov. 20, 2012) (citing 15 intra-circuit cases, predominantly supporting a one-third fee).

[4] The Court is aware that lower-percentage awards are common in so-called "mega-cases," including larger MDLs with settlement funds exceeding $100 million. See, *e.g.*, *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 339 (3d Cir. 1998) (noting that fee awards in class actions with recoveries exceeding $100 million have "ranged from 4.1% to 17.92%"); Manual for Complex Litigation § 14.121.

[5] Available at http://www.uscourts.gov/uscourts/RulesAndPolicies/rules/Duke%20Materials/Library/ Theodore%20Eisenberg,%20Geoffrey%20Miller,%20Attorneys%27%20Fees%20in%20Class %20Actions.pdf

drop slightly to a mean of 20.5% and a median of 21.9%, with only recoveries below $1.1 million reaching the 33.3%-or-higher range. To be sure, this report pegs fee awards well below the range identified in the intra-circuit case law reviewed thus far. But maintaining form, cases within this circuit have cited the Eisenberg and Miller study and yet still awarded fees above the reported averages. See, *e.g.*, *Silverman*, 739 F.3d at 958–59 (affirming an award of 27.5% of a $200 million common fund despite the fact that it was "well above the norm" according to the academic studies, which reported a mean of 12% and a median of 10.2%); *In re Lawnmower Engine Horsepower Mktg. & Sales Practices Litig.*, 733 F. Supp. 2d 997, 1013–14 (E.D. Wis. 2010) (awarding a 25% fee award based largely on risk factors); *Heekin v. Anthem, Inc.*, 2012 WL 5878032, at *2 (S.D. Ind. Nov. 20, 2012) (noting that "[a]lthough the Court finds the empirical studies helpful, they do not replace the analysis required under *Synthroid I*," and granting a 33.3% fee request, totaling $30 million). This Court similarly finds the Eisenberg and Miller study informative, but by no means dispositive.

The Court is also mindful that "[a] district judge, looking out for the interests of all class members, sometimes must consider issues that the class representatives and their lawyers prefer to let pass." *Silverman*, 739 F.3d at 959. This is not one of those cases. As in *Silverman*, the plaintiffs here are sizable, sophisticated entities capable of reviewing (and objecting to) the proposed fee arrangement. Specifically, the settlement administrator distributed the settlement notice to more than 3,000 potential class members, including (a) large traders in Class III milk futures, (b) clearing brokers on the Chicago Mercantile Exchange, and (c) the 100 largest dairy companies in the United States—*i.e.*, entities likely to have attorneys and other advisors counseling them on such matters. But beyond the objection filed by Schreiber (which the Court reviews in detail below), none of the Plaintiffs has objected to Class Counsel's fee petition,

either by filing a motion asking the judge to reduce the fees or by supporting Schreiber's objections.

### 3. Complexity, Length, and Expense

In defending their proposed award, Class Counsel emphasize the magnitude, complexity, and cost of this case as proof of their fee-worthiness. See, *e.g.*, *Synthroid I*, 264 F.3d at 721 (noting that market rate depends "in part on the amount of work necessary to resolve the litigation"); *Isby*, 75 F.3d at 1198–99 (listing "an assessment of the likely complexity, length and expense of the litigation" as factors that determine the reasonableness of a fee award); *Arenson v. Bd. of Trade of City of Chi.*, 372 F. Supp. 1349, 1352 (N.D. Ill. 1974) (noting that "[i]t would be difficult to imagine litigation presenting issues of greater subtlety and complexity" than those presented in a large antitrust matter involving commodity futures markets). Specifically, Class Counsel point to the esoteric nature of antitrust law in general, the specific complexities inherent in this six-year MDL antitrust matter, and the sizable legal and expert fees amassed in litigating these claims. These factors help paint the overall narrative of Class Counsel's undertaking, seemingly meant to show the Court that counsel are deserving of the requested fee.

Most of these facts cut in Class Counsel's favor. To be sure, this has been a long and arduous litigation, compounded by the intricacies of these particular commodities markets, the parsing of actions on a day-by-day basis over a long time period, and the inclusion of both traders and purchasers in the settlement class. Class Counsel have expended significant fees on expert work, retention of allocation counsel, and two separate mediations in order to allocate the settlement fund in a fair and reasonable manner. These facts buttress the reasonableness of Class Counsel's request and in no way justify a reduction of the requested one-third fee. On the other hand, as Schreiber is quick to point out, a good chunk of Class Counsel's efforts have been in

conjunction with their now-dismissed claims against Schreiber, and thus played no part in reaching the settlement with DFA. But as explained in detail below, Class Counsel's efforts in pursuing claims against Schreiber—regardless of the outcome of those claims or the influence that those efforts had on the overall settlement amount—are not a significant enough detour to overshadow the indisputably meritorious work performed here.

### 4.    Risk

When determining the reasonableness of a fee request, courts put a fair amount of emphasis on the severity of the risk (read: financial risk) that class counsel assumed in undertaking the lawsuit. See *Sutton v. Bernard*, 504 F.3d 688, 693 (7th Cir. 2007) (holding that class counsel was undercompensated where "the district court failed to provide for the risk of loss"); *Synthroid I*, 264 F.3d at 721 ("The market rate for legal fees depends in part on the risk of nonpayment a firm agrees to bear, in part on the quality of its performance, in part on the amount of work necessary to resolve the case, and in part on the stakes of the case."); *In re Cont'l Ill. Sec. Litig.*, 962 F.2d at 569 (emphasizing the need to adjust fee awards to account for risk). At its best, this consideration incentivizes attorneys to accept and (wholeheartedly) prosecute the seemingly too-big-to-litigate wrongs hidden within the esoteric recesses of the law, ensuring that the attorneys are compensated for their work at the end of the day (or, as is the case here, at the end of the six-year dispute). See *Silverman*, 739 F.3d at 959 ("The greater the risk of walking away empty-handed, the higher the award must be to attract competent and energetic counsel."). But read too literally, this factor could incentivize legal daredevilry, rewarding the settlement-seeking bluffers over the risk averse. See *In re Trans Union Corp. Privacy Litig.*, 629 F.3d at 746 ("[T]he logic of scaling the fee to the risk leads to absurdity if pressed too hard: it would justify

an astronomical fee in a frivolous suit in which the plaintiff prevailed by a fluke."). Mindful of this distinction, the Court assesses where Class Counsel lie on the risk spectrum.

One proxy for assessing risk is whether the litigation followed on the heels of some prior criminal or civil proceeding involving the same parties or subject matter. This inquiry provides insight into whether class counsel benefitted from the work of others, which acts a red flag for judges assessing fee petitions. See, *e.g.*, *In re Lawnmower Engine Horsepower Mktg. & Sales Practices Litig.*, 733 F. Supp. 2d at 1015 ("This is not a case in which a criminal prosecution against the defendants preceded the class's civil suit and established the defendants' liability, as is often the case in the antitrust context. Instead, class counsel had to build this case from the ground up, based on their own investigation."). Here, the Court has previously noted that Class Counsel benefitted from a large volume of documents and multiple deposition transcripts collected via a price-manipulation investigation by the Commodity Futures Trading Commission ("CFTC"). [See 652, at 3–5.] This raises a yellow, not red, flag. But deepening the hue, Plaintiffs allege in their second amended consolidated class action complaint that "Defendant DFA is a serial antitrust defendant" who has "entered into at least three consent decrees involving government allegations of violating laws prohibiting anticompetitive activities," where "[a]t least two of those orders relate to this matter," [245, ¶ 2], making Plaintiffs' endeavor seem like less of a risk than advertised.

Although Class Counsel undoubtedly benefitted from the CFTC's work, they nonetheless engaged in enough proprietary legal services to distinguish their efforts from a so-called piggyback lawsuit. Indeed, Class Counsel still managed to spend (albeit by their own, unaudited calculation) 18,617.59 hours on this matter over six years, indicating that while the CFTC's non-conspiracy-related investigation may have given Class Counsel a head start, the CFTC did not

run the race for them. And although DFA's track record surely has them high on the target list for antitrust plaintiffs' attorneys, there is nothing indicating that DFA's legal history has somehow awarded Class Counsel an undue benefit mandating a reduction in their otherwise reasonable fee request.

### 5. Quality of Performance

Yet another litmus test for assessing reasonableness is quality of Class Counsel's performance in achieving the settlement—that is, whether this is the type of outcome that willing clients would have envisioned from the outset. Somewhat circularly, Class Counsel argue that the quality of their services "is best indicated by the substantial benefits Lead Counsel achieved for the Class." [616, at 11.] The benefits they speak of include the purported two-thirds share of the $46 million settlement fund (*i.e.*, $30,666,666.67), plus a series of "remedial benefits," including (a) a non-reversionary provision stating that no matter how many class members fail to submit proofs of claim, none of the settlement monies will revert to the Defendants, (b) an agreement that DFA will only transact in Class III milk futures for legitimate business purposes, and (c) a provision that DFA may not purchase or sell Chicago Mercantile Exchange Cheese Spot Call contracts unless the proposed transaction has been reviewed and approved by at least two DFA officers. The theory is that these undertakings "will impose an economic discipline on DFA's market transactions that was lacking during the Class Period" which "should help conform and stabilize DFA's conduct in these sensitive markets so as to reflect economic demand and supply." [616, at 2.]

Schreiber is the only entity (or, if you prefer, class member) that objected to the fee petition, and it does not indicate whether the $30.67 million class award is above or below what the class anticipated. Hearing no other objections, and absent any other frame of reference for

considering the adequacy of the monetary award, the Court is inclined to agree with Class Counsel that this award is at least adequate. However, Schreiber does object to Class Counsel's proposition that the value of injunctive and declaratory relief should be considered in the fee award, claiming that there is no evidence that this arguably *pro forma* (or boilerplate) relief is as significant as Class Counsel claim. To Schreiber's point, it couldn't have required much arm twisting to get DFA to agree, in writing, to act in accordance with "legitimate business purposes." And the self-policing provision seems a rather modest punishment for a so-called serial antitrust offender. But even if the Court were to disregard these clearly hyperbolized benefits, there are still no objections before the Court explaining why the award—exaggerated or not—is anything but a satisfactory result in the eyes of the class.

### 6.     Time Spent / Lodestar Cross-Check

A district court is under no obligation to cross-check the requested fees against the lodestar. See *Williams v. Rohm & Haas Pension Plan*, 658 F.3d 629, 636 (7th Cir. 2011) ("[C]onsideration of a lodestar check is not an issue of required methodology." (citing *Cook v. Niedert*, 142 F.3d 1004, 1013 (7th Cir. 1998) ("[W]e have never ordered the district judge to ensure that the lodestar result mimics that of the percentage approach."))). Class Counsel nonetheless apprise the Court that their requested fee yields a lodestar multiplier of approximately 1.34, which falls on the lower end of the allowable range in comparable cases. See, *e.g.*, *Harman v. Lyphomed, Inc.*, 945 F.2d 969, 974 (7th Cir. 1991) (noting that "[a risk] multiplier is, within the court's discretion, appropriate when counsel assume a risk of non-payment in taking a suit" and "[m]ultipliers anywhere between one and four * * * have been approved"). Ultimately, the Court sees no utility in considering this somewhat-arbitrary (and under-vetted) calculation, and thus disregards this evidence for purposes of this fee petition.

But perhaps more interesting than Class Counsel's reported reasonableness of their self-calculated lodestar is their unprompted reduction of qualifying hours. Specifically, tucked away in their statement of facts, Class Counsel note that they excluded from their lodestar calculation all post-December 24, 2012 time spent working on their claims against Schreiber, claiming that their pre-December 24, 2012 Schreiber-related efforts "directly threatened DFA and directly encouraged it to agree to the Settlement," and implying that their post-December 24 hours did not.[6] [616, at 6.] For attorneys who are arguing for a percentage-of-the-fund fee award, any delineation of hours is seemingly unnecessary, especially where the delineation shines a light on Class Counsel's failed Schreiber-related efforts. See, *e.g.*, *Synthroid II*, 325 F.3d at 979–80 (noting that class counsel's efficiency should not be used "to reduce class counsel's percentage of the fund that their work produced"). And if Class Counsel's goal in undertaking the lodestar cross-check was simply to add another feather on the scale of reasonableness, any extension of the cut-off date (*e.g.*, up to the point where Plaintiffs moved for/received preliminary/final approval of the settlement agreement, which are all post-December 24, 2012) would have resulted in a smaller—*i.e.*, more reasonable—multiplier than 1.34.[7]

It seems more likely that Class Counsel presaged the objection that Schreiber lodged shortly after counsel filed their fee petition. In that objection, Schreiber argued that Class Counsel's fees *should* be measured by the lodestar method and that Class Counsel *should not* receive fees for *any* of their efforts to inculpate Schreiber into the alleged price-fixing scheme. Schreiber maligned Class Counsel's fee request as an effort "to reduce the class's recovery from

---

[6] Plaintiffs claim that December 24, 2012 is the date on which DFA signed documents agreeing to settle.

[7] Plaintiffs note that the risk multiplier including the fees during the "Reduction Period" would be 1.46, reflecting the fact that the fees incurred pursing claims against Schreiber amounted to less than 10% of the total toted up by Class Counsel during the almost six years since the filing of this litigation. [See 636, at 13.]

the settlement fund in order to finance Class Counsel's frivolous post-settlement litigation." [619, at 1.] Schreiber requested that the petition be denied without prejudice until the case has been fully adjudicated and after Class Counsel have submitted detailed time records evincing that their fee request excludes time spent on the case against Schreiber. As a point of reference, Schreiber filed its objections to Class Counsel's fee petition approximately three weeks *before* the Court granted Schreiber's motion for summary judgment [652] and approximately six weeks *before* the Court declared Schreiber to be a class member [670] (*i.e.*, while Plaintiffs were still actively pursuing claims against Schreiber).

In support of its objections, Schreiber highlighted the fact that Class Counsel negotiated the amount of the settlement fund before they sued Schreiber as fodder for its argument that Class Counsel intended to use those funds to finance their claims against Schreiber. But this fact (both then and now) cuts more against Schreiber that in its favor—specifically with regard to Schreiber's argument underpinning its Rule 11 motion for sanctions (discussed below), which is that Plaintiffs' claims against Schreiber have always been without evidentiary support. In other words, in combination, Schreiber argues that Class Counsel expedited their settlement with DFA (disposing of their arguably meritorious claims at a potentially cut-rate price) in order to fund a satellite lawsuit—at their own expense—that they knew to be frivolous. If Schreiber's view is accepted, Class Counsel sold the bird in its hand to chase after an empty bush, gambling both their and the class's settlement money on an expensive, time-consuming, and risk-laden wild-goose chase. Alternatively, if the Court were to credit Class Counsel's argument that (at least some of) their efforts in pursuing claims against Schreiber served as "[t]he primary 'negotiating tool'" in keeping the $46 million settlement fee in place, then Schreiber—which is now a class member—may have actually benefitted in the long run from its time spent on the other side of

the "v" because it is now the largest recipient of the funds that will be distributed to the class.[8]

Regardless, because the Court has adopted the percentage-of-the-fund approach, Schreiber's lodestar-based objections do not significantly impact the Court's analysis here. See *Synthroid II*, 325 F.3d at 979 ("As for the possibility that consumer class counsel litigated ineffectively: using too many hours to achieve a given result is a problem with hourly billing, but the district court did not employ the lodestar method of compensation. If consumer class counsel invested too many hours, dallied when preparing the settlement, or otherwise ran the meter, the loss falls on counsel themselves.").

### 7.    Objections

Two objections were filed in response to Class Counsel's fee petition: (1) Schreiber's objection to the amount of the requested award [619], and DFA's objection (fashioned as a motion for leave to respond) to a purported misstatement in Class Counsel's reply brief in further support of their fee petition [649].

Regarding the latter objection, the Court grants DFA's motion for leave to file a response to Direct Purchaser Plaintiffs' reply memorandum in further support of Class Counsel's petition for an award of attorneys' fees and reimbursement expenses [649]. DFA's one-page proposed response is not a substantive objection to Class Counsel's fee request, but rather more of a ministerial objection to an alleged misstatement of facts. Specifically, DFA offers its response "for the limited purposed of objecting to Plaintiffs' misstatement of the contents and sequence of certain confidential settlement negotiations between DFA and Plaintiffs." [649-1, at 1 (citing

---

[8] To be sure, the financial gain to Schreiber from the settlement is offset, at least from Schreiber's perspective, by the cost of the litigation, both financial and otherwise, and thus the Court could only speculate whether Schreiber views the end result as positive, negative, or neutral. But setting aside those costs, as the largest member of the class certified for settlement purposes, Schreiber's and Class Counsel's interests were aligned at least in regard to maximizing the amount of the settlement distributions to the class members.

636, at 3, 7, n.7).] The Court offers no opinion as to whether DFA's corrections are accurate, but DFA is nonetheless permitted to voice its concerns on the record.

Schreiber, on the other hand, attacks Class Counsel's fee request on several fronts, including the method of calculation and the overall fee request. As a threshold matter, though, Class Counsel argue that Schreiber lacks standing to object to the fee petition because it is not a member of the class. [636, at 13–14 (citing *Agretti v. ANR Freight Sys., Inc.*, 982 F.2d 242, 246 (7th Cir. 1992) (noting "that a non-settling party does not have standing to object to a settlement between other parties" unless a "non-settling defendant in a multiple defendant case * * * can show plain legal prejudice resulting from the settlement").] Without getting too deep in the weeds, the Court notes that the *Agretti* body of law applies to objections to the approval of *settlement agreements*, not the reasonableness of *fee petitions*. Because Schreiber—purportedly the largest member of the settling class [see 619, at 1]—stood to benefit from the terms of the fee arrangement, it had standing to object to the fee petition.

Complicating matters somewhat is the fact that Schreiber was still a defendant when it filed its objection on July 28, 2014 [619]. It wasn't until three weeks later, on August 18, 2014, that the Court granted Schreiber's motion for summary judgment [652], and another month after that, on September 12, 2014, that the Court granted Schreiber's motion declaring it a member of the class. [670, at 1 ("Schreiber is no longer a defendant in this action and, pursuant to the notice to the Class dated March 17, 2014, is fully able to participate as a Member of the Class * * *.").] Plaintiffs added Schreiber as a defendant on March 23, 2012 [248], approximately three years into this litigation, and just days after the Direct Purchaser Plaintiffs and DFA had reached their settlement agreement, at least as to the monetary component. [See 335, at 9 ("By early March 2012, Settling Defendants and the Plaintiffs had agreed to $46,000,000 as the cash

consideration."); 634, ¶ 6 ("On or about March 18, 2012, DFA agreed to the $46,000,000 cash consideration aspect of the proposed Settlement.").]. The question, then, is whether Plaintiffs successfully stripped Schreiber of its class affiliations simply by naming it as a defendant.[9]

Schreiber had standing to object to Class Counsel's fee petition. First, the Court believes that Schreiber was, at least in part, a member of the settlement class at the time it filed its objection, and Class Counsel have not provided any evidence to the contrary. Because Schreiber stands to receive more from the settlement fund if its objections are sustained, it has standing to raise them—"What more is required for standing?" *Synthroid II*, 325 F.3d at 976 (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)). Second, if Schreiber's objections were not ripe at the time of filing, they are now. See *Blanchette v. Conn. Gen. Ins. Corp.*, 419 U.S. 102, 139–40 (1974) ("[S]ince ripeness is peculiarly a question of timing, it is the situation now rather than the situation at the time of the District Court's decision that must govern."); *Public Water Supply Dist. No. 8 of Clay Cty., Mo. v. City of Kearny, Mo.*, 401 F.3d 930, 932 (8th Cir. 2005) ("Whether a case is ripe depends on the state of the case at the time of review, not at the time of filing."); *Casden v. Burns*, 306 F. App'x 996, 972–73 (6th Cir. 2009) (finding ripeness where the issue became ripe after filing but prior to adjudication, "and thus [plaintiff's] claims no longer involve 'abstract disagreements' and there no longer is a concern that her alleged injuries 'may not occur as anticipated.'" (quotations omitted)); *Soni v. Holtzer*, 255 F. App'x 614, 616 n.1 (3d Cir. 2007). Third, on the policy front, it would be unjust to deny a party in limbo (*i.e.*, a party that would be a class member but for its inclusion as a defendant) its right to object to a class

---

[9] The Court expressed its concerns about Plaintiffs' attempt to exclude Schreiber from the settlement class on several occasions, highlighting Schreiber's "dual role as a defendant in the litigation and (at least by its reckoning) a putative absent member of the prosed class," and noting that "[e]ven if Plaintiffs could survive summary judgment on their claims regarding the conspiracy in May through June 2004, Plaintiffs have not sufficiently explained their justification for excluding Schreiber from the class period with respect to the second manipulation period." [424, at 2.]

counsel's fee petition; to hold otherwise would allow a settlement class to silence a dissenting voice amongst the class by drumming up a well-timed claim against them. While the Court does not endeavor to create an all-sweeping rule governing all fee-petition objectors, it is clear based on the facts of this case that Schreiber has standing to object to Class Counsel's fee petition.[10]

Having established that Schreiber has standing to object to Class Counsel's fee petition, the Court now turns to the substance of Schreiber's objections. However, upon a thorough review, the Court does not find any substantive arguments raised by Schreiber that have not already been addressed above. To be sure, while Schreiber's objections are cogently presented, its main argument (*i.e.*, that Class Counsel should not get credit for time spend pursuing claims against Schreiber) only carries weight if the Court were to apply the lodestar method of calculating fees, which it does not. The rest of Schreiber's objections call into question the reasonableness of Schreiber's fee request, raising many of the same points that the Court has addressed above (citing similar cases in support as well). Accordingly, the Court views Schreiber's objections as a credible backstop for the Court's own reasoning, but finds no unique arguments in need of further discussion or elaboration.

### 8.    Costs

In addition to its one-third cut of the settlement kitty, Class Counsel also seek $482,749.95 in costs and expenses. See Fed. R. Civ. P. 23(h) ("In a certified class action, the court may award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement."). It is the Court's duty to ensure that the expenses are reasonable, whereby "[i]f counsel submit bills with the level of detail that paying clients find satisfactory, a federal court should not require more." *Synthroid I*, 264 F.3d at 722.

---

[10] Even if Schreiber did not have standing to object, the Court has an independent obligation to scrutinize the proposed fee arrangement in this matter and, in all likelihood, would have considered most, if not all, of the issues raised in Schreiber's objections.

In their original petition, Class Counsel requested $487,881.24 in expenses, itemized (with little detail) in the declaration of Christopher M. McGrath [615]. Mr. McGrath made clear that Class Counsel were not seeking any expenses related to their work in connection with the prosecution of Plaintiffs' claims against Schreiber after December 24, 2012. Two weeks later—likely in response to Schreiber's objection that Class Counsel failed to provided sufficient documentation justifying their expense request [see 619, at 14 (citing *Schulte*, 805 F. Supp. 2d at 600 (dismissing, *sua sponte*, class counsel's request for costs and expenses because counsel had "provided insufficient itemization and back-up documentation of the expenses so to allow the Court to make a meaningful assessment," noting that "the single page submitted thus far is simply not enough"))]—Mr. McGrath submitted a supplemental declaration in support of Class Counsel's expense request [634] in which he (a) reduced the expense request by $5,131.29 (approximately 1%), and (b) attached 64 pages of itemized bills and additional declarations in support of the requested expenses. Upon close examination of the supplemental records offered in support of Class Counsel's expense request, the Court finds the request to be reasonable,[11] and thus awards Class Counsel $482,749.95 in costs and expenses.

---

[11] Some of the itemized-expense requests arguably fall short of the specificity required for the Court to make a meaningful assessment. Specifically, the declaration of Martin Miller on behalf of Miller Law LLC requesting $2,259.37 in expenses [634, ex. B] and the declaration of Geoffrey Horn on behalf of Lowey Dannenberg Cohen & Hart, P.C. requesting $505.80 in expenses [634, ex. E] list expenses in bulk categories without any internal itemization. In addition, the Court found no support for the $164.45 requested by Finkelstein Thompson LLP. However, because the amounts at issue are small in comparison to the whole ($2,929.62 total, or approximately .6% of the total expense award), and because these un-objected-to amounts are in line with the other, well-supported requests, the Court finds it prudent and efficient to approve the requests without requiring the parties to incur the expense of submitting revised, more-detailed itemizations and any possible objections thereto.

### B. Schreiber's Bill of Costs

#### 1. Legal Standard

Following its victory on summary judgment, Schreiber filed a bill of costs seeking reimbursement of litigation costs as a prevailing party. Rule 54(d) says that "[u]nless a federal statute, these rules, or a court order provides otherwise, costs—other than attorney's fees—should be allowed to the prevailing party." Fed. R. Civ. P. 54(d). Rule 54(d) creates a strong presumption in favor of awarding costs to the prevailing party. See *Weeks v. Samsung Heavy Indus. Co., Ltd.*, 126 F.3d 926, 945 (7th Cir. 1997) ("The presumption is difficult to overcome, and the district court's discretion is narrowly confined—the court must award costs unless it states good reasons for denying them."). A district judge's "award of costs is the type of discretionary ruling to which [the Seventh Circuit] give[s] 'virtually complete' deference." *O'Regan v. Arbitration Forums, Inc.*, 246 F.3d 975, 989 (7th Cir. 2001) (quoting *Manley v. City of Chi.*, 236 F.3d 392, 398 (7th Cir. 2001)). Schreiber became a prevailing party when the Court dismissed Plaintiffs' claims against Schreiber "with prejudice and with costs" [669], and thus is entitled to fees under Rule 54(d). Schreiber seeks $32,215.23 in costs plus interest [694, 695] and Plaintiffs object [700], claiming that Schreiber is entitled to, at most, $2,109.60 in costs.

#### 2. Stay Pending Appeal

As a preliminary matter, Plaintiffs argue that the Court should stay its decision regarding the bill of costs pending resolution of Plaintiffs' appeal of this Court's order granting summary judgment in Schreiber's favor. Plaintiffs argue that a stay is appropriate because there is an issue of first impression before the Seventh Circuit: "what does the term 'commodity underlying' a futures contract mean for purposes of a private right of action under Section 22(a) of the Commodity Exchange Act, 7 U.S.C. § 25." [700, at 14–15 (citing *George v. Junior Achievement*

*of Cent. Ind., Inc.*, 2011 WL 5402418, at *1 (S.D. Ind. Nov. 4, 2011)).] First off, a district court is under no obligation to stay a bill of costs pending appeal, regardless of whether the appeal presents an issue of first impression. See, *e.g.*, *Kittler v. City of Chi.*, 2006 WL 1762036, at *2 (N.D. Ill. June 26, 2006); *Sembos v. Philips Components*, 2003 WL 22533579, at *1 (N.D. Ill. Nov. 6, 2003) (citing cases). However, while the Court declines to stay the adjudication of the bill of costs at this time, the Court will stay the enforcement of the bill of costs pending appeal.[12] *Kittler*, 2006 WL 1762036, at *2.

### 3.     Schreiber's Right to Amend Its Bill of Costs

Plaintiffs raise a second threshold argument by claiming that Schreiber had no right to submit an amended bill of costs, and thus the Court should strike Schreiber's initial filing as improper and ignore its corrected filing as untimely. Local Rule 45(a) gives a party 30 days to file a bill of costs, where any costs not filed within 30 days are deemed waived. Here, the Court dismissed Plaintiffs' claims against Schreiber "with prejudice and with costs" on September 12, 2014 [669]. Schreiber's initial bill of costs [679 (Oct. 13, 2014)] was timely filed, but its amended bill of costs [694 (Nov. 7, 2014)] was not—thirty days means thirty days. See *Congregation of the Passion, Holy Cross Province v. Touche, Ross & Co.*, 854 F.2d 219, 221–23 (7th Cir. 1988). But Schreiber's later-filed bill of costs was not a unique and independent filing; instead, Schreiber used its later-filed bill of costs "to revise [its] request downward and add supporting material in response to [Plaintiffs'] arguments," which this Court has discretion to allow. *Finchum v. Ford Motor Co.*, 57 F.3d 526, 533–34 (7th Cir. 1995); *Howard v. Campbell Soup Co.*, 1985 WL 1355, at *1 (N.D. Ill. May 15, 1985) (allowing, *sua sponte*, an untimely

---

[12] Because the Court is staying the enforcement of the bill of costs, interest will not accrue from the date the cost award is entered, see *McIlveen v. Stone Container Corp.*, 910 F.2d 1581, 1584 (7th Cir. 1990), but rather from the date upon which the appeal is resolved.

amendment to a bill of costs where "the latter bill corrects computation errors in [the payor's] favor"); see also *Piraino v. Int'l Orientation Res.*, 1997 WL 222948, at *1–2 (N.D. Ill. Apr. 30, 1997). Accordingly, the Court will consider Schreiber's amended petition as timely filed.[13]

### 4. Taxable Charges

The Court "may not tax a prevailing party's costs to the losing party under Rule 54(d) unless the specific expense is authorized by a federal statute." *Little v. Mitsubishi Motors N. Am., Inc.*, 514 F.3d 699, 701 (7th Cir. 2008); *Manley*, 236 F.3d at 398 ("As long as statutory authority exists for a particular item to be taxed as a cost, we shall not overturn a district court's determination that the cost is reasonable and necessary, absent a clear abuse of discretion." (citation omitted)). Recoverable costs include (1) fees of the clerk; (2) fees for transcripts; (3) fees for printing and witnesses; (4) fees for copies of papers necessarily obtained for use in the case; (5) docket fees; and (6) compensation of court appointed experts and interpreters. 28 U.S.C. § 1920.

Schreiber seeks $775.00 in fees for service of subpoenas, $30,500.13 in transcript fees, and $940.10 in copy fees. These are all taxable under § 1920. However, digging deeper into the itemized charges on the relevant invoices, Plaintiffs allege that there are certain sub-categories of charges that are not taxable.

First, Schreiber seeks $4,740.75 in "Realtime" (*i.e.*, live transcript fee) charges associated with its transcript costs. Such fees have been deemed non-taxable because the service is for "the mere convenience" of the attorneys. See *SP Techs., LLC v. Garmin Int'l, Inc.*, 2014 WL 300987, at *4–5 (N.D. Ill. Jan. 10, 2014). Absent any guidance from the Seventh Circuit, the Court

---

[13] The Court's decision to exercise its discretion to permit Schreiber to amend its Bill of Costs is akin to its similar decision to permit Class Counsel to submit a supplemental declaration in support of their request for expenses. In both instances, the revised filings better allowed the Court to fairly and accurately assess each side's entitlement to the claimed amounts.

respectfully disagrees. While Realtime (or LiveNote) service may be a convenience, it is a convenience that is becoming ubiquitous in the modern legal world. And perhaps more importantly, as Schreiber—the deponent in all of the depositions at issue—points out, "[t]he court reporters were all selected by the Plaintiffs at rates that Plaintiffs approved and over which Schreiber had no control," [693, at 3], meaning that Plaintiffs themselves deemed the Realtime service to be reasonable, and Schreiber incurred Realtime charges at Plaintiffs' behest. [See Birk Decl., 695, ¶ 4 ("Direct Purchaser Plaintiffs retained U.S. Legal Support to provide transcript services, and Schreiber ordered the same transcript copies requested by Direct Purchaser Plaintiffs.").] It would be unfair to allow Plaintiffs to proceed at a deposition using Realtime without allowing Schreiber to do (and recover costs for) the same. See *Kinzenbaw v. Case LLC*, 2006 WL 1096683, at *6 (Fed. Cir. Apr. 26, 2006) (approving costs for Realtime services that the district court deemed necessary).

Second, Schreiber seeks $4,400.00 for video charges and $130.00 in processing and handling charges associated with video recordings of depositions. Plaintiffs object to the video charges, even though it was Plaintiffs' decision to have the depositions in question video-recorded. And under Seventh Circuit precedent, if a deposition is video-recorded, Rule 54(d) permits an award of costs "of both video-recording and stenographic transcription to be taxed to the losing party." *Little*, 514 F.3d at 702. It would be unfair to allow Plaintiffs access to video recordings of transcripts for possible use at trial and to deny Schreiber the right to obtain those same video tapes (and, of course, to tax the Plaintiffs for them upon prevailing). Plaintiffs also object to the processing and handling charges, citing case law claiming that courier costs are generally disallowed. [700, at 11 (citing *Rogers v. City of Chicago*, 2002 WL 423723, at *2 (N.D. Ill. Mar. 15, 2002)).] Courier fees are not the same as processing and handling charges

from a court reporter. Plaintiffs offer no further support for this argument, and thus the Court rejects it.

Third, Schreiber seeks $932.10 in exhibit charges, $525.00 in handling/processing charges, $429.00 in E-CD litigation package charges, and $55.00 for miniscripts. Regarding the handling/processing charges, the Seventh Circuit has already held that such incidental costs are taxable. See *Finchum*, 57 F.3d at 534 ("We have * * * upheld the award of ["incidental"] costs in the past and we find no reason to disturb the district court's exercise of discretion to award such costs in this instance."). As to the exhibit charges, it is not unreasonable to request copies of the exhibits used during a deposition, for even if the exhibits have been produced in discovery, it could be that the deponent, attorney, or both marked on the exhibit during the deposition, making the deposition copy unique. Plus, exhibits are often authenticated during a deposition, and it may be necessary for attorneys to use the marked exhibit in order to benefit from that authentication. The remaining charges are so-called "convenience" costs related to transcript delivery. But again, this is an instance where Plaintiffs arranged for the depositions and thus set the bar for what they deemed reasonable and appropriate. [693, at 4 ("Schreiber ordered the exact same transcripts, at the same rates and with the same services, as Plaintiffs ordered.").] The Court will not penalize Schreiber for following in Plaintiffs' footsteps.

Fourth, in a similar vein, Plaintiffs object to additional transcript-related costs that they arranged for and Schreiber adopted: $5,995.48 in expedited charges, $2,932.80 in rough draft charges, and $740.00 in evening charges. For the reasons stated above, the Court also deems these charges taxable. See *Finchum*, 57 F.3d at 534.

### 5.    Transcript Copies

Plaintiffs agree that § 1920 allows for the taxing of transcript copies, but they argue that Schreiber's rates exceed the maximum allowable rates in this district. Per this District's General Order 12-0003, approved transcript rates range from $3.65 to $7.25 per page, depending on delivery time, and parties can recover between $.90 and $1.20 for copies of transcripts. First, Plaintiffs argue that all of Schreiber's transcript costs are for copies, not originals. This is wrong. The invoices clearly reflect the delivery of a single, original version of the transcript, despite the fact that the court-reporting agency refers to them as copies. Second, Plaintiffs note that the base per-page fee for the transcripts (absent any expediting fees) is $3.95 per page, which exceeds the $3.65 per-page maximum. But upon further review of the invoices, all of the transcripts were delivered (again, at Plaintiffs' request) within 14 days, and the maximum allowable rate based on that turnaround time is $4.25 per page. Accordingly, Schreiber's transcript fees are appropriate. See, *e.g.*, *Dishman v. Cleary*, 279 F.R.D. 460, 467–68 (N.D. Ill. Jan. 5, 2012).

### C.    Schreiber's Motion for Rule 11 Sanctions

Schreiber seeks Rule 11 sanctions against Plaintiffs for "submitting factual contentions in their pleadings and other papers lacking in evidentiary support, as required by Rule 11(b)(3)." [676, at 1.]

### 1.    Direct Purchaser Plaintiffs' Motion for Leave to File Surreply

Before addressing Schreiber's motion for sanctions, the Court must determine the relevant world of memoranda to consider in deciding that motion. Specifically, Plaintiffs moved this Court for leave to file a surreply [703] relating to the Rule 11 issue, as well as a motion to file that surreply under seal [701]. Plaintiffs' surreply is currently under seal on the Court's docket at [703-1]. The decision whether to grant a motion for leave to file a surreply is within the

Court's discretion. *Johnny Blastoff, Inc. v. L.A. Rams*, 188 F.3d 427, 439 (7th Cir. 1999). Denial of a motion to file a surreply is appropriate "when the movant has had the opportunity to thoroughly brief the issues." *Univ. Healthsystem Consortium v. UnitedHealth Grp., Inc.*, 2014 4685753, at *3 (N.D. Ill. Sept. 19, 2014). There is no need for a surreply when "[e]ach brief in the sequence on the motion fairly responded to the arguments in the brief that preceded it." *Franek v. Walmart Stores, Inc.*, 2009 WL 674269, at *19 n.14 (N.D. Ill. Mar. 13, 2009).

Plaintiffs argue that their surreply is warranted for three reasons: (1) to allow Plaintiffs to address a new argument that Schreiber made for the first time in its reply brief, (2) to correct "gross mischaracterizations" in Schreiber's reply brief, and (3) to provide the Court with a matrix to assist in reviewing certain relevant evidence. The first two reasons are, if meritorious, grounds for allowing the surreply—see *Univ. Healthsystem Consortium*, 2014 4685753, at *3— and the third practices upon the Court's discretion. In response, Schreiber argues that Plaintiffs' three justifications are specious, and that Plaintiffs' surreply is just an attempt to take another bite at the apple. Schreiber points out that this is the eighth surreply that Plaintiffs have filed or attempted to file in this case, and that Plaintiffs filed it nearly a month after Schreiber filed its reply brief. The Court finds Schreiber's arguments persuasive.

Even a quick glance at Plaintiffs' surreply is enough to show that Plaintiffs' aim was not to correct errors in Schreiber's reply brief, but rather to respond (again) to Schreiber's core arguments. Indeed, Plaintiffs spend seven of the eight pages of their brief responding to Schreiber's argument that certain of Plaintiffs' allegations against it were "utterly void of support," whereby Plaintiffs (again) attempt to temper these accusations by providing contrary evidence. Of course it is not uncommon for adverse parties to feel that their opponent's briefs are replete with "gross mischaracterizations," and it would be unjust to allow Plaintiffs to rebrand

Schreiber's arguments as genuine errors just to get the last word in. Tucked in at the end of their proposed surreply, Plaintiffs also argue that Schreiber sandbagged them by adding a new argument in its reply about the existence of certain high-level communications between DFA and Schreiber. This is not true; Schreiber included this argument in its opening brief. [676, at 9.]

Plaintiffs also attach five exhibits to their proposed surreply, consisting of four documents that they cited but did not attach to their response brief and a summary chart laying out the location in the record of evidence cited in exhibit 1 to Plaintiffs' opposition to Schreiber's Rule 11 motion. While Plaintiffs should have attached these exhibits to their opposition brief, the Court finds the exhibits useful in reviewing the merits of Schreiber's motion, and will consider them.

Thus, Plaintiffs' motion for leave to file a surreply [703] is granted in part and denied in part: the Court grants Plaintiffs leave to file only exhibits A through E of its proposed surreply (*i.e.*, not the surreply itself). Plaintiffs' motion to file its surreply under seal [701] is granted in part and denied as moot in part, such that exhibits A through E of Plaintiffs' surreply may remain under seal. Plaintiffs need not refile the exhibits on the docket; the Court will review and consider the documents as already provided. [See 703, ex. 1, exs. A–E.]

### 2. Timeliness

Plaintiffs argue that Schreiber's motion for sanctions is untimely because Schreiber filed it approximately 30 months after Plaintiffs sued Schreiber [245], and approximately 28 months after Schreiber first provided notice to Plaintiffs that their allegations violated Rule 11 [see 688, ex. A (letter from Schreiber's counsel to DFA's counsel, dated May 9, 2012)]. Plaintiffs add that Schreiber objects to comments that Plaintiffs made in their opposition to Schreiber's motion to dismiss [290], which was filed and ruled upon approximately two years ago.

Parties must request Rule 11 sanctions "as soon as practicable after discovery of a Rule 11 violation." *Kaplan v. Zenner*, 956 F.2d 149, 151 (7th Cir. 1992). Ninety days after final judgment is the "outer parameter" for filing a Rule 11 motion for sanctions. *Matrix IV, Inc. v. Am. Nat'l Bank & Trust Co.*, 649 F.3d 539, 552 (7th Cir. 2011). The Advisory Committee Notes to Rule 11 say that "it is anticipated that in the case of pleadings the sanctions issue under Rule 11 normally will be determined at the end of litigation." Fed. R. Civ. P. 11 advisory committee's notes. Further, "[i]f the challenged conduct is the institution of the action itself * * *, the question whether there has been a Rule 11 violation generally is not decided until after the litigation is completed, in order to avoid delaying the disposition of the merits of the case." 5A Wright & Miller, FEDERAL PRACTICE & PROCEDURE CIV. § 1337.1.

The purportedly violative conduct at issue here concerns Plaintiffs' allegedly baseless allegations of wrongdoing against Schreiber as set forth in their second amended complaint [245], which Plaintiffs filed on March 22, 2012. Schreiber cites to similarly offensive statements in Plaintiffs' opposition to Schreiber's motion to dismiss [290] as illustrative of their continuing sanctionable conduct, but Schreiber focuses almost exclusively on Plaintiffs' complaint as the core violation. Schreiber first provided notice to Plaintiffs of its intent to file a Rule 11 motion on May 9, 2012 [688, ex. A],[14] approximately two weeks after Plaintiffs sued Schreiber, and again on March 19, 2014 [see 676-1 ex. A], after Schreiber filed its motion for summary judgment but before briefing on that motion was completed. Because Plaintiffs did not withdraw or revise the offensive pleadings, Schreiber filed its Rule 11 motion on September 24, 2014 [676], 37 days

---

[14] Schreiber satisfied Rule 11's notice provision by sending a letter to Plaintiffs in which Schreiber identified the offensive statements and requested that Plaintiffs withdraw the claims pursuant to Rule 11(c)(2) [see Decl. of C. McGrath, 688, ex. A]. *Matrix IV*, 649 F.3d at 552 ("Gateway put Matrix on notice of its intent to seek sanctions by a letter sent two weeks after Matrix filed its initial complaint."). Unlike the letter in *Matrix IV*, Schreiber did not expressly mention its intent to seek sanctions. However, an express mention of Rule 11(c)(2)—which discusses motions for sanctions and the 21-day safe harbor—coupled with an express mention of the offending paper, is sufficient to put Plaintiffs on notice.

after the Court granted summary judgment in its favor [652], and 12 days after the Court entered final judgment pursuant to that ruling [669].

Rule 11 includes a 21-day safe harbor, which says that a party seeking sanctions must inform the alleged offender 21 days prior to filings in order to give the alleged offender an opportunity to withdraw the purportedly false statement. Fed. R. Civ. P. 12(c)(2). Plaintiffs argue that "[a] motion for sanctions served after an allegedly offending paper has been ruled upon defeats the purpose of Rule 11's safe harbor." [687, at 3 (quoting *Zahran v. Nat'l Guardian Life Ins. Co.*, 1999 WL 652052, at *3 (N.D. Ill. Aug. 16, 1999)).] But this is only true when both the notice *and* the Rule 11 motion are filed after the offending paper has been ruled upon. See *Matrix IV*, 649 F.3d at 552 ("[Matrix] claims that motions for Rule 11 sanctions filed after a final judgment, like the one at issue here, are not permissible. Matrix is incorrect * * *."). Thus, the concern articulated in *Zahran* does not apply here.

The Court must decide whether giving notice approximately two weeks after the release of the offending paper but filing the motion two-and-a-half years later, after the offending paper has been ruled upon, is reasonable. "Reasonableness is necessarily dictated by the specific facts and circumstances in a given case." *Kaplan*, 956 F.2d at 152. In *Matrix IV*, the movant put Matrix on notice of its intent to seek sanctions two weeks after the offending paper (*i.e.*, the complaint) was filed, but did not file its Rule 11 motion until two years later, after the district court dismissed the case. *Matrix IV*, 649 F.3d at 552. The court held that "[t]he 21-day window specified in Rule 11 is a floor, not a ceiling," and that just because the movant "filed its motion for sanctions 23 days after the district court dismissed the suit—and more than two years after the Rule 11 notice letter was sent—does not mean that the requirements of Rule 11 have not

been satisfied." *Id.* at 552–53. This case is on all fours with *Matrix IV*, and Schreiber's Rule 11 motion is therefore timely.[15]

### 3.     Rule 11 Sanctions

Rule 11(b) requires an attorney to certify, to the best of his or her knowledge, that any pleading that the attorney presents to the court is not being presented for any improper purpose— such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation—and that "the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery." Fed. R. Civ. P. 11(b); see also *Jimenez v. Madison Area Tech. College*, 321 F.3d 652, 656 (7th Cir. 2003). "The central goal of Rule 11 is to deter abusive litigation practices." *Corley v. Rosewood Care Ctr., Inc. of Peoria*, 388 F.3d 990, 1013 (7th Cir. 2004). Rule 11 thus serves to protect courts and parties against "callous disregard for governing law or the procedures of the court." *Allison v. Dugan*, 951 F.2d 828, 834 (7th Cir. 1992).

"The decision to impose sanctions is left to the discretion of the trial court in light of the available evidence," and "[t]he application of Rule 11 to the facts and circumstances of a particular case is an exercise of the trial court's discretion, which [is] reviewed for abuse of discretion." *Divane v. Krull Elec. Co., Inc.*, 200 F.3d 1020, 1025, 1028 (7th Cir. 1999). To win on a motion for sanctions, the movant must satisfy the "high burden of showing that Rule 11 sanctions are warranted." *Lundeen v. Minemyer*, 2010 WL 5418896, at *3 (N.D. Ill. Dec. 17, 2010 (citing *Fed. Deposit Ins. Corp. v. Tekfen Const. & Installation Co., Inc.*, 847 F.2d 440, 444

---

[15] Schreiber did not send Plaintiffs separate Rule 11 notices after each repeat offense. However, nearly all of Schreiber's objections are to statements that Plaintiffs made in their second amended complaint, and Schreiber makes reference to Plaintiffs' subsequent offenses only as ancillary support for its core objections (*i.e.*, not as independent Rule 11 violations). [See 676, at 4 and n.2 (referencing Plaintiffs' allegations in its opposition to Schreiber's motion to dismiss).] Under these circumstances, the Court deems Schreiber's objection procedures to be reasonable, and thus procedurally appropriate.

(7th Cir. 1998))). Rule 11 "imposes an objective standard of reasonable inquiry which does not mandate a finding of bad faith." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 47 (1991); *Cuna Mut. Ins. Soc. v. Office & Prof'l Emps. Int'l Union, Local 39*, 443 F.3d 556, 560 (7th Cir. 2006) ("The Court must 'undertake an objective inquiry into whether the party or his counsel should have known that his position is groundless.'" (quotation omitted)). Even when a court has ruled that a party has been "wrong on the law," sanctions against that party do not flow inevitably. *Harlyn Sales Corp. Profit Sharing Plan v. Kemper Fin. Servs., Inc.*, 9 F.3d 1263, 1269 (7th Cir. 1993).

To assess the reasonableness of a party's inquiry into the factual basis of its claims, the test is whether "competent attorneys performing a reasonable investigation could not have believed in the merit of the position taken in the complaint." *Id.* Courts also look to a number of other factors, including: "whether the signer of the documents had sufficient time for investigation; the extent to which the attorney had to rely on his or her client for the factual foundation underlying the pleading, motion or other paper; whether the case was accepted from another attorney; the complexity of the facts and the attorney's ability to do a sufficient pre-filing investigation; and whether discovery would have been beneficial to the development of the underlying facts." *Brown v. Fed'n of State Med. Bds.*, 830 F.2d 1429, 1435 (7th Cir. 1987).

Schreiber details nine specific statements in Plaintiffs' complaint as examples of how Plaintiffs lacked an evidentiary basis for bringing claims against Schreiber.[16] Upon reviewing

---

[16] While Schreiber cites to these nine specific examples, it argues that Plaintiffs' second amended complaint is replete with unsupported accusations, and that Plaintiffs' central claim that Schreiber conspired with DFA and Keller's Creamery to manipulate the price of milk futures is completely meritless. As such, while the Court reviews Schreiber's specific examples in detail, it also reviews Schreiber's Rule 11 motion in light of Plaintiffs' complaint as a whole. That being said, the Court is mindful that even a single misrepresentation can form the basis for a Rule 11 sanction, even though Plaintiffs' complaint contains other formally correct statements or is, on the whole, plausible. *Frantz v. U.S. Powerlifting Fed'n*, 836 F.2d 1063, 1067 (7th Cir. 1987).

each allegation in detail,[17] the Court finds that at the time Plaintiffs' filed their second amended complaint,[18] Plaintiffs claims—although presented to the Court (and Schreiber) with a healthy dose of hyperbole—were neither abusive nor wholly without evidentiary support. Plaintiffs had been investigating this alleged conspiracy for three years before adding Schreiber as a defendant. Their decision to sue Schreiber was not a fly-by-night decision, but rather a calculated and considered endeavor aided by heaps of discovery borrowed from the related CFTC investigation and by advice from multiple experts and economists. [688, ¶ 12.] Schreiber refers to the lawsuit as a fishing expedition, but as mentioned above in reviewing Plaintiffs' fee petition, Plaintiffs assumed a sizeable risk in undertaking these claims in the first place (a risk for which Plaintiffs recovered nothing while undoubtedly expending hundreds of hours of effort). Indeed, while the CFTC discovery may have been sufficient to fuel Plaintiffs' efforts against DFA, that information only whetted Plaintiffs' claims against Schreiber, prompting Plaintiffs to undertake significant additional (and costly) discovery in order to investigate their claims. And although Schreiber highlights several factual inconsistencies between certain of Plaintiffs' allegations and specific bits of evidence, those inconsistencies are overshadowed by the colorable specter of wrongdoing that arose from Schreiber's manipulation of cheese prices during the relevant time period. As the Court noted in granting Schreiber's motion for summary judgment, "Schreiber appears to have been engaged in an effort to influence the barrel cheese market for its own

---

[17] To refute Schreiber's nine specific examples of sanctionable conduct, Plaintiffs produced a 12-page, single-spaced exhibit laying out specific evidentiary bases for each of the nine allegations at issue. [687-1.] The Court shares Schreiber's frustration over the lack of context in Plaintiffs' chosen rebuttal format (*i.e.*, isolated bullet points without explanation or accompanying exhibits). Nonetheless, upon careful review, while the evidentiary excerpts do not provide smoking-gun evidence for Plaintiffs' allegations, the Court is persuaded that Plaintiffs were not following an imaginary trail of bread crumbs in continuing to investigate their claims against Schreiber.

[18] "The focus in Rule 11 sanctions is on what counsel knew at the time the complaint was filed, not what subsequently was revealed in discovery." *City of Livonia Emps.' Retirement Sys. v. Boeing Co.*, 2014 WL 4199136, at *5 (N.D. Ill. Aug. 21, 2014) (quoting *Corley v. Rosewood Care Ctr.*, 388 F.3d 990, 1014 (7th Cir. 2004)).

benefit," and Schreiber and DFA "communicated regularly during the spring of 2004," but when all the evidence was laid out, it was just "too much of a leap" for a jury to "infer an agreement to fix prices." [652, at 59–60.] And while certain of Plaintiffs' individual allegations raised a suspicion of price fixing, ultimately Plaintiffs claims were "no more suggestive of collusion than of parallel behavior," such that Plaintiffs' inferences were "untenable in light of the evidence as a whole." [*Id.* at 62.] The point is that this lawsuit was not, in the Court's eyes, a baseless or abusive filing. See *Bilharz v. First Interstate Bank of Wis.*, 98 F.3d 985, 989 (7th Cir. 1996) (affirming summary judgment but reversing Rule 11 sanctions because "although [plaintiff's] arguments were undoubtedly weak, we cannot say that [plaintiff's] claims were so devoid of factual support that sanctions were appropriate").

### 4. Fees

Under Rule 11(c)(2), "the court may award to the prevailing party [to a motion for sanctions] the reasonable expenses, including attorney's fees, incurred for the motion." Fed. R. Civ. P. 11(c)(2). Plaintiffs have not requested fees at this point, but regardless, the Court finds that Plaintiffs are not entitled to reasonable expenses here.

## III. Conclusion

For the foregoing reasons, the Court grants Class Counsel's fee petition [613], awarding them one-third of the $46 million common fund ($15,333,333.33) with interest thereon at the same rate paid on the Settlement Fund, plus $488,491.24 in costs and expenses. The Court grants DFA's motion for leave to file a response to Direct Purchaser Plaintiffs' reply memorandum in further support of Class Counsel's fee petition [649]. The Court denies Schreiber's motion for Rule 11 sanctions [676]. The Court grants in part and denies in part Direct Purchaser Plaintiffs' motion to file a surreply [703] and Direct Purchaser Plaintiffs' motion to file exhibit 1 to their

surreply under seal [701], granting Plaintiffs leave to file only the exhibits to their motion to file a surreply, which will remain under seal on the Court's docket as currently filed. Finally, the Court grants Schreiber's bill of costs [694], and awards them $32,215.23 plus interest, although enforcement of this award is stayed pending resolution of Plaintiffs' appeal of this Court's order granting summary judgment in favor of Schreiber.

Dated: February 20, 2015

_____
Robert M. Dow, Jr.
United States District Judge