**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| IN RE: DAIRY FARMERS OF AMERICA, INC. | ) | |
| CHEESE ANTITRUST LITIGATION | ) | Master File No. 9 CV 3690 |
| | ) | MDL No. 2031 |
| | ) | |
| THIS DOCUMENT RELATES TO: | ) | Judge Robert M. Dow, Jr. |
| | ) | |
| Indirect Purchaser Actions | ) | |

**MEMORANDUM OPINION AND ORDER**

Before the Court is Defendants' motion to dismiss Indirect Purchaser Plaintiffs' Consolidated Class Action Complaint [497]. For the reasons state below, the Court grants Defendants' motion. In addition, putative Intervenors' motion to intervene [723] is denied.

**I.      Background**

This multi-district litigation—composed of separate consolidated actions by both Direct Purchaser Plaintiffs and Indirect Purchaser Plaintiffs—has been pending for approximately six years now. Detailed descriptions of the underlying facts of the case can be found in Judge Hibbler's opinion on Defendants' motion to dismiss the Direct Purchaser Plaintiffs' complaint, *In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*, 767 F. Supp. 2d 880, 885–90 (N.D. Ill. 2011) (hereinafter "*DFA I*"), and in this Court's opinion on Defendants' motion to dismiss Indirect Purchaser Plaintiffs' federal claims, *In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*, 2013 WL 4506000, at *1–4 (N.D. Ill. Aug. 23, 2013) (hereinafter "*DFA II*").

This opinion is closely related to the Court's *DFA II* opinion, as it concerns Defendants' motion to dismiss the Indirect Plaintiffs' state-law claims as raised in their Consolidated Class Action Complaint [483]. The Court adopts the detailed factual history of the case as set forth in *DFA I* and *DFA II*, and highlights only those facts necessary to address the present motion.

## A.     Factual Background

Indirect Plaintiffs allege that Defendants and Schreiber Foods, Inc. conspired to fix, stabilize, raise, and maintain the prices of Class I & III milk and products containing Class I & III milk. The basic allegation is that Defendants bought all of the Class III milk futures on the Chicago Mercantile Exchange ("CME") covering a certain period of time. Defendants then monopolized the CME's Cheese Spot market (*i.e.*, the only commodity exchange market for cheddar cheese in the United States), which allegedly caused an increase in the USDA's milk rate, which in turn increased the price of Defendants' milk futures and the nationwide price for finished dairy products sold to consumers. This chain of events allowed Defendants to profit from both (a) the artificially high price of milk futures and (b) the artificially high price of finished dairy products. Indirect Plaintiffs contend that Defendants' scheme injured them by forcing them to overpay for finished dairy products, namely various types of cheese. The named Plaintiffs are citizens of eight states (Arkansas, California, Florida, Kansas, Michigan, Minnesota, North Carolina, and New York) who allegedly purchased Defendants' finished dairy products during the relevant time periods in their respective states.

## B.     Procedural Background

The "indirect" component of this MDL, as currently set forth in Indirect Plaintiffs' Consolidated Class Action Complaint [483 (under seal)], is composed of four class-action lawsuits brought by and on behalf of so-called indirect-purchaser Plaintiffs, filed at various times in various courts: *Rudman v. DFA*, No. 2:09-cv-00134 (D. Vt. May 29, 2009); *Waun v. DFA*, No. 2:11-cv-00219 (D. Vt. Sept. 13, 2011); *Asmann v. DFA*, No. 11-cv-4428 (Kan. Dist. Ct. Dec. 15, 2011); and *Rogers v. DFA*, No. 5:13-cv-00034 (D. Vt. Feb. 19, 2013).

In *DFA II*, the Court addressed Defendants' motions to dismiss three of these class-action complaints [160, 197, 287], granting the motions as they related to Indirect Plaintiffs' federal antitrust claims, but leaving open the question of whether the Court would exercise jurisdiction over Indirect Plaintiffs' related state-law claims. [365.] Approximately six months later, the Court granted Indirect Plaintiffs' request to file a Consolidated Class Action Complaint to present their remaining state-law allegations to the Court. [476.] Indirect Plaintiffs filed their Consolidated Class Action Complaint under seal on February 25, 2014, invoking various antitrust, consumer-protection, and unjust-enrichment laws from the eight states at issue. [483.]

### C.       Indirect Purchaser Plaintiffs' Consolidated Class Action Complaint

Indirect Plaintiffs' Consolidated Class Action Complaint wends its way through the antitrust laws of eight states, picking up related consumer-protection and unjust-enrichment claims along the way. All said, Indirect Plaintiffs raise three counts, which they label (1) State Statutes, (2) Violation of State Statutes, and (3) Unjust Enrichment. Decoded, these counts are best read as (1) Price-Fixing and Conspiracy, (2) Monopolization, and (3) Unjust Enrichment.

### 1.       Counts I and II: Antitrust and Consumer-Protection Claims

While Counts I and II of Indirect Plaintiffs' Consolidated Class Action Complaint sound in antitrust law, for various reasons, Indirect Plaintiffs were unable to bring claims under the antitrust statutes of two of the eight states at issue: Arkansas and Florida. For those two states, Indirect Plaintiffs brought their antitrust claims under the states' consumer-protection statutes instead. See Ark. Code § 4-88-107; Fla. Stat. § 501.204. Indirect Plaintiffs also invoked the consumer-protection laws of California (Cal. Bus. & Prof. Code § 17200) and North Carolina (N.C. Gen. Stat. § 75-1.1) *in addition to* their invocation of the antitrust statutes of those states.

Although Indirect Plaintiffs have alleged violations of a mix of both state antitrust and consumer-protection laws in Counts I and II, they do not distinguish between the two. For purposes of this opinion, however, delineation is imperative. Accordingly, the following chart provides a breakdown of Counts I and II, distinguishing Indirect Plaintiffs' antitrust claims from their consumer-protection claims.

| State | Count I:<br>Price Fixing and Conspiracy | | Count II:<br>Monopolization | |
|---|---|---|---|---|
| | **Antitrust** | **Consumer Protection** | **Antitrust** | **Consumer Protection** |
| Arkansas | | Ark. Code § 4-88-107 | | Ark. Code § 4-88-107 |
| California | Cal. Bus. & Prof. Code § 16726 | Cal. Bus. & Prof. Code § 17200 | | Cal. Bus. & Prof. Code § 17200 |
| Florida | | Fla. Stat. § 501.204 | | Fla. Stat. § 501.204 |
| Kansas | Kan. Stat. Ann. § 50-112 | | | |
| Michigan | Mich. Comp. Laws § 445.772 | | Mich. Comp. Laws § 445.773 | |
| Minnesota | Minn. Stat. §§ 325D.51 & 325D.53 | | Minn. Stat. § 325D.52 | |
| New York | N.Y. Gen. Bus. Law § 340 | | | |
| North Carolina | N.C. Gen. Stat. § 75-1 | N.C. Gen. Stat. § 75-1.1 | N.C. Gen. Stat. § 75-2.1 | |

## 2.      Count III: Unjust Enrichment Claims

Without specifying the laws of any particular state, Indirect Plaintiffs allege in Count III that Defendants were unjustly enriched by the Indirect Plaintiffs' overpayments for Defendants' finished dairy products. Indirect Plaintiffs ask the Court to disgorge Defendants of their unjust profits and return the overpayments to them in restitution.

## II.      Legal Standard on Motion to Dismiss

The purpose of a Rule 12(b) motion to dismiss is not to decide the merits of the case, but rather to test the sufficiency of the complaint. *Gibson v. City of Chicago*, 910 F.2d 1510, 1520

(7th Cir. 1990). In the context of a motion to dismiss, the Court takes as true the facts as set forth in the complaint along with all reasonable inferences. *Thulin v. Shopko Stores Operating Co., LLC*, 771 F.3d 994, 995 (7th Cir. 2014). To survive a Rule 12(b)(6) motion to dismiss, the claim first must comply with Rule 8(a) by providing "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), such that the defendant is given "fair notice of what the * * * claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). Second, the factual allegations in the claim must be sufficient to raise the possibility of relief above the "speculative level," assuming that all of the allegations in the complaint are true. *E.E.O.C. v. Concentra Health Servs., Inc.*, 496 F.3d 773, 776 (7th Cir. 2007) (quoting *Twombly*, 550 U.S. at 555). "A pleading that offers 'labels and conclusions' or a 'formulaic recitation of the elements of a cause of action will not do.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555). However, "[s]pecific facts are not necessary; the statement need only give the defendant fair notice of what the * * * claim is and the grounds upon which it rests." *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (citing *Twombly*, 550 U.S. at 555).

## III.    Antitrust Standing

In granting Defendants' prior motion to dismiss the federal antitrust claims raised by Indirect Plaintiffs in their (then three separate) class-action complaints, the Court held that Plaintiffs lacked antitrust standing to bring those claims under the "directness inquiry" set forth in *Associated General Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519 (1983) (hereinafter "*AGC*"). *DFA II*, 2013 WL 4506000, at *9–14. But the Court left open the questions of "whether and how the *AGC* factors apply to each of the various *state*

antitrust claims that Plaintiffs seek to bring." *Id.* at *15 (emphasis added). Those questions are now before the Court.

Defendants argue that (1) the Court should apply *AGC* to the state-law claims, dismissing them for lack of antitrust standing, (2) even if the Court does not apply *AGC* to the state-law claims, the Court should still dismiss those claims under state-law remoteness principles, and (3) the dismissal (under either theory) should apply to all of Plaintiffs' claims (*i.e.*, antitrust, consumer protection, and unjust enrichment), not just the antitrust claims.

In deciding whether to apply *AGC* to state-law antitrust claims, the Court looks to whether the relevant state supreme court or state legislature has spoken to the issue. See *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938); *Jean v. Dugan*, 20 F.3d 255, 260 (7th Cir. 1994). "In the absence of guiding decisions by the state's highest court, [federal courts] consult and follow the decisions of intermediate [state] appellate courts unless there is a convincing reason to predict [that] the state's highest court would disagree." *ADT Sec. Servs., Inc. v. Lisle-Woodridge Fire Prot. Dist.*, 672 F.3d 492, 498 (7th Cir. 2012).

Indirect Plaintiffs allege that Defendants have violated the antitrust laws of six states: California, Kansas, Michigan, Minnesota, New York, and North Carolina. Defendants argue that the state legislatures or the highest courts in each of these six states have issued clear directives that courts interpreting their state's antitrust statutes should follow federal law, and Indirect Plaintiffs (predictably) disagree. But before beginning a state-by-state analysis, the Court notes two general topics that are relevant in all six states: (1) harmonization provisions and (2) *Illinois Brick* repealer statutes.

## A. Harmonization Provisions

A harmonization provision—which can either be statutory or derived from the common law—says that a state's antitrust laws should be read in harmony with federal antitrust laws. All six of the states at issue have such provisions. Defendants point to these provisions as proof that the states would apply *AGC*. Indirect Plaintiffs disagree, arguing that (1) harmonization provisions apply to determine what qualifies as prohibited conduct, not who has standing to sue, and (2) even if a state has a harmonization provision, there nonetheless must be clear guidance under the state's law for applying *AGC*.

Both parties are correct, depending on where you look. Some states have interpreted harmonization provisions narrowly, excluding the incorporation of federal law regarding antitrust standing. See *Lorix v. Crompton Corp.*, 736 N.W.2d 619, 626 (Minn. 2007) (noting that "[t]he desire for harmony between federal and state antitrust law relates more to prohibited conduct than to who can bring a lawsuit," such that state courts are "not required * * * to abide by federal antitrust standing limitations" (citing *Comes v. Microsoft Corp.*, 646 N.W.2d 440, 446 (Iowa 2002) (noting that the purpose of Iowa's antitrust harmonization statute was to "achieve uniform application of the state and federal laws prohibiting monopolistic practices," not to define who can sue under antitrust law))).

That being said, other courts have applied *AGC* to state antitrust law based solely on harmonization provisions. See, *e.g.*, *In re Refrigerant Compressors Antitrust Litig.*, 2013 WL 1431756, at *10 (E.D. Mich. Apr. 9, 2013) ("This Court shall also apply the *AGC* test to the claims asserted under the laws of the three relevant states with harmonization provisions * * *."); *In re Dynamic Random Access Memory Antitrust Litig.*, 516 F. Supp. 2d 1072, 1095 (N.D. Cal. 2007) (hereinafter "*DRAM*").

Still other courts have played it safe, punting the issue absent clear guidance from the state in question. See, *e.g.*, *In re Potash Antitrust Litig.*, 667 F. Supp. 2d 907, 943–44 (N.D. Ill. 2009) ("[T]his Court is hesitant to decide who may be a proper plaintiff under Michigan's antitrust laws without any signal from an authoritative judicial or legislative source."), *vacated and remanded on other grounds*, *sub nom. Minn-Chem, Inc. v. Agrium Inc.*, 657 F.3d 650 (7th Cir. 2011); *In re Flash Memory Antitrust Litig.*, 643 F. Supp. 2d 1133, 1153 (N.D. Cal. 2009) ("This Court, however, is reticent to adopt an across-the-board rule that a state's harmonization provision, whether created by statute or common law, is an appropriate means of predicting how a state's highest court would rule regarding the applicability of *AGC* to state law antitrust claims. Neither party has provided the Court with the requisite, individualized analysis on a per state basis to enable the Court to render such a determination."); *In re Pool Prods. Distrib. Mktg. Antitrust Litig.*, 946 F. Supp. 2d 554, 564 (E.D. La. 2012) ("The *AGC* factors apply to standing inquires under state antitrust laws only to the extent that a state has adopted them.").

The Court is persuaded that the presence of a statutory harmonization provision (either statutory or common law), *absent any countervailing statutory law or case law from a state appellate court*, is sufficient to permit a district court to apply federal antitrust-standing law— including *AGC*—to claims brought under that state's antitrust laws.

First, the plain language of the harmonization statutes at issue—disseminated by the states' supreme courts and/or legislatures—offers no such limitation, instructing instead that each respective state's antitrust laws be read in harmony with federal antitrust laws, absent contradictory state law or policy. See, *e.g.*, *Mailand v. Burckle*, 572 P.2d 1142, 1147 (Cal. 1978) (California); Kan. Stat. Ann. § 50-163(b) (Kansas); Mich. Comp. Laws § 445.784(2) (Michigan); *Minn. Twins P'ship v. State*, 592 N.W.2d 847, 851 (Minn. 1999) (Minnesota); *Sperry v.*

*Crompton Corp.*, 863 N.E.2d 1012, 1018 (N.Y. 2007) (New York); *Madison Cablevision, Inc. v. Morganton*, 386 S.E.2d 200, 213 (N.C. 1989) (North Carolina). It seems odd, then, that a district court would read a non-existent exception into a state's harmonization provision as its prediction of how the state's highest court would rule on the issue. The safer prediction is to assume that the state court would apply the plain language of the provision.

Second, (as discussed in more detail below), the fact that many state legislatures found it necessary to repeal the Supreme Court's *Illinois Brick* decision—a federal antitrust-standing opinion—implies that absent the repeal, the *Illinois Brick* antitrust-standing rule *would have* applied to the states' laws under their respective harmonization provisions (*i.e.*, if the states' harmonization provisions didn't incorporate federal antitrust-standing law, *Illinois Brick* repealer statutes wouldn't have been necessary).

Third, antitrust standing is not Article III standing; the very concept of antitrust standing, which exists *in addition to* Article III standing,[1] is so intertwined with substantive antitrust principles that it would be counterintuitive to assume that states would not read this body of law in harmony with the remainder of the Supreme Court's substantive antitrust opinions. Indeed, the entire premise of the judicially-created "antitrust standing" inquiry stems from the fact that the plain language of the Clayton Act's standing provision is exceedingly broad, and so the Supreme Court derived a set of narrowing factors influenced by the same policies that gave birth to the antitrust laws in the first place. See *AGC*, 549 U.S. at 536–38. Thus, as a threshold matter, the Court will follow the plain language of the states' harmonization provisions and adopt federal antitrust-standing law in applying the states' antitrust laws absent contrary authority.

But to be clear, a harmonization provision does not guarantee that a state will apply *AGC*. Even states with a harmonization provision have the authority to reject the application of *AGC* if

---

[1] See, *e.g.*, *Loeb Indus., Inc. v. Sumitomo Corp.*, 306 F.3d 469, 480–81 (7th Cir. 2002).

*AGC* conflicts with existing state law (statutory or common law). For example, in *Lorix*, the Minnesota Supreme Court first rejected the broader notion that its common-law harmonization provision automatically incorporated federal antitrust-standing law, and then, in a separate analysis, specifically rejected the application of *AGC* under Minnesota antitrust law. *Lorix*, 736 N.W.2d at 626–29 ("Even viewed as guideposts rather than requirements, the *AGC* factors are not harmonious with our antitrust law."). It is this sort of analysis that makes the Court's decision more academic than effectual, since the identification of a harmonization provision is only the first step in deciding whether a state supreme court would apply the *AGC* factors, with an assessment of the state's extant antitrust-standing law a necessary follow-up.

### B. *Illinois Brick* Repealer Statutes

Although the standing provision in § 4 of the Clayton Act is broad—permitting civil suits by "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws," 15 U.S.C. § 15—the Supreme Court has endorsed several limiting principles such that not every person, however tangentially injured by an antitrust violator, has standing to sue. See *Blue Shield of Virginia v. McCready*, 457 U.S. 465, 472–75 (1982); *Hawaii v. Standard Oil Co.*, 405 U.S. 251, 263 n.3 (1972) (observing that the lower federal courts were "virtually unanimous in concluding that Congress did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation").

One such limiting principle (of particular relevance here) came from the Supreme Court's *Illinois Brick* decision, where the Court held that indirect purchasers of bricks lacked antitrust standing where their alleged damages were measured by the amount of overcharge passed onto them from the direct purchasers. *Illinois Brick*, 431 U.S. at 730–31; *McCready*, 457 U.S. at 474 ("[T]he Court found unacceptable the risk of duplicative recovery engendered by allowing both

10

direct and indirect purchasers to claim damages resulting from a single overcharge by the antitrust defendant. The Court found that the splintered recoveries and litigative burdens that would result from a rule requiring that the impact of an overcharge be apportioned between direct and indirect purchasers could undermine the active enforcement of the antitrust laws by private actions." (citations omitted)); *AGC*, 459 U.S. at 912 ("We observed that potential plaintiffs at each level in the distribution chain would be in a position to assert conflicting claims to a common fund, the amount of the alleged overcharge, thereby creating the danger of multiple liability for the fund and prejudice to absent plaintiffs."); see also *Loeb*, 306 F.3d at 481 ("*Illinois Brick* holds that the direct purchaser from the alleged antitrust violator(s) is the one with the right of action; those further removed from the illegal arrangement may not (under the federal antitrust laws, at least) bring their own actions."); *Int'l Bhd. of Teamsters, Local 734 Health & Welfare Trust Fund v. Philip Morris Inc.*, 196 F.3d 818, 825 (7th Cir. 1999) ("[O]nly the immediate purchaser of goods may sue under the antitrust laws.").

Since *Illinois Brick* came down in 1977, antitrust defendants have tried to stretch its application to stand for the proposition that "a defendant cannot be sued under the antitrust laws by any plaintiff to whom it does not sell (or from whom it does not purchase)," but, as the Seventh Circuit has noted, "[s]uch a rule would eliminate in one fell swoop all competitor suits based on exclusionary practices," which is "a step that the Supreme Court has never taken." *Loeb*, 306 F.3d at 481. And the Supreme Court subsequently clarified that "the chain-of-distribution inquiry in *Illinois Brick* was meant only to preclude duplicate recovery." *Id.* (citing *McCready*, 457 U.S. at 468–70); see also *id.* at 482 ("The reason the plaintiffs' suit in *Illinois Brick* failed was not because the defendants did *not* sell to them. Rather, it was because the defendants *did* sell to a third party who * * * could recover for any injury they claimed.").

Six years later, in 1983, the Supreme Court issued another opinion on antitrust standing—*AGC*—providing a six-factor test for examining the link between a plaintiff's harm and a defendant's wrongdoing: (1) the causal connection between the violation and the harm; (2) the presence of improper motive; (3) the type of injury and whether it was one Congress sought to redress; (4) the directness of the injury; (5) the speculative nature of the damages; and (6) the risk of duplicate recovery or complex damage apportionment. *Loeb*, 306 F.3d at 484 (citing *AGC*, 459 U.S. at 537–45). The "broad proposition" emanating from *AGC* is that "a party cannot recover when others more directly injured are better able to state a claim." *Id.* at 489.

At first glance, there appears to be some overlap between the *Illinois Brick* doctrine and the *AGC* six-factor test. In general, both tests relate to the directness of a plaintiff's injury. And specifically, several of the *AGC* factors—especially factor number six—echo the Court's ruling in *Illinois Brick*. See *Lorix*, 736 N.W.2d at 628 (holding that the "complexity of apportionment and risk of duplicative recoveries" factor "was at the heart of *Illinois Brick*'s bar to indirect purchaser suits"). However, other courts have been quite clear in holding that *Illinois Brick* and *AGC* present separate, distinct inquiries. See *Int'l Bhd. of Teamsters, Local 734 Health & Welfare Trust Fund v. Philip Morris Inc.*, 196 F.3d 818, 825 (7th Cir. 1999) (noting that the "direct-purchaser doctrine of *Illinois Brick* and the direct-injury doctrine of *Associated General Contractors* are analytically distinct" and are "independent obstacle[s] to recovery"); *Loeb*, 306 F.3d at 475 ("We find that *Illinois Brick* presents no obstacle to any of the plaintiffs' claims but that the claims of the scrap copper dealers are precluded under *AGC*."); *DFA II*, 2013 WL 4506000, at *14 (noting that *AGC*, and specifically its "directness inquiry," "presents a separate hurdle to Indirect Purchasers' claims"); see also *Southard v. Visa USA Inc.*, 734 N.W.2d 192,

198–99 (Iowa 2007) (adopting *AGC* despite its repealer statute); *Kanne v. Visa USA Inc.*, 723 N.W.2d 293, 298–300 (Neb. 2006) (same).

This delineation between *Illinois Brick* and *AGC* is important because in reaction to *Illinois Brick*, multiple state legislatures—including the legislatures of all but one of the states at issue here—passed "repealer statutes" abrogating the Supreme Court's prohibition of indirect-purchaser actions as articulated in *Illinois Brick*. The key question is how, if at all, these repealer statutes impact the Court's application of *AGC* under each state's law.

To answer that question fully, the Court must (and will) review the language of the repealer statutes at issue, as well as the relevant case law interpreting those statutes. But the Court notes that while at least 25 states enacted repealer statutes in response to *Illinois Brick* (see *Lorix*, 736 N.W.2d at 627), the Court is not aware of any legislative action by any state expressly rejecting *AGC*. The fact that so many states took action in response to *Illinois Brick* shows that states are quite capable of rejecting federal antitrust law when they see fit to do so. *Illinois Brick* was decided in 1977 and *AGC* in 1983, so state legislatures have had ample time to pass equivalent "repealer statutes" regarding *AGC*. On the other hand, the Court recognizes that by enacting a repealer statute, each state has taken some action to differentiate its antitrust-standing law from the federal landscape. In addition, despite the Seventh Circuit's recognition that *Illinois Brick* and *AGC* represent separate and distinct hurdles, this Court cannot overlook the overlap between some of the *AGC* factors and the *Illinois Brick* inquiry, which is not surprising since the *AGC* test was, at least in some ways, influenced by *Illinois Brick*. See, *e.g.*, *Wrobel v. Avery Dennison Corp.*, No. 05-cv-1296, 2006 WL 7130617 (Kan. Dist. Ct., Feb. 1, 2006) (state court opinion), available at [574-1, at 6] ("Because '*AGC* incorporates, rather that repudiates, the principles of *Illinois Brick*,' one could argue that jurisdictions rejecting *Illinois Brick* would also

reject the *AGC* standing test since its broad application would preclude most, if not all, indirect purchaser suits. In other words, applying *AGC* in a jurisdiction that recognizes indirect purchaser suits could effectively negate the legislative or judicial rejection of *Illinois Brick*." (quoting *McCarthy v. Recordex Serv.*, 80 F.3d 842, 851 (3d Cir. 1996))). But see *id.* ("Although this argument has some intuitive appeal, it fails to consider that '*AGC* and *Illinois Brick* address two analytically distinct aspects of antitrust standing." (quoting *McCarthy*, 80 F.3d at 851)). Ultimately, while the Court recognizes that similar policy concerns may have motivated both *Illinois Brick* and *AGC*, they remain separate and distinct tests. Accordingly, to determine whether a state's repealer statute has any impact on the state's willingness to apply *AGC*, the Court must review the specific language of the repealer statute and any associated case law.

### C.     State-by-State Analysis

With assistance from the parties, the Court now "undertake[s] the back-breaking labor involved in deciphering the state of antitrust standing in each of th[e] states on this motion" to determine whether to apply the *AGC* factors that the Court applied in dismissing Indirect Plaintiffs' federal antitrust claims. *In re Flash Memory Antitrust Litig.*, 643 F. Supp. 2d at 1153.

#### 1.     California

Standing Provision:

Much like the standing provision in the Clayton Act, California's Cartwright Act is broad in scope, permitting "[a]ny person who is injured in his or her business or property by reason of anything forbidden or declared unlawful by this chapter" to bring an antitrust action. Calif. Bus. & Prof. Code § 16750 subd. (a).

Harmonization Provision:

California's harmonization provision is based in common law, and is well-recognized in the California Supreme Court. *Clayworth v. Pfizer, Inc.*, 233 P.3d 1066, 1082 n.18 (Cal. 2010) (explaining that the *Illinois Brick* repealer statute was necessary because federal antitrust cases are otherwise treated as applicable and authoritative on Cartwright Act questions); *Mailand v. Burckle*, 572 P.2d 1142, 1147 (Cal. 1978); *Marin Cty. Bd. of Realtors, Inc. v. Palsson*, 549 P.2d 833, 835 (Cal. 1976) (noting that a "long line of California cases" has recognized that federal cases interpreting the Sherman Act are applicable to state antitrust cases because "both statutes have their roots in the common law"); *Cnty. of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1160 (9th Cir. 2001) ("[T]he Cartwright Act, Cal. Bus. & Prof. Code § 16700 *et seq.*, was modeled after the Sherman Act."). The California Supreme Court has rejected arguments that judicial interpretations of the Sherman and Clayton Acts "apply fully" to California's antitrust laws, noting that "[i]nterpretations of federal antitrust law are at most instructive, not conclusive, when construing the Cartwright Act." *Aryeh v. Canon Business Solutions, Inc.*, 292 P.3d 871, 877 (2013); see also *Samsun Electronics Co., Ltd. v. Panasonic Corp.*, 747 F.3d 1199, 1205 n.4 (9th Cir. 2014).

*Illinois Brick* Repealer Statute:

The California legislature took action "[w]ithin months of the decision," (*i.e.*, prior to the *AGC* decision), introducing Assembly Bill No. 3222 (1977–1978 Reg. Sess.) to prevent *Illinois Brick* "from having any effect on judicial interpretation of the Cartwright Act." *Clayworth*, 233 P.3d at 1082. The bill passed unanimously, and added a provision to the Act's standing provision stating that a person injured by an antitrust violator may bring suit "regardless of whether such injured person dealt directly or indirectly with the defendant." Calif. Bus. & Prof. Code § 16750

subd. (a), added by Stats. 1978, ch. 536, § 1, p. 1693; see also *Clayworth*, 233 P.3d at 1082

(citing *Union Carbide Corp. v. Superior Court*, 679 P.2d 14, 19–20 (Cal. 1984)).

Supreme Court/Appellate Court Law:

California's intermediate appellate court has endorsed the application of the *AGC* factors

in interpreting California's antitrust laws, despite the state's *Illinois Brick* repealer statute. See

*In re Flash Memory Antitrust Litig.*, 643 F. Supp. 2d at 1151–52 (applying *AGC* under California

law, noting that while the California Supreme Court has not reached the issue, at least one of its

intermediate appellate courts has applied *AGC* to its antitrust laws (citing *Vinci v. Waste Mgmt.,*

*Inc.*, 43 Cal. Rptr. 2d 337, 338–39 (Cal. 1995))). But see *In re Capacitors Antitrust Litig.*, 2015

WL 3398199, at *13 (N.D. Cal. May 26, 2015) ("The application of *AGC* to California state

antitrust claims has recently become murky, and that murkiness persuades the Court *AGC* should

not be applied."). The Ninth Circuit has also applied the *AGC* factors to assess standing under

California antitrust law (albeit "more liberally"), noting only that the scope of the directness

inquiry is broader under California law based on the state's repeal of *Illinois Brick*. See

*Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 987–91 (9th Cir. 2000); see also

*Clayworth*, 233 P.3d at 1077 (citing *AGC* and *Vinci* as cases that dealt with antitrust causation,

and then noting that these cases have "nothing to say on the general topic that concerns us: when

(as here) causation *has* been properly alleged, how are antitrust damages to be measured?").

Analysis:

The Court agrees with the *In re Flash Memory Antitrust Litigation* court, which followed

*Vinci* in applying the *AGC* factors to antitrust claims brought under the Cartwright Act. The

Court is mindful that, as the Ninth Circuit mentioned, California's antitrust-standing provision is

broader in some respects than federal antitrust-standing law because of California's repealer

statute, but the Court also recognizes that California's repealer statute applied only to *Illinois Brick*, and *Illinois Brick* and *AGC* are separate inquiries. See *In re Refrigerant Compressors Antitrust Litig.*, 2013 WL 1431756, at *10. Absent any binding California law to the contrary, the appellate court decision in *Vinci* and the moderately-deferential harmonization provision remain the best indicators of how the California Supreme Court would address the issue, and both lean in favor of applying *AGC* to claims brought under the Cartwright Act.

### 2. Kansas

Standing Provision:

Kansas also has a broadly-worded antitrust-standing provision, stating that a cause of action "may be brought by any person who is injured in such person's business or property by reason of" an antitrust violation. Kan. Stat. Ann. § 50-161(b).

Harmonization Provision:

Kansas is one of the two states at issue with a statutory harmonization provision. See Kan. Stat. Ann. § 50-163(b) ("Except as otherwise provided in subsections (d) and (e), the Kansas restraint of trade act shall be construed in harmony with ruling judicial interpretations of federal antitrust law by the United States [S]upreme [C]ourt. If such judicial interpretations are in conflict with or inconsistent with the express provisions of subsection (c), the provisions of subsection (c) shall control."). The harmonization provision also is echoed in Kansas's case law. See *O'Brien v. Leegin Creative Leather Prods., Inc.*, 321 P.3d 799, at *5 (Kan. Ct. App. 2014) (noting the Kansas legislature's recent amendment of the Kansas Restraint of Trade Act, and the legislature's instruction that "its provisions will be 'construed in harmony' with the United States Supreme Court's antitrust decisions" (citing Kan. State. Ann. 2013 Supp. 50-163(b), (c))); *Smith v. Philip Morris Cos., Inc.*, 335 P.3d 644, 652 (Kan. Ct. App. 2014) (same). The Supreme Court

of Kansas has noted that while it is "certainly foreseeable" that it would apply federal antitrust law in interpreting Kansas's antitrust laws and that such law would be "persuasive authority," ultimately federal antitrust law "is not binding upon any court in Kansas interpreting Kansas antitrust law." *Bergstrom v. Noah*, 974 P.2d 520, 531 (Kan. 1999).

*Illinois Brick* Repealer Statute:

Similar to other states, Kansas's repealer statute provides that a cause of action may be brought "regardless of whether such injured person dealt directly or indirectly with the defendant." Kan. Stat. Ann. § 50-161(b).

Supreme Court/Appellate Court Law:

Neither the parties nor the Court have located any appellate court decisions in Kansas discussing antitrust standing. At least one Kansas district court (*i.e.*, Kansas's trial court) has addressed the issue, concluding that Kansas courts should apply *AGC* despite its repealer statute:

> Because "*AGC* incorporates, rather than repudiates, the principles of *Illinois Brick*," one could argue that jurisdictions rejecting Illinois Brick would also reject the AGC standing test since its broad application would preclude most, if not all, indirect purchaser suits. In other words, applying *AGC* in a jurisdiction that recognizes indirect purchaser suits could effectively negate the legislative or judicial rejection of *Illinois Brick*.
>
> Although this argument has some intuitive appeal, it fails to consider that "*AGC* and *Illinois Brick* address two analytically distinct aspects of antitrust standing." In *AGC*, the Court was primarily concerned with the remoteness of the plaintiff's injury and whether it was too far removed from the antitrust injury to warrant a section 4 remedy. "This inquiry, akin to the determination of 'proximate cause' in the negligence context, is subtle and resists the use of hard-and-fast 'black letter' rules." In *Illinois Brick*, however, the Court created a bright-line rule that focused "exclusively on the risk of duplicative recovery and potential for overly-complex damages and apportionment calculations." Viewed in this context, the Court finds that the *AGC* standing test may be applied to this action even though the KRTA specifically contemplates indirect purchaser suits. The Court, therefore, agrees with Defendants that "the KRTA does not implicitly grant standing to every antitrust plaintiff who characterizes himself as an 'indirect purchaser.'"

*Wrobel*, No. 05-cv-1296, 2006 WL 7130617, available at [574-1, at 6–7] (internal citations omitted). Several federal courts have also applied *AGC* to antitrust-standing questions under Kansas law. See, *e.g.*, *Orr v. Beamon*, 77 F. Supp. 2d 1208, 1212 (D. Kan. 1999); *DRAM*, 516 F. Supp. 2d at 1094; *Sahagian v. Genera Corp.*, 2009 WL 9504039, at *6 (C.D. Cal. July 6, 2009); *In re Refrigerant Compressors Antitrust Litig.*, 2013 WL 1431756, at *10.

Analysis:

In Kansas, the only known state court to cite to *AGC* elected to adopt and apply the *AGC* test, despite the state's repeal of *Illinois Brick*. See *Wrobel*, No. 05-cv-1296, 2006 WL 7130617, available at [574-1, at 6] ("[T]he Court finds that the *AGC* standing test may be applied to this action even though the KRTA specifically contemplates indirect purchaser suits."); see also *Orr*, 77 F. Supp. 2d at 1211 ("In finding no Kansas cases to the contrary, the court concludes that standing under the Kansas antitrust statutes requires an antitrust injury similar to that required under the Sherman and Clayton Acts."); *DRAM*, 516 F. Supp. 2d at 1093–94 (holding that Kansas courts "would support application of the *AGC* test in assessing antitrust standing").

Although the court in *In re Potash Antitrust Litigation* elected not to follow *Wrobel*, *Orr*, or *DRAM* in its decision not to apply *AGC* in interpreting Kansas's antitrust laws, see 667 F. Supp. 2d at 944, the court did not cite any authority contradicting those cases, and simply found the supporting authority to be insufficient. This Court is not persuaded by the *Potash* analysis, and instead finds the well-reasoned *Wrobel* opinion to be more indicative of how the Kansas Supreme Court would address the application of *AGC*.

Nor is the Court persuaded by the Kansas cases that mention the fact that federal antitrust law is not binding on Kansas courts. See, *e.g.*, *Bergstrom*, 974 P.2d at 531; *O'Brien v. Leegin Creative Leather Prods., Inc.*, 277 P.3d 1062, 1068 (Kan. 2012). First off, these are not antitrust-

standing cases, and they do not address *AGC*. But perhaps more persuasively, since the *Bergstrom* and *O'Brien* decisions, the Kansas legislature has amended KRTA to provide that it "shall be construed in harmony with ruling judicial interpretations of federal antitrust law by the United States supreme court." Kan. Stat. Ann. § 50-163(b). Accordingly, and absent any binding authority to the contrary, the Court is persuaded that the Kansas Supreme Court would apply *AGC* in interpreting antitrust standing under KRTA.

### 3.     Michigan

<u>Standing Provision:</u>

Michigan affords a right to sue under its antitrust reform act to "[a]ny * * * person threatened with injury or injured directly or indirectly in his or her business or property by a violation of th[e] act." Mich. Comp. Laws § 445.778(2).

<u>Harmonization Provision:</u>

Michigan is the other state at issue with a statutory harmonization provision. See Mich. Comp. Laws § 445.784(2) ("It is the intent of the legislature that in construing all sections of this act, the courts shall give due deference to interpretations given by the federal courts to comparable antitrust statutes, including, without limitation, the doctrine of per se violations and the rule of reason."); *Salmon v. City of Cadillac*, 2005 WL 3416119, at *5 (Mich. Ct. App. Dec. 13, 2005) ("[B]ecause Michigan's antitrust legislation is patterned after federal antitrust legislation, federal court decisions applying the Sherman Act are persuasive authority in interpreting the [Michigan Antitrust Reform Act]."); *Mercy Mem'l Hosp. v. Porter*, 1999 WL 33326821, at *3 (Mich. Ct. App. Dec. 21, 1999) (same); *Elias v. Fed. Home Loan Mortg. Corp.*, 581 F. App'x 461, 468–69 (6th Cir. 2014).

<u>*Illinois Brick* Repealer Statute:</u>

Michigan's repealer statute extended antitrust standing to any person "threatened with injury or injured directly or indirectly." Mich. Comp. Laws § 445.778(2).

<u>Supreme Court/Appellate Court Law:</u>

The only opinion from a Michigan court citing *AGC* is a circuit court opinion (*i.e.*, not an appellate-court decision), where the court applied *AGC* despite Michigan's repealer statute:

> [T]his Court agrees with Defendants that it does not necessarily follow that Michigan's repeal of the *Illinois Brick* rule also eliminated the *Associated General Contractors* standing requirements. The Supreme Court in *Illinois Brick* made clear that its decision addressed only whether there should be a bar on "indirect purchaser" suits. It expressly "d[id] not address the standing issue," explaining that the "indirect purchaser" question is "analytically distinct from the question of which persons have sustained injuries too remote to give them standing to sue."

*Stark v. Visa U.S.A. Inc.*, 2004 WL 1879003, at *4 (Mich. Cir. Ct. July 23, 2004) (citing *Illinois Brick*, 431 U.S. at 728 n.7.). The *Stark* court also noted that "while Michigan appellate courts have not developed a test for determining when a plaintiff's injury is too remote to permit suit under [the Michigan Antitrust Reform Act], the Act requires courts to give 'due deference to interpretations given by the federal courts to comparable antitrust statutes.'" *Id.* (citing Mich. Comp. Laws § 445.784(2)). This nuanced understanding of the distinction between *Illinois Brick* and *AGC*, coupled with this application of the plain language of Michigan's harmonization provision, have inspired other courts to apply *AGC* to questions of antitrust standing under Michigan law. See, *e.g.*, *In re Ductile Iron Pipe Fittings Indirect Purchaser Antitrust Litig.*, 2013 WL 5503308, at *15 (D.N.J. Oct. 2, 2013); *In re Cathode Ray Tube Antitrust Litig.*, 2013 WL 4505701, at *9 (N.D. Cal. Aug. 21, 2013); *In re Refrigerant Compressors Antitrust Litig.*, 2013 WL 1431756, at *10; *Sahagian*, 2009 WL 9504039, at *6; *DRAM*, 516 F. Supp. 2d at 1094.

<u>Analysis:</u>

The combination of the *Stark* decision and Michigan's harmonization provision persuades the Court that the Michigan Supreme Court would apply the *AGC* factors to assess antitrust standing, and the Court sees no evidence to the contrary, binding or otherwise.

### 4.     **Minnesota**

The Court need not delve heavily into Minnesota law, as the Minnesota Supreme Court has already made clear that the *AGC* factors conflict with Minnesota antitrust law.

<u>Standing Provision:</u>

"Any person" injured by an antitrust violation may sue under Minnesota's antitrust law. Minn. Stat. § 325D.57.

<u>Harmonization Provision:</u>

"Minnesota law is generally interpreted consistently with federal antitrust law." *Lorix*, 736 N.W.2d at 626 (citing *Minn. Twins P'ship v. State*, 592 N.W.2d 847, 851 (Minn. 1999)).

<u>*Illinois Brick* Repealer Statute:</u>

"In 1984, our legislature added the words 'directly or indirectly' to Minn. Stat. § 325D.57 to make clear that, contrary to *Illinois Brick*, Minnesota antitrust law permits indirect purchasers to recover." *Lorix*, 736 N.W.2d at 626–27.

<u>Supreme Court/Appellate Court Law:</u>

The Minnesota Supreme Court is the only known state supreme court to reject (in most part, at least) the adoption of the *AGC* factors. *Lorix*, 736 N.W.2d at 632 ("The *AGC* factors * * * do not provide the benchmark for standing under Minnesota antitrust law.").

Analysis:

In light of *Lorix*, the Court will not apply the *AGC* factors to Plaintiffs' claims under Minnesota law.

Importantly, though, despite holding that the lower courts "erred in applying *AGC*," the *Lorix* court nonetheless noted that its rejection of *AGC* "d[id] not necessarily mean that Lorix ha[d] standing." *Lorix*, 736 N.W.2d at 630. Thus—although the Court is jumping the gun a bit by addressing this here—it is relevant to understand what antitrust-standing rules Minnesota does apply before deciding whether Plaintiffs' claims would pass muster in that court.

In spite of its refusal to adopt *AGC*, the *Lorix* court still acknowledged that some of the *AGC* factors overlap with Minnesota's antitrust-standing inquiry. Specifically, the court noted that "[w]hile Minnesota courts should analyze an alleged injury's relation to the goals of antitrust law by identifying the markets involved, the market analysis is not the focus of the standing inquiry." *Lorix*, 736 N.W.2d at 628. The court also noted that "whether the damages are speculative[] is relevant to standing under the Minnesota antitrust law." *Id.* And most importantly here, the court conceded that despite the broad language of its antitrust provision, "there are injuries so remotely related to antitrust violations that courts simply cannot provide relief," such that "[s]tanding under Minnesota antitrust law must be defined by some prudential limits informed by foreseeability, proximate cause, remoteness, and relation of the injury to the purposes of the antitrust law; otherwise, almost any antitrust violation would provide almost any citizen with a cause of action arising from the resulting ripples of harm throughout the state's economy." *Id.* at 631.

Lorix (the indirect purchaser) bought tires that were manufactured with price-fixed chemicals. *Lorix*, 736 N.W.2d at 622–23. Refusing to define the outer limits of standing under

Minnesota law, the court held that Lorix had standing because "she is an end user of a consumer good whose price was inflated by anticompetitive conduct earlier in the chain of manufacture," and that "as an end user, Lorix is the party most likely to be injured by an anticompetitive overcharge because she is the only party in the chain of purchase who cannot pass on part or all of that overcharge." *Id.* at 631. The court affirmatively rejected any "market-participant requirement," and held that "indirect purchasers of goods manufactured with price-fixed components" had standing to sue under Minnesota law. *Id.* at 628. However, the court did give one example of an indirect-purchaser injury that would be too remote to establish standing: namely, the Visa/Mastercard litigation cases where consumers alleged that they paid more for consumer goods due to Visa and Mastercard's illegal tying of debit card services with credit card services. *Id.* at 632 (citing *Gutzwiller v. Visa USA, Inc.*, 2004 WL 2114991 (Minn. Dist. Ct. Sept. 15, 2004)). It was the fact that the overcharges stemming from these violations "were passed on to consumers in the form of higher prices on essentially every good sold in the state of Minnesota" that led the *Lorix* court to declare that consumer standing should not "allow[] every person in the state to sue for an antitrust violation simply by virtue of his or her status as a consumer." *Id.*

To round out this analysis, the Court must predict whether the Minnesota Supreme Court would find that Indirect Plaintiffs have antitrust standing under Minnesota law without relying on the *AGC* factors. As a starting point, the injury here is certainly more remote than the injury in *Lorix*. In *Lorix*, the alleged antitrust-violators (*i.e.*, the chemical manufacturers) sold chemicals to tire manufacturers, who produced tires that were eventually sold to consumers. The path from the price-fixed thing (*i.e.*, tire chemicals) to the end product (*i.e.*, consumer tires) was short and narrow (or, as the *Lorix* court described it, "relatively focused"), and the list of affected

individuals and entities (*e.g.*, tire manufacturers, tire wholesalers/distributors/retailers, and tire consumers) was small. Here, the alleged antitrust-violators dealt in spot cheese and milk futures bought and sold on a commodities exchange, which allegedly translated to higher prices in the physical markets of milk and cheese products (finished dairy products) across the country. The leap from the commodities exchange to the vast end-user market here is sizeable, and making that leap would result in a grant of standing to any individual who purchased any product containing milk or cheese in the United States. To be clear, the ubiquity of the end-user product is not the problem (*i.e.*, there is no too-big-to-sue doctrine), but such a scenario presents a red flag as to the potential remoteness of the alleged injury. For example, while the chain in *Lorix* could be described as pyramidal (increasing in size from the original violators to the secondary and tertiary markets), the chain that Indirect Plaintiffs present begins with a similar pyramid but adds an exponentially larger tier to the bottom that overshadows the actual offense. In other words, by extending the alleged antitrust violation across markets and then further extending it to include all consumers of finished dairy products, Indirect Plaintiffs have transformed a "relatively focused" antitrust scheme into a distorted and overly broad arrangement that masks the underlying violation and highlights the remoteness of Indirect Plaintiffs' injury.

In addition, *Lorix* was a "component" case, where the price-fixed product was a component of the end-user product. *Id.* at 633 ("Antitrust laws * * * provide a remedy for consumers who have purchased goods manufactured with price-fixed components."). But here, the spot cheese and milk futures are not components of finished milk products. See *DFA II*, 2013 WL 4506000, at *14 n.13 (noting that "the causal connection is even more attenuated and complicated here * * * because the allegedly price-fixed products are not components of the finished goods."). Further, in addition to conceding that it would still consider certain of the *AGC*

25

factors, the Minnesota Supreme Court favorably cited the Minnesota district court's *Gutzwiller* decision, which denied standing to a plaintiff who was "not a consumer * * * in the allegedly restrained market." *Gutzwiller*, 2004 WL 2114991, at *6; see also *Lorix*, 736 N.W.2d at 628 (noting that while it's not "the focus of the standing inquiry," "courts should analyze an alleged injury's relation to the goals of antitrust law by identifying the markets involved"); *id.* at 626 (noting that "the purposes of Minnesota and federal antitrust law are the same," and that "[t]he primary purpose of antitrust laws is to protect interbrand competition" (citing *State Oil Co. v. Khan*, 522 U.S. 3, 14 (1997))). And regarding *Lorix*'s instruction that the court focus on the purpose of the antitrust laws in assessing standing, as the *Gutzwiller* court noted, "this is obviously not a situation where the [alleged] antitrust violators will go unpunished," 2004 WL 2114991, at *9, which is a sentiment that this Court has already articulated. See *DFA II*, 2013 WL 4506000, at *14 ("[B]y denying Indirect Plaintiffs leave to proceed with their * * * antitrust claims, the Court would not 'leave a significant antitrust violation undetected or unremedied.'" (quoting *Kochert v. Greater Lafayette Health Servs.*, 463 F.3d 710, 718–19 (7th Cir. 2006))).

The facts here align more with the facts in the Visa/Mastercard cases (including *Gutzwiller*) than the facts in *Lorix*, implying that even the Minnesota Supreme Court would draw a line somewhere along this extended, mixed-market chain. Ultimately, despite the *Lorix* court's refusal to adopt *AGC*, the Court is nonetheless persuaded by the court's citation to *Gutzwiller* as well as its concession that any assessment of antitrust standing must be "informed by foreseeability, proximate cause, remoteness, and relation of the injury to the purposes of the antitrust law" in holding that the Indirect Plaintiffs' injuries are too remote and speculative to afford standing under Minnesota antitrust law. *Lorix*, 736 N.W.2d at 629.

###     5.      New York

Standing Provision:

Similar to the other standing provisions reviewed herein, New York law extends standing to "any person who shall sustain damages by reason of any violation" of the state's antitrust act (called the Donnelly Act). N.Y. Gen. Bus. Law § 340.

Harmonization Provision:

New York's top court recently clarified that while New York courts generally construe the Donnelly Act in harmony with federal antitrust case law, it is "well settled" that New York courts interpret the Donnelly Act differently "where State policy, differences in the statutory language or the legislative history justify such a result." *Sperry v. Crompton Corp.*, 863 N.E.2d 1012, 1018 (N.Y. 2007); see also *Anheuser-Busch, Inc. v. Abrams*, 520 N.E.2d 535, 539 (N.Y. 1988) ("Although we do not move in lockstep with the Federal courts in our interpretation of antitrust law, the Donnelly Act—often called a 'Little Sherman Act'—should generally be construed in light of Federal precedent and given a different interpretation only where State policy, differences in the statutory language or the legislative history justify such a result." (internal citations omitted)).

*Illinois Brick* Repealer Statute:

New York's repealer statute specifies that a person who sustains damages as a result of an antitrust violation shall not have his or her recovery limited due to the fact that the person "has not dealt directly with the defendant." See N.Y. Gen. Bus. Law § 340.

Supreme Court/Appellate Court Law:

New York's Court of Appeals, its highest court, has not weighed in on the application of the *AGC* factors under the Donnelly Act. New York's Appellate Division, its second-highest

court, has endorsed the lower court's application of the *AGC* factors in two indirect-purchaser cases. See *Ho v. Visa USA, Inc.*, 793 N.Y.S.2d 8, 8–9 (N.Y. App. Div. 2005) (affirming the dismissal of plaintiffs' antitrust claims due to "the remoteness of their damages from the alleged injurious activity"), *aff'g*, 787 N.Y.S.2d 677 (N.Y. Sup. Ct. 2004) (applying the *AGC* factors in determining that "plaintiffs' alleged injury is far too remote to provide antitrust standing under the Donnelly Act"); *State ex rel. Spitzer v. Daicel Chem. Indus., Ltd.*, 840 N.Y.S.2d 8, 12 (N.Y. App. Div. 2007) (affirming the dismissal of claims where the plaintiff's injury was "too remote" from the alleged wrongdoing), *aff'g in relevant part*, *sub nom. State v. Daicel Chem. Indus., Ltd.*, 2005 WL 6056054 (Sup. Ct. Aug. 9, 2005); see also *Williams v. Citigroup, Inc.*, 954 N.Y.S.2d 762, at *4 (N.Y. Sup. Ct. 2012) (finding that plaintiffs "damages [we]re too remote 'from the alleged injurious activity' to confer standing," citing *Ho*).

Other courts have followed suit in finding that New York's highest court would likewise apply the *AGC* factors to issues of antitrust standing under the Donnelly Act. See, *e.g.*, *In re Refrigerant Compressors Antitrust Litig.*, 2013 WL 1431756, at *10; *Sahagian v. Genera Corp.*, 2009 WL 9504039, at *6 (C.D. Cal. July 6, 2009) (applying *AGC* under New York law, noting that "where state courts and legislatures have indicated that they would look to federal antitrust precedent in applying [their antitrust law], it seems that at the very least courts would require plaintiffs in antitrust actions to plausibly allege that they were participants in the relevant product market where the alleged anti-competitive activity took place."); *Nichols v. Mahoney*, 608 F. Supp. 2d 526, 545 (S.D.N.Y. 2009) ("[I]f the plaintiffs do not have standing to assert a federal antitrust claim, they do not have standing to bring a Donnelly Act claim."). But see *In re Ductile Iron Pipe Fittings Indirect Purchaser Antitrust Litig.*, 2013 WL 5503308, at *16 ("The Court is not persuaded that the *AGC* test applies to New York * * * antitrust law. In reaching this

conclusion, the Court notes that Defendants have not cited any state appellate cases to show that the highest court in [New York] would apply the *AGC* factors in th[at] state[].")

Analysis:

New York's lower- and mid-level courts have consistently endorsed the application of the *AGC* factors in assessing antitrust standing, in accordance with the state's harmonization provision. The Court has no reason to believe that New York's highest court would not do the same. Accordingly, the Court will apply the *AGC* factors in determining whether Indirect Plaintiffs have standing under New York's Donnelly Act.

### 6. North Carolina

Standing Provision:

North Carolina grants standing to "any person" injured by an antitrust violation. N.C. Gen. Stat. § 75-16.

Harmonization Provision:

North Carolina's harmonization provision, arising from common law, is similar to the New York provision, which recognizes the federal opinions interpreting the Sherman Act are instructive, but not binding, when interpreting its antitrust statute. *Madison Cablevision, Inc. v. Morganton*, 386 S.E.2d 200, 213 (N.C. 1989) (citing *Rose v. Vulcan Materials Co.*, 194 S.E.2d 521, 520 (N.C. 1973)).

*Illinois Brick* Repealer Statute:

North Carolina does not have a repealer statute, although the North Carolina Court of Appeals deemed such a provision unnecessary, claiming that North Carolina's standing provision is broad enough to incorporate indirect purchasers. See *Hyde v. Abbott Labs., Inc.*, 473 S.E.2d 680, 684–87 (N.C. Ct. App. 1996) ("We find that a slight risk of multiple liability is greatly

outweighed by the benefit of advancing the aforementioned policies of [North Carolina's Antitrust Act]."). In addition, the "legislative history also leads to the conclusion that the General Assembly intended to create indirect purchaser standing to sue under the state antitrust laws." *Crouch v. Crompton Corp.*, 2004 WL 2414027, at *11 (N.C. Super. Ct. Oct. 28, 2004). The *Crouch* court nonetheless realized that this broad reading of North Carolina's standing provision conflicts with the states harmonization provision, resolving that "unless and until *Hyde* is overruled by the Supreme Court or new legislation is passed, this Court is bound by the decision in *Hyde* to the extent that it holds that indirect purchasers have standing under the North Carolina antitrust laws."

Supreme Court/Appellate Court Law:

There are two North Carolina cases that discuss the application of *AGC*. First is the appellate court case of *Teague v. Bayer AG*, 671 S.E.2d 550 (N.C. Ct. App. 2009). While *Teague* did not reject the application of *AGC* in general, it did reject its application to the facts of that case.[2] *Id.* at 556–57. The court (somewhat questionably) distinguished the facts of its case from those in *AGC* "in several relevant ways," noting that "the plaintiff in *AGC* was not an indirect purchaser, * * * was not a person injured by reason of an antitrust violation * * * [and] alleged breach of a collective-bargaining agreement and not antitrust violations." *Id.* at 556. Because the court viewed its case as one that involved indirect-purchaser standing, it applied its reasoning in *Hyde* in holding that allowing indirect-purchaser standing would "best advance the legislative intent that such violations be deterred, and that aggrieved consumers have a private cause of action to redress [antitrust] violations." *Id.* at 558.

---

[2] *Teague* relied on an Iowa district court decision that rejected the *AGC* factors in determining an indirect purchaser's standing because "*AGC* did not involve price fixing and because the plaintiffs in *AGC* were competitors rather than purchasers." 671 S.E.2d at 557 (citing *Anderson Contracting, Inc. v. Gayer AG*, 2005 WL 6939352 (Iowa Dist. Ct. May 31, 2005)). Two years later, the Iowa Supreme Court made clear that *AGC* applies under Iowa law. *Southard*, 734 N.W.2d at 198–99.

Despite its sometimes-dubious and often-difficult-to-follow analysis, *Teague* cannot be interpreted as a wholesale rejection of *AGC*. The indirect plaintiffs in *Teague* alleged that defendants engaged in a price fixing scheme over a synthetic rubber product called EPDM, which was a key component in many rubber-based products that defendants manufactured, marketed, sold, and/or distributed to plaintiffs, including certain roofing materials. *Id.* at 553. At a minimum, *Teague* is distinguishable as a single-market component case involving indirect purchasers, as opposed to a mixed-market case where the price-fixed thing is not a component of end-user product and the Indirect Purchaser Plaintiffs are not—at least under the *Teague* standard—indirect purchasers. See, *e.g.*, *Teague*, 671 S.E.2d at 556–57 (distinguishing several cases that applied the *AGC* factors, noting that the plaintiffs in those cases were not indirect purchasers because "plaintiffs did not end up with a product supplied by the defendants").

More persuasive is the North Carolina Superior Court's decision in *Crouch v. Crompton Corp.*, 2004 WL 2414027. Although a lower-court decision, this densely-packed and well-supported opinion reconciles *Hyde* and the legislative history of the North Carolina Antitrust Act with the *Illinois Brick* and *AGC* opinions, resolving to apply a modified version of the *AGC* test to determine antitrust standing that retains the proximate-cause inquiry inherent in *AGC* while still respecting *Illinois Brick*'s ban on indirect-purchaser actions. *Id.* at *19 (discussing the modified five-factor inquiry in detail). The facts of *Crouch* mirror those of the *Lorix* case from Minnesota, where the indirect plaintiffs were purchasers of tires made with an allegedly price-fixed rubber component (*i.e.*, a mixed-market scheme involving both the chemicals market and the rubber market). Recognizing that "[t]here is no bright line test" and that "each situation must be considered on its facts and the factors applied" where "[d]ifferent factors might be important in different cases," *id.* at *20, the court ultimately found that the indirect purchasers lacked

antitrust standing based on a combination of all five *AGC* factors, all of which weighed against standing to some extent. *Id.* at *24–25.

Other courts have reviewed North Carolina's case law and statutory provisions in determining that North Carolina's highest court would apply the *AGC* factors, including at least one case decided after *Teague*. See, *e.g.*, *Sahagian*, 2009 WL 9504039, at *6; *DRAM*, 516 F. Supp. 2d at 1087–89.

<u>Analysis:</u>

Based predominantly on *Crouch* and the distinguishing facts of *Teague*, the Court is persuaded that the North Carolina Supreme Court would adopt and apply the *AGC* factors, at least in modified form. Despite its precedential value, the Court finds that the *Teague* opinion— which rejects a strict application of the *AGC* factors—is both distinguishable on its facts and questionable in its failure to recognize the analytical distinction between the *Illinois Brick* and *AGC* inquiries. While casting *Crouch* in a negative light, *Teague* did not expressly overrule that opinion, and because *Crouch* is both the better-reasoned of the two opinions and the case most factually-similar to Indirect Plaintiffs' position, it is likely that North Carolina's highest court would follow *Crouch* and *AGC* in determining whether Indirect Plaintiffs lack antitrust standing under North Carolina antitrust law.

## D.     Antitrust Standing Analysis

To recap, the Court has concluded that the highest courts in five of the six states at issue (California, Kansas, Michigan, New York, and North Carolina) would apply *AGC*, with Minnesota being the one outlier. But the Court also determined that despite its rejection of *AGC*, the Minnesota Supreme Court nonetheless recognizes prudential limits to antitrust standing such that it would likely find Indirect Plaintiffs' injuries too remote and speculative to award standing.

With regard to the five *AGC*-applying states, the Court reaffirms its prior reasoning with regards to Indirect Plaintiffs' federal antitrust claims in holding that Indirect Plaintiffs lack antitrust standing under *AGC*. See *DFA II*, 2013 WL 4506000, at *9–14. This remains true even under a modified *AGC* test that takes into account the many repealer statutes at play in the states at issue, as well as any common-law protections afforded to indirect purchasers. This decision is driven by several key factors, including (1) that this is a mixed-market case, where damages inflicted on the physical commodity market are not derivative of injuries in the futures market and the price-fixed products are not components of the finished goods, (2) the remoteness of Plaintiffs' injuries, highlighted by the long chain of more-immediate victims that precede Plaintiffs, and (3) the rapid and over-inclusive expansion of the causal chain required to reach Plaintiffs. And while the Direct Purchasers here were in a better position to remedy the alleged antitrust violation (and likewise to ensure that an alleged antitrust violation will not go undetected), the Court does not hold that Direct Purchasers are necessarily the only actors in the causal chain who have antitrust standing to sue; rather, the Court holds only that Indirect Plaintiffs' injuries are too remote and speculative to afford them antitrust standing.

### E.    Remoteness Doctrine in Monopolization Claims

Indirect Plaintiffs alleged both price-fixing and monopolization claims under various states' antitrust laws. Although the parties do not directly address the issue, the Court must decide whether its antitrust-standing analysis applies equally to both types of antitrust claims.

Judge Hibbler touched on this issue in *DFA I*, concluding that there was no precedent "suggest[ing] that the standing analysis should differ between claims under § 1 and § 2 simply because monopolization plaintiffs must prove the existence of a relevant market." *DFA I*, 767 F. Supp. 2d at 907. And other courts have applied the *AGC* antitrust-standing test to claims under

§ 2 of the Sherman Act (*i.e.*, the monopolization provision) without alteration. See, *e.g.*, *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 687–92 (2d Cir. 2009); *NicSand, Inc. v. 3M Co.*, 507 F.3d 442, 449–50 (6th Cir. 2007) (en banc); *Angelico v. Lehigh Valley Hosp., Inc.*, 784 F.3d 273–75 (3d Cir. 1999); see also *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 416–18 (2004) (Stevens, J., dissenting) (endorsing the dismissal of a monopolization claim for lack of antitrust standing, citing *AGC*).

The Court sees no reason why Indirect Plaintiffs' shortcomings in failing to establish antitrust standing for their price-fixing claims should not preclude them from raising their monopolization claims as well. Accordingly, because Indirect Plaintiffs lack antitrust standing, their price-fixing claims brought under state antitrust laws (*i.e.*, Cal Bus. & Prof. Code § 16726, Kan. Stat. Ann. § 50-112, Mich. Comp. Laws § 445.772, Minn. Stat. §§ 325D.51 and 325D.53, N.Y. Gen Bus. Law § 340, and N.C. Gen Stat. § 75-1), and their monopolization claims brought under state antitrust laws (Mich. Comp. Laws § 445.773, Minn. Stat. § 325D.52, and N.C. Gen. Stat. § 75-2.1) [see 483, ¶¶ 103(b), (d)–(h), 104(d)–(f)] are dismissed.

### F.     Remoteness Doctrine in Consumer-Protection Claims

Because of variances in the relevant states' price-fixing and monopolization laws, in addition to invoking claims under various state antitrust statutes, Indirect Plaintiffs also raised price-fixing and monopolization claims under several states' consumer-protection statutes. Specifically, Indirect Plaintiffs have raised price-fixing claims under four consumer-protection statutes (Ark. Code § 4-88-107 (Arkansas Deceptive Trade Practices Act), Cal. Bus. & Prof. Code § 17200 (California Unfair Competition Law), Fla. Stat. § 501.204 (Florida Deceptive and Unfair Trade Practices Act), and N.C. Gen Stat. § 75-1.1 (North Carolina Unfair and Deceptive Trade Practices Act) and monopolization claims under three consumer-protection statutes (Ark.

Code § 4-88-107, Cal. Bus. & Prof. Code § 17200, and Fla. Stat. § 501.204). [See 483, ¶¶ 103(a)–(c), (h), 113(a)–(c).] In two instances, Indirect Plaintiffs raised price-fixing claims in the alternative, invoking both the states' antitrust and consumer-protection provisions (*i.e.*, California and North Carolina). [See 483, ¶ 103(b), (f), (h).]

The question is whether Indirect Plaintiffs' lack of antitrust standing also disposes of their price-fixing and monopolization claims brought under the states' consumer-protection statutes. In short, there is no legal principle saying that a finding of remoteness in the antitrust context functions, as a matter of law, as a bar to any related consumer-protection claims. However, the directness inquiry in antitrust-standing law is predicated on the well-known concept of proximate causation. See *McCready*, 457 U.S. at 477 ("In the absence of direct guidance from Congress, and faced with the claim that a particular injury is too remote from the alleged violation to warrant § 4 standing, the courts are thus forced to resort to an analysis no less elusive than that employed traditionally by courts at common law with respect to the matter of 'proximate cause.'"); *DFA II*, 2013 WL 4506000, at *12 ("Because the concept of antitrust standing was developed with common law proximate causation standards in mind, directness is a particularly important factor in the Court's analysis."). Because causation also plays a role in consumer-protection claims, the Court must assess each state's consumer-protection laws to determine if the remoteness of Indirect Plaintiffs' injury precludes their ability to raise such claims.

### 1.     Arkansas

Indirect Plaintiffs allege both price-fixing and monopolization claims under § 4-88-107 of the Arkansas Deceptive Trade Practices Act.[3] The Act "provides a private right of action to

---

[3] Section 4-88-107 lists ten examples of actionable violations under the ADTPA, none of which is recognizable as an antitrust violation (*e.g.*, price fixing or monopolization). However, the statute does

'any person' who suffers actual damage or injury as a result of a violation of the Act." *Forever Green Athletic Fields, Inc. v. Lasiter Const., Inc.*, 384 S.W.3d 540, 552 (Ark. Ct. App. 2011) (quoting Ark. Code Ann. § 4-88-113(f)). And "[b]ased on the language of section 4-88-113(f), there must be a causal connection between the violation of the Deceptive Trade Practices Act and the injury." *Id.*; see also *Independence Cnty. v. Pfizer, Inc.*, 534 F. Supp. 2d 882, 888 (E.D. Ark. 2008) (dismissing a claim under the ADTPA based on causation issues and the overall remoteness of the injury). Separate from the causation requirement, "Arkansas law recognizes the remoteness doctrine" as applied to claims under the ADTPA, favoring suits by those directly injured over more-indirect victims. See *Independence Cnty.*, 534 F. Supp. 2d at 888 ("'[D]irectly injured victims can generally be counted on to vindicate the law as private attorneys general, without any of the problems attendant upon suits by plaintiffs injured more remotely.'" (quoting *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 269–70 (1992))).

In light of the importance of causation under Arkansas law, Indirect Plaintiffs' remoteness problems in the antitrust context also preclude their rebranded antitrust claims brought under the Arkansas Deceptive Trade Practices Act, requiring dismissal of those claims.

### 2. California

Indirect Plaintiffs allege price-fixing and monopolization claims under § 17200 of the California Unfair Competition Law. The causation element makes its way into the UCL through the standing requirement, whereby "[a] private person * * * has standing to assert a UCL claim only if he or she (1) 'has suffered injury in fact,' and (2) 'has lost money or property as a result

---

contain a catch-all provision that proscribes "[e]ngaging in any other unconscionable, false, or deceptive act or practice in business, commerce, or trade," Ark. Code Ann. § 4-88-107(a), and courts have interpreted this catch-all broadly so as to include antitrust claims. See, *e.g.*, *Independence Cnty. v. Pfizer, Inc.*, 534 F. Supp. 2d 882, 888 (E.D. Ark. 2008), *aff'd, sub nom. Ashley Cnty. v. Pfizer, Inc.*, 552 F.3d 659 (8th Cir. 2009).

of the unfair competition.'" *Hall v. Time*, 70 Cal. Rptr. 3d 466, 469 (Cal. Ct. App. 2008). The second prong of the standing test "imposes a causation requirement. The phrase 'as a result of' in its plain and ordinary sense means 'caused by' and requires a showing of a causal connection or reliance on the alleged misrepresentation."[4] *Id.*; see *id.* at 471 n.2 ("We use the word 'causation' to refer both to the causation element of a negligence cause of action * * * and to the justifiable reliance element of a fraud cause of action."). This causation requirement was refined in 2004 by the passage of Proposition 64, which made it so that "a private person has standing to sue only if he or she 'has suffered injury in fact and has lost money or property as a result of such unfair competition." *In re Tobacco II Cases*, 93 Cal. Rptr. 3d 559, 571 (citing UCL § 17203); see also *Kwikset Corp. v. Superior Court*, 246 P.3d 877, 887–88 (explaining the causation element).

Noting that "the voters clearly intended to restrict UCL standing," the Supreme Court of California nonetheless found that indirect antitrust plaintiffs "who *had* had business dealings with a defendant and had lost money or property as a result of the defendant's unfair business practices" had standing under the UCL. *Clayworth v. Pfizer, Inc.*, 233 P.3d 1066, 1087 (Cal. 2010) (noting that "indirect purchases may support UCL standing"). But despite its liberal approach to standing, the *Clayworth* court noted that the intent of Proposition 64 "was to confine

_____

[4] The parties dispute whether Indirect Plaintiffs must allege reliance to state a claim under the UCL. In *Kwikset Corp. v. Superior Court*, the Supreme Court of California addressed a claim "based on a fraud theory involving false advertising and misrepresentations to consumers," and noted that "in accordance with well-settled principles regarding the element of reliance in ordinary fraud actions," plaintiffs were required to "demonstrate actual reliance on the allegedly deceptive or misleading statements." 246 P.3d at 888 (citations omitted); see also *Hall*, 70 Cal. Rptr. 3d at 471 n.2 ("In a fraud case, justifiable reliance is the same as causation * * *."). Here, however, Indirect Plaintiffs' UCL claim is based on an "unlawful" or "unfair" antitrust violation, not a "fraudulent" misrepresentation. *In re Tobacco II Cases*, 207 P.3d 20, 29–30, 38 (Cal. 2009) (noting that "there are three varieties of unfair competition: practices which are unlawful, unfair or fraudulent," and requiring a showing of actual reliance for a fraud-based UCL claim). Accordingly, the Court is not persuaded that Indirect Plaintiffs must allege reliance on an alleged misrepresentation. But see *Lorenzo v. Qualcomm Inc.*, 603 F. Supp. 2d 1291, 1303–04 (S.D. Cal. 2009) (dismissing UCL claims for lack of standing where the antitrust plaintiff did not allege that he relied on any misrepresentations made by defendant (citing *Laster v. T-Mobile USA, Inc.*, 407 F. Supp. 2d 1181, 1183 (S.D. Cal. 2005))).

standing to those actually injured by a defendant's business practices and to curtail the prior practice of filing suits on behalf of clients who have not used the defendant's product or service, viewed the defendant's advertising, or had any other business dealing with the defendant." *Id.* at 1086–87 (internal citations omitted). In *Clayworth*, the price-fixing manufacturers sold the price-fixed medications to wholesalers, who then sold them to the plaintiff pharmacies. Thus, plaintiffs—one step removed from the alleged price-fixers—actually used defendants' products and had indirect dealings with defendants. Here, Indirect Purchasers did not use the allegedly price-fixed commodities and had no business dealings with defendants in the relevant markets. See, *e.g.*, *Troyk v. Farmers Grp., Inc.*, 90 Cal. Rptr. 3d 589, 626 n.33 (Cal. Ct. App. 2009) (refusing to define the extent of the UCL's causation requirement, but noting that defendant's conduct "must be more than a *remote* or trivial factor" in causing the injury (emphasis added)). These facts counsel against a broad application of *Clayworth* and Proposition 64.

In addition, the Court is also mindful of the fact that "the breadth of § 17200 does not give a plaintiff license to 'plead around' the absolute bars to relief contained in other possible causes of action by recasting those causes of action as ones for unfair competition," as Indirect Plaintiffs have done here. *Glenn K. Jackson Inc. v. Roe*, 273 F.3d 1192, 1203 (9th Cir. 2001) (citing *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 973 P.2d 527, 541 (Cal. 1999)).

Somewhat related, Indirect Plaintiffs based their price-fixing and monopolization claims—regardless of whether those claims were brought under state antitrust laws, consumer-protection provisions, or both—on the same set of facts, theories, and allegations. In other words, Indirect Plaintiffs made no attempts to distinguish their antitrust claims from their consumer-protection claims. And under California law, because Indirect Plaintiffs failed to adequately plead their antitrust claims, their state claims must also fail. See *Formula One Licensing, B.V. v.*

*Purple Interactive Ltd.*, 2001 WL 34792530, at *4 (N.D. Cal. Feb. 6, 2001) ("Where a plaintiff fails to state an antitrust claim, and where an unfair competition claim is based upon the same allegations, such state claims are properly dismissed." (citing *Kentmaster Mfg. Co. v. Jarvis Prods. Corp.*, 146 F.3d 691, 695 (9th Cir. 1998))); see also *In re Wellpoint, Inc., Out-of-Network UCR Rates Litig.*, 903 F. Supp. 2d 880, 927–28 (C.D. Cal. 2012) (dismissing UCL claims based on a lack of antitrust standing for plaintiffs' Sherman Act claims).

For all of these reasons, the Court finds that Indirect Plaintiffs lack standing to bring their claims under the UCL.

### 3. Florida

Indirect Plaintiffs allege price-fixing and monopolization claims under § 501.204 of the Florida Deceptive and Unfair Trade Practices Act. A consumer claim for damages under FDUTPA has three elements: "(1) a deceptive act or unfair practice; (2) causation; and (3) actual damages." *Soper v. Tire Kingdom, Inc.*, 124 So.3d 804, 806 (Fla. 2013) (citing *Rollings, Inc. v. Butland*, 951 So.2d 860, 869 (Fla. Dist. Ct. App. 2006)).

Although causation is a necessary element of a FDUTPA claim, Defendants do not press the expected argument, which is that the remoteness of Indirect Plaintiffs' injuries is insufficient to satisfy the FDUTPA causation requirement. See, *e.g.*, *2P Commercial Agency S.R.O. v. SRT USA, Inc.*, 2013 WL 246650, at *4 (M.D. Fla. Jan. 23, 2013) (noting that causation under FDUTPA "must be direct, rather than remote or speculative").

Instead, Defendants approach this issue indirectly, arguing that Florida courts regularly dismiss FDUTPA claims that are "merely a repackaging of the allegations offered for [failed] antitrust claims." *QSGI, Inc. v. IBM Global Fin.*, 2012 WL 1150402, at *4 (S.D. Fla. Mar. 14, 2012) ("When * * * a plaintiff's FDUTPA claim is based on the same allegations as its antitrust

39

claim, failure to establish a violation of the antitrust law is sufficient to conclude that the plaintiff has also failed to state a FDUTPA claim."); *JES Props., Inc. v. USA Equestrian, Inc.*, 2005 WL 1126665, at *19 & n.23 (M.D. Fla. May 9, 2005) ("Plaintiffs concede that their FDUTPA claims 'survive' or 'fall' with their antitrust claims."); *Hunter v. Bev Smith Ford, LLC*, 2008 WL 1925265, at *9 (S.D. Fla. Apr. 29, 2008); *Natural Answers, Inc. v. SmithKline Beecham Corp.*, 529 F.3d 1325, 1332–33 (11th Cir. 2008) (dismissing a Lanham Act claim because, *inter alia*, "the injury claims [wa]s far more remote" than what the statute requires, and then dismissing a related FDUTPA claim on the same grounds).

But Defendants' "repackaging" theory has only been applied where the underlying antitrust claims were rejected for substantive reasons, not simply due to a lack of standing. Indirect Plaintiffs' argument, then, is that a state consumer-protection claim should not be automatically rejected because the plaintiff lacked standing to bring a corresponding federal antitrust claim. While this argument has facial appeal, it fails to appreciate (a) the importance of antitrust standing, and (b) the nuances of Florida's antitrust laws. To the former, this Court has already distinguished antitrust standing from Article III standing by noting that antitrust standing is intertwined with substantive antitrust principles, thus requiring the importation of federal antitrust-standing law into state antitrust-standing law where the state has a harmonization provision. And to the latter, the reason why Indirect Plaintiffs brought their claims under FDUTPA is because Florida still adheres to the "direct purchaser" rule articulated in *Illinois Brick*. See *Mack v. Bristol-Myers Squibb Co.*, 673 So.2d 100, 102 (Fla. Dist. Ct. App. 1996). In other words, Indirect Plaintiffs avoided bringing their antitrust claim under Florida's antitrust laws knowing that such a claim would be doomed. The contours of Florida's antitrust laws

would be rendered moot were the Court to allow Indirect Plaintiffs to repackage their dead-on-arrival antitrust claims as FDUTPA claims.

In light of these concerns, the Court is persuaded that the Florida Supreme Court would either adopt the federal court's repackaging theory or read FDUTPA's causation requirement narrowly so as to preclude injuries that are too remote from the alleged antitrust violation. See, *e.g.*, *In re Wellpoint, Inc., Out-of-Network UCR Rates Litig.*, 903 F. Supp. 2d at 927–28 (dismissing a California consumer-protection claim where plaintiffs lacked antitrust standing to raise Sherman Act claims). Either way, Indirect Plaintiffs' FDUTPA claims must be dismissed.

### 4. North Carolina

In addition to its antitrust claim under § 75-1 of the North Carolina Unfair and Deceptive Trade Practices Act, Indirect Plaintiffs also allege a price-fixing claim under § 75-1.1 of the Act. The Act declares unlawful "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce." N.C. Gen. Stat. § 75-1.1. To state a claim under NCUDTPA, a plaintiff must show: "(1) an unfair or deceptive act or practice, or an unfair method of competition, (2) in or affecting commerce, (3) which proximately caused injury to the plaintiff or to his business." *Furr v. Fonville Morisey Realty, Inc.*, 503 S.E.2d 401, 408 (N.C. 1998); *Dalton v. Camp*, 548 S.E.2d 704, 711 (N.C. 2001); *Stetser v. TAP Pharma. Prods., Inc.*, 598 S.E.2d 570, 583–84 (N.C. Ct. App. 2004) (applying the same *prima facie* case to an antitrust claim brought under the consumer-protection statute). Again, the obvious (and perhaps most persuasive) argument is that Indirect Plaintiffs' alleged injuries are too remote to satisfy NCUDTPA's proximate-causation requirement.

But similar to their arguments regarding Indirect Plaintiffs' claims under FDUTPA, Defendants instead argue that Indirect Plaintiffs' claim under NCUDTPA should be dismissed

because it is premised on the same allegations as Plaintiffs' insufficiently-pled price-fixing claims (both state and federal). See, *e.g.*, *In re Digital Music Antitrust Litig.*, 592 F. Supp. 2d 435, 450–51 (S.D.N.Y. 2008) (dismissing consumer protection claims under, *inter alia*, California, Florida, and North Carolina law, noting that "[the courts] conclusion that Plaintiffs have not adequately alleged [a federal antitrust] violation necessarily precludes their attempt to recast that violation as an unfair business practice"), *vacated and remanded on other grounds*, *sub nom. Starr v. Sony BMG Music Entm't*, 592 F.3d 314 (2d Cir. 2010); see also *R.J. Reynolds Tobacco Co. v. Philip Morris Inc.*, 199 F. Supp. 2d 362, 396 (N.D.N.C. 2002) ("Because Plaintiffs do not allege any facts that suggest that Defendant's conduct is unlawful beyond the conduct that is the basis for their failed federal [antitrust] claims, Plaintiffs' state common law and statutory claims fail as well."). This argument is also persuasive, although rather broad in application.

Interestingly though, the Fourth Circuit has construed NCUDTPA—a statute modeled (verbatim) after § 5 of the FTC Act—consistently with the Sherman Act in assessing the merits of an antitrust claim brought under the guise on a consumer-protection claim, noting that the FTC Act "sweeps within its prohibitory scope conduct also condemned by § 1 of the Sherman Act," ultimately finding "no reason to conclude that, given the opportunity, North Carolina's Supreme Court would construe its state's act any differently." *ITCO Corp. v. Michelin Tire Corp., Commercial Div.*, 722 F.2d 42, 48 (4th Cir. 1983). True, "the Federal Trade Commission Act was designed to supplement and bolster the Sherman Act and the Clayton Act" such that the FTC has the power "to arrest trade restraints in their incipiency without proof that amount to an outright violation" of the federal antitrust laws, see *FTC v. Brown Shoe Co.*, 384 U.S. 316, 321

(1966) (citations omitted), but this is not one of those cases that would evade regulation but for the breadth of the FTC Act and its related state provisions.

The Fourth Circuit's rationale in *ITCO* adds credence to the broad-sweeping rule articulated in *In re Digital Music Antitrust Litigation* and *R.J. Reynolds Tobacco Co. v. Philip Morris Inc.*, and counsels in favor of reading NCUDTPA's causation requirement narrowly so as to preclude Indirect Plaintiffs from repackaging their failed antitrust claim as an unfair-competition claim. See, *e.g.*, *Miller v. W.H. Bristow, Inc.*, 739 F. Supp. 1044, 1055 (D.S.C. 1990) (noting that "[w]hile it is true that an anticompetitive practice falling short of a Sherman Act or Clayton Act violation may nonetheless violate the FTC Act, the scope of the FTC Act is directly linked to the antitrust laws," and holding that because "the relationship between the parties does not violate the Sherman Act * * * plaintiff has failed to show how the circumstances of this case bring it within the reach of the FTC Act"). For these reasons, the Court dismisses Indirect Plaintiffs' price-fixing claim under § 75-1.1 of NCUDTPA.

In summary, the same causation issue that plagued Indirect Plaintiffs' state-law antitrust claims also provides grounds for dismissal for Indirect Plaintiffs' state-law consumer-protection claims under Arkansas, California, Florida, and North Carolina law.

G.     **Remoteness Doctrine in Unjust Enrichment Claims**

Defendants next argue that the same "remoteness" issue troubling Indirect Plaintiffs' antitrust and consumer-protection claims also precludes Indirect Plaintiffs from raising their related state-law unjust enrichment claims. Indirect Plaintiffs raised their unjust enrichment claims generally without reference to the unjust enrichment law of any particular state, and thus the Court will review the law under all eight states.

As an initial matter, although there is some dispute on this issue, the general consensus is that California law does not recognize a cause of action for unjust enrichment. See *Melchior v. New Line Prods., Inc.*, 131 Cal. Rptr. 2d 347, 357 (Cal. Ct. App. 2003) ("[T]here is no cause of action in California for unjust enrichment."); *Hill v. Roll Int'l Corp.*, 128 Cal. Rptr. 3d 109, 118 (Cal. Ct. App. 2011) ("Unjust enrichment is not a cause of action, just a restitution claim.").

With regard to the remaining states, the Court notes at the outset that a failure to state an antitrust claim does not categorically preclude a plaintiff from succeeding on a related unjust enrichment claim. See, *e.g.*, *In re G-Fees Antitrust Litig.*, 584 F. Supp. 2d 26, 46 (D.D.C. 2008) ("No reason or logic supports a conclusion that a state's adherence to the rule of *Illinois Brick* dispossesses a person not only of a statutory legal remedy for an antitrust violation, but also dispossess the same person of his right to pursue a common law equitable remedy."); *D.R. Ward Constr. Co. v. Rohm & Hass Co.*, 470 F. Supp. 2d 485, 506–07 (E.D. Pa. 2006) (stating that the viability of an unjust enrichment claim "does not hinge upon the success of the state statutory antitrust claims"); *King Drug Co. of Florence v. Cephalon, Inc.*, 702 F. Supp. 2d 514, 540 (E.D. Pa. 2010) ("Unjust enrichment claims * * * are viable regardless of the applicable state antitrust laws."). But see *In re Flonase Antitrust Litig.*, 692 F. Supp. 2d 524, 542 (E.D. Pa. 2010) ("[W]here an antitrust defendant's conduct cannot give rise to liability under state antitrust and consumer protection laws, [p]laintiffs should be prohibited from recovery under a claim for unjust enrichment.").

However, because state antitrust claims and unjust-enrichment claims have similar elements, it may be that a fatal flaw in a plaintiff's antitrust claim will also seal the fate of the plaintiff's corresponding unjust enrichment claim (as was the case with Indirect Plaintiffs' consumer-protection claims). The elements for unjust enrichment claims under Arkansas,

Florida, Kansas, Michigan, Minnesota, New York, and North Carolina are essentially the same: "plaintiff must establish that (1) plaintiff conferred a benefit on the defendant; (2) defendant knew and received a benefit; and (3) defendant retained the benefit under circumstances that make it unjust." *In re Potash Antitrust Litig.*, 667 F. Supp. 2d at 948 (summarizing the unjust enrichment law of Michigan, Florida, and Kansas); see *Dews v. Halliburton Indus., Inc.*, 708 S.W.2d 67, 69 (Ark. 1986); *Fla. Power Corp. v. City of Winter Park*, 887 So.2d 1237, 1242 n.4 (Fla. 2004); *In re Estate of Sauder*, 156 P.3d 1204, 1220 (Kan. 2007); *Hudson v. Mathers*, 770 N.W.2d 883, 887 (Mich. Ct. App. 2009); *Caldas v. Affordable Granite & Stone, Inc.*, 820 N.W.2d 826, 838 (Minn. 2012); *Corsello v. Verizon N.Y., Inc.*, 967 N.E.2d 1177, 1185 (N.Y. 2012); *Booe v. Shadrick*, 369 S.E.2d 554, 555–56 (N.C. 1988).

Akin to the remoteness inquiry in the antitrust and consumer-protection contexts, five of the seven states (all but Arkansas and Minnesota) require that the plaintiff confer a direct benefit on the defendant in order to state a claim for unjust enrichment. See *Extraordinary Title Servs. v. Fla. Power & Light Co.*, 1 So.3d 400, 404 (Fla. Dist. Ct. App. 2009) (affirming dismissal of unjust enrichment claim where plaintiff could not "allege or establish that it conferred a direct benefit" upon defendant); *Spires v. Hosp. Corp. of Am.*, 289 F. App'x 269, 273 (10th Cir. 2008) (noting that Kansas law does not support an "indirect unjust enrichment claim"); *A & M Supply v. Microsoft Corp.*, 2008 WL 540883, *2–3, (Mich. App. Ct. 2008) (concluding that the unjust enrichment doctrine requires "direct receipt" of a benefit, and was therefore inapplicable to "indirect purchasers"); *New Dimension Dev., Inc. v. Orchard, Hiltz & McCliment, Inc.*, 2005 WL 2806234, at *6 (Mich. App. Ct. Oct. 27, 2005) ("[A]ny indirect benefit defendant derived from plaintiffs was too attenuated to warrant imposing the equitable doctrine of unjust enrichment, which must be 'employed * * * with caution,' because it 'vitiates normal contract principles.'"

(quoting *Kammer Asphalt Paving Co., Inc. v. East China Twp. Schs.*, 504 N.W.2d 635 (Mich. 1993))); *Sperry v. Crompton Corp.*, 863 N.E.2d 1012, 1018 (N.Y. 2007) (holding that the connection between the indirect plaintiffs and defendants in an antitrust action was "simply too attenuated" to support a claim for unjust enrichment); *Laydon v. Mizuho Bank, Ltd.*, 2014 WL 1280464, at * (S.D.N.Y. Mar. 28, 2014) (noting that under New York law, an unjust enrichment claim "requires some type of direct dealing or actual, substantive relationship with a Defendant," citing relevant cases); *Effler v. Pyles*, 380 S.E.2d 149, 152 (N.C. Ct. App. 1989) (dismissing an unjust enrichment claim where plaintiff failed to satisfy her "burden of showing that she conferred a benefit directly on defendant"); see also *In re Aftermarket Filters Antitrust Litig.*, 2010 WL 1416259, at *2–3 (N.D. Ill. Apr. 1, 2010) (dismissing unjust enrichment claims under the laws of Kansas, Michigan, and North Carolina because "plaintiffs [we]re unable to allege that they have conferred a benefit on defendants except to argue that they are the ultimate end users").

Here, Indirect Plaintiffs argue that Defendants were unjustly enriched because, "[a]s a result of the wrongful conduct, defendants charged *resellers* more for Finished Dairy Products," forcing Indirect Plaintiffs to "pay[] more for Finished Dairy Products" from the so-called resellers. [483, ¶¶ 116–17 (emphasis added).] In other words, Indirect Plaintiffs did not themselves confer any benefit directly on Defendants, and for that reason, they have failed to state a claim for unjust enrichment under the laws of Florida, Kansas,[5] Michigan, New York, and North Carolina.

---

[5] But see *Wrobel*, No. 05-cv-1296, 2006 WL 7130617, available at [574-1, at 9] (allowing indirect plaintiff's unjust enrichment claim to survive a motion to dismiss based on the fact that "Kansas specifically allows indirect-purchaser claims," but nonetheless noting that "there may be some limits that would apply," but that the court "d[id] not know, on the present pleadings, how far removed from direct-purchaser status Plaintiff may be"). Here, six years into this MDL litigation, the Court has a much better

That leaves Indirect Plaintiffs' unjust enrichment claims under Arkansas and Minnesota law. Because those states do not require direct dealing between the plaintiff and defendant, and because the Court has not adopted a categorical rule prohibiting unjust enrichment claims that are modeled after failed antitrust and consumer-protection claims—see, *e.g.*, *In re Flonase Antitrust Litig.*, 692 F. Supp. 2d at 542—the Court will not dismiss Indirect Plaintiffs' Arkansas and Minnesota unjust enrichment claims on causation/remoteness grounds.[6]

## IV.     Statute of Limitations

Defendants argue that Indirect Plaintiffs' statutory claims under California, Florida, Minnesota, and North Carolina law are barred by those states' four-year statutes of limitation.[7] See Cal. Bus. & Prof. Code § 16750.1 ("Any civil action to enforce any cause of action for a violation of this chapter shall be commenced within four years after the cause of action accrued.); Fla. Stat. § 95.11(3)(f) (setting a four-year statute of limitations for "[a]n action founded on a statutory liability"); Minn. Stat. § 325D.64 ("An action under sections 325D.49 to 325D.66 shall be forever barred unless commenced within four years of the date upon which the cause of action arose."); N.C. Gen Stat. § 75-16.2 ("Any civil action brought under this Chapter to enforce the provisions thereof shall be barred unless commenced within four years after the cause of action accrues."). Defendants further argue that Indirect Plaintiffs' unjust enrichment claims under Arkansas and North Carolina law are barred by those states' three-year statutes of

---

grasp on the extent of the remoteness between Indirect Plaintiffs and Defendants, and thus finds dismissal appropriate at the motion-to-dismiss phase.

[6] To avoid confusion, the Court notes that dismissal of Indirect Plaintiffs' unjust enrichment claims under Arkansas and Minnesota law is appropriate on other grounds, as discussed below.

[7] Indirect Plaintiffs' claims under Arkansas law as raised in the *Rogers* complaint were timely filed because Arkansas law provides a five-year statute of limitations. See Ark. Code Ann. § 4-88-115. Indirect Plaintiffs' claims under New York, Michigan, and Kansas law—as raised in the *Rudman*, *Waun*, and *Asmann* lawsuits—are not time barred because those named Plaintiffs had standing to raise those claims when their respective suits were filed, which in each case was within the relevant limitations period.

limitations, see Ark. Code Ann. § 16-56-105(3) (stating that "[a]ll actions founded on any contract or liability, expressed or implied" are subject to a three-year statute of limitations); N.C. Gen. Stat. § 1-52(1) (stating that an action "[u]pon a contract, obligation or liability arising out of a contract, express or implied," is subject to a three-year statute of limitations), and their Florida unjust enrichment claim is barred by that state's four-year statute of limitations, see Fla. Stat. § 95.11(3)(k) (setting a three-year statute of limitations for "[a] legal or equitable action on a contract, obligation, or liability not founded on a written instrument").

To assess this argument, the Court must first determine the date of accrual for the claims at issue. Defendants argue that all of these claims accrued—at the latest—on December 16, 2008, when the Commodity Futures Trading Commission issued a publicly-available consent decree announcing its findings regarding its investigation of DFA's allegedly-manipulative trading activities. [483, ¶ 91.] Indirect Plaintiffs do not object to this assertion, and thus the Court will adopt December 16, 2008 as the date of accrual. Accordingly, absent any tolling (and assuming that the various states' statutes of limitations apply here), the filing deadlines at issue under the relevant three- and four-year statutes of limitations are December 16, 2011 and 2012, respectively.

Next, the Court must review when Indirect Plaintiffs filed their claims. As a reminder, Indirect Plaintiffs' Consolidated Class Action Compliant "consolidate[d] four already-pending actions into one complaint." [476, at 3.] Indirect Plaintiffs' first-filed complaint, *Rudman v. DFA*, originally filed on May 29, 2009 in the federal district court in Vermont, included claims invoking the antitrust and unjust-enrichment laws of 25 states, including all of the states at issue here. But the *Rudman* complaint was brought by a single named Plaintiff—Jacqueline Rudman, a New York citizen—and did not include named plaintiffs from any of the other states whose laws

Ms. Rudman invoked in her complaint. Instead, it wasn't until the fourth-filed complaint, *Rogers v. DFA*, originally filed on February 19, 2013 in federal district court in Vermont, that Indirect Plaintiffs included claims on behalf of actual citizens of the states at issue here: Arkansas (Brian Rogers), California (Constantin Yiannacopoulos), Florida (Ann Miller), Minnesota (Mike Jackson), and North Carolina (Cravon Williams). Thus, for purposes of this analysis, December 16, 2008 is the date of accrual and February 19, 2013 is the date of filing, leaving a gap of approximately four years and two months.

To be clear, Indirect Plaintiffs do not argue that they validly stated claims on May 29, 2009 (*i.e.*, upon filing the *Rudman* complaint). Instead, they argue that Vermont's (the forum state's) choice-of-law provisions require the application of Vermont's six-year statute of limitations to many of the claims at issue, making the *Rogers* complaint timely without reference to the earlier-filed *Rudman* complaint. Alternatively, Indirect Plaintiffs argue that even if Vermont's six-year statute doesn't apply, their May 29, 2009 filing established placeholders for the claims at issue that were later filled by the filing of the *Rogers* complaint (either via the relation-back doctrine or a theory of tolling). The Court addresses each theory in turn.

A.    **Choice of Law**

Indirect Plaintiffs argue that their claims under Florida law and their unjust-enrichment claims under all states' laws are governed by Vermont's six-year statute of limitations,[8] making the 2013 *Rogers* complaint timely as to those claims.

In an MDL, a court must apply the choice-of-law rules of the transferor forum. See, *e.g.*, *Ferens v. John Deere Co.*, 494 U.S. 516, 523 (1990); *In re Air Crash Disaster Near Chicago, Ill.*

---

[8] The rationale behind Indirect Plaintiffs' selection of these particular claims is based on their allegation that these claims are governed by "general state statutes of limitations," and Vermont's so-called "general statute of limitations" is six years. Vt. Stat. Ann. tit. 12, § 511. Assumedly Vermont would apply a shorter statute of limitations to Indirect Plaintiffs' other claims.

*on May 25, 1979*, 644 F.2d 594, 610 (7th Cir. 1981) (holding that in MDL's "the choice-of-law rules to be used are those choice-of-law rules of the states where the actions were originally filed"); see also *In re Welding Fume Prods. Liability Litig.*, at 2010 WL 7699456, at *12–13 (N.D. Ohio June 4, 2010) (explaining choice-of-law principles for MDLs). Here, both *Rudman* and *Rogers* originated in Vermont's federal district court (invoking the court's diversity jurisdiction under 28 U.S.C. § 1332(d)), and "[a] federal court sitting in diversity jurisdiction applies the choice of law rules of the forum state." *Forest Park Pictures v. Universal Television Network, Inc.*, 683 F.3d 424, 433 (2d Cir. 2012).

Vermont follows the Restatement (Second) of Conflict of Laws for claims that sound in contract (*e.g.*, unjust enrichment) and claims invoking consumer-protection laws. See *Long v. Parry*, 921 F. Supp. 2d 269, 274 (D. Vt. 2013) (citing *McKinnon v. F.H. Morgan & Co.*, 750 A.2d 1026, 1028 (2000)). While Vermont courts have not yet addressed whether they would apply the Restatement to choice-of-law questions in antitrust actions, this seems to be the trend. See *Seidman v. Killington Ltd.*, 1990 WL 26680, at *4 (E.D. Pa. 1990) (debating which choice-of-law rule to apply under Vermont law and resolving to apply the Restatement based on "the overall trend of Vermont choice of law doctrine"); *Bryant v. Braithwaite*, 2013 WL 877107, at *4 (D. Vt. Mar. 8, 2013) (stating generally that Vermont "has adopted the Second Restatement of Conflicts of Laws"). The alternative would likely be the *lex loci delicti* rule that Vermont previously applied in tort and contract cases, which requires the court to apply the law of the state where the injury occurred. See, *e.g.*, *Goldman v. Beaudry*, 170 A.2d 636, 638 (1961). And not to spoil the ending, but because Vermont has no interest in adjudicating cases that neither involve any Vermont citizens nor invoke any Vermont laws, both approaches produce the same

result, meaning that the selection of which choice-of-law rule to follow is inconsequential. The Court will nonetheless follow the Restatement's choice-of-law approach to all claims.

Where, as here, there is a conflict between the laws of Vermont and other jurisdictions, a court must "ascertain whether a specific section of the Restatement governs what law should ordinarily apply to the particular action or legal issue." *Martineau v. Guertin*, 751 A.2d 776, 778 (2000). "If such a section exists, generally the law of a particular state is presumed to be the correct forum unless another state has a more significant interest in the litigation." *Id.* Section 142 of the Restatement is on point:

> [W]hether a claim will be maintained against the defense of the statute of limitations is determined under the principles stated in § 6. In general, unless the exceptional circumstances of the case make such a result unreasonable:
>
> (1) the forum will apply its own statute of limitations barring the claim.
>
> (2) The forum will apply its own statute of limitations permitting the claim unless:
>
>> (a) maintenance of the claim would serve no substantial interest of the forum; and
>>
>> (b) the claim would be barred under the statute of limitations of a state having a more significant relationship to the parties and the occurrence.

Restatement (Second) of Conflicts § 142 (1988 revision). Here, the Court need not review the § 6 factors, as it is clear that the states at issue have a far-more significant relationship to the parties and the occurrence than does Vermont. Juxtaposed against Vermont's total lack of interest in this lawsuit (Indirect Plaintiffs do not even mention the word "Vermont" in their Consolidated Class Action Complaint) is the fact that the named Plaintiffs are citizens of the states at issue who purchased allegedly price-fixed products in those states. And Indirect Plaintiffs enlisted named Plaintiffs from the various states at issue solely to take advantage of the laws of those states. It would be a sure misfire to allow Indirect Plaintiffs to benefit from the favorable aspects of certain states' laws and then scurry off to disinterested Vermont to avoid the less-favorable

aspects of those states' laws. That would be an exercise in Forum Shopping 101, and neither this Court nor a Vermont court would allow it. Thus, the applicable statutes of limitations are those prescribed by the various states at issue, not Vermont.

### B.        Relation-Back Doctrine

Indirect Plaintiffs argue in the alternative that the claims raised in the 2013 *Rogers* complaint relate back to the 2009 *Rudman* complaint. "An amendment to a pleading relates back to the date of the original pleading when the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading." Fed. R. Civ. P. 15(c)(1)(B).

Simply put, the *Rogers* complaint was filed as a stand-alone complaint, not as an amendment to the *Rudman* complaint, and therefore the claims raised in the *Rogers* complaint cannot relate back to the *Rudman* complaint. The consolidation of the four stand-alone complaints does not reclassify the complaints as amendments of their earlier-filed companions so as to justify a relation back.

Indirect Plaintiffs argue that a refusal to permit relating back in this instance would mean that "many class actions would effectively be barred from substituting named plaintiffs." [521, at 18 (citing *Phillips v. Ford Motor Co.*, 435 F.3d 785, 787 (7th Cir. 2006)).] But *Phillips* doesn't apply here. The point in *Phillips* was that without allowing substitute-named-plaintiffs' claims to relate back to original-named-plaintiffs' claims, a defendant could settle with a named plaintiff after the statute of limitations runs and effectively bar the class from relief. But Indirect Plaintiffs have not attempted to substitute the *Rogers* Plaintiffs for the *Rudman* Plaintiff, and even if they did, they would face other insurmountable hurdles not addressed in *Phillips* (*e.g.*, the Article III

standing issue discussed below). Indirect Plaintiffs cannot benefit from the relation-back doctrine.

What Indirect Plaintiffs are seeking to invoke here is not the relation-back rule, but rather a form of equitable tolling that would allow the state-law claims of named Plaintiffs in a later-filed federal class action to take advantage of "placeholder" state-law claims in an earlier-filed federal class action, which segues the Court to its next topic of discussion.

### C. Equitable Tolling

As one court put it, to determine which statute of limitations to apply in an MDL action, (1) "the Court must first determine which state's choice-of-law rules to apply in these cases," (2) "[t]hen, pursuant to those rules, it must choose the applicable statute of limitations," and (3) [l]astly, the Court must determine when each limitations period began to run and whether or not the applicable statutes of limitations have been tolled, either by the pendency of class actions or otherwise." *In re Vioxx Prods. Liability Litig.*, 2007 WL 3334339, at *2 (E.D. La. Nov. 8, 2007). The Court has now reached the final part of the last step in this analysis, where it must determine whether the filing of the *Rudman* class-action complaint tolled the statute of limitations for the claims raised in the later-filed *Rogers* class-action complaint.

Indirect Plaintiffs invoke "the doctrine of class-action tolling," citing the Supreme Court's *American Pipe* decision in support of their argument that the first-filed class action tolled the statute of limitations for any later-filed class actions where the plaintiffs in the later-filed class actions fall within the class definition of the first-filed class action. See *Am. Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 554 (1974).

In *American Pipe*, the Supreme Court held that where a district court has denied class certification—"at least where class action status has been denied solely because of failure to

demonstrate that the class is so numerous that joinder of all members is impracticable"—"the commencement of the original class suit tolls the running of the statute [of limitations] for all purported member of the class who make timely motions to intervene after the court has found the suit inappropriate for class action status." 414 U.S. at 553. The Supreme Court was concerned that a contrary rule would "deprive Rule 23 class actions of the efficiency and economy of litigation which is a principal purpose of the procedure" because "[p]otential class members would be induced to file protective motions to intervene or to join in the event that a class was later found unsuitable." *Id.*; see also *id.* at 554 ("We are convinced that the rule most consistent with federal class action procedure must be that the commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action."). The Supreme Court subsequently extended the doctrine to all putative class members, rather than solely intervenors. *Crown, Cork, & Seal Co. v. Parker*, 462 U.S. 345, 350 (1983).

But Indirect Plaintiffs face several sizable speedbumps in their attempt to extend *American Pipe* to the facts at hand. First, there is a threshold issue as to whether Ms. Rudman's lack of standing to raise claims under the laws of any states but New York precludes her ability to "place hold" on behalf of out-of-state plaintiffs. Second, the posture of this case is unlike that of *American Pipe* and *Crown, Cork & Seal* because the *Rogers* Plaintiffs filed their successive class action prior to any determination regarding the viability of Ms. Rudman's first-filed class action, making their suit a potentially-inappropriate "piggyback" class action. Third, *American Pipe* applies only to claims under federal law for which the period of limitations is also federal, whereas "[w]hen state law supplies the period of limitations, it also supplies the tolling rules." *Hemenway v. Peabody Coal Co.*, 159 F.3d 255, 265 (7th Cir. 1998); *Bd. of Regents of Tomanio*,

446 U.S. 478, 485 (1980). Thus, the Court must look to the laws of the various states at issue to determine whether those states recognize class-action tolling during the pendency of a federally-filed action (*i.e.*, whether the filing of a putative class action in federal court tolls the statutes of limitation applicable to state law claims asserted by new plaintiffs in a subsequent putative class action in federal court). See *In re Linerboard Antitrust Litig.*, 223 F.R.D. 335, 345 (E.D. Pa. 2004) (referring to this as "cross-jurisdictional class action tolling"). The Court addresses each issue in turn.

### 1. Article III Standing

Defendants argue that the filing of the *Rudman* complaint only tolled the statute for New York claimants because the only named Plaintiff in that action, Ms. Rudman, was a citizen of New York who purchased allegedly price-fixed products in New York, and thus only had Article III standing to raise claims under New York law, not the laws of any of the other states named in her class action complaint. See, *e.g.*, *In re Carrier IQ, Inc.*, 2015 WL 274054, at *10 (N.D. Cal. Jan. 21, 2015) ("[W]here a complaint includes multiple claims[,] 'at least one named class representative must have Article III standing to raise each claim' and * * * in a class action[,] 'each claim must be analyzed separately, and a claim cannot be asserted on behalf of a class unless at least one named plaintiff has suffered the injury that gives rise to that claim.'" (quoting *Los Gatos Mercantile, Inc. v. E.I. DuPont De Nemours & Co.*, 2014 WL 4774611, at *4 (N.D. Cal. Sept. 22, 2014))); *In re Flash Memory Antitrust Litig.*, 643 F. Supp. 2d 1133, 1164 (N.D. Cal. 2009) ("A class cannot assert a claim on behalf of an individual that they do not represent. Where * * * a representative plaintiff is lacking for a particular state, all claims based on *that* state's laws are subject to dismissal."); *In re Countrywide Fin. Corp. Mortg.-Backed Sec. Litig.*, 934 F. Supp. 2d 1219, 1230 (C.D. Cal. 2013) ("[A] class action only tolls the statute of limitation

for a claim when the name plaintiff had Article III standing with respect to that claim." (citing *Walters v. Edgar*, 163 F.3d 430, 432 (7th Cir. 1998))).

Before assessing this argument, there is a threshold question as to whether the Court can consider the issue of standing before addressing class certification. While the Supreme Court has deemed the resolution of class certification to be "logically antecedent" to Article III concerns, see *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 612 (1997); *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 831 (1999), "'[t]here is currently a split among federal courts as to * * * the question of whether standing can be considered prior to class certification in class action lawsuits.'" *In re Carrier IQ, Inc.*, 2015 WL 274054, at *9 (quoting *In re Refrigerant Compressors Antitrust Litig.*, 2012 WL 2917365, at *5 (E.D. Mich. July 17, 2012)). The Seventh Circuit has referred to the Supreme Court's language as a "directive" regarding order of operations, but that was based on the larger concern that "[t]he certification of a class changes the standing aspects of a suit, because '[a] properly certified class has a legal status separate from and independent of the interest asserted by the named plaintiff.'" *Payton v. Cnty. of Kane*, 308 F.3d 673, 680 (7th Cir. 2002) (citation omitted). In other instances, though, the Seventh Circuit has deemed standing "an antecedent legal issue" and thus considered it prior to evaluating class certification. *Arreola v. Godinez*, 546 F.3d 788, 794 (7th Cir. 2008). Much like the Seventh Circuit and other courts in this district, this Court concludes that "class certification issues are not always appropriate for a pre-standing evaluation." *In re Plasma-Derivative Protein Therapies Antitrust Litig.*, 2012 WL 39766, at *4–5 (N.D. Ill. Jan. 9, 2012). Here, the class-certification issue is not logically antecedent to the Article III issue because "[a] ruling as to [Ms. Rudman's] standing depends in no way upon the standing of proposed class members," *In re Wellbutrin XL Antitrust Litig.*, 260 F.R.D. 143, 155 (E.D. Pa. 2009), and thus the Court will proceed to assess whether

Ms. Rudman's lack of standing to raise non-New York claims also bars her ability to create tolled placeholders for those claims.

Indirect Plaintiffs argue that it would be unrealistic to charge class members with the task of assessing whether the named plaintiffs in a putative class have Article III standing to raise claims on their behalf, and any rule requiring such an undertaking would likely result in the filing of additional (and potentially unnecessary) lawsuits. See, *e.g.*, *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 372 (S.D.N.Y. 2011) (noting that withholding *American Pipe* tolling where a named plaintiff was found to lack standing would "punish class members for relying on the very thing Rule 23 is intended to provide: an efficient method for resolving class claims common to a class of individuals without the need for wasteful and duplicative litigation" (quotation omitted)). Indirect Plaintiffs also argue that if the goal of statutes of limitations is to put defendants on notice (see, *e.g.*, *Crown, Cork & Seal*, 462 U.S. at 355), then Ms. Rudman's allegations of a nationwide price-fixing conspiracy accomplished that feat, regardless of whether she personally had standing to raise each and every claim stated in her class-action complaint.

In addition, Indirect Plaintiffs cite a string of cases allegedly endorsing these (and other) pro-plaintiff policy positions. See, *e.g.*, *Haas v. Pittsburgh Nat'l Bank*, 526 F.2d 1083, 1097 (3d Cir. 1975); *Griffin v. Singletary*, 17 F.3d 356, 360 (11th Cir. 1994) (finding that *American Pipe* tolls the statute of limitations for putative class members where the plaintiff lacks standing, and noting that a contrary rule "'would produce the very evil which the [Supreme] Court sought to avoid in *American Pipe* and *Crown, Cork & Seal*'" because "class members uncertain of the district court's standing analysis * * * 'would have every incentive to file a separate action prior to the expiration of his own period of limitations'" (quoting *Edwards v. Boeing Vertol Co.*, 717 F.2d 761, 766 (3d Cir. 1983))); *Genesee Cnty. Emps.' Ret. Sys. v. Thornburg Mortg. Sec. Trust*

*2006-3*, 825 F. Supp. 2d 1082, 1132 (D.N.M. 2011) (adopting *Griffin*); *Rose v. Ark. Valley Envtl. & Util. Auth.*, 562 F. Supp. 1180, 1192–93 (W.D. Mo. 1983) ("I can see no more reason, as a general matter, to require a passive class member to anticipate the existence of and ultimate ruling upon [whether the plaintiff has standing] than to require him to do so with respect to questions of 'numerosity,' 'commonality' or 'typicality.'"); *Popoola v. Md-Individual Practice Ass'n*, 230 F.R.D. 424, 430 (D. Md. 2005) (adopting *Haas* and *Rose*, noting that a contrary rule would force individual class members to seek to intervene prior to the running of the statute to preserve their rights); *In re IndyMac Mortgage-Backed Sec. Litig.*, 793 F. Supp. 2d 637, 645–47 (S.D.N.Y. 2011); see also *W. & S. Life Ins. Co. v. JPMorgan Chase Bank, N.A.*, 2014 WL 5308422, at *17–18 (S.D. Ohio Oct. 16, 2014) ("The *American Pipe* tolling analysis can be extended to cases where the class action claims are dismissed for lack of standing."); *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 371–72 (S.D.N.Y. 2011) ("Although the law of the Second Circuit is far from settled on this issue, the failure to apply *American Pipe* tolling to this case would undermine the policies of 'efficiency and economy of litigation' that underlie Rule 23."). The Court addresses each of Indirect Plaintiffs' arguments in turn.

The Third Circuit's *Haas* opinion is the most on point, but is nonetheless unpersuasive. In that case, a Pennsylvania citizen brought class claims against three banks, although she only held accounts with two of them. The court's basis for tolling claims against the third bank (Equibank) rested almost exclusively on the fact that defendants received adequate notice of the relevant claim despite plaintiff's lack of standing to bring it. The court observed that the missing plaintiffs "were in existence at the time the action was originally brought and were described as claimants in the complaint," such that all that was needed to remedy the issue "was the prompt addition of a nominal plaintiff who held an Equibank card." 526 F.2d at 1097. The court's analysis was

brief, and said nothing of the policy considerations on the other side of the coin (discussed below) or Article III standing principles generally. While this decision was likely the most practical decision for this case—*i.e.*, triggering the "prompt addition of a nominal plaintiff" such that the case could continue—it seems unlikely that the court would have reached the same conclusion had Ms. Haas filed placeholder claims with respect to 50 banks instead of just one.

The most thought-provoking issue raised in the cases cited by Indirect Plaintiffs is whether there is anything special or unique about a named plaintiff's lack of standing that would differentiate such a shortcoming from a named plaintiff's failure to satisfy one of the Rule 23 categories (*i.e.*, numerosity, commonality, and typicality), so as to justify requiring putative class members to identify one but not the other in order to take advantage of *American Pipe* tolling. See *Rose*, 562 F. Supp. at 1192–93 ("I can see no more reason, as a general matter, to require a passive class member to anticipate the existence of and ultimate ruling upon [whether the plaintiff has standing] than to require him to do so with respect to questions of 'numerosity,' 'commonality' or 'typicality.'"). One potential difference is that from a legal perspective, unlike Rule 23 deficiencies, standing deficiencies are inexplicably linked to a court's jurisdiction. Another notable difference is that plaintiffs can exploit standing deficiencies (especially where, like here, the deficiency is obvious) to their benefit, whereas a Rule 23 deficiency is an unlikely vehicle for abuse. See *Me. State Ret. Sys. v. Countrywide Fin. Corp.*, 722 F. Supp. 2d 1157, 1166–67 (C.D. Cal. 2010) (refusing to extend *American Pipe* tolling where the plaintiff lacked standing because such a rule would "encourage filings made merely to extend the period in which to find a class representative"). Also, from a practical perspective, standing deficiencies such as these are often "apparent from the face of the complaints," *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 2012 WL 149637, at *2 n.3 (N.D. Cal. Jan. 18, 2012), whereas Rule 23

deficiencies are often not so obvious. At a minimum, standing deficiencies and Rule 23 deficiencies make unexpected bedfellows (at least in this context), and the Court is not convinced that the *American Pipe* rule should transfer so easily from one category to the other absent express authority to the contrary.

Regarding the argument that Ms. Rudman's complaint sufficiently put Defendants on notice of the *Rogers* claims—thus satisfying the core concern behind the existence of statutes of limitations—were this the proper logic, then there would be nothing stopping plaintiffs from raising claims under the laws of all 50 states at the time of filing, keeping the door open for any plaintiffs that might filter in at any given time. *Crown, Cork & Seal*, 462 U.S. at 354–55 (noting that "[t]he tolling rule of *American Pipe* is a generous one, inviting abuse," and that "[i]t is important to make certain, however, that *American Pipe* is not abused by the assertion of claims that differ from those raised in the original class suit."). The Court is concerned that these out-of-state placeholder suits might qualify as the type of abuse that the Supreme Court presaged.

Next, several of the cases cited by Indirect Plaintiffs argue that a refusal to extend *American Pipe* tolling to instances where the named plaintiffs lack of standing would incentivize putative class members—unsure of whether the named plaintiff has standing to bring claims on their behalf—to file duplicative and unnecessary suits prior to the expiration of the statute of limitations in order to preserve their rights. See, *e.g.*, *Griffin*, 17 F.3d at 360. While this is a possibility, it requires little legal acumen (at least in this instance) to determine that Ms. Rudman—a New York citizen who purchased allegedly price-fixed products in New York— lacks standing to bring claims under the laws of other states. See *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 2012 WL 149637, at *2 n.3. More relevant here, however, is the flipside of Indirect Plaintiffs' argument, which is that "extending *American Pipe* tolling to class action

claims the original named plaintiffs had no standing to bring will encourage filings made merely to extend the period in which to find a class representative." *Me. State Ret. Sys. v. Countrywide Fin. Corp.*, 722 F. Supp. 2d at 1166–67; accord *FDIC v. Countrywide Fin. Corp.*, 2012 WL 5900973, at *9 (C.D. Cal. Nov. 21, 2012); *cf. In re Crazy Eddie Sec. Litig.*, 747 F. Supp. 850, 856 (E.D.N.Y. 1990) (refusing to extend *American Pipe* tolling to successive class actions following the dismissal of the original suit for lack of standing, noting that "[t]here appears to be no good reason to encourage bringing of a suit merely to extend the period in which to find a class representative"). And to further allay the fear that putative class members, unsure of the named plaintiffs' standing, might file duplicative lawsuits to protect their rights, courts should maintain "scrupulous adherence to the requirement that the determination whether to certify a suit as a class action be made 'as soon as practicable after the commencement of the action.'" *Walters*, 163 F.3d at 433 (quoting Fed. R. Civ. P. 23(c)(1)).

Most importantly, though, "[t]he Seventh Circuit has [already] decided the issue, holding that the filing of a purported class-action complaint by a plaintiff who lacks standing does not toll the statute of limitations for those who later seek to intervene as plaintiffs." *Palmer v. Stassinos*, 236 F.R.D. 460, 465 (N.D. Cal. 2006) (citing *Walters*, 163 F.3d at 432). In *Walters*, a 14-year-old class action brought by a number of Illinois inmates was suddenly dismissed after the Supreme Court issued an opinion in an unrelated case that led to a finding that the named plaintiffs in *Walters* lacked standing to sue. The named plaintiffs argued that rather than dismissing the case, other class members should have been substituted as class representatives. But the reality was that, in light of the Supreme Court's ruling, the named plaintiffs lacked standing from day one. The Seventh Circuit held that "if the named plaintiffs lacked standing when they filed the suit, there were no other party plaintiffs to step into the breach created by the

named plaintiffs' lack of standing," thus dismissing the argument that "jurisdiction can be preserved even though the named plaintiffs lacked standing when the suit was filed." *Id.* at 432–33.

Additionally, from a defense perspective, requiring the named plaintiffs to have standing in order to activate *American Pipe* tolling would eliminate the concern over so-called placeholder actions, which arguably give plaintiffs unearned leverage over defendants by artificially raising the stakes while simultaneously buying time to piece together a more formidable lawsuit. As one court put it:

> The alternative proposed by the plaintiffs would allow named plaintiffs in a proposed class action, with no injuries in relation to the laws of certain states referenced in their complaint, to embark on lengthy class discovery with respect to injuries in potentially every state in the Union. At the conclusion of discovery, the plaintiffs would apply for class certification, proposing to represent the claims of parties whose injuries and modes of redress they would not share. That would present the precise problem that the limitations of standing seek to avoid. The Court will not indulge in the prolonged and expensive implications of the plaintiffs' position only to be faced with the same problem months down the road.

*In re Packaged Ice Antitrust Litig.*, 779 F. Supp. 2d 642, 654 (E.D. Mich. 2011) (quoting *In re Wellbutrin XL Antitrust Litig.*, 260 F.R.D. at 155); see also *Crown, Cork & Seal*, 462 U.S. at 354 (Powell, J., concurring) (reiterating that *American Pipe* "must not be regarded as encouragement to lawyers * * * to frame their pleadings as a class action, intentionally, to attract and save members of the purported class who have slept on their rights" (quoting *Am. Pipe*, 414 U.S. at 561)); see also *In re Elscint, Ltd. Sec. Litig.*, 674 F. Supp. 374, 377–78 (D. Mass. 1987).

Because Ms. Rudman lacked standing to raise claims under the laws of any states other than New York, her class action did not toll the statute of limitations for any such claims, making the *Rogers* claims at issue untimely. While this finding is dispositive as to Indirect Plaintiffs' claims, the Court will nonetheless address the remaining arguments regarding the alleged untimeliness of certain of Indirect Plaintiffs' claims for the sake of completeness.

## 2. Successive ("Piggyback") Class Actions

According to most courts that have addressed the issue, plaintiffs may not "piggyback one class action onto another," *Salazar–Calderon v. Presidio Valley Farmers Ass'n*, 765 F.2d 1334, 1351 (5th Cir. 1985), "and thereby engage in endless rounds of litigation in the district court." *Griffin*, 17 F.3d at 359 (affirming that "Plaintiffs may not piggyback one class action onto another and thus toll the statute of limitations indefinitely"); see also *Andrews v. Orr*, 851 F.2d 146, 149 (6th Cir. 1988) ("The courts of appeals that have dealt with the issue appear to be in unanimous agreement that the pendency of a previously filed class action does not toll the limitations period for additional class actions by putative members of the original asserted class." (citing cases)), *overruled on other grounds*, *Hall v. Warden, Lebanon Corr. Inst.*, 662 F.3d 745, 749–50 (6th Cir. 2011).

There are really two legal concerns subsumed in these cases. The first, as the Seventh Circuit has pointed out, is a concern regarding "the preclusive effect of a judicial decision in the initial suit applying the criteria of Rule 23." *Sawyer v. Atlas Heating & Sheet Metal Works, Inc.*, 642 F.3d 560, 563 (7th Cir. 2011). This concern applies to successive class actions (as opposed to individual lawsuits) filed *after* the denial of class certification, where the concern is that the new class may get an unwarranted second bite at the class-certification apple (depending, of course, on the reason for denial of class certification the first go-round). See, *e.g.*, *McKowan Lowe & Co. v. Jasmine, Ltd.*, 295 F.3d 380, 386 (3d Cir. 2002) (noting that "application of *American Pipe* tolling to successive attempts to certify *a previously rejected class* would sanction an endless succession of class filings" (emphasis added)). This concern has nothing to do with *American Pipe* or tolling principles generally, and has no direct application here.

The second concern—which is relevant here—relates to the difference between the tolling effect of a successive class-action complaint that is filed *prior to* any ruling on the viability of the initial class-action complaint as opposed to one filed *after* a class-certification ruling (as contemplated by *American Pipe*). Compare *Wyser–Pratte Mgmt. Co. v. Telxon Corp.*, 413 F.3d 553, 568–69 (6th Cir. 2005) ("[A] plaintiff who chooses to file an independent action without waiting for a determination on the class certification issue may not rely on the *American Pipe* tolling doctrine."), with *In re Vertrue Inc. Marketing & Sales Practices Litig.*, 719 F.3d 474, 480 (6th Cir. 2013) (distinguishing *Wyser–Pratte* as a case where "a putative class member who initiated a lawsuit four months before a lead plaintiff's motion for certification was granted," where tolling did not occur, from a case where "the district court had confirmed that it would not address the class certification issue," where tolling did occur).

The first appellate courts to address the issue found that *American Pipe* tolling does not apply to successive individual actions filed prior to class certification. According to the Sixth Circuit, "[t]he purposes of *American Pipe* tolling are not furthered when plaintiffs file independent actions before decision on the issue of class certification" because the secondary filing creates duplicative litigation. *Wyser–Pratte*, 413 F.3d at 569; see also *Glater v. Eli Lilly & Co.*, 712 F.2d 735, 739 (1st Cir. 1983) ("The policies behind Rule 23 and *American Pipe* would not be served, in fact would be disserved, by guaranteeing a separate suit at the same time that a class action is ongoing."); *In re Enron Corp. Sec.*, 465 F. Supp. 2d 687, 715–16 (S.D. Tex. 2006) (collecting cases on both sides, and concluding that "the *American Pipe* tolling doctrine applies only to opt-out plaintiffs after the district court makes the class certification determination, regardless of whether it denies or grants certification").

However, three recent appellate-court decisions have gone against the First and Sixth Circuits in finding that *American Pipe* tolling can be invoked in cases filed prior to a ruling on class certification, albeit only in successive *individual* suits (*i.e.*, not class actions). See *In re WorldCom Sec. Litig.*, 496 F.3d 245, 254–56 (2d Cir. 2007) (noting that while the *American Pipe* Court had the benefits of judicial efficiency and economy on its mind, the case "was not meant to induce class members to forgo their right to sue individually); *In re Hanford Nuclear Reservation Litig.*, 534 F.3d 986, 1009 (9th Cir. 2008) (echoing *In re WorldCom* and noting that plaintiffs "have a right to file at the time of their choosing"); *State Farm Mut. Auto. Ins. Co. v. Boellstoff*, 540 F.3d 1223, 1230–31 (10th Cir. 2008) (relying heavily on the *Crown, Cork & Seal* rule that "[o]nce the statute of limitations has been tolled, it remains tolled for all members of the putative class until class certification is denied" (quoting *Crown, Cork & Seal*, 414 U.S. at 554)); see also *Rochford v. Joyce*, 755 F. Supp. 1423, 1428 (N.D. Ill. 1990) (disagreeing with the First Circuit's *Glater* opinion based on the "clear" directive in *Crown, Cork & Seal*).

While the Court sees the appeal of the *Wyser–Pratte* and *Glater* decisions, it finds the more-recent opinions on the matter to be more persuasive. That being said, the Court questions whether the "plain language" of *Crown, Cork & Seal* that these more-recent decisions relied upon is as plain as the courts suggest: "Once the statute of limitations has been tolled, it remains tolled for all members of the putative class until class certification is denied. *At that point*, class members may choose to file their own suits or to intervene as plaintiffs in the pending action." 462 U.S. at 354 (emphasis added). To be sure, we are not "at that point" yet. But such an interpretation of *Crown, Cork & Seal* would require the Court to hold that the statute *is* currently tolled, but that plaintiffs cannot take advantage of this tolling unless and until the Court makes a class-certification ruling. While there is an economic allure to such a rule, it comes at the cost of

sacrificing individual choice. As one district court put it, it would run contrary to any known principle governing statutes of limitations "to say that [a successive plaintiff] must wait until the dispute is more stale before he can file his individual case." *Lehman v. United Parcel Serv., Inc.*, 443 F. Supp. 2d 1146, 1151 (W.D. Miss. 2006).

There is an ancillary issue as to whether successive *class actions* (as opposed to individual suits) may proceed prior to a certification ruling in a preceding class action and still take advantage of *American Pipe*'s tolling principle. As the Seventh Circuit noted, the factor that distinguishes post-certification *class* actions from post-certification *individual* actions is the potential for issue preclusion in successive class actions based on the court's Rule 23 findings in the initial class action. See *Sawyer*, 642 F.3d 560. But if a successive class action is filed before any Rule 23 decision in the initial suit, then this concern over issue preclusion disappears (at least until one of the cases reaches the class-certification stage). The Court sees no reason why *American Pipe*'s tolling principle should apply only to successive individual actions, and not to successive class actions.

Absent guidance to the contrary from the Seventh Circuit or the Supreme Court, this Court is inclined to extend *American Pipe* tolling to successive class-action plaintiffs who choose to file suit before a decision is rendered on class certification in the initial action. See, *e.g.*, *McKowan*, 295 F.3d at 389 ("[W]e see no good reason why class claims should not be tolled where the district court had not yet reached the issue of the validity of the class."). To be clear, this sub-holding (a) ignores the dispositive effect of Ms. Rudman's lack of Article III standing, as discussed above, and (b) assumes that *American Pipe* tolling applies in the cross-jurisdiction setting in the first place, which the Court addresses (and rejects) in the following section.

### 3. Cross-Jurisdictional Tolling

The elephant in the room here is that both *American Pipe* and *Crown, Cork & Seal* involve the tolling of *federal* statutes of limitations in class actions filed in federal courts, not the tolling of *state* statutes of limitations in class actions filed in federal courts. As mentioned above, "[w]hen state law supplies the period of limitations, it also supplies the tolling rules," *Hemenway*, 159 F.3d at 265, and thus the Court must look to the laws of the various states at issue to determine whether those states recognize cross-jurisdictional class-action tolling. See *In re Linerboard Antitrust Litig.*, 223 F.R.D. at 345.

Relevant here are the tolling laws of Arkansas, California, Florida, Minnesota, and North Carolina. Before reviewing those states' laws, there is some low-hanging fruit to tend to. Specifically, Indirect Plaintiffs raised claims under Cal. Bus. & Prof. Code § 17200, Minn. Stat. § 325D.53, and N.C. Gen. State. § 75-1.1 for the first time in their Consolidated Class Action Complaint. But *American Pipe* does not apply to toll new claims. *Crown, Cork & Seal*, 462 U.S. at 355 (Powell, J., concurring) ("It is important to make certain * * * that *American Pipe* is not abused by the assertion of claims that differ from those raised in the original class suit."); *Spann v. Cmty. Bank of N. Va.*, 2004 WL 691785, at *6 (N.D. Ill. Mar. 30, 2004) ("[T]he [first-filed] complaint only tolled the statute of limitations as to those claims actually alleged against [defendant] in the [first-filed] action."). Because these three claims did not appear in the *Rudman* complaint, they are time barred, and *American Pipe* tolling cannot save them.

As to the remaining states' laws at issue (addressed in alphabetical order), the Ninth Circuit has refused to import cross-jurisdictional tolling into California law. *Clemens v. DaimlerChrysler Corp.*, 534 F.3d 1017, 1025 (9th Cir. 2008) ("[T]he weight of authority and California's interest in managing its own judicial system counsel us not to import the doctrine of

cross-jurisdictional tolling into California law."). Florida does not allow *American Pipe* tolling at all, let alone in a cross-jurisdictional setting. See *Becnel v. Deutsche Bank, AG*, 507 F. App'x 71, 73 (2d Cir. 2013) ("Florida does not allow tolling during the pendency of class action lawsuits no matter where they are filed." (citing Fla. Stat. § 95.051(2))). Neither Minnesota nor North Carolina has considered the issue of cross-jurisdictional tolling, and as the Ninth Circuit noted in *Clemens*, "several federal courts have declined to import the doctrine into state law where it did not previously exist." 534 F.3d at 1025; *In re Urethane Antitrust Litig.*, 663 F. Supp. 2d 1067, 1082 n.10 (D. Kan. 2009) ("Plaintiffs (and the *Linerboard* court) were able to identify courts in only two states that have adopted cross-jurisdictional tolling.").[9] This Court likewise refuses to import cross-jurisdictional tolling into the laws of a state that has not addressed the issue.

Because the states at issue do not apply cross-jurisdictional tolling, the federally-filed *Rudman* class-action complaint did not toll the statute of limitations for statutory state-law claims brought under the laws of California, Florida, Minnesota, or North Carolina or for unjust enrichment claims brought under the laws of Arkansas, North Carolina, and Florida. This bar exists independently of Indirect Plaintiffs' Article III issues in bringing these claims, and moots the Court's decision to extend *American Pipe* tolling to successive class-action plaintiffs who choose to file suit before a decision is rendered on class certification in the initial action.

---

[9] The Illinois Supreme Court laid the foundation for why states should not adopt cross-jurisdictional tolling, reasoning that "[u]nless all states simultaneously adopt the rule of cross-jurisdictional class action tolling, any state which independently does so will invite into its courts a disproportionate share of suits which the federal courts have refused to certify as class actions after the statute of limitations has run." *Portwood v. Ford Motor Co.*, 701 N.E.2d 1102, 1103–05 (1998) ("[B]ecause state courts have no control over the work of the federal judiciary, we believe it would be unwise to adopt a policy basing the length of Illinois limitation periods on the federal courts' disposition of suits seeking class certification."). But see *In re Linerboard Antitrust Litig.*, 223 F.R.D. at 346 ("[D]eclining to adopt cross-jurisdictional class action tolling will invite the filing of numerous protective, duplicative and in many cases, unnecessary, suits by class members that want to consider filing claims under state antitrust law not included in a federal class action complaint.").

## V.      Filed-Rate Doctrine

In ruling on Defendants' motion to dismiss Direct Purchaser Plaintiffs' Corrected Consolidated Class Action Complaint, Judge Hibbler assessed the application of the filed-rate doctrine to the case, and held that plaintiffs were barred from raising claims based on the purchase of "products whose value is determined, at least in part, by the government minimum rate" for milk, and thus dismissed Direct Plaintiffs' "claims for damages stemming from the purchase of products priced on the basis of the government minimum milk prices." *DFA I*, 767 F. Supp. 2d at 894, 897. The filed-rate doctrine did not bar claims based on the purchase of "products whose price was based on CME prices." *Id.* at 896. This ruling is the law of the case.

Indirect Plaintiffs do not dispute the filed-rate doctrine's applicability to state-law claims. See, *e.g.*, *AT&T Co. v. Cent. Office Tel., Inc.*, 524 U.S. 214, 228 (1998). Instead, they attempt to avoid Judge Hibbler's ruling altogether by arguing that "the price of the products Plaintiffs purchased (*i.e.*, cheese) was determined solely by reference to the CME cheese spot market price totally independent of the price set by any government entity," and that "[t]he price of cheese was set by adding a margin to the CME cheese spot market prices and nothing else is involved." [521, at 12 (citing Consol. Class Action Compl., 483, ¶ 75).] If this were true, then Indirect Plaintiffs could potentially[10] have positioned themselves outside of realm of forbidden claims as explained in *DFA I*. But this is not what Indirect Plaintiffs' alleged in their complaint. Instead, paragraph 75 says that "[t]he price of Finished Dairy Products *sold to resellers* depends in whole or large part on the Cheese Spot price, without reference to, and independent of, prices set by any government agency." [Consol. Class Action Compl., 483, ¶ 75 (emphasis added).] While the

---

[10] The reason that such an allegation would only *potentially* save Indirect Plaintiffs' claims is because the claim is still dependent on the assumption that the entire class of indirect plaintiffs purchased finished dairy products made exclusively out of the cheese that Defendants purchased on the CME cheese spot market.

Court must make reasonable inferences in Indirect Plaintiffs' favor, it would be pure speculation to infer that the price of finished dairy products *sold to consumers* is not determined, even in part, by government minimum milk prices.

Approaching this argument from a different angle, Indirect Plaintiffs divide the world of finished dairy products into two categories—those that include milk that was priced based on a government rate and those that do not—and argue that because Defendants produce their own milk (at least in part), it is *possible* that the finished dairy products that Indirect Plaintiffs purchased fall entirely into the latter (non-barred) category. But whether the finished dairy products at issue *contain* government-priced milk is not the same inquiry as whether their prices were *determined*, at least in part, by the government minimum rate. And Indirect Plaintiffs repeatedly highlight the influence that the USDA rate had on finished dairy products nationwide, noting that "minimum prices for raw farm milk bought by many cheese manufacturers are set using a [USDA] pricing formula," that "Cheese Spot prices are also used as a component for the pricing of Class I Milk by, *inter alia*, the USDA and State of California," that "[p]rivate industry participants throughout the nation use the prices set by the USDA and State of California for Class I Milk as the mechanism for pricing in their contracts for the sale/purchase of Class I Milk and products containing Class I Milk," and that Defendants' "manipulation of the Cheese Spot market or the Milk Futures market caused an artificial and unlawful increase in the prices of Dairy Products including, but not limited to, Class I and III Milk prices set by the USDA and the California Department of Food and Agriculture, throughout the United States." [Consol. Class Action Compl., 483, ¶¶ 77–78, 81.]

If the USDA pricing did not determine (at least in part) the price of Defendants' finished dairy products, it is curious why Indirect Plaintiffs put such an emphasis on this element of the

story in their complaint (especially in light of Judge Hibbler's filed-rate ruling). This mystery quickly unravels when one considers the core allegation in Indirect Plaintiffs' complaint, which is that Defendants' actions in the commodities markets artificially raised the governmental price for milk, which in turn artificially raised the national price of milk and cheese, which ultimately allowed Indirect Plaintiffs to reap the benefit of the nationwide price increase in finished dairy products. Regardless of what inferences the Court may make in Indirect Plaintiffs' favor, the Court cannot ignore Indirect Plaintiffs' allegation that Defendants' activities raised the governmental price of milk, and that governmental pricing in turn influenced the price of finished dairy products nationwide; inferences do not overcome the big picture.

This holding also comports with the policies underpinning the filed-rate doctrine. The theory behind the doctrine is that "any 'filed rate'—that is, one approved by [a] governing regulatory agency—is per se reasonable and unassailable in judicial proceedings brought by ratepayers." *DFA I*, 767 F. Supp. 2d at 893 (quoting *Wegoland Ltd. v. NYNEX Corp.*, 27 F.3d 17, 18 (2d Cir. 1994)). The concern is that if an allegedly price-fixed product is priced based (even in part) on a government rate, then "determining a hypothetically reasonable rate for the purposes of calculating damages * * * would interfere with the regulatory agency's ratemaking authority." *Id.* Indirect Plaintiffs argue that the Court will not have to involve itself with any government rates in order to calculate damages in this case because the retailers that sold products to Indirect Plaintiffs "are in a fiercely competitive market and pass on the price increases incurred from the increases that defendants orchestrated on the CME cheese spot market." [521, at 12.] But this argument is belied by Indirect Plaintiffs' statements regarding the nationwide impact that governmental milk prices have on finished dairy products; Defendants' ability to impact governmental milk pricing defines the nature of the scheme. See *DFA I*, 767 F.

Supp. 2d at 896–97 (citing *Lower Lake Erie Iron Ore Antitrust Litig.*, 998 F.2d 1144, 1157 (3d Cir. 1993)). As such, any calculation of damages resulting from the price of finished dairy products would inevitably include, at least in part, an assessment of what governmental milk prices would have been absent Defendants' actions.[11] Accordingly, Indirect Plaintiffs' claims for damages are barred by the filed-rate doctrine.[12]

## VI. Failure to State a Claim: Monopolization

Invoking the antitrust laws of Michigan, Minnesota, and North Carolina, and the consumer-protection laws of Arkansas, California, and Florida, Indirect Plaintiffs allege that Defendants wrongfully acquired and maintained monopoly power in the Cheese Spot market. In response—and in addition to their arguments regarding Indirect Plaintiffs' lack of standing to raise these claims, as discussed above—Defendants argue that Indirect Plaintiffs failed to state a claim for monopolization under each state's law because (1) the purportedly monopolized market—the Cheese Spot market—does not encompass all interchangeable substitute products,

---

[11] Indirect Plaintiffs argue that a damages calculation will require them "to establish [1] what the price on the CME cheese spot market would have been in the absence of the wrongful conduct; [2] how much that caused the price Defendants charged for their branded cheese products to retailers or wholesalers to increase; and [3] how much of that increase was passed on to Plaintiffs and other consumers." [521, at 12.] It is the second step that necessarily involves a calculation of the government rate because Defendants' sale price was based on the going rate in the national market, which in turn was based, at least in part, on government milk prices.

[12] Indirect Plaintiffs argue that California's Cartwright Act does not recognize the filed-rate doctrine for rates set by state rate-making agencies. See *Knevlarbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 992 (9th Cir. 2000)). Defendants disagree, arguing that since *Knevelbaard*, the tide has changed in California. See *MacKay v. Superior Court*, 115 Cal. Rptr. 3d 893, 910 (Cal Ct. App. 2010). The Court is not convinced that *MacKay*—an insurance-rate case where the court noted "the limited nature of [its] holding"—expressly overruled what was otherwise established California law. See *In re Conseco Life Ins. Co. Life Trend Ins. Marketing & Sales Practice Litig.*, 2012 WL 2917227, at *9–10 (N.D. Cal. July 17, 2012) (noting disagreement amongst California courts regarding the filed-rate doctrine and refusing to apply it). As such, the Court will not apply the filed-rate doctrine to dismiss Indirect Plaintiffs' damages claims based on California law regarding rates set by the California Department of Food and Agriculture. This is somewhat of a moot point, as the Court has already found dismissal of Indirect Plaintiffs' California-law claims to be appropriate on other grounds.

and (2) Plaintiffs failed to allege that DFA had sufficient market power or excluded others from participating in the CME cheese spot call. The Court addresses each argument in turn.

## A.     Legal Standard

To state a claim for monopolization under *federal* law, Plaintiffs must plead "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power." *DFA I*, 767 F. Supp. 2d at 901. Michigan, Minnesota, and North Carolina interpret their antitrust statutes in harmony with federal law, and the parties do not dispute the applicability of this two-part test under those states' laws.

However, Defendants *do not* allege that this two-part test applies to Indirect Plaintiffs' monopolization claims brought under the consumer-protection laws of Arkansas, California, and Florida, nor do they explain what the monopolization standards are in those states. Instead, Defendants claim that Indirect Plaintiffs raised monopolization claims under these states' consumer-protection statutes only because they are barred from bringing monopolization claims under those states' antitrust statutes. Defendants then argue that Indirect Plaintiffs should be forbidden from circumventing those states' legislatures' limitations on antitrust recovery by repackaging their antitrust claims as "ill-fitting" consumer protection claims. Even though this is not a "failure to state a claim" argument (thus making it "ill-fitting" in regard to this section of the Court's opinion), the Court can dispose if it efficiently here.

Addressing the three states alphabetically, courts have interpreted the catchall provision of the Arkansas Deceptive Trade Practices Act—which prohibits any "unconscionable, false, or deceptive act or practice in business, commerce, or trade," Ark. Code § 4-88-107(a)(10)— broadly so as to encompass monopolization claims. See *Sheet Metal Workers Local 441 Health & Welfare Plan v. GlaxoSmithKline, PLC*, 737 F. Supp. 2d 380, 404–05 (E.D. Pa. 2010).

Similarly, individual plaintiffs can bring monopolization claims under California's Unfair Competition Law ("CUCL")—which prohibits "unlawful, unfair, or fraudulent business practice[s]," Cal. Bus. & Prof. Code § 17200—such that a "decision to grand [defendants'] motion to dismiss plaintiffs' Cartwright Act monopolization claims does not in any way prevent [a court] from allowing their CUCL claim to proceed." *Sheet Metal Workers*, 737 F. Supp. 2d at 406. And plaintiffs have also been successful in bringing monopolization claims under the Florida Deceptive and Unfair Trade Practices Act, which prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce," Fla. Stat. § 501.204(1). *Sheet Metal Workers*, 737 F. Supp. 2d at 408–09. In summation, Indirect Plaintiffs' consumer-protection claims under the laws of Arkansas, California, and Florida are not dismissible simply because those states do not provide a private right of action for monopolization claims under their respective antitrust statutes.

Accordingly, the Court will apply the two-part test to Indirect Plaintiffs' monopolization claims under Michigan, Minnesota, and North Carolina antitrust law, but because Defendants do not allege that Indirect Plaintiffs failed to state a claim under the Arkansas, California, and Florida consumer-protection statutes (or at least Defendants failed to provide the relevant legal standards under those states' laws), the Court will not address such arguments.

### B.     Relevant Market

Under federal law, "[t]he outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962). "In other words, the products in a market must have unique attributes that allow them to be substituted for one another, but make them difficult to replace with substitute products from outside the

market." *DFA I*, 767 F. Supp. 2d at 901. In most cases, proper market definition is a fact-intensive inquiry that is not suited for resolution on a motion to dismiss. *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 482 (1992).

Indirect Plaintiffs allege in their Consolidated Class Action Complaint that DFA wrongfully acquired and maintained monopoly power in the Cheese Spot market. [483, ¶ 108.] Indirect Plaintiffs define this market as the only commodities exchange for cheddar cheese in the United States [*id.* ¶ 30], explaining that the market provides a reference point for pricing for the USDA and for many cheese manufacturers nationwide [*id.* ¶¶ 32, 75–78]. Indirect Plaintiffs also note that the CME sets detailed trading rules for the Cheese Spot market that govern the quality and color of the cheese, freight charges, packaging requirements, inspection specifications, penalties for non-compliance, etc. [*id.* ¶¶ 31–34].

In response, Defendants highlight Plaintiffs' concession that the cheese traded on the CME Cheese Spot call market accounts for less than 2% of the annual supply of cheddar cheese, and argue that Plaintiffs' recounting of the characteristics of the CME does not refute that interchangeable substitute products—let alone the other 98% of the annual supply of cheddar cheese—should also be included in the relevant market.

At this stage, Indirect Plaintiffs have adequately pled a relevant market. The key factor in this decision relates to Plaintiffs' claims that (a) the Cheese Spot market is the only cheddar cheese market in the United States, and (b) purchases made on the Cheese Spot market are highly influential in setting the national price for finished dairy products. This aspect of the market makes it distinct from cheddar cheese purchases made outside of the Cheese Spot market, and is enough to satisfy the pleading standard.

## C.      Market Power / Exclusionary Conduct

In addition to establishing a relevant market, Indirect Plaintiffs must also plead that DFA possessed monopoly power in the Cheese Spot market—*i.e.*, that DFA possessed "the power to control prices or exclude competition." *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 391 (1956). There are two methods for proving that a defendant possessed monopoly power: (1) "through direct evidence of anticompetitive effects," or (2) "by proving relevant product and geographic markets and by showing that the defendant's share exceeds whatever threshold is important for the practice in that case." *Toys "R" Us, Inc. v. FTC*, 221 F.3d 928, 937 (7th Cir. 2000). While "[t]he existence of [monopoly] power ordinarily may be inferred from the predominant share of the market," *United States v. Grinnell Corp.*, 384 U.S. 563, 571 (1966), "in markets with low barriers to entry, a large market share does not necessarily translate into power over the prices in a market." *DFA I*, 767 F. Supp. 2d at 902 (citing *Ball Mem'l Hosp., Inc. v. Mut. Hosp. Ins., Inc.*, 784 F.2d 1325, 1336 (7th Cir. 1986)).

The Cheese Spot market is an open market, although one where the buyer agrees to take delivery of an actual product (*i.e.*, cheese). In their Consolidated Class Action Complaint, Indirect Plaintiffs describe it as a "thin market," meaning it is one in which there are a small number of traders and very few transactions, making it vulnerable to monopolization. [483, ¶ 37.] Indirect Plaintiffs allege that Defendants acquired every single contract for cheddar cheese on the Cheese Spot market, paying artificially high prices for these contracts (and assuming a loss in the process) with the goal of raising the national price on milk and cheese, thus allowing them to recoup their losses on the milk futures market and in the sale of its finished dairy products. [483, ¶¶ 38–39, 48–49, 75–82.] Defendants counter by arguing that Plaintiffs' Consolidated Class Action Complaint does not contain a single allegation that DFA excluded

anyone from buying or selling cheese on the Cheese Spot market. The Court disagrees with Defendants, and finds that Indirect Plaintiffs adequately alleged market power.[13]

## VII.    Failure to State a Claim: Consumer "Fraud"

In addition to the arguments addressed above, Defendants also seek to dismiss Indirect Plaintiffs' consumer-protection claims (which Defendants refer to as "consumer fraud" claims), arguing that Indirect Plaintiffs failed to allege unconscionable or deceptive conduct, and thus failed to state a claim under each relevant state's law. Defendants' argument is, for the most part, flawed.

As the Court already alluded to (see footnote 4, *supra*), three of the four state consumer-protection statutes at issue here (California, Florida, and North Carolina) proscribe not only deceptive, fraudulent, and unconscionable business practices, but also *unfair* business practices. See Cal. Bus & Prof. Code § 17200 (proscribing any "unlawful, unfair or fraudulent business act or practice"); Fla. Stat. § 501.204(1) (proscribing "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices"); N.C. Gen. Stat. § 75-1.1 (proscribing "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce"). And the *prima facie* requirements for stating a claim under these provisions change depending on whether the plaintiff is alleging fraudulent conduct or unfair conduct. See, *e.g.*, *In re Tobacco II Cases*, 207 P.3d at 29–30 (differentiating between the "three varieties of unfair competition [under the UCL]: practices which are unlawful, unfair or fraudulent"); *Wrestlereunion, LLC v. Live Nation Television Holdings, Inc.*, 2008 WL 3048859, at *3 (M.D. Fla. 2008) (noting that claims under the Florida Act require plaintiffs to allege that defendants "engaged in unfair methods of competition,

---

[13] Because the Court has already deemed Indirect Plaintiffs' monopolization claims dismissible on other grounds, the Court's finding regarding their ability to state a claim for monopolization is inconsequential, and the Court provides this ruling only for the sake of completeness.

unconscionable acts or practices, *or* unfair or deceptive acts or practices" (emphasis added));

*Dalton v. Camp*, 548 S.E.2d 704, 711 (N.C. 2001) ("In order to establish a *prima facie* claim for

unfair trade practices, a plaintiff must show: (1) defendant committed an unfair *or* deceptive act

or practice" where "[a] practice is *unfair* if it is unethical or unscrupulous, and it is *deceptive* if it

has a tendency to deceive." (emphasis added)). Here, Indirect Plaintiffs do not allege fraud or

deception [see 521, at 21 ("[T]he CCAC does not allege any fraud on the part of defendants

* * *.")], and thus need not plead deceptive or unconscionable conduct to state a claim under the

consumer-protection laws of California, Florida, or North Carolina.

The outlier is the Arkansas Deceptive Trade Practices Act ("ADTPA"), which proscribes

"unconscionable, false, or deceptive" business practices without reference to "unfair" business

practices. See Ark. Code § 4-88-107(a)(10). The ADTPA further notes that "[t]he deceptive and

unconscionable trade practices listed in this section are in addition to and do not limit the types

of *unfair* trade practices at common law or under *other statutes* of this state." *Id.* § 4-88-107(b)

(emphasis added). Thus, claims under the ADTPA are limited to "instances of false

representation, fraud, or the improper use of economic leverage in a trade transaction." *Universal

Coops., Inc. v. AAC Flying Serv., Inc.*, 710 F.3d 790, 795–96 (8th Cir. 2013). The "improper use

of economic leverage" prohibition is animated by the statute's proscription of "unconscionable"

business practices, *id.* at 795, such that "allegations of price fixing * * * are not the kind of

conduct prohibited under the[] statute[]." *In re Graphics Processing Units Antitrust Litig.*,

527 F. Supp. 2d 1011, 1030 (N.D. Cal. 2007) (dismissing indirect purchasers' claims under the

ADTPA); see also *Universal Coops.*, 710 F.3d at 795 ("An 'unconscionable' act is an act that

'affront[s] the sense of justice, decency, or reasonableness." (citation omitted)). In other words,

the Arkansas legislature has distanced the ADTPA from other state laws prohibiting unfair trade

practices, reserving the ADTPA for fraudulent and unconscionable acts. Upon review of Indirect Plaintiffs' Consolidated Class Action Complaint, the Court agrees with Defendants that Indirect Plaintiffs failed to allege that Defendants' conduct "affronts the sense of justice, decency, or reasonableness" so as to rise to the level necessary to state a claim under the ADTPA.

Accordingly, Indirect Plaintiffs' failure to state price-fixing or monopolization claims under Ark. Code § 4-88-107 provides an alternative ground for dismissal of those claims. And while Indirect Plaintiffs did state consumer-protection claims under California, Florida, and North Carolina law, this discussion is presented only in the interest of completeness as the Court has already dismissed those claims on other grounds.

## VIII.   Failure to State a Claim: Unjust Enrichment

The Court already concluded that all but two (Arkansas and Minnesota) of Plaintiffs' unjust enrichment claims are untenable in light of the Court's dismissal of the related antitrust claims on remoteness grounds, and the Court also found dismissal of all unjust enrichment claims appropriate under the filed-rate doctrine. The Court further noted that California law does not recognize a cause of action for unjust enrichment. See *Melchior*, 131 Cal. Rptr. 2d at 357. In addition to these grounds for dismissal, Plaintiffs fail to specify which states' laws, if any, give rise to their unjust enrichment claims, which presents another viable ground for dismissal. See, *e.g.*, *In re Refrigerant Compressors Antitrust Litig.*, 2013 WL 1431756, at *23 (citing cases).

Defendants' two remaining alternative arguments for dismissal of Indirect Plaintiffs' unjust enrichment claims are less persuasive. First, Defendants argue that under Florida, Minnesota, New York, and North Carolina law, unjust enrichment is not available as an

independent claim to a party with an adequate remedy at law.[14] Indirect Plaintiffs contend that they are entitled to plead in the alternative, see Fed. R. Civ. P. 8(d)(2), and Defendants counter that "where the unjust enrichment claim relies upon the same factual predicates as a plaintiff's legal causes of action, it is not a true alternative theory of relief but rather is duplicative of those legal causes of action." *In re Ford Tailgate Litig.*, 2014 WL 1007066, at *5 (N.D. Cal. Mar. 12, 2014) (quoting *Licul v. Volkswagen Grp. of Am., Inc.*, 2013 WL 6328734, at *7 (S.D. Fla. Dec. 5, 2013)). While Defendants' argument shows promise, it is not a widely-accepted theory for dismissal at the motion-to-dismiss stage, and Defendants provide no support for its application under the states' laws at issue. Accordingly, the Court finds this argument to be premature at the pleading stage. See, *e.g.*, *In re Light Cigarettes Mktg. Sales Practices Litig.*, 751 F. Supp. 2d 183, 191–93 (D. Me. 2010).[15]

Second, Defendants argue that the antitrust statutes in Minnesota, New York, and North Carolina and the consumer-protection statutes in Arkansas and North Carolina limit a plaintiff's potential recovery to compensatory damages, making equitable relief unavailable. Although the parties' arguments lack depth and clarity on this issue, because Indirect Plaintiffs raised unjust enrichment as an independent claim (and not merely as a remedy), the Court interprets Defendants' argument as saying that Indirect Plaintiffs' unjust enrichment *claims* are barred based on the *remedies* available under certain state statutes. But as with Defendants' first argument, this argument is also premature at the pleading stage, as Indirect Plaintiffs are entitled

---

[14] See, *e.g.*, *Bowleg v. Bowe*, 502 So.2d 71, 72 (Fla. Dist. Ct. App. 1987); *ServiceMaster of St. Cloud v. GAB Business Servs., Inc.*, 544 N.W.2d 302, 305 (Minn. 1996); *Samiento v. World Yacht Inc.*, 883 N.E.2d 990, 996 (N.Y. 2008); *Jefferson Standard Life Ins. Co. v. Guilford Cnty.*, 34 S.E.2d 430, 434 (N.C. 1945).

[15] "Should plaintiffs ultimately be unable to recover under [an antitrust claim], it does not mean [that] a legal remedy was unavailable (thereby justifying an equitable remedy of unjust enrichment), but only that their claim lacks merit." *In re Ford Tailgate Litig.*, 2014 WL 1007066, at *5; see also *United States v. Bame*, 721 F.3d 1025, 1030–32 (8th Cir. 2013) (noting how Minnesota courts regularly dismiss unjust enrichment claims even where plaintiffs pursue legal and equitable claims in the alternative).

to plead in the alternative. See, *e.g.*, *In re Chocolate Confectionary Antitrust Litig.*, 749 F. Supp. 2d 224, 237–42 (M.D. Pa. 2010) (covering Minnesota, New York, and North Carolina law); see also *In re Cardizem CD Antitrust Litig.*, 105 F. Supp. 2d 618, 669 (E.D. Mich. 2000) ("[C]ourts often award equitable remedies under common law claims for unjust enrichment in circumstances where claims based upon contract or other state law violations prove unsuccessful.").

## IX.    Schreiber Foods, Inc.

In their Consolidated Class Action Complaint, Indirect Plaintiffs (for the first time) inculpate Schreiber Foods, Inc. into their allegations, listing Schreiber as a "co-conspirator" in the price-fixing scheme. As a point of reference, Indirect Plaintiffs filed their Consolidated Class Action Complaint [483 (Feb. 25, 2014)] approximately six months before the Court granted Schreiber's motion for summary judgment [652 (Aug. 18, 2014)], dismissing Schreiber as a defendant in the Direct Purchaser action. Regardless, Indirect Plaintiffs have not sought to add Schreiber as an actual defendant in their action, and thus there is no need for the Court to address Indirect Plaintiffs' allegations against non-party Schreiber.

## X.    State Statutory Exemptions

Defendants argue that Indirect Plaintiffs' antitrust claims under New York and Kansas law are barred by express statutory exemptions. Again, the Court addresses these arguments only in the interest of completeness, having already dismissed these claims on other grounds.

### A.    New York Dairymen Exemption

The provision of New York's Donnelly Act that proscribes anticompetitive conduct contains an exemption for "cooperative associations, corporate or otherwise, of * * * dairymen * * * [and] to contracts, agreements or arrangements made by such associations," N.Y. Gen. Bus.

Law § 340(3), referred to as the "dairymen exemption." Defendants argue that they are a cooperative association of dairymen, and thus fall within the statute's exemption.

In crafting the dairymen exemption, the New York legislature "intended to duplicate Congress'[s] agricultural exemptions to the Capper-Volstead Act * * *, intend[ing] to exempt from the operation of the antitrust laws only legitimate activities and agreements." *Agritronics Corp. v. Nat'l Dairy Herd Ass'n, Inc.*, 914 F. Supp. 814, 827 (N.D.N.Y. 1996); see also *People v. Dairylea Coop., Inc.*, 452 N.Y.S.2d 282, 286 (N.Y. Sup. Ct. 1982) ("The exemption was intended to protect and permit dairy cooperative associations * * * to function as such without fear that doing so might be viewed as violating the statute * * * [and] was not intended to protect *carte blanche* an act otherwise criminal and outside of that limited area of exemption.").

In interpreting the exemption, New York's highest court deemed "[t]he language of the statutory exemption [to be] broad and unambiguous," affirming the dismissal of a complaint alleging "a violation of the Donnelly Act by means of an agreement or arrangement among dairymen's co-operatives and others involving the purchase and distribution of milk." *State v. Glen & Mohawk Milk Ass'n, Inc.*, 460 N.E.2d 1091, 1093 (N.Y. 1984). The court went on to say that this "legislative declaration, clear on its face, cannot be ignored." *Id.* Because of this exemption, "dairymen's co-operatives and those with whom they contract or agree [are] free from regulation under the Donnelly Act," and instead are subject to the "pervasive" regulatory scheme set forth in New York's Agriculture and Markets Law. *Id.*; see also *Margrove Inc. v. Upstate Milk Coop., Inc.*, 357 N.Y.S.2d 392 (N.Y. Sup. Ct. 1974), *aff'd, sub nom. Margrove Inc. v. Wegman's Food Markets, Inc.*, 373 N.Y.S.2d 1014 (N.Y. App. Div. 1975).

While the Court finds the binding precedent from New York's highest court persuasive, the parties have not provided the Court with enough information to determine whether

Defendants are, in whole or in part, members of a qualifying cooperative.[16] Moreover, the New York exemption is modeled after the federal Capper-Volstead Act,[17] but the parties have not provided any information about this Act or how interpretations of the Act impact Indirect Plaintiffs' claims here. While Defendants could ultimately prevail on this argument, the Court cannot resolve this issue at the motion-to-dismiss stage.

## B.     Kansas Dairymen Exemption

Similar to the New York exemption, the Kansas Restraint of Trade Act contains a dairymen exemption, stating that the Act "shall not be construed to apply to [a]ny association" organized under the state "cooperative marketing act" or "any association * * * governed by * * * the Capper-Volstead act." Kan. Stat. Ann. §§ 50-163(e)(1)–(2).

First, Indirect Plaintiffs argue that this provision, which took effect in April 2013, does not apply retroactively to reach Defendants' 2004 through 2006 conduct. But the statute says that "K.S.A. 2014 Supp. 50-163 * * * shall be applied retroactively to any choses in action premised on any provision of the Kansas restraint of trade act." Kan. Stat. Ann. § 50-164.

Second, Indirect Plaintiffs argue that the exemption should be read narrowly to avoid giving cooperatives a "free pass" when they engage in behavior that has nothing to do with the cooperative. Unlike its New York counterpart, however, the Kansas dairymen exemption is relatively new, and thus there is no case law interpreting the breadth of the exemption. Because of Kansas's harmonization provision, it would not be inappropriate for the Court to review federal case law interpreting the Capper-Volstead Act to determine the boundaries of the

---

[16] Indirect Plaintiffs admit in their complaint that DFA is a "vertically integrated cooperative of * * * raw milk producers," [483, ¶ 18], but this statement, standing alone, is insufficient to bring Defendants within the scope of the dairymen exemption.

[17] The Capper-Volstead Act provides protection for certain agricultural cooperatives, including dairymen, from federal antitrust law. See, *e.g.*, *Case-Swayne Co. v. Sunkist Growers, Inc.*, 389 U.S. 384, 389 (1967).

exemption. But again, the parties have not provided the Court with sufficient information regarding the contours of the Capper-Volstead Act or whether Defendants are a qualifying cooperative, making any attempt to undertake this analysis premature.

Finally, Defendants remark in a footnote that Indirect Plaintiffs failed to allege that Ms. Asmann purchased "articles imported into th[e] state" of Kansas, as required by the Kansas Restraint of Trade Act. Kan. Stat. Ann. § 50-112. Indirect Plaintiffs do not dispute this, but instead argue that they are entitled to discovery to determine the state of origin for Ms. Asmann's finished dairy products. Defendants disagree, arguing that because this is an affirmative element of the claim, Indirect Plaintiffs must allege it in their complaint. But at the pleading stage, "[s]pecific facts are not necessary; the statement need only give the defendant fair notice of what the * * * claim is and the grounds upon which it rests." *Erickson*, 551 U.S. at 93. Ms. Asmann accomplished that feat, and thus her claim is not dismissible on this ground.

## XI. Motion to Intervene

Movants Timmy P. Tholp, Wayde R. Alright, Chelsey M. Penix, Amber Lambert, Lisa R. Murphy, and Toni O'Dell filed a motion to intervene [723], although without specifying whether the motion refers to the Direct Purchaser action (which has already settled) or the Indirect Purchaser action (which is now dismissed). Regardless, Movants' motion is denied.

First, Movants failed to meet the intervention standards in either Rule 24(a) (intervention of right) or Rule 24(b) (permissive intervention). To the former, Movants have no statutory right to intervention, and have not claimed an interest relating to the property or transaction that is the subject of either the direct or indirect action. To the latter, Movants have no conditional right to intervene by a federal statute, and do not share a claim or defense with either the direct or

indirect action. In short, Movants' motion lacks sufficient detail to apprise the Court of Movants' interest, or how it relates to this litigation.

Second, Movants fail to comply with Federal Rule of Civil Procedure 24(c), which requires prospective intervenors to "state the grounds for intervention" in their motion, and to provide "a pleading that sets out the claim or defense for which intervention is sought." Fed. R. Civ. P. 24(c). Movants fail on both accounts, stating no grounds (other than conclusory ones) for their intervention, and failing to attach the required pleading.

Third, to the extent that Movants were direct purchasers (which seems unlikely), their claims would be governed by the approved settlement in that action, to which Movants did not object. To the extent that Movants were indirect purchasers, their motion is moot in light of this opinion dismissing the Indirect Purchaser action.

Vague statements that potential intervenors "have a common vested interest" in the litigation or that they "will provide questions of laws [sic] and facts that are common" are insufficient to trigger intervention. [723.] Defendant Dairy Farmers of America refers to Movants as "serial filers of similar motions lacking merit," and cites to several cases across the country highlighting their "long and litigious history filing frivolous lawsuits in courts across the country," and other similar observations. [724 (citations omitted).] Based on the brevity and lack of substance in Movants' motion, it appears as though this may be another example of their infamous work. Regardless, their motion [723] fails to meet the criteria for intervention as laid out in the Federal Rules for Civil Procedure, and must be denied.

## XII.    Conclusion

The Court finds dismissal of each of Indirect Plaintiffs' claims to be appropriate on at least two separate grounds. Accordingly, and for the reasons stated herein, the Court grants

Defendants' motion to dismiss Indirect Purchaser Plaintiffs' Consolidated Class Action Complaint [497]. In addition, putative Intervenors' motion to intervene [723] is denied.

Dated: June 29, 2015

_____
Robert M. Dow, Jr.
United States District Judge